IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDY KIM, in his personal capacity as a candidate for U.S. Senate, ANDY KIM FOR NEW JERSEY, SARAH SCHOENGOOD, SARAH FOR NEW JERSEY, CAROLYN RUSH and CAROLYN RUSH FOR CONGRESS, <br><br> *Plaintiffs*, <br><br> v. <br><br> CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk; SCOTT M. COLABELLA, in his official capacity as Ocean County Clerk; PAULA SOLLAMI COVELLO, in her official capacity as Mercer County Clerk; MARY H. MELFI, in her capacity as Hunterdon County Clerk; STEVE PETER, in his official capacity as Somerset County Clerk; HOLLY MACKEY, in her official capacity as Warren County Clerk; NANCY J. PINKIN, in her official capacity as Middlesex County Clerk; JOSEPH GIRALO, in his official capacity as Atlantic County Clerk; JOHN S. HOGAN, in his official capacity as Bergen County Clerk; JOANNE SCHWARTZ, in her official capacity as Burlington County Clerk; JOSEPH RIPA, in his official capacity as Camden County Clerk; RITA M. ROTHBERG, in her official capacity as Cape May County Clerk; CELESTE M. RILEY, in her official capacity as Cumberland County Clerk; CHRISTOPHER J. DURKIN, in his official capacity as Essex County Clerk; JAMES N. HOGAN, in his official capacity as Gloucester County Clerk; E. JUNIOR MALDONADO, in his official capacity as Hudson County Clerk; ANN F. GROSSI, in her official capacity as Morris County Clerk; DANIELLE IRELAND-IMHOF, in her official capacity as Passaic County Clerk; and JOANNE RAJOPPI, in her official capacity as Union County Clerk. <br><br> *Defendants*, <br><br> - and – <br><br> DALE A. CROSS, in his official capacity as Salem County Clerk; and JEFF PARROTT, in his official capacity as Sussex County Clerk; TAHESHA WAY, Esq., in her official capacity as Secretary of State for New Jersey. <br><br> *As Interested Parties*. | Civ. A. No. <br><br> _____ |

## VERIFIED COMPLAINT

Plaintiffs Andy Kim, Andy Kim for New Jersey, Sarah Schoengood, Sarah for New Jersey, Carolyn Rush, and Carolyn Rush for Congress (collectively, "Plaintiffs") file this Verified Complaint against nineteen (19) county clerks who utilize a party column ballot design in connection with New Jersey's primary elections.[1] Andy Kim is a three-time and current Congressional Representative for New Jersey's Third District, and a candidate for United States Senate in the upcoming June 4, 2024 Democratic Primary Election (hereinafter, the "Primary Election"). Sarah Schoengood and Carolyn Rush are candidates running for United States House of Representatives in New Jersey's Third and Second Congressional Districts, respectively, in the Primary Election.

On December 19, 2023, newspaper outlets reported the release of an internal poll showing Andy Kim with a 23-point lead over rival candidate Tammy Murphy ("First Lady Murphy" or "Murphy"), First Lady to New Jersey Governor Phil Murphy, for the Democratic nomination for United States Senator, and a more recent FDU poll, the first independent poll of the race, showed Mr. Kim with a 12-point lead over Murphy; despite such polling results, news

---

[1] The nineteen Defendant County Clerks are those from Monmouth, Ocean, Mercer, Hunterdon, Somerset, Warren, Middlesex, Atlantic, Bergen, Burlington, Camden, Cape May, Cumberland, Essex, Gloucester, Hudson, Morris, Passaic, and Union counties (collectively, "Defendants"). All Defendants and Interested Parties are named in their official capacities. The Salem and Sussex County Clerks are not named as defendants, but only as Interested Parties, since they have not traditionally utilized a party-column ballot in New Jersey primary elections, but instead use a traditional office block ballot design, consistent with that employed by other states throughout the rest of the nation. Similarly, the Secretary of State of New Jersey is only named here as an Interested Party since she is the chief elections officer in the state, although she is not charged with the duty of drawing or designing the ballots.

outlets also referred to him as the "underdog," and First Lady Murphy as the "favorite."[2] Such an anomaly would only make sense in New Jersey, where the vast majority of county clerks design the primary election ballot with unique features, unknown to any other State, that provide a substantial advantage to certain candidates over others that are running for the same office.

In practice, New Jersey's primary election ballot scheme revolves around a group of candidates running for different offices who were endorsed by county party leadership and featured together on the ballot in the same column, known as the "county line." The system provides preferential ballot position for such candidates and displays them in a manner that nudges voters to select them, even when they otherwise might not. By contrast, their opponents are often excluded from a chance at preferential ballot placement, displayed in a column by themselves or in a manner that is less appealing to or harder to find for voters, separated by one or more blank ballot spaces from their opponents, stacked in a column with candidates for other offices with whom they do not want to be associated, and/or otherwise strewn about haphazardly on the ballot.

The advantage this ballot design scheme provides to certain candidates, and the corresponding disadvantage to their opponents, have been studied by experts. Filed herewith are

---

[2] *See e.g.*, Matt Friedman, *Andy Kim Internal Poll Shows Big Lead over Tammy Murphy in New Jersey Senate Race*, POLITICO (Dec. 19, 2023 11:48am), https://www.politico.com/news/2023/12/19/kim-murphy-polling-nj-senate-race-00132429 (last accessed Feb. 20, 2024) ("Murphy has been endorsed by most powerful Democratic chairs, making her the favorite to win favorable ballot placement in most counties through New Jersey's peculiar 'county line' ballot design."); Dustin Racioppi, *Andy Kim is Tired of New Jersey being a 'laughingstock'*, POLITICO (Dec. 10, 2023 7am), https://www.politico.com/news/2023/12/10/andy-kim-nj-senate-race-00130460 (last accessed Feb. 20, 2024) ("For a candidate who is among the country's most prolific fundraisers and who's beaten well-heeled Republicans in a Trump district, Kim is an underdog in the conventional wisdom of the 2024 Senate race."); Jay Lassiter, *Andy Kim leads Tammy Murphy 32% to 20% in FDU Poll*, INSIDER NJ (Feb. 2, 2024, 6:00am) https://www.insidernj.com/andy-kim-leads-tammy-murphy-32-to-20-in-fdu-poll (last accessed Feb. 20, 2024).

multiple expert reports which each reveal a substantial and consistent advantage resulting from the "county line" and other unique features of New Jersey's outlier primary election ballot scheme. The advantages observed were found to be statistically significant and to impact election results, even carrying the potential to be outcome determinative.

While the materials submitted herein are voluminous, they are mostly comprised of expert reports to substantiate the harm and impact of the line, including the manner in which it alters election results and outcomes. These studies overwhelmingly show that New Jersey's ballot design practices give a substantial advantage to beneficiaries of the line compared to their opponents and further substantial disadvantages to unbracketed candidates. These expert reports offer quantitative and qualitative substantiation to what political operators, the media, scholars, and the general public know all too well – the county line ballot system is alive and well[3] – and is fundamentally unjust and undemocratic. The issue presented to the Court today is quite simple: the line must be abolished because it is unconstitutional, and a court decree acknowledging its constitutional illegitimacy can be easily entered prohibiting and enjoining its use in the upcoming 2024 primary. As the judge presiding over the related case of *Conforti v. Hanlon* held, "it is the Court's duty and imperative to protect the democratic process." Civil Action 20-08267 (ZNQ) (TJB) (D.N.J. May 31, 2022).

Government – including the Defendants (who themselves are often beneficiaries of the county line as elected officers) – cannot constitutionally design a primary ballot to favor only those candidates who happen to be endorsed by a faction of a party's leadership. The

---

[3] *See infra* n. 27 (describing political entrenchment and underrepresentation of minority populations in New Jersey stemming from the county line). *See also* Ver. Compl., Exh. F (compilation of selected scholars' and journalists' knowledge and observations about how the county line works in practice, and findings about the large impact the line has on candidates anointed to join it, and how it is accurately perceived as such by New Jersey voters, candidates, political party officials, and public officials).

Constitution demands a fair election, not necessarily a perfect one. But when the choices of primary voters, who by law are the sole judges to determine a party's nominee for the general election, are cynically manipulated by the Defendants, the result is anathema to fair elections. All of the scientific research backing Plaintiffs' application shows this to be so. The current primary election ballot design scheme represents an unconstitutional governmental thumb on the scale of New Jersey's primary elections, and further forces candidates to engage in a system of gamesmanship whereby they must trade off their associational rights to try to obtain a ballot advantage (or avoid disadvantage) or otherwise exercise those constitutional rights at the expense of equal treatment among similarly situated candidates. Unfair preferential treatment and gamesmanship that regularly impacts election results and sometimes impacts outcomes, are not features that belong anywhere near a government-sponsored ballot. Indeed, these ballot dynamics have predictable downstream effects that encourage backroom dealings and soft corruption, and they directly threaten election integrity, public confidence in our elections, and the fundamental premise of representative government.

New Jersey will soon be in the midst of competitive races for Senate and other offices in the upcoming primary. Concurrently, the issue of unconstitutional party-line primary ballots has been thrust into the limelight.[4] Since candidates featured on the county line stand to obtain a significant advantage due to their preferential ballot placement and discriminatory ballot design,

---

[4] On February 8, 2024, Mr. Kim and two of the three other currently-declared candidates for U.S. Senate sent a letter to 19 of New Jersey's 21 county clerks jointly requesting that they utilize an office block ballot in the upcoming Primary Election to ensure fairness to all candidates and voters. *See Kim, Campos-Medina, Hamm Jointly Seek Ballot Fairness*, INSIDER NJ, Feb. 8, 2024, https://www.insidernj.com/kim-campos-medina-hamm-jointly-seek-ballot-fairness/ (last accessed Feb. 23, 2024) (providing link to letter to county clerk, separately available at https://drive.google.com/file/d/1_7ucVyX58dVOoi2jL05V0qh13tVYa4zK/view). As of the date of filing this Verified Complaint, Mr. Kim has not received a single response from any of the county clerks.

Plaintiffs and various other off-line and unbracketed or less-bracketed candidates across the state will be constitutionally harmed in their respective races in connection with the Primary Election absent emergent relief by this Court. New Jerseyans deserve a fair election, untainted by the way in which New Jersey law authorizes Defendants to design primary ballots. Thus, Plaintiffs ask the Court to hold that New Jersey's outlier party column style ballots, and its unique attendant features, are unconstitutional and cannot be used in the upcoming Primary Election and future ones, and to order the use of an office-block style ballot in use in 49 states in the nation and already in use in two counties in New Jersey.

**NATURE OF THE CASE**

1.      New Jersey is a national outlier in primary election ballot design. Nineteen of its twenty-one counties use a party-column ballot for the primary election, with laws that allow the leadership of county political parties to influence the government's design of such ballots. Together, these laws confer a significant advantage to candidates endorsed by the party machine. These ballot designs stack the deck for certain candidates at the expense of others, thereby undermining the integrity of elections, hindering democracy, and confusing voters.

2.      Ballot position is extremely important in elections. For example, candidates listed first receive an advantage at the polls solely based on ballot position. This is due to a principle known as "position bias," "name order effect," or "primacy effect", which has been the subject of extensive research across various areas of human behavior, including electoral behavior of voters. Current state law arbitrarily excludes candidates from the ability to compete for first position in the ballot draw, and severely burdens those who are excluded.

3.      Ballot design and display are also extremely important. New Jersey's follows a unique and outlier method of primary election ballot design that brackets groups of candidates in

a column (or row)[5], rather than by listing the office sought followed immediately by the names of all candidates running for that office.[6]

4.  Thus, in practice, candidates endorsed by county political party leadership are lined together with other party-backed candidates from the highest office to the lowest, enabling them to compete for preferential ballot position and providing a cue to voters to make them appear more legitimate.

5.  For the purposes of visual illustration, the overwhelming majority of states and the District of Columbia model their primary election ballot design by listing the office sought, and then displaying all candidates for that office directly underneath or to the side, as follows:

<u>Elko County, NV 2018 Democratic primary</u>     <u>Sussex County, DE 2018 Democratic primary</u>



---

[5] For purposes of the Complaint and for ease of reference, unless otherwise specified, the word "column" is intended to refer to the column *or row* of the ballot where candidates are located, regardless of whether a County Clerk designs the ballot by listing offices vertically and candidates horizontally, or vice-versa.

[6] *See* Julia Sass Rubin, *New Jersey's Primary Ballot Design Enables Party Insiders to Pick Winners* (2020), *retrieved from* http://dx.doi.org/doi:10.7282/t3-31dy-0j57 (last visited Feb. 20, 2024) (discussing and compiling primary election ballots from all 50 states and the District of Columbia) (with ballot images made available by clicking on the link at Endnote ii or directly accessible at https://drive.google.com/drive/folders/1vudVsxEcLvY2nZAfD_k88780nyh5sGCr (last visited Feb. 20, 2024)).

Rubin*, supra* n.6. However, New Jersey's primary election ballot design – modeled in all instances at the expense of the taxpayers under *N.J.S.A.* 19:45-1 – is designed in such a way that candidates for the same office are listed in different columns which may not even be adjacent, and candidates for different offices are listed in the same column:

<u>Camden County, NJ 2018 Democratic primary</u>



*Id.* (a candidate for House of Representatives is listed in Column 2 and two other candidates for the same office are listed all the way in Column 9).

6.      New Jersey's system of primary election ballot design results from a combination of state election laws and interpreting case law with respect to primary elections. This law provides a mechanism for certain candidates of a party faction running for different offices to be featured together on the ballot in the same column with the same slogan ("bracketing").

7.      The State's laws and practices on primary election ballot design confer specific advantages on candidates who have received an endorsement from county party leadership: first, association with a full or almost-full slate with other candidates who are disproportionately incumbents, other highly-recognizable names, and "party elites", gives visual cue advantages enjoyed by these candidates (hereinafter referred to as the "weight of the line") that nudges

voters toward selecting these county line candidates; second, these endorsees (and certain other bracketed candidates) will be included in an initial ballot draw ("preferential ballot draw") and have an opportunity to obtain the first ballot position.[7]

8.      In contrast to these benefits conferred on endorsed candidates, "off-line" and unbracketed candidates who are often featured in a column by themselves or in a column with candidates with whom they did not bracket and with whom they do not share a slogan, are harder to find on the ballot, harder to know who they are running against and/or for what office, and may otherwise appear less legitimate on the ballot than the county line candidates. Furthermore, other candidates, unless competing for an ill-defined "pivot point" office or associated with someone who is competing for such an office, never have a chance to appear in first position on the ballot and can appear in obscure portions, far away from other candidates running for the same office.

9.      With respect to New Jersey's last primary election where President, United States Senator, and United States House of Representatives were on the ballot, an August 2020 New Jersey Policy Perspective analysis of the July 7, 2020 Primary Election demonstrates that in some races, a candidate's "share of the vote varied by as much as 50 percentage points, based on whether or not they were on the county line."[8] The 2020 Primary Analysis further found that "[o]nly two congressional incumbents have lost a primary in New Jersey in the last fifty years . . . . [a]nd, in both cases, they lost to other incumbents, following redistricting that eliminated one

---

[7] In practice, the existence of a county line with a full or almost full slate of candidates for every office is essentially universally present on New Jersey primary election ballots in 19 counties.
[8] *See* Julia Sass Rubin, *Does the County Line Matter?  An Analysis of New Jersey's 2020 Primary Election Results*, N.J. POLICY PERSPECTIVE (August 2020), https://www.njpp.org/publications/report/does-the-county-line-matter-an-analysis-of-new-jerseys-2020-primary-election-results/ (hereinafter "2020 Primary Analysis") (data based on preliminary post-election results).

of their districts . . . . [a]nd, in both cases, the incumbent who won the primary had also received the party endorsement and the county line in the county that decided the election." *Id.* The 2020 Primary Analysis also examined 2020 Primary Election races where "different candidates were on the county line in different counties in the same congressional district," and found that "the average vote margin between appearing on the county line and having one's opponent on the county line was 35 percentage points." *Id.* (*See also* Ver. Compl., Exh. C, Expert Report by Dr. Julia Sass Rubin, reviewing 20 years of congressional elections and finding a vote share variance of up to 79 percentage points depending on whether a candidate was on or off the county line, and an average margin of difference of 38 percentage points.)

