**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ANDY KIM, in his personal capacity as a candidate for
U.S. Senate, ANDY KIM FOR NEW JERSEY, SARAH
SCHOENGOOD, SARAH FOR NEW JERSEY,
CAROLYN RUSH and CAROLYN RUSH FOR
CONGRESS,

        *Plaintiffs*,

 v.

CHRISTINE GIORDANO HANLON, in her official
capacity as Monmouth County Clerk; SCOTT M.
COLABELLA, in his official capacity as Ocean County
Clerk; PAULA SOLLAMI COVELLO, in her official
capacity as Mercer County Clerk; MARY H. MELFI, in
her capacity as Hunterdon County Clerk; STEVE PETER,
in his official capacity as Somerset County Clerk;
HOLLY MACKEY, in her official capacity as Warren
County Clerk; NANCY J. PINKIN, in her official
capacity as Middlesex County Clerk; JOSEPH GIRALO,
in his official capacity as Atlantic County Clerk; JOHN S.
HOGAN, in his official capacity as Bergen County Clerk;
JOANNE SCHWARTZ, in her official capacity as
Burlington County Clerk; JOSEPH RIPA, in his official
capacity as Camden County Clerk; RITA M.
ROTHBERG, in her official capacity as Cape May
County Clerk; CELESTE M. RILEY, in her official
capacity as Cumberland County Clerk; CHRISTOPHER
J. DURKIN, in his official capacity as Essex County
Clerk; JAMES N. HOGAN, in his official capacity as
Gloucester County Clerk; E. JUNIOR MALDONADO, in
his official capacity as Hudson County Clerk; ANN F.
GROSSI, in her official capacity as Morris County Clerk;
DANIELLE IRELAND-IMHOF, in her official capacity
as Passaic County Clerk; and JOANNE RAJOPPI, in her
official capacity as Union County Clerk.

        *Defendants*,

- and –

DALE A. CROSS, in his official capacity as Salem
County Clerk; and JEFF PARROTT, in his official
capacity as Sussex County Clerk; TAHESHA WAY, Esq.,

in her official capacity as Secretary of State for New
Jersey.

        *As Interested Parties.*

---

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

**WEISSMAN & MINTZ**
220 Davidson Ave.., Suite 410
Somerset, New Jersey 08873
732-563-4565

**BROMBERG LAW LLC**
43 West 43rd Street, Suite 32
New York, New York 10036
212-859-5083

Of Counsel and On the Brief:

Brett M. Pugach
Yael Bromberg
Flavio L. Komuves

Dated: February 26, 2024

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

PROCEDURAL HISTORY.............................................................................................2

STATEMENT OF FACTS ...............................................................................................3

    A. Parties...................................................................................................................3

    B. New Jersey's Laws Pertaining to Primary Election Ballots.............................3

    C. Weight of the Line, Primacy Effect, and Disadvantages to Unbracketed
       Candidates...........................................................................................................6

    D. Forced Association............................................................................................10

    E. Ballot Position of Candidates ..........................................................................12

        1. Andy Kim.................................................................................................13

        2. Sarah Schoengood....................................................................................14

        3. Carolyn Rush ...........................................................................................15

STANDARD OF REVIEW ...........................................................................................16

LEGAL ARGUMENT....................................................................................................17

I.     ALL PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF
       SUCCESS ON THE MERITS ...........................................................................17

    A. Plaintiffs have Standing to Bring this Case. ...................................................22

    B. Plaintiffs have demonstrated they can win on the merits of their First and
       Fourteenth Amendment claims, and the chances of prevailing are
       significantly better than negligible. ..................................................................22

        1. The Substantial and Meaningful Burden on Plaintiffs.......................23

        2. No State Interest is Legitimate and Sufficiently Weighty to
        Justify the Burdens on Plaintiffs' Rights ...............................................33

    C.    Plaintiffs have demonstrated they can win on the merits of their
       Elections Clause claims, and their chances of prevailing are
       significantly better than negligible........................................................47

II.    PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE
       OF AN INJUNCTION ...................................................................................50

III.   GRANTING   PRELIMINARY   INJUNCTIVE   RELIEF   WILL   NOT
       RESULT IN EVEN GREATER HARM TO NONMOVANT..........................51

IV.    THE PUBLIC INTEREST FAVORS SUCH RELIEF....................................52

CONCLUSION.............................................................................................................53

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Adam v. Barone,*
  41 F.4th 230 (3d Cir. 2022) ................................................................ 17

*Akins v. Sec'y of State,*
  904 A.2d 702 (N.H. 2006) ........................................................... 36, 43

*Burdick v. Takushi,*
  504 U.S. 428 (1992) .......................................................... 30, 33, 40

*Cal. Democratic Party v. Jones,*
  530 U.S. 567 (2000) ............................................................... 26

*Conforti v. Hanlon,*
  2022 WL 1744774 (D.N.J. May 31, 2022) ........................................ *passim*

*Cook v. Gralike,*
  531 U.S. 510 (2001) ........................................................... *passim*

*Crawford v. Marion Cty. Election Bd.,*
  553 U.S. 181 (2008) ............................................................ 33

*Ctr. For Inv. Reporting v. SEPTA,*
  975 F.3d 300 (3d Cir. 2020) ...................................................... 31

*Devine v. Rhode Island,*
  827 F. Supp. 852 (D.R.I. 1993) .................................................. 29

*Doe by & through Doe v. Boyertown Area Sch. Dist.,*
  897 F.3d 518 (3d Cir. 2018) ...................................................... 16

*Eu v. San Francisco County Democratic Cent. Comm.,*
  489 U.S. 214 (1989) ............................................................ 31

*Gould v. Grubb,*
  536 P.2d 1337 (Cal. 1975) .................................................... 36, 43

*Graves v. McElderry,*
  946 F. Supp. 1569 (W.D. Okla. 1996) ........................................... 41, 43

*Matter of Holtzman v. Power,*
  62 Misc.2d 1020 (N.Y. Sup. Ct. 1970), aff'd, 34 A.D. 2d 917 (N.Y. App. Div. 1970) ...... 36, 43

*Jacobson v. Lee,*
  411 F. Supp. 3d 1249 (N.D. Fla. 2019), *vacated on other grounds*, *Jacobson v. Fla.
  Sec'y*, 957 F.3d 1193 (11th Cir. 2020), *vacated and opinion substituted*, 974 F.3d 1236
  (11th Cir. 2020) .................................................................38

*Kamdem-Ouaffo v. Task Mgmt. Inc.,*
  792 F. App'x 218 (3d Cir. 2019) ............................................... 50, 51

*Kautenburger v. Jackson,*
  333 P.2d 293 (Ariz. 1958) ...................................................... 43

*Mann v. Powell,*
  314 F. Supp. 677 (N.D. Ill. Dec. 5, 1969), 333 F. Supp. 1261 (N.D. Ill. 1969),
  summarily aff'd, 398 U.S. 955 (1970)............................................ *passim*

*McLain v. Meier*,
  637 F.2d 1159 (8th Cir. 1980) .......................................................... 35, 40, 41, 43
*Mullin v. Sussex Cnty., Del.*,
  861 F. Supp. 2d 411 (D. Del. 2012) ......................................................... 53
*Nelson v. Warner*,
  12 F.4th 376 (4th Cir. 2021) ......................................................................... 21
*Netsch v. Lewis*,
  344 F. Supp. 1280 (N.D. Ill. 1972) .................................................... 41, 43
*Ohio Council 8 Am. Fed'n of State v. Husted*,
  814 F.3d 329 (6th Cir. 2016) ....................................................................... 37
*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) .................................................................... 16,17
*Reynolds v. Sims*,
  377 U.S. 533 (1964) ....................................................................................... 32
*Rosen v. Brown*,
  970 F.2d 169 (6th Cir. 1992) ....................................................................... 29
*Sangmeister v. Woodward*,
  565 F.2d 460 (7th Cir. 1977) ............................................................... *passim*
*Temple Univ. v. White*,
  941 F.2d 201 (3d Cir. 1991) ......................................................................... 53
*Toll Bros. v. Twp. of Plainsboro*,
  555 F.3d 131 (3d Cir. 2009) .................................................................... 17,22
*United States v. Carolene Products Co.*,
  304 U.S. 144 (1938) ....................................................................................... 32
*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ....................................................................................... 40
*Weisberg v. Powell*,
  417 F.2d 388 (7th Cir. 1969) .......................................................... 31, 41, 43, 45
*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ....................................................................................... 32

Statutes

Article I, Section 4, Clause 1 of the Constitution ........................................ 47
*N.J.S.A.* 19:23-24 ................................................................... 21, 24, 45, 52
*N.J.S.A.* 19:23-17 ......................................................................................... 37
*N.J.S.A.* 19:49-2 ........................................................................................... 21

Rules

Fed. R. Civ. P. 65(c) ...................................................................................... 53

Scholarly articles

Brett M. Pugach, *The County Line: The Law and Politics of Ballot Positioning in New Jersey*,
  72 Rutgers U. L. Rev. 629 (2020) ............................................................... 44

iv

Laura Miller, *Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter*,
   13 N.Y.U. J. Legis. & Pub. Pol'y 373 (2010) ............................................................ 24, 30, 42
Ralph Simpson Boots, *The Direct Primary in New Jersey* 31-33 (1917)...................................... 53

## PRELIMINARY STATEMENT

A ballot must be a neutral and fair forum upon which voters select the candidate(s) of their choice. Yet, New Jersey combines all the worst elements of electioneering, unfair/unequal treatment, forced associations/punishment for non-associations, democracy inhibition, party-insider influence, political gamesmanship, voter confusion, bad ballot design, and candidate ostracization – and features them all prominently on its primary election ballot. The New Jersey primary ballot is an outlier unlike any in the remaining 49 states and the District of Columbia. It weaponizes the ballot to favor certain candidates and associations over others by providing significant structural advantages. At the same time, it also disproportionately disadvantages the electoral prospects of opposing candidates and treats otherwise similarly-situated candidates running for the same office unequally.  By attaching a penalty as a consequence for not associating with candidates running for other offices, it punishes those who exercise their right to not associate and/or forces candidates to associate with candidates running for other offices in order to try to protect their ballot position. Moreover, it does so in a haphazard and chaotic manner where the rules are never clear from the outset and change as they go. Indeed, county clerks, charged with administering this rigged system, claim to do so under the cover of unbridled discretion, even though they, as candidates, are beholden to and beneficiaries of the spoken and unspoken rules as publicly elected officials who benefit from the system.

In this manner, New Jersey's laws and practices surrounding ballot order and ballot design in primary elections, as implemented by county clerks, injure Plaintiffs' First and Fourteenth Amendment rights related to the fundamental right to vote, equal protection, and freedom of association. Neither the Defendants nor the State can articulate a legitimate state interest, let alone a state interest sufficiently weighty to justify the significant burden these laws

place on Plaintiffs' rights – a burden which must overcome a ballot advantage that is "substantively large, electorally consequential, and strongly statistically significant." Furthermore, these laws and practices, as implemented by the county clerks, violate the Elections Clause of the United States Constitution as they do not represent a valid regulation of the time, place, or manner of elections. The Verified Complaint and accompanying documents demonstrate that Plaintiffs are virtually certain to be irreparably harmed by the Defendants' conduct in the upcoming June 4, 2024 Democratic Primary Election ("Primary Election") absent relief by this Court, and that they have a substantial likelihood of success on merits so as to warrant the issuance of preliminary injunctive relief.

## **PROCEDURAL HISTORY**

On February 26, 2024 plaintiffs Andy Kim, Andy Kim for New Jersey, Sarah Schoengood, Sarah for New Jersey, Carolyn Rush, and Carolyn Rush for Congress (collectively "Plaintiffs") filed a Verified Complaint against the county clerks in 19 out of 21 counties in New Jersey, excluding Salem County and Sussex County (collectively "Defendants") in their official capacities. (Ver. Compl., hereinafter "VC".) The Verified Complaint challenges the constitutionality of various laws and practices pertaining to ballot position and placement on New Jersey's primary election ballots ("New Jersey's bracketing and ballot placement laws"). *Id.*

In addition to Defendants, Plaintiffs provided notice and a copy of all filings to the Salem and Sussex County Clerks, as well as to the Secretary of State (collectively, "Interested Parties"), as well as the Attorney General's Office since the constitutionality of New Jersey election statutes is in issue. The State Democratic and Republican committees were also noticed, along with all Democratic and Republican county political parties whose email addresses could be ascertained.

Plaintiffs now immediately file the instant application for a preliminary injunction seeking emergency relief in connection with the upcoming Primary Election.

## STATEMENT OF FACTS

Plaintiffs hereby adopt and incorporate by reference, in its entirety, the Verified Complaint, and expert reports filed on even date.[1] Plaintiffs highlight the following.

