## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANDY KIM, in his personal capacity as a
candidate for U.S. Senate; *et al.*,

        Plaintiffs,

    v.

CHRISTINE GIORDANO HANLON, in
her official capacity as Monmouth County
Clerk; *et al.*,

        Defendants.

Civ. Action. No.:
3:24-cv-1098-ZNQ-TJB

---

## DEFENDANT CHRISTINE GIORDANO HANLON'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

SPIRO HARRISON & NELSON LLC
Jason C. Spiro, Esq. (jspiro@shnlegal.com)
Brian M. Nelson, Esq. (bnelson@shnlegal.com)
Marissa K. DeAnna, Esq. (mdeanna@shnlegal.com)
200 Monmouth Street, Suite 310
Red Bank, New Jersey 07701
Tel: (732) 784-1470
  *Attorneys for Defendant,*
  *Christine Giordano Hanlon*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

PROCEDURAL HISTORY.................................................................................................. 5

STATEMENT OF FACTS ................................................................................................... 6

STANDARD OF REVIEW .................................................................................................. 9

POINT I ............................................................................................................................... 10
PLAINTIFFS LACK STANDING  TO ASSERT THEIR CLAIMS

POINT II .............................................................................................................................. 15
PLAINTIFFS HAVE FAILED TO NAME INDISPENSABLE PARTIES TO THIS
ACTION

POINT III............................................................................................................................. 19
PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF
SUCCESS IN CHALLENGING THE CONSTITUTIONALITY OF NEW
JERSEY'S ELECTION LAWS

    A.    Plaintiffs Fail to Meet their Burden of Establishing that they are Likely to
    Succeed on the Merits of their First and Fourteenth Amendment
    Challenges to New Jersey's Election Laws ....................................................... 21

        1.    New Jersey's Election Law Framework for Ballot Design .................... 21

        2.    Plaintiffs Fail to Establish a Constitutionally Recognized Burden.......... 25

        3.    The State's Important Interests in Orderly Regulation of Elections
        and Protecting the Association Rights of Candidates Justify the
        State's Reasonable Ballot Allocation Decisions...................................... 31

    B.    Plaintiffs Fail to Meet their Burden of Demonstrating that they are Likely
    to Succeed on the Merits of their Elections Clause Challenge ........................... 36

POINT IV............................................................................................................................. 39
PLAINTIFFS HAVE FAILED TO ESTABLISH IRREPARABLE HARM IN THE
ABSENCE OF AN INJUNCTION

POINT V .............................................................................................................................. 41
GRANTING PLAINTIFFS' REQUEST FOR AN INJUNCTION WOULD RESULT
IN IRREPARABLE HARM TO DEFENDANTS AND STATE ELECTION
OFFICIALS

    A.    The Harm and Impracticality of Imposing Burdens on the Ballot Design
    Process at this Late Stage of the Ballot Process .................................................. 42

    B.    The Harm and Impracticality of Imposing Burdens on the Entire Election
    System at this Late Stage of the Election Process ............................................... 46

# TABLE OF CONTENTS

(continued)

**Page**

POINT VI ...................................................................................................... 47

PLAINTIFFS HAVE FAILED TO ESTABLISH THAT GRANTING A
PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

    A.    Changes to the Ballot Design Process at this Late Stage of the Ballot
Process are not Practically Feasible within the Statutory Timing Provided
for the 2024 Primary Election Process.................................................. 48

    B.    The Public's Interest in Avoiding Voter Confusion ............................. 49

    C.    The Public Interest in Protecting the First Amendment Right to Candidate
Association.......................................................................................... 50

CONCLUSION.................................................................................................. 52

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Case(s)**

*Allen v. Wright,*
   468 U.S. 737 (1984)................................................................11, 14

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983)................................................................21, 22

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
   576 U.S. 787 (2015)................................................................38

*Burdick v. Takushi,*
   504 U.S. 428 (1992)................................................................21, 22

*Clingman v. Beaver,*
   544 U.S. 581 (2005)................................................................22

*Conforti v. Hanlon,* No. 20-08267
   2022 U.S. Dist. LEXIS 97003 (D.N.J. May 31, 2022)...............................*Passim*

*Cook v. Gralike,*
   531 U.S. 510 (2001)................................................................39

*Crawford v. Marion Cty. Election Bd.,*
   553 U.S. 181 (2008)................................................................32

*Donald J. Trump for President, Inc. v. Way,*
   492 F. Supp. 3d 354 (D.N.J. 2020)............................................49, 51

*ECRI v. McGraw-Hill, Inc.,*
   809 F.2d 223 (3d Cir. 1987) ..............................................41

*Eu v. San Francisco County Democratic Cent. Committee,*
   489 U.S. 214 (1989)................................................26, 33, 34, 35

*Exec. Home Care Franchising LLC v. Marshall Health Corp.,* No.15-1887,
   642 Fed. Appx. 181 (3d Cir. February 23, 2016) ............................10

*Foster v. Love,*
   522 U.S. 67 (1997)................................................................37

*Frank v. Walker,*
   574 U.S. 929 (2014) ...............................................................

*Graves v. McElderry,*
   946 F. Supp. 1569 (W.D. Okla. 1996).............................................36

*Harrison v. Jones,*
   44 N.J. Super. 456 (App. Div. 1957).............................................52

*Jacobson v Fl. Sec'y,*
   957 F.3d 1193 (11th Cir. 2020) ................................................10, 36

*Jacobson v. Lee*,
    411 F. Supp. 3d 1249 (N.D. Fla. 2019) ............................................................36

*Kos Pharms. Inc. v. Andrx Cor*.,
    369 F.3d 700 (3d Cir. 2004) ...............................................................................10

*Laidlaw, Inc. v. Student Transp. of Am., Inc.*,
    20 F. Supp.2d 727 (D.N.J. 1998) .......................................................................41

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983).............................................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).....................................................................................11, 12

*Mazo v. New Jersey Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) ...................................................................32, 33, 34

*Miller v. Mitchell*,
    598 F.3d 139 (3d Cir. 2010) ..............................................................................10

*N.J. Press Ass'n v. Guadagno*, No. 12-06353,
    2012 U.S. Dist. LEXIS 161941 (D.N.J. Nov. 13, 2012) ........................................

*Nader v. Federal Election Com'n*,
    725 F.3d 226 (D.C. Cir. 2013)...........................................................................11

*New Alliance Party v. New York State Bd. of Elections*,
    861 F. Supp. 282 (S.D.N.Y. 1994) ....................................................................28

*Niles-Bement-Pond Co. v. Iron Moulders' Union*,
    254 U.S. 77 (1920)............................................................................................16

*Price v. N.Y. State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008) ..............................................................................32

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)..............................................................................................35

*Quaremba v. Allan*,
    67 N.J. 1 (1975) ..........................................................................................25, 26

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ..............................................................................40

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    589 U.S. ---- (2020) ..........................................................................................50

*Sangmeister v. Woodard*,
    565 F.2d 460 (7th Cir. 1977) .............................................................................36

*Schundler v. Donovan*,
    377 N.J. Super. 339 (App. Div. 2005).................................................................53

*Shields v. Barrow*,
    58 U.S. 130 (1854)............................................................................................17

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)..........................................................................................11

*Simon v. Eastern Ky. Welfare Rights Organization*,
    426 U.S. 26 (1976) ..................................................................................12
*Singh v. Murphy*, Docket No. A-0323-20T4
    2020 WL 6154223 (App. Div. October 21, 2020) ...................................38
*Storer v. Brown*,
    415 U.S. 724 (1974) ..................................................................................22
*Tashjian v. Republican Party of Conn.*,
    479 U.S. 208 (1986) ..................................................................................35
*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ..................................................................................33
*U.S. Terms Limits, Inc. v. Thorton*,
    514 U.S. 779 (1995) ..................................................................................38
*United States v. Classic*,
    313 U.S. 299 (1941) ..................................................................................38
*Valenti v. Mitchell*,
    962 F.2d 288 (3d Cir. 1992) ......................................................................34
*Veasey v. Perry*,
    574 U.S. 951 (2014) ..................................................................................50
*Voltaggio v. Caputo*,
    210 F. Supp. 337 (D.N.J. 1962) ................................................................28
*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................................................11
*Weisberg v. Powell*,
    417 F.2d 388 (7th Cir. 1969) ....................................................................36
*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ..................................................................................11
*Woulfe v. Atlantic City Steel Pier Co.*,
    129 N.J. Eq. 510 (Ch. 1941) .....................................................................17

**Statute(s)**
*N.J.S.A.* 19:5-1 ..............................................................................................30
*N.J.S.A.* 19:23-26.1 ...............................................................................26, 27
*N.J.S.A.* 19:32-26.9 ......................................................................................21
*N.J.S.A.* 19:32-53 ...................................................................................12, 20
*N.J.S.A.* 19:48-2 ...........................................................................................21
*N.J.S.A.* 19:49-2 .......................................................................26, 27, 28, 47
*N.J.S.A.* 19:63-9 ...........................................................................................10

**Rule(s)**
F.R.C.P. 19 ......................................................................................................10

SHN\762709.1

## **PRELIMINARY STATEMENT**

Utilizing pseudoscience foisted upon County Clerks on the eve of making final preparations for the 2024 primary election, Plaintiffs are belatedly asking this Court to decide whether to disrupt 70 years of statutes and precedents governing how primary election ballots are designed in the State of New Jersey.  The extraordinary relief being sought by Plaintiffs must be denied as they lack appropriate standing, fail to name multiple indispensable parties, and fall woefully short of meeting their burden for obtaining preliminary injunctive relief.  In any event, the record is clear that adopting a new ballot design at this late stage cannot be accomplished within the timing required by New Jersey's election laws for the 2024 primary election.

