Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 1 of 13 PageID: 986

Singh v. Murphy, Not Reported in Atl. Rptr. (2020)
2020 WL 6154223

2020 WL 6154223
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey, Appellate Division.

Hirsh SINGH, Plaintiff-Appellant,
v.
Honorable Philip D. MURPHY, in his official capacity as Governor of New Jersey, Honorable Tahesha Way, in her official capacity as New Jersey Secretary of State, Defendant-Respondent.
In the Matter of the Petitions of Hirsh Singh for Recount and Recheck.

DOCKET NO. A-0323-20T4
|
Argued October 15, 2020
|
Decided October 21, 2020

On appeal from Executive Order No. 144 and related Executive Orders, pursuant to a transfer from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1757-20.

**Attorneys and Law Firms**

Hirsh Singh, appellant, argued the cause pro se.

Beau C. Wilson, Deputy Attorney General, argued the cause for respondents Philip D. Murphy, Governor and Tahesha Way, Secretary of State (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Beau C. Wilson, on the brief).

Joseph J. Bell argued the cause for respondent Holly Mackey, County Clerk, County of Warren (Bell & Shivas, P.C., attorneys; Joseph J. Bell, on the brief).

Before Judges Sabatino, Currier and Gooden Brown.

**Opinion**

PER CURIAM

*1 Plaintiff Hirsh Singh[1] is a New Jersey resident who was a candidate in the 2020 New Jersey Republican primary election for the United States Senate. Self-represented, he challenges the validity of the mail-in voting procedures that were utilized in the July 7, 2020 primary. The modified procedures were implemented pursuant to Executive Orders of the Governor issued in the wake of the COVID-19 pandemic. Plaintiff further challenges the validity of the modified mail-in voting procedures now being used for the 2020 general election in accordance with an additional Executive Order and a cognate statute enacted by the Legislature this summer. He seeks injunctive and other relief, including an order nullifying the announced results of the July 2020 primary election for Senate and the House of Representatives, directing a new primary election to be conducted, and enjoining the continued use of the modified mail-in system for the November 2020 General Election.

[1] As he pointed out in a motion with the trial court, plaintiff's first name had been misspelled in some previous court documents, but it is correctly shown here.

Plaintiff brought lawsuits in several counties to obtain relief, contending that if the modified mail-in voting procedures were nullified, he would have been declared the winning candidate in the statewide primary election. After the lawsuits were consolidated, plaintiff abandoned his efforts to seek a recount of the primary results and narrowed his focus to seek to invalidate the modified voting procedures under federal law. Insofar as that claim entails a facial challenge to the validity of the Governor's Executive Orders, it was transferred to this court procedurally for appellate review under the Court Rules, thereby leaving to the trial court any lingering as-applied factual disputes or other claims.

For the reasons that follow, plaintiff's facial challenges and his associated requests for injunctive relief are denied. As to his claims that the modified voting procedures for the primary election prescribed by Executive Order 144 did not comport with the federal constitution, we conclude that exercise of

authority was permissible under the emergency powers the Legislature delegated to the Governor under the Emergency Health Powers Act, N.J.S.A. 26:13-1 to - 31, and the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-30 to -63. Given the unassailable severity of the COVID-19 pandemic and the need to reduce the risk of infection to New Jersey voters and

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 2 of 13 PageID: 987

Singh v. Murphy, Not Reported in Atl. Rptr. (2020)
2020 WL 6154223

polling workers, the Governor was authorized to exercise those delegated emergency powers and revise customary in-person voting processes in order to protect the public health and safety.

As to plaintiff's claims that the modified voting procedures now being implemented for the general election violate the federal constitution and federal law, similar arguments were very recently rejected by the United States District Court in a persuasive October 6, 2020 published opinion, and we likewise decline to declare them invalid.

**\*2** Further, plaintiff has not demonstrated a right to the extraordinary and summary injunctive relief he seeks, applying the well-established criteria of Crowe v. De Gioia, 90 N.J. 126 (1982). Among other things, plaintiff has not established that his claims of invalidity are supported by settled law, that alteration of the present status quo is equitably warranted, or that the public interest favors nullification of the statewide primary results and the immediate cessation of the ongoing vote-by-mail processes for the general election.

Lastly, plaintiff's non-facial claims, including his claim of a deprivation of free speech rights by the Attorney General, are reserved for the trial court for disposition. The claims he has attempted to assert under the federal Freedom of Information Act, 5 U.S.C. § 552(a)(4)(B), seeking records and information from the United States Postal Service are dismissed without prejudice, for lack of jurisdiction in this state court.

I.

The Executive Orders at Issue
On February 3, 2020, three days after the United States Department of Health and Human Services Secretary declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19, Governor Philip D. Murphy issued Executive Order 102. That order created the state Coronavirus Task Force, to be chaired by the Commissioner of the New Jersey Department of Health (DOH), and consisting of the heads of the Department of Human Services, the Department of Law & Public Safety, the New Jersey State Police, the Department of Education, and the Office of Homeland Security and Preparedness. Exec. Order No. 102 (Feb. 3, 2020), 52 N.J.R. 366(b) (Mar. 2, 2020), ¶ 2-3.

On March 9, when there were more than 500 confirmed cases of COVID-19 in the United States, and eleven in New Jersey, Governor Murphy issued Executive Order 103, declaring a public health emergency and directing the "State Director of Emergency Management, who is the Superintendent of State Police, in conjunction with the Commissioner of DOH, to take any such emergency measures as the State Director may determine necessary." Exec. Order No. 103 (Mar. 9, 2020), 52 N.J.R. 549(a) (Apr. 6, 2020), ¶ 1.

Thereafter, on April 8, Governor Murphy issued Executive Order 120. The Executive Order noted in a preamble that public health officials were predicting that New Jersey's COVID-19 public health emergency was anticipated to peak in April 2020, and to continue for an indefinite time beyond the peak. Given those circumstances, Executive Order 120 postponed the statewide primary elections for United States Congressional and state local elections from the first Monday in June, as is normally called for by statute in N.J.S.A. 19:2-1, and rescheduled that primary election for July 7. Exec. Order No. 120 (Apr. 8, 2020), 52 N.J.R. 957(a) (May 4, 2020), ¶ 1.

