

 Neutral
As of: March 7, 2024 2:48 AM Z

# Conforti v. Hanlon

United States District Court for the District of New Jersey

May 31, 2022, Decided; May 31, 2022, Filed

Civil Action No. 20-08267 (ZNQ) (TM)

**Reporter**
2022 U.S. Dist. LEXIS 97003 *; 2022 WL 1744774

CHRISTINE CONFORTI, et al., Plaintiffs, v. CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk, et al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Motion granted by, Request granted, Request denied by, Without prejudice Conforti v. Hanlon, 2023 U.S. Dist. LEXIS 56359 (D.N.J., Mar. 31, 2023)

## Core Terms

candidates, Bracketing, ballot, county clerk, election, Plaintiffs', rights, parties, column, allegations, burdens, pivot, primary election, regulation, votes, argues, primacy, voters, Reply, moot, motion to dismiss, state law, disfavoring, printed, cases, official capacity, first column, designation, endorsed, row

**Counsel:  [*1]** For CHRISTINE CONFORTI, ARATI KREIBICH, KEVIN MCMILLAN, ZINOVIA SPEZAKIS, MICO LUCIDE, JOSEPH MARCHICA, NEW JERSEY WORKING FAMILIES ALLIANCE, INC., Plaintiffs: FLAVIO L. KOMUVES, LEAD ATTORNEY, Weissman & Mintz LLC, Somerset, NJ; YAEL BROMBERG, LEAD ATTORNEY, BROMBERG LAW LLC, GLEN ROCK, NJ; BRETT M. PUGACH, LEAD ATTORNEY, BROMBERG LAW LLC, New York, NY.

For CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk, Defendant: ERIK ANDERSON, LEAD ATTORNEY, REARDON ANDERSON LLC, Tinton Falls, NJ.

For SCOTT M. COLABELLA, in his official capacity as Ocean County Clerk, Defendant: JOHN C. SAHRADNIK, MATHEW BRADY THOMPSON, LEAD ATTORNEYS, BERRY, SAHRADNIK, KOTZAS & BENSON, TOMS RIVER, NJ.

For PAULA SOLLAMI COVELLO, in her official capacity as Mercer County Clerk, Defendant: ANGELO JOSEPH GENOVA, JENNIFER BOREK, LEAD ATTORNEYS, Genova Burns LLC, Newark, NJ; CHRISTOPHER ZAMLOUT, LEAD ATTORNEY, CHIESA SHAHINIAN & GIANTOMASI PC, WEST ORANGE, NJ.

For EDWARD P MCGETTIGAN, in his official capacity as Atlantic County Clerk, Defendant: JAMES T. DUGAN, LEAD ATTORNEY, ATLANTIC COUNTY DEPARTMENT OF LAW, ATLANTIC CITY, NJ.

For E. JUNIOR MALDONADO, in his official capacity as Hudson County Clerk, Defendant: **[*2]**  MICHAEL L. DERMODY, LEAD ATTORNEY, OFFICE OF HUDSON COUNTY COUNSEL, JERSEY CITY, NJ.

For LEAGUE OF WOMEN VOTERS OF NEW JERSEY, Salvation and Social Justice, Amicuss: HENAL PATEL, RYAN PAUL HAYGOOD, LEAD ATTORNEYS, NEW JERSEY INSTITUTE FOR SOCIAL JUSTICE, NEWARK, NJ.

For OFFICE OF THE BERGEN COUTY CLERK, Intervenor: JAIME RICHARD PLACEK, LEAD ATTORNEY, DECOTIIS, FITZPATRICK, COLE & GIBLIN, LLP, PARAMUS, NJ; RAFAEL JAUME CORBALAN, LEAD ATTORNEY, CHIESA SHAHINIAN & GIANTOMASI P.C., WEST ORANGE, NJ.

For GURBIR S GREWAL, Intervenor: GEORGE N. COHEN, LEAD ATTORNEY, OFFICE OF THE NJ ATTORNEY GENERAL, R.J. HUGHES JUSTICE COMPLEX, TRENTON, NJ.

For HONORABLE JAMES HOGAN, Intervenor: JOHN M. CARBONE, LEAD ATTORNEY, CARBONE AND FAASSE, RIDGEWOOD, NJ.

**Judges:** ZAHID N. QURAISHI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ZAHID N. QURAISHI

# Opinion

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon motions to dismiss by all named Defendants and Intervenor State of New Jersey. Plaintiffs Christine Conforti, Arati Kreibuch, Mico Lucide, Joseph Marchica, Kevin McMillan, Zinovia Spezakis, and New Jersey Working Families Alliance, Inc. ("NJWF"), sued in this Court alleging constitutional concerns with the New Jersey primary **[*3]** election system. Plaintiffs allege that the New Jersey "bracketing system" violates their First Amendment[1] rights as well as the Elections Clause of the U.S. Constitution. Their claims are brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and 42 U.S.C. § 1983. For the following reasons, the Court will grant in part and deny in part all motions to dismiss.

## I. PROCEDURAL HISTORY AND BACKGROUND

This matter arises out of the 2020 Democratic primary election (the "2020 Primary") and 2021 Democratic primary election (the "2021 Primary") in which Plaintiffs Conforti, Kreibich, Spezakis, Lucide, Marchica, and MacMillan ("Candidate Plaintiffs") participated as candidates for public office. NJWF endorsed numerous candidates participating in the 2020 Primary and 2021 Primary. Candidate Plaintiffs and NJWF (collectively, "Plaintiffs") seek declaratory relief and injunctive relief against Defendants Christine G. Hanlon, John S. Hogan, Scott M. Colabella, Paula Sollami Covello, Edward P. McGettigan, and E. Junior Maldonado (collectively, the "County Clerk Defendants") in their official capacities as county clerks.

On July 6, 2020, Conforti filed the initial complaint against Hanlon, Colabella, and Covello in their official capacities as county clerks. (ECF No. 1.) Defendant John Hogan, the Bergen **[*4]** County Clerk, filed a motion to intervene (ECF No. 7), which the Court granted (ECF No. 22). On January 25, 2021, Conforti, the other Candidate Plaintiff, and NJWF filed the operative Amended Complaint ("Am. Compl.," ECF No. 33) against the County Clerk Defendants in their official capacities as county clerks. The State of New Jersey filed a motion to intervene (ECF No. 53), which the Court granted (ECF No. 54). Defendant James Hogan, the Gloucester County Clerk, also filed a motion to intervene (ECF No. 62), which the Court granted (ECF No. 63).

Defendants were properly served. County clerks for the remaining fifteen counties in New Jersey are not parties to the matter but were furnished with a copy of the Amended Complaint. (Am. Compl. ¶ 64.) The Secretary of State was also furnished with a copy of the complaint. (*Id.* ¶ 65.) The County Clerk Defendants and the State of New

---

[1] Plaintiffs correctly plead their First Amendment injuries via the Fourteenth Amendment. For the sake of brevity only, the Court omits regular reference to the Fourteenth Amendment.

2022 U.S. Dist. LEXIS 97003, *4

Jersey filed a total of seven separate motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (collectively, the "Motions").[2] To resolve the Motions, the following are facts taken from the Amended Complaint.

During the 2020 Primary, Conforti, Kreibich, and Spezakis were federal candidates running for the U.S. House of Representatives in different districts. (Am Compl. ¶¶ 19, 24, 44.) Plaintiff Lucide ran for Atlantic County clerk. (*Id.* ¶ 28.) Marchica ran for party office on the County Committee in Mercer County. (*Id.* ¶ 33.) McMillan ran as an incumbent candidate seeking reelection to the Neptune Township Committee. (*Id.* ¶ 37.) NJWF is a non-profit independent organization that endorses candidates running in elections. (*Id.* ¶ 48.) As detailed below, the County Clerk Defendants are elected officials who are vested with certain statutory duties and obligations including but not limited to the, design, preparation, and printing of all ballots, the issuance of mail-in ballots, and conducting a drawing for ballot position for various elections held in various counties. (*Id.* ¶¶ 57-62.)

New Jersey is the only state in the country that organizes its primary election ballots by bracketing groupings of candidates (the "Bracketing Structure") rather than by listing the office sought followed immediately by the names of all candidates in a column (the "Bubble Ballot Structure"). (*Id.* ¶¶ 3, 68.) County clerks have sole jurisdiction over the Bracketing Structure for primary election ballots and are guided, in part, by New Jersey **[*6]** state law. (*Id.* ¶¶ 69-72.) New Jersey state law allows candidates to request that the county group their names together and that their identified common designation or slogan be printed opposite their names. (*Id.* ¶ 73.) To do so, each candidate's campaign manager must consent in writing to the county clerk (*id.* ¶ 74), and the candidates will thus become "bracketed" (*id.* ¶ 75). State law provides deadlines for candidates to request bracketing. (*Id.* ¶ 74.)

