

**ⓘ Cited**
As of: March 6, 2024 11:41 PM Z

## N.J. Press Ass'n v. Guadagno

United States District Court for the District of New Jersey

November 13, 2012, Decided; November 13, 2012, Filed

Civil Action No. 12-06353 (JAP)

**Reporter**
2012 U.S. Dist. LEXIS 161941 *; 2012 WL 5498019

NEW JERSEY PRESS ASSOCIATION et. al, Plaintiffs, v. KIM GUADAGNO, et. al, Defendants.

**Notice:** NOT FOR PUBLICATION

## Core Terms

Election, voters, polling place, polling, feet, photographs, exit, interviews, voting, zone, preliminary injunction, rights, solicitation, media, restrictions, regulation, gather, irreparable harm, public interest, right to vote, injunction, compelling interest, injunctive relief, organizations, distance

**Counsel:** **[*1]** For NEW JERSEY PRESS ASSOCIATION, a New Jersey not for profit corporation, individually and on behalf of its Newspaper Members, NEWARK MORNING LEDGER CO., doing business as THE STAR LEDGER, GANNETT SATELLITE INFORMATION NETWORK, INC., doing business as ASBURY PARK PRESS, HOME NEWS TRIBUNE, COURIER NEWS, THE DAILY RECORD and THE DAILY JOURNAL, NORTH JERSEY MEDIA GROUP INC., doing business as THE RECORD and THE HERALD NEWS, THE PRINCETON PACKET INC., doing business as PACKET PUBLICATIONS, RECORDER PUBLISHING CO., doing business as RECORDER COMMUNITY NEWSPAPERS, SEAWAVE CORP. OF RIO GRANDE, doing business as CAPE MAY COUNTY HERALD TIMES, Plaintiffs: THOMAS JOSEPH CAFFERTY, LEAD ATTORNEY, GIBBONS, P.C., Newark, NJ.

For KIM GUADAGNO, in her official capacity as the Secretary of State of the State of New Jersey, JEFFREY CHIESA, in his official capacity as the Attorney General of the State of New Jersey, Defendants: DONNA KELLY, LEAD ATTORNEY, OFFICE OF ATTORNEY GENERAL OF NEW JERSEY, TRENTON, NJ; SUSAN MARIE SCOTT, LEAD ATTORNEY, OFFICE OF THE NJ ATTORNEY GENERAL, TRENTON, NJ.

**Judges:** JOEL A. PISANO, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOEL A. PISANO

## Opinion

PISANO, District Judge.

This matter is presently before **[*2]** the Court on an Order to Show Cause by plaintiffs New Jersey Press Association, individually and on behalf of its Newspaper Members; Newark Morning Ledger Co. d/b/a The Star Ledger; Gannett

N.J. Press Ass'n v. Guadagno, 2012 U.S. Dist. LEXIS 161941

Satellite Information Network, Inc. d/b/a Asbury Park Press; Home News Tribune; Courier News; The Daily Record and The Daily Journal; North Jersey Media Group Inc. d/b/a the Record and The Herald News; The Princeton Packet, Inc. d/b/a Packet Publications; Recorder Publishing Co. d/b/a Recorder Community Newspapers; Seawave Corp. of Rio Grande d/b/a Cape May County Herald Times (collectively, the "Plaintiffs") seeking a preliminary injunction against Defendants Kim Guadagno, in her official capacity as the Secretary of State of the State of New Jersey and Jeffrey Chiesa, in his official capacity as the Attorney General of the State of New Jersey (the "Defendants").

