**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

ANDY KIM, in his personal capacity as a candidate for U.S. Senate, ANDY KIM FOR NEW JERSEY, SARAH SCHOENGOOD, SARAH FOR NEW JERSEY, CAROLYN RUSH and CAROLYN RUSH FOR CONGRESS

Plaintiffs,

vs.

CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk, et. al.,

Defendants.

- and -

DALE A. CROSS, in his official capacity as Salem County Clerk, et al.,

as Interested Parties.

Civil Action No.: 3:24-cv-1098 (ZNQ)(TJB)

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' CROSS MOTION TO DISMISS**

*Of Counsel and on the brief:*
Angelo J. Genova, Esq.
Rajiv D. Parikh, Esq.
Jennifer Borek, Esq.

*On the brief:*
Daniel A. Lebersfeld, Esq.
Katherine Szabo, Esq.

**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Tel: (973) 533-0777
Fax: (973) 533-1112
*Attorneys for Defendants*
*Christopher Durkin, Joanne Rajoppi, and Danielle Ireland-Imhof*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS ...........................................................................2

    A. Background of New Jersey's Statutory Framework for Ballot Placement................................................................................................2

    B. Plaintiffs' Candidacies ....................................................................5

    C. Process for Printing Ballots .............................................................7

    D. Plaintiffs' Complaint ......................................................................8

LEGAL ARGUMENT ...............................................................................10

    I.      PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED UNDER THE *PURCELL* PRINCIPLE. ..........................10

    II.     PLAINTIFFS' MOTION FAILS TO MEET THE STANDARD FOR A MANDATORY PRELIMINARY INJUNCTION...................................................19

    A. Plaintiffs Are Unable To Demonstrate A Substantial Likelihood Of Success On The Merits. ...................................................................20

        1.   Plaintiffs' Alleged Burdens are Minimal ...................................... 22

        2.   Defendants Have Shown Sufficiently Compelling State Interests ...................................................................................... 25

        3.   The State's Interest Clearly Outweighs Plaintiffs' Alleged Burdens........................................................................................ 28

        4.   *Conforti* Demonstrates That Plaintiffs Have Not Met Their Heightened Burden To Demonstrate A Likelihood of Success On The Merits. ............................................................................. 32

B. Plaintiffs Have Not Demonstrated That The Balancing Of Harms Favors Them ............................................................................... 38

III.   DISMISSAL IS REQUIRED UNDER FED. R. CIV. P. 12(b)(7) AND 19. ........................................................................................... 39

CONCLUSION .............................................................................................. 41

# TABLE OF AUTHORITIES

<u>Cases</u>

*Acierno v. New Castle Cnty.*,
   40 F.3d 645 (3d Cir. 1994) .............................................................................. 20, 36

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000) ............................................................................ 19, 36

*Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty*,
   39 F.4th 95 (3d Cir. 2022) ....................................................................................19

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ...................................................................................... passim

*Andino v. Middleton*,
   141 S. Ct. 9 (2020) ...............................................................................................16

*Arizona Dem. Party v. Hobbs*,
   976 F.3d 1081 (9th Cir. 2020) ........................................................................11, 17

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015) ............................................................................ 10, 17, 30, 31

*Belitskus v. Pizzingrilli*,
   343 F.3d 632 (3d Cir. 2003) .................................................................................25

*Benisek v. Lamone*,
   585 U.S. 155 (2018) ....................................................................................... 10, 14

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ........................................................................ 21, 22, 28, 33

*Bush v. Gore*,
   531 U.S. 98 (2000) ...............................................................................................33

*Carey v. Wisc. Election Comm'n*,
   624 F. Supp. 3d 1020 (W.D. Wisc. 2022)..............................................................11

*Conforti v. Hanlon*,
   No. 20-08267, 2022 WL 174774 (D. N.J. May 31, 2022) ................................ passim

*Continental Group, Inc. v. Amoco Chem. Corp.*,
  614 F.2d 351 (3d Cir. 1980)......................................................................36

*Cook v. Gralike*,
  531 U.S. 510 (2001) ................................................................................29

*Council of Alternative Political Parties v. Hooks*,
  179 F.3d 64 (3d Cir.1999) ......................................................................23

*Crookston v. Johnson*,
  841 F.3d 396 (6th Cir. 2016); *Page v. Bartels*, 248 F.3d 175, 196 (3d Cir. 2001).....38

*Curtin v. Virginia State Board of Elections*,
  463 F. Supp. 3d 653 (E.D. Va. 2020) ............................................... 14, 17

*Democratic Nat'l Comm. v. Wisc. State Legislature*,
  141 S. Ct. 28 (2020) ................................................................................10

*Democratic-Republican Org. of N.J. v. Gudagno*,
  900 F. Supp.2d 447 (D. N.J. 2012) ................................................ passim

*Doe v. Reed*,
  561 U.S. 186 (2010) ................................................................................25

*Eu v. San Francisco Cty. Democratic Cent. Comm.*,
  489 U.S. 214 (1989) ...................................................................... passim

*Farrington v. Falcey*,
  96 N.J. Super. 409 (App. Div. 1967) ......................................................26

*Foster v. Love*,
  522 U.S. 67 (1997) ...................................................................... 30, 31, 32

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
  847 F.2d 100 (3d Cir. 1988) ....................................................................19

*Graceway Pharms., LLC v. Perrigo Co.*,
  697 F. Supp. 2d 600 (D.N.J. 2010)..........................................................37

*Hope v. Warden York Cnty. Prison*,
  972 F.3d 310 (3d Cir. 2020) ....................................................................20

*Jenness v. Fortson*,
   403 U.S. 431 (1971) ............................................................................29

*Lake v. Hobbs*,
   623 F. Supp. 3d 1015 (D. Ariz. 2022), *aff'd*, 83 F.4th 1199 (9th Cir. 2023) ........11, 17

*League of Women Voters v. Fla. Sec. of State*,
   32 F.4th 1363 (11th Cir. 2022) ..........................................................11

*Memphis A. Phillip Randolph Inst. v. Hargett*,
   473 F. Supp. 3d 789 (M.D. Tenn. 2020) .............................................16

*Merrill v. Milligan*,
   *142 S. Ct. 879 (2022)* ................................................................ passim

*Minebea Co., Ltd. v. Papst*,
   231 F.R.D. 3 (D. D.C. 2005) ...............................................................13

N.J.S.A. 19:23-21 ...................................................................................7

*Nader v. Schaffer*,
   417 F. Supp. 837 (D. Conn.), *aff'd*, 429 U.S. 989 (1976).........................25

*Norman v. Reed*,
   502 U.S. 279 (1992) ............................................................................21

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*,
   99 F. Supp. 3d 461 (D.N.J. 2015)........................................................37

*Pharmacia Corp. v. Alcon Lab'ys, Inc.*,
   201 F. Supp. 2d 335 (D.N.J. 2002)......................................................37

*Punnett v. Carter*,
   621 F.2d 578 (3d Cir. 1980) ...............................................................20

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ...................................................................... passim

*Quaremba v. Allan*,
   67 N.J. 1 (1975)...................................................................................15

*Reilley v. City of Harrisburg*,
   858 F.3d 173 (2017)............................................................................11

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) ...................................................................20

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
  140 S. Ct. 1205 (2020)..........................................................................10

*Republican Party of Pa. v. Cortes*,
  218 F. Supp. 3d 396 (E.D. Pa. 2016) ........................................... 13, 14, 15

*Rogers v. Corbett*,
  468 F.3d 188 (3d Cir. 2006) ...................................................................23

*Smiley v. Holm*,
  285 U.S. 355 (1932) ..............................................................................31

*Smith v. Penta*,
  405 A.2d 350 (N.J. 1979).......................................................................25

*Storer v. Brown,*
  415 U.S. 724 (1974) ..............................................................................30

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997) ......................................................................... 28, 29

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) ..............................................................................30

*United States v. Classic*,
  313 U.S. 299 (1941) ..............................................................................31

*Voting Integrity Project, Inc. v. Bomer*,
  199 F.3d 773 (5th Cir. 2000) .................................................................31

