## WEISSMAN & MINTZ LLC
ATTORNEYS AT LAW

STEVEN P. WEISSMAN
ANNMARIE PINARSKI
WILLIAM G. SCHIMMEL
IRA W. MINTZ
FLAVIO L. KOMUVES
JASON L. JONES
JUSTIN SCHWAM
PATRICIA A. VILLANUEVA

Of Counsel
ROSEMARIE CIPPARULO
BRETT M. PUGACH
ADAM M. GORDON
YAEL BROMBERG

Counsel
DAVID A. MINTZ*

* ADMITTED TO PRACTICE ONLY IN NEW YORK

220 DAVIDSON AVENUE
SUITE 410
SOMERSET, NEW JERSEY 08873
(732) 563-4565
FAX (732) 560-9779

www.weissmanmintz.com

90 BROAD STREET
SUITE 254
NEW YORK, NEW YORK 10004
(212) 509-0918

JOEL N. WEISSMAN (1957-1998)
MARK ROSENBAUM (1955-2002)



March 11, 2024

VIA ELECTRONIC FILING
Hon. Zahid N. Quraishi, U.S.D.J.
United State District Court of the District of New Jersey
Clarkson S. Fisher Building
402 East State Street
Trenton, NJ 08608

      Re:    Kim, et al. v. Hanlon, et al.
              Civil Action No.: 24-1098(ZNQ)(TJB)

Dear Judge Quraishi:

Plaintiffs Andy Kim, Carolyn Rush, Sarah Schoengood, and their respective campaign committees respectfully submit this letter-brief in response to the motion to intervene filed by Camden County Democratic Committee ("CCDC") (Motion to Intervene, DE41).

This application for leave to intervene follows on the heels of a similar motion to intervene brought in *Conforti v. Hanlon,* 2023 WL 2744020 (D.N.J. 2023). In that motion, as in this one, CCDC acknowledges that Plaintiffs' complaint does not seek to affect their rights to endorse, or otherwise spend time or resources, on the candidates that the organization prefers. It likewise acknowledges that Plaintiffs' complaint does not ask the court to affect CCDC's ability to place a slogan, on the face of the ballot and in the face of the primary voters, that notes CCDC's endorsement of their chosen candidates. Despite this, CCDC asserted there, and again asserts here, that it has interests in, and derives advantages from, the ongoing existence of New Jersey's primary ballot design laws and practices, saying that "any disposition by the Court regarding the constitutionality of New Jersey's primary election system will impact and potentially impair CCDC's First Amendment rights." (Brief in Support of Motion to Intervene, DE41-1, p. 8). Specifically, CCDC asserts:

1

> CCDC has an identifiable, significantly protectable legal interest in its freedom to associate with Democratic candidates for office as afforded by the First Amendment. In *Kusper v. Pontikes*, the United States Supreme Court acknowledged, "[t]here can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). Thus, "[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Id.* at 57. Any disposition by the Court regarding the constitutionality of New Jersey's primary election system or ballot position and placement system will impact and potentially impair CCDC's First Amendment rights—namely, its freedom to associate with Democratic candidates for office.

[*Id.*, pp. 7-8; *see also id.* at pp. 13-14].

Given that Plaintiffs expressly do not seek to affect CCDC's rights to endorse candidates or identify their endorsees with a ballot slogan, what is CCDC *really* saying? It is arguing that the "ballot position and placement system" – that is, the system of laws and practices that includes bracketing, the county line, and the denial of primacy for certain candidates – in fact confers material benefits and advantages on CCDC and their candidates. They have now conceded the very point Plaintiffs are making – that the advantages that come from the weight of the line, bracketing, and primacy, admittedly confer real benefits upon the CCDC and its endorsees. After all, if these features of New Jersey ballot design didn't confer these advantages, but were either neutral or a disadvantage, CCDC would not have the requisite "interest" in defending their continuation, and (presumably) wouldn't waste the Court's time defending its unconstitutional privilege.

CCDC litigated this point in *Conforti* and over the objections of the plaintiffs there, it prevailed. The doctrine of judicial estoppel means that CCDC can no longer deny the essential fact of this case: that New Jersey law confers substantial and meaningful advantages on those organizations that, like CCDC, are given statutory power to confer county line status. Nor can it deny the substantial and meaningful advantages it gives to those candidates that the organization affiliated with. Moreover, it cannot deny that it is *de facto* the CCDC, as the county committee of the Democratic Party, that awards these benefits and compels the county clerk to design the ballot to prominently feature their endorsees. By successfully seeking intervention, CCDC concedes that the ballot design features under review in this matter are not just rigged, but are rigged in their favor. And understandably, CCDC wants this arrangement to continue, with all the benefits it confers. In a 2018 primary election ballot reprinted in the complaint, CCDC arranged for 7 columns of white ballot space to separate their preferred congressional candidate from his opponents who landed in Ballot Siberia. (DE1, ¶ 5; *see also id.* at ¶ 31, n. 18 and

2

supporting text describing how the primary ballot design leaves the political system susceptible to gamesmanship, such as in the emerging phenomenon of phantom candidates.)  CCDC only took advantage of this boon because the state's primary ballot design laws allowed it to. Why wouldn't it defend this spectacular advantage that current law gives it?

