# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANDY KIM, in his personal capacity as a
candidate for U.S. Senate, et al.,

      *Plaintiffs*,

v.

CHRISTINE GIORDANO HANLON, in her
official capacity as Monmouth County Clerk, et
al.,

      *Defendants.*

Case No. 3:24-cv-01098

## BRIEF OF *AMICUS CURIAE* THE AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Liza Weisberg
Jeanne LoCicero
American Civil Liberties Union
  of New Jersey Foundation
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, NJ 07102
(973) 854-1705
lweisberg@aclu-nj.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF *AMICUS CURIAE* ...........................................................1

SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ...............................................................................4

I.  Primary elections in New Jersey are not administered neutrally ........................4

II. The state is constitutionally prohibited from regulating electoral competition with its thumb on the scale. ............................................8

    A. County clerks in New Jersey, through primary ballot design procedures, violate the neutrality principle and unconstitutionally engage in viewpoint-based discrimination. ...............................................10

    B. County clerks in New Jersey, through primary ballot design procedures, violate the neutrality principle and unconstitutionally burden the right to vote..................................................14

CONCLUSION ...........................................................................18

# TABLE OF AUTHORITIES

## CASES

*ACLU of N.J. v. Grewal*, No. 3:19-cv-17807 (D.N.J. Mar. 11, 2020)......................1

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................. 9-10, 15

*Burdick v. Takushi*, 504 U.S. 428 (1992).........................................14, 15

*Burson v. Freeman*, 504 U.S. 191 (1992) ...................................................9

*Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000) ..............................8

*Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021)........................................................................................2

*Cook v. Gralike*, 531 U.S. 510 (2001) ...............................................11, 12

*Correa v. Grossi*, 458 N.J. Super. 571 (App. Div. 2019)...........................1

*Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64 (3d Cir. 1999)...........4

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)................14

*Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ............9

*Gould v. Grubb*, 14 Cal. 3d 661 (1975) ...........................................15, 16

*Holland v. Rosen*, 277 F. Supp. 3d 707 (D.N.J. 2017), *aff'd*, 895 F.3d 272 (3d Cir. 2018)........................................................................................2

*Hunter v. Erickson*, 393 U.S. 385 (1969) .................................... 10

*Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979)...... 14

*Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320 (D.N.J. 2016)........................................................................................2

*Matal v. Tam*, 582 U.S. 218 (2017) .......................................................11

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014)............9, 17

*N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008) ............9

*Norman v. Reed*, 502 U.S. 279 (1992)....................................................15

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ...............................10

*Reynolds v. Sims*, 377 U.S. 533 (1964) ....................................................15

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .................10

*Save Camden Pub. Sch. v. Camden City Bd. of Educ.*, 454 N.J. Super. 478 (App. Div. 2018) ....................................................................................1

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)...........................................9

*State v. DeAngelo*, 197 N.J. 478 (2009) .......................................................1

*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)..................................9

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)..............................14

*W.J.A. v. D.A.*, 210 N.J. 229 (2012) .............................................................1

*Williams v. Rhodes*, 393 U.S. 23 (1968) .........................................................8

## CONSTITUTIONS

U.S. Const. art. I, § 4, cl. 1 .......................................................................9

## STATUTES

N.J.S.A. 19:1-1..........................................................................................4

N.J.S.A. 19:5-3..........................................................................................5

N.J.S.A. 19:23-17......................................................................................5

N.J.S.A. 19:23-18......................................................................................5

N.J.S.A. 19:23-24......................................................................................6

N.J.S.A. 19:23-26.1...................................................................................6

N.J.S.A 19:49-2..........................................................................................5

## OTHER AUTHORITIES

Alexander J. Law, *The Restoration of Anti-Corruption as a Constitutional Principle*, 14 Alb. Gov't L. Rev. 144 (2021) ...................................................7

Brett M. Pugach, *The County Line: The Law and Politics of Ballot Positioning in New Jersey*, 72 Rutgers U. L. Rev. 629 (2020)......................................4, 5, 7

Julia Sass Rubin, *The Impact of New Jersey's County Line Primary Ballots on Election Outcomes, Politics, and Policy*, 48 Seton Hall J. Legis. & Pub. Pol'y 48 (2023) .....................................................................5, 6, 7, 8

