## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ANDY KIM, et al.

              Plaintiffs,

v.

CHRISTINE GIORDANO HANLON,
in her official capacity as Monmouth
County Clerk, et al.

              Defendants.

Case No. 3:24-01098 (ZNQ-TJB)

---

**MOTION OF THE LEAGUE OF WOMEN VOTERS OF NEW JERSEY,
SALVATION AND SOCIAL JUSTICE,
NEW JERSEY ALLIANCE FOR IMMIGRANT JUSTICE, AND
NEW JERSEY POLICY PERSPECTIVE
FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION**

The League of Women Voters of New Jersey (LWVNJ), Salvation and Social Justice (SandSJ), New Jersey Alliance for Immigrant Justice (NJAIJ), and New Jersey Policy Perspective (NJPP) seek to appear as *amici* in this case because they can offer the Court a useful perspective not represented by the parties. LWVNJ, SandSJ, NJAIJ, and NJPP file this in accordance with the March 12, 2024 deadline set by the Court for *amici* filings.

The League of Women Voters of New Jersey (LWVNJ) is the New Jersey chapter of the national League of Women Voters, a nonprofit, nonpartisan,

1

grassroots organization working to protect and expand voting rights and ensure everyone is represented in our democracy. LWVNJ is committed to promoting civic engagement and protecting democracy in New Jersey through advocacy, voter education, and voter assistance. LWVNJ's work educating and empowering New Jersey's voters enables the organization to directly interact with a large population of New Jersey's residents and to learn about barriers to the ballot directly from New Jersey's diverse communities. LWVNJ advocates for policies that make it easier for New Jersey residents to vote, particularly residents who have traditionally confronted obstacles to exercising that right. LWVNJ has successfully advanced equitable voting rights reforms to remove barriers to the ballot and increase voter participation, including online voter registration and automatic voter registration, improved access to vote-by-mail, in-person early voting, and voting rights restoration for people on parole and probation. LWVNJ has led work on fair districting to prevent gerrymandering and to increase the power of New Jersey's diverse communities. LWVNJ also works with state and local election officials to educate voters on how to effectively cast a ballot, runs a voter assistance hotline, and works in collaboration with others to lead election protection work. LWVNJ has approximately 1,600 members, the vast majority of whom are New Jersey voters. This case will directly affect their right to vote, particularly in the upcoming primary election.

Founded in 2018, Salvation and Social Justice (SandSJ) is a nonpartisan, statewide racial justice organization in New Jersey. In line with its mission to lift up poor, underserved, and traditionally oppressed communities, SandSJ educates voters to use their voices to effect change. SandSJ has advocated for major voting rights efforts in the state, including restoring the right to vote to all people with criminal convictions and limiting police presence at voting locations, so that there are no barriers to the ballot. SandSJ also co-leads a statewide Souls to the Polls program to assist Black faith organizations in encouraging congregants, specifically Black residents, to vote in elections, including primary elections.

New Jersey Alliance for Immigrant Justice (NJAIJ) is New Jersey's largest immigration coalition. Comprised of over 55 member organizations, NJAIJ is a nonpartisan organization that fights for policies that empower and protect immigrants. New Jersey has the nation's second highest proportion of immigrants to total population, with nearly one in four New Jerseyans being foreign born. NJAIJ is regularly a leader in campaigns to expand voter protections, rights, and democracy, including fair and transparent redistricting, language access, and visibility for communities of color through data disaggregation.

New Jersey Policy Perspective (NJPP) is a nonpartisan think tank that focuses on state-level public policies that lift up economic, racial, and social justice through evidence-based research and analysis, strategic communications, and authentic

partnerships. NJPP has long published research and scholarship on democracy related issues in New Jersey, including two reports on the issues with the state's ballot design.

LWVNJ, SandSJ, NJAIJ, and NJPP's constituencies and members are voters. This case affects their right to vote, and LWVNJ, SandSJ, NJIAJ, and NJPP can speak to that impact. Moreover, LWVNJ, SandSJ, NJAIJ, and NJPP seek to participate at this stage of the case because the Court's disposition of the Motion for Preliminary Injunction could decide whether voters can subsequently seek redress for the infringement of their rights by this system.

This Court has "broad discretion" to grant LWVNJ, SandSJ, NJAIJ, and NJPP's request to file an amicus brief in this case. *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002) (quoting *Waste Mgmt. of Pa., Inc. v. City of York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995)). Courts "may permit third parties to appear in court as amicus curiae where they 'can contribute to the court's understanding of the' issues being presented to the court." *United States v. Bayer Corp.*, No. 2:07-00001, ECF No. 47 at 2 (D.N.J. Jan. 03, 2007) (granting two motions for leave to appear as *amicus curiae*) (quoting *Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987)).[1] This Court typically grants "[a]micus status . . . when: (1) the amicus has a

---

[1] As this Court explained in *Alkaabi,* "the Third Circuit's application of Fed. R. App. P. 29, which governs the appearance of *amici* in the United States Courts of Appeals, provides guidance to this Court." 223 F. Supp. 2d at 592.

'special interest' in the particular case; (2) the amicus' interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the amicus is not partial to a particular outcome in the case." *Alkaabi*, 223 F. Supp. 2d at 592; *see also Bayer Corp.*, No. 2:07-00001, ECF No. 47 at 2-3 (same standard). Importantly, the touchstone for this inquiry is whether the proposed amicus has "a sufficient 'interest' in the case" and whether its proposed brief will be helpful and relevant. *Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d 128, 129 (3d Cir. 2002) (quoting Fed. R. App. P. 29(b)).

These considerations weigh heavily in favor of granting LWVNJ, SandSJ, NJIAJ, and NJPP's request to file an amicus brief in this case. ***First***, as an organization dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance, LWVNJ is vitally interested in this case. Likewise, SandSJ, as an organization committed to racial justice through empowering voters in the state, has a substantial interest in this case. As the state's largest immigration coalition, which advocates for expanded voter protections and a more inclusive democracy, especially for newly naturalized citizens and the immigrant community in New Jersey, NJAIJ has a vested interest in this case. And finally, as a nonpartisan organization that has, for years, researched and published democracy-related issues in New Jersey, including on the state's ballot design, in order to drive policy change, NJPP has a significant interest in this

case. LWVNJ, SandSJ, NJAIJ, and NJPP advocate for policies that make it easier for New Jersey voters to exercise their right to vote. LWVNJ also works with state and local election officials to educate voters on how to effectively cast a ballot. SandSJ engages in voter education on the importance of elections and has worked to restore voting rights to disenfranchised people. NJAIJ regularly leads campaigns, among newly naturalized citizens and within immigrant communities, to educate voters with limited English proficiency and to advocate for voter protections, voter rights, and inclusive democracy tools that impact these communities. And through publications and public engagement, NJPP educates voters on issues impacting New Jersey's democracy, such as prison gerrymandering and the state's ballot design. Through this work, LWVNJ, SandSJ, NJAIJ, and NJPP and seek to promote an open governmental system in New Jersey that is representative, accountable, and responsive. This case will directly affect the ability of New Jersey voters, including LWVNJ's and NJAIJ's members and voters in the communities that SandSJ and NJPP serve, to accurately record their votes.

As detailed in LWVNJ, SandSJ, NJAIJ, and NJPP's proposed amicus brief, New Jersey's ballot design rules burden the right to vote and threaten the integrity of the democratic process. *See* Ex. 1 at 6-28. If these rules remain in effect, they will continue to impede voters—and particularly voters of color—across New Jersey from effectively casting their ballots. *See* Ex. 1 at 16-28. They will also continue to

6

hinder LWVNJ, SandSJ, NJAIJ, and NJPP's efforts to empower voters, especially Black, Latino/a, Asian and other voters of color, and newly naturalized citizen voters, and strengthen democracy in New Jersey. LWVNJ, SandSJ, NJAIJ and NJPP therefore have a significant stake in this case. Their brief will apprise this Court how the challenged ballot design rules and practices impact voters and how potential remedies can alleviate these effects.

**Second,** LWVNJ, SandSJ, NJAIJ, and NJPP's interests and those of New Jersey voters "[are] not represented . . . in the case." *Alkaabi*, 223 F. Supp. 2d at 592. The Plaintiffs are three current candidates for New Jersey office. Verified Compl., p. 14. Although Plaintiffs are voters themselves, Plaintiffs' interests differ from those of New Jersey voters generally because they are candidates for New Jersey office. However well intentioned, Plaintiffs do not represent the interests of New Jersey voters from all walks of life and across the political spectrum. LWVNJ, SandSJ, NJAIJ, and NJPP are nonpartisan organizations whose missions center on empowering their members and the voters of New Jersey. They do not recruit or endorse any candidates of any party and do not work toward electing them. Their interests are instead focused on voter education and empowerment.

LWVNJ, SandSJ, NJAIJ, and NJPP are well-positioned to help the Court understand how New Jersey's ballot design rules burden the right to vote of New

Jersey voters, regardless of their political affiliations and views. This Court should allow this perspective, which otherwise may not be presented.

**Third,** LWVNJ, SandSJ, NJAIJ, and NJPP's brief is timely filed. Because the Federal Rules of Civil Procedure and the Local Rules of this Court do not address amicus briefs, Rule 29 of the Federal Rules of Appellate Procedure "provides guidance to this Court." *Alkaabi*, 223 F. Supp. 2d at 592. Traditionally, Rule 29(a)(6) provides that an amicus brief and motion are timely if filed no later than seven days after the principal brief of the party supported. Fed. R. App. P. 29(a)(6). However, Rule 29(a)(6) allows for later filing if a court grants leave and specifies the new time period in which to answer. In this case, this Court provided until March 12, 2024 for proposed *amici* filings. As such, LWVNJ, SandSJ, NJPP, and NJAIJ filed this motion with attached brief by the March 12, 2024 deadline.

Additionally, the attached amicus brief will help this Court reach a decision on questions directly at issue in the Motion for Preliminary Injunction. For instance, the County Clerk Defendants[2] erroneously contend that New Jersey's ballot design rules do not burden the right to vote because the ballot design "does not restrict voters' *access* to vote for the candidate of their choice." Dkt. 63 at 23. As LWVNJ,

---

[2] Angelo J. Genova, Esq., Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, *Kim v. Hanlon*, on behalf of Defendants Christopher Durkin, Joanne Rajoppi, and Danielle Ireland-Imhof.