10.     In these ways, New Jersey fails to treat similarly situated candidates—candidates pursuing the same office in the same political party—the same.

11.     In addition to injuring the electoral chances of unbracketed and off-line candidates, New Jersey's ballot design system also injures the voters who support such candidates, burdening their voting rights and their associational rights, making it more difficult to elect the candidates they prefer. It also burdens voters at large through the creation of a confusing, manipulated ballot design that taints the outcome of the elections, as it puts the State's thumb on the scale in favor of county line candidates and certain bracketed candidates who receive a state-conferred ballot advantage.

12.     Partisan   primary   elections   in   New   Jersey   are   an   annual   affair.

By virtue of when federal, state, and local terms expire, a primary election is guaranteed to be held every year. The unconstitutional ballot design laws and practices herein complained of have occurred annually and will continue to occur every year.

13.    Within one week of announcing her bid for the U.S. Senate seat on November 15, 2023, First Lady Murphy was quickly endorsed in rapid-fire succession by the Democratic Party Chairs of various counties whose voters comprise over 50% of statewide Democratic Party voters.[9]

14.    Although each county in New Jersey slightly differs in how it effectuates its endorsements, a county party chair's endorsement is always extremely influential, and in many counties is the sole determining factor in who receives the county party's endorsement (including

---

[9] *See* Wildstein, *Norcross suggests South Jersey support for Tammy Murphy for U.S. Senate*, N.J. NEW JERSEY GLOBE (Nov. 9, 2023 5:20PM), *available at*: https://newjerseyglobe.com/congress/norcross-suggests-south-jersey-support-for-tammy-murphy-for-u-s-senate/. On November 15, 2023, Murphy was endorsed by the entire Hudson County Democratic Organization and Somerset County Democratic Chair Peg Schaffer, who is also the Vice-Chair of the Democratic State Committee. On November 16, 2023, Murphy was endorsed by Camden County Democratic Chair Jim Beach. On November 17, 2023, Murphy was endorsed by Middlesex County Democratic Chair Kevin McCabe and Bergen County Democratic Chair Paul Juliano. On November 20, 2023, Murphy was endorsed by the Essex County Democratic Committee Chair Leroy Jones, who is also the Chair of the Democratic State Committee. *See* Joey Fox, *Breaking down the county-by-county battle between Andy Kim and Tammy Murphy*, N.J. GLOBE (Dec. 15, 2023 6:24pm), https://newjerseyglobe.com/congress/breaking-down-the-county-by-county-battle-between-andy-kim-and-tammy-murphy/ (last accessed Dec. 15, 2023). As reported by The New York Times, "[i]n 72 hours, without ever hitting the campaign trail, Ms. Murphy, a first-time candidate with limited experience, had lined up backing from Democratic leaders in one-third of the state's counties, representing 56 percent of New Jersey's registered Democratic voters." Nick Corasaniti and Tracey Tully, *A Senate Candidate Accused of Nepotism Has Another Edge: The Ballot*, THE NEW YORK TIMES (Dec. 22, 2023), *available at*: https://www.nytimes.com/2023/12/22/nyregion/menendez-tammy-murphy-senate-new-jersey.html (last accessed Feb. 23, 2024). To be sure, these endorsements alone are not the subject of this challenge; however, the manner in which they are used by the state to confer a ballot advantage for some candidates over others, or to promote gamesmanship in violation of constitutional rights, is.

in many of the counties that have already endorsed Murphy).[10] In turn, in practice, the candidate endorsed by county party leaders ends up being featured on the county line with the county party slogan, and thus will receive ballot advantages over their opponents.

15.     The ballot advantages provided to candidates featured on the county line are generally understood by those familiar with New Jersey's political system such that even though three-time Congressman Andy Kim (NJ CD-3) is ahead in the polls by double digits, he is nevertheless considered the political "underdog" in the U.S. Senate race.[11]

16.     In order to remedy these injuries, which are traceable to the actions of Defendants in designing ballots, and redressable by this Court through an injunction stopping unconstitutional ballot design, Plaintiffs seek a judgment that New Jersey's primary election bracketing and ballot placement system is unconstitutional.

17.     Plaintiffs also seek injunctive relief to ensure that the primacy effect/positional bias and the weight of the line do not continue to advantage county line and certain bracketed candidates over other unbracketed and off-line candidates running for the same office, and thereby arbitrarily undermine the integrity of New Jersey's elections and irreparably damage Plaintiffs' rights. Plaintiffs do not seek to disrupt the conduct of parties in their right to endorse the standard-bearer of their choice, or their right to contribute and pool resources to support that candidate in the primary or general election. Nor do Plaintiffs seek to disrupt the ability of parties to signify their endorsements or slogans on the ballot alongside the candidates of their choice.

---

[10] Technically, bracketing requests are run through the campaign manager of joint petition county candidates, *N.J.S.A.* 19:49-2, and if the slogan is the same as that of a New Jersey incorporated association, the corporation's permission is required. *N.J.S.A.* 19:23-17. In practice, the county chair of the county party has authority to make such decisions or closely controls those that have such authority.

[11] Racioppi, *supra* n. 2.

18.     The relief sought can be easily accomplished by the Court prohibiting and enjoining the use of county line style ballots in the upcoming 2024 primary. The Court may also direct the use of an office-block system for New Jersey primary elections, to bring it in line with common sense democracy measures in place in all other states in the nation and two New Jersey counties, including for the Primary Election in 100 days from this filing.

## JURISDICTION AND VENUE

19.     Plaintiffs bring this action under 42 *U.S.C.* §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

20.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 *U.S.C.* §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States and involve the protection of civil rights, including the right to vote.

21.     This Court has personal jurisdiction over the Defendants and Interested Parties, who are sued in their official capacities only.

22.     Venue is proper in the U.S. District Court for the District of New Jersey pursuant to 28 *U.S.C.* § 1391(b)(2) because, inter alia, a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

23.     This Court has authority to enter a declaratory judgment pursuant to 28 *U.S.C.* §§ 2201 and 2202.

**PARTIES**

**Plaintiffs**

<u>Andy Kim: U.S. Senate Candidate in Upcoming Primary Election</u>

24.     Plaintiff Andy Kim is a candidate for United States Senate in the 2024
Democratic Party primary election and a New Jersey registered voter. A three-time and current
United States Congressional Representative for New Jersey's Third Congressional District with a
long career in public service, he files this action in his personal capacity.

25.     Plaintiff Andy Kim for New Jersey is an unincorporated association and is the
official campaign entity for Andy Kim's campaign for United States Senator in the Primary
Election.

<u>Sarah Schoengood: U.S. House of Representatives (CD-3)</u>
<u>Candidate in Upcoming Primary Election</u>

28.     Plaintiff Sarah Schoengood is a candidate for United States House of
Representatives for New Jersey's Third Congressional District in the 2024 Democratic Primary
Election and a registered voter in CD-3.

29.     Plaintiff Sarah for New Jersey is an unincorporated association and is the official
campaign entity for Schoengood's campaign for United States Congress in the Primary Election.

<u>Carolyn Rush: U.S. House of Representatives (CD-2)</u>
<u>Candidate in Upcoming Primary Election</u>

26.     Plaintiff Carolyn Rush ("Rush") is a candidate for United States House of
Representatives for New Jersey's Second Congressional District in the 2024 Democratic primary
election and a registered voter in CD-2. She ran unsuccessfully for nomination to the same seat
in the 2022 Democratic primary election.

27.     Plaintiff Carolyn Rush for Congress is an unincorporated association and is the official campaign entity for Rush's campaign for United States Congress in the Primary Election.

**Defendants**

28.     Defendant Christine Giordano Hanlon is the Monmouth County Clerk who is vested with certain statutory duties and obligations including but not limited to the designing, preparation, and printing of all ballots, the issuance of mail-in ballots, and conducting a drawing for ballot position for various elections held in Monmouth County.

29.     Defendant Scott M. Colabella is the Ocean County Clerk who is vested with the same statutory duties and obligations for various elections held in Ocean County.

30.     Defendant Paula Sollami-Covello is the Mercer County Clerk who is vested with the same statutory duties and obligations for various elections held in Mercer County.

31.     Defendant Mary H. Melfi is the Hunterdon County Clerk who is vested with the same statutory duties and obligations for various elections held in Hunterdon County.

32.     Defendant Steve Peter is the Somerset County Clerk who is vested with the same statutory duties and obligations for various elections held in Somerset County.

33.     Defendant Holly Mackey is the Warren County Clerk who is vested with the same statutory duties and obligations for various elections held in Warren County.

34.     Defendant Nancy J. Pinkin is the Middlesex County Clerk who is vested with the same statutory duties and obligations for various elections held in Middlesex County.

35.     Defendant Joseph Giralo is the Atlantic County Clerk who is vested with the same statutory duties and obligations for various elections held in Atlantic County.

36.     Defendant John S. Hogan is the Bergen County Clerk who is vested with the same statutory duties and obligations for various elections held in Bergen County.

37.     Defendant Joanne Schwarz is the Burlington County Clerk who is vested with the same statutory duties and obligations for various elections held in Burlington County.

38.     Defendant Joseph Ripa is the Camden County Clerk who is vested with the same statutory duties and obligations for various elections held in Camden County.

39.     Defendant Rita M. Rothberg is the Cape May County Clerk who is vested with the same statutory duties and obligations for various elections held in Cape May County.

40.     Defendant Celeste M. Riley is the Cumberland County Clerk who is vested with the same statutory duties and obligations for various elections held in Cumberland County.

41.     Defendant Christopher J. Durkin is the Essex County Clerk who is vested with the same statutory duties and obligations for various elections held in Essex County.

42.     Defendant James Hogan is the Gloucester County Clerk who is vested with the same statutory duties and obligations for various elections held in Gloucester County.

43.     Defendant E. Junior Maldonado is the Hudson County Clerk who is vested with the same statutory duties and obligations for various elections held in Hudson County.

44.     Defendant Ann F. Grossi is the Morris County Clerk who is vested with the same statutory duties and obligations for various elections held in Morris County.

45.     Defendant Danielle Ireland-Imhof is the Passaic County Clerk who is vested with the same statutory duties and obligations for various elections held in Passaic County.

46.     Defendant Joanne Rajoppi is the Union County Clerk who is vested with the same statutory duties and obligations for various elections held in Union County.

47.     The Defendants acted under color of law in receiving and acting on bracketing requests, designing ballots, and conducting ballot drawings.

**Interested Parties**

48.     Interested Party Dale A. Cross is the Salem County Clerk who is vested with certain statutory duties and obligations including but not limited to the designing, preparation, and printing of all ballots, the issuance of mail-in ballots, and conducting a drawing for ballot position for various elections held in Salem County.

49.     Interested Party Jeff Parrot is the Sussex County Clerk who is vested with the same statutory duties and obligations for various elections held in Sussex County.

50.     Interested Party Tahesha Way, Esq., is the New Jersey Secretary of State who serves as the chief elections official for the State of New Jersey. Secretary Way is listed here as an Interested Party because the constitutionality of New Jersey election statutes is at issue and is named in her official capacity. Accordingly, no further notices are required under Fed. R. Civ. P. 5.1(a) or (c) or 28 U.S.C. § 2403(b).

51.     The Interested Parties are contemporaneously being provided with a notice of and a copy of the Verified Complaint and associated filings.

52.     A copy of the Verified Complaint and associated filings are also being or will be provided to any declared candidates running against Plaintiffs in the upcoming Primary Election, as well as to the Democratic State Committee and Republican State Committee, and 39 of the 42 Democratic and Republican county party committees for whom email addresses could be identified at this time.

## STATEMENT OF FACTS AND LAW

### A. Basic Ballot Layout

53.     New Jersey primary election ballots generally consist of a grid of rows and columns, and depending on the County Clerk's discretion, candidates are listed horizontally, and the office sought is listed vertically, or vice versa. (*See* ¶ 92, *infra*, as a typical example).

54.     This is the manner in which 19 out of New Jersey's 21 counties have historically organized their primary election ballots, with respect to their full-face machine ballots and the vast majority but not all counties use a similar design technique with respect to their vote-by-mail ballots.

55.     Two counties in New Jersey, Salem and Sussex, have historically used the "office block" or "bubble ballot" structure for primary elections, which is also used by an overwhelming majority of other states and the District of Columbia, *see, e.g.*, ¶ 5, *supra*, where the ballot is organized around the *office* sought, with each office listed, immediately followed by a list of all candidates running for that same office, without regard to bracketing. Morris County had also historically used the office block structure, but only with respect to Republican primary elections, and that practice ended in 2021 when the Morris County Republican Committee decided to award a county line. A few additional counties implemented an office block ballot structure in connection with their vote-by-mail ballots with respect to the last presidential primary election held on July 7, 2020, which similarly coincided with elections for U.S. Congress and Senate. These included Hunterdon, Passaic, and Warren County, although some of those counties reverted back to party column ballots for vote by mail in subsequent elections. *See* Exhibit A.

**B. <u>Pivot Point</u>**

56.     Ballot position in New Jersey primary elections is tied to bracketing. Once a specified candidate in the bracketed slate gets drawn for ballot position, all other candidates in that bracketed slate who are running for other offices get automatically placed on the same column of the ballot. Thus, ballot position is impacted by which office the County Clerk chooses to draw first in a preferential ballot draw. The office which the County Clerk chooses to draw first, is hereinafter referred to as the "pivot point." (In the example from ¶ 5 above, the U.S. Senate is the pivot point office, and the candidates bracketed with the Senatorial candidate endorsed by the party are found in Column 2).

57.     Candidates running for the pivot point office used by a particular County Clerk, along with the candidates with whom they are bracketed, are hereinafter referred to as "bracketed candidates."

58.     Candidates not running with candidates for the particular pivot point office used by a County Clerk, and who thus are relegated to non-preferential ballot draws, are herein referred to as "unbracketed candidates" or as being "not bracketed." This includes a slate of candidates who choose to run together on the ballot, when none of them are running for the pivot point office.

59.     As set forth below, depending on the year and the offices up for election on the primary election ballot, New Jersey's 21 County Clerks have adopted unpredictable, varying, and internally inconsistent methods of deciding which office to serve as the pivot point, and often do not decide and/or indicate which office will serve as the pivot point until after the petition filing deadline and after the deadline to submit bracketing requests has already passed.

C. **Bracketing**

60.     New Jersey law generally requires candidates who want to bracket with candidates running for other offices to request to be bracketed with a slate of candidates who have filed a joint petition with the County Clerk ("joint petition county candidates").[12] *N.J.S.A.* 19:23-18; *N.J.S.A.* 19:49-2.

61.     *N.J.S.A.* 19:49-2 sets forth the specific procedure for bracketing. Candidates who file petitions with the Municipal Clerk or with the Secretary of State[13] must, within 48 hours of the petition filing deadline, request permission from the campaign manager of joint petition county candidates to be bracketed with those joint petition county candidates. *See also supra*, n.10. Upon notification of the request, the campaign manager has 48 hours to grant permission to bracket with the joint petition county candidates. Candidates for other offices that submit petitions with the County Clerk are also able to bracket with the joint petition county candidates.