### A. Parties

Plaintiffs Andy Kim, Sarah Schoengood, and Carolyn Rush are all candidates in the upcoming 2024 Democratic Primary Election set to be held in 100 days on June 4, 2024. Kim is running for U.S. Senate; Schoengood is running in Congressional District ("CD") 2, and Rush in CD-3. Plaintiffs are also registered voters in the appropriate jurisdiction in which they are running. It is virtually certain that Plaintiffs will not be featured in the county line column of the primary election ballots in at least one county – and probably multiple ones – in the upcoming Primary Election, and that they will be otherwise be irreparably harmed as set forth below.

Defendants are 19 out of New Jersey's 21 county clerks in their respective counties (excluding Salem County and Sussex County) where one or more Plaintiffs are candidates. Their statutory duties make them each responsible for conducting a ballot draw and designing and otherwise preparing ballots in their respective counties.

### B. New Jersey's Laws Pertaining to Primary Election Ballots

For primary elections, the overwhelming majority of jurisdictions nationally use a ballot format which lists the office sought, and then immediately displays all of the candidates for that office directly underneath or to the side (hereinafter referred to as "bubble ballot" or "office

---

[1] The Verified Complaint includes key findings and analysis from the four expert reports attached thereto as Exhibits B-E. A summary of the analysis by Dr. Julia Sass Rubin and Dr. Sam Wang is set out in VC ¶¶ 105-11; by Dr. Josh Pasek is set out in VC ¶¶ 112-27; and by Dr. Andrew Appel is provided in VC ¶¶ 128-33.

block ballot"). *See* VC, ¶ 5 (with accompanying ballot image examples). Unlike these office block ballots in other states, 19 of New Jersey's 21 counties design primary election ballots with a grid of columns and rows, with one axis listing candidates and the other axis listing the office sought.[2] *Id.* (Camden ballot). The ballot is thus organized not around the *office* sought, but around bracketed groups of candidates appearing together as a group in a specific column, including, most prominently, a group of candidates endorsed by county party leadership, which is commonly referred to as the "county line" under state laws that allow certain candidates running for completely different offices to appear together in the same column ("bracketing"), with the same slogan additionally associated with their names. *Id*. at ¶¶ 3-4, 53-55.[3]

**Bracketing Process.** To bracket with candidates running for other offices, candidates must lodge requests to do so with their county clerks and obtain the approval of the other candidates with whom they seek bracketing. *Id*. at ¶¶ 60-62. Candidates who successfully bracket together will be featured in the same column with the same slogan. In practice, New Jersey primary election ballots in the 19 counties using party column ballots will feature a full or almost-full column of bracketed candidates (often including many incumbents and highly-recognizable names) for every office up and down who were endorsed by county party leadership and appear with the county slogan.[4] VC, ¶¶ 5-7, 60-62.

---

[2] For ease of reference, the word "column" will be used to identify the column *or row* where candidates are listed, regardless of whether the county clerk designs the ballots with candidates listed vertically or horizontally.

[3] Notably, the office block grid is *not* foreign to New Jersey; it is in use in two counties for mail-in and in-person ballots, and several counties implemented an office block ballot structure for their mail-in ballots for the last presidential primary election held in 2020. *Id*. at ¶ 55.

[4] Depending on the county, the endorsement leading to being featured on the county could be based on the vote of all county committee members at a convention, could be based on the vote of a select few party leaders/officeholders, and/or could be decided solely by the county party chair. County party chairs exercise tremendous influence over the process, regardless of which method is used in a particular county. VC, ¶ 14 and n. 10.

4

**Preferential Ballot Draw.** In order to determine the ballot position of various candidates, county clerks will draw for a particular office first, which includes all candidates running for that particular office. *Id.* at ¶¶ 7-8, 56-59. The office chosen by the county clerk to draw first is referred to as the "pivot point," and the initial ballot drawing for the pivot point office is referred to as the "preferential ballot draw." *Id.* at ¶¶ 7, 63-68. Once a candidate in the preferential draw gets placed on the ballot, all other candidates bracketed with such a candidate will also be automatically placed in the same column. This group of candidates are hereinafter referred to as "bracketed candidates." *Id.* at ¶ 57. Candidates who are not running for a pivot point office and/or who are not bracketed with candidates running for a pivot point office are not included in the preferential draw and are hereinafter referred to as "unbracketed candidates" or as being "not bracketed." VC, ¶ 58. Because candidates bracketed with a pivot point candidate are automatically placed in the same column, all bracketed candidates are eligible to receive – and often actually receive – the first ballot position or one further to the left (or further to the top) of the ballot than other unbracketed candidates. *Id.* at ¶¶ 7-8, 65-66.

**Non-Preferential Ballot Draw and Placement of Unbracketed Candidates.** After the preferential draw, a series of non-preferential draws take place between remaining unbracketed candidates for other offices. VC, ¶¶ 66-67. These unbracketed candidates are *identical* to bracketed ones in every other way. *See id.* at ¶¶ 10, 83. Yet, such unbracketed candidates are not eligible to receive the first ballot position, and will be placed further to the right (or further to the bottom) of the ballot than the bracketed candidates running for the same office. *Id.* at ¶¶ 8, 66-67, 83. Such unbracketed candidates are not even guaranteed the next available column after the bracketed candidates, and may be placed multiple columns away from the bracketed candidates with blank spaces in between; stacked in the same column as another candidate for the exact

same office; and/or placed in the same column as candidates with whom they did not request to bracket and who use a different ballot slogan. *Id.* at ¶ 67. Wherever located, these candidates are harder to find in these obscure places,[5] and otherwise appear to be less important or serious. *Id.* This further confuses voters and deprives candidates of a fair chance to compete for the same office. *Id.*

**Selection of Pivot Points.** County clerks typically use joint petition county candidates, such as county commissioners as the pivot point, but sometimes use United States Senator or Governor as the pivot point. *Id.* at ¶¶ 64, 69-70. Sometimes, county clerks have used President as the pivot point. *Id.* at ¶ 72. Which office is used as the pivot point by a particular county clerk is based on varying and inconsistent interpretations and standards, not announced to the public until the deadlines for petitions bracketing requests have already passed. VC, ¶¶ 75-76, 177-78. Nor do county clerks publish practices or standards for ballot design. *Id.*

### C. Weight of the Line, Primacy Effect, and Disadvantages to Unbracketed Candidates

Dr. Julia Sass Rubin, Dr. Samuel S.-H. Wang, and Dr. Josh Pasek provided expert reports reviewing data and survey results from New Jersey-specific past and upcoming elections, and explaining how features of New Jersey's unique primary election ballot design can confuse voters[6] and provide heuristics taking advantage of cognitive biases which impact voter behavior and nudge voters to select the bracketed candidates featured on the county line based on the

---

[5] The New Jersey election community refers to unbracketed candidates placed in particularly remote ballot positions as being relegated to "Ballot Siberia."

[6] Dr. Rubin and Dr. Pasek provide examples from the 2020 Democratic Primary election where (a) congressional opponents Christine Conforti and Stephanie Schmid were both featured on the county line even though only one seat was up for election, leading to almost 1/3 of votes in the Second Congressional District in Mercer County being disqualified due to overvoting, and (b) extremely large and disproportionate undervotes for U.S. Senate candidates in Atlantic County where Cory Booker chose to bracket off the county like with Brigid Harrison, leaving no Senate candidate on the county line. *See* VC, Exh. B, Pasek Report, ¶ 109; Exh. C, Rubin Report at 8-9; *see also* VC, ¶¶ 89-91.

visual display of the ballot and candidate placement. Among others, these include (a) the weight of line; (b) the primacy effect; (c) disadvantages to unbracketed candidates, including exclusion from the preferential ballot draw; (d) ballot gaps between candidates running for the same office/Ballot Siberia; and (e) being featured in a column by themselves or being stacked in a column with candidates with whom they do not want to associate.

The experts found that the "weight of the line," i.e., placing a full or almost full slate of party-endorsed candidates in a single column, with opponents in less full columns or columns by themselves, encourages voters to focus on the county line candidates and "simply proceed down the column . . . even when they do have a meaningful preference between the candidates." VC, ¶ 116; *see also id*. at ¶ 113. In a study of 45 federal primaries in New Jersey from 2002 to 2022 where a candidate was featured in the county line in at least one county and their opponent was on the county line in at least one other county demonstrates there was, on average, a <u>38% difference in performance for candidates when they were on the county line versus when their opponents were on the county line</u>. *Id*. at ¶ 105. These differences were found by Dr. Wang to be highly statistically significant, with the probability of this occurring by chance being "less than 1 in 1 quintillion."[7] *Id*. at ¶ 106.

---

[7] Dr. Rubin and Dr. Wang also conducted an analysis on New Jersey state legislative races finding that incumbents on the county line almost never lost contested primaries (1.4%), yet incumbents who were not featured on the county line in at least one county lost over half of their elections (52.6%), a 38-times greater loss rate. VC, ¶¶ 107-08. The loss rates for NJ incumbent state legislators who were featured on the county line in all the counties was 11 times lower than the loss rate for incumbent state legislators across the county in the last 14 years. *Id*. A state legislative incumbent running off the line in all of the counties in their district has not won a primary election in New Jersey in the last 16 years. *Id*. In a separate analysis, Dr. Rubin previously found that "only two congressional incumbents have lost a primary in New Jersey in the last fifty years," and in both instances, "they lost to incumbents, following redistricting that eliminated one of their districts," and in both of those instances, "the incumbent who won the primary had also received the party endorsement and the county line in the county that decided the election." Julia Sass Rubin, *Does the County Line Matter? An analysis of New Jersey's 2020*

Dr. Pasek also conducted a New Jersey-specific experimental study tied to the upcoming 2024 Democratic Primary Election, which examined the impact of the weight of the line and other ballot features, by varying/randomizing the position of senate and congressional declared candidates in various columns on hypothetical ballots. VC, ¶ 118. He found that, on average, the Senate or House candidate's performance improved by 24.7% when they were featured on the county line, over-doubling their share of the vote when they were not on the county line. *Id*. at ¶ 119. In all three contests studied, the county line benefit was "consistently present,"[8] having "aided every candidate in every contest," improving "their vote shares by between 6.7 and 38.2 percentage points depending on the candidate and contest." *Id*. Based on the results of the races studied for Senate and House candidates, these differences between a candidate or their opponent being on the line consistently impacted election results, sometimes rendering otherwise unviable candidates viable, and at times being outcome determinative in deciding the winner. *Id*. at ¶ 127.

The experts also reviewed a well-known phenomenon – the primacy effect – whereby a candidate who receives the first ballot position obtains more votes simply because they are listed first. Dr. Pasek explained that New Jersey was especially susceptible to primacy biases given its unique ballot placement rules and given that primacy benefits are generally larger in primary elections as compared to general elections. *Id*. at ¶¶ 113-14. He explained how being listed in an earlier position on the ballot gives a candidate an advantage, and thus, per New Jersey ballot

---

*Primary Election Results*, New Jersey Policy Perspective (August 2020), https://njpppprevious.wpengine.com/wp-content/uploads/2020/08/NJPP-Report-Does-the-County-Line-Matter-Analysis-of-New-Jerseys-2020-Primary-Election-Results-Final-1.pdf).

[8] By contrast, Dr. Pasek found that the county slogan alone on an office block ballot (without the county line) was not consistently present, and differed both quantitatively and qualitatively from the effect of the county line, clearly demonstrating that such effects are separate and distinct, and not simply synonymous with one another. VC, ¶ 122. Moreover, in their review of past NJ elections for Governor, U.S. Senate, and U.S. House of Representatives in the last ten year, Dr. Rubin and Dr. Wang found that on average, the benefit of the county line was over double-digit percentage points higher than just the endorsement (but not the county line). *Id*. at ¶ 109-10.

draw practices, rewards candidates who bracket with candidates running for a pivot point office, and thus can be eligible for first or better ballot position generally. *Id*. Doing so "can be expected to deliver a material benefit for candidates," namely, "extra votes due to the primacy effect." VC, ¶ 113. Dr. Pasek concluded that the primacy biases in New Jersey primary ballots are "extremely likely to constitute a substantial bias in New Jersey primary elections," and "will always negatively impact candidates who do not bracket with a candidate for the pivot-point positions." *Id*. at ¶ 114.

These conclusions were consistent with the results of his New Jersey-specific study where he found that "all [House and Senate] candidates on party-column ballots performed better when listed in the leftmost available position, [by a range of] 3.9 percentage points to 27.8 percentage points across candidates," seeing an average improvement in their performance of 18.9% over when they were not listed first.[9] *Id*. at 122. These effects - primacy plus weight of the line "stack, that is that first position benefits and the weight of the line appear to reinforce one another, yielding even larger benefits when they are presented together."[10] *Id*. at ¶ 124. Primacy benefits were also found to be stronger on party-column ballots than office block ballots. *Id*. at 123.