Plaintiffs lack standing because they fail to demonstrate concrete, non-speculative harm—and in some instances, such as in Monmouth County—no harm at all.  Plaintiffs assert "possible" harm, supported by generalized statistics, that may arise in elections featuring bracketed slates of candidates, without evidence to demonstrate that any constitutional deficiencies will arise in Monmouth County (or any other county) during the 2024 primary election.  For example, Plaintiffs raise the concern of being placed in "ballot Siberia", where candidates are visually disconnected from other candidates by space(s) between the candidates on the ballot, but even a cursory review of Monmouth County's 2020 primary election

1

ballot, attached to Plaintiffs' Complaint, shows the absence of any such candidate positioning or harm.

Further, Plaintiffs claim injuries that simply do not exist based on the facts presented.  Despite alleging to be disadvantaged, Congressman Kim successfully secured the endorsement of the Monmouth County Democrats allowing him to bracket with the slate of endorsed candidates on the ballot (*i.e.*, the county line).  In addition, as a candidate for U.S. Senate, he is statutorily entitled to be included in the ballot drawing for the first column or row on the ballot regardless of whether he's bracketed with a slate of candidates or not.  Likewise, Plaintiff Schoengood claims that she will be deprived of a favorable ballot position because she is only interested in bracketing with Kim, and Kim is on the county line in Monmouth and Burlington Counties without her, but Schoengood had an equal opportunity to seek the county line with Kim.  Unfortunately, she entered the race late and missed the deadline for seeking the Democratic endorsement in Monmouth County.  Not only are these circumstances of her own making, but there is no cognizable injury attributable to her anticipated ballot position.

Plaintiffs further assert that they can demonstrate a likelihood of success on the merits, but they present no credible evidence in support of that claim.  Plaintiffs present expert reports that merely make generalized, speculative conclusions about hypothetical scenarios involving bracketed ballots without any particularized

analysis of the impact of their ballot positioning on their actual elections.  The only plausible conclusion from Plaintiffs' expert reports is that the endorsement of the respective county political parties is, in some circumstances, important to a candidate's success; not that the county line itself mythologically generates additional votes that are not attributable to the endorsement of these long-established organizations.  Indeed, Plaintiffs' evidence only demonstrates the critical importance of the State's countervailing interest in protecting the associational rights of candidates and political party organizations while providing county clerks with sufficient discretion to effectively carry out their statutory duties in an unbiased manner.

Importantly, Plaintiffs' own actions, sitting on their hands for months while seeking the endorsements of local county political organizations, is evidence that cuts against any finding of irreparable harm.  Kim announced his candidacy on September 23, 2023 and raised concerns about bracketed balloting at that time. Nevertheless, Kim *chose* not to proceed with a constitutional challenge to bracketed balloting until after he failed to receive the endorsements of several county political organizations.  He sat on his alleged emergent claims for five months, before filing this action for injunctive relief with the same counsel that has been pursuing the same constitutional claims in the pending action in *Conforti v. Hanlon*.  This delay is dispositive evidence that, at the very least, Kim did not

believe that the long-established structure for bracketing candidate names would cause irreparable harm to his campaign in the absence of injunctive relief. At best, this is a self-created emergency, at worse it's political gamesmanship at the expense of taxpayers in 19 counties. Indeed, given Congressman Kim's status as the endorsed Democratic candidate in Monmouth County, he is unable to claim any conceivable harm arising out of his ballot placement in Monmouth County.

Plaintiffs' belated action, seeking to impose an entirely new ballot structure on county clerks on the eve of preparing ballots within already condensed statutory timeframes, would throw the primary election into chaos. Plaintiffs undoubtedly should be held accountable for that choice and the resulting risks posed to the integrity of the election process. As it stands, the county clerks have a mere 10 days from the March 27th deadline for receiving bracketing requests to perform the extraordinary work required to design, program and produce ballots in time for printing on April 5 (in the case of Monmouth County, 948 separate ballots with more than 2,000 candidates to be prepared simultaneously for mailing and the machines). The final ballot design has an impact on all aspects of Monmouth County's election systems for mailed and machine cast ballots, all of which must be programmed in the County's elections management software so that mail-in ballots can be sent by April 20 and machines are ready in time for early voting commencing on May 28.

4

The wholesale changes sought by Plaintiffs to primary election ballots at this late stage of the process would require efforts that are beyond extraordinary, including the recodification and certification of election systems, training and educating election workers, and educating voters, all in time for the primary election, which actually commences upon the mailing of ballots on April 20, not on June 4 as alleged by Plaintiffs.  Even if those efforts were possible, and funds could be appropriated to support those tasks, the Principal State Certification Manager for Election Systems and Software ("ES&S"), the election machine and software vendor for Monmouth and many of the New Jersey counties, has submitted an Affidavit averring that changes to the ballot design would require development, testing and certification that ***"could not be made and implemented prior to New Jersey's 2024 primary elections."***

Accordingly, Plaintiffs' request for preliminary injunctive relief should be denied.

## PROCEDURAL HISTORY

Plaintiffs Andy Kim, Andy Kim for New Jersey, Sarah Schoengood, Sarah for New Jersey, Carolyn Rush, and Carolyn Rush for Congress (collectively "Plaintiffs") filed a Verified Complaint against numerous New Jersey County Clerks, including Monmouth County Clerk Christine Giordano Hanlon. The Verified Complaint seeks to challenge the constitutionality of New Jersey laws that

dictate the design of the ballot in primary elections. Also on February 26, 2024, Plaintiffs filed an application for a preliminary injunction enjoining Defendants from utilizing the legally authorized ballot design in the 2024 primary election.

On February 29, 2024, the Court held a scheduling conference after which it issued an Order requiring all opposition briefs to be filed by March 6, 2024. An evidentiary hearing will be held at 10:30 a.m. on March 18, 2024.

## STATEMENT OF FACTS

On September 23, 2023, Plaintiff Andy Kim announced his candidacy for U.S. Senate.[1] Despite his awareness of the bracketing system utilized on primary election ballots in New Jersey for decades, Kim chose to wait until February 26, 2024 to file this lawsuit. Sarah Schoengood announced her candidacy for Representative of the 3rd Congressional District on January 21, 2024. (Pl. Br.[2] at 14.) Because she filed two days after the Monmouth County Democratic Committee's deadline for filing an intent to seek endorsement at the Monmouth County Democratic Convention, Schoengood foreclosed herself from appearing on the county line. On February 12, 2023, Carolyn Rush announced her candidacy for

---

[1] Sabrina Malhi, *Rep. Andy Kim will challenge Menendez in primary for Senate seat*, Washington Post (Sept. 23, 2023 6:59 p.m.), https://www.washingtonpost.com/politics/2023/09/23/bob-menendez-andy-kim-primary/ (last accessed March 5, 2024).

[2] Citations to "Pl. Br." refer to Plaintiffs' Brief in Support of their Motion for Preliminary Injunction dated February 26, 2024 and filed on February 26, 2024.

Representative of the 2nd Congressional District (which does not include

Monmouth County), over one year before filing this action.  Rush was also a

candidate for the same seat in the 2022 Democratic Primary election and faced

these same issues with the county line.

The primary election, while ostensibly held on June 4, 2024, actually

commences when voting starts upon the mailing of mail-in ballots on April 20th,

2024.  *N.J.S.A.* 19:63-9.  Several months of ballot preparation is required in

advance of this date. Less than a month before, Republican and Democratic

candidates must file petitions seeking their party's nomination by March 25, 2024.

(Hanlon Decl.[3] at ¶ 12.) Candidates seeking to bracket with other candidates and

use slogans to signify their association with one another must submit these requests

within 48 hours after the March 25, 2024 petition filing deadline. (*Id*. at ¶ 13.) The

bracketing process is not controlled by political party organizations, but rather by

statute, and any candidates can form a bracketed slate with the slogan of their

choice by securing at least 100 signatures on a petition for a County Commissioner

candidate. (*Id*. at ¶ 14.)

The County Clerk must conduct the drawing to determine final ballot

positions for primary election candidates for each political party 61 days prior to

---

[3] Citations to "Hanlon Decl." refer to the Certification of Christine Giordano
Hanlon dated March 6, 2024 and filed herewith.

7

election day, or April 4, 2024. (*Id.* at ¶ 16.) By April 4, most, if not all of the

candidate information and the offices being contested has been entered into

spreadsheets and the elections management software's database. (*Id.* at ¶ 17.)

Primary election ballots must be prepared for printing 60 days before election day,

or April 5, 2024. (*Id.* at ¶ 19.) In order to meet federal and state deadlines for the

mailing of mail-in ballots and to allow for enough time to program the County's

elections management software, changes cannot be made to the ballot after April 5,

2024. (*Ibid.*) By April 20, 2024, all mail-in ballots for the primary election must be

mailed. (*Id*. at ¶ 28.)