According to the DOH, in the three weeks that followed the issuance of Executive Order 120, there were 6,285 additional confirmed COVID-19 deaths in New Jersey.[2]

[2] SeeN.J. COVID-19 Information Hub, https://covid19.nj.gov/index.html (last accessed on October 9, 2020).

More election-related changes designed to deal with the COVID-19 crisis followed. On May 15, the Governor, through Executive Order 144, instituted a series of changes to the election infrastructure for the July 7 primary elections. Exec. Order No. 144 (May 15, 2020), 52 N.J.R. 1238(a) (June 15, 2020). In the preamble to that order, Governor Murphy referred to data received from the Center for Disease Control and Prevention (CDC) reporting that, as of that time, there were more than 4,000,000 COVID-19 cases worldwide, with nearly 300,000 deaths. Of those, more than 1,000,000 cases and 80,000 deaths were in the United States. As of that point, the Governor continued, there had been more than 100,000 cases and nearly 10,000 deaths in New Jersey. The severity of the pandemic had "ma[d]e it difficult for election officials, candidates, and voters to properly plan and prepare for and fully participate in the July primary elections if they were to proceed as they would under normal circumstances." Ibid.

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 3 of 13 PageID: 988

Singh v. Murphy, Not Reported in Atl. Rptr. (2020)
2020 WL 6154223

**\*3** The Governor further stated in Executive Order 144 that social distancing measures were necessary "for a period of as-yet-undetermined duration," and that "the COVID-19 outbreak may have significant effects on New Jersey's voting systems as long as social distancing measures are in place." Ibid. The order recognized a danger that, without an alternative way of voting, the pandemic would "hinder public participation in the democratic process, particularly among elderly and immune-compromised voters," and thereby would "undermine the legislative intent of N.J.S.A. 19:8-2 and 19:8-3.1," statutes aimed at securing the "right to vote," including for individuals with disabilities and the elderly. Ibid.

Based on these risks to public health and safety recited in the preamble, Executive Order 144 directed that "[a]ll elections that take place on July 7, 2020, shall be conducted primarily via vote-by-mail ballots," which would be sent automatically to all voters registered as Democrats or Republicans. Id. at ¶ 1. The order further directed that each county would be required to keep polling places open for the primary election and that voters who went to those polling places would be able to fill out provisional ballots there. Id. at ¶¶ 8, 10.

The primary election took place as planned on July 7, with most voters taking advantage of the vote-by-mail method for casting ballots.

Additional measures ensued. On August 14, Governor Murphy issued Executive Order 177, titled "[A]n Order to Protect Public Health by Mailing Every Active Registered Voter a [Vote-By-Mail] Ballot Ahead of the General Election." Exec. Order No. 177 (Aug. 14, 2020), 52 N.J.R. 1701(b) (Sept. 21, 2020).

Two weeks later, on August 28, the Legislature enacted N.J.S.A. 19:63-31, essentially incorporating the universal vote-by-mail procedures set forth in Executive Order 177 into statutory law, to be operative for the November 2020 General Election.

The Primary Election Results and Plaintiff's Challenges
The tabulated results for the primary election, certified by the Secretary of State, revealed that plaintiff received 146,139 votes, which was 8,727 votes less than Rikin Mehta, who received 154,866 total votes, and was declared the winner of the Republican Party nomination for United States Senate.[3]

[3] SeeOfficial Primary Election Results: U.S. Senate, N.J. Div. of Elections, https://www.state.nj.us/state/elections/assets/pdf/election-results/2020/2020official-primary-results-us-senate-amended-0826.pdf.

On September 1, plaintiff filed in the Superior Court in Morris County a statewide petition to contest the primary election. Eight days later, on September 9, the Assignment Judge for the Morris/Sussex Vicinage issued an order consolidating that petition in Morris County, along with various other recount petitions which plaintiff had, as of that time, filed throughout the State. On September 14, plaintiff filed an application for "partial summary judgment" on his consolidated Morris County claims.

On September 16, the Attorney General, representing both the Governor and the Secretary of State, entered opposition to plaintiff's motion for partial summary judgment and simultaneously cross-moved to dismiss plaintiff's petition, arguing that it was both unsupported and untimely. On the same day, plaintiff filed an order to show cause seeking a temporary restraining order and injunction to prevent the printing of mail-in ballots for the general election containing the names of the candidates certified to have won the primary election of July 7, 2020. Plaintiff also moved, as he phrased it, to "disqualify" the Attorney General's response papers, which he alleged had been submitted late. He asked the trial court to rule on the papers that had been submitted in his motion for partial summary judgment. The Attorney General filed opposition.

**\*4** On September 22, the trial court denied plaintiff's motion to disallow defendants' motion to dismiss but did not rule on the merits of the dispositive motions. On the same day, the court denied plaintiff's order to show cause for a temporary restraining order and preliminary injunction. Plaintiff concurrently filed an amended verified petition to contest the Republican primary election for United States Senator.

The next day, on September 23, the Chief Justice issued an order stating that, pursuant to N.J.S.A. 19:29-2, any of plaintiff's still-pending recount petitions or previously filed petitions to contest the primary election would be consolidated in the trial court in Morris County.

On September 28, plaintiff filed a motion in the trial court seeking to, among other things, withdraw from all pending recount applications he had filed, and obtain a prompt resolution of his partial motion for summary

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 4 of 13 PageID: 989

**Singh v. Murphy, Not Reported in Atl. Rptr. (2020)**
2020 WL 6154223

judgment on his petitions to contest the election. In that application, plaintiff argued that only the in-person provisional ballots were constitutionally valid, that the mail-in-ballots were constitutionally invalid, and that the court should "declare the entire primary election null and void" and "hold it again" to avoid disenfranchising voters.