Once petitions are filed and the bracketing deadline passes, the county clerks will choose a specific office as the "pivot point." (*Id.* ¶ 86.) The pivot point is the first column (or row depending on the design) on the primary ballot. (*Id.* ¶ 82.) By law, the names of all U.S. Senators must be placed in the first row of the primary ballot and thus drawn as the pivot point. (*Id.* ¶ 83.) If a U.S. Senator is not on the primary ballot, then Governor should be placed in the first row. (*Id.*) County clerks will then draw (by lottery) all pivot point candidates' names and place them on the ballot in the order drawn. (*Id.* ¶ 6.) This is known as the "preferential ballot draw." (*Id.* ¶ 6.) Once pivot point candidates are placed on the ballot in **[*7]** the preferential ballot draw, all candidates who were bracketed with the pivot point candidates are then placed in the same column. (*Id.* ¶ 6.) Candidates endorsed by the county party, who are all bracketed together and thus appear with a slate of similarly endorsed candidates, appear in a single column of the ballot with the same slogan. (*Id.* ¶ 7.) This is referred to as the "county line." (*Id.*)

If a candidate chooses to not (or cannot) bracket with other candidates, the candidate is an "unbracketed candidate." (*Id.* ¶ 6.) Unbracketed candidates are allegedly not eligible to receive the first ballot position (*i.e.*, the top left position) and will be placed further to the right or further to the bottom. (*Id.*) Moreover, unbracketed candidates are allegedly not guaranteed the next available column after the bracketed candidates. (*Id.* ¶¶ 6, 96-100.) Rather, these unbracketed candidates are (1) placed at the discretion of the county clerk multiple columns away from the

---

[2] Defendant John Hogan, the Bergen County clerk, filed a motion to dismiss (ECF No. 60) and a brief supporting his motion ("Hogan Motion Br.," ECF No. 60-1). Defendant Maldonado, the Hudson County Clerk, filed a motion to dismiss (ECF No. 57) and a brief supporting his motion ("Maldonado Motion Br.," ECF No. 57-3). Defendant Covello, the Mercer County Clerk, filed a motion to dismiss (ECF No. 58) and a brief supporting her motion ("Covello Motion Br.," ECF No. 58-1). Defendant Hanlon, the Monmouth County Clerk, filed a motion to dismiss (ECF No. 59) and a brief supporting her motion ("Covello Motion Br.," ECF No. 59-2). Defendant Colabella, the Ocean County Clerk, filed a motion to dismiss (ECF No. 55) and a brief supporting his motion ("Colabella Motion Br.," ECF No. 55-2). Defendant-Intervenor State of New Jersey filed a motion to dismiss (ECF No. 53) and a brief supporting its motion ("State Motion Br.," ECF No. 53-1). Defendant McGettigan, the Atlantic County Clerk, initially filed a motion to dismiss (incorrectly identified by counsel on the docket as a motion for judgment on the pleadings) at ECF No. 56, but it was rejected by the Clerk's Office for improper electronic signature. *See* Clerk's Quality Control Message entered March 29, 2021. McGettigan re-filed his brief supporting a motion to dismiss and proposed order ("McGettigan Motion Br.," ECF No. 63), but neglected to include a notice of motion. For the sake of clarity, the Court considers McGettigan's brief at ECF No. 63, but will address its decision to his Motion at ECF No. 56. Defendant James Hogan, the Gloucester County Clerk, filed a motion to dismiss but later withdrew it. (ECF No. 106.)

bracketed candidates with only blank spaces in between; (2) stacked in the same column as another candidate for the exact same office; and/or (3) placed in the same column as candidates with whom they did not request to bracket **[*8]** and who requested a different ballot slogan. (*Id.* ¶ 80.)

Although state law only provides that the U.S. Senate or Governor office should be used as the pivot point, some county clerks used the President as the pivot point or did not clearly identify who was the pivot point. (*See id.*, Ex. A.) For example, Atlantic County used the President as the pivot point. (*Id.* ¶¶ 85, 88.) Somerset County used the U.S. Senators as the pivot point in the Republican draw but featured a candidate for US Senator in the first column, a candidate for President in second column, and bracketed slate in third column. (*Id.* ¶ 89.)

The Bracketing Structure is not universal within the state. (*Id.* ¶ 67.) Nineteen out of New Jersey's twenty-one counties have historically used the Bracketing Structure with respect to their full-face machine ballots. (*Id.*) A majority, but not all counties, use a similar design technique with respect to their vote-by-mail ballots. (*Id.*) Salem and Sussex Counties have used the Bubble Ballot Structure. (*Id.* ¶ 68.) Morris County has used the Bubble Ballot Structure but only for Republican primary elections. (*Id.*) Hunterdon, Passaic, and Warren Counties implemented the Bubble Ballot Structure **[*9]** in connection with their vote-by-mail ballots with respect to the 2020 Primary. (*Id.*)

In an executive summary attached to the Amended Complaint as Exhibit B, Dr. Joanne M. Miller provided a summary of various studies into the effect of ballot design. (*Id.* ¶ 96; "Ballot Design Study," Am. Compl., Ex. B.) Dr. Miller reviews several studies that relate "primacy effects," a psychological theory that people have biases toward selecting the first object considered in a set, to a candidate's order on the ballot. (Ballot Design Study at 3.) The studies reviewed ballot designs in multiple states and concluded that first position on the ballot has a positive effect on the number of votes received. (*Id.* at 4-10.) Although none of the studies involved the New Jersey Democratic primary ballot (*id.* at 10), Dr. Miller concludes that the studies show that the unique features of the New Jersey ballot design are likely to have systematic effects similar to the ones studied in other states and candidate races (*id.* at 12-13).

Conforti was placed on ballots in Mercer, Monmouth, and Ocean County. (*Id.* ¶¶ 101-17.) In the Monmouth County ballot, Conforti was placed in the fourth column, three columns to the **[*10]** right from Conforti's competitor who ran in the county line and was bracketed with a U.S. Senate candidate (the pivot point for the ballot). (*Id.* ¶¶ 103, 105.) In the Ocean County ballot, Conforti was also placed in the fourth column (*Id.* ¶ 109.) In the Mercer County ballot, Conforti was placed in the first column with her competitor. (*Id.* ¶ 115.) Upon Plaintiffs' information and belief, approximately one-third of all Mercer County voters had their votes disqualified because they voted for more than one candidate for the same office. (*Id.* ¶ 117.)

Kreibich was placed on ballots in Bergen, Passaic, Sussex, and Warren Counties. (*Id.* ¶ 118.) Kreibich included the Bergen County ballot in the Amended Complaint, alleging she was placed in the third column with county freeholder candidates she chose to bracket with. (*Id.* ¶ 124.) Kreibich notes that the percentage margin of victory for Gottheimer (a competitor bracketed with a U.S. Senate candidate) was larger in Bergen than in Passaic, Sussex, and Warren Counties all of which separated candidates by office in its mail-in ballots and thus did not allow for the Bracketing Structure. (*Id.* ¶ 125.)

Lucide ran in the 2021 Primary. (*Id.* ¶ 128.) Atlantic **[*11]** County, one of the counties Lucide ran in, used the U.S. President candidate as the pivot point on the 2020 Primary ballot. (*Id.* ¶ 128.) Lucide alleges that the Bracketing Structure forces him to associate with candidates running for other offices or risk placement in a column further from the first column. (*Id.* ¶ 131.)

Marchica chose not to bracket with other candidates in Mercer County. (*Id.* ¶ 137.) On the ballot, Marchica was placed in the second column with a candidate for U.S. Senate and a candidate for the Fourth Congressional District, none of whom requested to bracket with one another. (*Id.*)

McMillan was placed on the ballot in Monmouth County. (*Id.* ¶ 144.) The Monmouth County clerk drew for ballot position based on U.S. Senate candidates, then President, and then for Fourth Congressional District. (*Id.* ¶¶ 145,

147, 148.) McMillan was placed in the sixth column with two county committee candidates with whom McMillan chose to bracket. (*Id.* ¶ 149.)

Spezakis intends to run in the 2022 Primary. (*Id.* ¶ 160.) Spezakis does not intend to bracket with any other candidates for any other offices.[3] (*Id.*) As such, Spezakis believes that she will be placed after all other candidates for other **[*12]** offices. (*Id.*)

As of January 2021, all Candidate Plaintiffs, except Lucide, lost their respective primary elections. (*Id.* ¶¶ 20, 25, 34, 42, 45.) Lucide was a candidate in the 2021 Primary and thus the Amended Complaint did not include information on his primary election. (*Id.* ¶ 28.) Conforti, Lucide, Marchica, and Spezakis intend to run for office again. (*Id.* ¶¶ 23, 32, 36, 47.) McMillan is contemplating running again but is highly discouraged by the unfair ballot placement that unbracketed and non-party endorsed candidates receive on the ballot. (*Id.* ¶ 42.) If Lucide wins or loses his primary election, he intends to run again in 2026, the next time that the Atlantic County clerk office appears on the ballot. (*Id.* ¶ 32.) It is unclear if Kreibich intends to run again. (*See id.* ¶¶ 24-27.) NJWF endorsed numerous unbracketed candidates for federal, state, and local office in the 2020 Primary, (*id.* ¶ 52), and intended to endorse candidates in the 2021 Primary, (*id.* ¶ 53).

Plaintiffs claim that they were deprived of certain First Amendment rights under the color of state law. (*Id.* ¶¶ 169-208, 223-25.) Specifically, Plaintiffs claim their Right to Vote/Vote Dilution, Right to Equal Protection, and Freedom **[*13]** of Association were violated by the County Clerk Defendants' implementation of the Bracketing Structure. (*Id.*) The County Clerk Defendants allegedly acted under the color of law in receiving and acting on bracketing requests, designing ballots, and conducting ballot drawings. (*Id.* ¶¶ 63, 223-25.) Additionally, Plaintiffs allege that the Bracketing Structure violates the Elections Clause of the United States Constitution and thus is unconstitutional. (*Id.* ¶¶ 210-21.)

## II. LEGAL STANDARD

Under Rule 12(b)(1), a court may dismiss a claim if it lacks subject-matter jurisdiction. *Ballentine v. United States, 486 F.3d 806, 810, 48 V.I. 1059 (3d Cir. 2007)*. Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," *Arbaugh v. Y & H Corp., 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)*, and to "raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Group Against Smog and Pollution, Inc. v. Shenango Inc., 810 F.3d 116, 122 n.5 (3d Cir. 2016)* (quoting *Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434, 131 S. Ct. 1197, 179 L. Ed. 2d 159 (2011)*). A Rule 12(b)(1) motion can raise a facial attack or a factual attack, which determines the standard of review. *Mazo v. Way, 551 F. Supp. 3d 478, 489 (D.N.J. 2021)* (quoting *Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014)*).