Plaintiffs, a collection of newspaper organizations, seek to enjoin Defendants from enforcing three New Jersey statutes (the "Election Laws") and a Directive of the New Jersey Attorney General that collectively prohibit individuals from engaging in expressive activity within 100 feet of a polling place in the State of New Jersey on an election  **[*3]** day. In particular, Plaintiffs request that they be permitted to take photographs of voters and conduct interviews of voters who are leaving a polling place within 100 feet of such polling place. Defendants oppose the request, arguing that the First Amendment does not require the State to permit solicitation of voters within 100 feet of a polling place and the balance of equities weighs in favor of the State. The Court heard oral argument on the Order to Show Cause on October 23, 2012. For the reasons set forth below, the Court finds that the Election Laws are reasonable restrictions under the First Amendment. Accordingly, the Plaintiffs' request for a preliminary injunction is denied.

## I. Background

Plaintiffs are newspaper organizations which seek to take photographs and conduct interviews of voters leaving polling places in the State of New Jersey at the general election on November 6, 2012, as well as at future elections. Plaintiffs commenced this action on October 9, 2012, seeking declaratory and injunctive relief to enable them to take photographs and conduct interviews within the 100-foot barrier currently imposed by the Election Laws, which, among other things, make it unlawful  **[*4]** for any person to speak to or solicit a voter in that zone. In particular, the Election Laws direct that voters will have a 100-foot free unobstructed passage to polling places, without interference from any person. [1] Plaintiffs allege that to the extent Defendants enforce the Election Laws to prohibit taking photographs and conducting interviews of voters within 100 feet of the entrance to New Jersey's polling places, the Election Laws impermissibly restrict Plaintiffs' free speech rights under the First and Fourteenth Amendments of the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution.

### A. Evolution of New Jersey Election Laws

The State of New Jersey has long prohibited any interaction with or solicitation of voters within 100 feet of a polling place. *See* N.J. Stat. Ann. 19:34-6 (prohibiting interference with a voter within 100 feet of a polling place), N.J. Stat. Ann. 19:34-7 (criminalizing solicitation within 100 feet of a polling place), and N.J. Stat. Ann. 19:34-15 (prohibiting the distribution of any printed materials or solicitation within 100  **[*5]** feet of a polling place). Beginning in 1988, the Attorney General of New Jersey permitted news media to conduct exit polling within the 100-foot exclusionary zone and in 2007, the Attorney General issued a Directive on Exit Polling: Media and Non-partisan Public Interest Groups (the "Directive"), which permitted both media and non-partisan entities to conduct exit-polling within the 100-foot zone. However, a 2009 New Jersey Supreme Court ruling construed the Election Laws to prohibit all expressive activity, including exit polling, in the 100-foot zone. *See In re Attorney General's 'Directive on Exit Polling: Media and Non-Partisan Public Interest Groups,"* 200 N.J. 283, 297, 981 A.2d 64 (2009) (hereinafter, "*Exit Polling"*) (holding that "*all expressive activity* within 100 feet of a polling place on Election Day" is prohibited, including exit polling) (emphasis added). In reaching that conclusion, the Court rejected the Attorney General's determination, in effect since 1988, that exit polling within the 100-foot zone was constitutionally protected. *Id.* at 310-11.

---

[1] The Election Laws are N.J. Stat. Ann. 19:34-6, N.J. Stat. Ann. 19:34-7, and N.J. Stat. Ann. 19:34-15.

N.J. Press Ass'n v. Guadagno, 2012 U.S. Dist. LEXIS 161941

Following the New Jersey Supreme Court's ruling in *Exit Polling*, several broadcast news media organizations filed suit in this Court, before **[*6]** the Honorable Peter Sheridan, seeking an injunction so that they could continue the exit polling that they had been conducting since 1988. Holding that the prohibition of exit polling within the 100-foot zone would severely impact the ability of the news organizations to accurately conduct such exit polling, Judge Sheridan granted their request and entered a preliminary injunction. *See ABC v. Wells*, 669 F. Supp. 2d 483, 486 (D.N.J. 2009). Plaintiffs in this case were not parties to *Exit Polling* or *ABC*. Several years later, on October 9, 2012, Plaintiffs commenced this action.