*Warner Lambert Co. v. McCrory's Corp.*,
  718 F. Supp. 389 (D.N.J. 1989)..............................................................37

## **Statutes**

N.J.S.A 19:14-12 ...................................................................................37

N.J.S.A. 19:23-6 .................................................................................3, 8

N.J.S.A. 19:23-14 ...................................................................................7

N.J.S.A. 19:23-17 ................................................................................................32

N.J.S.A. 19:23-18 ..............................................................................................3, 9

N.J.S.A. 19:23-22 ..................................................................................................7

N.J.S.A. 19:23-22.4 .............................................................................................7, 8

N.J.S.A. 19:23-24 ........................................................................................ 3, 4, 7, 8

N.J.S.A. 19:23-25.1 ..............................................................................................32

N.J.S.A. 19:23-27 ..................................................................................................8

N.J.S.A. 19:48-6 ..................................................................................................40

N.J.S.A. 19:49-2 ............................................................................................. 2, 3, 8

N.J.S.A. 19:63-9 ....................................................................................................8

## Other Authorities

7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1607 (3d ed.)..........................................40

New Jersey Globe, https://newjerseyglobe.com/congress/kim-says-he-wants-to-end-
the-county-line/ (Sep. 25, 2023) ...........................................................................36

New Jersey Globe, https://newjerseyglobe.com/congress/tammy-murphy-wins-bergen-
democratic-convention-by-big-margin/ (Mar. 4, 2024) ..............................................6

Official 2020 Primary Election Results: U.S. House of Representatives (Amended Aug.
26, 2020), available at https://nj.gov/state/elections/assets/pdf/election-
results/2020/2020-official-primary-results-us-house-amended-0826.pdf............. 7, 34

Official 2020 Primary Election Results: U.S. House of Representatives (Amended Aug.
26, 2020), available at https://nj.gov/state/elections/assets/pdf/election-
results/2020/2020-official-primary-results-us-house-amended-0826.pdf) ..................7

## Rules

Rule 12(b)(7) ......................................................................................................39

Rule 19 ................................................................................................... 39, 40, 41

Rule 19(b) .............................................................................................. 40

Rule 26(a)(2) ......................................................................................... 13

## PRELIMINARY STATEMENT

With this belated filing, plaintiffs, Andy Kim and Andy Kim for New Jersey (collectively "Kim"), Sarah Schoengood and Sarah for New Jersey (collectively "Schoengood"), and Carolyn Rush and Carolyn Rush for Congress (collectively "Rush", and with Kim and Schoengood "Plaintiffs") seek an emergent injunction against nineteen County Clerks in their official capacities ("Defendants"), declaring unconstitutional and enjoining several longstanding practices of counties and these duly elected County Clerks in preparing for primary elections. These age-old practices – specifically, the ballot design, candidate ballot placement drawing, and the placement of candidates and bracketing procedures – have withstood similar and unsuccessful challenges. This Court should similarly reject Plaintiffs' claims here.

First, the Supreme Court, in *Purcell v. Gonzalez*, *infra* unanimously adopted what has come to be known as the "*Purcell* principle," which precludes, absent extraordinary circumstances, late-filed constitutional challenges to elections rules on an emergent basis of the sort Plaintiffs have lodged here.  That Plaintiffs have had years to seek the same relief that is the subject of their application, yet waited until six weeks before the primary ballot design must be approved by Defendants, is grounds enough for the Court to rule that the *Purcell* principle's very high bar cannot be overcome here.  As such, Plaintiffs' motion fails at the threshold.

Second, even if *Purcell* was not an absolute bar, Plaintiffs nevertheless fail to meet the standard for the "mandatory" injunction they seek here, which seeks to upset the status quo, rather than preserve it. This is because Plaintiffs have not met their heightened burden to demonstrate a clear chance of success on the merits, given the Supreme Court's ruling in *Eu v. San Francisco County Democratic Central Committee*, which held that the States may not impinge on a candidate's freedom of association to bracket with other candidates absent a compelling state interest. Subsequent caselaw has confirmed that State laws may treat candidates affiliated with political parties differently than unaffiliated candidates, so long as they do not prevent a qualified voter from exercising his constitutional right to vote for any person he chooses. Further, Plaintiffs' own delay in seeking this relief belies any argument of irreparable harm as a matter of law. Indeed, given the last-minute confusion and abrupt changes to longstanding practices the emergent relief Plaintiffs seek would impose if granted, it is Defendants, and also the State's voters, who would ultimately be harmed by an injunction.

## **STATEMENT OF FACTS**

### A.    **Background of New Jersey's Statutory Framework for Ballot Placement.**

New Jersey organizes its primary election ballots through a grid of rows and columns, with the specific placement of the offices sought and the candidates for those offices varying by County. N.J.S.A. 19:49-2. A candidate's placement on the ballot depends on various factors including, but not limited to, endorsements from county

political party committees, affiliation with other candidates for the same office or others, and a ballot drawing conducted by the County Clerk. *See* N.J.S.A. 19:23-6, 19:23-18, and 19:23-24.

New Jersey law requires candidates who want to bracket with candidates running for other offices to file a joint petition with the County Clerk. (Plaintiff's Complaint ("Pl. Comp."), ¶ 60; N.J.S.A. 19:23-18; N.J.S.A. 19:49-2).  N.J.S.A. 19:49-2 sets forth the specific procedure for bracketing (sometimes referred to hereafter as the "Bracketing Structure"). Candidates who file petitions with the Municipal Clerk or with the Secretary of State must, within 48 hours of the petition filing deadline, request permission from the campaign manager of joint petition county candidates to be bracketed with those joint petition county candidates.  (Pl. Comp., ¶ 61). Upon notification of the request, the campaign manager has 48 hours to grant permission to bracket with the joint petition county candidates.  (*Ibid.*). Candidates for other offices that submit petitions with the County Clerk are also able to bracket with the joint petition county candidates. (*Ibid.*). Successfully bracketed candidates will be featured on the same column of the ballot with the same slogan.  (*Id.* ¶ 62).

The County Clerk will then conduct a drawing to determine the order of the ballot, the procedures of which are dictated by N.J.S.A. 19:23-24. The County Clerk has discretion as to which office to draw first for ballot positioning (i.e., Governor, United States Senate, etc.).  The office which the County Clerk chooses to draw first is referred

to by Plaintiffs as the "pivot point." (Pl. Comp., ¶ 56). "All candidates who shall file a joint petition with the county clerk of their respective county and who shall choose the same designation or slogan shall be drawn for position on the ballot as a unit and shall have their names placed on the same line of the voting machine." N.J.S.A. 19:23-24. Thus, once one of the bracketed candidates is placed on the ballot, all other candidates in that bracketed slate will be automatically placed in the same column, including those running for other offices. (Pl. Comp., ¶ 56). The County Clerk then draws for the second position and so on. N.J.S.A. 19:23-24.

Once the initial ballot draw for the first ballot position has taken place, then a series of ballot draws occur between remaining candidates for the other offices who were not bracketed with the first ballot position candidate. (Pl. Comp., at ¶ 66). These candidates will not receive the first ballot position and will be placed further to the right (or further to the bottom) of the ballot than the bracketed candidates running for the same office. (*Ibid.*).

Plaintiffs specifically challenge the procedures delineated by N.J.S.A. 19:23-24 – although expressly stated in the Complaint as a challenge to the processes used by the County Clerks – and claim that the statute creates an unfair framework whereby certain candidates are automatically guaranteed more favorable ballot placement due to their bracketing. (*See, e.g.*, Pl. Compl., ¶ 187). Plaintiffs summarize their allegations to the unconstitutionality of N.J.S.A. 19:23-24 in the following manner:

4

> unbracketed candidates have often been relegated to a ballot placement where they are (a) placed multiple columns away from the bracketed candidates, (b) stacked in the same column as another candidate for the exact same office, and/or (c) placed in the same column as candidates with whom they did not request to bracket and who requested a different ballot slogan. These candidates are harder to find in such obscure portions of the ballot commonly known as "Ballot Siberia" … and otherwise appear less important, further confusing voters and depriving candidates and their supporters of a fair chance to compete for the same office.