CCDC, of course, has the legal right to proclaim and defend the *status quo* of how the county clerks' implementation of New Jersey ballot design laws protects and entrenches them. ***But what CCDC cannot do is defend its desire to keep these benefits, while simultaneously denying that they even exist.*** This violates judicial estoppel which has been referred to as a "'doctrine against the assertion of inconsistent positions,' . . .  a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the *same* or in a *previous* proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from 'playing fast and loose with the courts.'"  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) (emphasis added).

To that end, in its motion for intervention, CCDC overtly and vigorously defends the gain of votes their candidates get from the current system, yet intentionally denies that that gain exists at all, or that it comes at the expense of Plaintiffs, who will experience a lost vote for every vote CCDC candidates gain. Not unlike climate skeptics who will only recognize facts selectively, CCDC denies the science supporting Plaintiffs' arguments, stating:

> Plaintiffs' argument that a "visual heuristic" drives voter decisions and choice is equally without merit. Plaintiffs, relying on "statistical analysis" performed by Dr. Wang and Dr. Pasek, allege that the 'display of information on a ballot can provide a visual heuristic which drives voter decisions and choice, "mak[ing] it easier for a voter to make choices listed first, clustered near one another, and/or arranged in an orderly line." [DE1,] ¶ 111. Plaintiffs' reliance on "reports" that suggest that voters "may tend to rely on heuristics or low-information cues to reach conclusions" *id.* ¶ 116, or that the way information is displayed on a ballot can "tend to nudge voters toward particular choices," *id.* ¶ 112, is theoretical at best. Plaintiffs' hypothetical conjecture cannot eliminate the constitutionally protected associational rights afforded to CCDC.

[DE41-1, pp. 17-18.]

This approach should not be tolerated. While CCDC is certainly free to defend the benefits it obtains from the current ballot design laws, it cannot simultaneously deny that those benefits exist. The studied effects show that the county line (both combined with and independent of the benefits of primacy), drives voters' choice to the benefit of candidates

featured on it, changes vote totals, and even affects election outcomes of competitors who are not featured on the county line. These are over and above the separate harms visited on candidates who are not featured on the county line at all; who choose not to bracket with other candidates, or who (like Schoengood) never even have a chance at the favored first ballot position for the office they are seeking. (*See* DE1, ¶ 187). Moreover, the benefit that CCDC earns from the challenged ballot is above and beyond the associational rights on the ballot it already enjoys in the form of a ballot slogan or endorsement, benefits that are not uniformly present on primary ballots in other states.[1]

Furthermore, CCDC's arguments accept that it is effectively <u>county party organizations</u> and their leadership that control the levers of power in deciding which candidates shall receive the benefits of New Jersey's ballot ordering system. (DE41-1, pp. 10-11, 15.) This is exactly what Plaintiffs contend in DE1, para 14 & n.10.[2] But CCDC proceeds to deny these paragraphs in its proposed answer.[3] CCDC cannot simultaneously claim that it is the entity that has the power to compel the Defendant County Clerks to award favored ballot position advantage to it, and simultaneously deny that same fact in its proposed answer. (*Compare* DE41-1, pp. 10-11, 15 *and* DE 41-3, *supra* n. 2.)

The Court should not tolerate CCDC's "fast and loose" position of, one the one hand, (1) defending the benefits it receives from the line in support of its Motion to Intervene, and simultaneously denying those benefits even exist in its proposed Answer; while on the other

---

[1]  If federal constitutional law compelled primary ballots to be in "county line" style, and compelled the allowance of ballot slogans for all candidates, one would expect these features to be commonplace. The fact is that all other 49 states and two New Jersey counties do not design their ballots in a "county line" method, and the fact that slogans are only allowed sporadically, undermines CCDC's claim that the <u>U.S. Constitution</u> affords them such rights.

[2]  Paragraph 14 of the Verified Complaint provides: "Although each county in New Jersey slightly differs in how it effectuates its endorsements, a county party chair's endorsement is always extremely influential, and in may counties is the sole determining factor in who receives the county party's endorsement (including in many of the counties that have already endorsed Murphy). In turn, in practice, the candidate endorsed by county party leaders ends up being featured on the county line with the county party slogan, and thus will receive ballot advantages over their opponents.[10]"

The accompanying footnote 10 offers: "Technically, bracketing requests are run through the campaign manager of joint petition county candidates, N.J.S.A. 19:49-2, and if the slogan is the same as that of a New Jersey incorporated association, the corporation's permission is required. N.J.S.A. 19:23-17. In practice, the county chair of the county party has authority to make such decisions or closely controles those that have such authority."