Ryan P. Haygood et al., *The End of the Line: Abolishing New Jersey's Antidemocratic Primary Ballot Design*, 48 Seton Hall J. Legis. & Pub. Pol'y 4 (2023) .......................................................................................17

Samuel S.-H. Wang, *Three Tests for Bias Arising from the Design of Primary Election Ballots in New Jersey*, 48 Seton Hall J. Legis. & Pub. Pol'y 24 (2023) ........................................................................................7

## INTEREST OF *AMICUS CURIAE*

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to the principles embodied in the United States Constitution and our nation's civil rights laws. The American Civil Liberties Union of New Jersey (ACLU-NJ) is a state affiliate of the ACLU whose mission is to preserve, advance, and extend the individual rights and liberties guaranteed to every New Jerseyan. Founded in 1960 and based in Newark, the ACLU-NJ operates on several fronts–legal, political, cultural–to bring about systemic change and build a more equitable society.

As further documented in the certification in support of its motion to file an *amicus curiae* brief, the ACLU-NJ has participated in a wide variety of cases, directly representing parties or in an *amicus curiae* capacity, involving election law and voting rights issues. *See, e.g.*, *Correa v. Grossi*, 458 N.J. Super. 571 (App. Div. 2019); *Save Camden Pub. Sch. v. Camden City Bd. of Educ.*, 454 N.J. Super. 478 (App. Div. 2018). The ACLU-NJ is also a frequent litigant and friend of the court in cases involving free speech. *See, e.g.*, *ACLU of N.J. v. Grewal*, No. 3:19-cv-17807 (D.N.J. Mar. 11, 2020); *W.J.A. v. D.A.*, 210 N.J. 229 (2012); *State v. DeAngelo*, 197 N.J. 478 (2009).

The ACLU-NJ has a track record of helping to inform the resolution of cases before this Court as *amicus curiae.* For example, the Court's published opinion in

*County of Ocean v. Grewal* includes several references to the ACLU-NJ's *amicus* brief and the issues elucidated therein. 475 F. Supp. 3d 355, 363 n. 5, 365 n. 6, 381 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021); *see also Holland v. Rosen*, 277 F. Supp. 3d 707, 724 (D.N.J. 2017), *aff'd*, 895 F.3d 272 (3d Cir. 2018); *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 340 (D.N.J. 2016).

As a nonpartisan advocacy organization, the ACLU-NJ is exclusively concerned with the constitutional issues presented in this matter and does not endorse or oppose any candidate for elected office. The special interest and expertise of the ACLU-NJ in these areas of constitutional law are substantial.

## SUMMARY OF ARGUMENT

The state has an obligation to serve as a neutral referee in administering elections. The integrity of self-government depends on it. But in New Jersey, the state steps outside this role. A unique feature of New Jersey's primary ballots known as the "county line" upsets the competitive mechanisms of the electoral process. Through the county line, the government manipulates election outcomes by giving preferential treatment to candidates who have won the endorsement of county committees of state-recognized political parties. In so doing, the government engages in viewpoint discrimination and undermines every primary voter's right to cast a free and effective ballot. The county line is unconstitutional.

The ballot box, no less than the town square, is a site of public debate and ideological competition. Government neutrality in the regulation of these fora is essential to a fair and functioning marketplace of ideas, which is the cornerstone of the First Amendment and the foundation of democracy. When the government fixes the marketplace rules to influence the results of political contests, it distorts the democratic process.

Voters express their political will by selecting candidates. In New Jersey, the state, through primary ballot design procedures, boosts the electoral prospects of some candidates and hinders the prospects of others. It thereby privileges the viewpoints of some voters and devalues the viewpoints of others. Indeed, the county line subjects all voters to the state's improper ideological coercion, in glaring violation of the First Amendment.

The state commits another constitutional offense when it fails to observe political neutrality in election administration: it severely burdens the right to vote. Free choice is the essence of the franchise right. But when county clerks in New Jersey organize primary ballots around the county line, they undercut that freedom and, to a substantial extent, predetermine voters' selections. They also abridge the right to vote by siphoning power away from voters and into the hands of the county committees of political parties. The ballot is meaningful because it a mandate and a mechanism of political accountability. New Jersey's primary ballot structure

3

teaches candidates to court county party leaders instead of constituents. As a result, voters wield diminished authority.