SandSJ, NJPP, and NJAIJ's amicus brief explains (Ex. 1 at 24-27), the right to vote does not protect only against laws that expressly "restrict voters' ability to vote for their candidate of choice," as the Defendants would have this Court believe (Dkt. 63 at 23). Voters also have a right not to be misled and confused by ballot designs. *See* Ex. 1 at 24-27. New Jersey's ballot design rules burden New Jerseyans' right to vote in that very way, and often disproportionately burden voters of color. *See* Ex. 1 at 7-27. The perspective of New Jersey voters on these questions would be valuable to the Court.

*Fourth,* "[w]hile the partiality of an amicus is a factor to be considered by a court in deciding whether to allow participation, there is no rule that amici must be totally disinterested." *Alkaabi*, 223 F. Supp. 2d at 592 (citing *Waste Mgmt. of Pa., Inc.*, 162 F.R.D. at 36). "Parties with . . . policy interests have been regularly allowed to appear as *amici*." *Id.* And this Court often grants *amici* leave to file briefs in support of or opposition to a party's motion. *See, e.g.*, *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health and Human Serv.*, No. 3:21-00634 (D.N.J. Feb. 26, 2021) (granting motion for leave to file amicus brief in support of plaintiffs' motion for a preliminary injunction); *Foley v. Horizon Blue Cross Blue Shield of NJ, Inc.*, No. Civ. 06-6219 FSH, 2007 WL 2694069, at *1 (D.N.J. Sept. 11, 2007) (granting motion for leave to submit amicus brief in support of defendant's motion to dismiss).

While LWVNJ, SandSJ, NJAIJ, and NJPP's amicus brief will support Plaintiffs, their sole objective in this case is to ensure that New Jersey's democratic process enables voters—and particularly Black, Latino/a, Asian, and other voters of color, newly naturalized citizen voters, and other historically marginalized voters—to effectively cast their ballots and to hold their elected officials accountable. LWVNJ, SandSJ, NJAIJ, and NJPP seek to file this amicus brief to share with the Court their distinct insights on how ruling on the Motion for Preliminary Injunction could affect New Jersey voters across the state.

WHEREFORE, LWVNJ, SandSJ, NJAIJ, and NJPP respectfully request that the Court grant this motion for leave to file an amicus brief and accept the accompanying proposed brief (Ex. 1) for filing.

Dated: March 12, 2024                       Respectfully submitted,

                                    /s/ *Henal Patel*

                                    Henal Patel
                                    Ryan P. Haygood
                                    Nuzhat Chowdhury*
                                    Micauri Vargas
                                    NEW JERSEY INSTITUTE FOR
                                    SOCIAL JUSTICE
                                    60 Park Place, Suite 511
                                    Newark, New Jersey 07102
                                    Telephone: (973) 624-9400
                                    hpatel@njisj.org
                                    rhaygood@njisj.org
                                    nchowdhury@njisj.org
                                    mvargas@njisj.org

                                    Kevin Hancock*
                                    Aseem Mulji*
                                    CAMPAIGN LEGAL CENTER
                                    1101 14th St. NW, Ste. 400
                                    Washington, D.C. 20005
                                    Tel: (202) 736-2200
                                    Fax: (202) 736-2222
                                    khancock@campaignlegalcenter.org
                                    amulji@campaignlegalcenter.org
                                    *Counsel for Amici*

                                    *\* Pro Hac Vice applications*
                                    *forthcoming*

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ANDY KIM, et al.

        Plaintiffs,

v.

                          Case No. 3:24-01098 (ZNQ-TJB)

CHRISTINE GIORDANO HANLON,
in her official capacity as Monmouth
County Clerk, et al.

        Defendants.

## BRIEF OF *AMICI CURIAE*
## THE LEAGUE OF WOMEN VOTERS OF NEW JERSEY,
## SALVATION AND SOCIAL JUSTICE,
## NEW JERSEY ALLIANCE FOR IMMIGRANT JUSTICE, AND
## NEW JERSEY POLICY PERSPECTIVE
## IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF *AMICI CURIAE* ..................................................................1

BACKGROUND & SUMMARY OF ARGUMENT ...........................................4

ARGUMENT ...............................................................................................7

   I.  New Jersey's Primary Ballot Design is Antidemocratic, Discriminatory and Unconstitutional and Needlessly Burdens New Jersey Voters ..............................7

     A.  New Jersey's Antidemocratic Primary Ballot Design Rules Subvert the Democratic Process ..........................................................................7

       i. New Jersey's Antidemocratic Primary Ballot Design Manipulates, Misleads, and Confuses Voters...............................................................7

       ii. New Jersey's Antidemocratic Primary Ballot Design Rules Disproportionately Harm Voters and Candidates of Color ...................16

     B.  New Jersey's Antidemocratic Primary Ballot Design Rules Unjustifiably Burden the Right to Vote.................................................................24

     C.  The State Has No Legitimate Interest in Forcing Voters to Try to Navigate a Manipulated, Misleading and Confusing Ballot.........................................28

   II.  New Jersey's Antidemocratic Primary Ballot Design Rules Will Imminently Harm Voters in the Upcoming 2024 Elections Without Court Intervention .......30

     A.  Absent a Preliminary Injunction, New Jersey Voters, Particularly its Black, Latino/a, Asian and other Voters of Color, Will Face Imminent, Irreparable Harm ................................................................................30

     B.  The Balance of Hardships Decisively Shifts Towards the Concerns of the Voters.................................................................................32

     C.  A Preliminary Injunction Must be Granted for the Public Interest............34

   III. The Purcell Principle Does Not Apply Here and Does Not Obstruct the Specific Relief Requested in this Instance .........................................................36

CONCLUSION.............................................................................................39

i

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................................25

*Burdick v. Takushi*, 504 U.S. 428 (1992)................................................ 25, 29

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86 (3d Cir. 1992...........................31

*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) .....35

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008).......................... 25, 28

*Crowe v. De Gioia*, 90 N.J. 126 (1982) ............................................. 30, 32

*Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) ................................................................................................... 30, 32

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................31

*Gould v. Grubb*, 14 Cal. 3d 661 (1975) .......................................... 26, 29

*Graves v. McElderry*, 946 F. Supp. 1569 (W.D. Okla. 1996) ...............................26

*Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792 F. App'x 218 (3d Cir. 2019).......... 30, 31

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ..............35

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, --- F.4th ---, 2022 WL 1435597 (11th Cir. May 6, 2022) ........................................................36

*McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980)........................................ 26, 29

*Merrill v. Milligan,* 142 S. Ct. 879 (2022)................................................37

*Nelson v. Warner*, 477 F. Supp. 3d 486 (S.D. W.Va. 2020)...................... 25, 26, 29

Norman v. Reed, 502 U.S. 279 (1992) ................................................ 25, 28

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020)...................................35

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ....................................................36

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) .....36

*Reynolds v. Sims*, 377 U.S. 533 (1964) ....................................................25

*Sonneman v. State*, 969 P.2d 632 (Alaska 1998)............................................26

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) .......35

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)................................ 30, 32

*Wisc. Legis. v. Wisc. Elections Comm'n*, 142 S. Ct. 1245 (2022)............................38

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................25

## Statutes

*N.J.S.A.* 19:23-24 ...............................................................................33

## Other Authorities

Annie Waldman & Aliyya Swaby, *How We Analyzed Literacy and Voter Turnout*, PROPUBLICA (Sept. 12, 2022), https://www.propublica.org/article/voter-participation-literacy-accessibility .......................................................12

Center for American Women and Politics, *State by State Information: New Jersey*, RUTGERS U. (last visited Mar. 10, 2024), https://cawp.rutgers.edu/facts/state-state-information/new-jersey...........................................................................................21

Center for American Women and Politics, *Where Does Your State Stand? CAWP's 2024 Rankings,* RUTGERS U. (last visited Mar. 10, 2024), https://cawp.rutgers.edu/news-media/press-releases/where-does-your-state-stand-cawps-2024-rankings...............................................................................................21

Center for American Women and Politics, *Women in New Jersey,* RUTGERS U. (Apr. 28, 2021), https://cawp.rutgers.edu/sites/default/files/resources/nj.pdf...............22

Charlene Phelps & Joe Marchica, *How can we fix New Jersey's fixed primary elections?*, N.J. MONITOR (Mar. 11, 2022), https://newjerseymonitor.com/2022/03/11/how-can-we-fix-new-jerseys-fixed-primary-elections-opinion/ ...........................................................................24

Clifford Kulwin & Ahmed Shedeed, *Voter suppression by another name*, NJ.COM (May 2, 2021), https://www.nj.com/opinion/2021/05/voter-suppression-by-another-name-opinion.html. .................................................................................20

Colleen O'Dea, *NJ midterms see low turnout*, N.J. SPOTLIGHT NEWS (Dec. 7, 2022), https://www.njspotlightnews.org/2022/12/nj-2022-midterm-election-sees-low-turnout/......................................................................................................24

Colleen O'Dea, *Understanding the party line in N*J, N.J. SPOTLIGHT NEWS (Dec. 4, 2023) ....................................................................................... 5, 23, 24

Colleen O'Dea, *Will the new Legislature be any more diverse than the last?*, N.J. SPOTLIGHT NEWS (Jan. 9, 2024), https://www.njspotlightnews.org/2024/01/how-diverse-is-njs-221-legislature/ ................................................................ 5, 20, 21

Daniel Israel, *Chiaravalloti Ends Re-Election Bid*, HUDSON REPORTER (Apr. 19, 2021), https://hudsonreporter.com/2021/04/19/chiaravalloti-ends-re-election-bid ..................................................................................................................19

David M. Zimmer, *Residents don't like how NJ sets up voting ballots by political party, poll shows*, NORTHJERSEY.COM (Nov. 17, 2022), https://www.northjersey.com/story/news/new-jersey/2022/11/17/nj-residents-against-voting-ballot-setup-political-party-poll-says/69655099007/...................16

David Wildstein, *12% of New Jersey voters turned out in 2022 primary election*, N.J. GLOBE (Aug. 12, 2022), https://newjerseyglobe.com/campaigns/12-of-new-jersey-voters-turned-out-in-2022-primary-election/ ...........................................24

David Wildstein, *Most New Jerseyans oppose organization lines, FDU poll says*, N.J. GLOBE (Nov. 15, 2022), https://newjerseyglobe.com/polling/most-new-jerseyans-oppose-organization-lines-fdu-poll-says/...........................................13

*Designing Polling Place Materials*, U.S. Election Assistance Comm'n (last visited May 18, 2021), https://www.eac.gov/election-officials/designing-polling-place-materials...........................................................................................................14