62.     Successfully bracketed candidates will be featured on the same column of the ballot with the same slogan. Once one of the bracketed candidates is placed on the ballot, all other candidates in the bracketed slate will be automatically placed in the same column. In this manner, New Jersey organizes its primary election ballots by columns of groupings of candidates.[14]

---

[12] Joint petition county candidates can be a slate of county commissioner (previously referred to as "county freeholder") candidates. Depending on the circumstances, there may be only one commissioner position up for election or no commissioner positions up for election. In such instances, case law ponders that a petition filed by a single commissioner candidate or by another county candidate (e.g. sheriff, county clerk, surrogate) will satisfy the "joint petition" requirement of *N.J.S.A.* 19:49-2, for purposes of bracketing.

[13] *N.J.S.A.* 19:23-6 sets forth which candidates running for which offices must file their nominating petitions with the Municipal Clerk, County Clerk, or Secretary of State.

[14] In races where there is a different pivot point candidate used by the County Clerk, instead of joint petition county candidates, *N.J.S.A.* 19:49-2 has not always been followed to the letter by

D. **Ballot Position**

63.     The County Clerk is required to hold a ballot draw to determine the order of placement of various candidates running for the same office on the ballot. *N.J.S.A.* 19:23-24.

64.     While *N.J.S.A.* 19:23-24 sets forth various procedures intended to ensure fairness as between the candidates being drawn, only some candidates get to enjoy those fair procedures on equal footing. This is because New Jersey case law interpreting the relevant enabling statutes has determined that an initial drawing for ballot position should take place only as among candidates who are bracketed together with joint petition county candidates, except in years when candidates for U.S. Senate or Governor are on the ballot pursuant to *N.J.S.A.* 19:23-26.1 (in which case the latter offices are considered the pivot point, as further described in the next section).

65.     Once the pivot point candidate(s) are drawn, all candidates running for other offices who are bracketed with them are automatically placed on that same column. These bracketed candidates running for other offices are therefore eligible to obtain the first ballot position, and will be placed further to the left (or further to the top) of the ballot than other unbracketed candidates running for the same office.

66.     Once the initial ballot draw has taken place, then a series of non-preferential ballot draws take place between remaining unbracketed candidates for the other offices. These candidates are not eligible to receive the first ballot position and will be placed further to the right (or further to the bottom) of the ballot than the bracketed candidates running for the same office.

---

County Clerks and a similar bracketing request process has sometimes been used vis-à-vis the campaign manager of the pivot point candidate. *See infra* ¶ 70.

67.     Such unbracketed candidates are not even guaranteed to receive the next available column after the bracketed candidates are placed on the ballot. Instead, pursuant to the discretion of the County Clerk, unbracketed candidates have often been relegated to a ballot placement where they are (a) placed multiple columns away from the bracketed candidates, (b) stacked in the same column as another candidate for the exact same office, and/or (c) placed in the same column as candidates with whom they did not request to bracket and who requested a different ballot slogan. These candidates are harder to find in such obscure portions of the ballot commonly known as "Ballot Siberia," i.e., the candidates found in Column 9 on the ballot in ¶ 5, *supra*) and otherwise appear less important, further confusing voters and depriving candidates and their supporters of a fair chance to compete for the same office.

68.     In this manner, bracketing, preferential ballot draws, ballot position, and ballot placement of candidates are all inextricably intertwined with respect to New Jersey's primary election ballots.

**E.  United States Senate and Gubernatorial Candidates**

69.     Pursuant to *N.J.S.A.* 19:23-26.1, the names of all candidates for United States Senator, when such office is up for election, must be placed on the first column of the primary election ballot. The same is true for candidates for Governor, if such position is up for election and United States Senator is not up for election.

70.     Interpreting New Jersey case law suggests that when United States Senator (or Governor) is on the ballot, county clerks should draw them first as the pivot point.

71.     All candidates for other offices who are bracketed with a candidate for United States Senator (or Governor) will then be automatically placed in the same column. Such bracketed candidates thus have a chance at obtaining the first ballot position and will be placed

further to the left (or further to the top) than all other candidates running for the same office who were not bracketed with a candidate for United States Senator (or Governor). By contrast, all candidates, including but not limited to candidates for the House of Representatives, who are not bracketed with a candidate for United States Senator (or Governor) are precluded from obtaining the first ballot position and will be placed further to the right (or further to the bottom) than all of the bracketed candidates running for the same office.

72.     In primary election cycles when candidates for President are on the ballot, some County Clerks have used President as the pivot point, and provided a similar ballot advantage to candidates who are bracketed with candidates for President, and corresponding disadvantage for all unbracketed candidates. *See also infra* ¶ 76.

## F.   <u>Arbitrary Criteria for Ballot Advantage and Varying Standards of County Clerks</u>

73.     In New Jersey primary elections, neither luck of the draw nor a rotational system is the primary factor in determining which candidates get the first ballot position. Rather, eligibility to even have a chance at first ballot position depends most importantly on arbitrary considerations such as whether a candidate is bracketed with other candidates running for other offices, and which office the County Clerk uses as the pivot point.

74.     Ballot order thus becomes dependent upon other arbitrary criteria including whether a candidate requested bracketing, whether bracketing was with a candidate that the County Clerk subsequently decides to use as the pivot point after petitions are already submitted, or whether the pivot point candidates with whom the candidate filed a bracketing request grants such request, etc. Such criteria rely on what actions occur with respect to other candidates running for other offices and how the County Clerk designs the ballot.

75.    Making matters worse, County Clerks have applied varying and internally inconsistent interpretations and unpredictable standards as to who the pivot point candidate should be.[15]

76.    With respect to the 2020 Primary Election, the last primary election where President, United States Senator, and House of Representatives were on the ballot together, the vast majority of counties used U.S. Senate as the pivot point. The Atlantic County Clerk appears to have used President as the pivot point. The ballots in Somerset County suggest that the county clerk may have used U.S. Senator as the pivot point in the Republican draw; however, with respect to the Democratic draw, Somerset County featured a candidate for U.S. Senator in the first column, a candidate for President in the second column, and a bracketed slate of candidates in the third column, including a candidate for President and a candidate for U.S. Senator, making it unclear what office, if any, was the pivot point. A copy of a ballot/sample ballot in connection with the 2020 Democratic and Republican Primary Elections from one municipality in each of New Jersey's 21 counties is set forth in Exhibit A. (*See* Ver. Compl., Exh. A, collection of 2020 primary ballots).

### G. Primacy Effect, Weight of the Line, and Other Ballot Placement Advantages and Disadvantages

77.    It has been well-documented that when choosing between a set of visually-presented options, a significant percentage of people will demonstrate a bias toward choosing the first or earlier-listed option, including in the context of selecting candidates listed on the ballot. This phenomenon, known as the primacy effect or positional bias, has a strong influence on decisions across a range of various forms of human behavior.

---

[15] *See also infra* ¶ 115, expert report data analysis by Dr. Josh Pasek "suggests that at least some county clerks are willing to manipulate the rules to place the county line first and that they do indeed see first position as beneficial."

78.     The primacy effect has also been widely proven to impact elections where first-listed candidates enjoy a meaningful advantage solely due to the fact that they are listed first. (*See* Ver. Compl., Exh. B, Expert Report by Dr. Josh Pasek, literature review and accompanying explanation.) Thus, candidates listed first among others running for the same office receive an advantage of additional votes solely due to their position on the ballot over all other candidates for that same office.

79.     To avoid a constitutional injury where some candidates are arbitrarily favored over others, other states have implemented some form of rotational system where ballots in different jurisdictions rotate which candidate receives first ballot position, or have all candidates running for the same office chosen by lot, so that each candidate running for the same office has an equal chance of obtaining the first ballot position, with the draw affecting only that office, not multiple ones.

80.     These mechanisms ensure constitutionally required fairness and an equal playing field by either minimizing ballot order effects and distributing those effects equally, or by providing all candidates for the same office with an equal chance of being drawn first so as not to arbitrarily favor one category of candidates over another. This is in stark contradiction to the primary ballot system employed in New Jersey, which prioritizes groupings of candidates over the office being sought, and then employs a biased drawing system among those groupings.

81.     In the past, other states have implemented ballot order practices which provided an advantage to certain favored candidates such as incumbents or based on the majority political party currently in power. State and federal courts applying both the federal and state constitutions have in many instances found such ballot ordering arrangements to be unconstitutional, including a United States Supreme Court summary affirmance.

82.     Even ballot order practices that do not appear to advantage one group of candidates over another have nevertheless been struck down by courts based on their effect, namely the advantage they provide to certain candidates over similarly situated but later-listed candidates and due to the arbitrary nature of the criteria.

83.     New Jersey's bracketing and ballot order practices systematically prevent unbracketed candidates from having any opportunity to ever be listed in the first column on the primary election ballot, and place them further to the right (or bottom) of the ballot, resulting in a serious electoral disadvantage.

84.     New Jersey's ballot system is problematic for additional reasons. Research has specifically shown that the primacy effect is at least as large, and sometimes even larger in the context of a primary election, and would thus lead to an even greater arbitrary advantage.

85.     New Jersey's bracketing and ballot order system provides a systemic advantage to candidates above and beyond the primacy effect alone, because it applies this effect to groupings of candidates that bracket for certain pivot point offices, and especially to county line candidates creating additional visual biases. Any ballot advantage based on or resulting from the actions or affiliations of different candidates running for different offices is unjustifiably arbitrary.

86.     The primary election ballots contain other poor ballot design features which nudge voters toward bracketed candidates, and contribute to other systemic biases and voter confusion leading to over and under votes, which can disenfranchise substantial numbers of voters. Such poor ballot design features include (a) placing a candidate far away from other candidates running for the same office with multiple blank spaces in between, i.e. Ballot Siberia; (b) the visual cue from a full ballot column with candidates for all offices up for election as compared to columns with fewer candidates, i.e. the weight of the line; (c) arbitrarily grouping

candidates for the same or different office in the same column, i.e. stacking; and (d) featuring candidates in a column all by themselves.

87.  The column form of ballot and weight of the line coupled with all of the poor ballot design features contribute to a confusing ballot for voters. New Jersey's voters are further deprived of a fair and democratic process as they are forced to cast their vote on a ballot in a system that provides an arbitrary advantage to certain candidates over others from the inception, based simply on whether or not they are bracketed with other candidates for a completely different office. Likewise, candidates are also deprived of a fair opportunity to compete by virtue of New Jersey's ballot design laws, practices, and customs.

### H. Candidate Ballot Placement in 2020 Democratic Primary Election

88.  Since 2020 was the last election cycle in New Jersey where candidates for President, United States Senator, and House of Representatives were all on the ballot together, it provides a helpful example of how county clerks designed their respective ballots and demonstrates how ballot positioning and ballot placement can impact where and how candidates appear on the ballot. A few illustrations can highlight various unique features found on New Jersey primary election ballots.[16]

---

[16] Some of these illustrations draw from political candidates who suffered similar constitutional injuries in connection with the 2020 Primary Election, which is the subject of the challenge in a similar although not identical lawsuit, *Conforti v. Hanlon*, No. 3:20-08267 (D.N.J.). The present matter differs from *Conforti* in several respects. It is brought by candidates for the U.S. Senate and House of Representatives, and is based on new quantitative and qualitative proofs in connection to the 2024 primary and beyond. The present matter also accompanies a request for emergency relief several months prior to the primary election at issue. For informational purposes, *Conforti* has survived eight motions to dismiss, and is presently in discovery.

89.     An example of "stacking," whereby candidates running for the same office are stacked together in the same column as one another, can be seen from a sample ballot[17] from the Mercer County Clerk's Office for the July 7, 2020 Democratic Primary Election in Robbinsville Borough, which shows the ballot position of congressional candidates in NJ CD-4:



OFFICIAL PRIMARY ELECTION SAMPLE BALLOT
**Robbinsville Borough**
Mercer County, New Jersey
July 7, 2020
4th Congressional District

*Paula Sollami Covello*
PAULA SOLLAMI COVELLO
Mercer County Clerk
209 South Broad Street
P.O. Box 8068, Trenton, NJ 08650-0068

**ATTENTION VOTERS**
IN ORDER FOR YOU TO PROPERLY CAST YOUR VOTE,
THE OVERHEAD LIGHT MUST BE LIT AND
THERE SHOULD BE AN 'X' NEXT TO EACH SELECTION.

## DEMOCRATIC

| OFFICE TITLE | Column A Democratic | Column B Democratic | Column C Democratic | Column D Democratic | PERSONAL CHOICE |
|---|---|---|---|---|---|
| U.S. President 4 Year Term - Vote for One | Regular Democratic Organization Joseph R. BIDEN 1A | | Bernie 2020, Not Me. Us. Bernie SANDERS 1C | A VOTE HERE IS A VOTE FOR ALL UNCOMMITTED DELEGATES BELOW 1D | 1 |
| 8th District Delegates to Democratic National Convention | A VOTE ABOVE IS A VOTE FOR ALL DELEGATES JOSEPH R. BIDEN Biden For President Linda GREENSTEIN Cathleen LEWIS Sharon SHINKLE Bruce STERN Kelvin GANGES | | A VOTE ABOVE IS A VOTE FOR ALL DELEGATES BERNIE SANDERS Bernie 2020, Not Me. Us. Rana BANERJEE Lizette DELGADO Franceline EHRET Brady RIVERA Neeharika THURAVIL | A VOTE ABOVE IS A VOTE FOR ALL UNCOMMITTED DELEGATES UNCOMMITTED Joseph WOLFGANG | NO PERSONAL CHOICE FOR DELEGATES |
| U.S. Senate 6 Year Term - Vote for One | Regular Democratic Organization Cory BOOKER 2A | Not Me. Us. Lawrence HAMM 2B | | | 2 |
| U.S. House of Representatives 2 Year Term - Vote for One | Mercer County Democrats Christine CONFORTI 5A | Farmers in Healthcare, Schools, Local businesses. David APPLEFIELD 3B | | | 3 |
| | Regular Democratic Organization Stephanie SCHMID 6A | | | | |
| Sheriff 3 Year Term - Vote for One | Regular Democratic Organization John A. "Jack" KEMLER 5A | | | | 5 |
| County Clerk 5 Year Term - Vote for One | Regular Democratic Organization Paula SOLLAMI COVELLO 6A | | | | 6 |
| Board of Chosen Freeholders 3 Year Term - Vote for Two | Regular Democratic Organization Lucylle RS WALTER 7A | | | | 7 |
| | John A. CIMINO 8A | | | | 8 |
| County Committee 2 Year Term - Vote for Two | | | | | |

Master ENG 4th
Robbinsville, Form 13,   D1

90.     In Mercer County, Christine Conforti was placed in the same vertical column as her opponent, Stephanie Schmid, even though she was running against Schmid, and even though her other opponent, David Applefield, was listed horizontally to her. Thus, even though voters

---

[17] All 2020 Primary Election ballot images included in the text of this Verified Complaint have been excerpted and contain other minor formatting and sizing adjustments to enhance readability.  They include the relevant portions of the ballot to accurately demonstrate the offices up for election and position of the various candidates.

could only vote for one candidate for the Fourth Congressional District, two candidates appeared on the same column.

91.     Approximately one-third of all 2020 Mercer County voters in the Fourth Congressional District who attempted to cast a vote in this race were disenfranchised because they voted for more than one candidate for the same office, and thus their over-votes were disqualified.