Unbracketed candidates are subject to even further disadvantages. Bracketed candidates are always eligible for first ballot position, whereas unbracketed candidates pursuing any office

---

[9] Even among only bracketed congressional candidates (not including those in a column by themselves), the earlier listed candidate received an 8.2% and 11.1% benefit over chance and 16.5% and 22.2% benefit over later-listed candidates in CD-7 and CD-8 respectively.

[10] Even further exacerbating the combined effect of the county line/weight of the line and primacy, Dr. Pasek examined NJ contested statewide (U.S. Senate and Governor) primary elections in 2020 and 2021 and found that county clerks were placing the county line candidates in the first column of the ballot "far more frequently than it should have been if the placement rules (based on a random draw of Senate or Gubernatorial candidates) were being followed as expected," which "suggest that at least some county clerks are willing to manipulate the rules to place the county line first and that they do indeed see first position as beneficial."

other than the pivot-point office are always excluded from the preferential draw, and thus have no chance to obtain the first ballot position. Unbracketed candidates are often relegated to more obscure portions of the ballot, where they are listed all by themselves or may be stacked in a column with other candidates, with whom they do not want to associate. *Id.* at ¶¶ 144; *see also id.* at ¶¶ 8, 63-67.

Overall, Dr. Pasek concluded that the weight of the line and the privileged ballot position of those candidates "strongly nudge[s voters] toward selecting" candidates on the county line who receive an "enormous handicap" due to ballot design. VC, ¶ 127. In his expert opinion, there is "every reason to expect the benefit conferred by New Jersey's primary ballot design will be present in the upcoming June 4th primary election," and even in situations of the line candidate winning by double digit margins, it has the potential to have been outcome determinative. *Id.* Likewise, Dr. Wang concluded that New Jersey primary ballots' features of the weight of the line, blank spaces on the ballot, and an extreme version of the primacy effect impact voter behavior "in ways that do not allow equal treatment of all candidates," and act "as a powerful force to steer voter behavior toward choices made by the county party chair." *Id.* at ¶ 111.

**D.  Forced Association**

Due to the advantages of bracketing and the disadvantages of not bracketing, candidates are thrust into a system where they have to engage in gamesmanship whereby they are presented with a Hobson's choice: to protect their ballot position, they can associate with candidates, through bracketing, with whom they would not want to associate; or they can decide to not associate with such candidates and thereby subject themselves to a barrage of ballot disadvantages and unequal treatment. VC, ¶ 201. Those who, by virtue of the realities of having to compete in a rigged system, force themselves to associate with candidates running for other

offices that include a pivot point candidate will be rewarded with preferential treatment, and those who exercise their right not to associate will be punished in the variety of ways in which unbracketed candidates are disadvantaged, as set forth above. *Id.*

Dr. Pasek's proofs show how ballot design in New Jersey incentivizes bracketing with as many candidates as possible to protect their ballot position given uncertainty as to pivot point offices being used by county clerks and to mitigate against ballot gaps, placement in Ballot Siberia, and being stacked in columns with candidates with whom they do not want to associate. *Id.* at ¶¶ 113-14. Even for candidates who will not be featured on the county line, Dr. Pasek found a strong incentive for bracketing given that his study results found that when congressional candidates were bracketed with a U.S. Senate candidate, they received an average bump of 12.7% over when those same candidates were unbracketed. *Id.* at 126. These incentives to bracket based on ballot advantages exist "regardless of whether candidates who share a bracket occupy similar factions of the party or whether they share similar views on issues," and serve "the purpose of jockeying for position rather than merely for demonstrating some underlying commonality." *Id.* at ¶ 114. Such incentives will always be present, since bracketed candidates will always have preferential ballot position whereas unbracketed candidates "will always [be] negatively impact[ed]." *Id.*

Unlike bracketed candidates, who are all featured with candidates with whom they requested to bracket, unbracketed candidates are often featured in a column with other candidates with whom they do not wish to associate. VC, ¶¶ 8, 67, 204. Even candidates who choose to bracket with candidates running for certain other offices can be excluded from preferential ballot treatment if the county clerk decides to use a different office as the pivot point, thereby favoring some candidate associations over others. *See id.* at ¶ 207. Plaintiffs are virtually certain to be

injured in the upcoming Primary Election by governmental punishment of the exercise of their right to not associate with a diminution in their chance to succeed in their election and by otherwise requiring them to associate with candidates for other offices in order to protect their ballot position.

Plaintiffs are further injured by being forced to engage in an arbitrary system of gamesmanship. *Id.* at ¶ 202. Indeed, candidates' ballot fate is subject to the discretion of county clerks who themselves run for office and often are beneficiaries of the county line. *Id.* at ¶¶ 59, 73-76. The rules of the game are never revealed and change as they go. *Id.* at ¶ 177. Candidates must seek and associate with candidates up and down the ballot to increase their likelihood of success. *See* VC, ¶ 114. If they do not engage in this game, then their association may be forced anyway with candidates they have nothing in common with and whom they may even oppose. *Id.* at ¶¶ 8, 67, 204. They will also have to contend with all ballot design features described above. Regardless of their exact eventual ballot position in each county, Plaintiffs are forced to participate in a rigged system that is manipulated and designed to favor certain candidates and party insiders over others. *Id.* at ¶¶ 202, 221.

**E.  Ballot Position of Candidates**

Each of the Plaintiffs has a commonality in that they are forced to engage in a state-sanctioned rigged system of gamesmanship which treats them unequally in comparison to otherwise similarly-situated candidates. In connection with the upcoming Primary Election, each of the Plaintiffs will not be featured in the county line (while one of their opponents will) in certain counties within the jurisdiction of their office, and thus it is virtually certain that they will suffer a substantial disadvantage or "enormous handicap." *See* VC, ¶¶ 145-49, 152-53, 161-62. The Plaintiffs running for United States House of Representatives will also have their ballot

position impacted by bracketing. For example, Schoengood will not be bracketed with a U.S. Senate candidate in certain counties, and will be excluded from the preferential ballot draw, and thus will not be among the candidates eligible to participate in the random draw for first position on the ballot, making it virtually certain that she will be disadvantaged from her bracketed opponents with respect to the primacy effect. *Id.* at ¶¶ 154-55. It is also virtually certain that in some counties within the district, she will be placed either (a) in a column further to the right (or a row further to the bottom) of her bracketed opponents; (b) and/or stacked in a column with other candidates running for the same or other offices with whom she did not bracket. *Id.* at ¶ 156. In contrast, it is virtually certain that in some counties within the district, at least one of her respective opponents will be featured on the county line with a virtually full slate of candidates, will have a chance at first ballot position, and will be featured in a column closer to the left (or closer to the top). *See id.* at ¶¶ 145-49, 152-53, 161-62. Additional detail relevant to each Plaintiff is further provided below.

1. <u>Andy Kim</u>

Several county Democratic parties have already officially endorsed (and thus, in practice, awarded the county line to) one of Andy Kim's opponents, Tammy Murphy, for United States Senator for the upcoming Primary Election: VC, p. 11 n.9.[11] Therefore, Andy Kim will not be on the county line, and thus is at a substantial electoral disadvantage compared to one of his opponents. *Id.* at ¶¶ 145-48. Additionally, various Democratic county party chairs have already officially endorsed one of Andy Kim's opponents, Tammy Murphy. *Id.* at p. 11 n.9 & *supra* n.11. These county chairs have extraordinary influence over the party's official endorsement and

---

[11] *See also* Joey Fox, *The New Jersey Globe 2024 House and Senate Endorsement Tracker*, N.J. GLOBE (Dec. 19, 2023, last updated Feb. 26, 2024), https://newjerseyglobe.com/congress/the-new-jersey-globe-2024-house-and-senate-endorsement-tracker/ (last accessed Feb. 26, 2024).

awarding of the county line, and in some instances, are the sole decision-maker. *See id.* at ¶¶ 13-14. In those counties too, there is every reason to believe that Andy Kim will not be featured on the county line and will be at a substantial electoral disadvantage. *Id.* at ¶¶ 145-48. The same is true for *any* county where he will not be featured on the county line.

In any county where Andy Kim is not featured on the county line, he will need to decide whether to bracket with candidates for other offices to avoid appearing in a column by himself and mitigate against the visual effect of the county line, or exercise his First Amendment right to not associate. VC, ¶ 149-50. Regardless of his ultimate selection, his associational and/or rights to equal protection/treatment of candidates will be injured. *Id.*

2.  Sarah Schoengood

CD-3 comprises portions of Monmouth, Burlington, and Mercer Counties. *Id.* at ¶ 151. Sarah Schoengood declared her candidacy on January 21, 2024, four-and-half months before the primary elections, but two days after the Monmouth County Democratic Committee's internal deadline for filing an intent to seek endorsement at the Monmouth County Democratic Convention. *Id.* at ¶ 152. She was thus prevented from seeking the endorsement, and therefore will not be featured on the Monmouth County line. *Id.* Her opponent, Herb Conaway won the endorsement and will be featured on the county line. *Id.* Thus, it is virtually certain that she will be at a substantial electoral disadvantage compared to one of her opponents. VC, ¶ 152. The same is true for any county where she will not be featured on the county line, including Burlington, where Conaway already won the endorsement at the convention. *Id.* at ¶ 153.

Furthermore, Sarah Schoengood believes that, among the candidates for United States Senator, she is most ideologically aligned with Andy Kim, and she does not intend to entertain bracketing requests to/from other U.S. Senate candidates since she does not share their ideology

on important issues and would not want voters to associate their policies with her campaign. *Id.* at ¶ 154. Thus, in counties like Monmouth and Burlington, where Andy Kim will be featured on the county line and where she will not, it is virtually certain that Sarah Schoengood will suffer a significant electoral disadvantage simply because she is choosing not to associate with a candidate for the pivot point office. *Id.* She is virtually certain to suffer all the same ballot design disadvantages described above, and will be vulnerable to be placed with ballot gaps in between her bracketed opponents or otherwise put in an unfavorable position, including in a column far to the right of the ballot. *Id.* at ¶¶ 155-56.

Even if there is a county where Andy Kim is not featured on the county line, leaving Schoengood with a potential to bracket with him off-line, she will still be forced to decide between foregoing the ballot advantages of bracketing and needlessly hitching her wagon to the ups and down of a Senate campaign, and there is no guarantee that Andy Kim would even accept such a bracketing request. VC, ¶ 157. Regardless of Schoengood's ultimate selection, her associational and/or rights to equal protection/treatment of candidates will be injured because of the Hobson's choice imposed on her associational rights by the ballot design laws. *Id.*

3.  Carolyn Rush

CD-2 comprises all of Atlantic, Cape May, Cumberland, and Salem Counties, and portions of Gloucester and Ocean Counties. *Id.* at ¶ 158. While Salem County does not have a party column ballot featuring a county line, the other five counties do. *Id.* Rush ran for the same seat in the 2022 Democratic Primary election, where one of her opponents was Tim Alexander, who is also one of her opponents in connection with the upcoming Primary Election, and in four

of the five counties with party-column ballots, Rush did not receive the line, nor bracket with any other candidates.[12] *Id.* at ¶ 159.

After declaring her candidacy for the upcoming 2024 Democratic Primary election, the Atlantic County Chair has already publicly stated that he "doubt[s that Rush] "is going to be our candidate," and that "[Tim] Alexander would also be a good candidate again." VC, ¶ 161. He also demanded an apology for comments that Rush made declaring that he influenced other county chairs to support Tim Alexander in 2022. *Id.* Thus, in 2024, there is every reason to believe that Carolyn Rush will not be featured on the county line at least in Atlantic and likely elsewhere, and will be at a substantial electoral disadvantage compared to at least one of her opponents. *Id.* at ¶ 162. Rush therefore faces the same concerns for off-line candidates set forth above, and must engage in the same bracketing decision making calculus set forth above, pitting her associational rights against equal treatment on the ballot. *Id.* at ¶¶ 162-63.

## STANDARD OF REVIEW

A plaintiff seeking preliminary injunctive relief must show (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief. *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (citations omitted). A "district court — in its sound discretion — should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Reilly v. City of Harrisburg,* 858 F.3d 173, 176 (3d Cir. 2017).

---

[12] In 2022, in Gloucester County, both Rush and Alexander were stacked together in the same column, on the county line, even though it was only vote for one. She won that county by over 20%, but lost the race overall. *Id.* at ¶ 160.