 The preparation of the ballots requires a substantial amount of work by the

County Clerk's office. The Clerk's office only has six employees and it is already

collecting information from the municipal clerks from 53 municipalities as to what

offices to include on the ballot. (*Id.* at ¶¶ 6, 11.) Monmouth County has 474

separate election districts, and each election district has two separate ballots – one

for Democrats and one for Republicans. (*Id*. at ¶ 10.) The Clerk's office must

design, program, print, and mail 948 separately designed ballots containing more

than 2,000 candidate names. (*Id*. at ¶¶ 10,11.) This process requires significant

coordination between the Clerk's office, the Superintendent, the Board of

Elections, Election Systems & Software, and the printer. (*Id*. at ¶ 20.)

Not only does the County Clerk rely upon the elections management software which must be programed for the election, but the County Superintendent relies upon this software to program the voting machines. (*Id*. at ¶ 21.) The Superintendent has custody of the voting machines, and is required to maintain them. (*N.J.S.A.* 19:32-53.) In addition to programming the machines, the Superintendent's office has to ensure that proper logic and accuracy testing is performed before the election. The Board of Elections is responsible for canvassing the mail-in ballots. The optical scanners used to canvass paper ballots must also be programmed, which are maintained by the Board of Elections. (Hanlon Decl. at ¶ 21.) Accordingly, the Superintendent and Board of Elections are impacted by any change to the election management software. (*Id*. at ¶ 22.)

Monmouth County utilizes ES&S ExpressVote XL machines, which have been coded and certified by the Secretary of State in accordance with existing New Jersey law. (*Id.* at ¶ 24.) As sworn to by Benjamin R. Swartz, Principal State Certification Manager for ES&S, the New Jersey Secretary of State certified the ExpressVote XL machines and software in 2022 and 2023. (ES&S Aff.[4] at ¶ 6.) The ExpressVote XL system used in New Jersey was certified and tested using the currently authorized ballot design style. (*Id.* at ¶ 8.) Changes to this format would

---

[4] Citations to "ES&S Aff." refer to the Affidavit of Benjamin R. Swartz dated March 4, 2024 and filed herewith.

9

require evaluation to determine if they are feasible, and development, testing, and certification would be required if the software were changed. (*Id.*) Notably, ES&S has sworn under oath that Plaintiffs' requested changes to the ballot could not be implemented prior to the primary election. (*Id.*)

Even if substantial changes could be made in such a truncated time period, the integrity of the election is put at great risk. (Hanlon Decl. at ¶¶ 30, 32.) For decades, primary election voters have used the ballot design that is currently authorized by law. (*Id.* at ¶ 31.) Voter confusion is likely to result if sudden changes are made to the primary election ballot design without sufficient time for the substantial voter education that would be necessary. (*Id.*)

## STANDARD OF REVIEW

Injunctive relief, generally, is "an extraordinary remedy that should be granted only in limited circumstances." *Exec. Home Care Franchising LLC v. Marshall Health Corp.,* 642 Fed. Appx. 181, 182-83 (3d Cir. 2016) (citing *Kos Pharms. Inc. v. Andrx Cor.*, 369 F.3d 70, 708 (3d Cir. 2004). To obtain a preliminary injunction, a party must demonstrate: "'(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief.'" *Id.* at 183 (quoting *Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010) (citation omitted)).

10

## POINT I

## PLAINTIFFS LACK STANDING
## TO ASSERT THEIR CLAIMS

Plaintiffs lack standing to challenge the Monmouth County Clerk's implementation of New Jersey election laws because they fail to demonstrate any particular injury arising out of the ballot design for Monmouth County's (or any counties') primary election.  *See Jacobson v Fl. Sec'y*, 957 F.3d 1193 (11th Cir. 2020) (requiring particular allegations of an injury to a voter or candidate for the purpose of finding Article III standing).

Article III of the United States Constitution "limits the jurisdiction of federal courts to 'Cases' and "Controversies'. . . ." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  The doctrine of standing is used "to identify those disputes which are appropriately resolved through the judicial process." *Id.* at 560 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).)  Standing is "an essential and unchanging part" of Article III's requirement that a "case" or "controversy" be before the court.  *Ibid.*; *see*, *e.g.*, *Allen v. Wright*, 468 U.S. 737, 751 (1984).

The *Lujan* Court articulated a three-part test to determine whether a plaintiff has standing.  *Lujan*, 504 U.S.  at 560.  First, the plaintiff must have suffered an "injury in fact."  The "injury in fact must be both (a) 'concrete and particularized,' and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Id.* at 560 (citing *Allen* 468 U.S. at 756; *Warth v. Seldin*, 422 U.S. 490, 508 (1975)); *Sierra Club v.*

11

*Morton*, 405 U.S. 727, 740–41 (1972); *Whitmore*, *supra,* 495 U.S. at 155 (quoting

*Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).  This standard requires more than

"'someday' intentions" to support a finding of the "'actual or imminent' injury that

our cases require." *Nader v. Federal Election Com'n*, 725 F.3d 226, 229 (D.C.

Cir. 2013).Second, the plaintiff must demonstrate "a causal connection between the

injury and the conduct complained of." *Lujan,* 504 U.S. at 560-61(citing *Simon v.*

*Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976).)  That is, the

injury must be "'fairly ... trace[able] to the challenged action of the defendant, and

not ... th[e] result [of] the independent action of some third party not before the

court.'"  *Ibid*.

Third, the plaintiff must demonstrate that the injury complained of is

"'likely,' as opposed to merely "speculative,'" and that the plaintiff's injury will be

"redressed by a favorable decision." *Id.*. at 561.  It is critical to note that "[t]he

party invoking federal jurisdiction bears the burden" of establishing each of these

three elements.  *Ibid.*  Accordingly, "each element must be supported in the same

way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with

the manner and degree of evidence required at the successive stages of the

litigation." *Ibid*.

Plaintiffs Kim and Schoengood are candidates on Monmouth County's

ballot, while Plaintiff Rush is not a candidate in Monmouth County.  Kim received

the endorsement of the Monmouth County Democrats, and therefore, will be on the county line.  Schoengood entered her race for Congress after the deadline to participate in the Monmouth County Democrats' convention had passed, and therefore, will not appear on the county organization's bracketed line.

Plaintiffs' claimed injuries are based on generalized assertions that receiving the endorsement of a county's political party, and the resulting inclusion as part of that organization's bracketed slate of candidates (i) provides an electoral advantage that violates the equal protection rights of candidates who don't receive such endorsements; and (ii) candidates feel associational pressure to bracket with other candidates in order to receive a more favorable ballot position potentially in the first column or row, which increases their chances of success in the primary election due to the primacy effect.  These injuries are entirely speculative, and in many respects factually inconsistent with Plaintiffs' anticipated ballot position in Monmouth and other counties.

In Monmouth and other counties, the first column or row on the ballot is randomly selected based on the Senate candidate in Monmouth and other counties in the 2024 primary election.  Thus, Kim has an equal chance of being placed in the first column on the ballot in Monmouth County (and others) and receiving the benefit of any primacy effect.  Kim also received the endorsement of the Monmouth County Democrats, so he has the benefit of any county line ballot

13

position effect in Monmouth County (as well other counties in which he will be on the county line).  Thus, as the beneficiary of the alleged ballot benefits at issue in this case, Kim has no standing to challenge Monmouth County's primary election ballot, and the impact of Kim's ballot position across all counties is entirely speculative.

Schoengood claims she will not have the opportunity for ballot primacy because she is only interested in bracketing with Kim and she won't have that opportunity because Kim exercised his associational rights (*i.e.*, he obtained the county line position in Monmouth and Burlington Counties, and he might not be interested in bracketing with her in Mercer County).  Schoengood does not provide any evidence concerning a concrete injury due to primacy impact in Monmouth County (or any County).  Such allegations of generalized risk of a primacy effect are insufficient to establish standing to challenge election processes.  *See Jacobson*, 957 F.3d 1193 (11th Cir. 2020)(denying standing when the claimed injury relied solely on an average measure of the primacy effect because there was "no basis to conclude that the primacy effect will impact any particular voter or candidate in any particular election").

For example, there is no evidence in the record that voters would be more likely to vote for Schoengood if she appeared in the first column of Monmouth County's ballot, but not on the county line.  Indeed, it is more plausible that

14

Monmouth voters would vote for Schoengood's opponent, no matter where she appears on the ballot because her opponent received the Monmouth County Democrats' endorsement, while Schoengood missed the deadline for seeking the county party's endorsement.

Similarly, Plaintiffs have failed to allege any concrete injury due to Kim's or Schoengood's association with other candidates. Kim actively sought the endorsement of the Monmouth County Democrats and other county party organizations. That endorsement has value, separate and apart from ballot position, and there is no evidence that Kim would not have sought those endorsements absent the benefit of county line ballot position. Moreover, Kim has no need to associate with candidates for ballot primacy because, as a U.S. Senate candidate, he has an equal chance of ballot primacy.