Transfer to the Appellate Division of the Facial Challenge to Executive Order 144

On September 30, the trial court transferred the consolidated matters to the Appellate Division for review under Rules 1:13-4(a) and 2:2-3(a)(2), and Vas v. Roberts, 418 N.J. Super. 509 (App. Div. 2011). Two days later, on October 2, plaintiff filed an application for emergent appellate relief challenging Executive Order 144, the primary election based on it, and the use of the results of the primary election on the ballots for the general election to be held on November 3, 2020.

On October 5, Presiding Judge for Administration Carmen Messano issued an order of this court denying plaintiff's application for emergent relief, noting that the matter had already been fully briefed in the Law Division and had been transferred to the Appellate Division under Rule 1:13-4. The order further stated plaintiff's application for emergent relief would be treated as a motion seeking acceleration of the matter, which the court granted. The order established an expedited simultaneous deadline for optional supplemental briefs, "limited to the constitutional challenge plaintiff has brought to the Executive Order issue," in anticipation of a prompt calendar date.

The following day, on October 6, plaintiff sent an email to this court, asking for a dispositive ruling on the papers already submitted to the Law Division. He also sought clarification as to whether an argument he had raised under the federal Freedom of Information Act (FOIA) remained a part of the case. The Attorney General separately advised this court that he intended to submit a supplemental brief by the court's specified October 13 deadline, and that he requested oral argument rather than a disposition on the papers.

Later that same day, this panel issued a follow-up order, setting oral argument for October 15, and clarifying that "[t]he discrete issues for which the Appellate Division has accepted jurisdiction solely concern appellant's facial challenges to the Governor's Executive Orders and the voting procedures for the 2020 election, and not any factual disputes or other disputes." The order further made clear that "[t]he various County Clerks and U.S. Senate candidate Rik Mehta who had responded to the trial court with regard to non-facial issues concerning the 2020 U.S. Senate Republican Primary need not participate as respondents in this appeal" unless they filed briefs by the common October 13 deadline.

**\*5** In accordance with this scheduling order, plaintiff filed on October 13 a twenty-nine-page submission, which he labeled as a "motion for summary judgment."[4] The submission concludes with these numerous requests for relief:

  i. Declare the Executive Order 144 issued by Governor Phil Murphy to be unconstitutional and in contravention of the Elections Clause and the Due Process [Clause] of the United States Constitution[.]

  ii. Restore the status quo ante as to the manner of conducting elections[.]

  iii. Declare the primary election of July 7, 2020 for all political parties unconstitutional and hence null and void[.]

  iv. Forbid the use in the General Election of ballots with names of candidates nominated through the process of the unconstitutional primary election created through the Executive Order 144 of Governor Phil Murphy[.]

  v. Direct the [S]tate of New Jersey to conduct fresh primary elections in accordance with the law for all races to fill up the offices of Senators and Representatives mentioned in the Elections Clause of the U.S. Constitution[.]

  vi. Declare the cease and desist letter sent by New Jersey's Attorney General to be election interference and in violation of the due process clause[.]

  vii. Declare the cease and desist letter sent by New Jersey's Attorney General to be in violation of the free speech clause[.]

  viii. Direct the Attorney General's office to rescind the letter and clarify that they were in violation of the Constitution and admit that the Petitioner acted in accordance with the Constitution and all laws[.]

  ix. Declare the entire system of mail-in ballots except as provided by previously defined procedures for the absentee ballots to be issued to the members of the Armed Forces to be in violation of the Freedom of Information Act[.]

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 5 of 13 PageID: 990

Singh v. Murphy, Not Reported in Atl. Rptr. (2020)
2020 WL 6154223

x. Issue an injunction forbidding the use of the mail-in ballot system for the general election of November 3, 2020[.]

<sup>4</sup> Consistent with appellate practice, we treat the pro se submission as a motion for summary disposition under Rule 2:8-3, and, because it presents legal arguments and citations to case law and various codified provisions, as an appellant's brief. We have also considered plaintiff's various submissions to the trial court.

On October 13, the Attorney General submitted a timely supplemental brief opposing plaintiff's application. The Attorney General argues that plaintiff's claims are procedurally untimely and that he should be equitably estopped from seeking relief. As to the merits, the Attorney General further argues that the Executive Orders at issue are facially and constitutionally valid, and that no injunctive or other relief is warranted.

In addition, the County Clerk of Warren County submitted a short letter brief requesting that plaintiff's appeal be denied in its entirety. The County Clerk argues that the special circumstances of the COVID-19 pandemic supported the Executive Orders modifying customary election processes, that the County dutifully carried out those processes, and that there is no reason at this juncture to nullify the outcome of the primary election or to alter the ongoing voting methods in the general election.<sup>5</sup>

<sup>5</sup> The County Clerk also observes that plaintiff received the most tabulated votes in Warren County in the Republican Senate primary.

**\*6** No other county clerks or parties submitted briefs or appeared in the appeal, including the declared Republican Party nominee for Senate. Oral argument was conducted on October 15, and the issuance of this opinion has been expedited.

The District of New Jersey Federal Decision
Meanwhile, on October 6, 2020, the United States District Court for the District of New Jersey issued a 31-page published opinion in Donald J. Trump for President, Inc. v. Way, ––– F. Supp. 3d ––– (D.N.J. 2020) (slip opinion). In that case, the Republican National Committee, along with President Donald J. Trump for President, Inc., and the New Jersey Republican State Committee, primarily sought a preliminary injunction enjoining N.J.S.A. 19:63-31. The plaintiffs argued the newly enacted statute violated the Elections Clause of the United States Constitution. The plaintiffs argued the new state statute violates the Elections Clause because it authorizes the canvassing of mail-in ballots beginning up to ten days before election day and the canvassing of ballots not postmarked but received within forty-eight hours of the polls' closing. Way, slip op. at 16, 21. The plaintiffs asserted this was inconsistent with the Elections Clause because Congress had set forth the time, place, and manner of holding national elections by federal statute in establishing a uniform general election day to be the Tuesday following the first Monday in November. 2 U.S.C. §§ 1, 7.