A facial attack "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal question . . . or because some other jurisdictional defect is present." *Constitution Party, 757 F.3d at 357* **[*14]** . In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." *Id.* at 358. "A factual attack concerns the actual failure of [plaintiff's] claims to comport with the jurisdictional prerequisites." *CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)*; *see id.* ("So, for example, while diversity of citizenship might have been adequately pleaded by the plaintiff, the defendant can submit proof that, in fact, diversity is lacking ") When considering a factual challenge, "the plaintiff [has] the burden of proof that jurisdiction does in fact exist," the court "is free to weigh the evidence and satisfy itself

---

[3] Maldonado provides a letter from Spezakis for a request to bracket with a candidate for U.S. Senate in the 2020 Primary. (ECF No. 57-2 at 9.) Given that Spezakis is contesting the use of the Bracketing Structure with respect to the 2022 Primary, the Court does not find this letter relevant to the claims at hand.

as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to [the] plaintiffs allegations . . . ." *Mortenson v. Fest Fed. Say. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

Under a Rule 12(b)(6) challenge, courts accept the plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiffs' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "Threadbare recitals of the elements of [standing], supported by mere conclusionary statements, do not suffice." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter" to show that Plaintiffs established standing and state a claim *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)); *see* *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).

## III. <u>DISCUSSION</u>

Plaintiffs argue that the Bracketing Structure is facially unconstitutional (Am. Compl. ¶¶ 86-100) and unconstitutional as applied to the County Clerk Defendants. (Am. Compl. ¶¶ 101-166.) Defendant John Hogan, Defendant Colabella, and Defendant-Intervenor State of New Jersey argue that Plaintiffs fail to show subject-matter jurisdiction. (Hogan Motion Br. at 16-17; Colabella Motion Br. at 2-8; Covello Motion Br. at 16; Maldonado Motion Br. at 9; State Motion Br. at 9-12, 15-18.) In particular, Defendants argue that **[\*15]** Plaintiffs do not show Article III standing elements (State Motion Br. at 15-19; ECF No. 89 ("State Reply Br.") at 9-11; Colabella Motion Br. at 5-8; Covello Motion Br. at 16-18; ECF No. 96 ("Covello Reply Br.") at 3-11; Hanlon Motion Br. at 29-31), the claims related to the 2020 Primary are moot (Colabella Motion Br. at 4; Covello Motion Br. at 16-18; Covello Reply Br. at 18-20; Maldonado Motion Br. at 9-11; State Motion Br. at 9; State Reply Br. at 2-6) and claims related to the 2021 Primary and future primaries are unripe (Hogan Motion Br. at 16-17; McGettigan Motion Br. at 12-13; Maldonado Motion Br. at 10-11; State Motion Br. at 12-15; State Reply Br. at 6-9). Certain defendants also argue that Plaintiffs' claims should be dismissed due to a failure to attach indispensable parties (*i.e.*, the Secretary of State and candidates who bracketed in the 2020 Primary and will bracket in future primaries). (Maldonado Motion Br. at 8-9; Hanlon Motion Br, at 27-28.) Defendant Colabella argues that the case should be dismissed because the Eleventh Amendment provides immunity for county clerks. (Colabella Motion Br. at 7.) All Defendants argue that Plaintiffs fail to state a claim.

## A. Failure to Join Certain Parties

The **[\*16]** Court first turns to arguments made that certain required parties were not named in this matter, as required by Federal Rule of Civil Procedure 19. (Maldonado Motion Br. at 8; Hanlon Motion Br. at 27-28.) Given that a failure to name a required party can be grounds for dismissal for lack of subject-matter jurisdiction, *see* *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 117, 88 S. Ct. 733, 19 L. Ed. 2d 936 (1968), a court must first determine whether a party should be joined if "feasible" under Rule 19(a). *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993). "If the party should be joined but joinder is not feasible because it would destroy diversity, the court must then determine whether the absent party is 'indispensable' under Rule 19(b)." *Janney Montgomery Scott*, 11 F.3d at 404.

Rule 19(a)(1) provides that:

[A] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because **[\*17]** of the interest.

Fed. R. Civ. P. 19(a)(1). "Any party whose absence results in any of the problems identified in either subsection is a party whose joinder is compulsory if feasible." *Janney Montgomery Scott*, 11 F.3d at 405.

Maldonado argues that the New Jersey Secretary of State (the "NJ Secretary") is a required party in this matter because the enforcement of the election laws is the Secretary's duty under New Jersey state law.[4] (Maldonado Motion Br. at 8.) Hanlon argues that (unnamed) political candidates must be named as parties because the "constitutional rights of candidates who wish to associate and bracket will be potentially impacted." (Hanlon Motion Br. at 28.) After reviewing the Plaintiffs' Omnibus reply, the Court cannot find any response to the joinder arguments. The lack of response is not dispositive here because the Court may consider the lack of required parties *sua sponte*. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 861, 128 S. Ct. 2180, 171 L. Ed. 2d 131 (2008).

The Court construes Maldonado's and Hanlon's joinder arguments as factual attacks; as such, no presumption of truth attaches, and the Court may weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Mortenson*, 549 F.2d at 891. The Court assumes that joinder is feasible because the matter arises out of a federal question and Maldonado and Hanlon have **[*18]** not shown that service of process for the NJ Secretary or potential candidates is not feasible.[5] In the absence of the NJ Secretary, the Court's decision can still provide complete relief among the parties because its decision would affect and involve the State of New Jersey, a party to the matter and a party that can speak for the NJ Secretary. Moreover, the Court finds that a decision in the absence of the NJ Secretary would not leave an existing party (*i.e.*, the individual County Clerk Defendants or the State of New Jersey) subject to multiple or otherwise inconsistent obligations because of the interest. The NJ Secretary does have an interest in the subject of the action given the office's position as the enforcer for election laws. Still, the Court does not find that a decision would impair or impede the NJ Secretary's ability to enforce election laws, because Plaintiffs' challenge is to the discretion of the County Clerks.[6] With respect to Hanlon's argument that other (unnamed) candidates are necessary parties due to the impact on their ability to bracket, it is well-settled that the interests of absent parties have no bearing on a Rule 19 analysis. *See Janney, 11* F.3d at 405 ("The effect a decision may have **[*19]** on the absent party is not material [to Rule 19].").


## B. Rule 12(b)(1)

As an initial step in a Rule 12(b)(1) challenge, the Court must determine whether Defendants' Motions are a facial or factual attack with respect to subject-matter jurisdiction. However, the court "must be careful [] not to allow its consideration of jurisdiction to spill over into a determination of the merits of the case, and thus must tread lightly." *Mazo*, 551 F. Supp. 3d at 490 (citations omitted).

Courts are entitled to "enforce the case-or-controversy requirement through the several justiciability doctrines that cluster about Article III." *Coastal Outdoor Adver. Group, LLC v. Twp. of Union*, 676 F. Supp. 2d 337, 344 (D.N.J. 2009). "The justiciability doctrines include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006); *Toll Brothers, Inc. v. Township of Readington*, 555 F.3d 131, 137 (3d Cir. 2009).

1. Standing - Individuals

---

[4] Maldonado also argues that he is not the proper party to defend the constitutionality of the Bracketing Structure because a clerk's duty is "largely ministerial" and Maldonado's discretion is not being questioned. (*Id.*) Given the nature of and factors under Rule 19(a), the Court construes Maldonado's argument to dispute standing, not advance his "necessary party" argument.

[5] The Court notes that Plaintiffs have indicated they provided the New Jersey Secretary of State with a copy of the initial complaint and the Amended Complaint. (Am. Compl. ¶ 65.)

[6] As discussed below, the County Clerk Defendants have ultimate discretion and authority. *See Quaremba v. Allan*, 67 N.J. 1, 334 A.2d 321 (N.J. 1975).

2022 U.S. Dist. LEXIS 97003, *19

Article III standing has three well-recognized elements. First, a plaintiff must plead an "injury in fact," or an "invasion of a legally protected interest" that is "concrete and particularized." *Lujan v. Defy. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Second, a "causal connection between the injury and the conduct complained of." Id. Third, a plaintiff must plead a likelihood "that the injury will be redressed by a favorable decision." *Id.* at 561. Because the standing elements "are not mere pleading requirements" but rather an essential part of **[*20]** a plaintiff's case, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* The use of these factors to test the justiciability of a complaint seeking a declaratory judgment survives *Iqbal* and *Twombly*. *Wayne Land & Min. Grp. v. Del. River Basin Comm'n*, 894 F.3d 509, 524-25 (3d Cir. 2018). Defendants primarily attack Candidate Plaintiffs on the lack of allegations regarding an injury-in-fact and causation related to the County Clerk Defendants. The Court discusses Defendants' facial attacks on Plaintiffs' standing below.

a. Injury-in-fact

"In the context of a motion to dismiss, we have held that the [i]njury-in-fact element is not Mount Everest. The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that claimant allege[] some specific identifiable trifle of injury." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citation and internal quotation marks omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." **[*21]** *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted).