## B. Plaintiffs' Complaint

Plaintiffs assert that if they are not permitted to conduct voter interviews and take voter photographs within 100 feet of polling places in New Jersey on election days, they "will be severely restricted in their efforts to gather and report truthful and significant information about the political process to the public." Compl. ¶ 42. Plaintiffs' reporters generally attempt to gather such information by approaching voters as they leave a polling place after having voted and asking them if they would be willing to pose for a photograph and/or speak with a reporter. Borg Aff. ¶¶ 10-11. [2] The **[*7]** reporters stand near the exit of the building and wear credentials identifying themselves as representatives of Plaintiffs' news organizations. *Id.* ¶¶ 13, 22. Voter participation is strictly voluntary and the reporters are instructed to be courteous and businesslike and not to hinder voters or interfere with the election process in any way. *Id.* ¶¶ 12-14. Plaintiffs use the information they collect from the interviews to analyze and report on voters' feelings about the political process, as well as to analyze and report on who voted for particular candidates and what factors influenced their votes. *Id.* ¶¶ 8, 15. Plaintiffs contend that they have conducted interviews and taken photographs of voters at polling places throughout New Jersey for many years and that they are unaware of any complaint from State election officials that their reporters have hindered voters or interfered with the voting process. *Id.* at ¶¶18-22.

Plaintiffs argue that the further away a reporter is located from the entrance to the polling place, the more difficult it is to conduct interviews and take photographs of voters. They claim that as the distance from the polling place increases, the more likely it is that the reporter will not be able to approach the voter before he/she gets into his or car and drives away or starts talking on a cell phone or disappears into a crowd. *Id.* ¶ 24. Also, as the distance increases, it becomes more difficult to determine which individuals are voters and to differentiate those who are exiting the polling place from those who are arriving to vote. *Id.* Plaintiffs contend that the Election Laws impermissibly infringe upon their First Amendment Rights and ask the Court to grant an injunction to prevent the State from enforcing them.

## III. Standard of Review

In evaluating a motion for a preliminary injunction, a court considers whether: **[*9]** "'(1) [] the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'" *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir.1999)) (applying standard on motion for preliminary injunction); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (same). Because a preliminary injunction is an extraordinary remedy, "[t]he burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers*, 428 F.3d. at 508. Moreover, the plaintiff, carrying the burden, must clearly show the four required prongs. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed.

---

[2] Plaintiffs submitted affidavits by executives at two of the plaintiff news organizations in support of their motion. Specifically, Jennifer A. Borg, the corporate secretary and general counsel of North Jersey Media Group Inc. d/b/a The Record and The Herald News submitted **[*8]** an affidavit (the "Borg Aff."), as did James Kilgore, the CEO of The Princeton Packet, Inc. c/b/a Packet Publications. Because Ms. Borg's and Mr. Kilgore's Affidavits are virtually identical, the Court refers only to Ms. Borg's affidavit in its recitation of the facts.

N.J. Press Ass'n v. Guadagno, 2012 U.S. Dist. LEXIS 161941

2d 162 (1997). If disputed issues of fact exist, a court cannot issue a preliminary injunction. *Gruntal & Co. v. Steinberg, 843 F. Supp. 1, 16 (D.N.J. 1994)*.

## IV. Legal Discussion

Plaintiffs argue that although the State has a compelling interest in securing the **[*10]** right to vote, the Election Laws are unconstitutional because there are no alternative channels through which Plaintiffs can gather the information they seek and because the Election Laws are not narrowly tailored to protect the government interests in avoiding voter intimidation or solicitation. Defendants argue that the First Amendment does not require the State to permit solicitation of voters within 100 feet of a polling place and that Plaintiffs will still have ample opportunity to gather the information. They further assert that granting an injunction would create substantial harm for Defendants, who would have to rework election preparations and procedures days before the Presidential election; and the State's interest in protecting the right to vote is paramount. Applying the four factors to Plaintiffs' request, the Court finds that Plaintiffs do not carry their burden to establish that injunctive relief is warranted.