(*Id.,* ¶ 67).  Plaintiffs allege that bracketing and the procedure for the ballot draw leads to unequal, and preferential ballot placement. (*Id.*, ¶ 187).

### B.    Plaintiffs' Candidacies

#### i.    Andy Kim

Plaintiff Andy Kim is a United States Congressman and a candidate for United States Senate in the 2024 Democratic Party primary election.  (Pl. Comp., ¶¶ 24, 135). After serving three terms as United States Congressman in New Jersey Congressional District 3 ("CD-3"), on September 23, 2023, Kim launched his primary election campaign for nomination to the U.S. Senate seat currently held by Senator Menendez for the June 4, 2024 Democratic Primary Election. (Pl. Comp., ¶¶ 137, 144).

Since that time, Kim has been actively soliciting local party endorsements throughout the State, winning endorsements in Monmouth County (February 10, 2024), Burlington County (February 24, 2024), Hunterdon County (February 25, 2024), Sussex County ((March 2, 2024), but with no county line awarded), and Warren County (March 3, 2024). Kim has currently won more county endorsements than any other candidate for

United States Senate.  *See* Joey Fox, "Tammy Murphy wins Bergen Convention…," New Jersey Globe,   https://newjerseyglobe.com/congress/tammy-murphy-wins-bergen-democratic-convention-by-big-margin/ (Mar. 4, 2024).

### ii. Sarah Schoengood

Plaintiff Sarah Schoengood is a candidate for United States House of Representatives for New Jersey's Third Congressional District in the 2024 Democratic Primary Election and a registered voter in CD-3. (Pl. Comp., ¶ 28).  CD-3 is comprised of portions of Monmouth, Burlington and Mercer Counties. (*Id.* at ¶ 151). Schoengood declared her candidacy on January 21, 2024, four-and-half months before the Primary Election, and two days after the Monmouth County Democratic Committee's internal deadline for filing an intent to seek endorsement at the Monmouth County Democratic Convention, foregoing her chance to screen for the Monmouth County Democratic Organization's support. (*Id.* at ¶ 152).

### iii. Carolyn Rush

Plaintiff Carolyn Rush is a candidate for United States House of Representatives for New Jersey's Second Congressional District ("CD-2") in the 2024 Democratic primary election and a registered voter in CD-2. (*Id.* at ¶ 26).  CD-2 is comprised of all of Atlantic, Cape May, Cumberland, and Salem Counties, and portions of Gloucester and Ocean Counties.  (*Id.* at ¶158).

Rush declared her candidacy on August 13, 2023.  Rush was also a candidate for CD-2 in 2022, where, despite not obtaining the county line in Gloucester County, won 61% of the vote in Gloucester County. *See* Official 2020 Primary Election Results: U.S. House of Representatives (Amended Aug. 26, 2020), available at https://nj.gov/state/elections/assets/pdf/election-results/2020/2020-official-primary-results-us-house-amended-0826.pdf).

### C.   Process for Printing Ballots

The sequence of printing the ballots for the 2024 Primary Election unfolds through a meticulous and comprehensive process governed by New Jersey's election laws. Specifically, starting 61 days before the election, on April 4, 2024 at 12:00 p.m., Municipal Clerks must certify to the County Clerk the names of candidates who filed their Primary Election Nomination Petition with the Municipal Clerk. N.J.S.A. 19:23-14. Concurrently, the Secretary of State must transmit the certification of Federal and State primary election candidates to County Clerks, ensuring that all candidate names are accurately conveyed for ballot preparation. N.J.S.A. 19:23-21.  At 3:00 p.m. on the same day, both County and Municipal Clerks conduct drawings to determine the ballot positions for primary election candidates. N.J.S.A. 19:23-24.  By April 5, 2024, exactly 60 days before the election, the County Clerk is required to transmit a certification of all candidates to be placed on the primary election ballot to Municipal Clerks, ensuring that candidates are accurately listed. N.J.S.A. 19:23-22, 22.4.

The County Clerk then prints official primary ballots and sample ballots for each political party. N.J.S.A. 19:23-22.4. This process requires the ballots to be bilingual in districts where Spanish is the primary language for 10% or more of the voters, underscoring the state's commitment to inclusivity and accessibility. N.J.S.A. 19:23-22.4. On April 20, 2024, 45 days before the election, ballots must be forwarded by first-class postage or hand-delivered by the County Clerk to each voter whose request for a mail-in ballot has been approved. N.J.S.A. 19:63-9. For uniformed and overseas mail-in voters, mail-in ballots must be sent out no later than April 20, 2024. (*Id.*).

By the Saturday preceding the primary election, June 1, 2024, Municipal Clerks must have printed official primary ballots in a quantity that exceeds the number of votes cast in the last general election, ensuring ample supply for the election process. N.J.S.A. 19:23-27. This detailed and sequential process, mandated by New Jersey law, illustrates the comprehensive and rigorous approach to election preparation. Altering the design of the ballot at any point in this established timeline could introduce significant challenges, potentially disrupting the finely tuned balance and putting the entire system in flux.

**D.  Plaintiffs' Complaint**

On February 26, 2024, less than two months before the primary ballots must be printed, Plaintiffs brought a federal action against Defendants, challenging various provisions of N.J.S.A. 19:23-6; 19:23-18; 19:23-24; and 19:49-2 (the "Election Laws") (Pl. Compl., Dkt. No. 1).  Specifically in the context of primary elections, Plaintiffs assert

8

that the following processes resulting from the Election Laws are unconstitutional: (1) ballots designed by columns or rows, rather than by office sought; (2) ballot draws that do not include a separate drawing for every office and where every candidate running for the same office does not have an equal chance at the first ballot position; (3) positioning candidates on the ballot automatically based upon a ballot draw among candidates for a different office; (4) placement of candidates such that there is an incongruous separation from other candidates running for the same office; (5) placement of  candidates underneath another candidate running for the same office, where the rest of the candidates are listed horizontally; or to the side of another candidate running for the same office, where the rest of the candidates are listed vertically; and (6) bracketing candidates together on the ballot such that candidates for different offices are featured on the same column (or row) of the ballot. (Pl. Comp., Prayer for Relief).

Plaintiffs claim that the Election Laws and the above procedures that flow from them violate their right to vote and freedom of association under the United States Constitution (Pl. Compl., Counts I, III).  Further, Plaintiffs claim violations of their right to equal protection under the Fourteenth Amendment of the United States Constitution. (*Id.,* Count II).  Finally, Plaintiffs claim a violation of the Elections Clause under the United States Constitution. (*Id.*, Count IV).

## LEGAL ARGUMENT

### I.   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED UNDER THE *PURCELL* PRINCIPLE.

Plaintiffs' eleventh-hour application should be denied as an initial matter pursuant to *Purcell v. Gonzalez*, 549 U.S. 1 (2006) – a decision that Plaintiffs' moving papers ignore completely – in which the Supreme Court unanimously held that courts should ***not*** grant injunctive relief relating to election rules or procedures prior to an election absent extraordinary circumstances and an unambiguous need to do so.  In *Purcell,* the Court, in vacating an order enjoining the State of Arizona from enforcing a voter identification law, explained that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4-5.  The Supreme Court has consistently reaffirmed what has come to be known as the *Purcell* principle, which holds that injunctive relief that disrupts the electoral process is the rare exception, and not the rule. *Merrill v. Milligan, 142 S. Ct. 879, 880 (2022)*; *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28 (2020); *Benisek v. Lamone*, 585 U.S. 155, 160-61 (2018).

In *Merrill*, Justice Kavanaugh articulated a four-part test by which federal courts should assess the type of injunctive relief that Plaintiffs seek here.  Specifically, the

*Purcell* principle can be overcome only if the movant establishes "***at least*** the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; ***and*** (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill v. Milligan*, *supra*, at 880 (2022) (Kavanaugh, *J.* concurring) (citations omitted) (emphasis added). As demonstrated below, Plaintiffs' application widely misses the mark on all of these factors.