[3]  CCDC's Answer accompanying the Motion to Intervene responds to Plaintiff's Verified Complaint Paragraph 14 (set out in *supra* n.2): "The allegations in this paragraph are not directed at Intervening Defendant, and, therefore, no response is required. To the extent a response is required, the allegations are denied." (Proposed Answer accompanying Motion to Intervene, DE 41-3).

4

hand (2) asserting in its Motion to Intervene that it is the entity responsible for compelling the county clerk to design a party-line ballot to its own benefit, and then simultaneously denying that same fact in its proposed Answer. The Court should not have to speculate about which internally contradictory segments of CCDC's documents should be considered credible, and which should be dismissed.

Thus, Plaintiffs are compelled to contest the motion to intervene insofar as it is based on illusion. If granted, the movant would have access to full participation in the litigation, including, presumably, full participation in an evidentiary hearing on an emergency basis, in the face of simultaneously asserting certain facts and simultaneously denying their existence.

To be clear, Plaintiffs do not wish to silence CCDC's voice in a matter of such large public import. However, its voice is more appropriately served by converting the motion to intervene to a motion to participate as *amicus curiae*.[4] Indeed, the Court's scheduling order does not exclude the engagement of amicus parties, and Plaintiffs consent to CCDC's engagement in that capacity. In this manner, CCDC, like the other potential *amici*, may bring the Court's attention to certain matters that it believes may have otherwise escaped consideration or sufficient attention, including perspectives uniquely advanced by such friends of the court.

What defies logic, however, is a chimera of asserting an interest that essentially admits a political advantage in the ballot design in order to gain expanded participation in this matter, and then, once that access is extended, to be only met with a series of denials by that party that such an advantage exists. Such posturing defies the efficiency of judicial resources which the current phase of litigation requires. The Federal Rules of Civil Procedure offer a reasonable solution.

Fed. R. Civ. P. 24 provides for intervention of right "unless existing parties adequately represent that interest," and for permissive intervention unless "intervention will unduly delay or prejudice the adjudication of the original parties' rights." The centerpiece of this litigation concerns the fundamental right to vote, and constitutional rights which flow therefrom. Accordingly, the tests to be applied on Plaintiffs' First and Fourteenth Amendment claims will be either strict scrutiny or the *Anderson-Burdick* balancing test. Under either permutation, the interests to be balanced, at a minimum, are those that relate to the Plaintiffs' asserted burdens as compared to interests articulated by the *government*. Notably, that balancing test does not directly involve those of a third-party political actor. The same holds true for Plaintiffs' Elections

---

[4] The Court may properly exercise discretion in denying a motion to intervene on factors such as its timeliness or the proposed intervenor's litigation conduct. *United States v. Wegeler*, 941 F.3d 665, 672 (3d Cir. 2019) ("we generally review dispositions of motions to intervene for abuse of discretion"). A court's power to deny a motion to intervene but to convert it to a motion for leave to appear amicus curiae, and grant that motion, also appears to be an appropriate subject for the exercise of discretion. *Kromnick v. Sch. Dist. of Philadelphia*, 739 F.2d 894, 900 (3d Cir. 1984).

Clause claims: the issue there is whether *government* (not private political entities) has exceeded its power by structuring state law in a way that dictates electoral outcomes Moreover, the governmental interests are more than adequately advanced by the 19 participating Defendant County Clerks, who are also ably positioned to address the burden claimed by the Plaintiffs, or by the Attorney General's Office should it join the action. Accordingly, there are "existing parties" here who "adequately represent" any interests as they relate to whether the state may confer ballot advantages beyond endorsements or slogans. And further, given the current phase of litigation, and in light of the illusory interests asserted only to gain access but then turn around to be denied upon that grant of access, it becomes clear that intervention will "unduly delay" and potentially even "prejudice" adjudication.

By comparison, the principles controlling amicus participation in district court, drawn generally from Fed. R. App. P. 29, contemplates the participation of amici to bring relevant matters to the attention of the Court so long as such participation does not simply burden the staff and facilities of the Court. Accordingly, there is a middle ground by which we may avoid undue delay or undue repetition while still allowing CCDC a means by which to contribute materially to proper disposition by the Court.

Respectfully submitted,

WEISSMAN & MINTZ                                BROMBERG LAW, LLC

By:   /s/ Brett M. Pugach                       By:   *Yael Bromberg*

By:   /s/ *Flavio L. Komuves*

Counsel for Plaintiffs