County clerks in New Jersey, through primary ballot design procedures, debase voters' rights to assert their independent political preferences and exercise power at the polls. The Court should preliminarily enjoin the use of these unconstitutional procedures.[1]

## ARGUMENT

### I.   Primary elections in New Jersey are not administered neutrally.

The "county line" is a feature of New Jersey's primary elections that allows county committees of political parties to grant a slate of candidates a uniquely powerful form of endorsement. [2] County clerks transmute that endorsement into ballot advantages that are nearly impossible for challengers to overcome. No other state conducts its primary elections in this way. Brett M. Pugach, *The County Line:*

---

[1] *Amicus curiae* confines its brief to a discussion of the legal merits in this case and does not take a position on factual disputes regarding the feasibility of implementing ballot design changes ahead of the June 2024 primaries or on other elements of the preliminary injunction standard.

[2] While many organizations may consider themselves political parties, for the purposes of New Jersey's administration of elections, the definition of "political party" is limited to those that garner at least 10% of the total votes cast in regular elections for the General Assembly. N.J.S.A. 19:1-1. Only Democrats and Republicans have met the statutory threshold since it was enacted. *See, e.g.*, *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 68 (3d Cir. 1999) ("At present, the only recognized political parties in New Jersey are the Democratic and Republican parties.").

*The Law and Politics of Ballot Positioning in New Jersey*, 72 Rutgers U. L. Rev. 629, 631 (2020).

The county line works as follows: By law, candidates who file a joint petition and "choose the same designation or slogan" for the primary election have their names "drawn for position on the ballot as a unit," and "shall have their names placed on the same line" of the ballot by the county clerks. N.J.S.A 19:49-2; *see also* N.J.S.A. 19:23-18. Candidates thus become "bracketed." The county committee of a political party, N.J.S.A. 19:5-3, is empowered to endorse favored candidates. "The slogan used by county committee-endorsed candidates is often owned by a corporation" controlled by party insiders, which, in accordance with New Jersey's slogan consent restrictions,[3] extends "permission for the slogan's use to the slate of candidates endorsed by the county committee." Pugach, *supra*, at 654. Thus, county committees may ensure that a handpicked set of candidates appear together as a group under the same slogan on primary ballots—a formation known as the county line.[4] Earning or failing to earn a place on the county line is frequently the most decisive factor in a primary candidate's campaign.

---

[3] New Jersey law requires those who wish to use a ballot slogan containing the name of another person or an incorporated association to receive the written consent of that person or entity. N.J.S.A. 19:23-17.

[4] County line primary ballots are used in nineteen of New Jersey's twenty-one counties. Julia Sass Rubin, *The Impact of New Jersey's County Line Primary Ballots on Election Outcomes, Politics, and Policy*, 48 Seton Hall J. Legis. & Pub.

Once petitions are filed and the bracketing deadline passes, the county clerks choose a specific office as the "pivot point." The pivot point is the first column (or, less commonly, row, depending on the ballot design) on the primary ballot. When a primary ballot includes candidates for U.S. Senate, that office is treated as the pivot point; if the ballot includes gubernatorial candidates and no U.S. Senate candidates, the governorship is treated as the pivot point office. *See* N.J.S.A. 19:23-26.1. Otherwise, county clerks have discretion to select a pivot point, and do so with varied and unpredictable results. County clerks then draw by lottery all pivot point candidates' names and place them on the ballot in the order drawn. N.J.S.A. 19:23-24. This is known as the "preferential ballot draw." Once pivot point candidates are placed on the ballot in the preferential ballot draw, all candidates who are bracketed with the pivot point candidates are placed in the same column or row—i.e., on the line. Thereafter, unbracketed candidates are arrayed on the ballot according to a series of non-preferential ballot draws. Unless competing for a "pivot point" office, unbracketed candidates never have a chance to appear in first position on the ballot.

---

Pol'y 48, 49 (2023). Everywhere else around the country, primary ballots are organized by electoral position; most states list candidates beneath the position they are seeking, while a few list candidates to the right of the position. *Id.* These ballot structures make it relatively intuitive for voters to identify which candidates are running for which electoral position and to select their preferred candidates. *Id.*

6

Why is the county line so influential? First, simply appearing in a group with other candidates produces a cognitive bias described as the "weight of the line." The "weight of the line" encourages straight-ticket voting for the grouped ("bracketed") candidates. *See* Samuel S.-H. Wang, *Three Tests for Bias Arising from the Design of Primary Election Ballots in New Jersey*, 48 Seton Hall J. Legis. & Pub. Pol'y 24, 38 (2023). What's more, the county line will often feature high-profile candidates running for the highest offices at the top of the ballot. Voters are much more likely to vote down the line for all candidates who are associated with the recognized names at the top of the ballot than they are to vote for a candidate on a different line. Pugach, *supra*, at 655.