*Districts by Number*, N.J. Leg., https://www.njleg.state.nj.us/districts/districtnumbers.asp (last visited Mar. 5, 2024) .................................................................................................19

First Am. Compl., *Conforti v. Hanlon*, No. 20-08267 (FLW-TJB) (D.N.J), (Jan. 25, 2021) ........................................................................ 10, 13,28, 33

Harbani Ahuja et al., Two New Jerseys: One State of Inequity, N.J. Inst. for Soc. Justice (Feb. 2024), https://njisj.org/reports/stateofinequity/.................6, 18

Jason C. Spiro, Esq., Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, *Kim v. Hanlon*, No. 24-01098 (ZNQ-TJB) (D.N.J) (Mar. 6, 2024) (citing *Conforti v. Hanlon,* 2022 U.S. Dist. LEXIS *50.......................28

Joey Fox, *An Interview with Bonnie Watson-Coleman*, N.J. Globe (Feb. 15, 2024), https://newjerseyglobe.com/congress/an-interview-with-bonnie-watson-coleman/ .........................................................................................................21

Joey Fox, *Nia Gill did extremely well in Montclair—but it wasn't enough to win,* N.J. Globe (June 8, 2023), https://newjerseyglobe.com/legislature/nia-gill-did-extremely-well-in-montclair-but-it-wasnt-enough-to-win/.................................22

Julia Sass Rubin, Toeing the line: New Jersey Primary Ballots Enable Party Insiders to Pick Winners, N.J. Pol'y Perspective (June 29, 2020), https://www.njpp.org/publications/report/toeing-the-line-new-jersey-primary-ballots-enable-party-insiders-to-pick-winners/ ......................................................5

Lawrence Norden & Sundeep Iyer, Design Deficiencies and Lost Votes, Brennan Ctr. 4 (2011), https://www.brennancenter.org/sites/default/files/2019-08/Report_Design_Deficiencies_Lost_Votes.pdf.............................................17

Lawrence Norden et al., Better Ballots, Brennan Ctr. 20 (2008) (listing this ballot design issue as "Problem 1"), https://www.eac.gov/sites/default/files/eac_assets/1/28/Better-Ballots-Brennan-Center.pdf .............................................................. 14, 17, 18

Lawrence Norden et al., Better Design, Better Elections, Brennan Ctr. (2012), https://www.brennancenter.org/sites/default/files/2019-08/Report_Better_Design_Better_Elections.pdf..................................................17

Matt Friedman, *Five N.J. Legislators Step out of Line*, Politico (May 24, 2021), https://www.politico.com/newsletters/new-jersey-playbook/2021/05/24/five-nj-legislators-step-out-of-line-492971 .....................................................................23

Mike Catalini, *How a congressman's challenge to New Jersey's first lady is shaking up a key Senate race,* Wash. Post (Feb. 29, 2024), https://www.washingtonpost.com/politics/2024/02/29/new-jersey-senate-kim-tammy-murphy-menendez/d64b8aa6-d6c2-11ee-82ad-c2391b06a8f5_story.html .........................................................................................................34

iv

*N.J. 2020 State Legislatures*, DAVE'S REDISTRICTING, https://davesredistricting.org/maps#viewmap::3e874200-c618-42b5-8ed0-55cfc0bc5755 (last visited Mar. 6, 2024).............................................................18

*N.J. 2022 State Legislatures*, DAVE'S REDISTRICTING, https://davesredistricting.org/maps#viewmap::61388384-5d1f-4f3b-9669-31e485b781f1 (last visited Mar. 5, 2024) .............................................................18

Nick Corasaniti & Tracey Tulley, *A Senate Candidate Accused of Nepotism Has Another Edge: The Ballot*, N.Y. TIMES (Dec. 22, 2023), https://www.nytimes.com/2023/12/22/nyregion/menendez-tammy-murphy-senate-new-jersey.html ...........................................................34

Nina Wang, *Tired of New Jersey Corruption, Young Democrats Fight Back Against the Machine,* MOTHER JONES (Mar. 4, 2024), https://www.motherjones.com/politics/2024/03/andy-kim-tammy-murphy-robert-menendez-new-jersey-senate/.............................................34

Paula Sollami Covello, Motion to Dismiss Brief*, Conforti v. Hanlon*, No. 20-08267 (FLW-TJB) (D.N.J) (Jan. 25, 2021) ...............................................28

Plaintiffs' Brief in Support of Motion for Preliminary Injunction at n.30, *Kim v. Hanlon*, No. 24-01098 (ZNQ-TJB) (D.N.J) (Feb. 26, 2024) ........................ 35, 36

Ronald Chen & John Farmer, Jr., *New Jersey's primary election ballots are rigged*, NJ.COM (June 27, 2021), https://www.nj.com/opinion/2021/06/new-jerseys-primary-election-ballots-are-rigged-opinion.html........................................ 20, 27

Ryan P. Haygood & Henal Patel, *New Jersey, this is no way to elect a U.S. Senator*, NJ.COM (Nov. 26, 2023), https://www.nj.com/opinion/2023/11/new-jersey-this-is-no-way-to-choose-a-senator-opinion.html .......................................20

Ryan P. Haygood ET AL., *The End of the Line: Abolishing New Jersey's Antidemocratic Primary Ballot Design*, 48 SETON HALL J. OF LEGIS. & PUB. POL'Y 1, 21 (2023).............................................................19

Sophie Nieto-Munoz, *New Jersey's next Legislature will have even fewer female lawmakers*, N.J. MONITOR (Nov. 13, 2023), https://newjerseymonitor.com/2023/11/13/new-jerseys-next-legislature-will-have-fewer-female-lawmakers/ ............................................... 22, 23

Sophie Nieto-Munoz, *Two longtime Democratic senators square off in primary*, N.J. MONITOR (May 5, 2023), https://newjerseymonitor.com/2023/05/05/two-longtime-democratic-senators-square-off-in-primary/........................................22

Sue Altman ET AL., *Democracy in New Jersey is Tainted*, NJ.com (Feb. 21, 2021), https://www.nj.com/opinion/2021/02/democracy-in-new-jersey-is-tainted-opinion.html.............................................................20

U.S. Census Bureau, Quick Facts: Camden City, New Jersey, https://www.census.gov/quickfacts/fact/table/camdencitynewjersey/IPE120219#IPE120219 (last visited Feb. 5, 2024) .............................................18

U.S. Census Bureau, QuickFacts: N.J., https://www.census.gov/
   quickfacts/NJ (last visited Mar. 5, 2024) ..................................................... 20, 21

U.S. IMMIGRATION POLICY CENTER, NEW AMERICAN VOTERS IN NEW JERSEY:
   BUILDING THE ELECTORAL POWER OF NATURALIZED VOTERS (Sep. 2022),
   https://newamericanvoters.org/assets/2022/10/NJ-NAV-State-Report-1.pdf......12

*Why voting-eligible citizens sat out the 2020 election*, PUBLIC WISE RESEARCH (June
   10, 2022), https://publicwise.org/publication/why-voting-eligible-citizens-sat-
   out-the-2020-election/ ...........................................................................................23

WILLIAM E. SCHLUTER, SOFT CORRUPTION: HOW UNETHICAL CONDUCT
   UNDERMINES GOOD GOVERNMENT AND WHAT TO DO ABOUT IT, 163-66 (Rutgers
   U. Press 2017)............................................................................................. 31, 34

### INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* League of Women Voters of New Jersey ("LWVNJ") is the New Jersey chapter of the national League of Women Voters, a nonprofit, nonpartisan, grassroots organization working to protect and expand voting rights and ensure everyone is represented in our democracy. LWVNJ is committed to promoting civic engagement and protecting democracy in New Jersey through advocacy, voter education, and voter assistance. LWVNJ's work educating and empowering New Jersey's voters enables the organization to directly interact with a large population of New Jersey's residents and to learn about barriers to the ballot directly from New Jersey's diverse communities. LWVNJ advocates for policies that make it easier for New Jersey residents to vote, particularly residents who have traditionally confronted obstacles to exercising that right. LWVNJ has successfully advanced equitable voting rights reforms to remove barriers to the ballot and increase voter participation, including online voter registration and automatic voter registration, improved access to vote-by-mail, in-person early voting, and voting rights restoration for people on parole and probation. LWVNJ has led work on fair

---

[1] *Amici* and counsel for *amici* are nonpartisan organizations that do not endorse or oppose candidates. The brief is submitted to provide the Court with a perspective about the discriminatory impact of New Jersey's antidemocratic ballot design on voters and candidates of color and women. *Amici* affirm that no counsel for a political party authored this brief in whole or in part or contributed money to fund the preparation and submission of this brief.

districting to prevent gerrymandering and to increase the power of New Jersey's diverse communities. LWVNJ also works with state and local election officials to educate voters on how to effectively cast a ballot, runs a voter assistance hotline, and works in collaboration with others to lead election protection work. LWVNJ has approximately 1,600 members, the vast majority of whom are New Jersey voters. This case will directly affect their right to vote, particularly in the upcoming primary election.

*Amicus curiae* Salvation and Social Justice ("SandSJ") is a nonpartisan, statewide racial justice organization in New Jersey. In line with its mission to lift up poor, underserved, and traditionally oppressed communities, SandSJ educates voters to use their voices to effect change. SandSJ has advocated for major voting rights efforts in the state, including restoring the right to vote to all people with criminal convictions and limiting police presence at voting locations, so that there are no barriers to the ballot. SandSJ also co-leads a statewide Souls to the Polls program to assist Black faith organizations in encouraging congregants, specifically Black residents, to vote in elections, including primary elections.

*Amicus curiae* New Jersey Alliance for Immigrant Justice ("NJAIJ") is New Jersey's largest immigration coalition. Comprising over 55 member organizations, NJAIJ is a nonpartisan organization that fights for policies that empower and protect immigrants. New Jersey has the nation's second highest proportion of immigrants to

total population, with nearly one in four New Jerseyans being foreign born. NJAIJ is regularly a leader in campaigns to expand voter protections, rights and democracy, including fair and transparent redistricting, language access, and visibility for communities of color through data disaggregation.

*Amicus curiae* New Jersey Policy Perspective ("NJPP") is a nonpartisan think tank that focuses on state-level public policies that lift up economic, racial and social justice through evidence-based research and analysis, strategic communications and authentic partnerships. NJPP has long published research and scholarship on democracy-related issues in New Jersey, including two reports on the issues with the state's ballot design.