92.     A ballot from the Monmouth County Clerk's Office for the July 7, 2020 Democratic Primary Election in Neptune Township's 1st Election District shows the ballot position of various candidates, and provides examples of ballot design features such as (a) preferential ballot position/primacy; (b) the "weight of the line;" (c) candidates running in a column by themselves; (d) gaps in spaces on the ballot between candidates running for the same office/Ballot Siberia; and (e) nonsensical ballot affiliations/associations:

93.     The Monmouth County Clerk's Office drew for ballot position based on U.S. Senate candidates first. Focusing on Township Committee candidate Kevin McMillan,  he was not included in the preferential ballot draw because he did not associate with a candidate for U.S. Senate. Therefore, he was prohibited from having any chance to receive the first ballot position.

94.     The other candidate running for Neptune Township Committee, Keith Cafferty ("Cafferty"), was automatically placed (in the first column) as a result of the initial ballot draw, due to the fact that he was bracketed with a Senate candidate (preferential ballot position/primacy).

95.     The Monmouth County Clerk's Office next drew from candidates for President, but because McMillan again chose to exercise his First Amendment right not to associate, he was not included in this next drawing because he did not associate with a candidate for U.S. President, and thus was not eligible for the third column.

96.     The Monmouth County Clerk's Office next drew from candidates for New Jersey's Fourth Congressional District, but because McMillan chose to exercise his First Amendment right not to associate with a candidate for House of Representatives, he was not included in this next drawing, and thus was not eligible for the fourth or fifth column.

97.     McMillan was eventually placed in the sixth column, with two candidates running for county committee with whom McMillan chose to bracket, as evident by their shared slogan. Beyond these county committee candidates, no other candidates for any other office are listed on the same column as McMillan, leaving 5 blank spaces above him (ballot gaps).

98.     By contrast, the candidates in the first column, including Cafferty, are all featured on a complete column of candidates for every available office, and are all featured with the same

slogan ("weight of the line"). A gap in the ballot exists between Cafferty and McMillan, who are running for the same office, yet are featured five spaces apart on the ballot (Ballot Siberia).

99.    The full slate of candidates for each office on the county line can further be contrasted with three candidates who were featured in a column by themselves, including presidential candidates Bernie Sanders, and NJ CD-4 congressional candidates Christine Conforti and David Applefield.

100.    The ballot also demonstrates that Christine Conforti was running for two different offices: House of Representatives for New Jersey's Fourth Congressional District and Monmouth County Committee. However, Conforti was featured on the county line only in connection with her bid for a County Committee seat, and not in connection with her bid for Congress. This resulted in an awkward posture whereby Conforti (the County Committee candidate) is bracketed in the same column and with the same slogan as her opponent for the congressional nomination, Stephanie Schmid.

101.    The same laws and practices that governed the primary ballot design in 2020 remain in full effect for the 2024 and subsequent ballots and there is no reason to think any of these constitutionally deficient features and practices will change for the 2024 ballot.

102.    The manner in which Defendants design the ballots further leaves the political system susceptible to gamesmanship, backroom dealings, and manipulation by various actors which result in unconstitutional ballot advantages that undermine election integrity and public confidence in our elections.[18]

---

[18]    Another notable phenomena demonstrated by the gamesmanship that the ballot system encourages is the engagement of phantom candidates, i.e., those who do not run in good faith for the sole purpose of taking up ballot space, pushing similarly situated candidates for other offices further out into obscure places on the ballot, and creating ballot advantages for some and disadvantages for others. *See supra* ¶ 5 and supporting text (Camden Ballot). *See also* Matt

I. **Expert Findings**

103.    The advantages of the various features of New Jersey's primary election ballot scheme in the specific context of New Jersey elections have been reviewed by various experts who have submitted expert reports in this matter. An expert report on the capabilities of New Jersey voting machines has also been submitted in this matter.

104.    The experts generally found as follows:

- A review of past New Jersey elections and a study on the upcoming Primary Election demonstrates that the "weight of the line" provides a consistent and substantial advantage to county line candidates over their opponents.
- Candidates listed first on a party column ballot enjoyed a consistent and substantial improvement over being listed in other ballot positions, due to the primacy effect.
- The benefits of the "weight of the line" and primacy stack, meaning that they combine and produce an ever greater advantage and effect when featured together.
- Even excluding the county line, bracketed candidates experience a significant ballot advantage over unbracketed candidates.
- The consistent benefits of the county line were found to be qualitatively and quantitatively different from, and not merely synonymous with, the ways in which candidates experience an inconsistent and distinct benefit from an endorsement/slogan on the ballot.
- Various ballot design features in New Jersey primary elections provide visual cues that steer voters toward candidates featured on the county line and otherwise nudge voters to select county line candidates.
- Given the advantages of the primacy effect and other disadvantages suffered by unbracketed candidates, there will always be an incentive for candidates to bracket with as many other candidates for other offices as possible, and unbracketed candidates will always be negatively impacted.
- Party column ballots in New Jersey primary elections encourage "straightlining" behaviors, swaying voters to vote for all/multiple candidates down the column, encouraging voters to vote for the county line candidates more frequently than they otherwise would.

---

Friedman, *Anti-machine Democrats in Camden County complain of 'Phantom Candidates'*, POLITICO (Apr. 10, 2019, 5:00am), https://www.politico.com/states/new-jersey/story/2019/04/09/anti-machine-democrats-in-camden-county-complain-of-phantom-candidates-960442 (last accessed Feb. 20, 2024); Matt Friedman, *Mysterious group promoting alleged 'Phantom Candidates' must stop Election Spending, Judge Says*, POLITICO PRO (Nov. 3, 2023 1:25pm), https://subscriber.politicopro.com/article/2023/11/n-j-judgesorders-dark-money-groups-bank-account-frozen-00125263 (last accessed Feb. 20, 2024).

- County line candidates were found to be placed in the first column far more frequently than would be expected if county clerks were properly following the rules, which is suggestive of manipulation.
- New Jersey's primary election ballot design features violate various general balloting principles and are expected to induce voter confusion.
- New Jersey's primary election ballot design features provide county line candidates with an enormous handicap over their opponents, alter election results, and can even be outcome determinative.
- There is every reason to expect that the benefits conferred by New Jersey's primary election ballot design features will be present in the upcoming 2024 and future primary elections.
- The voting machines currently used in New Jersey's various counties are capable of supporting an office block ballot design, and the work or effort to prepare the machines for office-block ballots is not significantly different than the work or effort to prepare row-and-column ballots.

<u>Dr. Rubin and Dr. Wang Expert Reports (Exhibits C and D)</u>

105.    Dr. Julia Sass Rubin studied 20 years of past New Jersey primary elections for United States Senate, House of Representatives races, and state legislative races. Dr. Rubin identified 45 congressional and senatorial primaries between 2002 and 2022 where one candidate had the county line in at least one county and where their opponent had the county line in a different county. In those races, she determined that <u>"[t]he margin in performance for those forty-five candidates between being on the county line and having their opponent on the county line ranged from 13 to 79 percentage points, with a median of 36 percentage points and a mean of 38 percentage points."</u> (*See* Ver. Compl., Exh. C, Expert Report by Dr. Julia Sass Rubin, at 3) (emphasis added.) She further found that of those 45 contests, three of those candidates were incumbents, and "[o]f the 21 counties that used a county line primary ballot in these two federal elections, the candidate on the county line won 100% of the time." *Id.*

106.    Dr. Samuel S.-H. Wang provided a separate expert report examining the data compiled by Dr. Rubin from a statistical perspective. He found with respect to the 38% average differential for U.S. House and Senate candidates between being on and off the county line over

45 contests, "[t]he probability that such a difference occurred by chance (*i.e.*, that it differed from an average of zero) is less than 1 in 1 quintillion (1 billionth of a billionth, or 1 in 1,000,000,000,000,000,000)." (*See* Ver. Compl., Exh. D, Expert Report by Dr. Sam Wang, at 11.)

107.    Dr. Rubin also studied 20 years of past New Jersey primary elections for state legislative races from 2003-2023, specifically focusing on the power of the county line for incumbents. She found that "only 3 of the 209 (1.4%) incumbent legislators in competitive primaries who ran on the county line in all the counties in their districts lost their primaries." (Expert Report, Dr. Rubin, at 3.) She also found that "[n]o incumbent New Jersey state legislator running on the county line in all the counties in their district has lost a primary over the last 14 years even as 1,145 incumbents lost primaries in the rest of the country during that time." *Id.* Dr. Rubin found that over the last 20 years, "19 incumbent state legislators lost the county line in at least one county in their district . . . . [and t]en of those 19 (52.6%) lost their primaries." *Id.* For that 20-year period, she compared the 52.6% loss rate for incumbent candidates running off the county line in at least one county with the 1.4% loss rate for incumbent candidates who ran on the county line in all counties in their district, finding a loss rate that was 38 times greater for candidates running off the county line in at least one county. *Id.* at 3-4. Furthermore, Dr. Rubin found that in the last 20 years, "only two legislative incumbents running off the county line in all the counties in their district have won their primaries," and "[n]o incumbent legislator running off the county line in all the counties in their district has won a primary in the last 16 years." *Id.* at 4.[19]

---

[19] Indeed, recent examples are consistent with these expert observations, and demonstrate that the fate of incumbents who do not get the county line has essentially been relegated to dropping out of the race or losing by sizable margins. *See e.g.*, Announcement by Nicholas A. Chiaravalloti

108.    Dr. Wang also examined this data on state legislative races compiled by Dr. Rubin from a statistical perspective. He compared "the two winning track records, 206 out of 209 incumbents fully on the line compared with 9 out of 19 incumbents that did not have the county line in all of their counties," finding that "the probability that they came from a population with the same odds of re-nomination is less than 1 in 3 billion," and thus "extremely statistically significant and is consistent with the interpretation that the county line is closely associated with the ability of incumbents to be renominated." (Expert Report, Dr. Wang, at 9-10.) He also compared the re-election performance of incumbent candidates in primary elections in New Jersey versus that of the other states nationally, from 2010 to 2023. *Id.* at 10. Outside of New Jersey, out of over 34,000 primary contests involving incumbents, the incumbent lost in 1,145 of them, demonstrating a loss rate of 3.37%. *Id.* Dr. Wang "compared this with the 1,014 New Jersey state legislative races where the incumbent was listed on every county line in their district that used a party column ballot," where "[a]ll but three were renominated, giving a failure

---

(April 19, 2021), *available at*: https://www.tapinto.net/towns/bayonne/sections/elections/articles/nicholas-a-chiaravalloti-announcement (last accessed Feb. 23, 2024) (three-term Assembly Majority Whip Nicholas Chiaravalloti withdraws nomination for fourth bid, announcing: "In reviewing my options, I considered running off the line. The task of winning off the line is daunting in a normal year; however, running against the HCDO [Hudson County Democratic Organization] this year would mean running against Governor Phil Murphy. I believe the power of the line and the popularity of Governor Murphy would make it impossible to compete successfully."); *see also* Max Pizarro, *The 2021 Reemergence of the County Party Chairs*, INSIDER NJ (Apr. 11, 2021), *available at*: https://www.insidernj.com/2021-reemergence-county-party-county-chairs/ (last accessed May 15, 2021); David Wildstein, *Vainieri Huttle will skip Bergen Dem convention, will run off the line in Senate Primary*, N.J. GLOBE (Feb. 23, 2021), *available at*: https://newjerseyglobe.com/legislature/vainieri-huttle-will-skip-bergen-dem-convention-will-run-off-the-line-in-senate-primary/ (last accessed Feb. 23, 2024) (eight-term assemblywoman objects to process that did not give her a chance to compete for the county line); David Wildstein, *Johnson vs. Vainieri Huttle, by the numbers*, NJ Globe (June 14, 2021), *available at*: https://newjerseyglobe.com/legislature/johnson-vs-vainieri-huttle-by-the-numbers/ (last visited Feb. 23, 2024) (stating that Johnson defeated Vainieri Huttle by nearly a 3-1 margin). (*See also* Ver. Compl., Exh. F, compilation of scholarly and media works.)

rate of 0.30%, eleven times lower than incumbents nationwide." *Id.* He found that "[t]he probability that this difference arose by chance is less than 1 in 20 billion." *Id.*

109.   Dr. Rubin further studied ten years of past New Jersey primary elections for Governor, United States Senator, and House of Representatives from 2012 to 2022, comparing the vote share of candidates "endorsed by county party organizations both in counties that used a county line ballot and in counties that did not." (Expert Report, Dr. Rubin, at 4.) She identified 37 such contests, finding that in 35 of them, "candidates received a larger share of the vote when they were on the county line than when they were endorsed but there was no county line." *Id.* Dr. Rubin found that "[t]he difference in the candidate's performance ranged from -7 to 45 percentage points, with a mean of 12 percentage points and a median of 11 percentage points." *Id.* emphasis added). She further found that "[t]he difference was even larger for non-incumbent candidates, with a mean of 17 percentage points and a median of 15 percentage points." *Id.* Even for incumbent candidates, she found an average of 7 percentage points difference from counties where endorsed candidates were featured on a county line compared to counties where such candidates were endorsed but the county did not have a ballot featuring a county line. *Id.* at 20. Dr. Rubin provided the example of the 2020 Republican primary for U.S. Senate, where county endorsements were split between Rik Mehta (16 counties) and Hirsch Singh (4 counties). *Id.* at 4. She found that in the five counties where Mehta was endorsed but a county line ballot was not used, Mehta "received an average of 35% of the total vote . . . versus 51% when he was on the county line." *Id.* She further found that "Mehta also lost in three of the five counties in which he was endorsed but the ballot was not structured around a county line, in contrast to winning every county in which he was on the county line." *Id.*

110.    Dr. Wang also examined this data on the county line and endorsements compiled by Dr. Rubin from a statistical perspective. With respect to the 35 out of 37 instances where the candidate received on average a 12.2% greater difference in vote share in counties where they were both endorsed by the county party and featured on the county line than when receiving the county party endorsement but not featured on a county line ballot, he found that "[t]his average difference differs from zero with extreme statistical significance, occurring by chance 1 in 1.9 million times (a probability of 0.00000051)," which "is consistent with the hypothesis that candidates derive a specific benefit from being on the county line that is separate from party endorsement." (Expert Report, Dr. Wang, at 13) (emphasis added.) Dr. Wang further found that the average difference when that number was further broken down for non-incumbents was 17.1 percentage points over 20 contests, and 6.5 percentage points for incumbents over 17 contests, with both measures reaching extreme statistical significance when measured against chance. *Id.* at 13-14. Similarly, he found that for statewide races (U.S. Senate and Governor) for non-incumbent candidates, "the difference in vote share for county-line with party endorsement over party endorsement alone averaged 15.6 percentage points across 7 contests," which "differs from zero with extreme statistical significance, occurring by chance less than 1 in 1,000 times." *Id.* at 14.

111.    The statistical analysis performed by Dr. Wang based on the compilation of data from Dr. Rubin led to results that were consistent with Dr. Wang's explanation of how the visual display of the ballot impacts the psychology and behavior of voters. Dr. Wang explained how the display of information on a ballot can provide a visual heuristic which drives voter decisions and choice, "mak[ing] it easier for a voter to make choices listed first, clustered near one another, and/or arranged in an orderly line." *Id.* at 7. He identified several features on New Jersey's party-

column ballots used in 19 out of 21 counties' primary election ballots: "It often contains an extreme version of a primacy effect, in which the first choice candidate appears at the left of the ballot, coupled with the weight of the line, and separated by multiple blank spaces from later choices." *Id.* He explained that among the features on New Jersey primary election ballots that "guide the eyes in ways that do not allow equal treatment of all candidates," the "[m]ost prominent is a column featuring not all candidates for one office, but one candidate or each office, with various opponents displayed elsewhere," which he refers to as the "'weight of the line.'" *Id.* at 6. After describing the various statistical analyses and cognitive science behind the various features of New Jersey primary election ballots and specifically the county line, Dr. Wang concluded, "[b]ased on principles of neuroscience and statistical testing, I conclude that the foregoing results are consistent with the explanation that the physical arrangement of candidate names on the county line acts as a powerful force to steer voter behavior toward choices made by the county party chair." *Id.* at 16 (emphasis added).