## LEGAL ARGUMENT

### I.   ALL PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

For purposes of analyzing a preliminary injunction, "likelihood of success" does not necessarily mean a standard of "more likely than not" but rather that the plaintiff "can win on the merits (which requires a showing of significantly better than negligible. . . )." *Reilly,* 858 F.3d at 179 (3d Cir. 2017). Plaintiffs now demonstrate that they have shown at least that they can ultimately win, and that their chances of prevailing are substantially better than negligible.

#### A.   Plaintiffs have Standing to Bring this Case.

To establish standing, plaintiffs must demonstrate (1) that they suffered an injury-in-fact, (2) that the injury is fairly traceable to defendants' conduct," and (3) that the injury will likely be redressed by a favorable decision." *Adam v. Barone*, 41 F.4th 230, 233-34 (3d Cir. 2022) (citations omitted). "Injury-in-fact" means the invasion of a legally protected interest, that the harm is concrete and particularized to plaintiffs, and that plaintiffs actually suffered or are imminently going to suffer that harm. *Id.* at 234 (emphasis added, citation omitted). Traceability means showing "but-for causation" between the defendant's act and the harm suffered or about to be suffered. *Id.* at 235. Finally, redressability means that an order from the court granting the requested relief would have a "substantial likelihood that the requested relief will remedy the alleged injury." *Toll Bros. v. Twp. of Plainsboro*, 555 F.3d 131 (3d Cir. 2009).

**Plaintiffs Are Suffering and Will Imminently Suffer an Injury-In-Fact Absent Relief by this Court.** As set forth in the Verified Complaint, the accompanying documents, and this brief, Plaintiffs will each suffer a "concrete and particularized" injury in connection with the upcoming Democratic Primary Election and their ballot placement. They will experience harm to their electoral chances, and an inability to compete on an equal footing, with a resultant

diminution in the chance of winning. All of the ballot design features described above will cause an injury that is virtually certain to occur, based on the commonly known understanding of how the ballot design system operates (*See* VC, Exh. F), which is now expertly-proven with quantitative and qualitative analysis (*See* VC, Exhs. B-E), and will be carried out, absent relief by this Court. Further, Plaintiffs are already being subjected to harm by being forced to campaign in a rigged ballot design system, and will be subjected to unconstitutional compelled association carried out by forcing them to either associate with candidates already running for other offices, or recruit such candidates, or forego a fair chance at obtaining the first ballot position, and risk further substantial ballot disadvantages and being stacked in the same column as candidates running for the same or other offices with whom they do not want to associate. The result: being featured in a column by oneself or being stacked in the same column with candidates with whom they did not request to bracket, are the only two possible inevitable fates for any unbracketed candidates.

For example, it is virtually certain that, at a bare minimum, at least in one county, Plaintiffs Kim, Schoengood and Rush will not be on the county line, yet one of their opponents will. Thus, their opponents will be subject to a substantial ballot advantage, which in past elections has been found to confer, on average, a 38% advantage (VC, ¶ 105), and which in a recent study on the upcoming Primary Election was found to confer, on average a 24.7% advantage (VC, ¶ 119), thereby providing an "enormous handicap" that benefits Plaintiffs' opponents (VC, ¶ 127). ***Imagine having to campaign in such a rigged system that your opponent gets a head start while you get tripped at the starting line.***

Similarly, it is virtually certain that, at a bare minimum, at least in some counties, candidates like Schoengood will not be bracketed on the county line with a U.S. Senate

candidate, and thus will be excluded from the preferential ballot draw, and therefore will be placed in columns further to the right (or bottom) of the ballot than their respective bracketed opponents. In Dr. Pasek's recent New Jersey study on the upcoming primary, candidates listed first on the ballot saw, on average, an 18.9% improvement in vote share. VC, ¶ 122. By exercising their right to not associate, they will not be treated equally as compared to similarly situated candidates running for the same office, and will experience the disadvantages described above.

Finally, all Plaintiffs have been harmed, are being harmed, and will continue to be harmed by having to participate in a primary election ballot system that rewards bracketing with candidates for other offices (and especially a pivot point office) and punishes those who exercise their right to not associate, pitting equal protection and associational rights against one another in the ways described above. They are being forced to decide between important constitutional rights and engage in gamesmanship with respect to bracketing and thus associating with other candidates for other offices on the ballot. They do not want to have to associate with candidates running for other offices who may have different policy positions, but are forced to consider bracketing in order to mitigate against the ballot and electoral advantages their opponents might otherwise have resulting from a governmental thumb on the scale placed in favor county line and other bracketed candidates, as well as the additional ballot and electoral consequences attached to exercising the right to not associate. Regardless of whether or with whom they might ultimately bracket, their associational and/or equal protection rights will be inevitably violated, let alone the harm to their chances of winning.

These numerous current and imminent injuries stemming from the ballot placement and positioning by the Defendants will harm the electoral prospects of these candidates, impairing

their ability to compete on equal footing with other candidates running for the exact same office, and violating their rights under the First and Fourteenth Amendments, as well as the rights of the voters who support them.

Many federal courts have found candidates to have standing even when the alleged harm was due only to the primacy effect alone, and thus even without the various additional and substantial harms found in New Jersey's ballot placement system. *See, e.g.*, *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. Dec. 5, 1969) (opinion and interlocutory order), 333 F. Supp. 1261 (N.D. Ill. Dec. 30, 1969) (opinion and final order), *summarily aff'd*, 398 U.S. 955 (1970). In *Mann*, the court enjoined a discriminatory manner of breaking ties to determine the order of candidates' names for primary ballot placement, mandating that the defendants use "nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballot." *Id*. Notably, *Mann* considered and rejected a challenge to the plaintiff-candidates' standing, which contended they lacked standing because election administrators had not yet certified and allocated official, final ballot positions. 333 F. Supp. at 1265. The court acknowledged, "the injury to candidates as a result of such action may be severe." *Id*. It added that even though some plaintiffs may ultimately get the preferred ballot placement, their standing does not depend on whether they were *actually* treated unfairly but upon the possibility they would experience unconstitutional discriminatory treatment. *Id*. (citation omitted) ("we agree, that the order of listing candidates' names on the ballot can affect the outcome of an election, and that candidates have a right to equal protection in the allocation of ballot positions").

Like in *Mann*, here Plaintiffs are subjected to a statute that threatens them with violations of their constitutional rights to equal opportunity for priority ballot positions and other

constitutional violations. Moreover, in a recent case alleging the same constitutional theories and harms, the plaintiffs there were found to have set forth sufficient allegations that they suffered an injury-in-fact. *See Conforti v. Hanlon*, Docket No. 20-08267-ZNQ-TJB, 2022 WL 1744774, at *7 (D.N.J. May 31, 2022) (collecting federal court decisions in various jurisdictions where, in the context of harm from the primacy effect alone, the plaintiffs were found to suffer an injury-in-fact so as to establish standing due to the loss of the chance at first position and the benefits it affords). Furthermore, here Plaintiffs' imminent injuries also include harms stemming from the weight of the line and other wrongful ballot design practices including injury to associational rights. Any one of the multiple harms set forth above suffices, as does their totality.

**Plaintiffs' Injuries are Fairly Traceable to the Defendants.** In ballot order cases, federal courts considering this issue have found that the types of injuries at issue here, related to ballot position and design of the ballot, are fairly traceable to the election officials in the state who are statutorily responsible for ballot design and ordering candidates on the ballot. *See, e.g.*, *Nelson v. Warner*, 12 F.4th 376, 385 (4th Cir. 2021).

All of Plaintiffs' various injuries are the product of ballot design and ballot positioning. New Jersey law vests responsibility over ballot design and ballot ordering with the county clerks and not some other official. *See N.J.S.A.* 19:49-2; *N.J.S.A.* 19:23-24. In fact, *N.J.S.A.* 19:49-2 explicitly states that "the order of the precedence and arrangement of parties and of candidates," are fully in the hands of "the county clerk [who] shall have the authority to determine the specifications for, and the final arrangement of, the official ballots." And *N.J.S.A.* 19:23-24 provides that "[t]he position which the candidates and bracketed groups of names of candidates for the primary election for the general election shall have upon the ballots used for the primary election . . . shall be determined by the county clerks in their respective counties . . . ." *Id.* Thus,

the alleged injuries are fairly traceable to the county clerks because they have statutory direct control over ballot design and ballot ordering of candidates.

**Plaintiffs' Injuries are Likely to be Redressed by a Favorable Decision Against Defendants.** For similar reasons, Plaintiffs' injuries are likely to be redressed by a favorable decision for them. *Toll Bros.*, 555 F.3d at 143 ("[t]his requirement [redressability] is "closely related" to traceability, and the two prongs often overlap"). As set forth above, county clerks are statutorily responsible for designing the ballot and ordering candidates' names on the ballots. Therefore, declaratory and injunctive relief to prevent them from carrying out unconstitutional provisions of the bracketing and ballot placement laws will redress plaintiffs' injuries.

**B.** **Plaintiffs have demonstrated they can win on the merits of their First and Fourteenth Amendment claims, and the chances of prevailing are significantly better than negligible.**

Plaintiffs' First and Fourteenth Amendment claims are governed by the *Anderson/Burdick* balancing test applied in voting rights cases challenging the constitutionality of state laws. In *Conforti*, Judge Quraishi ably described the framework of the test. At bottom, the severity of the burdens of laws injuring electoral participants is assessed and then balanced against the state interests pled and proven to justify those interests. 2022 WL 1744774, at *15-17. New Jersey's bracketing and ballot placement laws place a substantial and meaningful burden on Plaintiffs' rights, including with respect to the upcoming Primary Election. Specific features of New Jersey bracketing and ballot placement laws and practice warrant the application of strict scrutiny, based on the severity of the individual burdens as well as the totality of all the burdens. Furthermore, Defendants cannot articulate a legitimate state interest furthered by this primary election ballot scheme, and therefore New Jersey's ballot design system should not even survive a rational basis analysis. Even to the extent Defendants articulate and prove some

generalized state interest that is legitimate, none is sufficiently necessary to outweigh the burdens imposed on Plaintiffs.

**1. The Substantial and Meaningful Burden on Plaintiffs**

Based on the allegations in the Complaint, and the proofs of those allegations drawn from the expert reports, New Jersey's bracketing and ballot placement laws place a substantial and meaningful burden on Plaintiffs' rights.

**Ordering of Candidate Names.** Due to the primacy effect/name order effect, candidates listed first on the ballot receive additional votes solely because they are listed first. New Jersey's bracketing and ballot placement laws award certain anointed candidates with first ballot position. In particular, county clerks conduct ballot draws that do not include every candidate running for the same office, in the same draw as against each other, where each would have an equal chance to obtain the first ballot position. Nor do they rotate candidate names to more evenly distribute the number of times each candidate is listed first. Instead, the county clerks draw for ballot position based on a pivot point office to use for the preferential draw. Once the candidates for that particular office are drawn, all candidates running for other offices who are bracketed with candidates for the pivot point office are automatically placed on the ballot in the appropriate column, with all such bracketed candidates featured together in the same column with the same slogan. Thus, candidates bracketed with a candidate running for a pivot point office, and only those candidates, are eligible to be included in a drawing where they have a chance to receive the first ballot position and its resulting benefits. By contrast, any candidate running for a different office that is not bracketed with a candidate for the pivot point office chosen by the county clerk suffers the precise opposite, which means for them a state-sponsored *dis*advantage for electoral success.

The large benefits of this ordering effect, which are especially acute in primary elections, have been canvassed above in the explanations of Dr. Wang's, Dr. Rubin's, and Dr. Pasek's reports. In Dr. Pasek's study focused specifically on the upcoming 2024 Democratic Primary Election, Senate and House candidates, on average, saw an 18.9% improvement when listed first compared to later-listed positions on a party column ballot. VC, ¶ 122. The additional impact of the primacy effect in primary elections alone warrants additional scrutiny. *See* Laura Miller, Note, *Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter*, 13 N.Y.U. J. LEGIS. & PUB. POL'Y 373, 375-76 (2010).

**The Weight of the Line.** The way party-endorsed candidates are displayed by county clerks and corresponding substantial benefit of the weight of the line influence voters to vote for the party-endorsed candidates over others. New Jersey's primary election ballot will inevitably feature a county line displayed as a single column consisting of various party-endorsed candidates running for all or virtually all offices. These candidates are featured together on the ballot with the same slogan, usually in the left-most column or close thereto, headed by highly-recognizable top-of-the-ticket candidates that lend weight and legitimacy to down-ballot candidates through the weight of the line. Even without candidates with high name recognition, the visual cue that arises from a solid line of candidates guides a voter's eye in a way that favors candidates found in that line. All their opponents have to compete against the weight of the line, and their unbracketed opponents must also contend with other bad ballot design features such as placing candidates multiple columns away from their opponents running for the same office with only blank spaces between them; the visual cue provided by a ballot column which contains candidates running for all offices, arbitrarily grouping together in the same column candidates that are running for different offices; and featuring candidates in a column by themselves. The

weight of the line encourages voters to focus on the county line candidates and "simply proceed down the column . . . even when they do have a meaningful preference between the candidates." VC, ¶ 116.