Likewise, Schoengood had an opportunity to seek the county line position in Monmouth (and other counties), but delayed entering the race until after the deadline for Monmouth County. Thus, she denied herself the opportunity to appear on the county line, and she cannot claim to feel pressure to associate because she expressed that she has no interest in associating (with anyone other than Kim) and did not give herself the opportunity to associate with Kim in Monmouth County. There is no protection for candidates who miss established deadlines that apply equally to all candidates.

SHN\762699.1

## POINT II

## PLAINTIFFS HAVE FAILED TO NAME
## INDISPENSABLE PARTIES TO THIS ACTION

Plaintiffs' motion for injunctive relief, seeking to fundamentally change the structure of New Jersey's ballots on the eve of the primary election, fails to join numerous indispensable parties who are either (i) granted authority and discretion under Title 19 over election processes involving ballot design, or (ii) candidates who are constitutionally impacted by the ballot design issues raised by Plaintiffs.

Federal Rule of Civil Procedure 19 provides that:

> A person who is subject to service of process and whose joinder will not deprive the court of competent jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

"There is no prescribed formula for determining in every case whether a person or corporation is an indispensable party or not." *Niles-Bement-Pond Co. v. Iron Moulders' Union*, 254 U.S. 77, 80 (1920). "Each case must depend upon its own facts and circumstances…persons who not only have an interest in the controversy, but an interest of such nature that a final decree cannot be made without either

16

affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience are indispensable parties." *Shields v. Barrow*, 58 U.S. 130, 139 (1854). "All persons who may be affected by the relief caught or who are interested in the object of the suite are generally deemed necessary parties." *Woulfe v. Atlantic City Steel Pier Co.*, 129 N.J. Eq. 510 (Ch. 1941).

Here, Plaintiffs filed an action against the Monmouth County Clerk, based on the duties delegated to her by Title 19, but has failed to join the Superintendent of Elections and the Board of Elections, two parties who also play critical roles delegated to them under Title 19 in connection with election procedures that are implicated by the structuring of ballots. Both the Superintendent and the Board of Elections are indispensable to the ballot design and programming process. (Hanlon Decl. at ¶ 13, 14.) Because the Superintendent and Board of Elections are not under the control of the Monmouth County Clerk, this Court would not be able to grant Plaintiffs' requested relief without joining those additional, indispensable parties.

The Superintendent of Elections is responsible for the custody and maintenance of voting machines. *N.J.S.A.* 19:32-53. The same software that is utilized by the County Clerk in designing the ballot is used by the Superintendent to program the voting machines. (Hanlon Decl. at ¶ 14.) If the voting machines

17

need to be reprogrammed to allow for a different ballot design, the Superintendent would need to participate and the Superintendent's voting machine technicians would require training to understand the new programming. The Superintendent's voting machine technicians are responsible for uploading the election database to the machines, and must also perform or have a vendor perform logic and accuracy testing before an election. If the ballot is suddenly changed, not only will there be no time for training, but there will be no time for the appropriate testing for which the Superintendent is responsible.

Additionally, all voting machines must be certified by the Secretary of State. *N.J.S.A.* 19:48-2, and reprogramming of the voting machines to accommodate a new ballot design would require recertification by the State. (ES&S Aff. at ¶ 8.) The Superintendent would be required to cooperate in certification, and to make the machines available for inspection. Further, the Superintendent must prepare an annual budget request (*N.J.S.A.* 19:32-26.9) to submit to the County Commissioners, and cannot spend money that is not covered by the budget. Therefore, to re-code the voting machines, the Superintendent must have sufficient funds budgeted by the County Commissioners. Accordingly, the Superintendent has a significant interest in this litigation, and failure to name him as a party should result in a denial of Plaintiffs' requested relief.

18

The Board of Elections is responsible, in part, for receiving, counting, investigating, and certifying mail-in ballots. A new ballot design will necessarily affect the role of the Board of Elections, as the optical scanners used by the Board of Elections to canvass the ballots utilize the same software as the Clerk's office. (Hanlon Decl. at ¶ 14.) Also, the individuals counting the ballots will encounter problematic ballots if voters are confused by the new format, particularly where there has been no time for voter education. The Board of Elections must also train poll workers who will likely confront voter confusion at the polls if a new ballot design is suddenly utilized. Plaintiffs failed to join the Board of Elections despite their essential role in the election and reliance upon a ballot that voters are accustomed to. As such, Plaintiffs' request must be denied.

In addition, Plaintiffs have not named political candidates, including the direct opponents of Plaintiffs, who will be impacted by any decision rendered by the Court in connection with this matter. Through this action, the constitutional rights of candidates who wish to associate and bracket will be directly impacted. Namely, Plaintiffs are seeking a declaration that the statutes at issue are unconstitutional. If that were to occur, the First Amendment rights of candidates who wish to associate and bracket would be impacted.

For example, Tammy Murphy is a leading candidate for nomination through the Democratic primary; however, Kim has failed to join her as a party in this

emergent action. Notably, Kim is leading Murphy in multiple polls and Kim and Murphy have split various contests for the county line position on ballots.  Murphy undeniably has a constitutional right of association that would be impacted by any decision made by this Court; however, after pursuing the Democrat's nomination for over five months, Kim did not include his leading opponent, Murphy, as a party to this action.  Particularly when considering the emergent timing of this matter, that strategic omission is fatal to his requested relief.

## POINT III

## PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS IN CHALLENGING THE CONSTITUTIONALITY OF NEW JERSEY'S ELECTION LAWS

Plaintiffs have failed to demonstrate a likelihood of success on the merits of their First and Fourteenth Amendment claims.  As this Court recognized in *Conforti*, resolution of Plaintiffs' claims requires weighing of Plaintiffs' burdens and the state's interests, and that balance involves factual issues that necessitate factual discovery. *Conforti v. Hanlon*, 2022 U.S. Dist. LEXIS 97003, *51 (D.N.J. 2022) ("Plaintiffs' burdens and the State's interests are factual and may require discovery. Depending on further factual findings, the state's interests may be sufficiently compelling to pass muster under the relevant Constitutional tests.

Plaintiffs now seek to satisfy their burden of proving likelihood of success without any factual discovery into the facts pertinent to the 2024 primary elections,

based solely on conclusory expert reports opining about "possible" outcomes based on generalized and untested statistical conclusions provided to Defendants and this Court in incomplete and untimely fashion on the eve of the state's ballot design deadlines for the 2024 primary elections.  Plaintiffs have failed to meet their burden of demonstrating a constitutional right to appear on an office-block ballot, when weighed against the state's interests in protecting the integrity of the 2024 primary elections and the candidates' First Amendment associational rights.

The United States Supreme Court set forth a framework for the review of the constitutionality of state laws governing elections.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (establishing the standard by which states enact laws to administer elections, while balancing the threat of infringement on voter and candidates' rights); *Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (applying a flexible standard under which a court considering a state election law challenge must weigh the character and magnitude of the asserted injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule).

In *Anderson*, the Court recognized that "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates."  *Id*.  Rather,

21

there must be "a substantial regulation of elections if they are to be fair and honest . . . some sort of order, rather than chaos." *Id*. (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).  As the Court acknowledged, any state law governing the election process has at least some effect on "the individual's right to vote and his right to associate with others for political ends," however, "the state's important regulatory interests are generally sufficient to justify **reasonable, nondiscriminatory restrictions**." *Anderson*, 460 U.S. at 788 (emphasis added).

In weighing the burdens to plaintiff against the state interests, election regulations that impose a severe burden are subject to scrutiny by the courts and may be upheld only if they are narrowly tailored to serve a compelling state interest. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).  Conversely, election regulations that impose only reasonable burdens require a lower form of scrutiny. *Anderson*, 460 U.S. at 788.  The U.S. Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Burdick v. Takushi*, 504 U.S. 428, 438 (1992).

A. **Plaintiffs Fail to Meet their Burden of Establishing that they are Likely to Succeed on the Merits of their First and Fourteenth Amendment Challenges to New Jersey's Election Laws**

The New Jersey election laws at issue involve competing constitutional interests governing the right to associate implicated by bracketing slates of candidates running together as a team that must be weighed against Plaintiffs'

22

claimed infringement of constitutional rights based on being incentivized to associate and/or having an alleged diminished opportunity to be elected if they do not associate through bracketing with a slate of candidates.

### 1. <u>New Jersey's Election Law Framework for Ballot Design</u>

Given that the primary election which forms the basis of this matter involves a U.S. Senate election, *N.J.S.A.* 19:23-26.1 and *N.J.S.A.* 19:49-2 are applicable. *N.J.S.A.* 19:23-26.1 provides that "in the case of a primary election for the nomination of a candidate for the office of United States Senator . . . the names of all candidates for the office of United States Senator…shall be printed on the official primary ballot in the first column or horizontal row designated for the part of those candidates." *N.J.S.A.* 19:49-2 provides in relevant part, "in those counties where voting machines are used, the county clerk shall have the authority to determine the specifications for, and the final arrangement of, the official ballots." Further, the statute provides that:

> For the primary election for the general election in all counties where voting machines are or shall be used, all candidates who shall file *a joint petition with the county clerk* of their respective county and who shall choose the same designation or slogan *shall be drawn for position on the ballot as a unit* and shall have their names placed on the same line of the voting machine; and provided further, that all candidates for municipal or party office in municipalities in counties where voting machines are or shall be used who shall file a petition with the clerk of their municipality bearing the same designation or slogan as that of the candidates filing a joint petition with the county clerk as aforesaid, may request that his or her name be

23

placed on the same line of the voting machine with the
candidates who have filed a joint petition with the county clerk
as aforesaid by so notifying the county clerk of said county in
writing within two days after the last day for filing nominating
petitions and thereupon the county clerk shall forthwith notify
the campaign manager of such candidates filing a joint petition
as aforesaid of said request, and if the said campaign manager
shall file his consent in writing with the said county clerk
within two days after the receipt of said notification from said
county clerk, the clerk of said county shall place the name of
such candidate on the same line of the voting machine on which
appears the names of the candidates who have filed the joint
petition as aforesaid. *Id.*

In 2024, the ballot drawing for the primary election is "driven" by the fact

that there is a United States Senate race. Accordingly, *N.J.S.A.* 19:23-26.1

mandates that the first columns of the ballot be allocated to United States Senate

candidates (regardless of whether they are bracketed with other candidates).