The District Court in Trump v. Way declined to enter the injunction and allowed the ongoing mail-in voting procedures to continue. Among other things, the opinion found no violation of the Elections Clause or federal law occurring as the result of the modified procedures.<sup>6</sup>

<sup>6</sup> We discuss the opinion in more detail, infra, with respect to plaintiff's arguments to enjoin the vote-by-mail processes being used in the present general election.

II.

Pursuant to Rule 2:2-3(a)(2), "appeals may be taken to the Appellate Division as of right ... to review final decisions or actions of any state administrative agency or officer." Under this rule, "agencies whose actions have been held to be reviewable in the first instance by the Appellate Division are those located within the principal departments in the executive branch of state government." Vas v. Roberts, 418 N.J. Super. at 517. As "the Governor is the State's chief executive or administrative officer," id. at 519, a challenge to the constitutionality of an Executive Order of the Governor falls within the scope of a challenge to a final administrative decision or order under Rule 2:2-3(a)(2), Commc'ns Workers of Am., AFL-CIO v. Christie, 413 N.J. Super. 229, 251 (App. Div. 2010).

Plaintiff's main argument of facial invalidity rests upon the application of the Elections Clause set forth in Article I, Section 4, Clause 1 of the United States Constitution. That clause reads:

> The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 6 of 13 PageID: 991

**Singh v. Murphy, Not Reported in Atl. Rptr. (2020)**
2020 WL 6154223

Regulations, except as to the Places of [choosing] Senators.

[U.S. Const. art. I, § 4, cl. 1.]

Plaintiff contends that Executive Order 144 violated this provision because the Elections Clause requires a state's "Legislature thereof" to enact the procedures for holding elections for Senators and members of Congress. He argues that Executive Order 144 was a unilateral action of the Governor that needed to be concurrently adopted by the New Jersey Legislature in order to be constitutionally valid. However, that argument is not supported by settled law. In fact, precedents of the United States Supreme Court have adopted a more expansive notion of the form of state legislative power that may satisfy the Elections Clause.[7]

[7]   Respondents do not dispute that the Elections Clause and federal power potentially extend to state primary elections for federal offices. SeeFoster v. Love, 522 U.S. 67, 71 n.2 (1997) ("Congressional authority extends not only to general elections, but also to any 'primary election which involves a necessary step in the choice of candidates for election as representatives in Congress.' ") (citing United States v. Classic, 313 U.S. 299, 320 (1941)).

**\*7** The Elections Clause authorizes each state to enact processes to be followed in electing members of the House and Senate from their respective states. As the Supreme Court recognized in Storer v. Brown, 415 U.S. 724 (1974), states retain the power of establishing the time, place, and manner of primary elections under the Elections Clause. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Id. at 730. The Court explained in Foster v. Love, 522 U.S. 67, 69 (1997), that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections." The Court reiterated in U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 832 (1995) that the Framers intended the Elections Clause to grant states the authority to create procedural regulations for such federal elections.

Recent Supreme Court precedent has established that the reference to the "Legislature" in the Elections Clause encompasses more than just legislative lawmaking bodies. In Arizona State Legislature v. Arizona Indep. Redistricting Comm'n, 576 U.S. 787, 806-09 (2015), the Court upheld the validity of an independent congressional redistricting commission created by a voter ballot initiative rather than through a statute enacted by the Arizona Legislature. The Court rejected the challengers' argument that only the Arizona Legislature could specify the district boundaries and electoral processes. Tracing the history of Article I, Section 4, Justice Ginsburg's majority opinion for the Court observed that "[t]he dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules, not to restrict the way States enact legislation." Id. at 814-15.

The Supreme Court has made clear that the term "Legislature" as used in the Elections Clause does "not mean the representative body alone." Id. at 805. Instead, the term more broadly refers to a state's legislative power, "performed in accordance with the State's prescriptions for lawmaking." Id. at 808; see alsoSmiley v. Holm, 285 U.S. 355, 367-68 (1932) (holding that the Elections Clause allows a state's governor to exercise veto powers under state law to override decisions made by the legislature concerning the time, place, and manner of elections).

In our own state, constitutional powers are distributed among the three classic branches of democratic government: the Governor, the Legislature, and the Judiciary. SeeN.J. Const. art. III. Lawmaking power is shared by the Legislature and the Governor in numerous ways, including the Governor's power to veto legislation, N.J. Const. art. V, § 1, and the Legislature's reciprocal power to invalidate certain administrative regulations, which otherwise have the force of law, issued by the Executive Branch, N.J. Const. art. V, § 4. Our case law has long recognized that the branches of state government are not "water-tight compartments," but rather that the "aim of the separation-of-powers doctrine is not to prevent such cooperative action, but to guarantee a system in which one branch cannot" usurp the powers of another. Commc'ns Workers of Am., AFL-CIO v. Florio, 130 N.J. 439, 449-50 (1992).[8]

[8]   Plaintiff's appellate brief states that "no challenge is made under the provisions of the New Jersey Constitution," although he has referred to its provisions at times for purposes of context. An issue not briefed on appeal is deemed waived. SeeMidland Funding LLC v. Thiel, 446 N.J. Super. 537, 542 n.1 (App. Div. 2016).

The State convincingly argues that in issuing Executive Order 144 while the public health crisis caused by COVID-19 escalated, the Governor lawfully acted pursuant to his legislatively-assigned responsibilities vested in him by two statutes: The Emergency Health Powers Act, N.J.S.A. 26:13-1 to -31 (EHPA), and the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-30 to -63 (Disaster Control Act). These statutes, duly

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 7 of 13 PageID: 992

**Singh v. Murphy, Not Reported in Atl. Rptr. (2020)**
2020 WL 6154223

adopted by the Legislature, respectively define emergencies to include "an occurrence or imminent threat of an occurrence" of disease that "poses a high probability of," among other things, "a large number of deaths, illness, or injury in the affected population," N.J.S.A. 26:13-2, and "any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State," N.J.S.A. App. A:9-33.1.