Marchica alleges forced association with candidates they did not choose to bracket with, which suffices as a burden on their freedom to associate. *California Democratic Party v. Jones*, 530 U.S. 567, 574, 120 S. Ct. 2402, 147 L. Ed. 2d 502 (2000); (Am. Compl. ¶ 137). Candidate Plaintiffs (including Marchica) point to the primacy effect and the weight of the county line as burdens on their First and Fourteenth Amendment rights. (Am. Compl. ¶¶ 90-100.) Circuits are split on whether the primacy effect is a cognizable injury-in-fact, but generally accept it as an injury when a certain group receives the benefit consistently. *Compare Mecinas v. Hobbs*, 30 F.4th 890, 904 (9th Cir. 2022) ("Plaintiffs assert a cognizable injury resulting from the 'primacy effect,' which Plaintiffs allege is so substantial so as to give 'Republican candidates . . . a significant, state-mandated advantage, up and down the slate of partisan races,' violating the First and Fourteenth Amendments by diluting votes for candidates whose party the Statute disfavors and conferring an unfair political advantage on certain candidates solely because of their partisan affiliation."), *Nelson v. Warner*, 12 F.4th 376, 385 (4th Cir. 2021) ("Given the expert testimony credited by the district court that it was extremely likely that the primacy effect would have a negative impact on Nelson's vote tally, we hold that Nelson showed **[*22]** a substantial risk of injury that was particular and concrete."), *McLain v. Meier*, 637 F.2d 1159, 1165-67 (8th Cir. 1980) (incumbent-first statute "burden[ed] the fundamental right to vote possessed by supporters of the last-listed candidates" and violated equal protection), *Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977) (policy of awarding first position on the ballot to the incumbent party violated equal protection), *and Mann v. Powell*, 314 F. Supp. 677, *aff'd*, 398 U.S. 955, 90 S. Ct. 2170, 26 L. Ed. 2d 539 (1970) (favoring incumbents when breaking ballot order ties violated "Fourteenth Amendment right to fair and evenhanded treatment") *with Jacobson v. Florida Sec 'y of State*, 974 F.3d 1236, 1246 (11th Cir. 2020) (voter's reliance on the average measure of the primacy effect did not state an injury because it cannot tell the court "whether ballot order has diluted or will dilute [plaintiffs] or any other citizen's vote in any particular election.").

Although the parties did not direct the Court to a Third Circuit case that speaks directly to this issue (and the Court could not find a case that did), the Court notes that standing "depends considerably upon whether the plaintiff is himself an object of the action" and that "if he is, there is ordinarily little question that the action or inaction has caused him injury . . . ." *Constitution Party of Pa.*, 757 F.3d at 361 (quoting *Lujan*, 504 U.S. at 561-62). Candidate Plaintiffs pled that they are subject to the Bracketing Structure for the foreseeable future. (Am. Compl. ¶ **[*23]** 11.) The Candidate Plaintiffs have alleged that the primacy effect is significant in their elections and provided some evidence that it occurs in New Jersey elections. (*See* Ballot Design Study.) Plaintiffs allege a cognizable injury to satisfy the Court at this point in the litigation.

The Qualification Clause of the Constitution provides that "[n]o person shall be a Representative who shall not have attained to the Age of twenty-five years, and been seven years a citizen of the United States, and who shall not, when elected, be an [i]nhabitant of that State in which he shall be chosen." U.S. Const. Art. I, § 2, cl. 2. With respect to the Elections Clause claims, Conforti's, Kreibich's, and Spezakis's allegations of an impermissible regulation of federal elections are sufficient to show an injury-in-fact given that the Bracketing Structure regulates federal elections, and the three plaintiffs allege injuries related to the candidacy in such elections. With respect to Marchica, McMillan, and Lucide, they cannot provide an injury relating to the Elections Clause because they ran for state or local positions; to allow them to litigate those claims would be akin to an "impermissible generalized grievance." Lujan, 504 U.S. at 575.

b. Causation and Redressability

The Court finds that the standing elements of causation **[*24]** and redressability are also satisfied for Candidate Plaintiffs' First and Fourteenth Amendment claims and for Conforti's, Kreibich's, and Spezakis's Elections Clause claims. Under state law, County Clerk Defendants have significant discretion in their implementation of the Bracketing Structure. See Quaremba v. Allan, 67 N.J. 1, 334 A.2d 321 (N.J. Sip. Ct. 1975). Candidate Plaintiffs' injuries derive from the current and future enforcement of the Bracketing Structure. Thus, Plaintiffs' injuries flow directly from Defendants' actions. See Duke Power Co. v. Carolina Env't Study Gip., Inc., 438 U.S. 59, 77-78, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978) (applying a "but for" test to the causation analysis). It is likely that a declaratory judgment stating that the Bracketing Structure is unconstitutional and an injunction enjoining Defendants from enforcing it would prevent Plaintiffs' injuries. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), 528 U.S. 167, at 185-86, 120 S. Ct. 693, 145 L. Ed. 2d 610 (reasoning that "for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress"); N.J. Civ. Justice Inst. v. Grewal, Civ. No. 19-17518, 2021 U.S. Dist. LEXIS 57437, 2021 WL 1138144, at *5 (D.N.J. Mar. 25, 2021) (same).

2. Standing — NJWF

Organizations or associations "are unable to establish standing solely on the basis of institutional interest in a legal issue." Pa. Prison Soc'y v. Cortes, 508 F.3d 156, 162 (3d Cir. 2007) Instead, an organization may have standing to bring a claim where: (1) the organization itself has suffered an **[*25]** injury to the rights and/or immunities it enjoys; or (2) where it is asserting claims on behalf of its members and those individual members have standing to bring those claims themselves. Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 279 (3d Cir. 2014). An organization has direct organizational standing under the first prong when the organization itself suffers injuries as a result of the defendant's allegedly unlawful conduct. Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982). An organization has "associational standing" (sometimes referred to as "representational standing") under the second prong if (1) the organization's members have standing to sue on their own; (2) the interests the organization "seeks to protect are germane to its purpose," and (3) "neither the claim asserted, nor the relief requested requires individual participation by its members." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977). Defendants attack NJWF's standing primarily on a lack of allegations regarding an injury-in-fact and causation attributable to County Clerk Defendants. The Court discusses these facial attacks below.

a. Injury

The State argues that NJWF lacks standing to bring a claim in the instant matter because it cannot show an injury-in-fact as to any particularized interest that was impacted by the challenged bracketing statute and thus does not have **[*26]** standing to sue on its behalf or on its members' behalf. (State Motion Br. at 15-18.) Plaintiffs state that NJWF has direct organizational standing because the Bracketing Structure injured the organization itself by requiring it to divert resources to counteract unlawful conduct. (Omnibus Opp'n Br. at 31-32.) Plaintiffs also argue that it has associational standing because its members, such as Plaintiff Lucide, would have standing to sue in Lucide's own right. (Omnibus Opp'n Br. at 32.)

NJWF's direct organizational standing is predicated on a "diversion-of-resources" theory. However, such a theory cannot demonstrate an injury under the allegations in the Amended Complaint in the Third Circuit.[7]  *See Fair Housing Rights Center in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016) ("The Supreme Court specifically held that a fair housing group, like the FHRC, has standing to sue [under the Fair Housing Act] if the discriminatory practices it is challenging have impaired its ability to carry out its mission."); *Free Speech Coal., Inc. v. Attorney General United States*, 825 F.3d 149, 166 (3d Cir. 2016) ("Sufficient injury exists to confer standing where 'the regulation is directed at [plaintiffs] in particular; it requires them to make significant changes in their everyday business practices; [and] if they fail to observe the . . . rule they are quite clearly exposed to the **[*27]** imposition of strong sanctions,' even where there is no pending prosecution."). Thus, NJWF does not have direct organizational standing to litigate the claims involving burdens on First and Fourteenth Amendment rights. *Free Speech Coal.*, 825 F.3d at 166.

NJWF has adequately alleged that Lucide, a member of NJWF, has standing in his own right. (Omnibus Opp'n Br. at 6 n.3, 32.) Furthermore, NJWF's purpose is to "advance progressive policies and work[] to elect candidates who share its values and policy priorities"; such interests are germane to its purpose and would likely be protected by involvement in the matter. *(Id.* at 6.) Finally, neither the claim asserted nor the relief requested requires individual participation by its members. Thus, NJWF has shown that it has associational standing to litigate burdens on its members' First and Fourteenth Amendment rights.

With respect to the Elections Clause claims, the Court finds that NJWF has not shown it has direct or associational standing within the context of the Elections Clause. Given that NJWF, a corporation, may not run in an election, NJWF cannot prove that it directly suffered injuries due to the State of New Jersey's impermissible regulation of a congressional election. Moreover, the Court finds that NJWF has not shown **[*28]**  associational standing. As noted above, Lucide, the only specified member of NJWF involved in this matter (Omnibus Opp'n Br. at 32), does not have standing to sue under the Elections Clause.[8] Thus, the Court finds that NJWF has not shown that it has associational standing for the Elections Clause claim because it has not shown that a specific member has standing.

b. Causation and Redressability

For the same reasons as the Candidate Plaintiffs, NJWF has causation and redressability.[9]

---

[7] Plaintiffs point to the "competitive standing" noted in *Nelson v. Warner*, 477 F. Supp. 3d 486, 495-96 (SD W. Va. 2020) and *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544-45 (6th Cir. 2014) as evidence of an injury-in-fact for NJWF's direct standing. (Omnibus Opp'n Br. at 31-32.) Competitive standing is applicable "when regulations illegally structure a competitive environment — whether an agency proceeding, a market, or a reelection race — parties defending concrete interests . . . in that environment suffer legal harm under Article III." *Shays v. FEC*, 414 F.3d 76, 87, 367 U.S. App. D.C. 185 (D.C. Cir. 2005). The Court notes that the cited cases do not reference a Third Circuit case where "competitive standing" was extended to a corporation. *See Nelson*, 477 F. Supp. 3d at 496; *Cf: Republic of Philippines v. Westinghouse Elec. Corp.*, 139 F.R.D. 50, 61 (D.N.J. 1991) (discussing "competitive standing" in the context of sealing business records). Even when courts extended competitive standing, it was to a political party, not a non-profit corporation. *See Green Party*, 787 F.3d at 544 (laws "restricted [Green Party's] right to associate as political organizations, and . .. therefore articulated a 'factual showing of perceptible harm' resulting from the state's regulations.")