## A. Likelihood of Success on the Merits

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press ..." [3] U.S. Const. amend. I. A "major purpose of [the First] Amendment was to protect "the free discussion governmental **[*11]** affairs," which "includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 219, 86 S. Ct. 1434, 16 L. Ed. 2d 484 (1966). There is no dispute that the "First Amendment protects the media's right to gather news." *ABC*, 669 F. Supp. 2d at 487. However, the rights protected by the First Amendment are subject to reasonable restrictions. *See Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) ("The protections afforded by the First Amendment ... are not absolute and, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution."). The standard to determine whether a state regulation restricting speech, such as voter interviews and photographs, is constitutional "depends on whether the speech occurs in a traditional public forum ... and whether the statute is content-based or content neutral." *ABC*, 669 F. Supp. 2d at 487 (citing *The Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988)).

Here, it is undisputed that the public areas within 100 feet of a polling place are traditional public forums. *See Burson v. Freeman*, 504 U.S. 191, 196, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992) (finding that 100-foot zone around a polling place, which included sidewalks and streets adjacent to such polling place, was a traditional public forum); *see also Daily Herald*, 838 F.2d at 384 ("[P]ublic areas within 300 feet of the entrance to the polling place are traditional public forums because they traditionally are open to the public for expressive purposes").

With respect to the second prong of the constitutionality analysis, the Court finds that the Election Laws as originally drafted were content-neutral, since they forbid all types of expressive speech within the 100-foot zone. *See Exit Polling*, 200 N.J. at 304-05 (finding that the Election Laws were content-neutral because they prohibited all expressive **[*13]** activity and did not discriminate between permissible and non-permissible forms of speech). However, both parties agree that the Election Laws in their current form constitute content-based restrictions, which

---

[3] The First Amendment applies to the states through the Fourteenth Amendment. *See Thornhill v. Alabama*, 310 U.S. 88, 95, 60 S. Ct. 736, 84 L. Ed. 1093 (1940). **[*12]** The New Jersey Constitution also guarantees freedom from government suppression of speech. It provides, in pertinent part: "Every person may freely speak, write and publish his sentiments on all subjects . . . . No law shall be passed to restrain or abridge the liberty of speech or of the press." N.J. Const. art. I, para. 6.

N.J. Press Ass'n v. Guadagno, 2012 U.S. Dist. LEXIS 161941

are subject to strict scrutiny. [4] Thus, the Court will analyze the Election Laws under the rubric of content-based speech regulations.

For a content-based speech regulation to pass constitutional muster, "[t]he State must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Burson*, 504 U.S. at 198 (internal citations and quotations omitted). Here, both parties agree that protecting the right to vote is of the upmost importance and there can be no doubt that the State has a compelling interest in ensuring the integrity of the electoral process. *See Reynolds v. Sims*, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society."); *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 11 L. Ed. 2d 481 (1964) (Other rights, even the most basic, are illusory if the right to vote is undermined."); *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006) ("A State indisputably **[*15]** has a compelling interest in preserving the integrity of its election process.").

Having identified the State's compelling interests, the Court must determine whether the Election Laws are necessary to serve those interests. Plaintiffs argue that they have conducted interviews and taken photographs of voters at polling places in New Jersey for many years without incident and that they are unaware of any complaints of New Jersey election officials relating to their conduct. However, "the State need not wait for actual interference or violence or intimidation to erupt near a polling place for the State to act. The State may take precautions to protect and to facilitate voting; and the pertinent history is broad enough to provide the proof of reasonableness for a zone of order around the polls." *Citizens for Police Accountability Political Comm. et al. v. Browning*, 572 F.3d 1213, 1220-21 (11th Cir. 2009); *Burson*, 504 U.S. at 208 (holding that "*some* restricted zone around the voting area is necessary to secure the State's compelling interest" in preventing voter intimidation).