## A. Plaintiffs Have Not Established A "Clearcut" Case On The Merits

A corollary of the *Purcell* principle is that the movant must have a peculiarly strong case on the merits, which, as described above, courts have held must be "clearcut." *See, e.g.*, *League of Women Voters v. Fla. Sec. of State*, 32 F.4th 1363, 1372 (11th Cir. 2022); *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1031 (D. Ariz. 2022), *aff'd*, 83 F.4th 1199 (9th Cir. 2023); *Carey v. Wisc. Election Comm'n*, 624 F. Supp. 3d 1020, 1035 (W.D. Wisc. 2022). Thus, Plaintiffs are simply wrong to claim that, under these circumstances, they need only show that they "'can win on the merits (which requires a showing of significantly better than negligible…)'" (Plaintiffs' Brief ("Pl. Br."), p. 17) (quoting *Reilley v. City of Harrisburg*, 858 F.3d 173 (2017)).

The Court need look no further than its decision in *Conforti v. Hanlon*, No. 20-08267, 2022 WL 174774 (D. N.J. May 31, 2022) to rule that Plaintiffs have not made a

"clearcut" case on the merits.   Specifically, in *Conforti* the Court rejected a facial challenge to the Bracketing Structure brought by Plaintiffs' counsel, holding that they had not even "plausibly ***alleged*** that there is no set of circumstances under which the statutes involved in the Bracketing Structure would be valid." *Id.* at **14-15 (emphasis added).   While the Court allowed Plaintiffs' counsel's as-applied challenge to proceed past the motion to dismiss phase, it described that aspect of the challenge to the Bracketing Structure as "a close call." *Id.* at *17.

Nothing since the Court's decision has made the challenge to the Bracketing Structure any less of a "close call," and certainly not "clearcut" as the *Purcell* principle commands.   Specifically, the factual record in *Conforti* has not been developed beyond the allegations in the pleadings, as no discovery has been exchanged.   Nor should the opinions contained in Plaintiffs' purported expert reports submitted with their motion convince the Court to alter the course it set out in *Conforti*. While those experts claim to have provided some evidence that the Bracketing Structure puts noncounty-line candidates at a disadvantage they might not otherwise have, the fact remains their opinions have not been tested in discovery.   Indeed, if anything is "clearcut" about those reports, it is that the timing of this action was ***designed*** to shield them from any meaningful discovery.   The Court should not, and cannot, under such circumstances simply accept untested expert opinion testimony at face value, much less conclude that it converts a case that was a "close call" on the pleadings into a conclusive victory on the

merits.  *See Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 5-6 (D. D.C. 2005) ("The purpose of Rule 26(a)(2) is to prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal reports, to depose the expert witness in advance of trial, and to prepare for depositions and cross-examination at trial").

### B. Plaintiffs Have Not Demonstrated Irreparable Harm To Overcome The Purcell Principle

As described more fully in Point II.B, *infra*, Plaintiffs' claims of irreparable harm are speculative and belied by Plaintiffs' own unexplained delay in filing their application. This is especially so in the context of an election, as the *Purcell* principle essentially presumes that an eleventh-hour injunction to the operation of state election laws will generally tip the balance of harms in favor of the nonmovant, especially where, as here, the movant does not seek to preserve the *status quo*, but seeks a mandatory injunction. Judge Pappert of the Eastern District of Pennsylvania aptly described the countervailing interests at play:

> There is good reason to avoid last-minute intervention in a state's election process.  Any intervention at this point risks practical concerns including disruption, confusion or other unforeseen deleterious effects.  Comity between the state and federal governments also counsels against last-minute meddling.  Federal intervention at this late hour risks a disruption in the state electoral process which is not to be taken lightly.  This important equitable consideration goes to the heart of our notions of federalism.

*Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396, 404-05 (E.D. Pa. 2016) (quotations and alterations in original omitted).

13

## C. Plaintiffs Have Unduly Delayed

Even prior to *Merrill*, the Supreme Court and other federal courts have recognized that a litigant's undue delay in filing a constitutional challenge to a state election law or practice provides compelling independent grounds to deny emergently sought injunctive relief. *See Benisek*, 585 U.S. at 159 ("a party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.") (citations omitted); *Cortes*, 218 F. Supp. 3d at 404 ("Plaintiffs unreasonably delayed filing their Complaint and Motion, something which weighs decidedly against granting the extraordinary relief they seek"); *Curtin v. Virginia State Board of Elections*, 463 F. Supp. 3d 653, 658-59 (E.D. Va. 2020) (denying injunctive relief relating to absentee voting eligibility where "[p]laintiffs failed to demonstrate the requisite diligence") (citations omitted). In *Democratic-Republican Org. of N.J. v. Gudagno*, 900 F. Supp.2d 447 (D. N.J. 2012), this Court denied a motion for a preliminary injunction that sought to enjoin New Jersey's longstanding practice of reserving the first two columns of general election ballots to candidates from the two major political parties that was brought by order to show cause approximately six weeks before the general election. While Judge Wolfson denied the motion on the merits, she made clear - citing *Purcell* – that "Plaintiff's delay in bringing their motion – considering the timing of ballot printing and mailing – also weighs against granting preliminary injunctive relief. At this late state in

14

the election process, any injunctive relief ordered by this Court would dramatically upset ongoing ballot printing and distribution." 900 F. Supp. 2d at 461 n.8.

The court in *Republican Party of Pa. v. Cortes*, *supra*, was even more direct in denying a motion for preliminary injunction to enjoin a long-standing Pennsylvania law that restricted poll watchers to certain geographic areas:

> There was no need for this judicial fire drill and Plaintiffs offer no reasonable explanation or justification for the harried process they created. At the hearing, Plaintiffs explained that they were waiting for the General Assembly to pass House Bill 29, which would amend Section 2687(b) by requiring only that a poll watcher be a qualified registered elector in the Commonwealth of Pennsylvania. The bill was introduced in the House of Representatives in January 2015 and remains in committee. Having suddenly lost faith in the legislative process, Plaintiffs ask the Court to assume the General Assembly's role and enact House Bill 29 by judicial fiat. Such action would be inappropriate for a number of reasons, not the least of which is that at this late hour courts should not disrupt an impending election absent a powerful reason for doing so. There is no such reason here.

*Id.* at 405 (internal citations and quotations omitted).

Like the laws in *Democratic-Republican Org. of N.J.* and *Cortes*, New Jersey's Bracketing System is not new. Indeed, it has been the subject of state court litigation going back decades, *see e.g.*, *Quaremba v. Allan*, 67 N.J. 1 (1975), and is the subject of pending litigation initiated by Plaintiffs' attorneys in *Conforti* almost four years ago. Thus, the injunctive relief sought here is even more inappropriate than that in *Purcell*, in that the voter identification law at issue there was recently enacted.

15

More to the point, Kim, by his own admission, is intimately familiar with the Bracketing System and has been for some time, having ran in three separate congressional races going back to 2018.  He has also known for several months prior to filing this action that he would face the challenges he claims the Bracketing System imposes on him in his Senate run, which he announced in September of last year.  Yet, he and his counsel waited years since the filing of the *Conforti* action when the Bracketing System allegedly became untenable and more than four months since he announced his Senate candidacy, to institute proceedings to enjoin that practice a mere six weeks before the April 6 deadline by which the Defendants must have ballots ready for printing.  *See Democratic-Republican Org. of N.J.*, 900 F. Supp. 2d at 461 n.8 (denying injunction where "there [was] no dispute that [p]laintiffs ultimately were aware that their slogan was rejected on August 10, 2012, but failed to file their complaint until a month later on September 11, 2012").  Courts have held that injunctive relief should be denied where the movant has demonstrated far more diligence or provided far more reasonable notice than what Plaintiffs have provided here.  *See, e.g.*, *Merrill*, 142 S. Ct. at 879 (staying preliminary injunction in action brought 120 days before primary election); *Andino v. Middleton*, 141 S. Ct. 9 (2020) (staying preliminary injunction entered 46 days before general election); *Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 801 (M.D. Tenn. 2020) (finding unreasonable delay where Plaintiffs waited seven weeks to file complaint and two months to file motion for preliminary

injunction); *Curtin*, 463 F. Supp. 3d at 659 (finding that Plaintiffs failed to act with "requisite diligence" in challenging newly enacted absentee ballot rule where suit was filed two months after rule promulgated).