Second, New Jersey allows bracketed candidates to participate in the preferential ballot draw, which means that they receive more prominent ballot positioning. *Id.* at 658. Thus, while party-backed candidates typically get placed on the first row or column, unbracketed candidates are often relegated to "ballot Siberia." Alexander J. Law, *The Restoration of Anti-Corruption as a Constitutional Principle*, 14 Alb. Gov't L. Rev. 144, 174 (2021).

Evidence of the line's influence is overwhelming. Researchers have examined races in which a candidate appears on the line in some counties and off the line in others. There were forty-five such instances between 2002 and 2022. Rubin, *supra*, at 58. "The average margin in performance for those forty-five

candidates between being on the county line and having their opponent on the county line was thirty-eight percentage points." *Id.* Being on the line confers a stronger advantage than incumbency. *Id.* at 60. In other words, even strong name recognition does not appear to counter the impact of the line. When a candidate runs with both the power of incumbency and the line, the candidate is essentially invulnerable to challenge; since 2009, no incumbent on the line in all counties in their district has lost a primary. *Id.* at 57.

## II.  The state is constitutionally prohibited from regulating electoral competition with its thumb on the scale.

Just as the First Amendment requires the government to remain neutral when it regulates the competition of ideas in public fora, so too does it demand that the government act neutrally in administering the ideological competition of elections. After all, "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968). The democratic process retains legitimacy only insofar as elections reflect the will of voters, and not of the state. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 590 (2000) (Kennedy, J. concurring) ("In a free society the State is directed by political doctrine, not the other way around.").

The state, therefore, must make itself ideologically invisible in this process, or else taint the electoral proving ground and constrain individual political expression and agency. "The First Amendment is designed and intended to remove

8

governmental restraints from the arena of public discussion . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *McCutcheon v. Fed. Election Comm'n,* 572 U.S. 185, 203 (2014) (internal quotation marks omitted). In this way, "[t]he First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208 (2008). This open marketplace is instrumental to free elections, "[f]or speech concerning public affairs is more than self-expression; it is the essence of self-government," *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (internal quotation marks omitted). "Without such a marketplace, the public could not freely choose a government pledged to implement policies that reflect the people's informed will." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 583 (2011).

The state's power to regulate the time, place, and manner of elections under the Elections Clause, U.S. Const. art. I, § 4, cl. 1, "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)). The government, therefore, may impose only "*evenhanded* restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v.*

*Celebrezze*, 460 U.S. 780, 788, n. 9 (1983) (emphasis added). These regulations must be structured with "the aim of providing a just framework within which the diverse political groups in our society may fairly compete . . . ," *Hunter v. Erickson*, 393 U.S. 385, 393 (1969) (Harlan, J., concurring).

### A. County clerks in New Jersey, through primary ballot design procedures, violate the neutrality principle and unconstitutionally engage in viewpoint-based discrimination.

The county line operates as a form of viewpoint discrimination—the most "egregious" variety of First Amendment violation. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Through the county line, county clerks in New Jersey embed favored viewpoints in primary ballots. Distorting and disabling competition among electoral candidates in this way is at odds with the proper role of government in administering elections and with foundational tenets of First Amendment law.

Viewpoint discrimination occurs when the government "targets not subject matter, but particular views taken by speakers on a subject." *Id.* Regulations that elevate the viewpoints of certain speakers over others are subject to strict scrutiny and presumptively unconstitutional. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015); *Rosenberger*, 515 U.S. at 829-830.

The state's obligation to observe viewpoint neutrality applies—indeed, is at its pinnacle—when designing and disseminating ballots. Ballots function as

instruments of public debate in the political marketplace of ideas. When the government designs ballots that advantage some candidates and disadvantage others, it warps the marketplace. *See Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring) (reasoning that "[t]he First Amendment's viewpoint neutrality principle . . . . protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses" and that violating the neutrality principle can "distort the marketplace of ideas."). This distortion injures not only disadvantaged candidates, but all voters, who are constitutionally entitled to participate in the democratic process free from the government's ideological coercion.