Plaintiffs in this case have challenged New Jersey's primary ballot rules principally because of the burdens they impose on candidates and the electoral process. But those rules also burden the rights of voters. As an organization of and for voters, LWVNJ is well-positioned to address those burdens. Likewise, as racial justice organizations working to empower marginalized communities, SandSJ and NJAIJ are well-situated to address the disproportionate burden those communities face. NJPP researches, analyzes, and publishes on issues facing voters in New Jersey. *Amici* can thus provide the perspective of voters affected by New Jersey's primary ballot design. No party in this case focuses on that perspective, and it is important that it be heard.

## BACKGROUND & SUMMARY OF ARGUMENT

*Amici* and counsel for *amici* are nonpartisan organizations that neither endorse nor oppose candidates. Our interest is in democracy. Because Defendants' primary ballot design (also referred to as "the county line") is a frontal attack on our democracy, this brief is submitted solely in support of Plaintiffs' Motion to enjoin the county line's antidemocratic, discriminatory use.

The county line in New Jersey is a sophisticated form of voter suppression. While voter suppression elsewhere might outright block voters from exercising their right to vote, Defendants' form of suppression manifests itself in a different, but also harmful and discriminatory way.

In most places in America, primary ballots list each office with the names of the candidates running for that office displayed underneath or beside it. Verified Compl.[2] ¶¶ 5, 55. In New Jersey, however, chairs from county branches of both major political parties and other county party leaders decide the design of the ballots by grouping their endorsed candidates together in the same column or row to give them maximum visibility. *Id.* at ¶¶ 53, 59, 62. This party-endorsed column or row of candidates, also referred to as the "county line," awards candidates, on average, a

---

[2] Verified Complaint, referred to hereafter as "VC."

4

38 percent advantage at the polls, effectively constituting an insurmountable lead.[3] New Jersey stands alone as the only state in America that uses this design on its primary ballots. *See id.* at ¶ 1.

The consequences of this antidemocratic, discriminatory engineering are devastating for non-endorsed candidates, who, when placed in other rows and columns that are often far away from the main line, experience reduced visibility and face certain defeat. VC ¶¶ 86, 111, 176. Indeed, no incumbent state legislator placed on the county line has lost a primary in New Jersey since 2009, and only two congressional incumbents positioned on the county line have lost a primary in the state in the last 50 years.[4]

The impact of the county line is particularly harmful for Black, Latino/a, Asian and other people of color, as well as women in New Jersey, who remain grossly underrepresented in the state legislature.[5] Although New Jersey is one of the

---

[3] *See* Colleen O'Dea, *Understanding the party line in NJ*, N.J. SPOTLIGHT NEWS (Dec. 4, 2023), https://www.njspotlightnews.org/2023/12/understanding-the-party-line-in-nj/ ; *see also* Dr. Julia Sass Rubin, Expert Report, Ex. C, at 3.

[4] JULIA SASS RUBIN, TOEING THE LINE: NEW JERSEY PRIMARY BALLOTS ENABLE PARTY INSIDERS TO PICK WINNERS, N.J. POL'Y PERSPECTIVE (June 29, 2020), https://www.njpp.org/publications/report/toeing-the-line-new-jersey-primary-ballots-enable-party-insiders-to-pick-winners/.

[5] *See* Colleen O'Dea, *Will the new Legislature be any more diverse than the last?*, N.J. SPOTLIGHT NEWS (Jan. 9, 2024), https://www.njspotlightnews.org/2024/01/how-diverse-is-njs-221-legislature/.

most racially diverse states in America, the county line ensures that its elected representatives do not reflect that racial diversity and underrepresent women.

That underrepresentation in the state legislature has led to New Jersey's present-day reality, where elected officials rarely lose elections even as they fail to address this sobering truth: Black, Latino/a and other people of color in New Jersey face some of the worst racial disparities in America.[6]

*Amici* urge that New Jersey's fixed election design diminishes voting power, particularly for Black, Latino/a, Asian and other voters of color, makes it more difficult for candidates of color and women candidates to run for office and be elected, and ensures that the state's elected officials—from city council members to state senators to members of Congress—remain accountable to county party bosses rather than to voters.

To add insult to injury, the State has not articulated a legitimate, much less substantial or compelling, interest in maintaining its antidemocratic, discriminatory process, particularly since two counties in New Jersey are already using a common and straightforward alternative to the line. VC ¶¶ 5, 55.

Defendants must not conduct another election under this indefensible and harmful system. *Amici* respectfully request that this Court stop the irreparable harm

---

[6] *See* HARBANI AHUJA ET AL., TWO NEW JERSEYS: ONE STATE OF INEQUITY, N.J. INST. FOR SOC. JUSTICE (Feb. 2024), https://njisj.org/reports/stateofinequity/.

that will result in the June 2024 primary elections and the November 2024 general election by granting Plaintiffs' Motion for Preliminary Injunction.

## ARGUMENT

I.    **New Jersey's Primary Ballot Design is Antidemocratic, Discriminatory and Unconstitutional and Needlessly Burdens New Jersey Voters**

### A. *New Jersey's Antidemocratic Primary Ballot Design Rules Subvert the Democratic Process*

New Jersey's discriminatory primary ballot design subverts the democratic process by allowing county party leadership to dictate who is on the ballot and how prominently (or not) they are positioned on it, and in the process mislead, confuse, and manipulate voters before they even cast their ballot. Too often, the end result— as designed by the county line—is that on election day, whether or how voters vote is beside the point, because the outcome has already been decided for them. New Jersey's antidemocratic ballot design rules are especially harmful to Black, Latino/a, Asian and other voters and candidates of color and women.

### i. *New Jersey's Antidemocratic Primary Ballot Design Manipulates, Misleads, and Confuses Voters*

As the Complaint alleges, and as discussed above, New Jersey is the only state in the nation that organizes its primary election ballots with bracketed groups of candidates that, "depending on the County Clerk's discretion . . ." are listed in a column (or row), rather than by listing "the office sought followed immediately by

7

the names of all candidates running for that office." VC ¶¶ 3, 6, 53. Candidates running for different offices that are in the same bracket are featured together, usually in the same column, while unbracketed candidates find themselves exiled to a separate column on their own—sometimes several columns away from the bracketed candidates—or with other unbracketed candidates running for different offices. *Id.* at ¶¶ 62, 67, 86, 155, 178. In all other 49 states, the District of Columbia, and two counties within New Jersey—Salem and Sussex—primary election ballots list the office sought followed by the names of all candidates running for that office in what is called the "office block" or "bubble ballot."[7] *Id.* at ¶¶ 5, 55. As Plaintiffs allege, New Jersey's discriminatory bracketing system, coupled with its ballot positioning rules, and other poor visual ballot design features, results in ballots that not only invariably misdirect and bewilder voters, but also actively manipulate them toward certain voting choices. *Id.* at ¶¶ 7, 86, 104, 112, 116, 127, 178, 194.

First, New Jersey's discriminatory bracketing and ballot position rules grant bracketed candidates more favorable positions on the ballot (e.g., further to the left or closer to the top) than unbracketed candidates. *Id.* at ¶¶ 56, 58. Candidates listed first on a ballot receive an advantage due to "positional bias" or the "primacy effect,"

---

[7] During the June 2020 presidential primary, a few additional counties also used an office block structure for their vote-by-mail ballots, including Hunterdon, Passaic, and Warren. The Morris County Republican party had also used office block ballot design until 2021. VC ¶ 55.

a well-documented phenomenon that "when choosing between a set of visually-presented options, a significant percentage of people will demonstrate a bias toward choosing the first or earlier-listed option." *Id.* at ¶¶ 2, 77. This bias greatly influences who voters choose on a ballot. *See id.* at ¶ 77.

The discriminatory bracketing and ballot position rules confer positional bias on candidates "blessed" by county parties. While all bracketed candidates are technically given the opportunity to be placed in that favored first position, unbracketed candidates are never allowed that same opportunity. *Id.* at ¶ 83. This creates a system whereby county party leadership awards a significant, nearly insurmountable, statistical advantage to the candidates they choose to endorse.[8] Expert report data analysis of 46 New Jersey primary elections in 2020 and 2021 shows that some county clerks "are willing to manipulate the rules to place" certain bracketed candidate groupings first, specifically to take advantage of the benefits of the first position. VC ¶ 75. Reserving the positive gains of the primacy effect for bracketed candidates only, the current New Jersey ballot design rules capitalize on the biases of voters to create an inherently discriminatory distinction between bracketed and unbracketed candidates. And manipulation of ballot position by county clerks also undermines voter choice and the integrity of the democratic process.

---

[8] *See* Dr. Josh Pasek, Expert Report, Ex. B ¶ 183.

In addition, candidates endorsed by the county parties almost always appear in a single full bracket (e.g., a column) known as the "county line." *Id.* at ¶¶ 3, 4. Grouping these candidates together in a single, easily identifiable column creates an additional visual advantage, referred to as the "weight of the line." *Id.* at ¶¶ 105, 111. Unbracketed and "off-line" candidates, on the other hand, often featured "far away from other candidates running for the same office with multiple blank spaces in between," in a region of the ballot called "Ballot Siberia," do not benefit from this additional visual cue. *Id.* at ¶¶ 86, 111, 176. Candidates in Ballot Siberia appear as less legitimate to voters than candidates on the county line.[9] According to expert testimony, the visual difference between the neatly arranged county line and the perplexing, often scattered placements of unbracketed candidates in Ballot Siberia "guide the eyes in ways that do not allow equal treatment of all candidates." *Id.* at ¶ 111. Put another way, the "weight of the line" steers voters unconsciously toward candidates who are bracketed over those who are not.

Further, the effects of the two primary ballot design choices—the visual weight of the county line, and the primacy benefits given to early placement of bracketed candidates—stack together. In a statistical study included in his expert report, Dr. Josh Pasek found that "the first position benefits and the weight of the

---

[9] *See generally,* First Am. Compl., *Conforti v. Hanlon*, No. 20-08267 (FLW-TJB) (D.N.J), (Jan. 25, 2021).

line appear to reinforce one another, yielding even larger benefits when they present together."[10] Ultimately, this means that the visual impact of the county line and "Ballot Siberia," along with New Jersey's discriminatory ballot order rules, push unwitting voters toward certain preselected candidates and make it harder for voters to find their preferred candidate on the ballot and elect them. VC ¶¶ 86-87.