<u>Dr. Pasek Expert Report (Exhibit B)</u>

112.    Dr. Josh Pasek reviewed the literature and past studies (including his own) and provided an expert analysis of ways in which the primacy effect and other ballot design features can influence voter behavior and decisions. (*See* Ver. Compl., Exh. B, Expert Report by Dr. Josh Pasek, at ¶¶ 24-29, ¶¶ 38-49, ¶¶ 70-109.) He explained that the manner in which information is displayed on a ballot can "tend to nudge voters toward particular choices," and can "tend to confuse voters and result in voter errors." *Id.* at ¶ 29.

113.    Regarding the primacy effect, Dr. Pasek explained why and how the benefits of the primacy effect not only impact elections, but also can alter candidate strategy with respect to associating on the ballot via bracketing. *Id.* at ¶¶ 50-64. <u>He explained that candidates listed</u>

earlier on a ballot, and especially those listed in the first position, can be expected to perform better than candidates listed later on the ballot, and that this effect has been observed in the overwhelming majority of studies conducted throughout the country and internationally, and in a variety of different kinds of elections. *Id.* at ¶¶ 38-43. He further explained that such "[name] order effects have been shown to be larger in primary elections than in general elections," as well as "for down-ballot contests than for top-of-the-ticket races." *Id.* at ¶ 73. In the context of New Jersey elections, Dr. Pasek explained that because candidates running for or bracketed with a candidate running for the pivot point office are the only candidates who can obtain first ballot position, and because non-pivot point or unbracketed candidates will be placed further to the right (or top) of the ballot, "[c]andidates who wish to ensure that they are eligible for the leftmost (or top) positions are thereby incentivized to bracket together with a candidate running for the pivot-point position"; thus, "[r]unning with a pivot point candidate can be expected to deliver a material benefit for candidates, in the form of placement toward the left (or top) of the ballot, which in turn is expected to yield extra votes due to the primacy effect." *Id.* at ¶¶ 50-52.

114. Dr. Pasek further explained logically and mathematically how New Jersey's primary election ballot design even further incentivizes candidates to bracket with as many additional candidates as possible ("regardless of whether candidates who share a bracket occupy similar factions of the party or whether they share similar views on issues" and "for the purpose of jockeying for position rather than merely for demonstrating some underlying commonality") in order to avoid detrimental ballot position/placement, including (1) the fact that candidates are often uncertain about which office will be used as the pivot point by a county clerk in a given county; (2) to avoid ballot gaps between candidates running for the same office which would result in being placed in Ballot Siberia; and (3) to avoid being stacked in a column with

candidates running for the same or other offices with whom they did not request to bracket and do not want to be associated). (Expert Report, Dr. Pasek, at ¶¶ 53-62.) He found that "[n]ame order is extremely likely to constitute a <u>substantial bias</u> in New Jersey' primary elections," where "we have every reason to expect that these sorts of effects occur." *Id.* at ¶¶ 76-78 (emphasis added.) Moreover, he found that "[p]rimacy] biases in New Jersey [primary] elections will always negatively impact candidates who do not bracket with a candidate for the pivot-point positions, as these candidates are guaranteed to be placed in position further to the right of (or below) colleagues who are bracketed with someone in the pivot-point position." *Id.* at ¶ 81.

115. Examining statewide (U.S. Senate and Governor) contested New Jersey primary elections in 2020 and 2021 in 46 instances where the county clerk used U.S. Senator or Governor as the pivot point, Dr. Pasek found that the county line candidates across those races would be expected by chance to be placed in the first position 14 times, but were instead featured in the first column in 24 out of the 46 ballots. *Id.* at ¶¶ 65-68. He found that if done randomly, "we would expect the county line to be first this frequently around 2 in 1000 times," and thus concluded that <u>the county line candidates were placed in the first column or row of the ballot "far more frequently than it should have been if the placement rules (based on a random draw of Senate or Gubernatorial candidates) were being followed as expected,"</u> and further claimed that such data "<u>suggests that at least some county clerks are willing to manipulate the rules to place the county line first and that they do indeed see first position as beneficial.</u>" *Id.* at ¶¶ 68-69 (emphases added).

116. Regarding other cognitive biases which can nudge voters, Dr. Pasek explained how voters may tend to rely on "heuristics or low-information cues as a shortcut to reach conclusions," which can be particularly impactful on party-column ballots which "have been

shown to nudge voters toward selecting candidates in a single column." (Expert Report, Dr. Pasek, at ¶ 82, ¶ 88.) He explained that on party-column ballots, voters have a "tendency to simply proceed down the column . . . . even when they do have a meaningful preference between the candidates, because it gives them an easy way to make a seemingly acceptable choice," and that "the collective influence of this behavior would be expected to assist candidates who share a column with other candidates over those who do not irrespective of what voters' truly informed preferences might be." *Id.* at ¶ 93. Dr. Pasek found that the case for using party column ballots in New Jersey primary elections is particularly "far less compelling than in general election," since candidates do not occupy stable coalitions and because within-party slogans or factions are less likely to provide cues of meaningful difference to voters as compared to partisan party labels in a general election. *Id.* at ¶ 96. Moreover, he explained how this effect could be particularly problematic in the context of New Jersey's primary elections, because "spreading voters across columns might even imply that they do not share a party affiliation even though all candidates in New Jersey's Democratic primary must be Democrats and all candidates in the Republican primary must be Republicans." *Id.* at ¶ 91 n.11.

117.    Dr. Pasek explained how New Jersey primary election ballots contain features that are expected to induce voter confusion, including not always placing candidates for a particular office in subsequent columns and placing candidates in Ballot Siberia where it may be harder for voters to find them. (Expert Report, Dr. Pasek, at ¶ 106.) He identified 3 out of 4 general balloting principles articulated by the Brennan Center that New Jersey ballots often violate, which not only lead to errors, but does so in a manner which "will tend to aid particular candidates over others": (1) not splitting contests; (2) ensuring consistent ballot design; and (3) ensuring visually that ballots are easy to understand. *Id.* at ¶ 107. As but one example, Dr. Pasek

points to the 2020 Democratic Primary Election for the Fourth Congressional District where two candidates running for the same office were stacked together in the same column in Mercer County (even though it was vote for one), resulting in almost one-third of the votes from Mercer County in that congressional race being disqualified due to an overvote. *Id.* at ¶ 109.

118.    Dr. Pasek also designed an experimental study to estimate and determine the impact of the various ballot placement features of New Jersey's primary election ballot scheme, offering hypothetical ballots to participants where candidate positioning and which candidate was displayed on the county line varied such that "these cues are not conflated with either candidate quality or the machinations of county parties." *Id.* at ¶ 114. The study sampled individuals who previously voted in Democratic primaries and who reside in New Jersey's 7th and 8th Congressional Districts, and individuals were randomly assigned either a party column or office block ballot, and the positioning/order of candidates were randomly selected as between the following declared candidates as of the time when the survey was initially distributed for United States Senator and the applicable congressional district for the participant: (a) Tammy Murphy, Andy Kim, Patricia Campos Medina, and Larry Hamm for United States Senator; (b) Sue Altman, Jason Blazakis, and Gregory Vartan for Member of the House of Representatives in the Seventh Congressional District[20]; and (c) Robert Menendez Jr., Ravinder Bhalla, and Kyle Jasey for Member of the House of Representatives in the Eighth Congressional District. *Id.* at ¶¶ 115-19. The study endeavored to mimic, as much as possible, ballot conditions that were realistic and similar to that which New Jersey primary election voters have encountered in past elections, including use of the exact slogan used by the county line candidates in a particular county in past elections, holding constant a presidential candidate (Joe Biden) and candidates for county office

---

[20] Altman, Vartan and Blazakis were the active candidates when the study was designed and fielded. (Expert Report, Dr. Pasek, at n. 15.)

on the county line, having one other bracketed slate that was off the county line, etc. *Id.* at ¶¶ 118-19.)[21]

119.     Analyzing the results of the study, Dr. Pasek found that, despite randomization of which candidates were featured on the county line, <u>the frequency with which voters chose U.S. Senate candidates on the county line (211 times out of 603 party column ballots) "reflected a 10.0 percentage point benefit in vote share over chance and a 13.3 percentage point vote share over how those same candidates performed when they were not on the line,"</u> which was "strongly statistically significant," such that "the probability of receiving this benefit by chance was less than 1 in 10,000,000." (Expert Report, Dr. Pasek, at ¶ 124 & Table 1) (emphasis added.). <u>The benefits observed in the congressional races were even larger, "yielding a 26.2 percentage point benefit over chance and a 39.2 percentage point benefit over those same candidates when they were not on the line" in CD-7 (188 out of 316), and yielding "an 11.4 percentage point benefit over chance and a 17.1 percentage point benefit over those same candidates when they were not on the line" in CD-8 (94 out of 210),</u> both of which were found to be "strongly statistically significant and would be expected by chance less than 1 in 1000 times." *Id.* at ¶ 125 & Table 1 (emphases added). Dr. Pasek also found that <u>"[a]cross these three contests, the presence of a party line benefit was consistently present" and "this benefit appears to have aided every candidate in every contest,"</u> improving "their vote shares by between 6.7 and 38.2 percentage points depending on the candidate and contest." *Id.* at ¶ 126 & Table 2a (emphasis added). <u>Reviewing the results, he found that when candidates for United States Senator and House of Representatives "were placed on the county line in our study, they doubled their vote</u>

---

[21] While any participant could have seen one of a myriad of different permutations of candidate arrangements based on the random order of candidate placement, an image of one example of an office block ballot and of one example of a party column ballot that a participant could have seen in the study is set forth in Paragraphs 118-19 of Dr. Pasek's Expert Report.

shares, receiving an average of 47.4% of voters' preferences when given the line versus 22.7% otherwise, a 24.7 percentage point improvement in performance." *Id*. at ¶ 175 (emphasis added).

120. Dr. Pasek further found that the difference in vote share depending on which candidate was on the county line was "**consequential in terms of who would likely win**." *Id.* at ¶ 127 & Table 2a (emphases added). For example, in the U.S. Senate race, when Andy Kim was on the line, he led over Tammy Murphy in this sample by a margin of 60.4% to 16.9%, but when Tammy Murphy was on the line, they were almost tied. *Id.* at ¶ 127. In CD-7, "whichever candidate had the line was ahead," and in CD-8, "if Bhalla were on the line, he would likely get an outright majority of the vote, but the race would be close if either other candidate received this benefit." *Id.* He further compared the margin of victory in recent New Jersey primary elections for U.S. Senator, United States House of Representatives, and Governor, finding that "three (3) [out of 20 contested primary contests] were decided by margins of fewer than five percentage points and eight (8) were decided by less than the differential we observed for the average county line effect." *Id.* at 180 & n.45. Thus, Dr. Pasek concluded that "**[t]hese results indicate that the impacts of being listed on the county line are substantively large, electorally consequential, and strongly statistically significant.**" *Id.* at ¶ 128 (emphases added).

121. Dr. Pasek also found that the benefit of a county party endorsement/party slogan alone on office block ballots differed both quantitatively and qualitatively from the benefit of the county line with the same slogan. He found that, compared with the "consistent influence of the [county] line," the benefit of the party slogan alone was erratic, not always present, its influence depended on the particular race, and it varied greatly from the observed benefits of the county line such that it "is simply not synonymous with the effect of the party line," which "has an

effect of its own and [] appears to be distinct from the endorsement effect." (Expert Report, Dr. Pasek, at ¶¶ 129-39.)

122.    With respect to the primacy effect, Dr. Pasek found that as to the candidates in his experimental study, "[c]andidates on party-column ballots received benefits from placement in the first available position." *Id.* at ¶ 140. When U.S. Senate candidates were listed first, they received "a 7.2 percentage point improvement over chance and a 9.6 percentage point improvement over the average performance in later positions," which "was statistically significant and could be expected by chance less than 1 in 10,000 times." *Id.* at ¶ 141.) In CD-7, primacy "reflected a 17.0% benefit over chance and a 25.5% benefit over other candidates," and in CD-8, primacy reflected "a 13.8% benefit over chance a 20.7% benefit over other candidates," which "could be expected to occur less than 1 in 10,000 times by chance." *Id.* at ¶ 142. Dr. Pasek found that "all candidates on party-column ballots performed better when listed in the leftmost available position, with these benefits ranging from 3.9 percentage points to 27.8 percentage points across candidates." *Id.* at ¶ 144 (emphasis added). Reviewing the study results, he found that "[w]hen Senate and House candidates were placed in the first column, a phenomenon also made more common for party line candidates due to New Jersey's primary election rules they again performed far better, receiving 43.4% of voters' choices versus 24.5% otherwise, an improvement of 18.9 percentage points." *Id.* at ¶ 176 (emphasis added).

123.    Even among only congressional candidates that were bracketed (and thus excluding those who were featured in a column by themselves), the earlier-listed candidate among them experienced a large primacy effect, receiving an 8.2% benefit over chance and 16.5% benefit over the later-listed bracketed candidate in CD-7, and an 11.1% benefit over chance and 22.2% benefit over the later-listed bracketed candidate in CD-8, which was

statistically significant. (Expert Report, Dr. Pasek, at ¶ 143.) Thus, Dr. Pasek found that the observed first-position benefit "was not just due to the party line effect, but also more directly to primacy effects." *Id.* at ¶ 144. He also found "that the primacy benefit is stronger in the party-column ballot relative to the office-block ballot. *Id.* at ¶ 148.

124.   Dr. Pasek further examined how candidates on the county line performed when the county line was in the first column versus how they performed when the county line was not in the first column, as well as a comparison between how candidates in the first position performed when the county line was in the first position compared to how they performed when the county line was not in first position. *Id.* at ¶ 149. In comparing these data points, he found "that these effects stack, that is that first position benefits and the weight of the line appear to reinforce one another, yielding even larger benefits when they are presented together." *Id.* at ¶ 149 & Table 8 (emphasis added). For example, for U.S. Senate candidates, "the party line was chosen 9.2 percentage points more often than when the party line candidate was in later positions," and "first-position Senate candidates were chosen 12.9 percentage points more often when that coincided with the party line." *Id.* at ¶ 150.

125.   Dr. Pasek found that party-column ballots encouraged voters to straightline their votes more often than would be expected by chance and more often than voters did on office block ballots (11.6% difference), which "implies that many voters did tend to go down the party line in making their choices and that the line encouraged those choices to be more similar than they would otherwise be," demonstrating that New Jersey's party-column primary election ballots "are nudging voters toward selecting party line candidates more often than they would otherwise." (Expert Report, Dr. Pasek, at ¶¶ 153-57 & Tables 9 & 10.)

126.    Dr. Pasek examined the performance of congressional candidates who bracketed with U.S. Senate candidates (but were not on the county line) to the performance of unbracketed congressional candidates (who in this study were always listed in Column 5, since they were not entitled to compete for ballot position on the first four columns, which were reserved for U.S. Senate candidates and those bracketing with them). *Id.* at ¶ 158. Even excluding the candidates bracketed on the county line, he found an average bracketing effect between CD-7 and CD-8 of 12.7 percentage points. *Id.* at ¶ 161 & Table 11.