The advantages of the weight of the line and ballot placement for candidates featured on the county line are substantial and provide an "enormous handicap." *Id.* at ¶ 127. Dr. Rubin's review of congressional and senatorial primaries in New Jersey primary elections from the past 20 years found an average of a 38% difference in vote share when candidates were on the county line, versus when their opponents were. Similarly, in Dr. Pasek's study focused specifically on the upcoming 2024 Democratic Primary Election, Senate and House candidates, on average, over-doubled their vote share when on the county line compared to when one of their opponents were on the county line, improving their performance, on average, by 24.7%. The benefit of being featured on the county line was found to be "consistently present," *id.* at ¶ 119, and benefited every candidate in all of the races included in the study. These impacts consistently altered election results, altered the viability or chances of a candidate's success, and in some instances were outcome determinative.[13] The weight of the line strongly nudges voters to vote for candidates on the county line, and there is "every reason to expect the benefit conferred by New Jersey's primary ballot design will be present in the upcoming June 4ᵗʰ primary election." *Id.* at ¶ 127.

**Other Ballot Disadvantages for Unbracketed Candidates.** In addition to being excluded from even a chance of obtaining the first ballot position, being placed further to the right (or bottom) of the ballot, and having to compete against the weight of the line, unbracketed

---

[13] *See* VC, ¶ 127. It is not necessary to show that the winner and loser of an election changed as a result of the New Jersey's primary election ballot design in order to prevail under *Anderson/Burdick*. Nevertheless, the potential to change electoral outcomes heightens both the character and magnitude of the burden, and militates strongly in favor of strict scrutiny.

candidates are subject to even further disadvantages: they are also not automatically placed in the next available column after their bracketed opponents are listed. Indeed county clerks have routinely separated unbracketed candidates from their bracketed opponents running for the same office with one or more blank spaces on the ballot, including relegating candidates to obscure "Ballot Siberia" places. Additionally, they will be either (1) placed in a column all by themselves, compared to their opponent listed on the county line with a full slate of candidates; and/or (2) stacked in a column with candidates for the same or other offices with whom they do not want to be associated. Even as compared to other bracketed candidates who were not featured on the county line, Dr. Pasek found in his experimental study of upcoming Senate and House that when congressional candidates were displayed as bracketed with a U.S. Senate candidate, they received an average bump of 12.7% over when those same candidates were displayed as unbracketed. VC, ¶ 126.

**Burdens on Associational Rights.** In addition to the above harms, New Jersey's bracketing and ballot placement laws also burden fundamental associational rights. The Supreme Court has recognized that a critical component of the freedom to associate is the corresponding right to not associate. *See, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). New Jersey's bracketing and ballot placement laws, as implemented and carried out by the county clerks in designing primary ballots, significantly burden candidates' freedom to not associate in a variety of ways, including by forcing candidates to associate and/or by attaching a punishment to certain candidates who do not associate with candidates running for other offices.

Indeed, every candidate running in a primary is faced with an unconstitutional Hobson's choice. They can choose to bracket with candidates running for other offices with whom they do not want to associate, and hopefully protect their chances at a better ballot position. Or they can

exercise their right to not associate with candidates running for other offices and be punished with a barrage of ballot disadvantages and unequal treatment. This Scylla-or-Charybdis choice pits the right of association against equal protection rights, needlessly forcing candidates to sacrifice one or the other. If a candidate chooses the former, they will be forced to bracket with candidates running for other offices with whom they may not want to associate, violating their First Amendment right to not associate. If they choose the latter, they will not be treated equally as compared to other candidates running for the same office and will lose a favorable (or even neutral) place on the ballot, in violation of their Equal Protection and other fundamental rights under the First and Fourteenth Amendments.[14]

Here via state law and practices surrounding the ballot, as implemented by county clerks, the government is attaching a punishment and/or a penalty to a candidate's decision not to associate *on the ballot itself*. This penalty harms candidates' electoral prospects and fails to treat them the same as similarly situated candidates running for the same office. Regardless of whether it is viewed as an advantage for forfeiting their right to not associate or as a disadvantage for exercising their right to not associate, candidates' rights have been and will continue to be violated – by the government – in every primary election.

**The combined effects of ordering names, the weight of the line, other ballot-based disadvantages, and the burden on associational rights impose severe burdens.** Viewed in their totality, and in light of Plaintiffs' expert evidence, strict scrutiny is warranted under the *Anderson/Burdick* balancing test. Under that test, when election laws impose "severe restrictions" to First and Fourteenth Amendment rights, then they should be subject to strict

---

[14]   More, past New Jersey ballots have demonstrated that the cumulative poor ballot design features have forced otherwise unaffiliated candidates to associate on the same line, even if they share different slogans, adding to voter confusion and forced association. *See infra* p. 39.

scrutiny, and must be narrowly tailored to support a compelling state interest. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). There are numerous specific features of New Jersey's bracketing and ballot placement laws that warrant strict scrutiny.

First, the magnitude of the burdens from the various state-conferred ballot advantages are consistent, substantial, and provide favored candidates with an "enormous handicap." *See* VC, ¶ 127. Dr. Pasek's and Dr. Rubin's findings, summarized above, show that in past and upcoming elections, candidates on the county line obtain oversize advantages from being on the county line, from being listed in first position, or both (and the effects are even greater when combined). Dr. Pasek further found that the "substantial bias" for the primacy effect in New Jersey primaries "will always negatively impact candidates who do not bracket with a candidate for the pivot-point positions," *id.* at ¶ 114, (as is true of the plaintiffs here, in at least one county). These benefits conferred on a specific, select group are substantial and are neither neutral nor nondiscriminatory.

Second, in addition to altering vote totals and <u>percentages</u>, these effects also affect election <u>outcomes</u>. Dr. Pasek's survey found the observed effects from the various poor ballot design features were often larger than the margin of victory between candidates and larger than the margin of victory in many recent statewide elections. *Id.* at 120. It was also larger than the margin of victory between the two leading U.S. Senate candidates (Andy Kim and Tammy Murphy) in the most recent independent poll. The effects are so large that candidates and the public can reasonably question whether a candidate winning by double-digit margins would have won if a different ballot design was used. *See id.* at ¶ 127. ***A government-conferred benefit yielding this level of electoral advantages is radical and extreme, and places severe burdens on electoral participants, warranting strict scrutiny.***

Third, the burdens are also severe in light of the impact on candidates' associational rights which must be forfeited to compete on equal footing with otherwise similarly-situated candidates, lest candidates risk punishment for not bracketing with candidates running for other offices. Courts have found the burden to be extremely significant where ballot laws yield situations where candidates are listed in the same column as other candidates with whom they did not bracket and did not wish to associate. *See, e.g.*, *Devine v. Rhode Island*, 827 F. Supp. 852, 861-62 (D.R.I. 1993) (placement of independent and/or minor party candidates for state office on a general election ballot underneath a political party or presidential candidate with whom they do not associate or belong "raises . . . serious constitutional concerns").[15]

Similar principles apply here. As in *Devine*, New Jersey's bracketing and ballot placement system have allowed candidates to be featured in the same column headed by candidates with whom they are not bracketed and with whom they do not wish to associate. Similarly, as in *Devine*, here the existence of a separate individual slogan next to the candidate's name does not mitigate the constitutional burden on associational rights caused by visually aligning disparate candidates. Further in *Devine* and current New Jersey law, the visual display of the candidates' names together gives the appearance and impression of nonexistent candidate affiliations and/or is bound to create voter confusion regarding same. Finally, as in *Devine*, here certain groups of candidates, namely those not on the county line, are treated differently by being

---

[15] *Devine* involved three independents running under the slogan "Reform '92" who were placed in the same column under perennial presidential candidate and convicted felon Lyndon LaRouche. The court found by providing a visual association between the Reform candidates and LaRouche, the State had committed an unconstitutional potential mislabeling of candidate affiliations that placed "serious burden[s]" on the First and Fourteenth Amendments that would not survive strict scrutiny nor the *Anderson* balancing test. *See id.* at 862. The court further found that this burden was even more serious than that in *Rosen v. Brown*, 970 F.2d 169 (6th Cir. 1992), where the court found a constitutional deprivation of associational and equal protection rights stemming from the fact that major party candidates were allowed a slogan in a general election, but minor party candidates were not. *Id.* at 861.

subject to placement in columns with candidates with different slogans and with whom they are not associated. Therefore, these additional burdens should subject New Jersey's primary election bracketing and ballot placement system to strict scrutiny.

Fourth, this complicated and convoluted ballot design structure causes confusion: it prevents some voters from successfully exercising their choice and/or otherwise disenfranchises voters, both to their own detriment and that of candidates. New Jersey's primary election design features inherently inflicts a severe burden of voter confusion, through ballot gaps, the full slate of county line candidates, stacking, and featuring candidates in a column by themselves or in a column with candidates running for other offices with whom they are not associated. The example of overvoting described in the Verified Complaint, ¶¶ 89-91, which is traced there to bad ballot design, left approximately one-third of voters disenfranchised for voting for too many candidates. It is hard to imagine the disqualification of multiple voters' votes by confusing those voters, to be anything less than a severe burden warranting strict scrutiny.

Fifth, elected county clerks, who themselves benefit from ballot positioning and other ballot design features like the county line, have exercised uncontrolled discretion in determining the order of candidates and visual display of ballots.[16] Ballot order systems which revolve around discretion of elections officials have been considered most objectionable, and have been struck down by reviewing courts. *See* Miller, 13 N.Y.U. J. LEGIS. & PUB. POL'Y at 391; *Sangmeister v. Woodward*, 565 F.2d 460, 467 (7th Cir. 1977) (striking down ballot order practice that gave

---

[16] *See* VC, ¶ 115 (noting large statistical anomalies in the expected vs. observed instances of the county line also receiving first ballot position); *see also Sangmeister v. Woodward*, 565 F.2d 460, 466-67 (7th Cir. 1977) (finding intentional discrimination based on exclusionary and systematic practices in existence for over 100 years and in numerous counties for county clerks who exercised statutory discretion in ordering candidates on the ballot by placing candidates from their own party at the top).

discretion to clerks for ballot placement).[17] The Clerks' exercise of discretion has yielded varying and inconsistent standards in designing the ballot and selecting the pivot point, etc. Placing candidates in the Kafkaesque situation where they are not told the ground rules before applicable deadlines evokes the kind of highly arbitrary decision-making processes that courts properly enjoin. *Ctr. For Inv. Reporting v. SEPTA*, 975 F.3d 300, 317 (3d Cir. 2020) ("the lack of structure and clear policies governing the decision-making process creates a real risk that it may be arbitrarily applied"). ***The level of unfettered discretion is staggering; Dr. Pasek found that the frequency by which county line candidates secured the first column was a statistical anomaly and "suggests that at least some county clerks are willing to manipulate the rules to place the county line first and that they do indeed see first position as beneficial."*** VC, ¶ 115.

Sixth, and relatedly, as articulated in the Amended Complaint and above, New Jersey is the only state in the nation that designs its primary election ballots in the unique ways described. The Supreme Court has required the state to demonstrate a compelling interest when state election laws burden First Amendment associational rights, and have been particularly skeptical of such alleged state interests when nothing can "explain what makes [the particular state's] system so peculiar that it is virtually the only State that has determined that such a [system] is necessary." *See Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 226 & n.17 (1989) (finding no justification for California's primary endorsement ban where only two other states – New Jersey and Florida – implemented similar restrictions). Thus, when combining the

---

[17] *See also Weisberg v. Powell*, 417 F.2d 388, 391-94 (7th Cir. 1969) (discretion exercised by election official to break ties in ballot order system was unconstitutional and in practice tipped scales in favor of some candidates, who were endorsed by party organizations, over others); *Mann*, 333 F. Supp. at 1267 (holding it is unconstitutional for election officials to use discretion to break ties for ballot position and enjoining election officials from breaking ties by any means other than by lot or other nondiscriminatory means where each candidate has an equal opportunity to be placed first on the ballot).

State's outlier practices coupled with the arbitrariness intrinsic to the system, the burdens on electoral participants are severe.

Finally, to the extent that one or more of the above items may not, by themselves, require strict scrutiny, when viewed collectively, the combination of all of these burdens and other qualities that make these laws particularly suspect contributes to the character and magnitude of the burdens imposed so as to warrant strict scrutiny based on the severity of the burden. *See Conforti*, 2022 WL 1744774, at *17 (denying 7 motions to dismiss in a related case brought under the same constitutional theories, explaining that "the fundamental rights involved in this case are more than moderately infringed upon. The court therefore will apply a moderate to severe level of scrutiny"). This ruling was made on a motion to dismiss, without the benefit of experts' analysis, whereas here, the corroborative evidence demonstrating strict scrutiny is before the Court.