Further, *N.J.S.A.* 19:49-2 sets forth the way candidates may affiliate with other

candidates. Specifically, the only candidates that can file joint petitions under New

Jersey law are county candidates who are running for the same office for the same

term. If a candidate seeks to be included "on the line" or bracketed with county

candidates, they must make a written request, generally known as a bracketing

letter, for such inclusion to the county clerk within two days of the filing of their

petition. The county clerk in turn forwards that request to the county candidates'

campaign manager for approval. The candidates, through their campaign manager

may grant or deny consent to the request to bracket.

24

In addressing *N.J.S.A.* 19:49-2, the New Jersey Supreme Court has recognized the importance of the Legislature's authority to adopt reasonable election regulations: "there can be no doubt about the authority of the Legislature to adopt reasonable regulations for the conduct of primary and general elections. Such regulations, of course, may control the manner of preparation of the ballot, so long as they do not prevent a qualified elector from exercising his constitutional right to vote for any person he chooses." *Quaremba v. Allan*, 67 N.J. 1, 11 (1975), *aff'd as mod*. 128 N.J. Super 570 (App. Div. 1974).

In *Quaremba*, the New Jersey Supreme Court concluded that bracket ballot placement, under *N.J.S.A* 19:49-2, does not rise to the level of a constitutional, equal protection issue that requires redress. *See id*. at 10-18. In *Quaremba*, Plaintiffs, candidates for State Senate and Freeholder, challenged ballot bracketing, arguing that an unaffiliated candidate would draw more votes if an opponent's name were not grouped with candidates for other offices. The New Jersey Supreme Court flatly rejected that argument, holding: "Even if that be true, it affords no basis for invalidating, as unreasonable, the legislative determination that whatever the effect on an unaffiliated candidate, the public interest is better served by permitting a grouping of candidates having common aims or principles and authorizing those candidates 'to have this fact brought to the attention of the voter

in a primary election with the additional effectiveness produced by alignment of their names on the machine ballot.'" *Id.* at 13.

As further recognized by the United States Supreme Court in *Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214 (1989), when considering the balance between plaintiffs' alleged burden and a state's interests, the associational rights of political parties are an important state interest protected under the First Amendment.  Thus, Plaintiffs' claimed rights are no more important than the state's interest in protecting the rights of candidates who wish to associate on a primary ballot.

### 2.  Plaintiffs Fail to Establish a Constitutionally Recognized Burden

As this Court recognized in *Conforti*, "[w]hen reviewing a case under the *Anderson-Burdick* [test], courts tend to establish a robust factual record to characterize an alleged burden." *Conforti,* 2022 U.S. Dist. LEXIS 97003 at *45. Plaintiffs seek to satisfy their burden of proving likelihood of success without establishing such a robust factual record.[5]  Rather, Plaintiffs rely on generalized

---

[5] Plaintiffs' counsel consciously delayed engaging in discovery in *Conforti* that could have developed such a factual record.  On February 12, 2024, in the weeks leading up to filing this emergent application, Plaintiffs' counsel sought a nearly two-month extension to the exchange of discovery responses from February 20, 2024 to April 12, 2024, thus pushing back the development of relevant evidence until after the anticipated resolution of this motion.

and conclusory expert reports that fail to support Plaintiffs' claims in any particularized way.

### a.  <u>Plaintiffs' Asserted Burden on their Equal Protection Rights</u>

Ballot allocation cases, such as this one, are recognized as involving a lesser burden on the right to vote. *See Democratic-Republican Org. v. Guadagno*, 900 F. Supp. 2d 447, 456 (D.N.J. 2012) ("[T]he statute in question, however, does not restrict access to the ballot or deny any voters the right to vote for candidates of their choice. . . . Instead, it merely allocates the benefit of positional bias, which places a lesser burden on the right to vote.").  In *Conforti*, this Court recognized that such cases should not be pegged to any particular level of scrutiny, but, rather, should employ a weighing process. *Conforti,* 2022 U.S. Dist. LEXIS 97003 at *49 (citing *Democratic-Republican Org.*, 900 F. Supp. 2d at 453).  This Court acknowledged that the New Jersey election laws underlying the ballot bracketing structure have a "plainly legitimate sweep," and as such may be invalidated only if "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep."  *Id.*

Plaintiffs have failed to establish that Monmouth County (or any County) is applying, let alone substantially applying, the New Jersey elections law in an unconstitutional manner.  Plaintiffs contend that candidates listed in the first column on the ballot receive additional votes solely because they are listed in the

27

first column.  That position, without more, has been rejected by courts in this

Circuit.  *See Democratic-Republican Org. v. Guadagno*, 900 F. Supp. 2d at 459

("placing political party candidates on the left side of the ballot and all other

candidates on the right side, as prescribed by *N.J.S.A* 19:5-1 and 19:14-12, does

not violate Plaintiffs' constitutional rights. These statutes impose, at most, a

minimal burden on Plaintiffs' ballot access."); *Voltaggio v. Caputo*, 210 F. Supp.

337, 339 (D.N.J. 1962) (finding that even though independent candidates could not

be placed first on the ballot, there was no violation of the Fourteenth Amendment).

Thus, in order to challenge the constitutionality of ballot position

allocations, Plaintiffs must set forth "persuasive, empirical evidence" that their

column position will have a significant impact on election day.  *See Democratic-*

*Republican Org.,*900 F. Supp. 2d at 458 (collecting cases requiring empirical

evidence). Plaintiffs' sole reliance on conclusory expert reports fails to meet that

empirical burden.

Plaintiffs contend that certain candidates benefit from the positional bias of

being in the first ballot column; however, as Plaintiffs concede, the impacts of

positional bias depend on the factual circumstances of the election, office and

candidates in question. *See New Alliance Party v. New York State Bd. of Elections*,

861 F. Supp. 282, 288 (S.D.N.Y. 1994) ("[C]ourts have consistently held that the

effect of ballot placement on election outcomes is a factual determination. . . . That

28

position bias is a popular perception of the voting public, however, is not sufficient to exempt [plaintiff] from the burden of proving its claims.").

As a Senate candidate, Kim's ballot position is randomly assigned, so Kim has an equal opportunity to obtain a first column ballot position.  Thus, bracketing has no impact on his chances of receiving first column ballot position and Kim has no equal protection argument relating to access to the first ballot column.  Indeed, Dr. Pasek compared bracket and office-line ballots based on first column effects and concedes there was *no difference* for Senate candidates. (Pasek Report at ¶ 147.)("On average, the effect of being listed first for a Senate candidate was 2.1[%] larger on a party-column ballot than an office-block ballot. While this may be a real distinction, we could not distinguish a benefit of this magnitude from chance.").  For the Congressional candidates, there is still no reliable evidence on the record suggesting that appearing in the first versus second or third column of the ballot will have a significant impact on a candidate's election chances, or that there is any consistent or likely application of New Jersey's election laws that would otherwise significantly impact a candidate's chances.

Plaintiffs also claim to be burdened by the "weight of the line," or the placement of party-endorsed candidates in a single column.  Plaintiffs' experts acknowledge, however, that any statistical evidence showing an advantage to the "weight of the line" could be attributed to an "endorsement effect" or other

political or associational factors.  Dr. Pasek apparently attempted to address those issues by designing and conducting a study for this case, together with Braun Research, where potential voters are asked to respond to hypothetical ballots delivered to voters through text message links.  Plaintiffs failed to provide Defendants with timely or complete information about Dr. Pasek's study design, or his conduct of the study or its results, so any reliance on the study plainly would be prejudicial.  Nevertheless, it is apparent that his study generated inconsistent results, general survey confusion, and limited substantiated conclusions.  For example, Dr. Pasek observed disparate impacts when attempting to isolate and measure the impact of the "weight of the line," but he ultimately conceded that the benefits a candidate receives depends on the particular circumstances of the election contest.  (*Id*. at ¶ 135)("this disparate impact suggests that the benefits of county party endorsements likely hinge on features of the contest in which the endorsement takes place.").[6]

     Plaintiffs also contend that they are burdened because unbracketed candidates are not automatically placed in the column next to their opponents, or

---

[6] Plaintiffs also cite to the fact that no state legislative incumbent who was featured on the county line lost a primary election in the last 14 years, and that only two congressional incumbents lost their primary elections in the last 50 years. Plaintiffs fail to consider, however, that other factors besides the "weight of the line" may be at work, such as the benefits of incumbency, name recognition, gerrymandering, and fundraising.

may be in a column alone or with candidates running for the same office, or with candidates with whom they do not wish to be associated. Plaintiffs assert that these possible placement scenarios, or a combination of these placement scenarios, might place them at a disadvantage, but Plaintiffs fail to point to evidence that these ballot placement possibilities will happen or would significantly impact the candidates.