**\*8** The Disaster Control Act, the older and more invoked provision, is especially on point. Enacted in 1941, the statute bestows on the Governor broad authority "to utilize and employ all the available resources of the State Government and of each and every political subdivision of this State, whether of men, properties or instrumentalities, and to commandeer and utilize any personal services and any privately owned property necessary to avoid or protect against any emergency." N.J.S.A. App. A:9-34.

The purpose of the statute is to "protect the public by centralizing control over local government resources in situations whose remedies were beyond the authority and power of local government." Worthington v. Fauver, 88 N.J. 183, 195 (1982). For this reason, the Governor is not required to "wait for a serious disruption to occur" before invoking the powers granted under the Act. Ibid. The Governor's broad delegated authority to issue emergency orders encompasses "any matter that may be necessary to protect the health, safety and welfare of the people," N.J.S.A. App. A:9-45(i), even where such action alters the rules that would govern in non-emergency periods. Cnty. of Gloucester v. State, 132 N.J. 141, 145 (1993).

Our courts on multiple occasions have sustained executive orders that "flow[ ] out of the Governor's legislatively-delegated emergency powers to act on behalf of the safety and welfare of the people of New Jersey under the Disaster Control Act." See Commc'ns Workers of Am., AFL-CIO v. Christie, 413 N.J. Super. at 259 (listing such cases in which the Governor invoked his or her emergency powers).

"Where the executive acts pursuant to an express or implied authorization from the Legislature ... he exercises not only his own powers but those of the Legislature." Worthington, 88 N.J. at 208 (emphasis added). Hence, as a matter of established New Jersey law, the Governor may exercise powers that have been delegated to him by the Legislature in order to address emergency situations. Such emergency action does not offend legislative hegemony in its delegated sphere.

Nor do the emergency statutes repose in the Governor, as plaintiff argues, unbridled "dictatorial" power. If the Legislature disagrees with a Governor's emergency action it can respond by passing legislation, subject to veto, that repeals or amends the Disaster Control Act or EHPA with language disallowing a particular exercise of authority.

Judicial review of the exercise of delegated powers is limited. "In such circumstances the executive action should be 'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.' " Ibid. (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)) (concerning analogous concepts of federal separation of powers). "In such a case [the executive's] actions pursuant to that delegated authority are constitutionally valid as long as he has not exceeded his statutory authority and the government as a whole has the power to act." Worthington, 88 N.J. at 208.

Executive Order 144 was issued and implemented consistent with this legislative delegation of emergency authority. Plaintiff has not demonstrated any basis on which to conclude that the Governor's issuance of Executive Order 144 to conduct the primary election in a way designed to canvass votes while minimizing person-to-person contact due to the COVID-19 emergency exceeded his broad authority "to utilize and employ all the available resources of the State Government and of each and every political subdivision of this State ... to avoid or protect against any emergency." N.J.S.A. App. A:9-34.

**\*9** Plaintiff's brief asserts that the Disaster Control Act does not support the Executive Order because the modifications of the election process "have nothing to do with property damage or destruction." But that argument overlooks the other language within the Act empowering the Governor to protect the "health, safety and welfare of the people." N.J.S.A. App. A:9-33. It is plain that the measures undertaken to reduce in-person contact at the polls are aimed at promoting the health and safety of voters and poll workers in the midst of a deadly pandemic that still has yet to be contained.[9]

[9] The Attorney General has drawn our attention to a recent opinion of the federal district court in Montana involving parallel issues. In that case, the Montana Governor, under emergency powers delegated to him by the Legislature to suspend enforcement of regulatory statutes, issued a directive that the ordinary statutory prohibition on the use of mail-in ballots in the general election in Montana was going to be lifted for the 2020 general election due to concerns caused by COVID-19. Against a challenge that, among other things, the

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 8 of 13 PageID: 993

**Singh v. Murphy, Not Reported in Atl. Rptr. (2020)**
2020 WL 6154223

Governor's suspension of the regulatory prohibition on mail-in balloting violated the Elections Clause, the District Court held that by invoking his emergency powers under state law in enacting the regulatory suspension, the Governor acted within the scope of the delegated powers of the Legislature in affecting the time, place, and manner of Montana's federal elections. The Attorney General contends this result and reasoning, although not binding precedent, happens to be consistent with the similar delegation of emergency powers exercised by Governor Murphy in his Executive Orders under the EHPA and the Disaster Control Act. Because the opinion apparently has not been published, we do not cite to it or rely on it as precedential authority, seeRule 1:36-3, and mention it only for comparative and historical purposes.

Plaintiff argues that the Executive Order itself represents an improper delegation of authority to other executive agencies, such as the State DOH and the county departments of health, as well as the CDC. The Executive Order merely recites in this regard that vote-by-mail ballots shall be processed and canvassed "in accordance with guidelines provided" by such health agencies. The reference to health guidelines is not a misuse or transfer of the emergency powers delegated to the Governor. Rather, it bespeaks a commitment that those powers will be implemented in accordance with public health standards. If anything, the reference to such guidelines helps assure that the emergency powers are not implemented recklessly or arbitrarily.

Plaintiff has pointed out that on April 14, six days after Governor Murphy issued Executive Order 120, which postponed the primary election, the Legislature ratified the postponement of the primary date. L. 2020, c. 21, titled "An Act Concerning the Date of the Primary Election." The complete text of that April 14 legislation reads:

> 1. a. Notwithstanding the provisions of [N.J.S.A. 19:2-1], [N.J.S.A. 19:23-40], any provision of Title 19 of the Revised Statutes, or any other law, rule, or regulation to the contrary, the 2020 primary election shall not be held on the Tuesday next after the first Monday in June, falling on June 2, 2020, and shall be held instead on the Tuesday next after the first Monday in July, falling on July 7, 2020. Any other election scheduled to occur between May 13, 2020 and July 6, 2020, inclusive, shall be rescheduled to be held on July 7, 2020.
>
> **\*10** b. Nothing in this act shall be interpreted to affect the deadlines prescribed under the provisions of Title 19 of the Revised Statutes for the nomination of candidates, filing of petitions, acceptance of nominations, certification of nominations, and any other deadline required to be met preceding the primary election, when that deadline occurs before April 11, 2020, including, but not limited to, the deadline for filing nominating petitions under [N.J.S.A. 19:23-14], for amending defective petitions under [N.J.S.A. 19:23-20], for the filing of objections to nominating petitions under [N.J.S.A. 19:13-10], for determining the validity of objections to nominating petitions under [N.J.S.A. 19:13-11], and for drawing for ballot positions under [N.J.S.A. 19:23-24], which dates shall continue to be determined by reference to June 2, 2020. All other deadlines prescribed under the provisions of Title 19 of the Revised Statutes for meeting statutory requirements for a primary election shall be calculated using the July 7, 2020 primary election date.
>
> c. Notwithstanding the provisions of subsection b. of this section, or any other law, rule, or regulation to the contrary, the party affiliation deadline established under [N.J.S.A. 19:23-45] shall be calculated based on the July 7, 2020 primary election date.
>
> d. Notwithstanding the provisions of Title 19 of the Revised Statutes, or any other law, rule, or regulation to the contrary, petitions for direct nomination for the general election required to be filed under [N.J.S.A. 19:13-3] through [N.J.S.A. 19:13-9] shall be due by 4:00 p.m. on July 7, 2020.
>
> 2. This act shall take effect immediately.

[Ibid.]

To be sure, the Legislature did not pass similar legislation ratifying the universal vote-by-mail procedures effectuated by Executive Order 144 between its issuance on May 15, and the primary election on July 7. As we have already shown, the passage of such cognate legislation was not vital, because the Governor already possessed the delegated authority to take emergency action to safeguard public health and safety.

Moreover, although it is not essential to our analysis, subsequent events are indicative of an arguable legislative ratification of, or acquiescence to, the health and safety measures undertaken in Executive Order 144. Such ratification or acquiescence is intimated by the statute that established the vote-by-mail procedures for the 2020 general election, enacted on August 28, 2020. L. 2020, c. 71 (Chapter 71).

Chapter 71 states that "[n]otwithstanding any other law to the contrary, to allow enough time for the county clerks to

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 9 of 13 PageID: 994

Singh v. Murphy, Not Reported in Atl. Rptr. (2020)
2020 WL 6154223

print and mail the ballots to voters, the following deadlines are modified as follows ... the last day a vacancy may occur for primary election nominees for the November 2020 General Election ... shall be August 28, 2020," the date that the law went into effect. N.J.S.A. 19:63-31(k)(2). The statute further states that "the deadline to fill a vacancy in the primary election nominees for the November 2020 General Election ... shall be August 31, 2020." N.J.S.A. 19:63-31(k)(3). By thereby foreclosing the possibility of a special election to fill any vacancy for primary election nominees for the 2020 general election, the Legislature appears to have implicitly ratified the outcomes of the July 7 primary election and, also by implication, the validity of the modified election procedures that were used in that election.

Additionally, the legislative fiscal estimate prepared by the non-partisan Office of Legislative Services for the 2020 general election legislation expressly references Executive Order 144, stating that "many of the requirements of [L. 2020, c. 71] coincide with those of Executive Order 144 requiring the procurement of secure ballot drop boxes for the July 7, 2020 primary elections. This bill expands that requirement to any subsequent election in the State." Office of Legis. Servs., Fiscal Note to Assembly Bill No. 4475 (Aug. 26, 2020) (emphasis added).

**\*11** Courts "may refer to [a] bill's fiscal note to ascertain legislative intent if necessary." Matter of 1997 Assessments, 311 N.J. Super. 600, 606 (App. Div. 1998). Here, the August 26 Fiscal Note's express declarations that the provisions of N.J.S.A. 19:63-31 "coincide with" and "expand" election procedures and "requirements" implemented by Executive Order 144 provide further indicia that the Legislature intended to ratify those emergency procedures. See In re Plan for Abolition of Council on Affordable Hous., 424 N.J. Super. 410, 419-20 n.3 (App. Div. 2012) (holding that legislative history referencing a reorganization plan enacted by the Governor through legislatively delegated powers constituted a ratification of executive action), aff'd as modified, 214 N.J. 444 (2013).

As we have said, we need not and do not rely on an inference of ratification to uphold the constitutional validity of Executive Order 144. We mention it simply as an indication that the Legislature itself evidently has not concluded that its institutional lawmaking powers were usurped. For that matter, the Legislature has not brought suit or moved to intervene in this litigation, as contrasted with the lawsuit pursued by the Arizona Legislature in the redistricting commission case seeking to nullify the commission's authority under the Elections Clause. Arizona State Legislature, 576 U.S. at 787.

In sum, plaintiff's argument that Executive Order 144 was facially invalid and violated the Elections Clause of the United States Constitution is unpersuasive. Through the exercise of the emergency powers delegated to him by the Legislature, the Governor took authorized action to address a mounting pandemic and protect the public health, safety, and welfare.

Due Process and Equal Protection Clauses
Plaintiff's facial challenge to the Governor's actions under the Due Process Clause of the Federal Constitution is also unavailing. Plaintiff alleges he was deprived by Executive Order 144 of his due process right to cast ballots in an election created by the Legislature in accordance with the Constitution.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[A] statute is invalid on substantive due process grounds if it 'seeks to promote [a] state interest by impermissible means.' " Caviglia v. Royal Tours of Am., 178 N.J. 460, 472 (2004) (alterations in original). "[A] state statute does not violate substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory." Greenberg v. Kimmelman, 99 N.J. 552, 563 (1985).

Plaintiff offers no controlling legal authority for a claimed Due Process right to cast a vote by a particular method. Nor has he convincingly argued that by changing the primary rules to limit person-to-person contact and the spread of infection from COVID-19, Executive Order 144 was enacted with an illegitimate, arbitrary, or discriminatory purpose.