[8] NJWF does note that another member was a congressional candidate in the 2020 Primary. (Omnibus Opp'n Br. at 6 n.3.) However, NJWF has not provided specific allegations that the member has standing in his or her own right. *(See id.)*

[9] Plaintiffs raised *Jacobson v. Fla. Sec'y*, 957 F.3d 1193 (11th Cir. 2020), as instructive here because Nelson distinguished Jacobson by noting that the injury was not traceable to the Florida Secretary of State because she "had no role in ordering candidates' names on ballots" and "had no control over county supervisors except through coercive judicial process." *Nelson*, 477 F. Supp. 3d at 499. Instead, the parties who directly controlled the ballot order were the proper plaintiffs. *Id.* We do not believe it necessary to discuss here given that the New Jersey Bracketing Structure and relevant case law clearly indicate that county clerks order the names on the election ballot.

3. <u>Mootness</u>

A dispute is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982)). The determinative question is "whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007) (quotations and citation omitted). But mootness sets a high bar: it must be "impossible for a court to grant any effectual relief whatever." *Knox v. SEIU, Local 1000*, 567 U.S. 298, 307, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012) (quotations and citation omitted).

The State argues that the case is moot because the 2020 Primary has already been held.[10] (*Id.* at 10.) The State further argues that the "capable of repetition yet evading review" doctrine should not apply because Plaintiffs have not shown **[*29]** there is a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." (*Id.* at 11.) Plaintiffs do not dispute that the case is moot but do argue that the "capable of repetition yet evading review" doctrine applies for all Plaintiffs except Lucide whose claim was not attacked as moot. (Omnibus Opp'n Br. at 37-49.) Defendants note that Plaintiffs filed their complaint one day before the 2020 Primary; Defendants contend that this precludes Plaintiffs from arguing that they do not have enough time to litigate the issue. (State Reply Br. at 3.)

A mooted case may still be litigated under the "capable of repetition yet evading review" doctrine[11] if (1) "the challenged action is in its duration too short to be fully litigated prior to cessation or expiration" and (2) "there is a reasonable expectation that the same complaining party will be subject to the same action again." *United States v. Juvenile Male*, 564 U.S. 932, 938, 131 S. Ct. 2860, 180 L. Ed. 2d 811 (2011) *(per curiam)*. The Court has already noted that the New Jersey statutes provide a short timeline to fully litigate matters involving New Jersey primaries because clerks print ballots between 50 days before the election to less than three depending on the **[*30]** county. *See Mazo*, 551 F. Supp. 3d at 492 (noting that "[e]ven a prudent candidate who timely submits her [application to the county clerk] will not generally have time to challenge the [ballot design]") As such, the Court finds that the first prong is satisfied. Plaintiffs argue that *Belitskus v. Pizzingrilli*, 343 F.3d 632, 648 n.11 (3d Cir. 2003), is instructive as to all Plaintiffs with respect to the second prong. (Omnibus Opp'n Br. at 47.) In *Belitskus*, the Third Circuit noted that "the only question [for the second prong] . . . [is] whether there is a 'demonstrated probability' that the same parties will again be involved in the same dispute." 343 F.3d at 648 n.11 (citing *Honig v. Doe*, 484 U.S. 305, 318 n.6, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1998)). Given that "it is reasonable to expect political candidates to seek office again in the future," the Third Circuit has affirmed that the second prong of "capable of repetition yet evading review" doctrine is generally satisfied absent express statements that a plaintiff would not seek election. *Merle v. United States*, 351 F.3d 92, 94 (3d Cir. 2003) (holding that it was "reasonable to expect that Merle will wish to run for election either in 2004 or at some future date" without allegations of intent to do so). The Court holds that the second prong is satisfied because there is a demonstrated probability that the same parties will again be involved in the same dispute.[12] (Am. Compl. **[*31]** ¶¶ 23, 32, 36, 42, 47.) Thus, Plaintiffs' claims regarding the 2020 Primary are not moot under the "capable of repetition yet evading review" doctrine.

---

[10] Several County Clerk Defendants also make mootness arguments. (Colabella Motion Br. at 4; Covello Motion Br. at 18-19; Maldonado Motion Br. at 9; Hanlon Motion Br. at 29-30.) The mootness arguments made in each County Clerk Defendants' brief are substantially similar to the ones made in the State of New Jersey's brief. For the sake of brevity and clarity, the Court will review arguments made in the State of New Jersey's brief and supplement such arguments with relevant points made in the County Clerk Defendants' briefs.

[11] *Cf Federal Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462-63, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007) (the doctrine applies to an organization which "credibly claimed that it planned on running 'materially similar' future targeted broadcast ads" in advance of future elections, and the period between elections was too short to allow the organization sufficient time to fully litigate its constitutional challenges sufficiently in advance of the election date).

[12] Although McMillan and Kreibich did not state an intention to run again (Am. Compl. ¶¶ 24-27; State Reply Br. at 4 & n.1), *Merle* allows plaintiffs such a presumption without expressly alleging it. *Cf Int'l Org. of Masters, Mates & Pilots v. Brown*, 498

2022 U.S. Dist. LEXIS 97003, *31

4. Ripeness

If further factual development would help the court adjudicate the case, the case may be unripe and therefore nonjusticiable. *Abbott Labs. v. Gardner*, 387 U.S. 136, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967).; *see, e.g., Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, at 812, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 ("[F]urther factual development would 'significantly advance our ability to deal with the legal issues presented."). Within the Third Circuit, the *Step-Saver* test is applied in declaratory judgment cases and looks to "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643 (3d Cir. 1990); *see Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539-540 (3d Cir. 2017). "[W]here the constitutionality of a state provision is at issue, the Supreme Court has taken into account the degree to which postponing federal judicial review would have the advantage of permitting state courts further opportunity to construe the challenged provisions." *Plains All Am. Pipeline*, 866 F.3d at 540 (quoting *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405,412 (3d Cir. 1992)) (quotation marks omitted).

The State argues that Plaintiffs' claims concerning the 2021 Primary and future elections are not yet ripe for review under the *Step-Saver* test and under the principles expressed in the Third Circuit's opinion in *Plains All American Pipeline*.[13] (State Motion **[*32]** Br. at 12-15.) The State argues that the first factor is not satisfied here because Plaintiffs' allegations as to future elections are based on a series of contingencies. (State Motion Br. at 13-14.) Applying Third Circuit guidance on the second factor, the State argues that the legal status of the parties will not be changed or clarified by an opinion, that a court ruling would be necessarily advisory, and further development of facts is necessary before a "real and substantive controversy" has occurred. *(Id.* at 14-15.) Finally, the State argues that Plaintiffs' "broad speculation" is insufficient to show that the candidates' plan of action in 2021 or later will be affected by a declaratory judgment in this matter. *(Id.* at 15.)

The Court finds that *Mazo v. Way* is instructive as to each prong. 551 F. Supp. 3d at 495-98. Although the Court considered the constitutionality of New Jersey's slogan statutes in *Mazo*, many of the same arguments are prevalent in this matter. *See id.* at 496 (finding that a "speculative at best" argument is not persuasive given that "there is no basis on which to conclude the [statutes] will operate to a different end in 2022."). Here, Plaintiffs' interests are adverse to Defendants' interests because Plaintiffs **[*33]** allege that the Bracketing Statute applied to them once before and will apply again under circumstances that will recur. *Id.* The second prong also favors ripeness because most First Amendment cases present predominantly legal questions and, even if it did not, the same state law will operate to Plaintiffs' detriment here. *Id.* at 497. The third prong also favors ripeness because a judgement will clarify Plaintiffs' rights and "the rights of all other who would seek to engage in similar activities." *Id.* (quoting *Presbytery of N. J. of Orthodox Presbytarian Church v. Florio*, 40 F.3d 1454,1470 (3d Cir. 1994). Thus, Plaintiffs have demonstrated that their claims are ripe.

5. Political Question Doctrine

Colabella argues that Plaintiffs' theory of diminution of votes presents a non-justiciable political question that should be dismissed under the reasoning of *Rucho v. Common Cause*, 139 S. Ct. 2484, 204 L. Ed. 2d 931 (2019).

---

U.S. 466,473, 111 S. Ct. 880, 112 L. Ed. 2d 991 (1991) ("Respondent has run for office and may well do so again. The likelihood that the Union's rule would again present an obstacle to a preconvention mailing by respondent makes this controversy sufficiently capable of repetition to preserve our jurisdiction."). The State of New Jersey raises an interesting point about *Belitskus*, 343 F.3d at 649, and the Third Circuit's lack of jurisdiction with respect to a plaintiff who left the state with "no evidence in the record to suggest he will return in the future." Here, Candidate Plaintiffs live in New Jersey and have not expressed an intention to leave. Thus, the Court is satisfied that there is a reasonable expectation that Candidate Plaintiffs will be subject to the Bracketing Structure in a future election.

[13] County Clerk Defendants also make ripeness arguments. (Covello Motion Br. at 20; Hanlon Motion Br. at 31; Hogan Motion Br. at 16-17; McGettigan Motion Br. at 12-13.) For the same reasons as discussed in footnote 9, the Court will primarily consider the State of New Jersey's arguments.