Here, a history of voter intimidation and obstruction in New Jersey is what led the legislature to enact the Election **[*16]** Laws in the first instance. *See Exit Polling*, 200 N.J. at 299-302 (discussing history of election regulation in New Jersey and noting that "New Jersey, like many other states, experienced corrupting and corrosive practices outside polling precincts that undermined the right to vote."). Although there is no evidence that these Plaintiffs have disrupted the voting process in the past, "[t]he cost of a disturbed election is too high to allow the State only to react to disturbances, but not to prevent disturbances." *Citizens*, 572 F.3d at 1221. Therefore, the Court concludes that the State's long history of election regulation and the practical need to prevent disturbances at the polls all prove that the Election Laws are necessary to protect the State's interest in ensuring the right to vote.

Accordingly, the only remaining question is whether the Election Laws are narrowly tailored to serve the State's interests. To prove that the Election Laws are narrowly tailored, the State must show that the statutes are "reasonable and do[] not *significantly impinge* on constitutionally protected rights." *Burson*, 504 U.S. at 209 (internal citation and quotation omitted, emphasis added in *Burson*). The **[*17]** Supreme Court's ruling in *Burson* is instructive here. In that case, the Court addressed the facial constitutionality of a Tennessee statute that prohibited campaign activity within

---

[4] In their brief, Plaintiffs apply the standard for content-neutral speech restrictions in arguing that the Election Laws are unconstitutional. See Pl.'s Br. at 13-14. Under that standard, the government may regulate the time, place and manner of content-neutral speech, so long as such restrictions are "narrowly tailored to serve a significant interest, and leave open ample alternatives for communication." *Burson*, 504 U.S. at 197 (citing *United States v. Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983)). However, Plaintiffs argued at oral argument that the Election Laws are in fact content-based because the New Jersey Supreme Court's decision in *Exit Polling* specifically exempted "de minimis speech, such as casual banter between voters about trivial subjects, *e.g.,* the weather" from the Election Laws' prohibitions. *See Exit Polling*, 200 N.J. at 305 fn. 9. While **[*14]** the Court does not find this argument particularly persuasive, it notes that as a result of the ABC decision exit polling is now treated differently than other types of protected speech in New Jersey. And in any event, the State concedes in its brief that the Election Laws should be analyzed under the standard of content-based speech regulations. See Def.'s Br. at 10-11.

N.J. Press Ass'n v. Guadagno, 2012 U.S. Dist. LEXIS 161941

100 feet of a polling place. [5] *Id.* at 193. In upholding the Tennessee statute, the Court found that the 100-foot zone around a polling place was a "minor geographic limitation" and restrictions in that zone did not constitute a "significant impingement" of First Amendment rights. *Id.* at 210.

Plaintiffs argue that *Burson* is not applicable here because the facts are materially different. In *Burson*, a campaign worker wanted to solicit votes of voters entering a polling place, whereas Plaintiffs aim to conduct interviews and take photographs of voters only *after* they have already voted. While the facts in Burson are indeed **[*18]** different and it may not be binding on the Court in this case, the Court nonetheless finds the *Burson* opinion to be highly persuasive and applies its reasoning here. The New Jersey Election Laws create the same size restrictive zone as the Tennessee statute that was upheld in *Burson* and the Court concludes that the Election Laws are sufficiently tailored to meet the State's needs without significantly impinging on Plaintiffs' constitutional rights. Other federal courts have applied *Burson* in cases involving restrictions against approaching voters after they have voted and have reached the same conclusion. *See, e.g.,* Citizens, 572 F.3d at 1218-19 (applying *Burson* and holding that Florida statute, which prohibited solicitation of voters *exiting* a polling place within 100 feet of such polling place, was constitutional). [6] Therefore, the Court finds that Plaintiffs are unlikely to succeed on the merits of their claim.