Thus, even if it were possible and practical, as Plaintiffs claim, to implement the changes they seek in the short time frame they undoubtedly engineered, the Court should not reward them for their undue delay in seeking their extraordinary remedy.

### D. It Is Neither Feasible Nor Practicable To Implement Relief Within Plaintiffs' Time Frame

Courts have recognized that the *Purcell* principle requires the movant to independently demonstrate the feasibility of implementing the relief sought in the timeframe the application necessitates. *Arizona Dem. Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020) ("as we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new procedure for curing unsigned ballots at the eleventh hour"); *Lake v. Hobbs*, 623 F. Supp.3d 1015, 1031-32 (D. Az. 2022) (agreeing that "*Purcell* also caution[s] federal courts to refrain from enjoining election law too close in time to an election if the changes will create administrative burdens for election officials.")   Literal possibility is not enough.   Rather, the movant must demonstrate that the State can implement the sought after relief "without significant cost, confusion, or hardship."  *Merrill*, 142 S. Ct. at 880.

17

Plaintiffs' putative expert with respect to feasibility, Andrew W. Appel, does not purport to opine that the ballot overhaul can be accomplished within the short time frame Plaintiffs demand.  Rather, Mr. Appel only concludes that certain voting machines used in different counties are capable of "support[ing] an office-block ballot and are used with office-block formats in other states." (*See* Compl., Exh. E, Expert Report by Dr. Andrew W. Appel ("Appel Report"), p. 6).  He otherwise admits that two other machines may not be able to support an office-block ballot format as those machines have not been so configured in any other jurisdiction.  (*Ibid.*).

By contrast, Defendants have demonstrated that, while a change to an office-block ballot format is technically possible on a long-enough time frame, requiring those changes in time for the April 6 deadline for ballots to be printed creates a risk of delay that could impact statutory deadlines. (*See* Certification of Nicole Nollette ("Nollette Cert."), ¶¶ 9-11). Indeed, Election Systems & Software, LLC ("ES&S"), the provider of elections systems for fifteen counties in New Jersey, cannot change the currently planned ballot design in time to have ballots prepared for the primary election. (Certification of Benjamin R. Swartz ("Swartz Cert.") (Dkt # 46), ¶¶ 5, 8).

It is beyond any dispute that Plaintiffs are, on an emergent basis, seeking to upend a longstanding and statutorily mandated ballot design a mere six weeks before those ballots must be approved for printing.  Other than the tactical advantage they obviously hoped to obtain, there can be no plausible explanation as to why Plaintiffs chose to bring

18

their application years after their attorneys filed the *Conforti* action and several months after Kim announced his Senatorial campaign.  Even assuming, *arguendo*, that Plaintiffs' recently minted (and untested) expert reports somehow make their case somewhat more compelling on the merits, they clearly do not transform what the Court previously described as a "close call" at the pleading stage, into a "clearcut" entitlement to relief on an expedited basis.  The *Purcell* principle therefore acts as an independent bar to Plaintiffs' motion.

## II.    PLAINTIFFS' MOTION FAILS TO MEET THE STANDARD FOR A MANDATORY PRELIMINARY INJUNCTION.

Even without regard to the *Purcell* principle, injunctive relief "is an extraordinary remedy . . . which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000).

A movant for a preliminary injunction must satisfy a four-factor test. They must first establish (1) "a reasonable probability of success on the merits" and (2) that "irreparable harm would result if the relief sought is not granted." *Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty*, 39 F.4th 95, 102-03 (3d Cir. 2022) (quotation omitted). If the movant can satisfy those two gateway factors, the court must then assess two equitable factors: (3) "whether the relief would result in greater harm to the non-moving party" and (4) "whether the relief is in the public interest." *Id.* (quotation

omitted).   Only if "all four factors, taken together, balance in favor of granting the requested preliminary relief[,]" may a preliminary injunction issue. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Here, because Plaintiffs are seeking a "mandatory injunction" that alters, rather than preserves, the status quo, they must meet "a particularly heavy burden in demonstrating its necessity."  *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (citing *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980)).  This "heightened standard" requires Plaintiffs "to show a substantial likelihood of success on the merits and that their right to relief is indisputably clear."  *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quotation and alterations in original omitted).

## A.   Plaintiffs Are Unable To Demonstrate A Substantial Likelihood Of Success On The Merits.

Given the stringent criteria established by the Supreme Court, Plaintiffs' claims lack the requisite merit to succeed, as the balance decidedly tips in favor of the State's well-founded regulatory interests over any alleged, yet unsubstantiated, burdens on constitutional rights.  Specifically, when election laws are challenged on First Amendment grounds, courts first "examine whether [the challenged law] burdens rights protected by the First and Fourteenth Amendments." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989). If so, the *Anderson/Burdick* test requires courts to weigh "the character and magnitude of the asserted injury to the rights

protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"
against "the precise interests put forward by the State as justifications for the burden
imposed by its rule," taking into consideration "the extent to which those interests make
it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428 (1992)
(citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983)). When a state election law provision
imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth
Amendment rights of voters, "the State's important regulatory interests are generally
sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788; *see also Burdick*, 504
U.S., at 434. Only when those rights are subjected to "severe" restrictions, must the
regulation be "narrowly drawn to advance a state interest of compelling importance."
*Norman v. Reed*, 502 U.S. 279, 289 (1992).

In this case, the State's commitment to maintaining an accessible ballot—a ballot
that minimizes voter confusion, allows political parties a right to associate, and facilitates
voters' ability to clearly recognize candidates and their respective political affiliations—
stands as a critical and legitimate endeavor. Plaintiffs, by contrast, have not clearly
demonstrated that the Defendants have enforced any "severe" limitations on their rights.
Even in a hypothetical scenario where such allegations were made, the statutes in
question are meticulously crafted to support the State's objectives. Through adherence to
the procedures mandated by the challenged statutes, Defendants have, at most, applied a
fair, nondiscriminatory restriction on Plaintiffs. This restriction is undeniably warranted

by the State's significant interests. Consequently, these statutes withstand even strict scrutiny, rendering the Plaintiff's claims untenable.

### 1.  Plaintiffs' Alleged Burdens are Minimal

If a burden "imposes only 'reasonable, nondiscriminatory restrictions'" on constitutional rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). Here, the alleged burdens to unbracketed candidates who, as explained below, are a class that warrants minimal scrutiny, are minimal. Plaintiffs cannot establish a claim that the ballot drawing and design processes violated Plaintiffs' right to vote, freedom of association, freedom of speech, or equal protection rights, or that they constituted vote dilution.

### a.  The Ballot Design is Non-Discriminatory

Although election statutes that "limit political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status" impose severe burdens and will be "especially difficult for the State to justify," *Anderson*, 460 U.S. at 793, in this case, the differentiation is between candidates who are bracketed and unbracketed, a distinction that does not align with any recognized suspect or quasi-suspect classifications. There is no exclusion of "certain classes of candidates from the electoral process," and voters are able to cast votes for Plaintiffs. *Id.*

### b.  The Ballot Design Does Not Limit Ballot Access

Second, Plaintiffs' alleged burdens center around ballot positioning, which this Court has deemed a "less important aspect of voting rights than access." *Democratic-Republican Org.,* 900 F. Supp. 2d at 456 (citing *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006).

This is because "States may treat candidates affiliated with political parties differently than unaffiliated candidates." *Id*. In fact, in *Democratic-Republican Org.*, this Court rejected a request for emergent relief very similar to that of Plaintiffs, and held the following:

> placing political party candidates on the left side of the ballot and all other candidates on the right side does not violate Plaintiffs' constitutional rights. These statutes impose, at most, a minimal burden on Plaintiffs' ballot access. Because the Plaintiffs' burden, if any, is negligible, any reasonable regulatory interest provided by the State will ensure the statutes' constitutionality under *Anderson. Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 78 (3d Cir.1999) … Here, the State has explained that the statute is grounded in the integrity of the election process by ensuring that voters can clearly identify which candidates are affiliated with political parties.