In *Cook v. Gralike*, for example, the Supreme Court held unconstitutional Article VIII of the Missouri Constitution, which required that labels be placed on the ballot next to the names of certain candidates who had failed to take legislative action to support congressional term limits or failed to take a pledge committing to such action. 531 U.S. 510, 514-15, 526-27 (2001). The ballot labels read: "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS," respectively. *Id.* at 514-15. The majority opinion confined its analysis to the Elections Clause, determining that the Article VIII ballot labels were not an authorized form of election regulation thereunder. *Id.* at 525-26. But in concurrence, Justice

11

Rehnquist, joined by Justice O'Connor, offered another reason to invalidate them:

Article VIII "discriminates on the basis of viewpoint." *Id.* at 531-32 (Rehnquist, J.,

concurring). Only candidates who did not conform to the state's policy preferences

received "derogatory" ballot treatment. *Id.* at 532.

> The result is that the State injects itself into the election
> process at an absolutely critical point—the composition of
> the ballot, which is the last thing the voter sees before he
> makes his choice—and does so in a way that is not neutral
> as to issues or candidates.

*Id.* The candidates were free to advertise their positions on term limits "with

speech of their own," the concurrence explained, "[b]ut the State itself may not

skew the ballot listings in this way without violating the First Amendment." *Id.*

Analogously, county clerks in New Jersey inject themselves into the election

process at the ballot composition stage in a biased and prejudicial manner. The

clerks amplify the county committees' ideologically motivated candidate

endorsements through ballot composition choices and preferential draws.[5]

---

[5] To be clear, the parties' ability to denote candidate endorsements on ballots, through slogans or otherwise, is not at issue here; at issue is the state's ability to confer ballot advantages that typically correspond with party endorsements. These advantages would be unconstitutional even if they were entirely divorced from party endorsements, as they would still reflect the government's improper role in skewing the ballot to favor certain candidates, thus distorting the electoral marketplace of ideas. Plaintiffs' experts have demonstrated that candidates derive "a specific benefit from being on the county line that is separate from party endorsement." *See* Ver. Compl., Exh. D, Expert Report by Dr. Samuel S.-H. Wang, at 13. The county line confers an average additional seventeen

Candidates favored by the committees receive advantageous ballot placement, while disfavored candidates are sent to "ballot Siberia"—treatment akin to a derogatory label. Indeed, Plaintiffs' experts show that "the magnitude of the biases we observe . . . amounts to an enormous handicap in favor of candidates who are featured on the county line." *See* Ver. Compl., Exh. B, Expert Report by Dr. Josh Pasek, at 79.

Primary elections should measure the electorate's needs, priorities, and values. Voters assert those needs, priorities, and values through candidate selection. In New Jersey, because of the state's ballot design procedures, primary elections measure party preferences above all, and voters' needs, priorities, and values are effectively censored. The state thus privileges the viewpoints of some voters and demeans the viewpoints of others. Importantly, *all* voters are denied the chance to express their political attitudes in a neutral forum, free from government interference and influence.

This viewpoint-based discrimination, effectuated through ballot design procedures, cannot withstand strict scrutiny. Generalized arguments that the procedures promote election integrity and clarity are belied by direct evidence that

---

percentage points over party endorsement alone for nonincumbent candidates. *Id.* at 12.

they do the opposite. To be sure, the ballot design procedures are not narrowly

tailored to serve those ends. The county line offends the First Amendment.

**B.   County clerks in New Jersey, through primary ballot design procedures, violate the neutrality principle and unconstitutionally burden the right to vote.**

When the state steps outside the bounds of the First Amendment and uses its

administrative apparatus to influence primary election outcomes, it debases the

right to vote in two ways: (1) by limiting voters' right to freely choose for whom to

vote and (2) by diminishing the power of a voter's primary ballot.

"It is beyond cavil that 'voting is of the most fundamental significance under

our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)

(quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184

(1979)). The judiciary is thus "obliged to train a skeptical eye on any qualification

of that right." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 210 (2008).