New Jersey's primary ballot design manipulates voters' unconscious biases and creates systemic biases to manipulate voters toward certain results. In practice, this means that it is the county clerks, who are responsible for ballot design and placement, and not the voters, who are truly selecting the candidates who win.[11]

Moreover, New Jersey's primary ballot design fails to meet a fundamental objective of good ballot design: making clear which candidates are running for which office. When unbracketed or off-line candidates are relegated to "Ballot Siberia," visually remote from other candidates running for the same office, with gaps between the candidate's name and the office sought, it can require exceptional

---

[10] Pasek, *supra* note 8, at ¶ 149.

[11] Plaintiffs' VC details examples of intended manipulation to Plaintiff Rush. During the 2022 primaries, the Cumberland County Chair, along with the Executive Committee, overrode the committee's membership vote to not endorse a candidate, unilaterally giving the county line, instead, to candidate Tim Alexander. VC ¶ 159. For the upcoming 2024 Democratic Primary election, the Atlantic County Chair has already publicly stated that he doubts Plaintiff Rush will be the County's candidate, but that "[Tim] Alexander would also be a good candidate again." VC ¶ 161. These events strongly indicate that county party leadership partake in machinations behind-the-scenes to use New Jersey's primary ballot design rules to award the benefits of the county line to their candidate of choice.

acuity for a voter to correctly match them. [12] Navigating this design can be immediately difficult and confusing for voters who are voting for the first time, have limited English proficiency, have low literacy skills, or even those who have just moved to New Jersey from one of the other 49 states that use office block ballots.[13] For instance, New Jersey's bracketing rules can lead counties to split contests into multiple rows or columns, creating a visually confusing ballot. The Camden County 2018 primary ballot for the Democratic Party, for example, had six empty columns between candidates running for the U.S. House of Representatives. *See* Figure 1. The ballot also split candidates running for the same office into different rows, making it even more difficult for voters to determine which candidates were running in the race. *Id.*

---

[12] *See* Sass Rubin, *supra* note 3, at ¶ 7.

[13] One in five Americans struggle to read English at a basic level. For people who struggle to read, "the electoral process can become its own form of literacy test," creating barriers to voting at every step, "from registration to casting a ballot." It is easy to infer that this difficulty is exacerbated when the ballot, as with the unfair New Jersey primary ballot, is visually confusing and not intuitive. Annie Waldman & Aliyya Swaby, *How We Analyzed Literacy and Voter Turnout*, PROPUBLICA (Sept. 12, 2022), https://www.propublica.org/article/voter-participation-literacy-accessibility. Additionally, due to insufficient language access at the polls, as well as being new to the "system" and unfamiliarity with ballot design, newly naturalized voters are also affected by many of the ballot and voting challenges listed for Black, Latino/a and Asian voters. Newly naturalized voters are often first-time voters in a household, thus even less familiar with the particularities of New Jersey's ballot design. U.S. IMMIGRATION POLICY CENTER, NEW AMERICAN VOTERS IN NEW JERSEY: BUILDING THE ELECTORAL POWER OF NATURALIZED VOTERS (Sep. 2022), https://newamericanvoters.org/assets/2022/10/NJ-NAV-State-Report-1.pdf.

Figure 1: Camden County 2018 Democratic Party Primary Ballot[14]

(U.S. House of Representatives Race Outlined)



In its June 2021 primary elections, Camden County's Democratic Party ballot for Camden City again had similarly large gaps between candidates for the same office, as well as split-row races.[15] These visual gaps and split contests make it difficult for voters to discern which candidates are running in which races, which can lead voters to unintentionally invalidate their ballot.[16] Figure 1 also shows the confusing visual impact of candidates placed to the far right in "Ballot Siberia," who barely seem to be on the same ballot as the rest of the candidates to the far left. *See* Figure 1.

---

[14] First Am. Compl. in *Conforti, supra* note 9, at ¶ 4.

[15] *See* David Wildstein, *Most New Jerseyans oppose organization lines, FDU poll says*, N.J. GLOBE (Nov. 15, 2022), https://newjerseyglobe.com/polling/most-new-jerseyans-oppose-organization-lines-fdu-poll-says/ (first image above the article).

[16] *See* Sass Rubin, *supra* note 3.

New Jersey's primary ballot design violates federally-recognized best practices, as outlined by reports from the U.S. Election Assistance Commission, which lay out best practices for ballot design.[17] These reports make clear that splitting contests across different pages or columns often causes substantial voter confusion, which can result in many wasted or miscast votes.[18] One egregious example of this design flaw is the "butterfly ballot" used in Palm Beach County, Florida during the 2000 presidential election.[19] As a result of the design defect, 29,000 ballots in Palm Beach County were not counted in a presidential election decided by fewer than 600 votes.[20] Since then, this contest-splitting problem has affected other elections as well. In 2002, for instance, a flawed split-column ballot design in Kewaunee County, Wisconsin led to "an astounding 11.8% of voters recording no vote for this race (in contrast to 1.1% . . . statewide for [that] race)."[21] The contest-splitting permitted by New Jersey's ballot design rules—and the

---

[17] *Designing Polling Place Materials*, U.S. Election Assistance Comm'n (last visited Mar. 10, 2024), https://www.eac.gov/election-officials/designing-polling-place-materials.

[18] *See* LAWRENCE NORDEN ET AL., BETTER BALLOTS, BRENNAN CTR. 20 (2008) (listing this ballot design issue as "Problem 1"), https://www.eac.gov/sites/default/files/eac_assets/1/28/Better-Ballots-Brennan-Center.pdf.

[19] *See id.* at 21.

[20] *See id.*

[21] *Id.* at 22.

associated gaps in ballots that isolate some candidates in "Ballot Siberia"—likely causes similar voter confusion.

In fact, the county line runs afoul of 3 of the 4 general good balloting principles recommended by the Brennan Center: "(1) not splitting contests; (2) ensuring consistent ballot design; and (3) ensuring visually that ballots are easy to understand."[22] As a result, New Jersey primary ballots contain features that induce voter confusion, lead to errors in voting, and do so in a manner that "will tend to aid particular candidates over others." VC ¶ 117.

Here, the allegations in Plaintiffs' Complaint—which must be taken as true—establish that these and other confounding design features "contribute to . . . systemic biases and voter confusion leading to over and under votes, which can disenfranchise substantial numbers of voters."[23] VC ¶ 86. This antidemocratic process forces New Jersey's voters to cast their vote on a visually perplexing ballot that provides a near

---

[22] Dr. Pasek, *supra* note 8, at ¶ 106.
[23] *See* Sass Rubin, *supra* note 4.

insurmountable advantage to candidates chosen by political parties over other candidates—ultimately deciding their votes for them.[24] VC ¶¶ 59, 84-85, 104.[25]

> ii. *New Jersey's Antidemocratic Primary Ballot Design Rules Disproportionately Harm Voters and Candidates of Color*

The burdens imposed by New Jersey's antidemocratic ballot design falls disproportionately on Black, Latino/a, Asian and other voters and candidates of color and women candidates, who have historically faced obstacles to exercising their right to vote and run for office. Ballot design studies demonstrate "that when basic usability principles are ignored in the design of ballots, a significant percentage of voters will be disenfranchised, and the affected voters will disproportionately be . . .

---

[24] Expert analysis by Dr. Samuel S.-H. Wang of 45 congressional and senatorial primaries from 2002 to 2022 found that the difference between being on the county line and not being on the county line varies by a range of 13 to 79 percentage points—an average of 38% margin difference. Dr. Wang found this to be so statistically significant that "the likelihood that it could have occurred by chance was less than 1 in 1 quintillionth." VC ¶ 176; Dr. Samuel S.-H. Wang, Expert Report, Ex. D, at ¶ 11. This indicates that the county line is a significantly influencing, if not outright manipulative, ballot design method.

[25] In fact, the practice of the county line is quite unpopular with New Jersey voters. A poll conducted by Fairleigh Dickinson University in October-November 2022, found that nearly two-thirds of New Jersey residents surveyed (about 65%) were against county political parties awarding preferential ballot positions, or the county line. Wildstein, *supra* note 15. In Bergen County, that disapproval rate was 74% and in Passaic, 86% of respondents opposed the practice of the county line. David M. Zimmer, *Residents don't like how NJ sets up voting ballots by political party, poll shows*, NORTHJERSEY.COM (Nov. 17, 2022), https://www.northjersey.com/story/news/new-jersey/2022/11/17/nj-residents-against-voting-ballot-setup-political-party-poll-says/69655099007/.

minority [voters]."[26] Indeed, "poor and racial and ethnic minorities [across] the country have been most impacted when these problems are not adequately addressed."[27] By undermining fundamental principles of clear ballot design, New Jersey especially harms these voters with a confusing primary ballot design that leads them to unintentionally disenfranchise themselves, for instance, by overvoting and undervoting.[28]

The effects of structural racism also exacerbate the burden placed on Black, Latino/a, Asian and other voters of color by New Jersey's discriminatory primary ballot design. For instance, in Camden, people of color make up over 95% of the

---

[26] NORDEN, *supra* note 18, at 13; *see also id.* at 19 ("[S]everal studies indicate that residual vote rates are higher in low-income and minority communities and among the elderly . . . . As a result, the failure of a voting system to protect against residual votes is likely to harm low-income and minority voters, as well as the elderly, more severely than other communities." (citing eight academic studies, including Robert Darcy & Anne Schneider, *Confusing Ballots, Roll-Off, and the Black Vote*, 42 W. Pol. Q. 347 (1989))); LAWRENCE NORDEN ET AL., BETTER DESIGN, BETTER ELECTIONS, BRENNAN CTR. (2012), https://www.brennancenter.org/sites/default/files/2019-08/Report_Better_Design_Better_Elections.pdf. ("Poor design increases the risk for lost or misrecorded votes among all voters, but the risk is even greater for particular groups. Several studies have shown higher rates of lost or misrecorded votes in low-income and minority communities as well as for the elderly and the disabled[.]" (footnote omitted)).

[27] LAWRENCE NORDEN & SUNDEEP IYER, DESIGN DEFICIENCIES AND LOST VOTES, BRENNAN CTR. 4 (2011), https://www.brennancenter.org/sites/default/files/2019-08/Report_Design_Deficiencies_Lost_Votes.pdf.