127.    Overall, Dr. Pasek concluded that when New Jersey primary election ballots feature a county line "and privileges the position of those candidates, <u>voters are strongly nudged toward selecting those same candidates.</u>" *Id.* at ¶ 169 (emphasis added). He also concluded that there is "<u>every reason to expect the benefit conferred by New Jersey's primary ballot design will be present in the upcoming June 4th primary elections, where our study results reveal competitive Senate and House races poised to be decided by margins far smaller than what we observe from the effects of candidate placement decisions induced by the design of the New Jersey [primary election] ballot.</u>" *Id.* at ¶ 183 (emphasis added). In addition to changing candidate performance, even if candidates benefitting from New Jersey's primary election ballot scheme "win their elections by double-digit margins, there is a possibility that the party line effect could have been outcome determinative, meaning that candidates and the public can reasonably question whether the candidate would have won had the counties employed a different ballot design." *Id.* Finally, Dr. Pasek concludes that voter frustration as captured "in a recent Fairleigh Dickinson University poll [finding] two-thirds of New Jersey residents reported that 'Parties shouldn't have control' to favor candidates with preferential placement on the primary ballot," was consistent with the unfairness borne out by the data found in the study he oversaw in connection with his expert

report, where "the magnitude of the biases we observe both individually and cumulatively amounts to an enormous handicap in favor of candidates who are featured on the county line." *Id.* at 185.

Dr. Appel Expert Report (Exhibit E)

128.    Dr. Andrew W. Appel reviewed the various voting machines used by different counties in New Jersey to see if they can accommodate an office block ballot format for primary elections, rather than the party-column style that is currently used.

129.    Dr. Appel explained that old mechanical interlock machines that are no longer used in the State of New Jersey might have experienced challenges in accommodating an office block ballot, which may have necessitated a gridded, party column style of ballot. (Ver. Compl., Exh. E, Expert Report, Dr. Appel, at 2.) However, "[c]omputerized voting machines, such as all the ones now in use in New Jersey are not subject to this mechanical limitation." *Id.*

130.    Dr. Appel listed the types of voting machines used in each county in New Jersey and provided an analysis on the capabilities of each. *Id.* at 2-5.

131.    For the vast majority of counties, the same voting machines used in New Jersey are also used in other states that present office block ballots. *Id.* at 4-5. For other voting machines used in some New Jersey counties, Dr. Appel explained why and how such machines should have the capability to support office block ballots. *Id.*

132.    Dr. Appel provided his expert opinion "that the work or effort needed to prepare office-block ballots, using the same [software], will not be significantly different from the work or effort needed to prepare row-and-column ballots." *Id.* at 5.

133.    Dr. Appel's overall assessment was that "the voting equipment used in New Jersey can accommodate office-block voting, and the election management systems can support the preparation of office-block ballots."[22] *Id.* at 1.

**J.    Ballot Placement for Plaintiff Candidates in the Upcoming Primary Election**

134.    It is virtually certain that Plaintiffs are impacted, and will be impacted, by New Jersey's primary election ballot scheme in connection with the upcoming Primary Election.

Andy Kim: June 4, 2024 Democratic Primary Election for United States Senator

135.    Plaintiff Andy Kim is a three-time elected United States Congressman who considers himself to be more of a public servant than a politician.

136.    Mr. Kim began his career as a public servant following September 11th when he secured a college internship with the United States Agency for International Development (USAID). He later worked at the U.S. State Department where he served in Afghanistan as a civilian adviser to four-star commanding generals before working as a national security official under President Barack Obama, including as Director for Iraq at the National Security Council. In all of these roles, he served as a career public servant rather than as a political appointee.

137.    Mr. Kim has been elected three times – in 2018, 2020, and 2022 – to represent New Jersey Congressional District 3 ("CD-3"), where he was raised.

138.    Mr. Kim decided to run for office for the first time in 2017 to hold then-elected representative of the district, former Congressman Tom MacArthur (CD-3), accountable for his

---

[22] For one type of voting machine (Sequoia AVC Advantage) used in only one county (Burlington) and only in election day precincts and which is now otherwise obsolete, Dr. Appel could not find evidence of its use for office block ballots, but nevertheless, based on his having "studied this machine intensely in 2008," he "know[s] of no reason that it could not support an office-block ballot layout." *Id.* at 5.

role in national efforts to repeal and replace the Affordable Care Act, including the removal of pre-existing conditions protections from health care coverage.

139.    Mr. Kim ran unopposed in the 2018 Democratic primary.

140.    Even though he was unopposed, Mr. Kim privately voiced frustration to Democratic officials about having to appear on the ballot in a column with Senator Bob Menendez, who was also up for reelection that year and who had recently been the subject of controversy. Nevertheless, Mr. Kim was ultimately placed on all 2018 Democratic Primary Election ballots within the district that use a county-line format, in a column with, and right underneath Senator Bob Menendez, even though he differed from Senator Menendez from both a policy and values perspective, and even though he refused to endorse Senator Menendez or campaign with him.

141.    In 2018, Mr. Kim went on to win what was largely seen as an improbable general election against Republican incumbent Tom MacArthur, achieving a slim margin of less than 4,000 votes (a 1.3 percentage point margin). The 2018 general election for CD-3 was not officially called for eight days, and was the closest congressional race in New Jersey. He became the first Korean American to serve in Congress in twenty years.

142.    In 2020, Mr. Kim again ran unopposed in the Democratic primary, and won the general election against a Republican candidate by a wider 7.7 percentage point margin. In doing so, he became the first Democrat since the Civil War to win reelection in New Jersey's Third Congressional District. He was one of only seven Congressional Democrats in the nation in 2020 to win a district that President Donald Trump won twice.

143.    In 2022, Mr. Kim won the Democratic primary by a margin of 93% to 7%, and won the general election against a Republican candidate by 11.9 percentage points, an even wider margin than his 2020 win.

144.    On September 23, 2023, Mr. Kim launched his primary election campaign for nomination to the U.S. Senate seat currently held by Senator Menendez for the June 4, 2024 Democratic Primary Election.

145.    Within one week of First Lady Tammy Murphy's entry into the same primary contest for United States Senator, she was immediately endorsed in rapid fire succession by numerous county chairs in some of New Jersey's largest Democratic counties totaling over half of the state's registered Democratic voters. *See supra*, n. 9.

146.    In addition, certain county party organizations, via the sole decision of the county chair or a small subset of county leadership, have already made official endorsements of the First Lady, all but guaranteeing, in practice, that she will be featured on the county line column of the primary election ballot in those counties, and in turn that Mr. Kim and other candidates for U.S. Senate will not, thereby creating ballot advantages and disadvantages for otherwise similarly situated candidates. *See supra*, nn. 9, 10.

147.    It is thus virtually certain that at least in some counties (and in the aggregate when considering the state as a whole), First Lady Murphy will reap the benefit of a significant advantage due to her ballot placement on the county line over Mr. Kim and the other candidates running for U.S. Senator in the upcoming Primary Election.

148.    Since their campaign announcements, First Lady Murphy has received a flurry of additional endorsements from county chairs, and Mr. Kim has received some endorsements by convention. These endorsements are exactly that – a decision to grant a slogan or endorsement

on the ballot. It is unconstitutional for New Jersey's laws to be applied in such a manner that unconstitutionally entangles this party endorsement with a state-sponsored ballot and electoral advantage and government thumb on the scale that systematically advantages some and disadvantages others, sometimes even with potentially outcome-determinative results. Mr. Kim would prefer not to participate in this process that forces him to bracket with other candidates on the ballot in the county line, but because of the significant structural advantage that the First Lady maintains by virtue of her many county chair endorsements, he feels like he must try and compete if he wants to have any chance of winning the primary.

149.   In such counties where Mr. Kim's opponents are featured on the county line, he will have to decide whether or not to seek bracketing with candidates for other offices (and obtain their consent) in order to avoid further disadvantages experienced by unbracketed or less bracketed candidates, even if he might not be ideologically aligned with such other candidates or otherwise might not want to have to proactively seek out or be associated with such other candidates.

150.   If he subsequently chooses to bracket with other candidates,[23] his right to associate, and more importantly, his right to not associate, will be impeded by forcing such association and further gamesmanship in order to mitigate against an already unequal playing field stemming from the design of the ballot itself. By contrast, if he chooses not to bracket with other candidates – or if he seeks bracketing and is denied by the other candidate – there is every reason to expect that he will suffer additional and significant ballot disadvantages.

---

[23] Under N.J.S.A. 19:49-2, bracketing letters are due two days after petitions are due, or March 27, 2024 and responses to bracketing letters are due two days later, on March 29, 2024.

Sarah Schoengood:  June 4, 2024 Democratic Primary Election for

House of Representatives (CD-3)

151.    New Jersey's Third Congressional District comprises portions of Monmouth, Burlington, and Mercer Counties.

152.    Sarah Schoengood declared her candidacy on January 21, 2024, four-and-half months before the Primary Election, but two days after the Monmouth County Democratic Committee's internal deadline for filing an intent to seek endorsement at the Monmouth County Democratic Convention. She was thus prevented from seeking the endorsement, and even from speaking or otherwise appearing, and therefore will not be featured on the county line. Her opponent, Herb Conaway won the endorsement and will be featured on the county line. Thus, it is certain that she will be at a substantial electoral disadvantage arising from the weight of the line effect compared to one of her opponents, and will also suffer from the primacy effect and other ballot disadvantages in every county where she does not bracket with a U.S. Senate candidate.

153.    Additionally, the Democratic county party chair in Burlington County had already officially endorsed one of Ms. Schoengood's opponents, Herb Conaway. Then, at its convention held on February 24, 2024, the convention endorsed Mr. Conaway, effectively awarding him use of the county line. New Jersey news outlets had previously reported that party leadership and elected officeholders had been trying to broker a deal to put both Herb Conaway and Carol Murphy (both of whom are sitting members of the New Jersey General Assembly from the same district) on the line in Burlington. There does not appear to be a basis in New Jersey law to permit such an arrangement, nor should ballot placement be dictated by party leaders when such responsibility is statutorily entrusted to county clerks. Regardless, the county chair and

influential party leaders never had included Ms. Schoengood in their 'line-sharing' plan and, with the endorsement now settled, she will <u>not</u> be featured on the county line and will be at a substantial electoral disadvantage compared to one of her opponents, specifically, Mr. Conaway. The same is true for any county where she will not be featured on the county line.

154.    Furthermore, Ms. Schoengood believes that, among the candidates for United States Senator, she is most ideologically aligned with Mr. Kim, and she does not intend to entertain bracketing requests to/from other U.S. Senate candidates since she does not share their ideology on important issues and would not want voters to associate their policy positions with her campaign. Thus, in counties where Mr. Kim already won the county party convention, like Monmouth and Burlington, and thus where Mr. Kim will be featured on the county line and where she will not, it is virtually certain that Ms. Schoengood will suffer a significant electoral disadvantage simply because she is choosing to exercise her First Amendment right to not associate with a candidate for the pivot point office. Among others, it is virtually certain that she will be excluded from being placed on the ballot via the preferential ballot draw and will be substantially harmed by the primacy effect vis-à-vis her bracketed opponents.

155.    Indeed, while at least one of her opponents will be eligible for first ballot position, Ms. Schoengood will not be able to be placed in any of the first several columns (at least equal to the number of columns for each U.S. Senate candidate). In other words, if the four currently declared U.S. Senate candidates are on the ballot, the absolute best ballot position she can achieve is fifth, and there is no guarantee she will even get the next available column.

156.    Because Ms. Schoengood is unbracketed, she will also be vulnerable to be placed with ballot gaps in between her bracketed opponents or otherwise put out in Ballot Siberia,

and/or could be either in a column by herself or stacked in a column with other candidates for the same or different offices with whom she does not want to associate.

157.    Even if there is a county where Mr. Kim is not featured on the county line, Ms. Schoengood will need to decide whether to bracket with candidates for other offices to avoid appearing in a column by herself and mitigate against the visual effect of the county line, or exercise her First Amendment right to not associate, and needlessly hitch her wagon to the ups and downs of a campaign for a completely different office. Moreover, there is no guarantee that Mr. Kim, or other downballot candidates to whom Ms. Schoengood may be forced to seek out, would even accept such a bracketing request. Regardless of Ms. Schoengood's ultimate selection, her associational and/or rights to equal protection//treatment of candidates will be injured.

Carolyn Rush: June 4, 2024 Democratic Primary Election for House of Representatives (CD-2)

158.    New Jersey's Second Congressional District comprises all of Atlantic, Cape May, Cumberland, and Salem Counties, and portions of Gloucester and Ocean Counties. While Salem County does not have a party column ballot featuring a county line, the other five counties do.

159.    Carolyn Rush ran for the same seat in the 2022 Democratic Primary election, where one of her opponents was Tim Alexander, who is also one of her opponents in the upcoming Primary Election. In 2022, the Cumberland County Chair (along with the Executive Committee) overrode the committee membership's vote to not endorse a candidate, and instead unilaterally gave the line to Mr. Alexander. In 2022, the Cape May party chair tried to pressure Ms. Rush to drop out to make way for Mr. Alexander and was influential in helping him get the county line. In 2022, the Atlantic County Chair was extremely influential in ensuring that Mr. Alexander received the line in Atlantic County. In 2022, Mr. Alexander also received the line in

Ocean County. Ms. Rush did not bracket with any other candidates in those counties where she was not on the county line in 2022.

160.    In 2022, there was one county (Gloucester County), where Ms. Rush was on the county line, but it was shared with her opponent, Tim Alexander, such that they were both stacked together in the same column, on the county line, even though it was only vote for one. Unlike in the counties where she was not on the county line (and only Tim Alexander was on the county line) Rush won Gloucester County by a large margin of 60% to 39% over Tim Alexander.[24] Despite this win in Gloucester County, she did not prevail in the rest of the district, but still obtained a respectable 38.3% of the total vote – a margin that is within the range of benefits that has been observed as flowing from obtaining the county line.[25]

161.    After declaring her candidacy for the upcoming 2024 Democratic Primary election, the Atlantic County Chair has already publicly stated that he "doubt[s that Rush] is going to be our candidate," and that "[Tim] Alexander would also be a good candidate again." He also demanded an apology for comments that Ms. Rush made declaring that he influenced other county chairs to support Mr. Alexander in 2022. Moreover, in 2022, the Atlantic County Democratic Committee tried to prevent Ms. Rush from using her requested ballot slogan; the Secretary of State denied the challenge after it became clear that the Atlantic County Democratic Committee tried to hijack Ms. Rush's slogan by adding it as an "alternate name" to their corporate entity *after* petitions were already filed.[26]

---

[24]    *See*    https://results.enr.clarityelections.com/NJ/Gloucester/113837/web.285569/#/summary (2022 Primary Election Results from Gloucester County Clerk) (last visited Feb. 21, 2024).
[25] *See* https://www.nj.gov/state/elections/assets/pdf/election-results/2022/2022-official-primary-results-us-house.pdf (last visited Feb. 21, 2024).
[26] Michelle Brunetti, *Rush to Run Again*, Press of Atlantic City (Feb. 12, 2023), p.A3.

162.    The county chairs have extraordinary influence over the party's official endorsement and awarding of the county line, and in some instances, are the sole decision-maker. In four counties, the county chairs exercised that influence to ensure Mr. Alexander, the same candidate running against her in the upcoming Primary Election, got the county line instead of Ms. Rush. Thus, in 2024, there is every reason to believe that Ms. Rush will not be featured on the county line and will be at a substantial electoral disadvantage compared to at least one of her opponents. The same is true for any county where she will not be featured on the county line.