*   *   *

Long ago, the Supreme Court recognized the fundamental nature of voting rights because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) (identifying without deciding categories of laws which implicated the Fourteenth Amendment that might "be subjected to more exacting judicial scrutiny" including state laws which "restrict[] those political processes which can ordinarily be expected to bring about repeal of undesirable legislation."); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (because voting rights are "preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."). Strict scrutiny of these infringements on the rights of electoral participants is therefore warranted.

2.     **No State Interest is Legitimate and Sufficiently Weighty to Justify the Burdens on Plaintiffs' Rights.**

To the extent that the Court finds strict scrutiny to be appropriate, the state law must be narrowly tailored to support a compelling state interest. *Burdick*, 504 U.S. at 434. Regardless of whether the Court deems strict scrutiny to be appropriate, the state's law must, at the very minimum, be justified by "relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (lead opinion) (citation omitted). Here, there is no legitimate state interest actually furthered by New Jersey's bracketing and ballot placement system. It is simply insufficient for Defendants to articulate a state interest that is important in a general sense, without demonstrating <u>how</u> that state interest justified the specific feature of the law such that it is necessary to burden the Plaintiffs' rights.

Plaintiffs can anticipate alleged state interests based on those asserted in the seven motions to dismiss filed by the six county clerk defendants and by the Attorney General – who intervened to defend the constitutionality of these same laws and practices – in the *Conforti* matter, all of which were denied. *See Conforti v. Hanlon*, No. 20-08267-ZNQ-TJB, 2022 WL 1744774 (D.N.J. May 31, 2022). In essence, the alleged state interests asserted in that matter more or less fell into two basic categories: (1) preserving ballot integrity and avoiding voter confusion; and (2) allowing candidates to express their associations on the ballot *with the additional benefit, beyond the use of a slogan or endorsement, of aligning their names in the same column*. These anticipated state interests are insufficient to justify the burdens imposed by New Jersey's primary election bracketing and ballot placement laws.

It is difficult to see how any purported and substantiated state interests are advanced in New Jersey by a party-line ballot system when two counties in the state use an office block system, and when certain counties have previously used the office block system, at least for

33

mail-in votes. To our knowledge, the State has not challenged or questioned the use of the office block system. Moreover, its presence in the State undermines the strength of any alleged state interests in favor of the unconstitutional party line ballot system.

**Preserving Ballot Integrity and Avoiding Voter Confusion**. Preserving ballot integrity and avoiding voter confusion may generally be important state interests in the abstract, but do not justify the specific features of New Jersey's bracketing and ballot placement laws and practices. If anything, the laws and practices at issue here *damage* the integrity of our primary elections, and *promote* voter confusion, rather than avoiding it.

In the context of a ballot, which is supposed to be a neutral forum upon which voters can select a candidate of their choice, ballot integrity presupposes basic concepts of fairness and equal treatment. By contrast, here it is simply unclear, and Defendants cannot adequately articulate how providing certain candidates with demonstrable, mathematically proven ballot advantages affecting the layout of the ballot and the way in which ballot draws are conducted preserves the integrity of the election. On the contrary, New Jersey's outlier system puts a governmental thumb on the scales of primary elections – *and Everyone knows it*.

*Everyone involved in New Jersey politics knows that county line ballots are about power, influence, control, and favoritism on the ballot, and not about ballot integrity.*[18] *Candidates know this.*[19] *Voters know this.*[20] *Officeholders and party elites know this.*[21] *Experts know this. "[T]he use of a ballot that is known to influence voters in systemic ways has critical*

---

[18] *See generally* VC, p. 4 & n.3; Exhibit F (compiling scholarly, media works).
[19] *Id.* at p. 5 n.4 (letter from three Senate candidates); Exhibit F (compiling commentary and quotes by electeds).
[20] *See infra* n.30 (FDU poll showing two-thirds of NJ residents polled oppose the county line system); Exhibit F (electeds commenting on FDU Poll).
[21] See Exhibit F (compiling commentary and quotes by electeds and others).

*implications for the legitimacy of elections. . . . Voters apparently perceive the system as unfair, which makes sense, as these conclusions are supported by the data.*"[22]

As to avoiding voter confusion, it would be difficult to design a more confusing ballot than New Jersey's primary election ballots. The features of the ballot described in Plaintiffs' papers make it difficult to find candidates, determine what they are running for, understand who they are running against, etc. There is nothing orderly or fair about a ballot that has candidates haphazardly and chaotically spewn about. Making matters even worse, neither voters nor candidates know the rules of the game in advance, or why candidates were placed where they are. Indeed, arguments that the state has an interest in avoiding voter confusion are usually centered around the idea that the law/practice is consistently and universally applied, so voters know where they can expect to find the various candidates.

As demonstrated above, the hallmark of the state's ballot design is not to avoid confusion or chaos, but rather to provide arbitrary structural advantages to some candidates, selective disadvantage to others, and chaos at large. In *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980), the court struck down a general election ballot order law which favored incumbents, finding that the state justification of "making the ballot as convenient and intelligible as possible for the great majority of voters . . . . virtually admits that the state has chosen to serve the convenience of those voters who support incumbent and major party candidates at the expense of other voters," and held that such state interest does not even survive rational basis review. Other courts have also rejected the state interest of avoiding voter confusion and similar state interests when there is a disconnect between this alleged goal and the practical realities of the law as manifested on the ballot. *See Sangmeister*, 565 F.2d at 467 (rejecting interest in avoiding

---

[22] *See, e.g.*, VC, Exhibit B, at ¶¶ 183-85 (emphasis added).

confusion and having consistent practice for voters to know in advance because it was "difficult to understand how this practice satisfies those requirements any more efficiently than would a neutral system of ballot placement"); *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1277-81 (N.D. Fla. 2019), *vacated on other grounds*, *Jacobson v. Fla. Sec'y*, 957 F.3d 1193 (11th Cir. 2020), *vacated and opinion substituted*, 974 F.3d 1236 (11th Cir. 2020) (finding generally important state interests of voter confusion and uniformity to be weak state interests in that case in light of numerous non-confusing alternatives that would not burden plaintiffs' rights).[23]

New Jersey's ballot design laws and practices benefit certain candidates over others, and do so in a manner that invites confusion and unduly influences voters. Dr. Pasek and Dr. Wang explained how the ballot is designed in such manner as to use visual cues that strongly nudge or otherwise steer voters toward the candidates on the county line. It is clear that the law has chosen to serve the convenience of those voters and party factions who support certain candidates at the expense of others. Dr. Pasek also explains how the features unique to New Jersey in primary election ballots, identified above, induces voter confusion. He further explains that New Jersey's primary election bracketing and ballot placement system routinely violate 3 out of 4 general balloting principles articulated by the Brennan Center, including (1) not splitting contests; (2)

---

[23] *See also Matter of Holtzman v. Power*, 62 Misc.2d 1020, 1024 (N.Y. Sup. Ct. 1970), *aff'd*, 34 A.D.2d 917 (N.Y. App. Div. 1970) (rejecting avoidance of voter confusion as state interest in connection with incumbent-first statute, as nothing on the ballot actually indicated that the first listed candidate was the incumbent and even if sophisticated voters knew that, they might mistake the first-listed candidate as an incumbent in a race where there was no incumbent); *Akins v. Sec'y of State*, 904 A.2d 702, 708 (N.H. 2006) (rejecting asserted interest in promoting a logical and easily understood ballot where state failed to demonstrate that arranging candidates in order of the party receiving the most votes in a prior election and/or by alphabetical order was necessary to create a manageable ballot); *Gould v. Grubb*, 536 P.2d 1337, 1344-45 (Cal. 1975) (rejecting asserted state interest of facilitating "efficient, unconfused voting" because even if most voters care most about voting for or against an incumbent, there were other means to identify incumbents "which avoid considerable discrimination against voters for nonincumbents" through preferential ballot position).

ensuring consistent ballot design; and (3) ensuring visually that ballots are easy to understand. He also pointed to examples from the 2020 primary elections of large and disproportionate numbers of (1) overvotes when two congressional candidates were placed in the same column; and (2) undervotes, when an incumbent U.S. Senate candidate bracketed with candidates off the county line. *See supra* n.6. Nothing about New Jersey's bracketing and ballot placement system promotes the avoidance of confusion.

> Providing the Additional Associational Benefit of Visually Aligning Names. Defendants are anticipated to assert an interest in having associations between candidates expressed directly on the ballot *through the additional benefit, beyond the use of a slogan or endorsement, of visually aligning such candidates together*. This is not a legitimate interest at all, let alone a governmental one, much less one that outweighs the burdens here.

Preliminarily, it must be noted that this case does not challenge provisions of New Jersey law which allow candidates to be featured on the ballot with a slogan next to their name, nor does it challenge the ability of party-endorsed candidates, or any candidates for that matter, to be featured on the ballot with a common slogan as other candidates running for other offices, so long as, it accords with *N.J.S.A.* 19:23-17.[24] Thus, candidates who share common beliefs and want to be associated with one another and to express that on the ballot will continue to have that ability. Nor does the relief Plaintiffs seek in any way change candidates' opportunities for coordination and association outside the context of the ballot. Subject only to campaign finance law limits, all candidates – whether or not supported by party leadership – can give and receive

---

[24] *Cf. Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (law prohibiting judicial candidates from appearing on general election ballot with their party affiliation presents only a minimal burden "because political parties and judicial candidates remain free to provide, and voters remain free to receive, a plethora of information regarding" candidate affiliation).

financial support from nongovernmental donors, volunteers, or organizations. They may also earn the benefits of endorsements and uncoordinated independent expenditures. But when the government takes on the mantle of an advocate for or against a primary candidate, it transgresses fundamental principles of ballot neutrality.

Notably, the Attorney General has already conceded in *Conforti* that a slogan is sufficient for voters to identify who is associated and who is not associated. Therein, the Attorney General claimed that unbracketed candidates are not injured when they are placed on columns with candidates with whom they did not bracket, and with whom they did not want to associate, because their names appear with different slogans. *See Conforti*, Docket No. 20-08267-ZNQ-TJB, AG Brief in Support of Motion to Dismiss, ECF 53-1, p. 21 ("Voters could see what positions Plaintiffs were running for, and who Plaintiffs chose to associate or not associate with by virtue of the shared slogan."). This argument alone totally and completely undermines any shred of justification for needing to visually align candidates at all, let alone doing so in a way that provides them a ballot advantage. There cannot be a double standard whereby a slogan is sufficient to recognize non-association of unbracketed candidates, but insufficient to identify association of bracketed candidates. In fact, what this emphasizes is that New Jersey's bracketing and ballot placement system is focused more on providing a ballot advantage to certain candidates over others, than it is about protecting associational rights.

In that vein, these laws and practices revolve around pivot point offices selected by county clerks. Therefore, the state's anticipated interest is not just in preserving associational rights of candidates *generally*, and in doing so above and beyond use of the slogan through the additional effectiveness of visually aligning their names. Rather, more *specifically*, the more accurately-stated anticipated state interest is in preserving associational rights of candidates who

bracket with two commissioner candidates, in some elections, in some counties, in some years, or with a Senate and/or Gubernatorial candidate, in other elections, in other counties, in different years. If that sounds like a ridiculous and absurd state interest to have to defend, perhaps it is. Indeed, not all ballot associations are treated equally in New Jersey primary elections. Only those bracketing requests with pivot point candidates – decision as to the office used is not made until after petitions and bracketing requests are submitted – are entitled to preferential ballot treatment. By contrast, bracketing requests with non-pivot point candidates are not entitled to preferential ballot position, and risk relegation to Ballot Siberia, ballot gaps, etc.

Furthermore, the additional effects of visually aligning names of candidates often sends confusing signals to voters about associations, that render the alleged associational value of bracketing meaningless. For example, what message is sent to voters when a candidate for one office is listed in the same column as a candidate for a different office, with whom they did not bracket and did not wish to associate? *See* VC, ¶ 89 (ballot image of Lawrence Hamm and David Applefield). What message is being communicated to voters when a candidate and her opponent are listed in the same column on the county line? *Id.* at ¶¶ 89-91 (ballot image of Christine Conforti and Stephanie Schmid). What message is being communicated to voters when a candidate running for two different offices, is not bracketed with herself, but is bracketed with her opponent? *Id.* at ¶¶ 92, 100 (ballot image of Christine Conforti in Column 1 for one office and Column 4 for another). Is a voter to believe that she wanted to associate with her opponent or that she did not want to associate with herself?