Accordingly, this is no evidentiary record sufficient to support finding any burden on Plaintiffs' Fourteenth Amendment rights.

### b. Plaintiffs' Asserted Burden on their Right to Associate

In *Conforti*, this Court recognized that "if there is a consistent benefit for those who bracket and a consistent detriment for those who do not bracket, then the statute creates a . . . moderate burden on the right to associate." Plaintiffs have failed to establish even that moderate burden in this case. *Conforti,* 2022 U.S. Dist. LEXIS at*48.

Plaintiffs' expert report fails to establish a "consistent benefit" to candidates who bracket or a "consistent detriment" for those who do not bracket. The potential benefits and detriments depend on the factual circumstances of the election, office and candidates in question. For example, as a Senate candidate, Kim has no ballot access basis to believe that bracketing would have a consistent benefit. As a Congressional candidate, Schoengood has not been incentivized to

31

bracket because she has made clear that she would only bracket with a candidate with aligned interests such as Kim.

Plaintiffs' expert, Dr. Pasek, also speculates in conclusory fashion that because of the bracketing effect, "voters cannot reliably presume that candidates who are bracketed together are doing so for any reason beyond the desire to win their respective elections." (Pasek Report at ¶ 63.)  That ignores the endorsement effect and the benefits of association outside of ballot placement that Pasek, himself, acknowledges in his report.  The great weight of evidence shows that candidates associate with other candidates because of the value of those associations beyond ballot position.

**3.** **The State's Important Interests in Orderly Regulation of Elections and Protecting the Association Rights of Candidates Justify the State's Reasonable Ballot Allocation Decisions**

Because Plaintiffs have failed to demonstrate a severe burden, the State must only show "relevant and legitimate" state interests that are "sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.,* 553 U.S. 181, 191 (2008). In considering the weight of these interests, the Court's review is "'quite deferential,'" *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 153 (3d Cir. 2022) (quoting *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008), and will not require "'elaborate, empirical verification of the weightiness of the State's

asserted justifications.'" *Id.* at 153 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).

Here, New Jersey has important regulatory interests in (a) upholding candidates' right to associate with other political candidates and make those associations known to voters, and (b) maintaining the integrity of the election and preventing voter confusion.

### a. The State's Strong Interest in Preserving Candidates' Rights to Associate and Make those Associations Known to Voters

Plaintiffs contend, against the weight of well-settled law, that New Jersey does not have a legitimate interest in allowing candidates to bracket together to demonstrate their association with one another. *See Eu*, 489 U.S. at 224 (citing *Tashjian*, 479 U.S. at 214) ("it is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments."). *Eu* makes clear that States are constitutionally prohibited from enacting election laws that infringe on political parties' rights to associate. *Eu*, 489 U.S. at 222 ("A State's broad power to regulate the time, place, and manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.'"). "Barring political parties from endorsing and opposing candidates not only burdens their

freedom of speech but also infringes upon their freedom of association." *Eu*, 489 U.S. at 224.

Thus, the State has a strong interest in preserving the rights of county political organizations to endorse particular candidates and associate with those candidates on the election ballot.  Visually aligning those candidates on the primary ballot serves as a valid expression of that interest.  Because the burdens alleged by Plaintiffs fail to qualify as severe, the Court should be deferential to the State's identified interest. *Mazo*, 54 F.4th at 153.

Plaintiffs contend that the States already address the candidates' interest in protecting associational rights by including common slogans on the ballots. However, the issue is whether ballot bracketing is a reasonable approach to giving effect to candidates' association rights, and not whether the use of slogans on ballots sufficiently identifies candidates' associations. There is no requirement for a state to choose an alternative to a reasonable ballot alignment.

### b.  <u>The State's Strong Interest in Preserving Timely and Orderly Elections and Avoiding Voter Confusion</u>

Additionally, as this Court has recognized, the State has a strong interest in preserving a timely and orderly election. *Conforti,* 2022 U.S. Dist. LEXIS at *49 (citing *Valenti v. Mitchell*, 962 F.2d 288, 301 (3d Cir. 1992) ("The state's interest in a timely and orderly election is strong.").  "It is well-settled that the State has an interest in regulating elections to ensure that voters can understand the ballot." *Id.*;

*see Mazo*, 54 F.4th at 154 (quoting *Eu*, 489 U.S at 231) ("'A State indisputably has a compelling interest in preserving the integrity of its election process.'").  To maintain the integrity of the election process, the state must ensure that voters will not be prevented by confusion from exercising their vote. *See Mazo*, 54 F.4th at 154 (quoting *Tashjian,* 479 U.S. at 221-22) ("States have 'legitimate interests in preventing voter confusion and providing for educated and responsible voter decisions.'").

In New Jersey, primary election voters are accustomed to the current ballot design, which has been utilized for decades. (Hanlon Cert. at ¶ 31.) If the ballot were suddenly changed, significant voter education would be required to inform primary voters as to how to identify candidates running as a team or slate on the ballot. *Id.* As this Court has recognized, changes in ballot design can disenfranchise voters by confusing them. *See Conforti,* 2022 U.S. Dist. LEXIS *50 ("The State's interests in providing a manageable and understandable ballot, as well as ensuring an orderly election process are hampered by the fact that one-third of all Mercer County voters were disenfranchised because they voted for more than one candidate for the same office."). As the United States Supreme Court has recognized, "[c]ourt orders affecting election . . . can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).  Thus, the State has a strong interest in ensuring

that any changes to the ballot are the result of thoughtful and deliberate decisions of the legislature, particularly considering New Jersey's long-standing use of the current ballot structure.

Plaintiffs ignore the recognized, strong state interest in the orderly management of elections and cite to inapposite cases where the only state interest was invidious discrimination.  For example, in *Sangmeister v. Woodard*, 565 F.2d 460 (7th Cir. 1977), the County Clerks placed *their own party* first on the ballot, and the Court found the only purpose was intentional discrimination.[7]  Similarly Plaintiffs cite to *Weisberg v. Powell*, 417 F.2d 388 (7th Cir. 1969), but in that case, the Secretary of State was basing ballot placement decisions *on his own party affiliation,* and advising people he wanted to be elected to file by mail by a certain day to ensure better placement on the ballot.  Finally, Plaintiffs cite to *Graves v. McElderry*, 946 F. Supp. 1569 (W.D. Okla. 1996), in support of their proposition that "political patronage is not a legitimate state interest," however, the issue in *Graves* was that the Democratic candidate was always listed first on the General Election ballot. *Id.* at 1571.  Here, in contrast, all candidates have the opportunity

---

[7]Plaintiffs' citation to *Jacobson v. Lee*, 411 F. Supp. 3d 1249 (N.D. Fla. 2019) undermines Plaintiffs' position. The Eleventh Circuit vacated *Jacobson*, finding that the plaintiffs lacked standing because their claimed injury was based on statewide averages of primacy effect similar to Plaintiffs' experts in this case. *Jacobson v. Fla. Sec'y,* 957 F.3d 1193, 1205 (11th Cir. 2020).

to bracket if they wish and seek placement on the county line or to affiliate with any other group of candidates.

Accordingly, the State's interest in upholding associational rights and maintaining election integrity and avoiding voter confusion are sufficiently weighty to justify any minimal burdens to Plaintiffs.

### B. Plaintiffs Fail to Meet their Burden of Demonstrating that they are Likely to Succeed on the Merits of their Elections Clause Challenge

Plaintiffs also contend that the manner in which ballot placement occurs as it applies to Senate and House of Representative candidates violates the Elections Clause of the United States Constitution.  Article I, Section 4, Clause 1 of the United States Constitution provides, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may from time to time by Law make or alter such Regulations, except as to the Places of [choosing] Senators."  In *Foster v. Love*, 522 U.S. 67, 69 (1997), the Supreme Court noted that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of Congressional elections."  Further, the Supreme Court noted that the Framers intended the Elections Clause to grant states the authority to create procedural

regulations for such federal elections." *U.S. Terms Limits, Inc. v. Thorton*, 514 U.S. 779, 832 (1995).

The Court has also recognized that the reference to "Legislature" encompasses more than just the lawmaking body. *Singh v. Murphy*, 2020 WL 6154223 (App. Div. 2020). Instead, it refers to the state's legislative power "performed in accordance with the State's prescriptions for lawmaking." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 805 (2015).

In this matter, the State Legislature has established the laws, essentially the manner in which ballot position is to be drawn, for primary elections. They have in turn empowered county clerks to implement those laws, which permits reasonable discretion.[8] The Supreme Court has held that "'the states are given, and in fact exercise, a wide discretion in the formulation of a system for the choice by the people of representatives in Congress.'" *Voltaggio,* 210 F. Supp. at 338-39 (quoting *United States v. Classic*, 313 U.S. 299, 311 (1941)). Indeed, the state of New Jersey has exercised this discretion, and in doing so, has given county clerks the power to implement the laws related to ballot design.