Although plaintiff has made factual contentions that the vote-by-mail processes for the primary election were incorrectly administered in certain locations and resulted in irregularities in the counting of ballots, those claims are beyond the scope of a facial challenge to the Executive Orders properly before this court. Any remaining as-applied factual contentions must be litigated in the trial court. R. 2:2-3(a)(2) (noting the appellate court's function as a reviewing court, and not as a fact-finder that can hear witnesses and make factual findings); see also State v. S.S., 229 N.J. 360, 365 (2017) ("the customary role of an

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 10 of 13 PageID: 995

**Singh v. Murphy, Not Reported in Atl. Rptr. (2020)**
2020 WL 6154223

appellate court is not to make factual findings but rather to decide whether those made by the trial court are supported by sufficient credible evidence in the record"); In re Contest of Democratic Primary Election of June 3, 2003 for Off. of Assembly of Thirty-First Legis. Dist., 367 N.J. Super. 261, 265 (App. Div. 2004) (reviewing a Law Division adjudication of an election contest petition brought under N.J.S.A. 19:29-1).

**\*12** We similarly discern no basis for relief as to plaintiff's facial arguments under the Equal Protection Clause. U.S. Const. amend. XIV, § 1. He asserts that if the court nullifies the results of the Republican Primary Election, then it must likewise nullify the results of the Democratic Primary Election, or else that would give the other major political party an unfair campaigning advantage. We need not adjudicate that hypothetical situation, because, as noted above, plaintiff has failed to demonstrate that the Executive Order regulating the primary election as a whole was facially unconstitutional.

The Freedom of Information Act
Plaintiff alleges that the procedures implemented by Executive Order 144 violate the FOIA by creating an "opaque process," alleging he has no means of obtaining information regarding certain procedures followed by the county canvassing boards. In particular, plaintiff alleges that the United States Postal Service has failed to produce records relating to the election that he has requested, which also violates the FOIA. Plaintiff has not, however, made the United States Postal Service, or any federal entity, a party in this case.

The FOIA states that, absent certain exceptions, "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

State courts do not have jurisdiction over a FOIA claim. Jurisdiction for FOIA claims lies in "the district court of the United States in the district in which the complainant resides," not in state court. 5 U.S.C. § 552(a)(4)(B). Plaintiff has not pointed to any authority in which a state court has entertained such a claim in the context of an election contest, or in any other context. His FOIA claims against the United States Postal Service or any other federal agency must be brought in federal court, should he choose to pursue them.

Free Speech Claims
Plaintiff contends that a cease-and-desist letter he received from a Deputy Attorney General on June 25 directing him to stop asking voters to submit duplicate ballots and change their votes was a violation of his free speech rights under the First Amendment to the United States Constitution. U.S. Const. amend. I. The letter was apparently founded upon 52 U.S.C. § 10307(e), which makes it illegal for voters to vote twice in federal elections, subject to certain exceptions.

The factual, as-applied issue as to whether plaintiff's speech was unconstitutionally chilled by the Attorney General's letter is outside the narrow appropriate scope of this court's review of a final administrative decision under Rule 2:2-3(a)(2). The claim does not assert facial invalidity of the Governor's Executive Orders, which were the only claims properly transferred here pursuant to the appellate rules. Consequently, that particular claim must be adjudicated in the trial court.

Claims Concerning the General Election and for Injunctive Relief
Apart from his arguments concerning the primary election, plaintiff contends the administration of the present general election is likewise invalid under the federal constitution. He argues the inclusion of prevailing nominees for federal office from the primary election on the ballot for the general election violates the Due Process Clause, because the primary election itself was unconstitutional. The premise of that argument is incorrect, for the reasons this opinion has already noted.

**\*13** Plaintiff specifically requests the court to "[d]eclare the entire system of mail-in ballots except as provided by previously defined procedures for the absentee ballots to be issued to members of the Armed Forces" to be invalid. He further asks this court to "[i]ssue an injunction forbidding the use of the mail-in ballot system for the general election."

These and other requests for injunctive relief asserted by plaintiff implicate well settled principles under New Jersey civil law. In Crowe v. De Gioia, 90 N.J. at 126, the Court identified several factors to guide whether injunctive relief is appropriate.

Singh v. Murphy, Not Reported in Atl. Rptr. (2020)

2020 WL 6154223

First, a preliminary injunction should not be granted except to prevent irreparable harm, which the Court defined as harm that "cannot be redressed adequately by monetary damages," "severe personal inconvenience," or where the "nature of the injury or of the right affected" make it appropriate. Id. at 132-33. The second principle is that "temporary relief should be withheld when the legal right underlying the plaintiff's claim is unsettled." Ibid. Third, a preliminary injunction should not issue unless the plaintiff makes a preliminary showing of "a reasonable probability of success on the merits." Ibid. Fourth, a court must evaluate "the relative hardship to the parties in granting or denying relief." Id. at 134.

In addition, and germane here, a case that " 'presents an issue of significant public importance' requires the court to 'consider the public interest in addition to the traditional Crowe factors.' " N.J. Election Law Enf't Comm'n v. DiVincenzo, 445 N.J. Super. 187, 195-96 (App. Div. 2016) (quoting Garden State Equal. v. Dow, 216 N.J. 314, 321 (2013)) (emphasis added).

These traditional Crowe factors likewise bear upon requests for permanent injunctive relief. See, e.g., Murray v. Lawson, 136 N.J. 32, 50-51 (1994), cert.granted, judgment vacated on other grounds, 513 U.S. 802 (1994); Horizon Health Center v. Felicissimo, 135 N.J. 126, 139 (1994).

The Crowe analysis has been applied in the context of injunctive relief sought concerning an election. See, e.g., Finkel v. Twp. Comm., 434 N.J. Super. 303, 310 (App. Div. 2013); McKenzie v. Corzine, 396 N.J. Super. 405, 416 (App. Div. 2007) (citing N.J. Democratic Party, Inc. v. Samson, 175 N.J. 178, 190 (2002)).

Applying those factors here, plaintiff has not demonstrated that injunctive relief of any kind should be ordered.

First, for simplicity, we will assume purely for sake of discussion that plaintiff has alleged that his rights as both a political candidate and voter will be irreparably harmed if the court does not compel an immediate halt to the processes being used in the general election. Even if that assumption were true, the other Crowe factors overwhelmingly tip against his requests for the extraordinary and massive injunctive measures he has sought.