2022 U.S. Dist. LEXIS 97003, *33

(Colabella Motion Br. at 10-11; Colabella Reply Br. at 2-3.) In response, Plaintiffs provide a plethora of arguments for why Rucho does not preclude this matter as a non-justiciable political question. (Omnibus Opp'n Br. at 53-58.) In Rucho, the Supreme Court held that partisan gerrymandering claims present nonjusticiable political questions for want of identifying a "clear, manageable, and politically neutral" standard. 139 S. Ct. at 2498. The Court cannot find any justification **[*34]** in Colabella's brief for expanding Rucho from questions on redistricting so as to preclude the matter at hand.

6. Eleventh Amendment Immunity

Colabella briefly contends that he is entitled to Eleventh Amendment immunity because he "exercised his discretionary authority under New Jersey election law, the subject and enforcement of which emanates from the State, with the Secretary of State as the chief election official in the state." (Colabella Motion Br. at 7.) Despite bearing the burden of establishing his right to such immunity, *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995), Colabella offers no authority for his proposition and no argument beyond that statement.

Traditionally, counties do not enjoy state sovereign immunity under the Eleventh Amendment. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010). There are exceptions to that rule and a three-factor analysis provided by the Third Circuit for identifying those exceptions. *See* *Orden v. Borough of Woodstown*, 181 F. Supp. 3d 237 (D.N.J. 2015) (applying *Fitchik* factors to county entities). Here, the Court need not engage in that analysis because, as Plaintiffs have correctly noted, the Third Circuit has already held that the Eleventh Amendment does not prohibit a suit against county officials seeking to restrain them from performing duties alleged to violate a plaintiff's Constitutional rights. *See* *Finberg v. Sullivan*, 634 F.2d 50, 54 (3d Cir. 1980) (en banc) ("On the basis of the reasoning employed in *Ex Parte Young*, [209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)], we find **[*35]** that [the officials] are parties to [plaintiff's] dispute over the constitutionality of these rules and properly named as defendants in her suit."). Accordingly, the Court rejects Defendant Colabella's theory that he is entitled to Eleventh Amendment immunity.

C. Rule 12(b)(6)

Given that the Court has found Plaintiffs have standing, we move onto Defendants' Rule 12(b)(6) arguments. The Supreme Court has found it "beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (citations and quotation marks omitted). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Id.* Hence, States may enact "comprehensive and sometimes complex election codes," where "[e]ach provisions of these schemes . . . inevitably affects - at least to some degree - the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983). Because "the rights of votes and the rights of candidates do not lend themselves to neat separation," the Supreme Court has "minimized the extent to which voting rights cases are distinguishable from ballot access cases." *Anderson*, 460 U.S. at 786.

We first discuss the relevant New Jersey Bracketing Structure **[*36]** and case law surrounding it in part to determine whether New Jersey state courts have already decided the issue.

1. Relevant New Jersey Statutes and Cases

The Bracketing Structure is created by the combined effect of three state statutes. N.J.S.A. 19:23-18 permits "several candidates for nomination to the same office" to "request that their names be grouped together, and that the common designation to be named by them shall be printed opposite their names." N.J.S.A. 19:49-2 requires that their names then be drawn for position together as a single unit on a primary ballot:

> For the primary election for the general election in all counties where voting machines are or shall be used, all candidates who shall file a joint petition with the county clerk of their respective county and who shall choose

the same designation or slogan shall be drawn for position on the ballot as a unit and shall have their names placed on the same line of the voting machine ....

Finally, N.J.S.A. 19:23-26.1 dictates which offices being elected should be placed in the first column or row on the ballot, *i.e.*, sets the pivot point:

In the case of a primary election for the nomination of a candidate for the office of United States Senator and in the case of a primary **[*37]** election for the nomination of a candidate for the office of Governor, the names of all candidates for the office of United States Senator or Governor shall be printed on the official primary ballot in the first column or horizontal row designated for the party of those candidates. In the event that the nomination of candidates for both offices shall occur at the same primary election, the names of all candidates for the office of United States Senator shall be printed in the first column or horizontal row designated for the party of those candidates, and the names of all candidates for the office of Governor shall be printed in the second column or horizontal row. No candidate for nomination for any other office shall have his name printed in the same column or horizontal row as the candidates for nomination for the office of United States Senator or Governor.

As Plaintiffs and Defendants point out, New Jersey state courts have reviewed similar challenges to the Bracketing Structure. *See Quaremba v. Allan, 67 N.J. 1, 334 A.2d 321 (N.J. Sup. Ct. 1975); Schundler v. Donovan, 377 N.J. Super. 339, 872 A.2d 1092 (N.J. Super. Ct. App. Div. 2005).* The Court reviews two seminal cases to understand the contours of the Bracketing Structure under state court interpretations.

In Quaremba, unsuccessful primary candidates argued, in relevant part, that **[*38]** New Jersey's grouping provision "creates preferred classes of primary candidates," and "imposes an unequal burden on unaffiliated candidates and thus denies them their constitutional rights." 334 A.2d at 325. Judgment was entered for the defendant county clerk after a trial, and it was affirmed by the Appellate Division. On review, the New Jersey Supreme Court affirmed, reasoning that the plaintiffs had failed to show the "invidious discrimination" required by the United States Supreme Court to establish a constitutional violation. A.2d at 326 (citing *Ferguson v. Skrupa, 372 U.S. 726, 732, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963)*). The New Jersey Supreme Court also noted that the scope of judicial review of a clerk's discretionary actions is properly limited to assessing whether he acted in good faith and did not intentionally discriminate against any candidate or group of candidates. *Id.* at 329. Thus, the clerk's discretion (as vested by the legislature) is to be upheld unless it is not "rooted in reason." *Id.* at 328.

In *Schundler v. Donovan, 377 N.J. Super. 339, 872 A.2d 1092 (N.J. Super. Ct. App. Div. 2005),* the Appellate Division reviewed a summary proceeding before a trial court that approved two county clerks' bracket-drawing for seven gubernatorial primary candidates. At the proceeding, one candidate claimed that there should not be a distinction between bracketed and non-bracketed candidates **[*39]** because non-bracketed candidates did not have a chance at the first slot or column. *Id.* at 1094. The clerks had randomly drawn names twice, once for the full-slate (*i.e.*, fully bracketed) candidates and a second time for the non-bracketed candidates. *Id.* Given that the ballot layout only included five columns, each gubernatorial candidate after the fourth name drawn was placed together, horizontally into the fifth and final bracket. *Id.* at 1095. Reasoning that the clerks were not mandated to place the candidates in any particular way and one would need at least eight columns to accommodate all slates, affiliations, and non-affiliated candidates, the trial court found the arrangement to be "rooted in reason." *Id.*

On review, the Appellate Division echoed the trial court's deference to the county clerks' discretion, but recognized that the clerks were also bound by the statutory standards of N.J.S.A. 19:23-16.1. Because the constitutionality of that statute had been called into question by a prior Superior Court decision and an opinion by the New Jersey Attorney General, the panel considered its constitutionality, particularly in the wake of the United States Supreme Court's decision in *Eu v. S.F. Cnty. Democratic Cent. Comm., 489 U.S. 214, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989). Schundler, 872 A.2d at 1098-99.* The Schundler court interpreted Eu as prohibiting **[*40]** restrictions on First Amendment expressive rights based "on anything but a directly implicated, profoundly important public interest." *Id.* at 1098. In the specific context of an election, the restriction would have to be "necessary to the integrity of the electoral process." *Id.* (quoting *Eu, 489 U.S. at 232*). Applying that standard, the Appellate Division

reasoned that the first sentence of N.J.S.A. 19:23-26.1 was not unconstitutional and that "there can be no rights violation where a county clerk makes a fair effort to treat candidates for the highest office equally while making a good faith effort to "give effect to the expressive rights of all candidates." Id. at 1099. Ultimately, under the unique circumstances of the case, the Appellate Division instructed the county clerks to re-draw the names of the primary candidates in a single draw without regard to the candidates' bracketed or non-bracketed status, so that all candidates were afforded an equal opportunity to avoid the disfavored fifth column on the ballot. Id.

Quaremba and Schundler make clear that the state courts have been inclined to uphold the constitutionality of New Jersey's Bracketing structure. While these decisions may be persuasive, it is well-settled that this Court is not bound by their [*41] interpretation of rights under the United States Constitution. Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); United States v. Bedford, 519 F.2d 650, 654 (3d Cir. 1975). For further guidance, the Court looks to federal authority.

2. Facial vs. As-Applied Constitutional Challenges

A plaintiff bringing a facial challenge to the constitutionality of a statute must "establish that no set of circumstances exists under which the Act would be valid," United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), or show that the law lacks a "plainly legitimate sweep." Washington State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008); see Bruni v. City of Pittsburgh, 824 F.3d 353, 362 (3d Cir. 2016). In the First Amendment context, the Supreme Court has recognized "a second type of facial challenge," whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) (quotation marks omitted); but see Washington State Grange, 552 U.S. at n.6 ("We generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law."). "A significant consideration in overbreadth analyses is the likelihood and frequency of invalid applications of the statute compared to valid applications. Free Speech Coalition, Inc. v. AG of the United States, 677 F.3d 519, 538 (3d Cir. 2012). Facial challenges are disfavored for several reasons: they "rest on speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten [*42] to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Stevens, 559 U.S. at 473 (collecting cases); see Washington State Grange, 552 U.S. at 450-451.