## B. Irreparable Harm

A plaintiff seeking a preliminary injunction must establish that he is likely to suffer irreparable harm in the absence of preliminary relief. *See* Winter v. NRDC, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The possibility of some remote future injury is insufficient to justify injunctive relief. *Id.; see also* Acierno v. New Castle Cnty., 40 F.3d 645, 653 (3d Cir. 1994). **[*20]** With respect to First Amendment rights, the Supreme Court has recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976). Relying on *Elrod*, Plaintiffs argue they will suffer irreparable harm as a result of the loss of their First Amendment rights. Plaintiffs assert that they have no alternative method to gather the information they desire and that the farther away the reporters and photographers must stand from a polling place, the fewer voters there are and the more difficult it becomes to identify them. The Court does not find these arguments compelling.

As discussed above, the Election Laws constitute reasonable restrictions under the First Amendment and Plaintiffs have not suffered an unconstitutional loss of their First Amendment rights. Moreover, there are ample alternative methods of obtaining the desired information. Reporters and/or photographers can operate at a distance of 101 feet from a polling site or conduct their interviews through alternate means, such as over the phone. On the presidential election day, some five million people are expected to **[*21]** vote at more than 3,400 polling places in operation in New Jersey. Even if some of those voters leave the polling place or become unavailable before they reach the 100-foot barrier, thousands — if not millions — of others will not. Plaintiffs surely can find sufficient numbers of such voters

---

[5] The Tennessee statute banned "the display of campaign posters, signs or other campaign materials, distributions of campaign materials, and solicitation of votes for or against any person or political party of position on a question" within 100 feet of a polling place. *Id.* at 193. The Court considered the statute to be a content-based restriction on protected speech and applied strict scrutiny.

[6] The Court is aware that the *ABC* Court found that *Burson* was distinguishable on the facts and that the Election Laws could not prohibit exit polling within the 100-foot exclusionary zone. *See* ABC, 669 F. Supp. 2d at 488 (finding that *Burson* was not applicable because it dealt **[*19]** with the state's interest in prohibiting certain activity *at the entrance* to a polling place, as opposed to exit polling, which takes place as voters *leave* a polling place). Although this Court does not find the reasoning in *ABC* persuasive, it does not need to reach the issue of whether exit polling should be permitted within the 100-foot zone at this time because exit polling differs substantially from the activities that Plaintiffs wish to conduct. In particular, exit polling involves the collection of data from a random sample of voters in a manner that satisfies polling experts, so as to ensure the accuracy of the data. *Id.* at 484. Here, Plaintiffs simply wish to conduct voter interviews and take photographs and there is no need for Plaintiffs to select voters in any particular manner for the interviews or photographs to be useful.

N.J. Press Ass'n v. Guadagno, 2012 U.S. Dist. LEXIS 161941

that are willing to be interviewed and/or photographed. [7] Likewise, modern photographic technologies enable Plaintiffs to take photos from a substantial distance and Plaintiffs will be able to approach voters for close-up shots outside of the 100-foot zone. [8] If there is any confusion about who is in fact a voter, Plaintiffs can simply ask the individual if he or she just voted prior to asking whether he or she will consent to an interview.

That is not to say that Plaintiffs might not have to work harder to achieve their ends and it may well be that from a distance of 101 feet, Plaintiffs' efforts will not achieve their maximum desired effect. Standing alone, however, that does not constitute a constitutional violation. *See Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) ("An adequate alternative does not have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech.") (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 802, 109 S. Ct. 2746, 105 L. Ed. 2d 661) (1989)). The Court also notes that these restrictions have been in effect since 2007, yet Plaintiffs have proffered absolutely no evidence that they were hindered in their efforts to gather the information they needed in either the 2008 or 2010 national elections. While Plaintiffs argue that they will encounter difficulty in this election cycle, the mere possibility of some remote future injury is insufficient to justify the imposition of injunctive relief. See *Winter*, 555 U.S. at 22.