*Id*. at 458.

The precedent is clear. Plaintiffs fail to allege a burden on the right to vote because the bracketing statutes or ballot design does not restrict voters' *access* to vote for the candidate of their choice.

### c. The Ballot Design Does Not Burden Plaintiffs' Right to Associate.

Next, Plaintiffs' argument that New Jersey's bracketing and ballot system burdens candidates' fundamental associational rights is rooted in untested theories that they deem fact, as well as incomplete and selective data from experts. Indeed, Plaintiffs' purported expert who analyzed the alleged effects of associating or not associating with other candidates, Dr. Joshua Pasek, notes in his results from his study that "it is not possible to fully disentangle the effects of the line, of endorsements, of bracketing, of being listed toward the left side of the ballot, and of voter confusion at the same time while presenting voters with ballots that resemble those they could actually receive." (*See* Pl. Compl., Exh. B, Expert Report by Dr. Josh Pasek, at ¶¶ 174.)  And those are just the factors he selectively chose to analyze. At no point did Dr. Pasek consider critical factors including, but not limited to, incumbency, money raised or spent by a candidate, candidate endorsements, name identification, or candidate popularity/approval in his analysis. Without a detailed analysis of these additional factors, Plaintiffs have not made a sufficient showing whether, as the Court stated in *Conforti*, "there is consistent benefit for those who bracket and a consistent detriment for those who do not bracket." 2022 WL 1744774, at *34. Moreover, Plaintiffs have not provided any caselaw holding that any of the burdens alleged warrant moderate scrutiny, let alone strict scrutiny. This is because none exist.

Conversely, it is well settled that although "state statutes regulating ballot access inevitably affect - at least to some degree - the individual's right to vote and his right to associate with others for political ends, … not all such restrictions are unconstitutional. . . . Where the statute imposes only a minimal nondiscriminatory burden on minor parties, yet affords reasonable access to the ballot, it generally has been upheld." *Democratic-Republican Org.*, 900 F. Supp. 2d at 456 (*quoting Belitskus v. Pizzingrilli*, 343 F.3d 632, 643 (3d Cir. 2003)). This framework holds that not all burdens are deemed constitutionally prohibitive, especially when these burdens are balanced against the state's legitimate interests in maintaining the integrity and clarity of the electoral process.

## 2.   Defendants Have Shown Sufficiently Compelling State Interests

The preservation of the electoral process's integrity stands as a cornerstone of democratic governance, a principle emphatically endorsed by the Supreme Court. *See Doe v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest in preserving the integrity of the electoral process is undoubtedly important."); *Smith v. Penta*, 405 A.2d 350, 353 (N.J. 1979) ("'a state has a more general, but equally legitimate, interest in [. . .] preserving parties as viable and identifiable interest groups; insuring that the results of primary elections, in a broad sense, accurately reflect the voting of party members.'") (quoting *Nader v. Schaffer*, 417 F. Supp. 837, 845 (D. Conn.), *aff'd*, 429 U.S. 989 (1976)). The State's vested interest extends to preventing primary election outcomes that might confuse or mislead voters who depend on party labels to signify specific

25

ideologies. New Jersey's bracketing statutes and ballot design are meticulously designed to safeguard these pivotal governmental interests, while affording due deference to the county clerks' discretion.[1] They ensure the preservation of political parties' and candidates' freedom to either associate or disassociate, making such associative characteristics clear to voters, facilitating a ballot that is both manageable and comprehensible, and guaranteeing the smooth conduct of elections.

Plaintiffs' critique that New Jersey's bracketing and ballot placement laws inherently damage electoral integrity and foster voter confusion overlooks the nuanced balance these laws strike between facilitating voter understanding and ensuring a fair representation of political parties and candidates. Indeed, the structure of any electoral system inherently involves trade-offs. By grouping candidates by party affiliation and political alliances, voters are provided with a clearer understanding of the ideological and policy positions represented on the ballot, enhancing their ability to make informed choices. Plaintiffs' request for relief would upend the entire election process, requiring voters, poll workers, and election staff, who are inherently familiar with the current ballot design, to understand a completely new design – all of this during a competitive

---

[1]County clerks have wide latitude in crafting the ballot, unless an abuse of discretion is apparent, and such discretion has been upheld consistently in New Jersey. *See Farrington v. Falcey*, 96 N.J. Super. 409 (App. Div. 1967) ("the county clerk is given a wide discretion in these matters, and that the court will not interfere with the exercise of that discretion unless clearly unreasonable, is well established by our decisions.")

Presidential election year. Moreover, the argument that the system is universally recognized as a tool for political manipulation lacks any understanding of the electoral dynamics within New Jersey. The process of bracketing and ballot placement is governed by rules and regulations that ensure transparency and fairness. While no system is perfect, the assertion that New Jersey's method is a deliberate attempt to skew electoral outcomes undervalues the State's efforts to maintain electoral integrity and voter accessibility.

The Supreme Court's ruling in *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989) underscores the fundamental right of political parties and organizations to freedom of association as protected under the First and Fourteenth Amendments. This seminal decision articulated that the right to associate encompasses not only an individual voter's choice of political party but also the prerogative of a political party to delineate its membership and select representatives who most accurately embody the party's ideologies and preferences. *Id.* at 224-25. *Eu* established a clear judicial ethos that, while the State may consider party affiliation in ballot design, outright prohibition of such affiliation is constitutionally untenable without a compelling state rationale—a rationale absent in *Eu*, where no evidence suggested that party endorsements unduly swayed voters or that such a prohibition was essential for conducting orderly and fair elections.

3.  <u>The State's Interest Clearly Outweighs Plaintiffs' Alleged Burdens</u>

Applying the *Anderson/Burdick* balancing test here, it is clear that any alleged burden that New Jersey's statutory framework for ballot placement imposes on certain candidates does not outweigh the State's substantial interest in preserving the integrity and orderliness of its electoral process. This balance is grounded in the understanding that all electoral systems inherently involve some level of regulatory burden to ensure fair and orderly elections. The Supreme Court has previously upheld statutes that imposed more significant burdens on candidates than those alleged by Plaintiffs here, demonstrating a recognition of the States' broad authority to regulate elections in a manner that ensures their integrity and fairness.

For instance, in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367, (1997), the Court upheld the constitutionality of an "anti-fusion" law, which prohibited candidates from associating with more than one political party on a ballot. The Court elucidated that states have a compelling interest in establishing orderly elections, allowing them to enact reasonable election regulations that may inherently favor the traditional two-party system. *Id.* This precedent underscores the permissible scope of state regulation in electoral processes, even when such regulations may present challenges to certain candidates.

New Jersey's approach, including the bracketing and ballot placement procedures, similarly seeks to balance the need for a clear and navigable ballot with the rights of

candidates. The State's method of organizing ballots—favoring candidates who demonstrate a "modicum of community support" by allowing them to be grouped together and clearly identified—serves a legitimate purpose in maintaining electoral integrity. This rationale aligns with the Supreme Court's reasoning in *Jenness v. Fortson*, 403 U.S. 431, 442 (1971), which acknowledged the state's interest in facilitating voter identification of candidates associated with political parties.

The State's interest in ensuring that voters can easily identify political party candidates and understand their choices on the ballot cannot be understated. Such regulatory measures, as argued by the State, are essential for maintaining the integrity, fairness, and efficiency of the electoral process, a principle affirmed in *Timmons*, 520 U.S. at 364. This interest in safeguarding the electoral process justifies the State's approach to ballot placement and outweighs any alleged burdens on Plaintiffs.

4.    Plaintiffs Have Not Shown A Likelihood Of Success On The Merits On Their Elections Clause Claims.

Plaintiffs argue that the bracketing and ballot placement systems exceed the state authority under the Elections Clause and, thus, must be struck down as unconstitutional. However, this argument overlooks the broad discretion historically afforded to states in the regulation of elections, a principle firmly established in Supreme Court jurisprudence. In *Cook v. Gralike*, 531 U.S. 510, 522 (2001), the Supreme Court noted that the Elections Clause constituted a limited delegation. The Elections Clause authorizes each state to

enact processes to be followed in electing members of the House and Senate from their respective states.