Yet "[n]o bright line separates permissible election-related regulation from

unconstitutional infringements on First Amendment freedoms." *Timmons v. Twin

Cities Area New Party*, 520 U.S. 351, 359 (1997). Rather, under what has come to

be known as the *Anderson-Burdick* balancing test, "the rigorousness of [a court's]

inquiry into the propriety of a state election law depends upon the extent to which a

challenged regulation burdens" the plaintiff's rights. *Burdick*, 504 U.S. at 434.

Evaluating these alleged burdens, in turn, requires a "weighing" of several factors,

including: (1) the "character and magnitude" of the alleged constitutional injury; (2) "the precise interests put forward by the State as justifications for the burden imposed by its rule[;]" and (3) "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.

If, according to these factors, the challenged regulation imposes "'severe' restrictions" on the plaintiff's rights, then the law may be upheld as constitutional only if it is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). In other words, strict scrutiny applies. However, if the challenged "provision imposes only 'reasonable, nondiscriminatory restrictions'" upon the plaintiff's rights, *id.* (quoting *Anderson*, 460 U.S. at 788), the state need only show that its "legitimate interests" in upholding the law "sufficient[ly] . . . outweigh" the burden imposed on the plaintiff. *Id.* at 440.

Choice is foundational to the franchise right. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Because "[a] fundamental goal of a democratic society is to attain the free and pure expression of the voters' choice of candidates," the government must "avoid any feature that might adulterate or, indeed, frustrate, that free and pure choice." *Gould v. Grubb*, 14 Cal. 3d 661, 677

(1975). "In our governmental system, the voters' selection must remain untainted by extraneous artificial advantages imposed by weighted procedures of the election process." *Id.*

The county line is an extraneous artificial advantage that significantly taints voters' choice in primary elections. As Plaintiffs' expert Dr. Samuel S.-H. Wang demonstrates in his report, when voters mark primary ballots structured around the county line, they are not exercising cognitive independence; rather, they are reacting to visual cues that drive their behavior and make their selections almost inevitable. *See* Ver. Compl., Exh. D, Expert Report by Dr. Samuel S.-H. Wang, at 6-7. In other words, while enjoying the illusion of genuine choice, voters are actually reproducing choices already made by county committees and cemented by county clerks. *Id.* at 16 (concluding, "[b]ased on principles of neuroscience and statistical testing," that "the physical arrangement of candidate names on the county line acts as a powerful force to steer voter behavior toward choices made by the county party chair.").

In addition to manipulating voter choice, the county line undermines the right to vote by weakening voters' authority at the polls and sapping the ballot of its force and impact. The right to vote encompasses the right to influence the political process through electoral accountability. In this way, elections are not only contests, but also mandates. When county committees and government

16

officials have the power to manipulate outcomes, candidates learn to orient their allegiance to those actors, rather than to constituents. The state thus erodes the "responsiveness [that] is key to the very concept of self-governance through elected officials," *McCutcheon*, 572 U.S. at 227.

Politicians in New Jersey are keenly aware of the importance of the county line in securing their political futures—and of who controls it. Because of this dynamic, elected officials are primarily accountable to party insiders rather than constituents. *See* Ryan P. Haygood et al., *The End of the Line: Abolishing New Jersey's Antidemocratic Primary Ballot Design*, 48 Seton Hall J. Legis. & Pub. Pol'y 4, 6 (2023). If an elected official does not campaign or govern as the county party desires, the candidate may lose the line and almost surely lose the primary as a result. This scheme's ultimate effect is to rob voters of their power, relocating that power in the hands of county parties and clerks.

In these two ways—by curtailing voter choice and shrinking voter power— the state, through its primary ballot design procedures, imposes a severe burden on the right to vote that none of the state's interests suffice to justify.

17

## CONCLUSION

For the forgoing reasons, *amicus curiae* urges the Court to grant Plaintiffs'

motion for a preliminary injunction.

Dated: March 12, 2024               Respectfully submitted,

                                    */s/ Liza Weisberg*
                                    Liza Weisberg (N.J. Bar No. 247192017)
                                    Jeanne LoCicero (N.J. Bar No. 02052000)
                                    American Civil Liberties Union
                                     of New Jersey Foundation
                                    570 Broad Street, 11th Floor
                                    P.O. Box 32159
                                    Newark, NJ 07102
                                    (973) 854-1705
                                    lweisberg@aclu-nj.org