[28] In her report, Dr. Sass Rubin found, for example, that the Democratic Congressional District 2 (CD2) primary in 2020 likely resulted in a 20% undervote. CD2 is a plurality district, comprised of 35% people of color. *See* Sass Rubin, *supra* note 3.

city's population: Black people comprise almost 43% and the Latina/o community makes up 53.3% of the population.[29] Of that population, 31.6% live in poverty;[30] unsurprising, as New Jersey has one of the worst racial wealth gaps in the country.[31] Indeed, in Camden County, one in four Black residents live in poverty and one in five Latina/o residents live in poverty.[32] Voters experiencing poverty are disproportionately impacted by poor ballot design, which makes New Jersey's ballot design particularly harmful to these communities.[33]

The county line has also undermined voter choice in other majority-minority parts of the state by causing candidates to drop out of the race before they even make it to the ballot. In 2021, the incumbent Assemblyman for Legislative District 31, which is overwhelmingly comprised of people of color,[34] lost the support of the

[29] U.S. Census Bureau, Quick Facts: Camden City, New Jersey, https://www.census.gov/quickfacts/fact/table/camdencitynewjersey/IPE120219#IPE120219 (last visited Feb. 5, 2024).
[30] *Id.*
[31] AHUJA *supra* note 6.
[32] *Id.*
[33] *See* NORDEN, *supra* note 18 and accompanying text.
[34] Legislative District 31 is majority people of color: in 2021, when the 2010 legislative maps were still in effect, the district was 25.6% Black, 25.2% Latino/a, and 23.0% Asian. *N.J. 2020 State Legislatures*, DAVE'S REDISTRICTING, https://davesredistricting.org/maps#viewmap::3e874200-c618-42b5-8ed0-55cfc0bc5755 (last visited Mar. 6, 2024). Under the new maps, post-2020 Census, the district is: 27.2% Black, 32.6% Latino/a, and 13.3% Asian. *N.J. 2022 State Legislatures*, DAVE'S REDISTRICTING, https://davesredistricting.org/maps#viewmap::61388384-5d1f-4f3b-9669-31e485b781f1 (last visited Mar. 5, 2024). It is comprised of Bayonne, Kearny, and sections of Jersey City. *Districts by*

county party and was dropped from the county line as a result of a practice in Hudson County's Democratic Party that allows town mayors to choose who will be placed on the county line.[35] The Assemblyman stated publicly that he chose not to run because of the challenges of running outside of the county line and his unwillingness to run on a county line that would be against the Governor he supports.[36] The Mayor/Party endorsed candidate ran unopposed on the county line.[37] Thus, instead of having a meaningful choice between multiple candidates for the State Assembly, the voters of this district had the decision made for them by one man—the mayor— due to New Jersey's ballot design system. Removing the opportunity for voters to

---

*Number*, N.J. LEG., https://www.njleg.state.nj.us/districts/districtnumbers.asp (last visited Mar. 5, 2024).

[35] Daniel Israel, *Chiaravalloti Ends Re-Election Bid*, HUDSON REPORTER (Apr. 19, 2021), https://hudsonreporter.com/2021/04/19/chiaravalloti-ends-re-election-bid; *See also* Ryan P. Haygood ET AL., *The End of the Line: Abolishing New Jersey's Antidemocratic Primary Ballot Design*, 48 SETON HALL J. OF LEGIS. & PUB. POL'Y 1, 21 (2023).

[36] Israel, *supra* note 35 ("'In reviewing my options, I considered running off the line,' Chiaravalloti said. 'The task of winning off the line is daunting in a normal year; however, running against the [Hudson County Democratic Organization] this year would mean running against Governor Phil Murphy. I believe the power of the line and the popularity of Governor Murphy would make it impossible to compete successfully. As a strong supporter of the Governor, I do not see any benefit to running against a ticket he leads.'").

[37] *Id.*

19

elect a candidate they might have preferred and replacing it with a candidate chosen for them is an illegal form of voter suppression.[38]

New Jersey's antidemocratic primary ballot design and discriminatory bracketing laws also create insurmountable barriers for aspiring Black, Latino/a, Asian and other candidates of color and women candidates to be elected—and may discourage them from trying altogether, as reflected in the racial and gender disproportionality in the State Legislature.[39] While people of color are nearly 50% of New Jersey's population,[40] the current State Legislature is nearly 70% white, a disparity reinforced by the county line.[41] New Jersey's state representation is also overwhelmingly male-dominated.[42] While women account for nearly 51% of New

---

[38] Ronald Chen & John Farmer, Jr., *New Jersey's primary election ballots are rigged*, NJ.COM (June 27, 2021), https://www.nj.com/opinion/2021/06/new-jerseys-primary-election-ballots-are-rigged-opinion.html (Ronald Chen is the former Public Advocate of New Jersey and John Farmer, Jr. was the Attorney General of New Jew Jersey from 1999-2006); Clifford Kulwin & Ahmed Shedeed, *Voter suppression by another name*, NJ.COM (May 2, 2021), https://www.nj.com/opinion/2021/05/voter-suppression-by-another-name-opinion.html.

[39] Sue Altman ET AL., *Democracy in New Jersey is Tainted*, NJ.com (Feb. 21, 2021), https://www.nj.com/opinion/2021/02/democracy-in-new-jersey-is-tainted-opinion.html.

[40] U.S. Census Bureau, QuickFacts: N.J., https://www.census.gov/quickfacts/NJ (last visited Mar. 5, 2024); *see also* Ryan P. Haygood & Henal Patel, *New Jersey, this is no way to elect a U.S. Senator*, NJ.COM (Nov. 26, 2023), https://www.nj.com/opinion/2023/11/new-jersey-this-is-no-way-to-choose-a-senator-opinion.html.

[41] O'Dea, *supra* note 5.

[42] *Id.*

Jersey's population,[43] they make up only 34.2% of New Jersey's State Legislature.[44] In fact, there will be even fewer women in the current New Jersey legislative session than in the previous one, with women holding 41 out of 120 seats, down from 43 last session.[45] The state currently ranks 23rd out of 50 for gender parity in legislatures across the country and was one of the only states to see a decrease in women's representation in its state legislature after the 2023 elections.[46]

The county line causes these disparities in representation by limiting voters' choices, thereby limiting access to Black, Latino/a, Asian and other candidates of color and women candidates, at all legislative levels. *See* VC ¶¶ 117, 178. New Jersey Congresswoman Bonnie Watson-Coleman recently expressed that the county line affirmatively limits opportunities for women and persons of color to compete and win as candidates.[47] Because the county line favors incumbents, who are and

---

[43] U.S. Census Bureau, *supra* note 40.

[44] O'Dea, *supra* note 5.

[45] *Id*.

[46] Center for American Women and Politics, *Where Does Your State Stand? CAWP's 2024 Rankings*, RUTGERS U. (last visited Mar. 10, 2024), https://cawp.rutgers.edu/news-media/press-releases/where-does-your-state-stand-cawps-2024-rankings; Center for American Women and Politics, *State by State Information: New Jersey*, RUTGERS U. (last visited Mar. 10, 2024), https://cawp.rutgers.edu/facts/state-state-information/new-jersey.

[47] The NJ Congresswoman explains that "the political mechanisms that order who gets to be the candidate, who gets the valued position on the ballot, who gets to be supported – that had generally been controlled by white men who were most comfortable with advancing people that they knew best, which were white men." Joey Fox, *An Interview with Bonnie Watson-Coleman*, N.J. GLOBE (Feb. 15, 2024), https://newjerseyglobe.com/congress/an-interview-with-bonnie-watson-coleman/.

have always been disproportionately white and male,[48] the county line perpetuates a cycle of underrepresentation of the state's diversity. Jean Sinzdak, associate director of the Center for American Women and Politics at Rutgers University, notes that since incumbents have a lot of power in politics, re-electing incumbents "allows men elected decades ago to remain in their positions until they retire."[49] Even when a woman candidate has the advantages of being an incumbent, however, the county line can impede her opportunity to succeed. For example, New Jersey's recent redistricting forced incumbent, and Black woman candidate, State Senator Nia Gill to run against her then-colleague, State Senator Richard Codey in the 2023 primary elections for Legislative District 27.[50] Although both were longtime incumbents, Codey secured the county line.[51] Running off the line, Senator Gill lost the race and her seat.[52] "Because county parties are especially influential in New Jersey," achieving fairer elections and more equal representation in the legislature will not

---

[48] *See* Center for American Women and Politics*, Women in New Jersey,* RUTGERS U. (Apr. 28, 2021), https://cawp.rutgers.edu/sites/default/files/resources/nj.pdf.

[49] Sophie Nieto-Munoz, *New Jersey's next Legislature will have even fewer female lawmakers*, N.J. MONITOR (Nov. 13, 2023), https://newjerseymonitor.com/2023/11/13/new-jerseys-next-legislature-will-have-fewer-female-lawmakers/.

[50] Sophie Nieto-Munoz, *Two longtime Democratic senators square off in primary*, N.J. MONITOR (May 5, 2023), https://newjerseymonitor.com/2023/05/05/two-longtime-democratic-senators-square-off-in-primary/.

[51] *Id.*

[52] Joey Fox, *Nia Gill did extremely well in Montclair—but it wasn't enough to win*, N.J. GLOBE (June 8, 2023), https://newjerseyglobe.com/legislature/nia-gill-did-extremely-well-in-montclair-but-it-wasnt-enough-to-win/.

be possible under the county line and current system unless they willingly choose to "diversify their pool of candidates."[53] Assemblywoman Shavonda Sumter, Chair of the New Jersey Legislative Black Caucus, called for the elimination of "the line" to "[e]nsur[e] that there is greater access for minority and women candidates[, which] is critical for balanced statewide representatives."[54]

Further, the county line has also suppressed voter turnout by fueling voter disillusionment and distrust in the integrity of New Jersey's democratic processes.[55] Voters, especially Black, Latino/a, Asian and other voters of color, seeing uncompetitive primary races[56] and a lack of meaningful choices, ultimately believe that election results in New Jersey are a foregone conclusion.[57] The voter

---

[53] Nieto-Munoz, *supra* note 50.

[54] Matt Friedman, *Five N.J. Legislators Step out of Line*, POLITICO (May 24, 2021), https://www.politico.com/newsletters/new-jersey-playbook/2021/05/24/five-nj-legislators-step-out-of-line-492971.

[55] In general, voter disillusionment and frustration leads to lack of trust in the government, the electoral system, and voting, which in turn leads to low rates of voter engagement. *See Why voting-eligible citizens sat out the 2020 election*, PUBLIC WISE RESEARCH (June 10, 2022), https://publicwise.org/publication/why-voting-eligible-citizens-sat-out-the-2020-election/.