163.    In any county where Ms. Rush is not featured on the county line, she will need to decide whether to attempt to bracket with candidates for other offices, including a U.S. Senate candidate as the pivot point office, to avoid the additional substantial disadvantages of exclusion from the preferential ballot draw/primacy effect and various other disadvantages that unbracketed candidates face, or exercise her First Amendment right to not associate. Ms. Rush does not want the fate of her race to be impacted by her appearance on the ballot in a column with a candidate for another office, and does not want to give voters the impression that she adopts the policy position of any candidate she might bracket with. She also does not want the fate of her race to be negatively impacted by not bracketing. Regardless of Ms. Rush's ultimate selection, her associational and/or rights to equal protection/treatment of candidates will be injured.

**K**. **Pertinent Election Calendar for the Upcoming Primary Election**

164.    June 4, 2024 is the date of the Primary Election.

165.    April 20, 2024 is the date when mail-in ballots must begin to be sent out to the voters pursuant to the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), as

amended by the Military and Overseas Voter Empowerment (MOVE) Act, and New Jersey state law.

166. April 6, 2024 is the state law deadline for clerks to have their printers proofs prepared, although the courts have traditionally adjusted this deadline if necessary to implement court orders, and particularly where ballot placement designs have been successfully challenged.

167. April 5, 2024 is when the clerks conduct a public draw to determine the order in which candidates will appear on the ballot, although the courts have routinely postponed this deadline and/or ordered county clerks to redraw the ballot positions of candidates if necessary in connection with a successful legal challenge to a candidate's ballot placement.

## CLAIMS FOR RELIEF

## COUNT I

### U.S. Const. Amend. I and XIV, 42 *U.S.C.* § 1983

### Violation of Plaintiffs' First and Fourteenth Amendment Rights Under Federal Constitution (Right to Vote)

168. Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

169. The United States Constitution protects the rights of voters to effectively cast their votes and the right of individuals to associate for the purpose of advancing their political beliefs. If an electoral system fails to provide fundamental fairness, fundamental constitutional principles are implicated.

170. Courts considering challenges to state election laws pertaining to fundamental rights under the First and Fourteenth Amendments to the United States Constitution must balance the character and magnitude of the injury to the plaintiffs' rights against specific justifications advanced by the State for imposing such burdens. Regardless of the severity of the

burden imposed, the state's law/rule must be justified by state interests that are legitimate and sufficiently weighty to justify the limitations imposed.

171.  New Jersey's bracketing and ballot placement system directly and substantially injure Plaintiffs' First and Fourteenth Amendment rights. This includes the rights of candidates like Plaintiffs who are similarly situated to other candidates running for the same office, yet not treated equally on the ballot, and the qualified voters in New Jersey who support them.

172.  New Jersey's bracketing and ballot placement system skews New Jersey's elections, providing a substantial, yet arbitrary advantage to bracketed candidates, as well as a substantial, yet arbitrary disadvantage to unbracketed candidates like Plaintiffs.

173.  New Jersey's bracketing and ballot placement system is virtually certain to injure various candidates like Plaintiffs and their supporters, in the upcoming Primary Election. It makes it harder to successfully elect such candidates, arbitrarily diminishing their chances solely because they are not featured on the county line or bracketed with certain candidates running for other offices. This also lessens the impact of votes cast by the supporters of such candidates, as the ballot placement system was designed from the outset to favor county line candidates and/or other bracketed opponents. The same principles impacted various elections up and down the ballot and across various counties in the 2020 primary election and beyond, and is virtually certain to allow the State to put its thumb on the scales in favor of certain bracketed candidates in all subsequent primary elections, including in the upcoming Primary Election.

174.  The impact of positional bias is heightened because New Jersey's bracketing and ballot placement system impacts primary elections, as compared to general elections.

175.  New Jersey's bracketing and ballot placement system are also particularly suspect for a variety of reasons. Providing a state-conferred ballot advantage to bracketed candidates

inherently advantages party-endorsed candidates who have historically run candidates for every position up for election on the ballot, and who have the resources to do so, thereby further entrenching the power of incumbents and political elites.[27]

---

[27] Another sitting member of Congress has expressed that the county line system affirmatively limits opportunities for women and persons of color to compete and win as candidates. Joey Fox, *An Interview with Bonnie Watson-Coleman*, *available at* https://newjerseyglobe.com/congress/an-interview-with-bonnie-watson-coleman/ (NJ Congresswoman explaining that "the political mechanisms that order who gets to be the candidate, who gets the valued position on the ballot, who gets to be supported – that had generally been controlled by white men who were most comfortable with advancing people that they knew best, which were white men.") (citing Matt Friedman, *Have you heard of this thing called 'the line'?* POLITICO (Feb. 9, 2024), *available at*: https://www.politico.com/newsletters/new-jersey-playbook/2024/02/09/have-you-heard-of-this-thing-called-the-line-00140622). *See also* Ryan P. Haygood, Henal Patel, Nuzhat Chowdhury, *The End of the Line: Abolishing New Jersey's Antidemocratic Primary Ballot Design*, 48 SETON HALL J. OF LEGIS. AND PUB. POL'Y 1, 5-7, 20-21 (2023) (describing the impact of the county line on racial underrepresentation in New Jersey, and explaining that "[t]his disproportionate representation is attributable to the political party chairs – overwhelmingly white and male – who determine the candidate endorsements for the county line."); Debbie Walsh, Opinion Editorial, *Women's Legislative Progress in Peril*, N.J. GLOBE (Apr. 3, 2023), *available at*: https://newjerseyglobe.com/legislature/opinion-womens-legislative-progress-in-peril/ (last accessed Feb. 24, 2024) (by Director of the Center for American Women and Politics of Eagleton Institute of Politics at Rutgers University) ("The party line in New Jersey politics, which bestows beneficial placement on voters' ballots as well as electoral resources, has become an almost unassailable fortress, controlled by political elites that bestow their favor on preferred candidates. Of the candidates expected to have the party line this year, only about 38% are women. And of those women who have the party line, only 44% are running in a district that is currently represented by someone in their party. What we can't know is how many women chose not to run at all because they couldn't secure the party line. . . If this is the sort of abusive potential inherent to our party line system, then that system must end. Granting party insiders the power to give their preferred slates of candidates an unfair advantage by way of boosted ballot placement undermines the agency of New Jersey voters and stifles the political conversation that allows the best ideas and candidates to capture the attention of voters. It crushes the potential for new candidates to emerge in Garden State politics."); Amber Reed, Jeffrey Chang, Patrick Stegemoeller, Ronak Patel, Bob Sakaniwa, Commentary, *How New Jersey's Line Disempowers Asian Americans*, N.J. MONITOR (Feb. 13, 2024), *available at*: https://newjerseymonitor.com/2024/02/13/how-new-jerseys-line-disempowers-asian-americans/ (commentary by New Jersey Asian American leaders, describing racial underrepresentation in New Jersey, and explaining "[a] healthy democracy is transparent, competitive, and leaves the most serious decision-making to those our Constitution entrusts: the voters. New Jersey must join the rest of the nation in having fair ballots and give AAPIs, and all of our communities of color, a fighting chance."); Brett M. Pugach, Esq., *The County Line: The Law and Politics of*

176.    Dr. Rubin's data and Dr. Wang's analysis demonstrated that, from the period of 2002 to 2022, in the 45 congressional and senatorial primaries where counties split endorsements between candidates, the difference between being on the county line and not being on the county line varied a candidate's share of the vote by a range of 13 to 79 percentage points, with an average 38% margin difference when candidates were featured on the county line as compared to when their opponent was featured on the line. (Exh. C, Expert Report, Dr. Rubin, at 3.) Dr. Wang found this differential to be so statistically significant that the likelihood that it could have occurred by chance was less than 1 in 1 quintillionth. (Exh. D, Expert Report, Dr. Wang, at 11.) In the experimental study analyzed by Dr. Pasek in CD-7 and CD-8, he found that for the U.S.

---

*Ballot Positioning in New Jersey*, 72 RUTGERS U.L. REV. 629, 658–61 (2020) (describing self-perpetuating system stemming from the ballot advantages of the county line which is granted by county chairs as a carrot to reward unwavering loyalty of those already within the political machine and withheld as a stick to punish dissent); John Farmer and Ron Chen, Opinion Editorial, *New Jersey's Primary Election Ballots are Rigged*, NEW JERSEY STAR LEDGER(June 27, 2021), *available at*: https://www.nj.com/opinion/2021/06/new-jerseys-primary-election-ballots-are-rigged-opinion.html (by NJ's Attorney General 1999-2006 and then-director of Eagleton Institute of Politics at Rutgers University, and Distinguished Professor of Law, Former Public Advocate for New Jersey and Dean of Rutgers School of Law-Newark) ("[The county line] enables entrenched political machines to remain in power and frustrate the ambitions of emerging and historically marginalized groups. A candidate, even an incumbent, must tailor his or her positions to satisfy the party establishment rather than the voters whose wishes a primary election is ostensibly designed to measure. The county line discourages candidates from deviating from the dictates of party insiders, and thus encourages them to see themselves as representing the interests of party insiders more than the public welfare. It commits important decisions of public policy to the deliberations of private, unelected bosses, who serve as puppet-masters on issues involving their interests, and frustrates any effort to hold those private interests accountable."); William E. Schluter, SOFT CORRUPTION: HOW UNETHICAL CONDUCT UNDERMINES GOOD GOVERNMENT AND WHAT TO DO ABOUT IT (Rutgers University Press 2017), pp 9-10 (describing New Jersey primary elections in the context of political machines, and explaining that "[m]anipulation of the candidate selection process by party insiders is a blatant example of soft corruption."); 163-66 ("As suggested by the words of Boss Tweed, primary elections in counties and districts dominated by one party are the elections that really matter, because the winners are virtually assured of being voted into office in the general election in November. [New Jersey] Local party leaders recognize this fact and jealously guard the power they have over the procedures that regulate the primary."). (*See also* Exh. F, compilation of scholarly and media works.)

Senate candidates analyzed, there was an average 10.0% benefit over chance for candidates when they were on the county line, and an average difference of 13.3% when they were on the line versus when they were off the line, which was strongly statistically significant. (Exh. B, Expert Report, Dr. Pasek, at ¶ 124 & Table 1.) He also found for the U.S. House of Representatives candidates, there was a 26.2% benefit (in CD-7) and an 11.4% benefit (in CD-8) over chance for candidates when they were on the county line, and a difference of 39.2% (in CD-7) and 17.1% (in CD-8) when they were on the line versus when they were off the line, which was strongly statistically significant. *Id.* at ¶ 125 & Table 1. On average, United States Senate and House of Representative candidates in the study experienced a 24.7% improvement in performance when they were on the line compared to when they were not. *Id.* at ¶ 175. Dr. Pasek also found that the benefit of the county line was consistent and gave an advantage to every candidate in every race. *Id.* at ¶ 126. For example, according to Dr. Pasek's experimental study of CD-7 and CD-8 participants, when Andy Kim was on the line, he received 60.4% of the vote to Tammy Murphy's 16.9%, but when Tammy Murphy was on the line, there was a much smaller margin of 43.3% to 38.7%. *Id.* at 127. And, in a situation where Tammy Murphy gets the line and ends up in the first column, the same study shows she receives a plurality of 48.8% of the vote compared to all other candidates, whereas when Andy Kim secures both, he receives a majority of 76.5%. *Id.*; *see also id.*, Table 2a.

177.    Additionally, the discretion afforded to County Clerks, who are themselves elected officials who benefit from receiving a ballot placement advantage, has led to varying standards across New Jersey's 21 counties and from election cycle to election cycle impacting which candidates for which offices other candidates need to bracket with and how and where those candidates will be located on the ballot. County Clerks do not generally publish practices

or standards on ballot design, relying solely on unbridled and unpredictable discretion in each election cycle.

178.   New Jersey's ballots also contain a variety of poor and unconstitutional ballot design features, including the weight of the line, which often combine/exacerbate the impact of the primacy effect, nudge voters toward bracketed and particularly county line candidates, and contribute to other systemic biases and voter confusion. Many of these features were observed with respect to the July 7, 2020 Democratic Primary Election, the last time President, U.S. Senate, and U.S. House of Representatives was on the ballot, including (a) placing a candidate far away from other candidates running for the same office with multiple blank spaces in between, i.e., Ballot Siberia; (b) the visual cue from a full ballot column with candidates for all offices up for election as compared to columns with fewer candidates, i.e., the weight of the line; (c) arbitrarily grouping candidates for different office in the same column, i.e., bracketing; (d) placing candidates in the same race (when it is vote for one) or for other offices together in the same column when they did not request to bracket together, i.e., stacking; and (e) featuring candidates in a column all by themselves.

179.   As a direct and proximate cause of state law and Defendants' ballot design procedures, Plaintiffs and the voters that support them are virtually certain to be injured by a diminution in their chance to succeed in their respective elections in the upcoming Primary Election.

180.   No state interest in New Jersey's bracketing and ballot placement system can justify the burdens it places on Plaintiffs' rights. This is especially true given that this case does not seek to challenge the constitutionality of a ballot slogan, which would remain readily available to offer associational signals on the New Jersey ballot in an office block format, nor

does it seek to disrupt general endorsement rights that extend beyond the ballot design by the county party committees, but instead challenges other primary ballot design practices that are radically different and affect candidates like Plaintiffs in a way that is above and beyond what the other states allow on their ballots. Also noteworthy is the precedent set by two New Jersey counties that already use office block format without raising concern, and the fact that other counties have used office block format for their mail in ballots, further illustrating the lack of state interest at stake.

181.   The constitutional injuries that will be inflicted upon Plaintiffs are redressable by the entry of an order from this Court consistent with the relief requested in this Verified Complaint.

182.   The Civil Rights Act, 42 U.S.C. § 1983, provides relief to persons deprived of the rights, privileges, and immunities guaranteed to them under the United States Constitution.

183.   Because Defendants acted under color of state law in engaging in unconstitutional ballot design, and accordingly deprived the rights of Plaintiffs and the voters who support them, shifting attorney fees must be awarded according to 42 U.S.C. § 1988.

## COUNT II

### U.S. Const. Amend. I and XIV, 42 *U.S.C.* § 1983

### Violation of Plaintiffs' First and Fourteenth Amendment Rights Under Federal Constitution (Equal Protection)

184.   Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

185.   New Jersey's bracketing and ballot placement system violate equal protection rights as they fail to treat similarly situated persons—that is, candidates pursuing the same office in the same political party, the same with respect to ballot order and the display of the ballot.

186.    As set forth above, candidates on the county line are provided with a substantial ballot advantage.

187.    State election laws have also been interpreted to provide for a preferential ballot draw as between candidates running for the pivot point office. Those bracketed with candidates for the pivot point office are in turn granted preferential ballot position, including the ability to obtain the first ballot position. Any other unbracketed candidates running for the same exact office are not included in the preferential ballot draw, will not obtain a favorable ballot position, and are wholly excluded from any chance at receiving the first ballot position, and in turn, the benefit of the primacy effect.

188.    Even for candidates running for (or bracketing with candidates running for) pivot point offices, the primacy effect is exacerbated on party-column ballots and combine in powerful ways when coupled with the county line. Dr. Pasek also determined that county clerks have placed the county line candidates in the first column at a rate that is far more frequent than what would be expected by chance and if the ballot placement rules were followed, and in a manner that is suggestive of manipulation. *See supra* ¶ 115.