What message is being communicated when a congressional candidate brackets with one Senate candidate in one county, but then brackets with the Senate candidate's opponent in another? *Compare* VC, Exh. A, p. 49 (Singh and Smith bracketed in Ocean County), *with id.* at

p. 43 (Mehta and Smith bracketed in Monmouth County). Are we to believe that Smith shared common beliefs with Singh in Ocean, but then lost those common beliefs and shared new common beliefs with Mehta in Monmouth? Such bizarre and contradictory ballot associations are likely to appear again in the 2024 Primary Election.[25] This small handful of a myriad of like examples reinforce that the preferential ballot treatment and visual alignment of candidate names for certain bracketed candidates, as compared to the haphazard chaos applied to unbracketed candidates has more to do with providing an advantage to certain favored candidates than it does with respecting nonsensical associational rights, which are not even applied on an equal basis.

Moreover, as to the *strength* of the state interest, the ballot itself is not meant to be a forum for candidate expression. *See Burdick*, 504 U.S. at 438 (purpose of primary election ballot was to select a candidate and the ballot's constitutional function was not meant to provide "a more generalized expressive function"). There is no First Amendment right to use a ballot for expressive purposes. *See, e.g., Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 453 n.7 (2008); *cf. Cook v. Gralike*, 531 U.S. 510, 525 (2001) (state cannot use ballot to bring one piece of information to attention of voters and thereby highlight that information or issue as paramount).

**Balancing the severe burdens on electoral participants and the gossamer interests asserted by the State.** Many courts deciding ballot order cases have found state laws and practices which are not neutral and/or discriminatory to be unconstitutional. *See, e.g.*, *McLain*,

---

[25] *See* Joey Fox, *Dueling County Endorsements for Senate Might Create Headaches for N.J. Congressional Candidates: Sherill, Norcorss, Pallone have Endorsed Tammy Murphy, But May Run on Some Lines with Andy Kim*, New Jersey Globe, February 21, 2024, 1:28pm, https://newjerseyglobe.com/congress/dueling-county-endorsements-for-senate-could-create-headaches-for-n-j-congressional-candidates/ (last visited Feb. 21, 2024) (explaining how endorsement of U.S. Senate candidates in various counties will likely lead to multiple congressional candidates being featured on the county line with one Senate candidate in one county, and their opponent in another county).

637 F.2d at 1167 (ballot order listing winner of last election first and thereby benefiting incumbents was unconstitutional as it amounted to favoritism which served to convenience only voters supporting incumbents and major party candidates); *Sangmeister*, 565 F.2d at 467 (ballot order system based on preference and discretion of county clerk was unconstitutional amounting to intentional discrimination stemming from systematic and widespread exclusionary practices); *Weisberg*, 417 F.2d at 391-94 (election officials' practice of breaking ties for ballot position based on preference of election official amounted to intentional or purposeful discrimination because it was essentially choosing favorites, regardless of underlying reasons for why they preferred certain candidates).[26]

Here, a combination of state law preferences for bracketed candidates and county clerk discretion as to pivot points and ballot placement discriminates in favor of bracketed candidates and punishes unbracketed candidates. It puts the state's thumb on the scales in favor of certain candidates over others, and represents state-sanctioned favoritism. It is hard to imagine how New Jersey law could be considered neutral and non-discriminatory when it is dependent on what actions each candidate takes with respect to other candidates running for other offices, and what office the county clerk subsequently decides to use as the pivot point. It is equally hard to imagine how it could be considered neutral and non-discriminatory when unbracketed candidates are not only excluded from the initial ballot draw, but are also further disadvantaged through Ballot Siberia, ballot gaps, stacking, etc.

---

[26] *See also Graves v. McElderry*, 946 F. Supp. 1569, 1581 (W.D. Okla. 1996) (political patronage is not a legitimate state interest to classify or discriminate in configuring ballot position of candidates); *Mann*, 333 F. Supp. at 1267 (holding Fourteenth Amendment requires equal treatment of "newcomers and incumbents alike" and elections officials could not circumvent court decision which prohibited favoring party regulars by implementing "the transparent device of favoring incumbents or those with 'seniority'"); *Netsch v. Lewis*, 344 F. Supp. 1280, 1281 (N.D. Ill. 1972) (priority based on incumbency and seniority was unconstitutional).

In the ballot order context, scholars have recognized that "[w]hen election practices that impact the right to vote also act to entrench incumbents or other political elites, courts should be particularly suspicious." *See* Miller, 13 N.Y.U. J. Legis. & Pub. Pol'y at 401 (citing Samuel Issacharoff & Richard Pildes, *Politics as Markets: Partisan Lockups of the Democratic Process*, 50 Stan. L. Rev. 643 (1998)).[27] New Jersey's bracketing and ballot placement laws provide state-conferred advantages on the ballot to bracketed candidates which, for all practical purposes, virtually always includes party-endorsed candidates who are inevitably featured on the county line, which entrenches the power of incumbents and party insiders. In fact, no state legislative incumbent who was featured on the county line in all of their counties lost a primary election in the last 14 years. *See* VC, ¶ 108.  Only two congressional incumbents lost their primary elections in the last fifty years, and in both instances it was to another incumbent following redistricting and the incumbent that won was the incumbent who was featured on the county line in the critical county in the new congressional district. *See id.* at ¶ 9.

---

[27] *See also* Brett M. Pugach, *The County Line: The Law and Politics of Ballot Positioning in New Jersey*, 72 Rutgers U. L. Rev. 629, 632-34 (2020) (providing historical background of how New Jersey, under the leadership of then-Governor Woodrow Wilson, was at the forefront of a nationwide reform to abandon party-nominating conventions and institute a direct primary election where voters could choose their party nominees for the general election free from the corrupting influence of a small handful of party insiders). The direct primary election was specifically designed to give voters, not elites, the power to determine which candidates would be submitted to the voters in a general election. Direct election remains the law today, but experience shows that political systems have regressed to the pre-Wilson era where the influence of a small group of party insiders, though not legally decisive, unduly distorts the right of all party voters to determine the nominee. This is all the more true today given the rise of county political machines, the cause of and the emerging realities of the 2024 senatorial race, and the increased scrutiny of entrenchment. *See e.g.*, Max Pizarro, *The 2021 Reemergence of the County Party Chairs*, Insider NJ (Apr. 11, 2021), *available at*: https://www.insidernj.com/2021-reemergence-county-party-county-chairs/  (last accessed Feb. 25, 2024); Nancy Solomon, *Tammy Murphy Gets Key Placement on Many NJ Primary Ballots, Since Democratic Bosses Say So*, Gothamist (Feb. 12, 2024), *available at*: https://gothamist.com/news/tammy-murphy-gets-key-placement-on-many-nj-primary-ballots-since-democratic-bosses-say-so (last accessed Feb. 24, 2024).

Numerous courts have invalidated state laws and practices that prevented certain types of candidates from ever receiving the first ballot position and/or that otherwise provide a ballot position advantage to certain types of candidates over others. *See, e.g.*, *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. 1969), *aff'd*, *Powell v. Mann*, 398 U.S. 955 (1970) (mandating "fair and evenhanded treatment" and enjoining ballot placement of candidates "by any means other than a drawing of candidates' names by lot or other nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballots."); *McLain v. Meier*, 637 F.2d 1159 (ballot order system listing winner of last election first and thereby benefiting incumbents was unconstitutional); *Sangmeister v. Woodward*, 565 F.2d 460 (ballot order system based on preference and discretion of county clerk was unconstitutional); *Graves v. McElderry*, 946 F. Supp. 1569 (ballot order system giving Democrats top position on all general election ballots was unconstitutional); *Netsch v. Lewis*, 344 F. Supp. 1280 (N.D. Ill. 1972) (ballot order system that granted priority to candidates based on incumbency and seniority was unconstitutional).[28]

Here, Dr. Pasek concluded that "[n]ame order is extremely likely to constitute a substantial bias in New Jersey primary elections," and "[p]rimacy biases in New Jersey elections

---

[28] *See also Weisberg v. Powell*, 417 F.2d 388 (7th Cir. 1969) (practice of elections officials to use their own preference and discretion to break ties in ballot order system based on order in which petitions were filed was unconstitutional); *Gould v. Grubb*, 536 P.2d 1337 (Cal. 1975) (ballot order system that listed incumbent first and which listed other candidates by alphabetical order was unconstitutional under state and federal constitution); *Kautenburger v. Jackson*, 333 P.2d 293 (Ariz. 1958) (ballot order system based on alphabetical order was unconstitutional under state and federal constitution); *Matter of Holtzman v. Power*, 62 Misc.2d 1020 (N.Y. Sup. Ct. 1970), *aff'd*, 34 A.D.2d 917 (N.Y. App. Div. 1970) (ballot order system listing incumbents first was unconstitutional) *Akins v. Sec'y of State*, 904 A.2d 702, 707 (N.H. 2006) (adopting *Anderson/Burdick* test for state constitutional analysis and applying strict scrutiny to general election ballot order scheme based on prior electoral success of party and by alphabetization based on the primacy effect which while small could potentially impact a close election); *Gould*, 536 P.2d at 1344 (applying strict scrutiny to incumbent-first ballot order scheme based on dilution of votes of supporters of nonincumbent candidates).

will always negatively impact candidates who do not bracket with a candidate for the pivot-point positions." *See* VC, ¶ 114. In Dr. Pasek's experimental study focused specifically on the upcoming 2024 Democratic Primary Election, he found that every House and Senate candidates performed better when listed in the first column on a party-column ballot, and saw, on average, an 18.9% improvement in their vote share compared to later-listed positions on the ballot. *Id.* at 122. Furthermore, the benefits of the primacy effect also "stack" with the benefits of other unique and problematic features on New Jersey primary election ballots, such as the weight of the line, which can lead to even greater advantages when both are present. *Id.* at ¶ 124. And this doesn't even consider the other benefits that ballot design laws confer on party-favored candidates. These advantages and disadvantages have harmed the electoral prospects of unbracketed candidates, and will harm the electoral prospects of Plaintiffs and others in the upcoming Primary Election.

These laws and practices fail to treat similarly situated candidates the same for reasons that are entirely arbitrary. Whether a candidate is eligible to obtain the ballot advantages or will be subject to ballot disadvantages stem from two factors: (1) whether a candidate is bracketed with a candidate running for a completely different office; and (2) which office the county clerk decides to use as the pivot point. Each of these criteria is arbitrary and wholly unrelated to what order candidates' names should appear. A candidate's ballot position vis-à-vis their opponents running for the same office should not be determined by something so irrelevant as the discretion of a county clerk in determining a pivot point office or unbridled ballot-design decisions. In fact, courts throughout the country have been particularly critical of ballot order schemes that permit discretion of election officials and non-uniform or arbitrary standards in determining ballot position. *See, e.g.*, *Sangmeister*, 565 F.2d at 467 (striking down ballot order practice that gave

discretion to clerks for ballot placement); *Weisberg*, 417 F.2d at 391-94 (discretion exercised by election official to break ties in ballot order system was unconstitutional and in practice tipped scales in favor of some candidates, who were endorsed by party organizations, over others); *Mann*, 333 F. Supp. at 1267 (election officials may not constitutionally use discretion to break ties for ballot position and enjoining election officials from breaking ties by any means other than by lot or other nondiscriminatory means where each candidate has an equal opportunity to be placed first). Such arbitrary considerations related to what candidates are running for what other positions and who is bracketed with who have no business dictating ballot advantages and disadvantages to certain candidates in a state-sponsored, publicly-funded primary election.

Simply put, existing law and practice allows some candidates to draw for first ballot position or to be automatically placed there, while other candidates for the same office are subjected to subsequent rounds of drawing as among each other only for non-preferential ballot position and/or to random, standardless decisions about which column to assign to the other, similarly situated, primary election candidates. It is noteworthy that *N.J.S.A.* 19:23-24, which governs ballot draws, goes into great substantive and procedural detail to ensure fairness between the candidates being drawn for the same office. *See id.* (dictating equal sizes and thickness of cards with candidate names, thorough shaking and mixing of cards, and drawing of cards without knowledge of names); yet, not all candidate are included in the same drawing. Fair procedures are rendered meaningless if they only apply to some candidates, but not to others. While candidates may not have a right to a particular place on the ballot, their exclusion from a chance at obtaining the first ballot position and from equal treatment among candidates running for the same office, violates their constitutional rights. Bracketed candidates are systematically provided with a systematic, unfair, and substantial ballot advantage over other unbracketed candidates.