---

[8] It is important to note that discretion is necessary for clerks in configuring their ballot. This is due to spatial and technological limitations created depending on the number of candidates running and positions in which elections are being held.

Plaintiffs rely upon *Cook v. Gralike*, 531 U.S. 510, 523 (2001) to support their untenable position that the current method of ballot design "dictate[s] electoral outcomes," "favor[s] or disfavor[s] a class of candidates," or "evade[s] important constitutional constraints." In *Cook*, a Missouri Constitution provision required a notation to be printed on primary and general election ballots next to congressional and senatorial candidates if they did not support term limits. *Id*. at 514. Plaintiffs attempt to compare New Jersey's ballot design to Missouri's notations, and fail to effectively do so. The notations complained of in Missouri were described by the lower courts, and endorsed by the Supreme Court, as "pejorative," "derogatory," "intentionally intimidating," and "official denunciation." *Id.* at 524. Further, the Supreme Court noted that the notations had been referred to as "the Scarlet Letter." *Id.* at 524-25. Nothing even remotely similar occurs under New Jersey law. Plaintiffs unsuccessfully attempt to cast ballot placement as a "sanction" comparable to a blatantly pejorative notation. Rather, in New Jersey, ballot placement falls squarely within the "manner" of holding an election, and affords all candidates the opportunity to bracket or not bracket with other candidates. It does not pejoratively describe or denunciate candidates who did not agree with a particular political position, or attach a derogatory label to those who choose not to bracket.

Further, Plaintiffs attempt to garner support for their position that New Jersey's primary ballot laws do not serve as a "manner" of regulating elections by pointing to *Conforti*, 2022 U.S. Dist. LEXIS at*19, wherein the Court held that there were "sufficient allegations that the Bracketing Structure does not act as a 'manner' of regulating federal elections and may dictate electoral outcomes and favor or disfavor certain classes of candidates." However, the instant matter relies upon a wholly different standard: Plaintiffs must show a "significantly better than negligible" chance that the Plaintiffs will win on the merits. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The standard is greater than in a motion to dismiss, and Plaintiffs have failed to meet that burden. They claim that the allegations are now supported by "scientific proof" but the expert reports submitted fall far short of "proof." More accurately, they are *opinions* based upon disputable studies whose authors doubtfully claim their studies to be incontrovertible "proof" that bracketing dictates election outcomes. And, as described *supra*, Pasek's study provides conflicting evidence, hardly qualifying as "scientific proof."

## POINT IV

## PLAINTIFFS HAVE FAILED TO ESTABLISH IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

Plaintiffs have failed to meet their burden of making a "clear showing of immediate irreparable injury." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).  Specifically, Plaintiffs seek to establish irreparable harm by asserting a speculative risk to their constitutional rights, while at the same acknowledging that they sat on their claims and participated in the ballot system that they now seek to turn on its head on the eve of the primary elections.  *Id*. ("Establishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]."); *see also Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("[T]he claimed injury cannot merely be possible, speculative, or remote.").

Here, Kim announced his candidacy for United States Senate on September 23, 2023.  At the time, Kim stated that he'd support ending the county organizational line system; however, he did not proceed with an emergent action to protect his constitutional rights.  Rather, he confirmed that he would, himself, seek county lines for his Senate bid: "I'll work within the system we have, seek county endorsements, and respect the contribution structures and limits that are currently

in place."[9]  Kim's own actions demonstrate that he did not foresee a risk of imminent harm as a result of New Jersey's long-standing ballot design laws.

Plaintiffs fail to explain how Kim now faces imminent harm after he failed to address that purported harm for the past five months, particularly given that Plaintiffs' counsel has been litigating the same constitutional challenge in the *Conforti v Hanlon* case for the duration of that time.  In fact, for the reasons discussed in Point I, *infra*, Kim, personally, does not face any concrete, non-speculative harm.  In fact, Kim has already received the county line from Monmouth, Burlington, Hunterdon, and Warren Counties, and as a Senate candidate, he has an equal opportunity to receive placement in the first column or row on ballots in every county.

For Schoengood, she entered the race late and either missed the deadlines for seeking county convention endorsements (*e.g.*, Monmouth County) or simply has not expressed her intent to pursue those endorsements.  Thus, it was her inaction or choice not to appear on the county line (together with Kim, the only candidate with whom she would like to associate) and Plaintiffs have failed to establish that any resulting diminished chances are caused by bracketing on the ballot, as opposed to

---

[9] Joey Fox, *Kim says he wants to end the county line*,  New Jersey Globe, (Sept. 25, 2023 9:00 a.m.) https://newjerseyglobe.com/congress/kim-says-he-wants-to-end-the-county-line/ (last accessed March 6, 2024).

SHN\762699.1

her failure to obtain her party's endorsement, her late entry into the race or her lack of name recognition.

Thus, although a loss of First and Fourteenth Amendment rights can constitute irreparable harm, that is not the case here, given that the New Jersey election laws provide reasonable procedures for administering elections and Plaintiffs have failed to establish that they have suffered any loss of their Constitutional rights.  Further, any claimed pressure for Plaintiffs to associate with other candidates is negligible and far outweighed by the candidates' First Amendment right to associate with each other, as discussed more fully under Point IV, *supra*.

## POINT V

## GRANTING PLAINTIFFS' REQUEST FOR AN INJUNCTION WOULD RESULT IN IRREPARABLE HARM TO DEFENDANTS AND STATE ELECTION OFFICIALS

In weighing the limited, speculative harm identified by Plaintiffs against the competing harm to Defendants resulting from Plaintiffs' far-reaching requests on the eve of ballot preparation, the harm to Defendants caused by any late changes to the ballot would far exceed any harm to Plaintiffs.

Courts have recognized that any order changing the operations of New Jersey's election laws late in the election process would cause significant hardship to election officials and workers.  *See N.J. Press Ass'n v. Guadagno*, 2012 U.S.

43

Dist. LEXIS 161941, *23-24 (D.N.J. 2012) (recognizing risk of irreparable harm when election changes would cause a strain to thousands of election officials and poll workers at more than 3,400 polling locations throughout the State, each of whom would be required to learn and apply a new set of regulations in an extremely short period of time).  Plaintiffs' requested injunction would create a similar strain on election officials and workers given that it would require a redesign of an entire ballot with a cascading effect on programming of election machines, state certifications of those machines and retraining and reeducating thousands of election workers and millions of voters. *Id.* (changes to election laws could cause hardship for the voters who would be subjected to new and potentially confusing regulations on the eve of the election).

## A. <u>The Harm and Impracticality of Imposing Burdens on the Ballot Design Process at this Late Stage of the Ballot Process</u>

The 2024 primary election involves a particularly complex ballot.  It includes candidates for President, Delegates for President, United States Senate, United States Congress, County Commissioner, and municipal officials.  The primary election also includes municipal political party or "county committee" representatives for each election district in each county.  In Monmouth County alone, this involves 474 separate election districts, and two representatives from each political party to be elected in the primary for each election district.  Each election district has two separate ballots—one for Democrats and one for

Republicans. (Hanlon Decl. at ¶ 10.)  Accordingly, the clerk's office is tasked with designing, programming, printing and mailing 948 separately designed ballots containing more than 2,000 candidate names and slogans. (*Id*. at ¶¶ 10-11.)

Election officials are responsible for accomplishing those tasks within an incredibly compressed timeframe. Specifically, pursuant to *N.J.S.A.* 19:49-2, the timeframe for submissions from candidates who wish to bracket with other candidates and use slogans to associate with one another is between *March 25 and March 27, 2024*.  By that date, municipal candidates must submit petitions to the municipal clerks in their jurisdictions; county candidates submit petitions to the County Clerk; state and federal candidates submit petitions to the Secretary of State. (*Id.* at ¶ 12.) Immediately after those submissions, the county clerks must prepare the ballots by *April 4, 2024*, the deadline for the clerk's office to conduct the drawing to determine final ballot positions for all primary election candidates. (*Id.* at ¶ 16.) The deadline for printing those ballots is April 5, 2024. (*Id*. at ¶ 19.) That is the last possible day that any changes can be made to the ballot in order for the primary election to meet both federal and state deadlines for mail-in ballots (which must be mailed by *April 20, 2024*) and to allow enough time for the programing of the County's election management software. (*Id*. at ¶¶ 19, 28.) Those statutory time constraints are extraordinary *in the normal course* and have become increasingly difficult with the increased utilization and prevalence of

voting by mail, and particularly so in Presidential election years when county committee races are also taking place. (*Id*. at ¶ 29.)

In Monmouth County, the clerk's office has 6 employees to support meeting those deadlines. (*Id*. at ¶ 6.)  To prepare for the March 25 submissions, the clerk's office is *already* collecting information from municipal clerks about the types of offices that will be on the ballot in the 53 municipalities in Monmouth County. (*Id*. at ¶ 11.) That information is included in a spreadsheet that the clerk's office updates when the clerk receives name and slogan information that corresponds with the offices. (*Id*. at ¶ 17.) Because it involves over 2,000 names, it takes the clerk's staff days to input all of this information.  At the same time, the clerk's office proceeds with approvals from the campaign managers of the county candidates about who will be bracketed.