On the second prong, plaintiff has not shown his legal theories of invalidity are supported by "settled law." Nor, on the related third prong, has he made a sufficient showing of a probability of success on the merits to justify enjoining the ongoing general election.

To the contrary, we have already dispelled above plaintiff's arguments of unconstitutionality under the Elections Clause. And, to the extent that plaintiff argues the mail-in voting procedures now being used for the general election violate "settled" federal law, the recent published opinion of the United States District Court in Trump v. Way shows otherwise.

**\*14** The District Court in Trump v. Way declined to enter an injunction regarding the 2020 general election and rejected the plaintiffs' "broad construction" of the federal election laws, noting that states had historically been given wide discretion in permitting various forms of absentee voting and early voting. Way, slip op. at 16. As to the late-received ballots, the court held there was "no direct conflict" between New Jersey's law and the federal election day statutes. Id. at 24. The court also found, in balancing the harms, that entering an injunction against the universal vote-by-mail procedures "would frustrate ... ongoing efforts to educate voters about the new by-mail election ... at the risk of time and expense for the State and confusion for the voters." Id. at 29. The court held, for the same reason, that enjoining a state's election procedures on the eve of an election would not be in the public interest and would risk voter disenfranchisement. Id. at 30.

"[I]t is well-established that under principles of comity, and in the interests of uniformity, federal interpretations of federal enactments" by federal courts in published cases, though not controlling on state courts, are nevertheless "entitled to our respect." Ryan v. American Honda Motor Co., Inc., 186 N.J. 431, 436 (2006). The District Court's precedential opinion in Trump v. Way appears to be soundly reasoned, and, at the very least, reflects that plaintiff's requests for injunctive relief are not supported by "settled" law and that they lack rather than possess a probability of success.[10]

[10] Since plaintiff's facial challenges lack merit, we need not ponder the legal and voter confusion that would ensue if a federal court ruled under federal law that an election may continue to proceed as planned and a state court separately ruled under federal law that it may not.

The fourth and fifth Crowe factors—concerning the relative interests of the parties and the interests of the public at large—manifestly tip against granting the extraordinary measures plaintiff seeks. McKenzie, 396 N.J. Super. at 416 (including the consideration of the public interest in the Crowe analysis in the context of an

Case 3:24-cv-01098-ZNQ-TJB   Document 61-5   Filed 03/06/24   Page 12 of 13 PageID: 997

**Singh v. Murphy, Not Reported in Atl. Rptr. (2020)**
2020 WL 6154223

election). The general election utilizing the mail-in voting procedures has been underway for many weeks. According to the representation of the Deputy Attorney General made to us at oral argument, it is estimated that over a million New Jersey voters have already marked and mailed in their ballots. Disrupting that process now would inevitably cause widespread upheaval and potential voter disenfranchisement. Similarly, an order nullifying the primary election at this juncture and invaliding nominees on the general election ballot would produce comparable harm.

It must also be underscored that the entire state, including political candidates such as plaintiff, were on notice as of May 15 when Executive Order 144 was issued, that the procedures for the primary election would be modified to allow mail-in voting due to the COVID-19 pandemic. Apparently no one, including plaintiff, filed suit to enjoin that process before the primary election took place.

The voters and other candidates who participated in that primary election had a right to expect that the votes would be counted and that the results would be certified and used in the general election. Although we need not reach or rest upon defendants' argument that plaintiff is "equitably estopped" from bringing his claims, his inaction before the primary took place surely affects the comparative equities.[11] Plaintiff took advantage of the extended opportunity to campaign and attract voters for the primary election and did not attempt to halt the process. It was only after he was not victorious in the primary that he went to court and argued that Executive Order 144 is unconstitutional. Meanwhile, other candidates for the Senate and the House of Representatives, as well as other offices, had their status as nominees (or, as the case may be, defeated candidates) determined.

[11] We recognize that plaintiff filed his election contest petition on September 1 apparently in compliance with the twelve-day deadline for such petitions under N.J.S.A. 19:29-3, as the last Senate recount from Sussex County was announced on August 20. Nevertheless, mere compliance with the statutory deadline for an election contest does not mean the equities and the public interest support the extraordinary injunctive relief he seeks. Plaintiff knew weeks before the July primary what Executive Order 144 said, and that it was allowing citizens to vote by mail without an advance request for a ballot. The change from usual voting processes was clear. There was no need to wait for the election to occur in order to bring a challenge to the procedures. Ideally, "[t]he time to protest [to the process] is before the election, and not, as here, after the event." Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 233 (1960). Even if plaintiff's complaint is not time barred or estopped, its timing bears upon the balancing of Crowe factors for obtaining injunctive relief.

**\*15** In addition to the Crowe factors under state law, there is a wealth of federal precedent that weighs heavily against entertaining on-the-brink challenges to the voting procedures of upcoming elections. See, e.g., Purcell v. Gonzalez, 549 U.S. 1, 5-6 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."); Nader v. Keith, 385 F.3d 729, 736 (7th Cir. 2004) (disallowing third-party presidential candidate's suit challenging constitutionality of state election code that was not filed until June of an election year, which was four months after his candidacy was announced, and "created a situation in which any remedial order would throw the state's preparations for the election into turmoil"); Kay v. Austin, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.").

To the extent we have not discussed them, any other arguments made by plaintiff that bear upon facial validity lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

III.

For these abundant reasons, plaintiff's facial challenges to Executive Order 144 and any other pertinent Executive Orders are denied, and his requests for injunctive relief and summary judgment/decision are likewise denied. Jurisdiction in this appellate court is concluded, and the matter is remanded to the trial court to adjudicate in due course plaintiff's as-applied and other claims, including any necessary determinations of material fact.

Affirmed in part, remanded in part.

**All Citations**

Not Reported in Atl. Rptr., 2020 WL 6154223

**Singh v. Murphy, Not Reported in Atl. Rptr. (2020)**
2020 WL 6154223

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.