Plaintiffs have not plausibly alleged that there is no set of circumstances under which the statutes involved in the Bracketing Structure would be valid. Plaintiffs do allege that an incumbent has not won in the past fifty years without gerrymandering and provide evidence that the primacy effect may affect election outcomes. (Am. Compl. ¶¶ 8, 96.) These allegations are sufficient to plausibly show that the law may lack a plainly legitimate sweep or may be invalidated as overbroad. Moreover, the reasons for disfavoring facial challenges are not apparent in this context; the Bracketing Structure has been in effect for more than seventy years, the Court's review does not seen to run contrary to the principle of judicial restraint, and the Court's ultimate decision will review laws that have been molded by the people's wills for the past seventy-odd years. Stevens, 559 U.S. at 473.

A plaintiff may also proceed on the theory that the law is unconstitutional as applied to the plaintiff's circumstances. Fed. Election Comm'n, 551 U.S. at 456-57. "An as-applied attack . [*43] . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."[14] Democratic-Republican Org. of N.J. v. Guadagno, 900 F. Supp. 2d 447, 460

---

[14] The Court did reject a similar challenge to New Jersey's ballot placement. See Democratic-Republican Org., 900 F. Supp. 2d at 457 (Wolfson, J.). On a motion for preliminary injunction, the plaintiff failed to provide evidence to demonstrate that certain ballot placements confer any benefit. Id. The Court noted that, in virtually all the cases concerning constitutional challenges to ballot placement, formatting, or layout, other courts have required evidence demonstrating that ballot placement confers a benefit prior to determining whether the plaintiffs have been burdened, let alone harmed. Id. at 458. Given the lack of

(D.N.J. 2012) (quoting *United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010)*). We review the as-applied challenge under the Anderson-Burdick test.

3. Anderson-Burdick Test

Formulated in Anderson and refined in Burdick, the Supreme Court provided a factoring test to determine the constitutionality of burdens on election-related First Amendment rights. *See Wash. State Grange, 552 U.S. at 452-53* (applying *Anderson-Burdick* test to facial challenge of election law). "The Supreme Court has repeatedly [considered under *Anderson-Burdick*] . . . regulations that have the potential of channeling expressive activity at the polls." *Mazo, 551 F. Supp. 3d at 502* (quoting *Burdick, 504 U.S. at 438*; *Storer, 415 U.S. at 728*). "In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Grange, 552 U.S. at 449-450*.

The parties do not challenge the use of the *Anderson-Burdick* framework but do challenge the standard of review. (State Motion Br. at 20; Colabella Motion Br. at 13; Maldonado Motion Br. at 11-13; Covello Motion Br. at 20-22; Hanlon Motion Br. at 25-26; Hogan Motion Br. at 11-14; McGettigan Motion Br. at 9-12.) Defendants **[*44]** argue for rational basis review because the alleged burdens on each right are minimal. (Colabella Motion Br. at 12, 23, & 25-26; Covello Motion Br. at 24-35; Hanlon Motion Br. at 26; Hogan Motion Br. at 13 - 14; Maldonado Motion Br. at 11-13; McGettigan Motion Br. at 9-12; State Motion Br. at 28-30.) Plaintiffs argue for strict scrutiny because the burdens on their rights are severe. (Omnibus Opp'n Br. at 75-89.) As such, the Court will apply the *Anderson-Bur dick test* to the claims at hand. *Cf. Mazo, 551 F. Supp. 3d at 502*; *Democratic-Republican Org., 900 F. Supp. 3d at 460*.

Under the *Anderson-Burdick* test, the Court considers "what burden is placed on the rights which [P]laintiffs seek to assert and then [the Court] balance[s] that burden against the precise interests identified by the [S]tate and the extent to which these interests require that [Plaintiffs'] rights be burdened. Only after weighing these factors can [the Court] decide whether the challenged statute is unconstitutional." *Democratic-Republic Org., 900 F. Supp. 3d at 460* (quoting *Anderson, 460 U.S. at 789*). On a motion to dismiss under Rule 12(b)(6), the question is whether a plaintiff has stated a claim for relief. Where plaintiffs' claims assert a legal burden rather than a factual burden, dismissal at this stage would be warranted because further proceedings, *i.e.*, discovery, **[*45]** would not "benefit the resolution" of Plaintiffs' claims or "change the nature/magnitude of the burden imposed." *Id.* When reviewing a case under the *Anderson-Burdick*, courts tend to establish a robust factual record to characterize an alleged burden. *See Mazo, 551 F. Supp. 3d at 508 n.12*.

a. Measuring Burdens on First Amendment Rights

"Determining the magnitude of the burden [] requires considering its 'likely' consequences 'ex ante,' 'categorically,' and on' [candidates] generally'." *Id. at 504* (quoting *Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 206-208, 128 S. Ct. 1610, 170 L. Ed. 2d 574 (2008)* (Scalia, J., concurring in the judgment) and *Storer v. Brown, 415 U.S. 724, 738, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974)*). Rational basis review is warranted when a plaintiff's rights are minimally burdened in a nondiscriminatory manner. *Burdick, 504 U.S. at 434*; *see Munro v. Socialist Workers Party, 479 U.S. 189, 199, 107 S. Ct. 533, 93 L. Ed. 2d 499 (1986)* (rational basis review for slight effect on constitutional rights when state affords minor-party candidate easy access to the primary election ballot and the opportunity for the candidate to wage a ballot-connected campaign). Strict scrutiny is warranted when plaintiffs First Amendment rights are severely burdened, such as when there is a prohibition on certain guaranteed rights. *See Eu v. S.FCnty. Democratic Cent. Comm., 489 U.S. 214, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989)* (strict scrutiny warranted when state prohibited party from endorsing candidates in primary election).

Here, Plaintiffs argue that the Bracketing Standard violates their right to vote, dilutes their vote, violates **[*46]** the Equal Protection Clause, and burdens their freedom to associate.[15] (Am. Compl. ¶¶ 97, 169-208, 223-25.)

---

"persuasive empirical evidence," the Court was not convinced that "placement on the right of the ballot would result in any harm, much less one of constitutional magnitude." *Id.*

With respect to the right to vote, this Court has concluded that the position on a ballot is "a less important aspect of voting rights than access." *Democratic-Republican Org., 900 F. Supp. 2d at 456*. How much less is generally a question of fact. *See id.* ("Plaintiffs, however, have not alleged or argued that placement elsewhere on the ballot would prevent voters from locating them."). Here, Plaintiffs provide a review of ballot design studies from other states; in those ballots with similar characteristics, the ballot position of candidates appeared to have provided them with positive benefits. (Am. Compl. P 96.)

With respect to vote dilution, the term has primarily been considered in the context of partisan gerrymandering. Plaintiffs have neither pled in their Amended Complaint nor argued in their briefing how the Court should construe this claim in terms of assessing any burden on the First Amendment rights. As such, the Court will assign no burden or a minimal burden to the vote dilution aspect of Plaintiffs' claims.

Plaintiffs allege that county clerks have violated the Equal Protection Clause by implementing varying and undisclosed standards in designing the ballot and in determining **[*47]** the pivot point, even within the same county and across party lines (Am. Compl. 1167 - 68, 72, 85, 88-89, 177) and provide *Bush v. Gore, 531 U.S. 98, 106, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000)* as support for this point. However, the Supreme Court in Bush v. Gore expressly noted that it did not answer "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." 531 U.S. at 109. The classification in this case is between bracketed and non-bracketed candidates, which is classification that does not fall into a suspect or quasi-suspect category. Accordingly, the Court finds that the Bracketing Standard is nondiscriminatory for the purpose of the Equal Protection Clause. *See id.*

The Supreme Court has held that political parties have a right to choose "the standard bearer who best represents the party's ideologies and preferences." *See Eu, 489 U.S. at 224*. Yet, Plaintiffs argue that this freedom to associate impedes their rights to not associate or substantially burdens it. (Am. Compl. ¶¶ 80, 87, 95, 96.) There is a grain of truth in that statement: assuming there is at least one gubernatorial candidate, no non-gubernatorial or non-congressional candidate can be placed in the first column without bracketing and by operation of state law. Plaintiffs moreover provide **[*48]** evidence that, taken as true, implies that a candidate's choice not to bracket can have an impact on the total votes in counties that bracket candidates as opposed to counties that do not. (*See* Am. Compl. ¶ 125.) If there is a consistent benefit for those who bracket and a consistent detriment for those who do not bracket, then the statute creates a cost to a candidate's right to not associate. As such, the Court finds that the Bracketing Structure imposes a moderate burden on the right to associate.

Having measured the burden, the Court turns to deciding what level of scrutiny is warranted. The Supreme Court has noted that strict scrutiny does not apply if the regulations require "nominal effort," *Crawford, 553 U.S. at 205*, or if the burdens are "ordinary" and "widespread." *Clingman v. Beaver, 544 U.S. 581, 593 - 97, 125 S. Ct. 2029, 161 L. Ed. 2d 920 (2005)*. Moreover, although the statutes underlying the Bracketing Structure seem to have a "plainly legitimate sweep," "[a] law may [still] be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Grange, 552 U.S. at 450 51*. Accepting the allegations of the Amended Complaint as true, and drawing all reasonable inferences in favor of Plaintiffs as the non-moving parties, the Court **[*49]** finds that, collectively, the fundamental rights involved in this case are more than moderately infringed upon. The Court therefore will apply a moderate to severe level of scrutiny. *See Democratic-Republican Org., 900 F. Supp. 2d at 453* ("Ballot access cases should not be pegged into the [strict scrutiny, intermediate scrutiny, and rational basis] categories. Rather, following Anderson, [the Court's] scrutiny is a weighing process . . . .") (quoting *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006)).

b. Compelling Interest of State

The State of New Jersey puts forth that the Bracketing Structure furthers important State interests because it: preserves candidates' rights to associate or not to associate; makes those associative characteristics of candidates

---

[15] Plaintiffs advance Freedom of Speech arguments for the first time in their Omnibus Opposition Brief. (Opp'n Br. at 87-89.) Given that Plaintiffs assert no claim for infringement of their Freedom of Speech, the Court will not address their unpled issue.

known to voters; provides a manageable and understandable ballot; and prevents voter confusion. (State Motion Br. at 25 - 29; State Reply Br. at 17.) "The state's interest in a timely and orderly election is strong." *Valenti v. Mitchell, 962 F.2d 288, 301 (3d Cir. 1992)*. It is well-settled that the State has an interest in regulating elections to ensure that voters can understand the ballot. *Democratic-Republican Org., 900 F. Supp. 2d at 456*. It is also well-settled, as recognized above, that states may not prohibit political parties from choosing their standard bearers. *See id.; Eu, 489 U.S. at 224*.