Finally, **[*23]** as discussed below, even if Plaintiffs were able to demonstrate irreparable harm from the requirement that they remain at least 100 feet away from the entrance of polling places while conducting voter interviews and taking photographs, any such injury is outweighed by the public interest and the State's interest in an orderly and efficient voting process.

## C. Harm to the Defendants

In weighing Plaintiffs' request for a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. The Court finds that granting Plaintiffs' request could cause irreparable harm to Defendants.

Plaintiffs' request seeks, in part, for the Court to modify the State's practices and procedures with respect to the 100-foot exclusionary zone around polling places less than two weeks before a presidential election, at a time when the State's preparations for the election are well underway. Impinging upon the State's administrative and regulatory process for overseeing elections at this late date could cause a substantial burden on Defendants. Any order changing the operations **[*24]** of New Jersey's Election Laws would cause significant hardship for the thousands of election officials and poll workers at more than 3,400 polling locations throughout the State, each of whom would be required to learn and apply a new set of regulations in an extremely short period of time. In addition, it could cause hardship for the voters who would be subjected to new and potentially confusing regulations on the eve of the election. *See Purcell*, 549 U.S. at 4-5 (Court orders affecting elections ... can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

Plaintiffs have had ample opportunity in the three years since the *Exit Polling* and *ABC* cases were decided to bring this action, yet they waited until the eleventh hour to seek emergent relief from this Court. While Plaintiffs are of course entitled to decide when best to bring an action in federal court, the potential harm to Defendants is significantly increased at this stage. By comparison, as discussed above, Plaintiffs will still be able to gather the information they need. Accordingly, the balance of equities favors Defendants.

---

[7] In contrast to exit polling, which requires that pollster approach voters according to a certain sampling methodology to ensure accuracy, *see ABC*, 669 F. Supp. 2d at 484, Plaintiffs' activities have no such requirement. In other words, there is no reason to believe that approaching Voter A as opposed to Voter B for the purposes of taking photographs and/or conducting interviews would make any difference whatsoever in the accuracy of the information gathered.

[8] Plaintiffs **[*22]** argued at oral argument that although technology allows them to take photographs from greater distances, they also wish to take close-up and candid shots of voters.

N.J. Press Ass'n v. Guadagno, 2012 U.S. Dist. LEXIS 161941

**D.  [\*25] Injunction is not in the Public Interest**

Finally, the Court determines that public concerns warrant that the Court deny Plaintiffs' request. In reaching this decision, the Court considers two principle interests: (1) the public's interest in the State's ability to ensure a safe, orderly and efficient voting process in which voters are able to exercise their constitutional rights without undue influence or obstruction; and (2) the public's interest in obtaining information from the media about the results of the election and ensuring that the media's rights to free speech are not unduly abridged.

While the Court does not doubt the Plaintiffs' good intentions to report on stories of public interest without interfering with the voting process, "it takes little foresight to envision polling places awash with exit [reporters], some competing (albeit peacefully) for the attention of the same voters at the same time to discuss different issues or different sides of the issue." *Citizens*, 572 F.3d at 1221. This would not only create unnecessary confusion, but creates the likelihood that "some — maybe many — voters faced with *running the gauntlet* will refrain from participating in the election  **[\*26]** process merely to avoid the resulting commotion when leaving the polls." *Id.* (emphasis in original). And although the media's right to free speech is vitally important, "voting is about the most important thing there is." *Id.* at 1221. Ultimately, considering the implicated concerns and according them due weight, the Court determines that public interest weighs in favor of denying Plaintiffs' request. Therefore, the Court concludes that injunctive relief would be inappropriate.


**V. Conclusion**

For the reasons above, the Plaintiffs' request for a preliminary injunction is denied. An appropriate order follows.

/s/ Joel A. Pisano

JOEL A. PISANO, U.S.D.J.

Dated: November 13, 2012

---

**End of Document**