States retain the power of establishing the time, place, and manner of primary elections under the Elections Clause. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730 (1974). The Supreme Court later explained in *Foster v. Love*, 522 U.S. 67, 69 (1997), that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections." The Court reiterated in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995) that the Framers intended the Elections Clause to grant states the authority to create procedural regulations for such federal elections. Recent Supreme Court precedent has established that the reference to the "Legislature" in the Elections Clause encompasses more than just legislative lawmaking bodies.

In *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 806-09 (2015), the Court upheld the validity of an independent congressional redistricting commission created by a voter ballot initiative rather than through a statute enacted by the Arizona Legislature. The Court rejected the challengers' argument that only the Arizona Legislature could specify the district boundaries and electoral processes. Tracing the history of Article I, Section 4, Justice Ginsburg's majority opinion for the Court observed that "[t]he dominant purpose of the Elections Clause, the historical record

30

bears out, was to empower Congress to override state election rules, not to restrict the way States enact legislation." *Id.* at 814-15. The Elections Clause grants the states "comprehensive ... authority to provide a complete code for the congressional elections, not only as to times and places, but in relation to ... supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns," unless Congress should "supplement these state regulations or ... substitute its own." *Smiley v. Holm*, 285 U.S. 355, 366–67 (1932); *see also Foster*, 522 U.S. at 71, n.2. Thus, the Elections Clause grants the states "wide discretion in the formulation of a system for the choice by the people of representatives," *United States v. Classic*, 313 U.S. 299, 311 (1941), the only limitation being that "the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).

Here, there is no conflict between the Elections Laws and any federal statute, including the Elections Clause. Nor do Plaintiffs direct the Court to any federal law regulating methods of determining the bracketing and ballot placement of candidates. New Jersey's bracketing and ballot placement systems are designed to operate within the scope of authority delegated by the Elections Clause, facilitating the orderly conduct of elections—a goal consonant with the clause's intent to empower states in the regulation of electoral processes.

Contrary to the claims made by the Plaintiffs, New Jersey's bracketing statutes do not predetermine electoral outcomes. Rather, these laws afford candidates the autonomy to decide whether to align with others on the primary election ballot. This system does not restrict any candidate's ability to be listed on the ballot alongside candidates running for the same office. Importantly, these regulations do not interfere with voters' rights to support their chosen candidates in the primaries. Furthermore, the discretion regarding the use of slogans on the primary ballot is entirely in the candidates' hands, within the guidelines established by N.J.S.A. 19:23-17 and 25.1. This framework underscores the flexibility and fairness of New Jersey's approach, emphasizing candidate choice and voter autonomy without compromising the electoral process' integrity.

Moreover, as the Court is aware, these same statutes have been challenged regularly – almost every election cycle – with Congress taking no steps to preempt New Jersey's laws. Where Congress "declines to preempt state legislative choices," the Elections Clause vests the states with responsibility for the "mechanics of congressional elections." *Foster*, 522 U.S. at 69. Given this legal backdrop, Plaintiffs' challenge under the Elections Clause lacks a substantial basis for success.

    4.   *Conforti* Demonstrates That Plaintiffs Have Not Met Their Heightened Burden To Demonstrate A Likelihood of Success On The Merits.

To bolster their argument for success on the merits, Plaintiffs ask this Court to draw conclusions that are at odds with its previous decision in *Conforti* on these identical

legal issues, where the Court was obligated to draw all reasonable inferences in favor of identical factual allegations.[2] Specifically, in *Conforti*, the Court utilized the *Anderson/Burdick* balancing test which, as stated above, balances the alleged burden on the rights that a plaintiff seeks to assert against the precise interested of the State and the extent to which these rights are burdened. 2022 WL 1744774, at \*32. While analyzing the Plaintiffs' alleged burdens on their First and Fourteenth Amendment rights, this Court first "concluded that the position on a ballot is 'a less important aspect of voting rights than access'" and then "assign[ed] ***no burden or a minimal burden*** to the vote dilution aspect of Plaintiffs' claims. *Id.* at \*33-34 (citing *Democratic-Republican Org. of NJ,* 900 F. Supp. 2d at 456) (emphasis added). The Court next concluded that the "Bracketing Standard is nondiscriminatory for the purpose of the Equal Protection Clause." *Id.* at \*34 citing *Bush v. Gore,* 531 U.S. 98, 109 (2000).

In determining the burden on the *Conforti* plaintiffs' right to associate, the Court provided the following analysis:

> The Supreme Court has held that political parties have a right to choose "the standard bearer who best represents the party's ideologies and preferences." *See Eu,* 489 U.S. at 224. Yet, Plaintiffs argue that this freedom to associate impedes their rights to not associate or substantially burdens it. There is a grain of truth in that statement: assuming there is at least one gubernatorial candidate, no non-gubernatorial or non-congressional candidate can be placed in the first column without bracketing and by

---

[2] Plaintiffs fully admit that the differences between the present matter and *Conforti v. Hanlon*, No. 3:20-08267 (D.N.J.) are not created by the actual claims set forth in their Complaint, but rather the type of Plaintiffs and alleged proof of those claims.

operation of state law. Plaintiffs moreover provide evidence that, taken as true, implies that a candidate's choice not to bracket can have an impact on the total votes in counties that bracket candidates as opposed to counties that do not. If there is a consistent benefit for those who bracket and a consistent detriment for those who do not bracket, then the statute creates a cost to a candidate's right to not associate. As such, the Court finds that the Bracketing Structure imposes a moderate burden on the right to associate.

*Id.* at *34 (internal citations omitted).

Again, the Court correctly took Plaintiffs' allegations as true. However, the Court's analysis hinged upon the *Conforti* plaintiffs' strategic presentation of facts to cast the allegations in a skewed light. Specifically, the alleged "benefit" of bracketing alleged in the *Conforti* Complaint was a mere 2.1%[3] improvement in a county when the alleged benefactor of the Bracketing Structure, Josh Gottheimer, was an incumbent congressman with high name recognition and who resides in the county. *See* Official 2020 Primary Election Results: U.S. House of Representatives (Amended Aug. 26, 2020), available at https://nj.gov/state/elections/assets/pdf/election-results/2020/2020-official-primary-results-us-house-amended-0826.pdf. That same deference cannot be given to Plaintiffs' application for emergent relief. Ultimately, the Court, while "accepting all allegations in the Amended Complaint as true," applied a moderate to severe level of scrutiny. *See Conforti*, 2022 WL 1744774, at *35. The Court then turned to the compelling interests

---

[3] In the 2020 Primary Election, Congressman Gottheimer received 67.15% of the vote in Bergen County, compared to 64.98% in Warren County.

of the State, finding that the State's interests in providing a manageable and understandable ballot are "at least marginally compelling." *Id.* at \*36. Finally, the Court balanced the alleged burdens against the State's interest, finding that it was a "close call" to allow the *Conforti* plaintiffs' claims to proceed, ultimately holding that "[d]epending on further factual findings, the *state's* interests may be sufficiently compelling to pass muster under the relevant Constitutional tests." *Id.* (emphasis added).

In this context, the Plaintiffs' current application for emergent relief must not only contend with, but surpass the evidentiary hurdles encountered in *Conforti*. Given the Court's previous findings, the assertion that Plaintiffs will successfully prove their case on the merits is highly speculative and unfounded. The burden of proof for emergent relief demands not just a plausible claim but a clear demonstration of likelihood of success, which is heightened here because Plaintiffs undoubtedly seek a mandatory injunction. Indeed, the standard for emergent relief in elections cases is even more stringent, particularly in a challenge to New Jersey's ballot placement. *See Democratic-Republican Org.,* 900 F. Supp. 2d at 457-58 (noting in almost every case related to constitutional challenges against the placement, formatting, or layout of ballots, courts have necessitated proof showing that the placement of a ballot offers an advantage before deciding if the plaintiffs have faced a burden or harm).