[56] In 2021, only 10% of New Jersey's legislative positions were contested in the primaries. Two years later, after redistricting, that percentage of contested primaries in the state increased only minimally—to 11.3%, one of the lowest percentages in the country. O'Dea, *supra* note 3., https://www.njspotlightnews.org/2023/12/understanding-the-party-line-in-nj/.

[57] The skepticism is warranted. No incumbent state legislator on the county line has lost a primary in New Jersey since 2009, and only two incumbent congressional legislators on the county line have lost a primary in the state in the last 50 years. Sass Rubin, *supra* note 4. In the last 20 years, only 3 of 209 incumbent legislators in

suppression and disillusionment caused by the county line is clearly seen in turnout in New Jersey's recent elections, where just 12% of voters participated in the 2022 primary elections [58] and only 41% of voters participated in the 2022 general election—a two-decade low for midterm election turnout in the state. [59] Among Black, Latino/a, Asian and other voters of color, New Jersey has earned areputation as a state where "[p]arty insiders, elected officials, and power players"—not the voters—"pick our representatives for us." [60]

### B. *New Jersey's Antidemocratic Primary Ballot Design Rules Unjustifiably Burden the Right to Vote*

The Supreme Court has long recognized that "voting is of the most fundamental significance under our constitutional structure," and that the right to an

---

competitive primaries who ran on the county line in all of the counties in their districts have lost their primaries. It is nearly impossible for an incumbent to lose when running on the line. Dr. Sass Rubin, *supra* note 3, at p. 3. Further, the county line gives candidates, on average, a 38-percentage point advantage over candidates who are not on the line. This advantage, in primary elections with low voter turnout and narrow margins, is nearly insurmountable. O'Dea, *supra* note 3; *see also* Sass Rubin, *supra* note 4.

[58] David Wildstein, *12% of New Jersey voters turned out in 2022 primary election*, N.J. GLOBE (Aug. 12, 2022), https://newjerseyglobe.com/campaigns/12-of-new-jersey-voters-turned-out-in-2022-primary-election/.

[59] Colleen O'Dea, *NJ midterms see low turnout*, N.J. SPOTLIGHT NEWS (Dec. 7, 2022), https://www.njspotlightnews.org/2022/12/nj-2022-midterm-election-sees-low-turnout/.

[60] Charlene Phelps & Joe Marchica, *How can we fix New Jersey's fixed primary elections?*, N.J. MONITOR (Mar. 11, 2022), https://newjerseymonitor.com/2022/03/11/how-can-we-fix-new-jerseys-fixed-primary-elections-opinion/.

effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

When analyzing the constitutionality of a restriction on the right to vote, courts "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the Plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burdens imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Nelson v. Warner*, 477 F. Supp. 3d 486, 502 (S.D. W.Va. 2020) (applying *Anderson-Burdick* standard to review right to vote challenge against ballot ordering statute). This analysis is "flexible," and the "rigorousness of [the court's] inquiry" increases with the severity of the burden. *Id.* Importantly, no threshold level of burden is required. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008). To the contrary, "[h]owever slight [the] burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

25

The right to vote is not protected only against laws that expressly restrict voters' ability to vote for their candidate of choice. Federal and state courts have consistently recognized that misleading or unfair ballot designs also improperly burden the right to vote. *See, e.g., McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) (holding "incumbent first" ballot statute unconstitutional because the ballot design "burden[ed] the fundamental right to vote possessed by supporters"); *Nelson*, 477 F. Supp. 3d at 509 (concluding ballot ordering statute "burden[ed] the individual plaintiffs' right to vote" by "systemically awarding the highly beneficial first ballot position to candidates based solely on their political party"); *Gould v. Grubb*, 14 Cal. 3d 661, 672 (1975) (concluding incumbent first ballot provision burdened the right to vote of "voters supporting nonincumbent candidates" and subjecting the provision to "strict judicial scrutiny"); *Sonneman v. State*, 969 P.2d 632, 638 (Alaska 1998).

Federal courts have also recognized that positional bias, caused by ballot design laws, can unfairly influence voters and thereby burden the right to vote. For instance, in *McLain v. Meier*, the Eighth Circuit affirmed the district court's finding that there is "ballot advantage in the first position" and concluded that this positional bias burdened the right to vote. 637 F.2d at 1166-67; *see also id.* (noting that the Eighth Circuit was "not the first" to affirm this conclusion and collecting cases); *Sonneman*, 969 P.2d at 638 (recognizing impact of "positional bias"); *Graves v. McElderry*, 946 F. Supp. 1569, 1579 (W.D. Okla. 1996) (recognizing that "position

bias arising from ballot configuration" infringes on the right to vote and "voters' rights of free speech and association"). New Jersey's antidemocratic ballot design laws burden the right to vote by misleading voters and manipulating voters out of meaningful choices, thereby impeding their ability to cast votes that accurately reflect their preferences.

In New Jersey, "while votes may not be actively suppressed, with classic measures like literacy tests or poll taxes," they are "devalued to a vanishing point by a system" that "assures that most general election seats are 'safe'" and makes primary elections the critical competition, while structuring the ballots in those primaries with misleading cues that steer voters "toward choices favored by the [county party] bosses."[61] In that sense, the county line in New Jersey is itself a sophisticated form of voter suppression. While voter suppression elsewhere might outright block voters from exercising their right to vote, New Jersey's county line undemocratically dilutes the voting strength of voters, particularly those who are Black, Latino/s, Asian, and other voters of color, and new citizens.

As Plaintiffs allege, VC ¶¶ 86, 104, 117, 178, the county line improperly burdens the right to vote in New Jersey.

---

[61] Chen, *supra* note 38; *see also* Dr. Pasek, *supra* note 8, at ¶ 106.

### C. The State Has No Legitimate Interest in Forcing Voters to Try to Navigate a Manipulated, Misleading and Confusing Ballot

Defendants lack a "sufficiently weighty" interest to justify the burden imposed by New Jersey's ballot design laws on the right to vote. *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89). Indeed, Defendants lack even a legitimate interest in maintaining a primary ballot design that confuses voters and hinders their ability to cast votes that accurately reflect their preferences. Defendants have argued that "New Jersey's bracketing statutes protect important governmental interests, such as . . . providing a manageable and understandable ballot, and ensuring an orderly election process." [62] As detailed above, New Jersey's discriminatory ballot design rules produce objectively confusing ballot layouts, which can include large gaps and split-row or -column races that obscure the full set of candidates in a race. *See* Figure 1. These ballots are the antithesis of "manageable and understandable," and they impede rather than "ensur[e] an orderly election process."[63] Likewise, the bias caused by the weight of the county line, as well as the manipulation of positional bias, compromises "electoral fairness," rather than "ensur[ing]" it.[64]

---

[62] Jason C. Spiro, Esq., Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction at p.35, *Kim v. Hanlon*, No. 24-01098 (ZNQ-TJB) (D.N.J) (Mar. 6, 2024) (citing *Conforti v. Hanlon,* 2022 U.S. Dist. LEXIS *50).
[63] *Id.* at 27.
[64] Paula Sollami Covello, Motion to Dismiss Brief at p.23*, Conforti v. Hanlon*, No. 20-08267 (FLW-TJB) (D.N.J) (Jan. 25, 2021).

As such, under the *Anderson-Burdick* test—whether this Court applies strict scrutiny or simply balances the State's purported interests against the burdens imposed on voters—New Jersey's discriminatory primary ballot design rules are unconstitutional. *See Burdick*, 504 U.S. at 434. Federal and state courts have struck down ballot design laws where the State's purported justifications were similarly "unsound." *McLain*, 637 F.2d at 1167; *see, e.g., id.* (concluding that North Dakota's incumbent first statute would "not withstand even [a] minimal standard of review" because state did not have legitimate interest in "favoritism" of incumbent candidates); *Nelson*, 477 F. Supp. 3d at 511 (striking down West Virginia's ballot ordering statute as unconstitutional, because state lacked sufficiently "weighty justification" for allocating positional advantage to candidates based on system that was "not neutral"); *Gould*, 14 Cal. 3d at 672 (concluding city's justification for its incumbent first ballot provision based on its interest in "facilitat[ing] efficient, unconfused voting" "falls far short of the mark" and holding provision unconstitutional). Defendants cannot demonstrate a legitimate interest in forcing voters to use a misleading and confusing ballot design, especially when a simpler alternative exists and is already used elsewhere in the state.

Accordingly, this Court should strike down New Jersey's discriminatory ballot design laws, including the antidemocratic county line.

## II.    New Jersey's Antidemocratic Primary Ballot Design Rules Will Imminently Harm Voters in the Upcoming 2024 Elections Without Court Intervention

All remaining factors support issuing a preliminary injunction in this case, given the "anticipated irreparable harm to [voters] in the absence of injunctive relief," "[their] favorable position in the balance of equities," and "the public's interest in granting the injunction." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (citations omitted); *Crowe v. De Gioia*, 90 N.J. 126, 132-34 (1982). Court intervention is urgently needed to mitigate the imminent damage that current New Jersey primary ballot design rules will inflict on voters during the 2024 primary elections, which will also have direct consequences to voters for the 2024 November general election as well. Furthermore, granting this injunction will address a longstanding need to safeguard voters' rights and uphold electoral integrity in New Jersey, aligning both with immediate needs and broader democratic principles.

### A.    *Absent a Preliminary Injunction, New Jersey Voters, Particularly its Black, Latino/a, Asian and other Voters of Color, Will Face Imminent, Irreparable Harm*

Irreparable harm arises when damage "cannot be redressed by a legal or an equitable remedy following a trial." *Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792 F. App'x 218, 221 (3d Cir. 2019) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977

F.2d 86, 91 (3d Cir. 1992)). This principle applies to situations where "actual or imminent harm which cannot otherwise be compensated by money damages" affects voters directly. *Id.* Even the threat of hindering First Amendment interests, "for even minimal periods of time," is recognized as causing irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). Concerns over unfair, discriminatory ballot design laws and manipulative practices are especially pressing, posing immediate threats to the integrity of the 2024 New Jersey primary elections and having implications for the 2024 general election.[65] *See* VC ¶ 127. These issues not only challenge the fairness of New Jersey elections generally but also disproportionately impact Black, Latino/a, Asian and other voters of color,[66] highlighting significant racial justice concerns.