189.    Unbracketed candidates are further disadvantaged when their names are placed multiple columns away from bracketed candidates running for the same office, or when listed underneath other candidates running for the same office (who are displayed horizontally).

190.    Dr. Pasek found that even excluding candidates who were bracketed on the county line, the average difference in performance observed in the study between bracketed and unbracketed congressional candidates was 12.7%. *See supra* ¶ 126.

191.    The unequal treatment of such candidates and voters who support them is based on an entirely arbitrary characteristic, namely whether or not a candidate is bracketed with a

pivot point candidate and/or on the county line, coupled by the varying and unpredictable standards employed by the County Clerks.

192. By way of example, if U.S. Senate is used as the pivot point (as it was in almost all counties in 2020), a candidate who is not bracketed with a U.S. Senate candidate will have no ability to be placed on the ballot via the preferential ballot draw. Thus, any congressional candidate who is unbracketed - either through exercising their own choice not to associate, or because a pivot point candidate refused their request to bracket - will have no chance at obtaining the first ballot position, whereas any of their opponents running for the same exact office who bracket with U.S. Senate candidates, including those on the county line, by virtue of bracketing, will be placed based on an initial ballot draw for first position.

193. Depending on the number of U.S. Senate candidates who appear on the ballot, the unbracketed congressional candidate will be ineligible for that same number of left-most columns. In other words, if the four currently-declared U.S. Senate candidates are featured on the ballot, then even assuming that the county clerk picks between remaining congressional candidates next (which is not a guarantee), the best ballot position the congressional candidate can achieve is Column 5 (whereas their bracketed opponents can compete for the first four columns). This further allows a situation where the unbracketed congressional candidate can be placed multiple ballot spaces away from their opponents with no other candidates running for the same office in between them.

194. Plaintiffs are already impacted by the various bad ballot design features employed by Defendants, and are virtually certain to be during early and mail-in voting (which begins on April 20, 2024) and on Election Day, including by having to compete against the weight of the

line, which nudges voters to provide significant advantages to certain bracketed candidates, including those on the county line.

195.   As a direct and proximate cause of state law and Defendants' ballot design procedures, Plaintiffs are virtually certain to be injured by a diminution in their chance to succeed in their respective elections in the upcoming Primary Election as a result of their unequal treatment.

196.   No state interest in New Jersey's bracketing and ballot placement system can justify the burdens it places on Plaintiffs' rights. This is especially true given that this case does not seek to challenge the constitutionality of a ballot slogan, which would remain readily available to offer associational signals on the New Jersey ballot in an office block format, nor does it seek to disrupt general endorsement rights that extend beyond the ballot design by the county party committees, but instead challenges other primary ballot design practices that are radically different and affect candidates like Plaintiffs in a way that is above and beyond what the other states allow on their ballots. Also noteworthy is the precedent set by two New Jersey counties that already use office block format without raising concern, and the fact that other counties have used office block format for their mail in ballots, further illustrating the lack of state interest at stake.

197.   The constitutional injuries that will be inflicted upon Plaintiffs are redressable by the entry of an order from this Court consistent with the relief requested in this Verified Complaint.

198.   The Civil Rights Act, 42 U.S.C. § 1983, provides relief to persons deprived of the rights, privileges, and immunities guaranteed to them under the United States Constitution.

199.    Because Defendants acted under color of state law in engaging in unconstitutional ballot design, and accordingly deprived the rights of Plaintiffs and the voters who support them, shifting attorney fees must be awarded according to 42 U.S.C. § 1988.

## COUNT III

## U.S. Const. Amend. I and XIV, 42 *U.S.C.* § 1983

### Violation of Plaintiffs' First and Fourteenth Amendment Rights Under Federal Constitution (Freedom of Association)

200.    Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

201.    New Jersey's bracketing and ballot placement system places additional burdens on Plaintiffs' associational rights. The right of association includes the corresponding right not to associate. State law burdens this right by leaving candidates, including those like Plaintiffs who do not wish to associate with certain other candidates, with a Hobson's Choice; they can either (1) forfeit their right to not associate with certain other candidates, and nevertheless try to negotiate a bracketing arrangement with a willing candidate just to get a fair shot at the first ballot position and/or to avoid or mitigate against having their opponents obtain a substantial advantage from bracketing/weight of the line; or (2) exercise their right not to associate and be punished for doing so by being excluded from the preferential ballot draw and risk getting relegated to obscure portions of the ballot in Ballot Siberia and/or put themselves at a substantial disadvantage from their opponents. Having to choose between equal and fair ballot treatment and First Amendment rights punishes candidates and the voters who support them simply based on their decision to bracket or not bracket with candidates running for different offices. Thus candidates, whether they ultimately choose to bracket or not, are harmed either way.

202.    In order to be included in the preferential ballot draw, candidates are forced to try to engage in gamesmanship and associate with existing pivot point candidates for other offices (and candidates for subsequent pivot point offices) with whom they may not want to associate and whose policies they may disagree with, or are forced to try to recruit candidates to run for various high-level and/or county offices, just to avoid getting treated unfairly on the ballot. And even if they try to associate in this manner, they can be rejected by other candidates exercising their own associational rights and right not to associate. Either way, candidates lose the opportunity for fair treatment on the ballot.

203.    By way of example, if U.S. Senate is used as the pivot point (as it was in almost all counties in 2020), a candidate who is not bracketed with a U.S. Senate candidate (either by choice or because she cannot find a willing Senate candidate) will have no ability to be placed on the ballot via the preferential ballot draw. According to Dr. Pasek, candidates meeting these criteria (like Schoengood and possibly Rush) have mathematical and statistical ballot placement incentives to bracket generally and to do so with multiple candidates; will forego these benefits if they choose not to bracket or cannot find a willing Senate candidate; and will also experience significant negative differences in vote share.

204.    Regardless of the ultimate ballot design, Plaintiffs will be harmed. Even when featured on the county line itself, it forces candidates to forego their right to not associate, not only to obtain the benefits of going on the county line, but also to avoid a situation where the candidate's opponent gets the substantial advantage of having the county line. The same is true for decisions to bracket off the county line. Even unbracketed candidates, who are already at a substantial disadvantage for choosing to exercise their right to not associate, may nevertheless be placed in a column with other candidates with whom they do not wish to associate.

205.    Plaintiffs do not want to give voters the impression that they share all policy positions with, or even that they endorse, other candidates for other offices who they might have to bracket with to protect their ballot position. Plaintiffs also do not want to have the fates of their own elections impacted by other candidates' elections. At the same time, they don't want to give ballot advantages to their opponents or otherwise suffer corresponding and additional ballot disadvantages if they do not bracket.

206.    Forcing candidates to choose between favorable ballot position and placement on the one hand, and associational rights on the other hand, violates their First Amendment rights.

207.    Furthermore, because the initial ballot draw and preferential ballot placement depends on bracketing with specific pivot point candidates for specific offices (e.g. President, United States Senator, Governor, joint petition county candidates), but not with candidates for other offices (e.g. House of Representatives, State Senate, General Assembly, municipal council, county committee, etc.), New Jersey state law arbitrarily favors and bestows ballot advantages upon certain candidate associations over other associations in such manner as to simultaneously violate both associational rights and Equal Protection rights under the First and Fourteenth Amendments.

208.    As a direct and proximate cause of state law and Defendants' ballot design procedures, Plaintiffs are virtually certain to be injured in their respective races elections in the upcoming Primary Election by punishing the exercise of their right to not associate with a diminution in their chance to succeed in their election and/or by otherwise requiring them to associate with candidates for the same and other offices in order to protect their ballot position and placement.

209.    No state interest in New Jersey's bracketing and ballot placement system can justify the burdens it places on Plaintiffs' rights. This is especially true given that this case does not seek to challenge the constitutionality of a ballot slogan, which would remain readily available to offer associational signals on the New Jersey ballot in an office block format, nor does it seek to disrupt general endorsement rights that extend beyond the ballot design by the county party committees, but instead challenges other primary ballot design practices that are radically different and affect candidates like Plaintiffs in a way that is above and beyond what the other states allow on their ballots. Also noteworthy is the precedent set by two New Jersey counties that already use office block format without raising concern, and the fact that other counties have used office block format for their mail in ballots, further illustrating the lack of state interest at stake.

210.    The constitutional injuries that will be inflicted upon Plaintiffs are redressable by the entry of an order from this Court consistent with the relief requested in this Verified Complaint.

211.    The Civil Rights Act, 42 U.S.C. § 1983, provides relief to persons deprived of the rights, privileges, and immunities guaranteed to them under the United States Constitution.

212.    Because Defendants acted under color of state law in engaging in unconstitutional ballot design, and accordingly deprived the rights of Plaintiffs and the voters who support them, shifting attorney fees must be awarded according to 42 U.S.C. § 1988.

**COUNT IV**

**U.S. Const. Art. I, § 4, cl. 1, 42 *U.S.C.* § 1983**

**Violation of Elections Clause Under Federal Constitution**

213.    Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

214.    Article I, Section 4, Clause 1 of the United States Constitution (hereinafter "the Elections Clause") states as follows: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time make or alter such Regulations, except as to the Place of chusing Senators."

215.    The Elections Clause is the exclusive delegation of power to States over congressional (U.S. Senate and U.S. House of Representatives) elections, and as such the Constitution does not provide for any State authority over congressional elections beyond regulating the time, place, and manner of such elections.

216.    The authority under the Elections Clause to regulate the time, place, and manner of congressional elections cannot be exercised so as to dictate electoral outcomes or to favor or disfavor a particular class of candidates.

217.    New Jersey's bracketing and ballot placement system does not regulate the "time" of federal elections.

218.    New Jersey's bracketing and ballot placement system does not regulate the "place" of federal elections.

219.    New Jersey's bracketing and ballot placement system does not regulate the "manner" of federal elections.

220.    New Jersey's bracketing and ballot placement system is not merely a procedural regulation, but is far worse – it dictates electoral results and even outcomes.

221.    New Jersey's bracketing and ballot placement system is designed to favor bracketed candidates, and particularly those who secure the county line and thus benefit from the totality of the preferential ballot positioning, a combination of the weight of the line and the primacy effect, as described further herein, while disadvantaging similarly situated candidates who do not secure preferential ballot positioning and are forced to engage in gamesmanship to minimize the impact of the bias, or to face the aforementioned Hobson's Choice between their equal protection and associational rights.

222.    New Jersey's bracketing and ballot placement system are designed to disfavor and penalize all candidates not featured on the county line, and especially penalize a class of unbracketed federal candidates, who choose not to align with candidates running for any other office and/or who choose not to align with candidates running for the particular office that the county clerk subsequently decides to use as the pivot point office, and thus are prohibited from being placed on the ballot as a result of a preferential ballot draw and excluded from eligibility to obtain the first ballot position.

223.    New Jersey's bracketing and ballot placement system doubles down on a further penalty to a class of unbracketed federal candidates for expressing their view that they do not want to associate with any candidate running for the pivot point office by subjecting them to a series of other disfavored treatment such as being relegated to Ballot Siberia, being listed multiple spaces away from bracketed candidates running for the same office, being listed in a column by themselves as compared to a column with a full slate of candidates for all offices on

the ballot, and/or being featured on a column with candidates with whom they did not wish to associate.

224.    These various penalties and disfavored treatment handicap candidates not featured on the county line and other unbracketed federal candidates in ways that exceed State authority to regulate the manner of congressional elections under the Elections Clause.

225.    Having exceeded state authority under the Elections Clause, New Jersey's bracketing and ballot placement system must be struck down as unconstitutional.

226.    The Civil Rights Act, 42 U.S.C. § 1983, provides relief to persons deprived of the rights, privileges, and immunities guaranteed to them under the United States Constitution.

227.    Because Defendants acted under color of state law in engaging in unconstitutional ballot design, and accordingly deprived the rights of Plaintiffs and the voters who support them, shifting attorney fees must be awarded according to 42 U.S.C. § 1988.


**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

(a) Declaring, under the authority granted to this Court by 28 *U.S.C.* § 2201 that the following practices and the statutes that enable them violate the United States Constitution with respect to primary elections in New Jersey:  (1) ballots designed by columns or rows, rather than by office sought; (2) ballot draws that do not include a separate drawing for every office and where every candidate running for the same office does not have an equal chance at the first ballot position; (3) positioning candidates on the ballot automatically based upon a ballot draw among candidates for a different office; (4) placement of candidates such that there is an incongruous

separation from other candidates running for the same office; (5) placement of candidates underneath another candidate running for the same office, where the rest of the candidates are listed horizontally, or to the side of another candidate running for the same office, where the rest of the candidates are listed vertically; and (6) bracketing candidates together on the ballot such that candidates for different offices are featured on the same column (or row) of the ballot;

(b) Preliminarily and permanently enjoining the Defendants from implementing and carrying out any of the above unconstitutional practices under the authority granted to this Court by 28 *U.S.C.* § 2202;

(c) Requiring the Defendants, in connection with the 2024 Primary and in future elections, to use a ballot organized by office sought, rather than by column or row, and which implements for each office on the ballot, either (1) a rotational ballot order system which ensures to the greatest extent possible that each candidate running for the same office obtains the first ballot position in an equitable proportion; or (2) a randomized ballot order system which affords each candidate for the same office an equal chance at obtaining the first ballot position;

(d) Awarding Plaintiffs all reasonable attorneys' fees, costs, and disbursements incurred in connection with bringing this action pursuant to 42 *U.S.C.* § 1988, and other applicable laws;

(e) Retaining jurisdiction of this matter; and

(f) Granting such other and further relief as the Court deems just and proper.

Dated this 26th day of February, 2024.

Respectfully submitted,

/s/ Brett M. Pugach                          /s/ Yael Bromberg
Brett M. Pugach                              Yael Bromberg
Flavio L. Komuves                            BROMBERG LAW LLC
WEISSMAN & MINTZ                             43 West 43rd Street, Suite 32
220 Davidson Ave, Suite 410                  New York, NY 10036-7424
Somerset, NJ 08873                           (212) 859-5083
(732) 563-4565                               ybromberg@bromberglawllc.com
bpugach@weissmanmintz.com
fkomuves@weissmanmintz.com

*Counsel for Plaintiffs*

## DECLARATION

I, Andy Kim, being one of the Plaintiffs in this matter, declare under penalty of perjury that the facts alleged in the foregoing complaint are true and correct. With respect to facts relating solely to Plaintiffs Rush and Schoengood, my declaration is made in reliance on the Declarations that each of them has filed contemporaneously herewith. Executed at Marlton, New Jersey, this 26 day of February, 2024.

_____
Andy Kim

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

ANDY KIM, et al.,

        Plaintiffs,

        v.

CHRISTINE GIORDANO HANLON, in her
capacity as Monmouth County Clerk, et al.,

        Defendants.

Civil Action No. _____

## VERIFICATION OF SARAH SCHOENGOOD

    I, Sarah Schoengood, being one of the Plaintiffs in this matter, declare under penalty of

perjury that the facts alleged in the Verified Complaint filed on even date, relating solely to me,

are true and correct. Executed at Freehold, New Jersey, this 26th day of February, 2024.

_____
Sarah Schoengood

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

ANDY KIM, et al.,

          Plaintiffs,

        v.

CHRISTINE GIORDANO HANLON, in her
capacity as Monmouth County Clerk, et al.,

          Defendants.

Civil Action No. _____

**VERIFICATION OF CAROLYN RUSH**

    I, Carolyn Rush, being one of the Plaintiffs in this matter, declare under penalty of

perjury that the facts alleged in the Verified Complaint filed on even date, relating solely to me,

are true and correct. Executed at Sea Isle City, New Jersey, this 26th day of February, 2024.

Carolyn Rush