Dr. Pasek explained both logically and mathematically how and why the primary election ballot design in New Jersey incentivizes bracketing with as many candidates a possible to protect their ballot position given uncertainty as to pivot point offices being used by county clerks and to avoid and/or mitigate against all of the various harms and ways in which unbracketed candidates (and especially those not bracketed with a pivot point candidate) can be disadvantaged/punished on the ballot. Moreover, as set forth above, Dr. Pasek's study found a 12.7% bump in vote share for congressional candidates who bracketed with a U.S. Senate candidate compared to when those same candidates did not bracket, and that margin even excluded situations where the bracketed candidate was on the county line. He found that the advantages of bracketing exist "regardless of whether candidates who share a bracket occupy similar factions of the party or whether they share similar views on issues," and serve "the purpose of jockeying for position rather than merely for demonstrating some underlying commonality." *See* VC, ¶ 114. Moreover, he found that these ballot advantage incentives will be present in any election, since unbracketed candidates "will always [be] negatively impact[ed]." *Id.*

In analyzing whether plaintiffs are likely to succeed under *Anderson-Burdick* balancing, the Court has before it an ample of body of law confirming, as the *Conforti* court did, that the manipulation of voter choices is unconstitutional. And here, the Court now also has before it overwhelming scientific evidence of the manipulation of New Jersey ballot design laws on candidates not hallowed with placement on the county line, which is real and quantifiable. No legitimate countervailing state interests can be proven, and thus the scale on which these burdens and interests are weighed points decisively in favor of Plaintiffs. Accordingly, it is likely that Plaintiffs will prevail on those counts of the complaint requiring *Anderson-Burdick* balancing.

**C.    Plaintiffs have demonstrated they can win on the merits of their Elections Clause claims, and their chances of prevailing are significantly better than negligible.**

Plaintiffs' are also independently likely to succeed on their Elections Clause claims. This clause of the Constitution requires a separate, independent analysis, and is not tied to the *Anderson/Burdick* balancing test. Article I, Section 4, Clause 1 of the Constitution (hereinafter the "Elections Clause") states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time make or alter such Regulations, except as to the Place of chusing [sic] Senators." The Elections Clause is the only delegation of power granted to States over congressional elections, and this exclusive delegation of power does not provide for any State authority over congressional elections outside of regulating the time, place, and manner of such elections. *See Cook v. Gralike*, 531 U.S. 510, 522-23 (2001). While this grant of authority to the states is broad, it is limited to procedural regulations. *Id.* at 523.

In *Cook*, the Supreme Court considered a Missouri Constitution provision that required a notation to be printed on both primary and general election ballots next to congressional and senatorial candidates who failed to take certain actions in support of terms limits on Senators and Representatives, and/or refused to take a pledge on term limits in the event they get elected (hereinafter "Term Limit Amendment"). *See id.* at 513-15 (citations omitted). The notations would state the following, respectively: "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS," and/or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS." *See id.* at 514 (citations omitted). The candidate claimed that the Term Limit Amendment merely regulated the manner of holding elections by providing information related to the congressional candidates, and therefore fell within the power delegated to the States by the Elections Clause. *See id.* at 523.

However, the Court disagreed, finding that the Term Limit Amendment was not a procedural regulation. *See id.*

The Court reiterated that the Elections Clause allowed States to adopt procedural regulations but not "dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional constraints." *Id.* (citation and quotation marks omitted). The Court found that the Term Limit Amendment was not a procedural regulation, as it clearly was not a time or place regulation, nor did it regulate the manner of holding elections. *Id.* The Court found that the term "manner" included matters such as "'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" *See id.* at 523-24 (citation omitted). Thus, the Court found that the Term Limit Amendment did not fall within the types of procedural regulations "which experience show are necessary in order to enforce the fundamental right involved, ensuring that elections are 'fair and honest,' and that 'some sort of order, rather than chaos, is to accompany the democratic process.'" *Id.* at 524 (citations omitted).

Instead, the Court found that the Term Limit Amendment was "plainly designed to favor candidates who are willing to support the particular form of a term limit amendment set forth in its text and to disfavor those who either oppose term limits entirely or would prefer a different proposal." *Id.* This was because the Term Limit Amendment "attaches a concrete consequence to noncompliance" found on primary and general election ballots. *See id.* The Court recognized that the labels operate in the sense of appearing harmful or negative, and as a sanction or penalty for candidates who fail to comply with the Term Limit Amendment's conditions, further acknowledging the "substantial political risk" imposed by the ballot labels on such candidates. *See id.* at 525. In fact, the Court further found that "the adverse labels handicap candidates 'at the

most crucial stage in the election process – the instant before the vote is cast.'" *Id.* (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)). Furthermore, the Court found that it directed voters' attention to a single issue or consideration, implying that such issue/consideration was important and paramount, which would influence voters to cast their vote against those candidates who were disfavored with the negative label. *See id.* Although the Court was unable to determine exactly how much a candidate was disadvantaged by the Term Limit Amendment, it nevertheless held that "the labels surely place their targets at a political disadvantage to unmarked candidates for congressional office," and thus was not a procedural regulation, but one that attempted to "'dictate electoral outcomes.'" *See id.* at 525-26 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S 779, 833-34 (1995)). Therefore, the Court held that the Term Limit Amendment was not authorized by the Elections Clause.

Here, there does not appear to be any legitimate argument that New Jersey's primary election ballots regulate the time or place of holding an election. As to regulating the manner of holding elections, as in *Cook*, New Jersey's bracketing and ballot placement laws do exactly what the Elections Clause prohibits: it dictates election outcomes and favors and disfavors classes of candidates.[29] The list of items that the Court in *Cook* and prior courts deciding Elections Clause cases viewed as procedural all have something in common: they are meant to apply neutrally, and not to bestow an advantage to some candidates over others. In comparison, New Jersey's primary election ballots provide an advantage to bracketed and party-endorsed candidates, and disadvantage to unbracketed candidates in the ways described herein. New

---

[29] *See generally* VC, at ¶¶ 103-27 (collecting evidence from expert reports of how the government imposes ballot and electoral advantages that amount to an "enormous handicap" in favor of party-endorsed candidates featured on the county line, and further systematically disadvantages unbracketed candidates compared to bracketed candidates, in ways that alter election results and even carry the potential to be outcome determinative).

Jersey's system is the antithesis of the reasons set out in *Cook* to maintain procedural regulations: fairness, honesty, order, and the prevention of chaos.

New Jersey's laws and the ballot design practices of 19 county clerks most heavily and substantially favor candidates on the county line over all other candidates. More generally, they plainly favor candidates who bracket with pivot point candidates as determined by county clerks, and disadvantage anyone else, including those bracketed with non-pivot point candidates and those who are unbracketed and do not wish to associate with such pivot point candidates. As in *Cook*, the advantages and disadvantages flow from concrete benefits provided to bracketed candidates, and denied to unbracketed ones, all of which have been fully described above. This certainly operates as a sanction or penalty for not associating with such candidates, and candidates who do not bracket accordingly submit themselves to substantial political risk for not doing so. Moreover, because these consequences attach on the ballot itself, it handicaps unbracketed candidates at the most critical stage of the election process, right before voters cast their votes. In *Conforti*, the presiding judge previously acknowledged that the complaint there sufficiently alleged that New Jersey's primary ballot laws do not "act as a 'manner' of regulating federal elections and may dictate electoral outcomes and favor or disfavor certain classes of candidates." 2022 WL 1744774, at *19. The allegations are now backed with scientific proof at a level sufficient to find a likelihood of success on the merits on this point.

## II.   PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF AN INJUNCTION

Harm is irreparable if it "'cannot be redressed by a legal or an equitable remedy following a trial.'" *Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792 F. App'x 218, 221 (3d Cir. 2019) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992)). Plaintiffs seeking a preliminary injunction must show "actual or imminent harm which cannot otherwise be

compensated by money damages." *Id.* (citation and quotation marks omitted). As set forth above, here Plaintiffs demonstrated imminent harm related to (1) a diminution in their chances to succeed in their elections stemming from various ballot design laws and practices disfavoring them; (2) their equal protection rights via the preferential treatment of similarly situated candidates over others running for the same office; (3) their associational rights via forced association and/or attaching a punishment to their decision to not associate; and (4) the violation of the Elections Clause. None of these imminent harms can be adequately compensated by monetary damages, nor by any other form of relief following a trial or other resolution resulting in a final judgment. Absent injunctive relief, the ballots will be prepared so as to violate Plaintiffs' constitutional rights and the Primary Election will take place on June 4, 2024, providing an advantage and "enormous handicap" in favor of Plaintiffs' opponents that is "substantively large, electorally consequential, and strongly statistically significant" in various counties, which will alter election results and potentially be outcome determinative. *See* VC, ¶¶ 120, 127. Therefore, Plaintiffs have clearly demonstrated that they will suffer irreparable harm in the absence of injunctive relief.

## III.   GRANTING PRELIMINARY INJUNCTIVE RELIEF WILL NOT RESULT IN EVEN GREATER HARM TO NONMOVANT

Compared to the substantial harm Plaintiffs will suffer in the absence of an injunction, any harm to nonmovants is minimal and pales in comparison to the deprivation of constitutional rights Plaintiffs will imminently suffer. If the requested relief is granted, Defendants will need to design ballots in April in such manner as to not employ the various unconstitutional design tactics set forth in Plaintiffs' prayer for relief. This can be easily accomplished through use of an office block ballot, a method already in practice in New Jersey. Dr. Appel's expert report makes clear that the voting machines used in New Jersey are capable of accommodating an office block

ballot, and "that the work or effort needed to prepare office-block ballots, using the same [software], will not be significantly different from the work or effort needed to prepare row-and-column ballots." *See* VC, ¶¶ 132-33. Furthermore, Defendants have the infrastructure in place for conducting a ballot draw for all candidates for each office, since they are already statutorily-required to conduct a public draw in April. *See N.J.S.A.* 19:23-24. Moreover, the requested relief does not seek to eliminate ballot slogans or prevent county political parties or others from endorsing candidates and/or otherwise exercising their associational rights in any manner that does not use a government-sanctioned ballot to needlessly trample on constitutional rights of other candidates.

## IV.    THE PUBLIC INTEREST FAVORS SUCH RELIEF

Having government officials comply with constitutional requirements should always be in the public interest, particularly where the fundamental right to vote is at stake. Without relief from this Court, critical primary elections in 2024 will proceed in an unconstitutional manner where a government-sanctioned ballot advantage that is "substantively large, electorally consequential, and strongly statistically significant" can provide an "enormous handicap" in favor of certain candidates over others. See VC ¶¶ 120, 127. This would leave our democratic system susceptible to justifiably being called into question as to the legitimacy and result of the election, thereby destroying voter confidence in government, their elected representatives, and this and future elections. Dr. Pasek found that even when candidates win by double-digit margins, it is possible that the county line ballot system "could have been outcome determinative, meaning that candidates and the public can reasonably question whether the candidate would have won had the counties employed a different ballot design." *See* VC, at ¶ 127.

Voters want a fair ballot and overwhelmingly believe that they should have control over who is selected as the party's nominee for the general election, without governmental ballot design needlessly favoring party-backed candidates or otherwise injecting visual and other ballot cues to unduly influence voters.[30] Indeed, it was for this very reason that, over 100 years ago, New Jersey (under the leadership of then-Governor Woodrow Wilson) was at the forefront of a national movement for a direct primary whereby voters themselves could select their own party nominees without such corrupting influences. *See* Ralph Simpson Boots, *The Direct Primary in New Jersey* 31-33 (1917). Granting injunctive relief will protect that promise by restoring such power – without unnecessary governmental interference – to voters, instill confidence in election results, and further the public interest.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction that stops Defendants' deeply unconstitutional actions regarding ballot design from being implemented or used in the 2024 Democratic Primary Elections.[31]

---

[30] *See* Brent Johnson, *Majority of N.J. Against County Parties Endorsing Candidates in Primary Elections, Poll Finds*, NJ.Com (Nov. 17, 2022), *available at*: https://www.nj.com/politics/2022/11/majority-of-nj-against-county-parties-endorsing-candidates-in-primary-elections-poll-finds.html (last accessed Feb. 24, 2024) (citing 2022 Fairleigh Dickinson University Poll finding two-thirds of New Jersey residents polled "oppose the system in which county party leaders endorse specific candidates running for the party's nomination and give them preferential placement on the ballot, known colloquially as 'the county line.'").

[31] Any bond requirement under Fed. R. Civ. P. 65(c) should be waived, as it customarily is in cases seeking to vindicate "important federal rights" or the "public interest[ ]." *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991), or where it would cause "financial hardship." *Mullin v. Sussex Cnty., Del.*, 861 F. Supp. 2d 411, 428 (D. Del. 2012).

Respectfully submitted,

BROMBERG LAW LLC                          WEISSMAN & MINTZ

By:     _____             By: _____
        Yael Bromberg, Esq.              Flavio Komuves, Esq.


                                         _____
                                         By: Brett M. Pugach, Esq.

Dated: February 26, 2024

54