Once complete, all of the data is transferred into the import spreadsheet and then to an ES&S database to program for the election. (*Ibid.*) The clerk's office then sends the ballot information to the ballot printer to place all of the information on the paper ballot, while at the same time creating the machine layout to correspond with the paper.   All of the paper ballots need to be coded to correspond to the scanners at the Board of Elections, which in turn is coded and connected with the ES&S Electionware system. (*See id.* at ¶¶ 21-24.) Then, proofreading and

46

testing begins to ensure that the ballots will be scanned and counted properly for 948 ballots and more than 2,000 candidates.

Plaintiffs' requested changes to the ballot design at this late stage in the process would cause enormous administrative costs to the clerk's office in terms of resources require to redesign the ballot, retrain and reeducate staff, and accomplish all of the normal tasks that already strain the clerk's office undoubtedly leading to delays that are not permitted by New Jersey election laws and errors that are never acceptable in a Presidential primary election.  Primary election voters are accustomed to New Jersey's ballot design, which has been utilized for decades. (*Id.* at ¶ 31.) Significant voter education would be required to make primary election voters aware of any new proposed changes to be able to determine how to identify candidates running as a team or slate on the ballot. (*Ibid.*) Any abrupt changes to New Jersey's longstanding primary election ballot structure would likely cause significant voter confusion in the absence of a comprehensive voter education campaign. (*Ibid.*)

### B. <u>The Harm and Impracticality of Imposing Burdens on the Entire Election System at this Late Stage of the Election Process</u>

The process of designing and producing ballots is part of a much larger, integrated election system that involves the election machines and software as well as the physical ballots themselves. In Monmouth County, that system is managed

by the County Clerk, the Superintendent of Elections, and the Board of Elections. (*Id.* at ¶ 4.)

At present, Monmouth County utilizes ES&S ExpressVote XL machines, which have only been coded and certified by the Secretary of State to conform with existing ballot design. (*Id.* at ¶ 24.) Any changes to the ballot require reprogramming of the election machines and software that are specifically tailored to the current ballot design.  Further, as Benjamin Swartz, ES&S' Principal State Certification Manager avers, any changes to the ballot design "would need to be evaluated to determine feasibility" and "would require development, testing and certification of a new and/or updated version of the software." (ES&S Aff. at ¶ 8.) For Monmouth County, any effort to re-code ES&S machines and then reprogram the election management software for 948 separate ballots containing more than 2,000 candidate names and slogans in the remaining time provided for the primary election would be fraught with risk for the primary election. (Hanlon Decl. at ¶¶ 30, 32.) Not only would those measures be resource intensive and costly, but as ES&S expressly stated, they "could not be made and implemented prior to New Jersey's 2024 primary elections." (ES&S Aff. at ¶ 8.)

Courts have recognized that imposing additional logistical challenges on state election officials, in circumstances not nearly as fraught with risk, can be a significant harm that would result from entering Plaintiffs' proposed injunction.

*See Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 374-75 (D.N.J. 2020) (recognizing significant harm when New Jersey must either "hire and train additional staff members to review, canvass, and count ballots"). The risks of making significant changes in such a short amount of time on machines that have not previously been used, tested or certified for office block balloting, could greatly compromise the integrity of a number of highly competitive primary elections at a time when the integrity of the election process is already under extreme scrutiny. (Hanlon Decl. at ¶ 30.)

For these reasons, the balance of harms weighs heavily against Plaintiffs' requested injunctive relief.

## POINT VI

## PLAINTIFFS HAVE FAILED TO ESTABLISH THAT GRANTING A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

Plaintiff's motion for a preliminary injunction, on the eve of the New Jersey county clerks' preparation of primary election ballots, is against the public interest because it would (i) require extensive delays to the primary election process, (ii) cause voter confusion and risks to the integrity of the upcoming primary election, and (iii) overturn the New Jersey legislature's long-established determination to

SHN\762699.1

bracket candidates consistent with the public interest in supporting candidates' right to associate on the election ballot.

It is a general principle that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S. 1 (2006); *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 574 U.S. 951 (2014)).

### A. <u>Changes to the Ballot Design Process at this Late Stage of the Ballot Process are not Practically Feasible within the Statutory Timing Provided for the 2024 Primary Election Process</u>

A critical consideration for Plaintiffs' application for injunctive relief, is the public interest in a timely, efficiently run and appropriately certified election. Plaintiffs' expert attempts to address the point of whether New Jersey's voting equipment can accommodate an "office block" format; however, those conclusions are generalized and speculative.  (*See* Appel Report ("Although no state currently using the ExpressVote XL does so with an office-block format, several pieces of evidence suggest that it is possible").)  Also, notably, nowhere do Plaintiffs or their experts address what is required from voting machine vendors to accommodate an office block format on New Jersey's current machines, whether that could be accomplished in time for the 2024 primary elections, or the resources or costs required for such a transition.

50

In contrast to Mr. Appel's unsubstantiated conjecture, ES&S' Principal State Certification Manager submitted an affidavit that directly addresses this issue and makes clear that certification of a new ballot format could not be accomplished in time for the primary elections:

> [ES&S systems] used in New Jersey were certified and tested using the current, traditional ballot layout style. Any deviations from that style would need to be evaluated to determine feasibility. Depending on the ballot layout style requirements, any changes would require development, testing and certification of a new and/or updated version of software. ***Such deviations could not be made and implemented prior to New Jersey's 2024 primary election.***

(ES&S Aff. at ¶ 8 (emphasis added).)  Given that statement from ES&S, there is a strong public interest in proceeding with the 2024 primary election, on the statutory time frame under New Jersey election laws, based on the standard election ballot.

## B.  <u>The Public's Interest in Avoiding Voter Confusion</u>

In addition to the feasibility of certifying the machines if they must be re-coded, Courts must consider that enjoining a state's election regulations and procedures on the eve of an election can "result in voter confusion" and incentivize voters "to remain away from the polls." *Purcell*, 549 U.S. at 4-5; *see Donald J. Trump for President, Inc.,*, 492 F. Supp. 3d at 375-376 (changes to New Jersey's election procedures on the eve of the election "are likely to cause confusion among the electorate that is against the public interest").

51

Here, changing the ballot design at this stage of the election would require considerable resources, training and education for election officials to coordinate changes to the ballot, reprogramming and training on the election machines and software, and training and education for election workers and voters on the new ballots themselves. Such changes to the ballot design at this late stage of the primary election process would dramatically impact the county clerks' ability to ensure an orderly and efficient election process. (*See* Hanlon Decl. at ¶¶ 30-32*; see also N.J. Press Ass'n v. Guadagno*, 2012 U.S. Dist. LEXIS 161941, *25 (D.N.J. 2012)(recognizing the "public's interest in the State's ability to ensure a safe, orderly and efficient voting process in which voters are able to exercise their constitutional rights without undue influence or obstruction").)  There is a strong public interest in avoiding disorder and confusion caused by late changes to the election process.

### C. <u>The Public Interest in Protecting the First Amendment Right to Candidate Association</u>

The New Jersey Supreme Court has also recognized, in considering the election laws at issue here, the strong public interest in permitting grouping of candidates to protect their First Amendment association rights.  *See Quaremba,*67 N.J. at13 (quoting *Harrison v. Jones*, 44 N.J. Super. 456, 461 (App. Div. 1957)(holding that "even if it were true that an unaffiliated candidate would draw more votes if his opponent's name were not grouped with those of candidates for

52

other offices, it affords no basis for invalidating, as unreasonable, the legislative determination that whatever the effect on an unaffiliated candidate, the public interest is better served by permitting a grouping of candidates having common aims or principles and authorizing those candidates 'to have this fact brought to the attention of the voter in a primary election with the additional effectiveness produced by alignment of their names on the machine ballot.'").)

Plaintiffs' request for this court to impose an office-block format on New Jersey ballots conflicts with the long-established principle that courts should not require any particular ballot structure. *See Schundler v. Donovan*, 377 N.J. Super. 339, 349-50 (App. Div. 2005) ("We do not require any particular method of ballot construction. That is beyond our expertise. We are content to rely on the good faith and experienced wisdom of the county clerks to devise an approach to ballot positioning that treats [candidates] fairly and equally to the greatest extent practically possible.").  As New Jersey courts also recognize, although ballot structure is subject to judicial review, "judicial officers on any such review should not substitute their judgment for the reasonable decisions of the public officers in whom the Legislature has reposed the authority and duty to administer the electoral process with fidelity to the requirements of law, constitutional principle, and in the public interest." *Ibid.*

Accordingly, given the strong public interests in favor of denying Plaintiffs' requested ballot changes, Plaintiffs have failed to demonstrate that public interests weigh in favor of granting a preliminary injunction at this late stage of the primary election process.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction.

Dated: March 6, 2024

Respectfully submitted,

<u>/s/ *Jason C. Spiro*</u>
Jason C. Spiro
Brian M. Nelson
Marissa K. DeAnna
SPIRO HARRISON & NELSON LLC
200 Monmouth Street, Suite 310
Red Bank, New Jersey 07701
Tel: (732) 784-1470
jspiro@shnlegal.com
bnelson@shnlegal.com
mdeanna@shnlegal.com

*Attorneys for Defendant Christine Giordano Hanlon*