Political parties have the right to associate. This right, **[*50]** however, should not impede on a candidate's right to either associate or not associate. The State's interests in providing a manageable and understandable ballot, as well as ensuring an orderly election process are hampered by the fact that one-third of all Mercer County voters were disenfranchised because they voted for more than one candidate for the same office. (Am. Compl. ¶ 117.) Taking the standard into account and the presumption of truth under *Rule 12(b)(6)*, the Court concludes that such interests are at least marginally compelling.

c. <u>Balancing the Burdens Against the Interests</u>

Accepting Plaintiffs' allegations as true, their <u>First Amendment</u> rights (right to vote, equal protection, and freedom to associate) have been meaningfully affected by the Bracketing Structure and the potential primacy effects it may be applying to certain elections. It is not clear at this stage that these burdens can be justified by the State's more generalized interests in preserving rights of bracketing candidates and in informing voters. This is a close call, but on balance the Court is satisfied that Plaintiffs have alleged a claim under Counts I, II, and III. This is not a case where aggrieved candidates have alleged legal **[*51]** burdens that can be measured at the motion to dismiss stage. *Cf Mazo, 551 F. Supp. 3d at 508 n.12*. Rather, in this case, Plaintiffs' burdens and the State's interests are factual and may require discovery. Depending on further factual findings, the state's interests may be sufficiently compelling to pass muster under the relevant Constitutional tests. For these reasons, Court will deny the relevant portions of the Motions.

4. <u>Elections Clause</u>

When the regulation involves the time, place, and manner of primary elections, the only question is whether the state system is preempted by federal election law on the subject. *United States Term Limits, Inc. v. Thornton, 514 U.S. 779, 832, 115 S. Ct. 1842, 131 L. Ed. 2d 881 (1995)*. However, when the regulation does not regulate the "time, place, or manner," courts must consider whether the regulation on its face or as applied falls outside that grant of power to the state by, for example, "dictat[ing] electoral outcomes, favor[ing] or disfavor[ing] a class of candidates, or evading] important constitutional restraints." *Cook v. Gralike, 531 U.S. 510, 523, 121 S. Ct. 1029, 149 L. Ed. 2d 44 (2001)*. The Supreme Court has struck down such regulations when they "attach[] a concrete consequence to noncompliance" rather than informing voters about some topic. *Id. at 524*. The timing of such a "label" may also add to the gravity of injury, especially when it occurs "at the **[*52]** most crucial stage in the election process — the instant before the vote is cast." *Id. at 525* (quoting *Anderson v. Martin, 375 U.S. 399, 402, 84 S. Ct. 454, 11 L. Ed. 2d 430 (1964)*).

Here, the State conferred its power to regulate the "manner" of federal elections to the county clerks, including the County Clerk Defendants, by requiring them to design and print ballots. <u>N.J.S.A. 19:23-26.1</u>, 19:42-2. In Defendants' view, the Bracketing Structure is a pettnissible regulation on the "manner" of federal elections. (State Motion Br. at 30; State Reply Br. at 22-23; Colabella Motion Br. at 26-30; Covello Motion Br. at 35-38.) Plaintiffs argue that the Bracketing Structure exceeds the State's authority by dictating electoral outcomes and favoring or disfavoring a class of candidates, *i.e.*, favoring candidates who bracket with incumbents and disfavoring candidates who do not. *Cook, 531 U.S. at 523*. The concrete consequence here is that less established candidates are deprived of the primacy effect, which Plaintiffs allege has occurred and will continue to occur in New Jersey elections. Given that Plaintiffs allege that no non-incumbents have won a federal election without gerrymandering in the past fifty years (Am. Compl. ¶ 8) and referred to evidence suggesting that ballot position impacts voting (Am. Compl. ¶ 90-98), Plaintiffs **[*53]** sufficiently allege that the Bracketing Structure may favor or disfavor a class of

candidates or may dictate electoral outcomes. *Cf. Cook,* 531 U.S. at 525 ("the instant before the vote is cast" is the "most crucial stage in the election process").

Prospective candidates brought a § 1983 claim challenging the constitutionality of an initiative amending the Missouri Constitution (titled "Article VIII") to require that any failure of United States Senators or Representatives, or nonincumbent candidates, to support term limit provisions be noted on the ballots. *Id.* at 510. The Supreme Court considered the question of whether "the State may use ballots for congressional elections as a means of giving its instructions binding force." *Id.* at 522. To answer the question, the Supreme Court noted that the "manner" of elections includes matters like "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Id.* at 523 - 24 (quoting *Smiley v. Holm,* 285 U.S. 355, 366, 52 S. Ct. 397, 76 L. Ed. 795 (2001)). "In short, Article VIII [was] not among 'the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental **[*54]** right involved,' ensuring that elections are 'fair and honest,' and that 'some sort of order, rather than chaos, is to accompany the democratic process.' *Id.* at 524 (citations omitted). Given that the labels imposed "substantial political risk" and implied that the issue "is an important — perhaps paramount — consideration in the citizen's choice which may decisively influence the citizen to cast his ballot against candidates branded as unfaithful," the Supreme Court held that Article VIII was facially unconstitutional. *Id.* at 525.

Taking the allegations as true and drawing all inferences in favor of the non-moving party, Conforti, Kreibich, and Spezakis provide sufficient allegations to show that the Bracketing Structure does not act as a "manner" of regulating federal elections and may dictate electoral outcomes and favor or disfavor certain classes of candidates. For these reasons, the Court will deny the relevant portions of the Motions

5. Section 1983

As a final matter, the Court finds that Plaintiffs' Count V, baldly alleging a § 1983 claim cannot survive because the section itself does not confer a right. *See Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979) ("[O]ne cannot go into court and claim a violation of § 1983 — for § 1983 by itself does not protect anyone from anything.") **[*55]** Moreover, Plaintiffs' constitutional claims are already addressed by Counts I-IV. The Court will therefore dismiss Count V.

## IV. <u>CONCLUSION</u>

The Court recognizes the gravitas of its decision to allow this case to move forward. The undersigned does not take it lightly. However, it is the Court's duty and imperative to protect the democratic process. Here, all Plaintiffs have met their burden to show standing for Counts I, II, and III. Plaintiffs Conforti, Spezakis, and Kreibich have demonstrated their standing to pursue claims for Elections Clause violations under Count IV. All Plaintiffs have pled plausible claims for relief in Counts I, II, and III. Plaintiffs Conforti, Spezakis, and Kreibich have also pled plausible claims for relief in Count IV, the Elections Clause claims. For the reasons stated above, Defendants' motions to dismiss will be GRANTED IN PART and DENIED IN PART. An appropriate order follows.

/s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**

**UNITED STATES DISTRICT JUDGE**

Date: **May 31, 2022**

**ORDER**

2022 U.S. Dist. LEXIS 97003, *55

<u>OURAISHI, District Judge</u>

**THIS MATTER** comes before the Court upon Motions to Dismiss filed by the State of New Jersey ("State Motion," ECF No. 53); Scott M. Colabella in his official capacity as the Ocean County clerk ("Colabella **[*56]** Motion," ECF No. 55); Junior Maldonado in his capacity as the Hudson County clerk ("Maldonado Motion," ECF No. 57); Sollami Covello in her official capacity as the Mercer County clerk ("Covello Motion," ECF No. 58); Christine G. Hanlon in her official capacity as the Monmouth County clerk ("Hanlon Motion," ECF No. 59); John S. Hogan in his official capacity as the Bergen County clerk ("Hogan Motion," ECF No. 60); and Edward P. McGettigan in his official capacity as the Atlantic County clerk ("McGettigan Motion," ECF No. 63). For the reasons set forth in the accompanying Opinion,

**IT IS** on this **31st** day of **May 2022**,

**ORDERED** that the Maldonado Motion (ECF No. 57), Hanlon Motion (ECF No. 59), Covello Motion (ECF No. 58), Hogan Motion (ECF No. 60), and McGettigan Motion (ECF No. 63) are hereby **DENIED**; and it is further

ORDERED that the State Motion (ECF No. 53), Colabella Motion (ECF No. 55), and Covello Motion (ECF No. 58) are hereby **GRANTED IN PART** and **DENIED IN PART** as set forth below; and it is further

**ORDERED** that Plaintiffs' Count V is dismissed with prejudice and the State Motion, Collabella Motion, and Covello Motion are otherwise **DENIED**; and it is further

**ORDERED** that Plaintiffs' Count **[*57]** IV with respect to Plaintiffs Lucide, McMillan, and Marchica is dismissed *sua sponte* and with prejudice for lack of standing; and it is further

**ORDERED** Plaintiffs' Count IV with respect to Plaintiff New Jersey Working Family, Inc. is dismissed *sua sponte* and without prejudice for lack of standing.

/s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**