**B.**     **Plaintiffs' Have Failed To Demonstrate Irreparable Harm**

Plaintiffs, because they seek a mandatory injunction, bear a heightened burden to demonstrate "'clear showing of immediate irreparable injury'" absent relief. *Acierno*, 40 F.3d at 655 (quoting *Continental Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351 (3d Cir. 1980)).   Yet Plaintiffs merely speculate that the Bracketing System will diminish their chances of winning their respective primaries.  (Pl. Br., p. 51).  Because "speculation cannot support an injunction," *Adams*, 204 F.3d at 488, Plaintiffs' claim of irreparable harm fails at the threshold.

Of course, Plaintiffs fail to acknowledge that their own delay in initiating this lawsuit is the reason they are at an immediate risk of any alleged harm. Plaintiffs, as a general matter, have known about New Jersey's ballot structure for years. Kim specifically has known about the alleged challenges he claims he will face in the Senatorial primary for at least four months before filing this application, having stated in a September 2023 interview that despite his belief that the county line should be abolished, he would "work within the system we have, seek county endorsements, and respect the contribution structures and limits that are currently in place." Joey Fox, "Kim says he wants to end the county line," New Jersey Globe, https://newjerseyglobe.com/congress/kim-says-he-wants-to-end-the-county-line/  (Sep. 25, 2023). Nevertheless, Plaintiffs waited less than six weeks before the April 4, 2024

deadline to determine ballot positions to file their motion for emergent relief. *See* N.J.S.A 19:14-12.

That Plaintiffs' undue delay undoubtedly created the emergency they now claim necessitates immediate relief, conclusively undermines their claim of irreparable injury. *See* O*tsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 99 F. Supp. 3d 461, 505 (D.N.J. 2015) (stating that plaintiff's delay in filing for injunctive relief despite knowledge of an upcoming deadline, "undercuts the urgency that forms the cornerstone of injunctive relief; indeed, it indicates a lack of urgency"); *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 382 (D.N.J. 2002) (finding plaintiff's delay an "equally dispositive basis" to disprove claims of irreparable injury and deny preliminary injunctive relief). This is so, because whether "delay is viewed under the theory of laches or implied acquiescence, significant delay in bringing an action and applying for injunctive relief…may justify denial of a preliminary injunction." *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 393 (D.N.J. 1989) (internal quotations omitted). Thus, even if Plaintiffs' motion did not implicate the unique concerns of the *Purcell* principle, the Court should not reward them for resting on their claims until the final weeks of preparation for the Primary Election. *See Graceway Pharms., LLC v. Perrigo Co.,* 697 F. Supp. 2d 600, 605 (D.N.J. 2010) (explaining that such extraordinary relief should not "be granted in the face of a movant's inequitable conduct, including laches, i.e., unjustified delay or dilatory conduct").

37

### B.    Plaintiffs Have Not Demonstrated That The Balancing Of Harms Favors Them

Plaintiffs barely play lip service to the burdens their eleventh-hour application will impose on Defendants.  Indeed, their expert, Andrew W. Appel, mostly avoids the issue by addressing only whether the various voting machines can support a block balloting format, rather than providing the Court with even a cursory examination of how such changes could be implemented and on what timeframe. (*See* Appel Report, pp. 4-6).

By contrast, Defendants have provided statements from representatives of the vendors of the voting machines as well as from state officials who are intimately familiar with the ballot certification process.  (Swartz Cert. ¶¶ 5-9, Certification of Mary Melfi (Dkt. #45) ¶¶ 1-9; Certification of Ann F. Grossi (Dkt #49) ¶¶ 8-10).  Those statements detail how the halting and confusing preparations for the upcoming Primary Election an injunction will undoubtedly cause would not be appropriate at this stage even if Plaintiff's speculatory claims were fully adjudicated; and their belated attempts to rush this litigation only serve to highlight the problems with judicial intervention at this time. *See Crookston v. Johnson,* 841 F.3d 396, 399 (6th Cir. 2016); *Page v. Bartels*, 248 F.3d 175, 196 (3d Cir. 2001) (when considering interim injunctive relief that might impact a state election, stating "if aggressive federal court intervention is not necessarily appropriate following an adjudication of unconstitutionality, then surely it cannot be any more appropriate at [an earlier] stage of the proceedings").

### III.   DISMISSAL IS REQUIRED UNDER FED. R. CIV. P. 12(b)(7) AND 19

Plaintiffs' dilatory filing conspicuously fails to name as defendants various county election officials, political parties or declared candidates for office, all of whom will negatively be affected by the relief Plaintiffs ultimately seek. This failure requires dismissal of this action under Rule 12(b)(7) for "failure to join a party under Rule 19."

Specifically, Rule 19 requires, in relevant part, that "a person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction **must** be joined as a party if" that person is necessary to "accord complete relief among the parties"; or if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may… as a practical matter impair or impede the person's ability to protect the interest." (emphasis added).  Many individuals who fall under both categories of Rule 19, all of whom are located in New Jersey and are subject to service of process, are missing from Plaintiffs' pursuit of emergent relief.

First, simply ordering the County Clerks to change the ballot structure will not afford complete relief here.  Rather, the putative new ballot structure Plaintiffs seek to have the Court impose would need to be configured to voting machines, which are outside of the control and purview of the County Clerks.  Rather, custody of voting machines is left to each County's Board of Elections or Superintendent of Elections, who

are currently not parties to this action. *See* N.J.S.A. 19:48-6.  Accordingly, at least those parties are necessary to afford complete relief here.

Alternatively, the rights of Plaintiffs' primary opponents, county political parties, and any other individuals who are primary candidates, will undoubtedly be severely impaired if they are not joined.  As Plaintiffs themselves concede, the Bracketing System at least serves a legitimate interest of political candidates to associate with one another and for political parties to endorse candidates, Constitutional interests the Supreme Court held to be compelling in *Eu*.  Upending the Bracketing System, by definition, impairs that Constitutional interest.

Nor is this a case where absent parties are "required to be joined if feasible cannot be joined", under Rule 19(b), which refers to situations in which "the person's joinder would defeat the court's subject-matter jurisdiction, or the person is not subject to personal jurisdiction, or the person properly objects to the venue of the action."  7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1607 (3d ed.).  But even if Rule 19(b) did apply, the Court would have to consider, as relevant here: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;" or "(2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures[.]" As described above, primary election candidates and county political parties' fundamental First Amendment rights to associate under *Eu* would certainly be eviscerated by the Court

40

entering the emergent relief Plaintiffs' seek without those necessary and indispensable parties having a chance to be heard.  Moreover, there is no way to mold the relief Plaintiffs seek – requiring the County Clerks to use an "office-block ballot" (Plaintiffs' Order to Show Cause, Dkt 5.2) – that would not compel the unnamed county officials who are responsible for the voting machines to implement changes to the ballot structure.

All told, fashioning the remedy that Plaintiffs seek is not the simple exercise they portray it to be.  Rather, it implicates the Constitutional rights and statutory obligations of numerous parties who are undoubtedly subject to the Court's jurisdiction, but whom Plaintiff chose not to name as defendants or provide adequate notice as interested parties, despite having ample time to do so.  Rule 19 requires dismissal or an Order requiring joinder of these indispensable parties.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants, Christopher Durkin, Essex County Clerk, Joanne Rajoppi, Union County Clerk, and Danielle Ireland-Imhof, Passaic County Clerk, respectively request that Plaintiffs' application for a preliminary injunction be denied and Defendants' cross-motion to dismiss be granted.

**GENOVA BURNS LLC**
*Attorneys for Defendants,*
*Christopher Durkin, Joanne Rajoppi and*
*Danielle Ireland-Imhof*

By: */s/ Jennifer Borek*

41

Jennifer Borek, Esq.
Angelo J. Genova, Esq.
Rajiv D. Parikh, Esq.
494 Broad Street
Newark, New Jersey 07120
Tel: 973-533-0777
jborek@genovaburns.com
agenova@genovaburns.com
rparikh@genovaburns.com
*Attorneys for Defendants*
*Christopher Durkin, Joanne*
*Rajoppi, and Danielle*
*Ireland-Imhof*

17457892v4 (9998.435)