Such harms "cannot be adequately compensated by monetary damages" or any remedy available after a trial. *Kamdem-Ouaffo*, 792 F. App'x at 221. Without immediate intervention, the upcoming primary election on June 4, 2024, will proceed in a manner that infringes upon voters' constitutional rights and entrenches

---

[65] *See, e.g.,* WILLIAM E. SCHLUTER, SOFT CORRUPTION: HOW UNETHICAL CONDUCT UNDERMINES GOOD GOVERNMENT AND WHAT TO DO ABOUT IT, 163-66 (Rutgers U. Press 2017). "As suggested by the words of Boss Tweed, primary elections in counties and districts dominated by one party are the elections that really matter, because the winners are virtually assured of being voted into office in the general election in November. [New Jersey] Local party leaders recognize this fact and jealously guard the power they have over the procedures that regulate the primary."
[66] *See supra* Brief Argument I(A)(ii).

systemic biases, unfairly benefiting certain hand-selected candidates over others. VC ¶¶ 85, 87. This advantage is characterized as "substantively large, electorally consequential, and strongly statistically significant" in certain counties and threatens to decisively alter election outcomes. VC ¶¶ 120, 127.

New Jersey voters, particularly its Black, Latino/a, Asian and other voters of color, will be without meaningful choice, subject to the predetermined manipulations of Defendants and the county line, which will leave them with candidates they do not prefer for at least the next legislative and presidential terms, if not longer. *See* VC ¶¶ 86, 115, 127. These consequences cannot be remedied after the fact; the harm is immediate and definite upon the tabulation of the ballots in June 2024.

As a result, voters will "suffer irreparable harm in the absence of injunctive relief." *See Winter*, 555 U.S. at 20; *Doe by & through Doe*, 897 F.3d at 526 (citations omitted); *Crowe,* 90 N.J. at 132-34. As such, urgent court action is necessary to preserve the fairness and integrity of the electoral process and the right to vote in New Jersey's 2024 elections and beyond.

### B. The Balance of Hardships Decisively Shifts Towards the Concerns of the Voters

Absent court intervention, voters, particularly Black, Latino/a, Asian, and other voters of color face the imminent risk of being deprived of a fair election. To prevent unconstitutional electoral practices, the requested relief calls for a straightforward modification to the New Jersey primary ballot design by April 2024,

recommending the adoption of New Jersey's office block ballot as a viable alternative. VC ¶¶ 104. Expert analysis confirms that New Jersey's voting machines can support this format without significant additional effort or resources.[67] And in fact, the office block ballot is already used in two counties in New Jersey—Salem and Sussex—and has been used by other counties in the state in previous elections, including the 2020 primary elections, as well. *See* VC ¶ 55. The office box ballot design is an easy, alternative method that ensures all candidates are presented fairly and that aligns with good ballot design guidelines and existing practices, such as the statutory requirement for a public draw of ballot positions in April. *See N.J.S.A.* 19:23-24.

The relief sought aims to ensure electoral fairness and efficient governance without hindering political endorsements or activities, thereby upholding the principles of democracy and racial equality. Further, the requested relief provides an easy and effective alternative option to the current county line ballot design, which will also provide "a manageable and understandable ballot . . . ensuring an orderly election process."[68]

---

[67] *See generally* Dr. Andrew W. Appel, Expert Report, Ex. E.
[68] First Am. Compl. in *Conforti*, *supra* note 9.

### *C. A Preliminary Injunction Must be Granted for the Public Interest*

In the area of democracy and voting, it is crucial to ensure that government officials adhere to constitutional requirements for the public interest, particularly those safeguarding the fundamental right to vote. Without court intervention, New Jersey's 2024 primary elections will proceed in an unconstitutional manner, using the county line to award preferred candidates a "substantively large, electorally consequential, and strongly statistically significant" advantage—at the expense of New Jersey's voters, particularly its Black, Latino/a, Asian and other voters of color. *See* VC ¶¶ 120, 127. This unconstitutional advantage will significantly undermine the legitimacy of the democratic system, diminishing voter trust in the electoral process, their representatives, and the integrity of current and future elections.[69]

---

[69] *See* SCHLUTER, *supra* note 65. Findings of Dr. Pasek's expert report suggest that even significant winning margins might be questioned under the current ballot system, casting doubt on the validity of election outcomes. *See* Dr. Pasek, *supra* note 8, at ¶ 184. This is particularly relevant given the intense public attention on the upcoming election and issues surrounding the unfair ballot design. *See* Nick Corasaniti & Tracey Tulley, *A Senate Candidate Accused of Nepotism Has Another Edge: The Ballot*, N.Y. TIMES (Dec. 22, 2023), https://www.nytimes.com/2023/12/22/nyregion/menendez-tammy-murphy-senate-new-jersey.html; Mike Catalini, *How a congressman's challenge to New Jersey's first lady is shaking up a key Senate race,* WASH. POST (Feb. 29, 2024), https://www.washingtonpost.com/politics/2024/02/29/new-jersey-senate-kim-tammy-murphy-menendez/d64b8aa6-d6c2-11ee-82ad-c2391b06a8f5_story.html; Nina Wang, *Tired of New Jersey Corruption, Young Democrats Fight Back Against the Machine,* MOTHER JONES (Mar. 4, 2024), https://www.motherjones.com/politics/2024/03/andy-kim-tammy-murphy-robert-menendez-new-jersey-senate/.

Furthermore, "[i]njunctions protecting First Amendment freedoms are always in the public interest," and "protection of 'franchise-related rights is without question in the public interest.'" *See Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005).

Granting injunctive relief reinforces the commitment to direct primaries, ensuring voters can directly select party nominees of either political party without undue influence.[70] "[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional [law]." O*tto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (same). By upholding this commitment, the court would not only empower New Jersey voters and enhance confidence in election results without undue influence, but it would also address racial justice concerns underlying the use of the county line ballot design.

Immediate injunctive relief is thus necessary to serve the public interest; such court intervention is needed to ensure the integrity and fairness of the 2024 primary and general elections and affirm every voter's role in the electoral process, from

---

[70] Plaintiffs' Brief in Support of Motion for Preliminary Injunction at n.30*, Kim v. Hanlon*, No. 24-01098 (ZNQ-TJB) (D.N.J) (Feb. 26, 2024).

choosing a preferred candidate without interference through casting their vote for that candidate.

### III.    The Purcell Principle Does Not Apply Here and Does Not Obstruct the Specific Relief Requested in this Instance

To address the challenges associated with New Jersey's discriminatory primary election ballot design rules, it is essential to integrate the Supreme Court's guidance while promptly rectifying systemic injustices that disproportionately affect Black, Latino/a, Asian and other voters of color. The Supreme Court has expressly stated that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)). This "*Purcell* principle" requires more demanding scrutiny of last-minute changes to election laws that "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4-5; *see also League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, --- F.4th ---, 2022 WL 1435597, at *3 (11th Cir. May 6, 2022) (non-precedential stay order). However, the requested relief does not impede the statutorily required public draw of candidates for the ballot in April or change any current ballot, as none have been printed for this upcoming primary election yet.[71] Further, the imminent harm to voters caused by New Jersey's current, more

---

[71] Plaintiffs' Brief, *supra* note 70, at 51-52.

confusing ballot design requires a thorough consideration of the aforementioned principle.

In *Merrill v. Milligan*, Justice Kavanaugh, in a concurrence joined by Justice Alito, highlighted a critical aspect of the *Purcell* principle's application: the possibility of implementing changes without undue collateral effects. He noted, "[c]hanges that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement." 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring). This insight is particularly relevant in New Jersey, where the current primary ballot design laws—not the requested relief—introduce complexities and biases that impair electoral fairness and disproportionately disadvantage Black, Latino/a, Asian and other communities of color. The evidence indicates that the discriminatory impact, manipulation, and voter confusion created by the current primary ballot practices are profound, highlighting the urgent need for them to be corrected. Implementing changes that will make ballots easier to read, simplify the voting process, and eliminate these systemic biases is both feasible and urgently necessary, thereby aligning the requested remedy with Justice Kavanaugh's reasoning without invoking significant disruption or confusion.[72]

---

[72] *See, e.g.*, Dr. Appel, *supra* note 67.

The adverse effects of the county line on voter behavior and election integrity, particularly among Black, Latino/a, Asian and other voters of color, provide clear-cut and necessary grounds for immediate judicial intervention. The current scenario, marked by significant negative impacts on the democratic process and burden on the fundamental right to vote, differs markedly from those situations where the *Purcell* principle might traditionally caution against last-minute changes. The compelling need for equitable and transparent elections justifies immediate judicial action to address these injustices before they cause irreparable harm to New Jersey voters. As the Supreme Court did not apply the *Purcell* principle in cases requiring significant alterations to election rules, such as the ordering of entirely new maps for the Wisconsin State Assembly and Senate with just over four months until the primary elections (*Wisc. Legis. v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022)), it demonstrates that when changes are aimed at correcting fundamental electoral inequities, the principle does not apply.

The feasibility of implementing necessary changes without significant disruption, as discussed by Justice Kavanaugh, combined with the clear-cut merits of ensuring electoral fairness and the necessity of stopping the impact of the unconstitutional county line before it causes irreparable and imminent harm to New Jersey voters this upcoming election year, supports the case for judicial intervention in New Jersey. Further, it will be neither disruptive nor complex to implement a

ballot design that two counties in the state already use—and that multiple other counties in the state have used at least once before—before ballot positions have even been drawn and ballots have even been printed. This approach thus aligns with ensuring a fair electoral process for all voters while also addressing the critical need to dismantle systemic barriers that undermine democratic principles and racial equality in New Jersey elections.

Therefore, the *Purcell* principle should not apply to the case at hand, and the court should grant plaintiffs' Motion for Preliminary Injunction and requested relief.

## CONCLUSION

*Amici* urge that New Jersey's use of the county line illegally burdens and diminishes voting power, particularly of Black, Latino/a, Asian and other voters of color, makes it more difficult for candidates of color, as well as women candidates, to run for office and be elected, and ensures that the state's elected officials—from city council members to state senators to members of Congress—are accountable to county party leadership rather than to voters. Voters across New Jersey, particularly Black, Latino/a, Asian and other voters of color, will face imminent and irreparable harm in light of the upcoming June 2024 primary elections and 2024 general election. Defendants have not proffered a legitimate, much less substantial or compelling, interest in maintaining its antidemocratic and discriminatory process, especially as

two counties in New Jersey are already using the requested relief, the office box ballot—a common and straightforward alternative to the county line.

*Amici* therefore respectfully urge this Court to grant Plaintiffs' Motion for Preliminary Injunction.