## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANDY KIM, in his personal capacity as a candidate for
U.S. Senate, ANDY KIM FOR NEW JERSEY, SARAH
SCHOENGOOD, SARAH FOR NEW JERSEY,
CAROLYN RUSH and CAROLYN RUSH FOR
CONGRESS,

        *Plaintiffs*,

 v.

CHRISTINE GIORDANO HANLON, in her official
capacity as Monmouth County Clerk; SCOTT M.
COLABELLA, in his official capacity as Ocean County
Clerk; PAULA SOLLAMI COVELLO, in her official
capacity as Mercer County Clerk; MARY H. MELFI, in
her capacity as Hunterdon County Clerk; STEVE
PETER, in his official capacity as Somerset County
Clerk; HOLLY MACKEY, in her official capacity as
Warren County Clerk; NANCY J. PINKIN, in her
official capacity as Middlesex County Clerk; JOSEPH
GIRALO, in his official capacity as Atlantic County
Clerk; JOHN S. HOGAN, in his official capacity as
Bergen County Clerk; JOANNE SCHWARTZ, in her
official capacity as Burlington County Clerk; JOSEPH
RIPA, in his official capacity as Camden County Clerk;
RITA M. ROTHBERG, in her official capacity as Cape
May County Clerk; CELESTE M. RILEY, in her official
capacity as Cumberland County Clerk; CHRISTOPHER
J. DURKIN, in his official capacity as Essex County
Clerk; JAMES N. HOGAN, in his official capacity as
Gloucester County Clerk; E. JUNIOR MALDONADO,
in his official capacity as Hudson County Clerk; ANN F.
GROSSI, in her official capacity as Morris County Clerk;
DANIELLE IRELAND-IMHOF, in her official capacity
as Passaic County Clerk; and JOANNE RAJOPPI, in her
official capacity as Union County Clerk.

        *Defendants*,

- and –

DALE A. CROSS, in his official capacity as Salem
County Clerk; and JEFF PARROTT, in his official
capacity as Sussex County Clerk; TAHESHA WAY,

**Civil Action No.:
3:24-cv-01098-ZNQ-TJB**

Esq., in her official capacity as Secretary of State for
New Jersey.

       *As Interested Parties.*

---

## PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

**WEISSMAN & MINTZ**
220 Davidson Ave., Suite 410
Somerset, New Jersey 08873
732-563-4565

**BROMBERG LAW LLC**
43 West 43rd Street, Suite 32
New York, New York 10036
212-859-5083

Of Counsel and On the Brief:

Brett M. Pugach
Yael Bromberg
Flavio L. Komuves

Dated: March 12, 2024

## **TABLE OF CONTENTS**

I.  Defendants' Procedural Arguments Must be Rejected and Should Not Prevent the Court from Reaching the Merits of the Application for Preliminary Injunction .........................................................................................................1

    A.  Plaintiffs Joined All Necessary Parties and Went Above and Beyond the Requirements of Rule 19 to Ensure Various Additional Parties Had Notice of the Lawsuit and of the Application for Preliminary Injunction and an Opportunity to Participate ......................................1

    B.  Defendants' Assertions of Delay are Disingenuous, Conflict With Prior Positions of Numerous Defendants, and Should be Outright Rejected..................................................................................................................3

    C.  Extending Application of *Purcell* to this Case is Unwarranted and Would Contravene the Very Purposes Underlying this Principle ..........................7

    D.  Plaintiffs Clearly have Standing and the Theories Behind Defendants' Arguments were Previously Rejected by this Court ........................12

II.  Defendants Provide No Evidence and Make No Arguments that Detract from Plaintiffs' Likelihood of Success on the Merits...........................................14

    A.  Defendants have Not Undermined Plaintiffs' Clear Showing of Likelihood of Success on the Merits of their Elections Clause Claim..................................................................................................................14

    B.  Defendants have Not Undermined Plaintiffs' Clear Showing of Likelihood of Success on the Merits of their First and Fourteenth Amendment Claims ................................................................................16

    C.  Defendants' Reliance on State Court Cases was Already Correctly Rejected by this Court, which is Not Bound by State Court Interpretations of Federal Law .............................................................................21

III  Defendants have not met their burdens of proving that even greater harm to the non-moving party would occur under the Third Circuit's preliminary injunction test ................................................................................27

    A.  Defendant Clerks are already presenting voters with election races in office-block format with existing software and equipment, belying their claim that it would be impossible or difficult to do.........................27

B.    Neither voter confusion, the burdens of additional ballot draws, voter education needs, or other factors will meaningfully burden clerks if the injunction is granted.........................................................36

CONCLUSION....................................................................................................................39

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bado v. Gilfert*, 13 N.J. Super. 363 (App. Div. 1951) ...................................................22

*Batko v. Sayreville Democratic Org.*, 373 N.J. Super. 93 (App. Div. 2004)................................22

*Conforti v. Hanlon*, Docket No. 20-08267-ZNQ-TJB,
2022 WL 1744774 (D.N.J. May 31, 2022) ........................................................... *passim*

*Cook v. Gralike*, 531 U.S. 510 (2001) ...............................................................16

*Crawford v. Marion Cty. Election Bd.*, 553 U.S 181 (2008) ........................................22

*Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447 (D.N.J. 2012),
*aff'd*, 700 F.3d 130 (3d Cir. 2012) ...............................................................2,6,7,8

*Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989)................................24,25

*Farrington v. Falcey*, 96 N.J. Super. 409 (App. Div. 1967)........................................21-22

*Harrison v. Jones*, 44 N.J. Super. 456 (App. Div. 1957)................................................22

*Hawkes v. Gates*, 129 N.J.L. 5 (1942) ...............................................................21

*In re Hoffman*, 134 N.J.L. 155 (1946) ...............................................................21

*Lautenberg v. Kelly*, 280 N.J. Super. 76 (Law Div. 1994) ........................................23

*Mazo v. Durkin*, Docket No. 20-cv-08336, 2022 WL 2235945 (D.N.J. June 22, 2022) .............4,5

*Moskowitz v. Grogan*, 101 N.J. Super. 111 (App. Div. 1968)................................21,23

*New Jersey Democratic Party, Inc. v. Samson*, 175 N.J. 178 (2002) ............................9

*Pennsylvania Democratic Party v. Boockvar*, 238 A.345 (Pa. 2020)........................10

*Quaremba v. Allan*, 67 N.J. 1 (1975)...............................................................22,23,36

*Republican Party of Pa v. Cortes*, 218 F.Supp. 3d 396 (E.D. Pa. 2016)......................10

iii

*Richardson v. Caputo*, 46 N.J. 3 (1965) ........................................................................21

*Schundler v. Donovan*, 377 N.J. Super. 339 (App. Div. 2005),
*aff'd*, 183 N.J. 383 (2005) ................................................................................23,24,25,26

*Surrick v. Killion*, 449 F.3d 520 (3d Cir. 2006) ..............................................................21

*Yang v. Kosinski, No. 20-1494* (2d Cir, June 1, 2020) ......................................................9


Statutes

*N.J.S.A.* 19:23-26.1 ......................................................................................23,24,25

N.J.S.A. 19:49-2 .........................................................................................................23


Articles

David Wildstein, *Passaic County Democrats Give their Line to Tammy Murphy*, New Jersey
Globe (Feb. 10, 2024) .........................................................................................................4

David Wildstein, *Andy Kim Wins Ocean County Democratic Convention:*
*Ocean County Dems Back Tim Alexander, Matt Jenkins for Congress*, New Jersey Globe
(Mar. 10, 2024) ................................................................................................................13

Joey Fox, *Conaway Easily Wins Mercer Convention for NJ-3, Completing Clean Sweep of*
*County Lines*, New Jersey Globe (Mar. 11, 2024) .........................................................12

O.W. Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457 (1897) ................................38

Riordan Frost, *Who is Moving and Why? Seven Questions about Residential Mobility*,
Joint Center for Housing Studies of Harvard University (May 4, 2020) ................................37-38

In the face of overwhelming evidence that the New Jersey primary election bracketing and ballot placement system provides a substantial advantage to party-endorsed candidates on the county line and to bracketed candidates over off-line and unbracketed candidates who thereby suffer the consequences of an enormous handicap, all to the detriment of voters and basic tenets of democracy, Defendants resort to a series of arguments previously rejected by this Court in a similar matter, *Conforti v. Hanlon*, Docket No. 20-08267-ZNQ-TJB, 2022 WL 1744774 (D.N.J. May 31, 2022), and a barrage of baseless procedural arguments in an attempt to prevent this Court from reaching the merits of the application for a preliminary injunction. Rather than repeat at length all of the facts set forth in the Verified Complaint, exhibits and expert reports, opening brief in support of the preliminary injunction, and other accompanying papers, Plaintiffs hereby incorporate such documents and arguments by reference and provide the following additional arguments and information in reply.

I.      **Defendants' Procedural Arguments Must be Rejected and Should Not Prevent the Court from Reaching the Merits of the Application for Preliminary Injunction.**

This matter is properly before the Court and procedurally situated so as to allow for a ruling on the merits to prevent irreparable harm in connection with the upcoming Primary Election. Defendants' procedural arguments lack merit, and should not prevent the Court from deciding the application, nor from issuing expedited preliminary injunctive relief.

A.      **Plaintiffs Joined All Necessary Parties and Went Above and Beyond the Requirements of Rule 19 to Ensure Various Additional Parties Had Notice of the Lawsuit and of the Application for Preliminary Injunction and an Opportunity to Participate.**

Several Defendants ask this Court to either deny the injunction or dismiss the case for failure to name indispensable parties, including (1) all county Republican and Democratic County Committees and all candidates benefited by the primary ballot design law (DE60, p. 10);

(2) "direct opponents" of plaintiffs (DE61, p. 19); (3) county boards of election and superintendents of election (DE63, p. 39); or (4) "all local and state-wide political organizations" (DE50, p. 2.).[1] This argument was made and rejected once before in *Conforti v. Hanlon*, 2022 WL 1744774 at *6. One of the defendants there asked for dismissal under Rule 19 on the grounds that the Secretary of State and some class of "other (unnamed) candidates"[2] whose "ability to bracket" might be impacted were not named parties. *Id.* The Court rejected both arguments, and it should again reject them here and hew to the same analysis regarding nonjoinder of other organs of county government or "all . . . political organizations." *See id.*

Given the position Defendants have taken in this case, it is clear that as in *Conforti*, the action can proceed, given the notice and opportunity to be heard extended to non-parties. It's also noteworthy that here, Plaintiffs took extra steps to provide broad notice of their claims not just to all 21 county clerks, but also expressly named the Secretary of State as an interested party.[3] (DE1). Further, Plaintiffs sent copies of their Complaint to all known Democratic

---

[1] The Complaint shows on its face that Plaintiffs named the New Jersey Secretary of State, who is a cabinet officer of the State of New Jersey, and represented by the New Jersey Attorney General, as an interested party in the caption, which makes unavailing any claims that the State government was not properly notified of this action.

[2] This argument is as equally unavailing now as it was in *Conforti*. Surely, Plaintiffs cannot be expected to name as defendants such an infinite and amorphous group, namely every potential political candidate that may potentially be impacted; nor are they indispensable parties. Indeed, Defendants have not cited any ballot order cases where all opposing candidates, let alone all potential candidates for any race throughout the State, were deemed to be indispensable parties. In fact, candidates were not named nor otherwise found to be indispensable in *Conforti*, and in numerous ballot order cases, including in the Third Circuit. *See, e.g.*, *Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447 (D.N.J. 2012), *aff'd*, 700 F.3d 130 (3d Cir. 2012).

[3] Here, the Secretary of State was named as an interested party, provided notice of the action and accompanying documents, and was given the opportunity to participate. Likewise, the Attorney General has accepted service of the complaint and accompanying papers, and even appeared in this matter in connection with the Court's February 29, 2024 Case Management Conference. At that Case Management Conference, the Attorney General even asked questions about the timing in which they would be permitted to intervene. For whatever reason, to date, they have chosen not to participate and did not file a brief in opposition or otherwise enter a formal appearance on

candidates for U.S. Senate and Congressional Districts 2 and 3, and to all state and county political parties, both Republican and Democratic, (DE8), apprising them that the case had been filed, and providing all pleadings, thus allowing them to seek intervention if they thought it warranted. The case has also received wide coverage, given that the New York Times and state-focused political media have intensely covered it. Of this full set of individuals/entities receiving notice through direct service of the papers, or constructively, only one has sought intervention. (DE41).

Lastly, the suggestion that other county government agencies are indispensable parties lacks merit: it is the clerks, and only the clerks, who are charged by law with ballot design and layout; other agencies have no role in the process. *See Conforti*, 2022 WL 1744774, at *6 (finding that "relief from the court could be provided among parties," and a decision by the Court would not "impair or impede the NJ Secretary's ability to enforce election laws, because Plaintiffs' challenge is to the discretion of the County Clerks").

The wide knowledge expressly or constructively given as to the pendency of the case, their failure to intervene by those posited to have an interest in the case, their adequate representation by existing parties, and the Court's prior ruling in *Conforti* settle the issue.

### B.   Defendants' Assertions of Delay are Disingenuous, Conflict With Prior Positions of Numerous Defendants, and Should be Outright Rejected.

Defendants unconvincingly try to assert that this case and the application for preliminary injunction were untimely filed allegedly as a result of plaintiff Andy Kim's delay. This is both factually and legally wrong. Among others, one of the critical harms at issue in this case stems from the "weight of the line." As set forth in Plaintiffs' opening brief and in the Verified

---

the docket. To the extent that either the Secretary of State and/or the Attorney General might have an interest, they have consciously chosen not to avail themselves of the opportunity to participate and assert any such interests at this critical phase of the litigation.

Complaint, in practice, the visual display of the county line stems from the endorsement of the county party committee, which then gets effectuated through New Jersey's bracketing procedures and ultimate placement on the ballot by the county clerk. In this regard, while county party chairs in certain counties had endorsed Mr. Kim's opponents earlier, the first official endorsement of Mr. Kim's opponent from the actual county party entity was from the Democratic county committee in Passaic County on February 10, 2024.[4] Two days earlier, Mr. Kim, along with two other candidates also running for United States Senate, sent a letter to all county clerks asking them to voluntarily adopt office-block ballots, as failing to do so would constitute a violation of voting rights. *See* Verified Complaint ("VC"), at p. 5 n.4. Mr. Kim hoped to resolve this issue without litigation, but did not hear back from a single county clerk. *Id.* He then timely commenced suit, filing the Verified Complaint and application for preliminary injunction a mere two weeks later.[5]

Additionally, many of the Defendants, including at least 6 county clerks who were defendants in *Conforti*, and an additional 2 county clerks who were defendants in *Mazo v. Durkin*, Docket No. 20-cv-08336, 2022 WL 2235945 (D.N.J. June 22, 2022), previously took positions in those matters asserting that those plaintiffs' claims were unripe. Some of those Defendants even indicated that <u>Plaintiffs should have waited until *after the petition filing deadline or after the ballot draw* to file their claims</u>, in order to be ripe; put another way,

---

[4] *See* David Wildstein, *Passaic County Democrats Give their Line to Tammy Murphy*, New Jersey Globe (Feb. 10, 2024) ("Passaic County Democrats today voted to endorse Tammy Murphy for U.S. Senate, formally giving the First Lady her first organization line."), *available at*: https://newjerseyglobe.com/congress/passaic-county-democrats-gives-their-line-to-tammy-murphy/ (last accessed Mar. 10, 2024).

[5] Another Plaintiff, Sarah Schoengood, who is a first-time candidate running for U.S. House of Representatives for New Jersey's Fourth Congressional District, did not even declare her candidacy until about one month before the Verified Complaint was filed. Moreover, the first county that awarded the county line to one of her opponents was Monmouth County, whose convention was also held only about two weeks before the lawsuit was filed.

multiple election officials took the position that similar challenges were too early, too late, or

both, effectively taking the view that the calendar had no viable dates for such a suit to be filed

or adjudicated.[6]

　　　When it was legally convenient to so argue, the Defendants did not raise any concerns

with their suggested later timing in those cases. Nevertheless, now, when it is legally

inconvenient for those same Defendants to maintain this position, and notwithstanding the fact

that Plaintiffs filed weeks and months ahead of Defendants' previously-suggested timeframes,

they claim that Plaintiffs waited too long to file. Defendants will always claim that Plaintiffs are

too early, too late, or as in *Conforti*, both. Their inconsistent positions are further undermined

here by the fact that the Verified Complaint and application for preliminary injunctive relief were

filed 100 days prior to the Primary Election, almost two months before vote by mail ballots are to

be sent out, about one and a half months before the ballot draw, and even almost a full month

prior to the petition filing deadline, i.e., before the candidates are even finalized for each race. At

bottom, this demonstrates that there is no day of the year that would be acceptable to Defendants,

---

[6] *See, e.g.*, *Conforti*, Docket No. 3:20-cv-08267 (Hudson County Clerk Brief in Support of Motion to Dismiss, ECF No. 57-3, at p. 9) ("The live controversy then is the placement on the ballot *at the moment the ballot draw is performed* . . . . The Plaintiffs never challenged the ballot placement *during a time frame in which a court may have affected her position on the ballot*.") (emphasis added); *id.* (Monmouth County Clerk Brief in Support of Motion to Dismiss, ECF No. 59-2, at p. 31 (claiming plaintiff did not file when there was an actual controversy, "*e.g., when the ballot draw occurred on April 9, 2020*") (emphasis added); *id.* (Bergen County Clerk Brief in Support of Motion to Dismiss, ECF No. 60-1, at p. 17 (asserting claim would not be ripe until *after the petition filing deadline*); *see also id.* (Mercer County Clerk Brief in Support of Motion to Dismiss, ECF No. 58-1, at p. 1 (claiming on one hand that certain "Plaintiffs ha[d] ample time to challenge the ballot design prior to their respective elections," and on the other hand that other plaintiffs filed too early to be "at risk of any concrete and particularized injury"); *see also id.* (Atlantic County Clerk Brief in Support of Motion to Dismiss, ECF No. 56, at pp. 12-13); *id.* (Ocean County Clerk Brief in Support of Motion to Dismiss, ECF No. 55-1, at p. 32 (adopting and joining in the arguments made by co-defendants); *id.* (Attorney General Brief in Support of Motion to Dismiss, ECF No. 53-1, at pp. 12-15); *Mazo v. Durkin*, Docket No. 20-cv-08336, 2022 WL 2235945, at *4 (D.N.J. June 22, 2022) (acknowledging that the Union and Essex County Clerks argued that the plaintiff's claims were both moot and unripe).

and their baseless claims of delay are clearly grounded in feeble attempts to prevent the federal judiciary from adjudicating a serious constitutional challenge to New Jersey's primary election bracketing and ballot placement system.

Rather than suffer the consequences of filing a Verified Complaint and a motion for preliminary injunction unsupported by evidence, *see Democratic-Republican Org. of New Jersey v. Guadagno*, 900 F. Supp. 2d 447, 461 (D.N.J. 2012), *aff'd* 700 F.3d 130 (3d Cir. 2012) (injunctive relief denied in absence of empirical evidence), Plaintiffs acted diligently to muster the evidence necessary to substantiate their claims, and their requested injunctive relief, and presented it as soon as possible in this uniquely dynamic and evolving election cycle. This included an experimental study performed, not in a vacuum, but in connection with the upcoming primary election, designed and analyzed by Dr. Pasek in his underlying expert report. The presentation of such evidence is customary, indeed necessary, in a motion for preliminary injunction in the voting rights context. Accordingly, Plaintiffs filed the instant action and application within a reasonable time period after the first Democratic county committee's official endorsement of one of Plaintiffs' opponents. They did so in the event that county clerks were unwilling to agree to constitutional ballot design despite increased public attention on the issue. Under these circumstances, Plaintiffs were not dilatory and timely filed this case, such that the Court can decide the merits of the application for preliminary injunction.[7] Accordingly, the merits of the application for preliminary injunction must be considered.

---

[7] For all the foregoing reasons, in response to any theory raised by Defendants, any claim of unreasonable delay must be rejected under the circumstances.

**C.** **Extending Application of *Purcell* to this Case is Unwarranted and Would Contravene the Very Purposes Underlying this Principle.**

In a last-ditch effort to prevent the Court from deciding the merits of the preliminary injunction, Defendants try to hide behind the *Purcell* principle, which generally cautions against last-minute changes to election laws. Defendants cite to many cases in which the doctrine was applied essentially on the eve of the election. By contrast, here, as set forth above, this matter was filed 100 days before the Primary Election, months in advance of various statutory deadlines, and an evidentiary hearing is scheduled to take place even prior to the petition filing deadline. A case filed on the eve of an election is qualitatively different than one filed 100 days before Election Day, particularly when candidate petitions have yet to be filed and ballot draws have yet to be conducted.

Various Defendants' reliance on *Guadagno*, 900 F. Supp. 2d 447, is curious given its stark contrast to the timing at issue in this case. *See, e.g.*, DE60, at pp. 18-19 (acknowledging that the *Guadagno* plaintiffs "filed approximately one week before the deadline to print mail-in ballots"). In *Guadagno*, the court referenced *Purcell* in a footnote and emphasized the fact that many county clerks had already printed and sent out mail-in ballots when the case was decided, such that "any injunctive remedy ordered by this Court would dramatically upset ongoing ballot printing and distribution." *Id.* at 461 n.8. Even more importantly, the court in *Guadagno* held that such considerations about the case's timeliness would <u>not</u> "be an impediment to relief if Plaintiffs had demonstrated a clear constitutional violation." *Id.* (citing *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883-84 (3d Cir. 1997)).

Here the facts are critically distinguishable in two important ways. First, this matter was filed a month and a half prior to the deadline for printing ballots, not one week. Thus, none of the important statutory deadlines were immediately on the horizon, and, in fact, the evidentiary

7

hearing in this case will even take place before candidate petitions are due (let alone ballot proofs which follows approximately 2 weeks later), and thus before we even have an official list of candidates who are running. Furthermore, the risk of voter confusion is understandably concerning when ballots have already been sent out to voters like in *Guadagno*, but that is simply not the case here. Second, for all the reasons set forth in Plaintiffs' moving papers and below in this brief, Plaintiffs can demonstrate a clear constitutional violation. Again, a major reason that the court in *Guadagno* found that the plaintiffs could not demonstrate a clear constitutional violation was because "Plaintiffs provide[d] *no* evidence that demonstrates that certain ballot placement confers any benefit," via empirical evidence or otherwise. *Id.* at 457-58 (emphasis in original). By contrast, here Plaintiffs' come to this Court much earlier than in *Guadagno*, and with the exact type of empirical evidence that was lacking in *Guadagno*.

Moreover, as all election lawyers in this state know, in almost every election cycle, there are various candidate petition challenges, ballot position challenges, and other reasons that have led courts to extend statutory deadlines or otherwise issue injunctive relief and/or require changes to ballots much further into the election timeline than when Plaintiffs filed this case. (Komuves Decl., Exh. I) (ordering on *April 22, 2019*, after the statutory deadline for mailing mail-in ballots, that the names of mayoral and borough council candidates be certified to appear on the primary ballot in connection with the June 4, 2019 primary election); *id.* at Exh. J (March 29, 2022 order to show cause enjoining clerk from preparing, printing, or sending out ballots for a *May 10, 2022 municipal election*, setting a return date of April 4, 2022, whereupon dates for a hearing would first be scheduled); *id.* at Exh. K (April 19, 2022 Order requiring Middlesex County Clerk to conduct a new ballot draw, and to thereafter "draw, prepare and design ballots with respect to the June 7, 2022 Primary Elections in Middlesex County consistent with the

results of the Provisional Drawing ordered."); *id.* at Exh. L (April 15, 2019 Order requiring Middlesex County Clerk to design ballots free of gender discrimination, such as by using an alternative ballot design used in the 2018 Mercer primary, for the June 5, 2019 Democratic primary election, and relaxing the date for preparation of mail-in ballots for affected districts to May 1, 2019, upon the filing of a verified complaint on April 11, 2019); *see also New Jersey Democratic Party, Inc. v. Samson*, 175 N.J. 178 (2002) (allowing Democratic U.S. Senatorial candidate to be placed on the ballot after the statutory period for filling a vacant nominee had already expired, only ***34 days before the General Election***, finding "sufficient time" even after thousands of absentee ballots had ***already been disseminated***, since, if the process was expedited, "most could be prepared and mailed within ***five business days,***" and voter confusion could be mitigated by "an explanatory letter to all voters to whom a revised ballot has been sent.") (emphasis added).

Similarly, in *Yang v. Kosinski,* 960 F.3d 119 (2d Cir. June 1, 2020), the Second Circuit Court of Appeals affirmed a May 5, 2020 order granting preliminary injunctive relief, and did so only ***21 days ahead of the June 23, 2020 primary election***. Therein, the State Board of Elections appealed a grant of preliminary injunction by the United States District Court for the Southern District of New York. In light of the cancellation by two presidential candidates Andrew Yang and Bernie Sanders of their campaigns, the Board deemed the presidential primary nothing more than a "beauty contest," and canceled it altogether, articulating a state interest in minimizing social contacts to reduce the spread of COVID and to focus its limited resources on managing other contested primary elections. The Second Circuit reasoned that it need not determine which standard of review to apply to the preliminary injunction, because the plaintiffs and their intervening delegates would prevail under either theory; for the sake of the argument, the more

rigorous standard was applied. The United States District Court for the Southern District of New York found that the plaintiffs and their intervenor delegates possess a right to appear on the ballot so that they may be elected and contribute to shaping the party agenda at the Democratic National Convention. The Second Circuit affirmed 21 days before the primary election, and the State Board of Elections was ordered to add the race and the candidates on the ballot pursuant to their First Amendment associational rights and inseparable Fourteenth Amendment liberty claims.[8]

Moreover, application of the *Purcell* principle would be incompatible with its underlying purposes, namely to preserve the integrity of the election and avoid voter confusion. Stated differently, here there is a greater risk of undermining the integrity of the election and of causing voter confusion if injunctive relief is *denied*, than if it were to be *granted*.

As previously explained in Plaintiffs' opening brief, and as set forth below, *see infra* pp. 17-18, Plaintiffs have provided expert reports and evidence demonstrating that, as a result of New Jersey's unique and unnecessary ballot design practices, candidates on the county line receive an enormous advantage over their off-line opponents, and bracketed candidates receive a substantial advantage over their unbracketed opponents. Opponents are further punished with

---

[8]     Defendants make much hay of language found in a decision arising out of the United States District Court for the Eastern District of Pennsylvania, *Republican Party of Pa v. Cortes*, 218 F.Supp. 3d 396 (E.D. Pa. 2016). Specifically, they pluck language from the decision concerning a "judicial fire drill" when the late filing there was brought **18 days before the election**. However, here, the Plaintiffs filed the instant action **100 days before the election**. The language and decision in *Cortes* is inapposite here. *Cortes* relates to a challenge to state geographic restrictions on pollworkers limiting their ability to serve within the county of their registration. Unlike the claims presented here, the Eastern District of Pennsylvania found that the challenge *did not invoke any violations of constitutional rights* because the fundamental right to vote was not implicated. Reviewing the *Cortes* decision, the Supreme Court of Pennsylvania later acknowledged that *Cortes* "made its decision on multiple bases, including the merits as well as the timing of the claims." *Pennsylvania Democratic Party v. Boockvar*, 238 A.345, 384 (Pa. 2020).

additional disadvantages, including but not limited to the inability to draw for position (leaving them vulnerable to substantial primacy effect disadvantages), having to compete against the weight of the line, and having to avoid or suffer the consequences of Ballot Siberia. In fact, Dr. Pasek concluded that, due to such advantages, which alter election results and can be outcome determinative, voters could reasonably question the legitimacy of the winner of an election, even in instances of double-digit margin victories. In this regard, various County Clerk Defendants even asserted in a submission opposing the entry of this Court's scheduling order that "the function of an election is not to choose a winner, but to assure the voters and other candidates that the loser lost fair and square." DE16, at p. 3. With the cat now out of the bag as to how much New Jersey primary elections are designed to substantially favor party-endorsed and certain bracketed candidates over their opponents, allowing the 2024 election to proceed under the current status quo would severely undermine the integrity of the election and the voters' confidence in its fairness and its outcome.

The same holds true as to voter confusion. Plaintiffs submitted unrebutted evidence that the current bracketing and ballot placement system allows unbracketed candidates to be placed in columns where they are harder to find, harder to know what they are running for, and harder to know who they are running against. They can also be stacked in columns with their opponents or with candidates that they do not want to be associated with. Moreover, Plaintiffs provided significant evidence of actual voter confusion, including, among other examples, an enormous number of overvotes in the 2020 Democratic Primary Election for CD-4 in Mercer County where the votes of one-third of voters in the county from that congressional district were disqualified due to over-voting. They further provided expert opinion explaining how the current system

regularly violates 3 out of 4 general principles of ballot design which leads to voter error. These considerations further militate against application of *Purcell* to this case.

**D.      Plaintiffs Clearly have Standing and the Theories Behind Defendants' Arguments were Previously Rejected by this Court.**

Some Defendants argue the injunction should be denied for want of standing. (DE61, p. 11). This issue was raised and settled in *Conforti*, 2022 WL at 1744774 at \*7-9, and there is no reason for revisiting it, including both with respect to the First and Fourteenth Amendment violations, and also separately with respect to the Elections Clause violation. Indeed, Plaintiffs' standing is at least as strong as what the court found sufficient in *Conforti*. Plaintiffs' scientific experts have concluded, using multiple methods of analysis, that New Jersey's primary ballot design laws and practices, as implemented by the county clerks, confer a large advantage to candidates who meet one or more of these independent conditions, separately: they are (1) listed on a county line; (2) bracketed with other candidates on any line; and (3) listed first on the ballot. ***None of these factual conclusions have been rebutted; They are the very antithesis of a fairly conducted election in which the public can be justifiably confident of its results.***

These dangers are real, present, and irreparable: there is at least one county (and in fact many counties) where Plaintiff Kim will not receive the benefits associated with the county line (though he may still draw first ballot position). *See* https://newjerseyglobe.com/wp-content/uploads/2024/03/Dem-convention-tracker-311.png. There is at least one county (and in fact all three counties in CD-3 – Monmouth, Burlington, and Mercer[9] – where Schoengood will

---

[9] Since the filing of the Verified Complaint, the Democratic county committee in Mercer County has now made an official endorsement of one of Schoengood's opponents for CD-3. *See* Joey Fox, *Conaway Easily Wins Mercer Convention for NJ-3, Completing Clean Sweep of County Lines*, New Jersey Globe (Mar. 11, 2024), *available at*: https://newjerseyglobe.com/congress/conaway-easily-wins-mercer-convention-for-nj-3-completing-clean-sweep-of-county-lines/ (last visited Mar. 12, 2024).

not receive the benefits associated with the county line, and, as an unbracketed candidate not pursuing a pivot point office, will also not even have an opportunity for first ballot position.[10] And there is at least one county where Rush will not receive the benefits of the county line.[11]

Furthermore, each of these candidates will be treated differently from their similarly situated opponents running for the same office. Moreover, each candidate will be further harmed in their associational rights in that they will either (1) be forced to associate with other candidates to protect their ballot positions and prevent/mitigate against their opponents from getting an advantage over them[12]; or (2) be penalized for exercising their right to not associate with other candidates and suffer those same disadvantages.

---

[10] Andy Kim will be featured on the county line in all three of these counties, and Schoengood does not intend to bracket with any of the other U.S. Senate candidates, with whom she is not ideologically aligned. *See* VC, at ¶ 154. Thus, in all three of these counties, Schoengood will also be further harmed by the various ways in which unbracketed candidates get treated on the ballot, whether she appears with ballot gaps between candidates running for the same office/Ballot Siberia, whether she is featured in a column by herself compared to the "weight of the line," and/or whether she is stacked in a column with candidates running for the same or different office with whom she did not request to bracket and does not want to associate.

[11] Since the filing of the Verified Complaint, one of the county committees in CD-2 has now made an official endorsement of one of Rush's opponents. *See* David Wildstein, *Andy Kim Wins Ocean County Democratic Convention: Ocean County Dems Back Tim Alexander, Matt Jenkins for Congress*, New Jersey Globe (Mar. 10, 2024), *available at*: https://newjerseyglobe.com/congress/andy-kims-wins-ocean-county-democratic-convention/ (last visited Mar. 10, 2024) (explaining that Rush's opponent, Tim Alexander, was awarded the county line in Ocean County).

[12] Thus, even in counties where Andy Kim won the county line (and where neither of the congressional candidate Plaintiffs are running), his First Amendment freedom to not associate is still violated. This is because the ballot advantages of allowing his (or any candidate's) opponent to get the county line, and the corresponding disadvantage of not getting the county line, are so large that he is forced to associate with the other candidates for other offices on the county line, even where he may not agree with their policies, refuses to endorse them or campaign with them, or otherwise does not want to associate with them. *See* VC, at ¶ 140. Regardless of whether he is on the county line or not, in every county he will have to sacrifice his associational rights or incur the penalty that the current bracketing and ballot placement system places on exercising those rights. Moreover, because this system is unconstitutional in a substantial number of its applications, every county clerk Defendant must be subject to this Court's jurisdiction.

Effectively, each of these candidates will be going into the primary election with an opponent already having an edge that is traceable by an unbroken, heavy line to the state's unconstitutional ballot design laws, as implemented by the county clerks.  This is more than sufficient to justify standing, as the *Conforti* court previously ruled.

Nor is there any reason to revisit the Court's holdings on traceability and redressability in *Conforti*, where the Court found that (1) county clerks exercise "significant discretion" in ballot design and placement of candidates; (2) the "Plaintiffs' injuries flow directly from Defendants' [County Clerks'] actions"; and (3) declaratory and injunctive relief against the county clerks "would prevent Plaintiffs' injuries." 2022 WL 1744774, at *8 (citations omitted).

## II.     Defendants Provide No Evidence and Make No Arguments that Detract from Plaintiffs' Likelihood of Success on the Merits.

The claims and the evidence presented to this Court in the *Conforti* matter were held sufficient to withstand a motion to dismiss, both with respect to their Elections Clause and First and Fourteenth Amendment causes of action. Plaintiffs now advance similar theories and arguments, and additionally present unrefuted expert reports and evidence to buttress their allegations in connection with their application for a preliminary injunction.

### A.     Defendants have Not Undermined Plaintiffs' Clear Showing of Likelihood of Success on the Merits of their Elections Clause Claim.

Plaintiffs have demonstrated, and Defendants have not refuted, grounds for preliminary injunctive relief under the Elections Clause, even without considerations of the burdens and state interests under the *Anderson/Burdick* balancing test. At the motion to dismiss phase in *Conforti*, this Court found that plaintiffs "sufficiently allege[d] that the Bracketing Structure may favor or disfavor a class of candidates or may dictate electoral outcomes," and that they sufficiently alleged that New Jersey's bracketing and ballot placement system attaches a "concrete

consequence" to unbracketed and disfavored candidates via their ballot position. 2022 WL 1744774, at *18.

In this case, Plaintiffs have provided expert reports containing an abundance of scientific and statistical evidence to demonstrate a likelihood of success on the merits. The evidence demonstrates that New Jersey's primary election bracketing and ballot placement system clearly favors party-endorsed candidates and bracketed candidates over all other off-line and unbracketed candidates. This is not just theoretical, but is based on quantitative evidence and analysis specifically tied to New Jersey elections, past and current, which demonstrate that the favored classes of candidates have a substantial advantage over their disfavored opponents. Furthermore, it is hard to imagine how ballots can "dictate electoral outcomes" in a greater way than rewarding an opponent with an "enormous handicap." Indeed, Dr. Pasek found that the ballot design system in New Jersey alters election results, renders otherwise unviable candidates viable, and has the potential to be outcome determinative. Moreover, due to the advantage of being on the county line and of being bracketed, as well as the corresponding and additional disadvantages of being off the line or unbracketed, New Jersey's ballot design laws and practices, as carried out by the county clerks, clearly attach a "concrete consequence" to candidates not favored by party leadership, as well as to candidates who choose to exercise their right to not associate. Surely such ballot advantages/disadvantages do not represent mere procedural principles and are not contemplated as a permissible "manner" of regulating an election.

Nothing submitted by Defendants does or could detract from the expert evidence provided by Plaintiffs to demonstrate the way in which the ballot design in 19 counties in New Jersey favors certain classes of candidates over others. Indeed, some Defendants' contention, that

the treatment of non-party-favored and unbracketed candidates is not similarly "pejorative" or "derogatory" as the notation placed on the ballot that certain candidates did not support term limits in *Cook v. Gralike*, 531 U.S. 510 (2001), rings hollow. *See, e.g.*, DE61, at pp. 39-40. Words are not the only way to ostracize candidates on a ballot. Physically separating candidates away from party-endorsed opponents running for the same office, having them run in a column by themselves as compared to the full "weight of the line," placing them in obscure portions of the ballot, relegating them to Ballot Siberia, making them appear unserious, harder to find, and harder to know what they are running for or who they are running against, is certainly equal to or more of a sanction or penalty than a notation that they did not support term limits as a matter of policy. Here, candidates are excluded from the first and additional columns of the ballot and will find themselves stacked in columns with other candidates with whom they do not wish to associate and/or *placed in the functional equivalent of a ballot time-out* just because they were not endorsed by party leaders and/or exercised their right to not associate with certain other candidates running for other offices. For this reason alone, Plaintiffs clearly show a likelihood of success on the merits of their Elections Clause claims, warranting the Court's entry of preliminary injunctive relief.

**B.** **Defendants have Not Undermined Plaintiffs' Clear Showing of Likelihood of Success on the Merits of their First and Fourteenth Amendment Claims.**

In *Conforti*, at the motion to dismiss phase, this Court acknowledged that New Jersey's primary election bracketing and ballot placement system could be "'invalidated as overbroad if a substantial number of its applications are unconstitutional.'" 2022 WL 1744774, at *17 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51

16

(2008)).[13] Furthermore, based on the allegations of the complaint, the Court found that "collectively, the fundamental rights involved in this case are more than moderately infringed upon," and thus were subject to "a moderate to severe level of scrutiny." *Id.* As set forth in the opening brief here, Plaintiffs in *this* matter have now advanced similar theories buttressed with expert reports containing a plethora of historical data, behavioral and cognitive science, statistical analyses, surveys tied to this election cycle, and other evidence tying the harms specifically to New Jersey elections and finding every reason to believe that such effects will impact the upcoming 2024 Democratic Primary Election and future elections in this state. This court recognized that challengers can demonstrate such a burden by showing that there is a benefit bestowed upon candidates based on their bracketing and ballot position. *See, e.g.*, *id.* at *16 (acknowledging harm to the right to vote where "the ballot position of candidates appeared to have provided them with positive benefits"); *id.* at *17 (acknowledging harm to freedom to associate "[i]f there is a consistent benefit for those who bracket and a consistent detriment for those who do not bracket[, such that] the statute creates a cost to a candidate's right to not associate"). Here, Plaintiffs have now done so in connection with this application for preliminary injunctive relief.

Plaintiffs have gone above and beyond demonstrating these harms and the consistent and substantial nature of these burdens. Among others, these include expert evidence of an average ***38% difference*** between congressional candidates being on the county line and their opponents being on the county line over the last 20 years. The record demonstrates an ***average 24.7% advantage*** of the same county line effect found by Dr. Pasek in a survey conducted in connection with the upcoming Primary Election; an ***18.9% average primacy effect*** for candidates when they

---

[13] As in *Conforti*, here Plaintiffs bring both a facial and as-applied challenge.

are listed in first position compared to later-listed positions; and ***an average 12.7% advantage for candidates who bracket*** (even excluding those who bracket on the county line), compared to when those same candidates were unbracketed. The rebuttal expert evidence further demonstrates a consistent benefit, giving bracketed candidates and especially those on the county line a substantial ballot advantage over their opponents, an enormous handicap in favor of party-endorsed candidates, and the ability to alter election results and even outcomes. Nothing in Defendants' dozens of submissions detracts from this expert evidence. *See* Expert Reply Report, Dr. Josh Pasek, Exh. A; Expert Reply Report, Dr. Samuel S.-H. Wang, Exh. B.

The advantages and disadvantages stemming from the ballot design in New Jersey primary elections are staggering, and no state interest can possibly outweigh the harm to Plaintiffs, candidates, voters, the public welfare, and the legitimacy of elections in this State, which can now reasonably be called into question, even in the case of double-digit margin victories. Furthermore, as set out in Plaintiffs' opening brief, generalized state interests of promoting ballot integrity and avoiding voter confusion are severely undermined based on the extent to which the advantages provided undermine the legitimacy of election results and promote voter confusion, as evidenced by Dr. Rubin, including examples like in Mercer County where almost 1/3 of CD-4 voters in Mercer County were disenfranchised as a result of their votes being disqualified due to voting for too many candidates in light of candidates being stacked on top of one another on the county line.

Similarly, any alleged state interest in preserving candidates' rights to associate ring hollow. As explained in Plaintiffs' prior submissions, New Jersey allows candidates and parties to associate with one another, endorse one another, campaign with one another, etc. It goes even above and beyond what the overwhelming majority of other states do in that it even allows

candidates to associate with one another on the ballot itself, via use of a common slogan. This case and the relief requested do not seek to disturb those slogans or endorsements. In fact, as previously explained, the Attorney General even admitted in the *Conforti* case that no voter will be confused as to which candidates are associated with one another, since they can simply view the slogan to make such determination. *See Conforti*, Docket No. 20-08267-ZNQ-TJB, Attorney General Brief in Support of Motion to Dismiss, ECF 53-1, p. 21.

It is clear that this challenge to New Jersey's bracketing and ballot placement system is not about endorsements or slogans or associations; parties and candidates will continue to enjoy all of these rights and privileges under the relief Plaintiffs are seeking. Instead, when you strip away the rhetoric of associational rights, it is clear that the substance of this alleged "state interest" is simply about maintaining an enormous state-conferred advantage that consistently benefits party-endorsed and certain other bracketed candidates over their opponents,[14] resulting in additional votes for their candidates and electoral harm to the prospects of their opponents. This is not a legitimate interest at all, and certainly cannot outweigh the considerable harm to Plaintiffs.

Moreover, as set forth in detail in Plaintiffs' opening brief, the current bracketing and ballot placement system often leads to nonsensical associations: a candidate bracketing with their own opponent; candidates being featured in a column with someone with whom they did not request to bracket; and candidates running in the same column and with the same slogan as one candidate for a different office in one county, and with that same candidate's opponent in a

---

[14] Indeed, this explains the elephant in the room of why various county political parties have sought to expend considerable time and resources to intervene in *Conforti* and in this matter. For further discussion on this point, *see* DE77.

different county.[15] Even candidates requesting bracketing do not necessarily have anything in common or want to be associated with one another. As explained by Dr. Pasek, perhaps the best that can be said for bracketed candidates is simply that they share an incentive to reap the rewards that New Jersey's ballot design system bestows upon the county line and bracketed candidates (or to prevent their opponents from obtaining such benefits over them) and to avoid the disadvantages faced by off-line and unbracketed candidates. Various Defendants even appear to acknowledge this, since they argue that Plaintiffs and other candidates should be required to simply "recruit"[16] candidates to run for various other offices up and down the ballot, to try to mitigate against the harm they will inevitably experience at the hands of the Clerks' implementation of the ballot design laws. (DE54, pp. 6, 9, 12).

Simply put, Defendants have not demonstrated that New Jersey's unique ballot design features further legitimate state interests in any meaningful way, let alone in a manner sufficient to outweigh the severe and substantial burdens imposed. **<u>Nor could they.</u>** Indeed, no other state designs their ballot this way, and Defendants have not so much as offered an explanation, let alone proof, as to why it is so important to favor and punish candidates in such a significant

---

[15] Some candidate associations are even valued differently compared to other candidate associations, depending on which office the county clerk decides to use as the pivot point, since only candidates associated with a candidate for that pivot point office will enjoy primacy benefits.

[16] Imagine a candidate running for Town Council needing to simply "recruit" a candidate for United States Senator, President of the United States, House of Representatives, and county offices, just to avoid ballot harm. Moreover, even if it were feasible to find and convince such candidates to run, which is highly questionable, the Town Council candidate may not agree with their platforms (which are also much different from the local issues they would face in office), and/or may not want to have their campaign associated with the ups and downs of their campaigns for a completely different office.

manner, especially when their associational rights (including on the ballot) already far surpass that allowed by other states.[17]

C.     **Defendants' Reliance on State Court Cases was Already Correctly Rejected by this Court, which is Not Bound by State Court Interpretations of Federal Law.**

This Court already considered and rejected Defendants' misplaced reliance on state court cases discussing New Jersey's primary election bracketing and ballot placement system. *See Conforti*, 2022 WL 1744774, at *14 (citing *Erie R. Co. v. Tomkins*, 304 U.S. 64, 78 (1938) (federal courts are "not bound by [state law] interpretations of rights under the United States Constitution")). Nevertheless, Defendants surprisingly spend considerable time discussing these very same cases. These cases are inapplicable, decided under different standards, wrongly decided, and/or not persuasive. More importantly, as this Court aptly recognized, state court decisions, to the extent they interpret the U.S. Constitution, are not binding on a federal court. *Surrick v. Killion*, 449 F.3d 520, 535 (3d Cir. 2006) ("[D]ecisions of the [State] Supreme Court do not bind this Court with respect to federal law . . . .").

The majority of these state cases were decided decades ago, and did not address the constitutionality of New Jersey's bracketing and ballot placement system, but instead addressed how the state law should be interpreted, and what extent of discretion a county clerk was permitted under the statutes in effect then, under the norms of constitutional law at the time, with its fawning deference to governmental action. *See generally Richardson v. Caputo*, 46 N.J. 3 (1965); *In re Hoffman*, 134 N.J.L. 155 (1946); *Hawkes v. Gates*, 129 N.J.L. 5 (1942); *Moskowitz v. Grogan*, 101 N.J. Super. 111 (App. Div. 1968); *Farrington v. Falcey*, 96 N.J. Super. 409

---

[17] It should be noted that the Attorney General, who appeared at the scheduling conference, has decided not to intervene or otherwise participate to assert a state interest, despite the fact that the Attorney General almost always participates to defend the constitutionality of state statutes.

(App. Div. 1967); *Harrison v. Jones*, 44 N.J. Super. 456 (App. Div. 1957); *Bado v. Gilfert*, 13 N.J. Super. 363 (App. Div. 1951). Furthermore, these cases were decided when New Jersey's primary endorsement ban was still in effect, which prohibited political parties from endorsing candidates in a primary election. *Cf. Batko v. Sayreville Democratic Org.*, 373 N.J. Super. 93 (App. Div. 2004) (primary endorsement ban in New Jersey not struck down until 2004). The singular case that did discuss constitutionality was nevertheless decided well before the current *Anderson/Burdick* balancing test was announced by the Supreme Court of the United States. *See Quaremba v. Allan*, 67 N.J. 1 (1975).

*Quaremba* relied heavily on the above state court cases dealing with statutory interpretation. As to constitutionality, the court appeared to focus on two standards, neither of which remain applicable and/or dispositive in a challenge under the First and Fourteenth Amendment under today's standards. The court first looked for intentional and purposeful discrimination on the part of the county clerk, and then looked to determine if the county clerk's discretion was "rooted in reason." *See id.* at 16. These analyses are focused more on the specific actions of the discretion exercised by the county clerk, than on the constitutionality of the law more generally. They also suggest loose applications of standards similar to strict scrutiny or rational basis, with nothing in between. Today's standard for equal protection and other First and Fourteenth Amendment challenges goes beyond a simple determination of intentional discrimination. Instead, it calls for careful considerations of the burdens and of the state interests, and requires that any state interest be sufficiently weighty to justify the imposition of the burdens. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S 181, 191 (2008) (lead opinion) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)). Thus, the analysis is not limited to a determination of whether a county clerk's action was merely rooted in reason, which is

essentially a rational basis determination. Moreover, *Quaremba* did not involve a complex constitutional challenge under the theories developed in this case, and thus, the specific issues arising from the claims in this matter have never been decided.

The more recent state court cases that address bracketing, also dealt in part with interpretation of state law, and particularly *N.J.S.A.* 19:23-26.1. *See, e.g.*, *Schundler v. Donovan*, 377 N.J. Super. 339 (App. Div. 2005), *aff'd*, 183 N.J. 383 (2005). In *Schundler*, the court was faced with the issue of interpreting the intersection of *N.J.S.A.* 19:23-26.1, which called for gubernatorial candidates to all be featured on the first line of the ballot, and *N.J.S.A.* 19:49-2, which calls for bracketing requests to run through joint petition county candidates, taking into consideration court decisions like *Moskowitz v. Grogan*, which held that state candidates who were not affiliated with joint petition county candidates could not draw for position as against those who were affiliated with county candidates. Making matters more complicated, the court was faced with a situation where the physical limitations of the ballot made it impossible to fit all seven of the gubernatorial candidates on the first column or row. *See* 377 N.J. Super. at 344.

*N.J.S.A.* 19:23-26.1 prescribes three requirements with respect to primary elections involving candidates for United States Senator and Governor: (1) the names of all candidates for United States Senator or Governor had to be printed on the first column of the ballot; (2) in an election where both of these offices were on the ballot, the names of the candidates for United States Senator should be printed in the first column and the names of the gubernatorial candidates should be printed in the second column; and (3) no candidates for any other office should be featured on the ballot in the same column as candidates for United States Senator or Governor. While a prior Law Division opinion found that the whole statute was unconstitutional, *see Lautenberg v. Kelly*, 280 N.J. Super. 76 (Law Div. 1994), the law was never repealed by the

Legislature, and thus the Appellate Division in *Schundler* undertook its own constitutional review. *See Schundler*, 377 N.J. Super. at 346-47. The court proceeded to find that the first two components of *N.J.S.A.* 19:23-26.1 were constitutional, and evidenced a legislative intent to treat senatorial and gubernatorial candidates with integrity and fairness, and that "equality of treatment among candidates for the same office is a linchpin of that idea." *Id.* at 348. Thus, the court held that county clerks must try to effectuate these principles "to the greatest extent possible." *Id.*

The court then held that the third component of *N.J.S.A.* 19:23-26.1 was unconstitutional because it was at odds with associational rights articulated by the Supreme Court in *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989). *See id.* The *Schundler* court then held that the county clerks had to make "a fair effort to follow the dictate that all candidates for the highest office, *i.e.*, U.S. Senator or Governor, be treated equally to the extent physical constraints allow, as long as, at the same time, a good faith effort is made to effect the expressive rights of all candidates," and further noted that "[w]ell considered choices" by county clerks based on "decent effort[s]" to balance these ends would be sustainable. 377 N.J. Super. at 348. The court further stated that due to the physical limitations of the ballots and voting systems then in use (nearly 20 years ago), the presence of seven gubernatorial candidates in the election at issue, a ballot draw and bracketing will provide some candidates with "a more substantial advantage in ballot position than any decent notion of even treatment allows," while "other, non bracketed, candidates will be shunted off to obscure columns of the ballot." *See id.* at 348-49. The court then quickly noted that in more typical elections with less candidates for the top office on the ballot, bracketing should not interfere with the ability to treat all candidates for the top office equally. *See id.* at 349. Thus, the court held that for the gubernatorial election, a single drawing

had to occur between those candidates for governor, "without so extraneous a consideration as bracketing or non-bracketing as the beginning point." *Id.*

In striking down the third component of *N.J.S.A.* 19:23-26.1, the court severely overstated the breadth of the *Eu* decision, relying on *Eu* to claim that "[t]he First Amendment protects the free speech and associational rights of every candidate in a primary election *to declare a ballot affiliation* with any other candidate, or to designate his or her choice not to affiliate." *See id.* at 348 (emphasis added). It then referred to *Eu* as requiring bracketing "as a matter of constitutional imperative." *Id.* However, this unjustified major expansion of the principles in *Eu* by a state court are not supported by the decision itself and are at odds with common sense.

*Schundler* rests on the faulty premise that the principles in *Eu* apply to the ballot itself. *See id.* (claiming *Eu* recognized a First Amendment right to "declare a ballot affiliation with any other candidate"). However, nowhere in the *Eu* decision is bracketing ever discussed, nor is there any indication anywhere in that opinion that the associational principles set forth in that case apply to the *ballot* itself. Nor did *Schundler* explain any basis for leaping to such conclusion that the breadth of the principles in *Eu* extend to the *ballot*. Instead, *Eu* dealt with associational rights regarding the ability of a political party to *endorse* a candidate in connection with a primary election, and the right of a party to govern its internal affairs.

The validity of the court's conclusions about bracketing in *Schundler* is also severely undermined by experience within and outside of New Jersey. If *Eu* required bracketing "as a matter of constitutional imperative," then it follows that bracketing would have to be required in every state. However, no other states organize their primary election ballots the way New Jersey does in this regard. *See* VC, at ¶¶ 3-6. Indeed, almost every state uses office-block ballots

(sometimes called 'bubble ballots' when applied to paper as opposed to voting-machine ballots) in their primary elections, which do not even allow for bracketing. *See id*. Plaintiffs submit that perhaps it is not the other 49 states and the District of Columbia that are violating the Constitution by not allowing for bracketing in primary elections, but instead the single state of New Jersey which requires bracketing requests to be honored in such way as to treat candidates for the same office unequally and unfairly, and thereby undermines the integrity of the election.[18] Moreover, not even all the county clerks in New Jersey allow for bracketing in partisan primaries, and Salem and Sussex counties in particular have not bracketed candidates. *See id.* at p. 2 & n.1.

These considerations make clear that the entire premise of bracketing being required as a constitutional right is simply misguided. The continuation of this premise significantly burdens Plaintiffs' rights, and the failure to treat them equally based on such a faulty premise perpetuates an injustice and continues to injure rights of candidates and the voters who support them, in violation of constitutional precepts. Moreover, the Court now has before it expert reports and other evidence demonstrating the character and magnitude of the burden at stake, in ways that go far beyond anything that the New Jersey state courts in *Quaremba* or *Schundler*, or the U.S. Supreme Court in *Eu*, ever considered. *How can the right to bracket be protected by a federal constitutional right, when it is singularly featured, among all fifty states, only on the New Jersey*

---

[18] As explained in Plaintiffs' opening brief, a ruling in Plaintiffs' favor would not conflict in any way whatsoever with *Eu*. That case dealt with the right of a political party to endorse a candidate prior to a primary. Political parties are free to endorse candidates in New Jersey, and even get to award a common slogan to candidates they so endorse. This goes well above and beyond what most other states allow, and beyond what *Eu* requires, including allowing this slogan to appear on the ballot itself. *Eu* did not require that party associational rights appear on the ballot at all, and certainly did not sanction party-endorsed candidates getting any kind of preferential treatment, let alone substantial advantages that yield enormous handicaps which alter election results and have the potential to be outcome determinative, even in situations of double-digit margins of victories.

*primary ballot, and where it is not narrowly tailored, as evidenced by the additional presence of*

*a slogan or endorsement on the ballot?*

### III. Defendants have not met their burdens of proving that even greater harm to the non-moving party would occur under the Third Circuit's preliminary injunction test.

#### A. Defendant Clerks are already presenting voters with election races in office-block format with existing software and equipment, belying their claim that it would be impossible or difficult to do.

On the whole, Defendants offer declarations that try to convince the Court that the relief sought by Plaintiffs cannot be awarded. Plaintiffs seek an injunction against the pernicious advantages that selected candidates now receive in the way candidates are presented to primary voters: the gridded, county line ballot used in 19 of New Jersey's counties.

Plaintiffs proffer a widely-accepted alternative for relief in connection with the upcoming Primary Election: a form of office-block ballot. In an office block ballot for primary elections, the voting machine (or paper ballot) presents candidates as grouped by the office for which they are running, rather than by their political party faction or bracketing. This means that all candidates seeking nomination for a particular position, such as senator or mayor, are listed together under the heading of that office. Voters then select their preferred candidate for each office from among the listed options.  In general, there are two widely-accepted forms of office-block ballot presentations, and they appear at ¶ 5 of the VC. (DE1). In one (the Nevada example), the name of the office sought, its term, and how many candidates are to be elected appears above a list of candidates presented in a single column. In another (the Delaware example), the information about the office name, term, and the number to be elected is presented

in one column, and immediately to its right there is another single column listing the candidates competing for the office.[19]

The Clerks' messaging, for the most part, asserts that neither of the two prevailing voting systems in New Jersey - the ES&S system or the Dominion system – the two largest vendors in the nation – could accommodate an office-block presentation without difficulty.[20] Implicit in their argument is that the change from the county-line ballot for the primary to an office-block system would tax their abilities to the point where they could not comply with a court order directing such a change. But their claims are unfounded when one considers that they *routinely* present voters with elections that consist entirely of office-block presentations, or consist of a hybrid of office-block and gridded ballots. **They are doing this today, *with the voting systems they already use, with the software they already license, and with the vendors they already contract with*.**[21]

Initially, the Clerks freely admit that the overwhelming majority of their election-preparation tasks would need to be performed regardless of the Court's order in this case. For

---

[19] When presented on an electronic voting machine, ballots of this style keep their designation as "office block" ballots; when they are presented on paper, they are sometimes known as a "bubble" ballot, recalling standardized tests that students have historically taken where they fill in an oval or "bubble" with a pencil, representing their choice to an answer. For purposes of the brief, however, these two are basically synonymous.

[20] The Clerks have a personal vested interest in defeating Plaintiffs' claims. As noted in the VC, the Clerks must run in primary and general elections every five years, and to the extent they are selected to run on the "county line," receive all of the same discriminatory advantages that other county-line candidates receive. Because the ballot design laws they now defend help them personally win re-election, and because they are beholden to maintain their continued access to the county-line, their declarations on this point should be received with a healthy degree of skepticism in light of their self-interest in retaining the existence of these laws.

[21] The ExpressVote XL uses an underlying gridded architecture to present races in the gridded, party-column format (for the general election) or a county-line format (for the primary election). Even assuming *arguendo* that that gridded architecture must be used for every element of the ballot presented on the ExpressVote XL, it is abundantly clear that the technology is fully capable of displaying races to voters <u>as if</u> they were office-block races. See discussions *infra* of the ExpressVote XL currently being used to present races to voters in office-block format.

example, the assembly and data entry of the names of each and every candidate seeking office (which cannot begin until the March 25 petition filing deadline and the resolution of any candidacy objections); collecting and managing candidate slogans; selecting the ballot template and layout; and translating as needed into other languages will all "need to be carried out regardless of whether an injunction is entered." (*E.g.*, DE60-1 (Peter Decl.), ¶¶ 16-17; Declaration of Edward P. Perez (Exh. C hereto) ("Perez Decl.), ¶¶ 16-17 (describing the data entry phase of creating the election definition file)). Similarly, draws for ballot position for contested races will be required regardless, as will the transfer of ballot layout information to the printer, the transfer of ballot files to each and every voting machine by use of flash drives, and the proofreading, uploading, and logic-and-accuracy testing of ballot and equipment, the preparation and mailing of both mail-in ballots and sample ballots; these will all take place for the June 2024 primary, with or without this Court's intervention (DE60-1, ¶¶18-35). Part of the steps required to create the election definition file is the application of ballot layout templates to the baseline data set. Perez Decl., ¶¶ 18-27.  So the real question becomes what the Clerks must do differently if the Court enjoins the current primary ballot design laws and practices. The answer is: ***not very much***. The difference in the time for applying a baseline data set to even a new ballot layout, using modern election management software used by Defendants, "can be measured in a matter of hours (or a day or so at the very most – and certainly not weeks or months." (Perez Decl., ¶ 27); *see also* Expert Reply Report, Dr. Andrew Appel, Exh. D.

Even if this weren't evidence that the Clerks' delay claims are hollow and exaggerated, the Court must note that these Defendants, using their *existing* hardware and software, *already* regularly present races in office-block configuration to voters, without any suggestion that running these office-block races is in any way burdensome for the county clerks or their staffs.

Take, for example, the ballot for April 2023 school board election in East Hanover. (Komuves Decl., Exh. A), run on an EVS 6300[22] and Express Vote XL in-person voting system and an ES&S DS450 and/or DS950 for their vote-by-mail system. The ballot clearly shows an ***office-block*** presentation for the school board race, where four candidates were competing for three seats. To its right, in another area of the ballot, voters are asked to vote on a public question. This literally represents an office-block presentation for that race. It is, in Morris County Clerk Ann Grossi's own words, a "traditional" design layout in that it's in active, current use in that county, where the vendor need only "plug in" the names to that layout format. (DE49, ¶¶ 4, 8).

Here's more proof: a nonpartisan municipal election was run in Long Branch in May 2022 using an ES&S ExpressVote XL in-person voting system and a DS450 and/or DS850 vote-by-mail system. Here, it was not just one race that was run, but two: one for mayor and one for council. Again, both races were presented to voters in ***office-block format***, with the mayoral race above, and the council below. (Komuves Decl., Exh. B.) The races were uncontested, but there is no obvious bar to adding additional mayoral or council candidates below those listed. Yet, Monmouth County Clerk Hanlon tells this Court that "I am not personally aware of the ES&S Express Vote XL machines or accompanying election management software being used with an office block balloting format in any county of the State." (DE61-2, ¶ 26). How can she say this with a straight face, when elections presented in that format are being conducted in her very own county? She claims that her equipment has not "previously been used, tested, or certified" for races presented in office-block format (*Id.*, ¶ 30). Does she expect the Court to believe that the office-block races run in Long Branch are a figment of voters' imagination, or that they were run without being tested or certified? And while these may be low-turnout races, Defendants cannot

---

[22] ES&S says that all New Jersey counties using its equipment run it with EVS 6200 and 6300 software, regardless of the specific model of the voting machine it's coupled with. (DE46, ¶6).

simultaneously claim that the office block presentation they each already employ in their respective counties, would now lead to voter confusion in connection with the relief that Plaintiffs seek.

There's more. Typically, general elections in New Jersey involve a mix of partisan races (e.g., Governor, Legislature, county offices), and nonpartisan ones (e.g., board of education, nonpartisan municipal races, fire commissioners). Look at the Hoboken general election from November 2023 (Komuves Decl., Exh. C), run on an ES&S ExpressVote XL in-person voting system and either a Dominion ImageCast Central or a DS950 for vote-by-mail system.[23] Clearly, this ballot is a hybrid: on the one hand, it presents four partisan races in a gridded, party-column style, but also simultaneously presents two discrete nonpartisan races in an office-block style, all in the same ballot. Maldonado, the Hudson County clerk who designed this, does not even deny that concurrent gridded and office-block ballots are in use in his county, but instead spends time in his certification (DE59-1) attempting to impeach Dr. Pasek's showing of irregularities in the expected outcomes of supposedly neutral ballot draws (DE1, ¶ 115).[24]

Given this active and current use of office-block ballots, no "re-coding" or "reprogam[ming]" would be needed to run them using anything radically different from New Jersey's existing ballot templates and layouts. (DE61-1, ¶ 26; Perez Decl., ¶ 22 (noting that all existing election management software is sold predesigned with the tools necessary to "accommodate a significant degree of diversity in ballot design, including unique state-specific needs" in a way that is "comprehensive," "customizable," and "flexible.")). Office block ballots are simply not "new processes" or "new designs." (Cf. DE60-1, ¶ 42).

---

[23] According to election databases, Hudson changed its vote by mail scanners between 2022 and 2024. It was not clear which was in use in 2023; however, as both are capable of office-block presentations, the issue needn't be explored further.

[24] This is an issue that needn't be resolved on Plaintiffs' preliminary injunction motion.

The ES&S vendor's attempt to bolster these Clerks' testimony about feasibility of office-block ballot presentations is unserious at best. Their declarant, employed by a vendor who receives millions of dollars a year from their clients now opposing this preliminary injunction, says that the Express Vote XL can accommodate the "current, traditional ballot layout style" and that "deviations" from that style would require "development, testing, and certification of a new and/or updated version of software." (DE46, ¶ 8). But as noted above, it's unfair to read the term "traditional" ballot layout for ES&S systems as meaning only the grid-style ballot in use in primaries. Rather, this "tradition" includes races presented to voters in office-block and grid layouts, as well as hybrids of the two. They are being run now, with existing equipment and software.

Plaintiffs' rebuttal expert, Edward Perez, who has 16 years' experience with a major voting systems company (including five as its Director of Product Management) and is now a senior advisor on election law and technology policy research, and government relations, affirms that the ES&S systems in use today can easily accommodate office-block ballots with existing equipment. (Perez Decl., ¶¶ 21-23). Mr. Perez points out that ES&S itself recently tried to win a contract to supply Delaware with ExpressVote XL voting machines and the current version of Electionware software – the very software and equipment now used in New Jersey. In ES&S' proposal, they expounded to the Delaware authorities about this system's flexibility, scalability, ballot style capability, ballot creation flexibility, and flexibility in office and candidate presentation, for both paper ballots and those cast on electronic voting systems, and amply demonstrated that the ExpressVote XL could easily and readily handle office-block ballot presentations, both for in-person voting machines and for mailed ballots. (*Id.*, ¶ 30).

By ES&S' own admissions and by observing what its equipment is now doing in New Jersey, it is clear that office-block ballots are feasible here. Even some of Defendants' declarants admit as much: for example, the Warren Clerk admits that the ES&S-supplied equipment that she and approximately 13 of New Jersey's 21 counties uses – the ExpressVote XL – for in-person voting and a DSx50 central scanner for mailed ballots "*has the ability to technically allow a ballot design which is either based on a bubble ballot, a design referenced by Plaintiffs in their complaint, or bracketing of candidates*." (DE57-1, ¶¶ 7-8, emphasis added).[25] Lastly, Camden County, which uses the ES&S equipment for in person voting and vote by mail scanning is also clearly able to present races to voters in a hybrid format, with both gridded and office-block style ballots appearing on the same ballot. (Komuves Decl., Exh. D (Cherry Hill ballot from Nov. 2023 with gridded portion, contested school board race in office-block format, and uncontested fire commission race in office-block format) & Exh. E (Audubon ballot from Nov. 2023 with gridded portion and contested school board race in office-block format)). It therefore follows that Camden County, consistently with other ES&S jurisdictions able to present office-block style, grid-style, or hybrid ballots, can do the same with its existing equipment.

The other major system in use in New Jersey, the Dominion suite of election products, is likewise running both office-block and gridded elections today, without difficulty.

The Hunterdon Clerk, for example, shows how she designed a quintessential office-block ballot for voters in the 2020 primary election, which was held all by mail because of the pandemic (DE45, Exhibit B). At the time, the equipment in use for central counting was the

---

[25] Mackey's fundamental objection to Plaintiffs' relief is not really a technological one, but rather a concern that if this court were to grant relief to Plaintiffs, it would conflict with a *state* court order because the local party has sued, and has threatened suit, for her use of office block ballots. *Id.* at ¶¶ 5, 11. The Supremacy Clause of the U.S. Constitution easily resolves that conflict.

Dominion ImageCast Central. If she accomplished this feat in the middle of a pandemic, is there a serious question that she (or anyone else with the same machinery) could accomplish it today? No. This demonstrates that the Dominion equipment used *at least* in Bergen, Cumberland, Essex, and Mercer Counties and possibly others) (*cf.* DE63-2, ¶ 4) has the capacity of preparing office-block ballots with candidates below the title of the race (rather than in a singular column to the right, as was true in the ExpressVote XL examples given above).

Even today, Dominion equipment is used in Cumberland County to construct general election ballots that have a hybrid of gridded and office-block nonpartisan races. (Komuves Decl., Exh. F (Nov. 2023 ballot with gridded ballot plus two contested school board races presented in office-block format). Similarly, Dominion equipment was recently used in Mercer County in November 2022 to print a general election ballot that had a gridded partisan race presented on one side of the page, and not one, not two, but <u>three</u> contested office-block races presented on the back side of the page (Komuves Cert., Exh. G). And, just weeks later, Mercer County presented voters with a single contested race (with no gridded portion) in office-block format.  (Komuves Decl., Exh. H). Much like the argument presented above about the ES&S systems, this shows that using existing Dominion technology, voters can be presented, and are being presented, with races only in office-block format, or in combination with gridded ballots.

A Dominion representative (who, like the ES&S declarant, represents a company earning millions annually from clients resisting Plaintiffs' application) tries to bolster these claims with a declaration, but these efforts are ultimately unavailing. First, the declarant presents a laundry list of tasks that has to be done before every election, whether or not this Court were to enjoin the use of office-block ballots. (DE63-2, ¶ 5). Second, as detailed above, Dominion equipment is already being used to actively present election contests to voters in office-block formats. It is

therefore hard to take seriously a claim that Dominion will require 4-6 weeks to "complete ballot programming services" (*id.*, ¶ 9) for an election presented in office-block format when it is already providing the same service now, to existing clients for elections that include races presented in office-block format as described above.

Lastly, a representative of one of New Jersey's ballot printing services has also submitted a declaration (DE65-1). He, too, receives compensation from the county clients who are resisting this application. And his statements are difficult to credit. Any design of a primary election ballot with office-block races will, of necessity, be based on known ballot layouts that constitute or include office-block races as described above. It is palpably incorrect to say that only one of his eleven clients uses an office-block ballot (*Id.*, ¶ 12). In reality, probably most jurisdictions present voters with at least hybrid gridded and office-block ballots every general election day, because besides the partisan races, it is common to vote in nonpartisan school board, and sometimes, nonpartisan municipal races, in the annual November elections. Besides these hybrid ballots, counties present voters with office-block races when April school board, May municipal, or runoff elections are held other than on general election day. (*E.g.*, Komuves Decl., Exhs. A, B, H). Thus, the claim that a printer would have to "re-start our process of working with every county clerk . . . to complete the new design" (DE65-1, ¶ 20) is a fallacy because the office-block design is basically an existing one, not a new one.

Moreover, Mr. Perez advises that the ease with which Dominion and ES&S systems can layout mailed ballots affords great "flexibility and choice available in multiple ballot templates," and that election officials need not be constrained by printing vendor limitation, as the flexibility of the election software gives election officials "some measure of control over their ballot printing process." (Perez Decl., ¶ 25). Indeed, Mr. Perez describes with cogent clarity the step-

by-step process in creating the ballot definition file, from data entry of candidate names associated with office numbers, to ballot format and layout design, to proofing the information. As noted, Mr. Perez describes how, even if revisions become necessary, the process takes hours or a day or so at most, not weeks or months. (Perez Decl., ¶ 27).  He explains that the flexibility of the system is a function of the marketplace demands given the limited number of vendors in the nation and their incentives to create a flexible product system that serves even the most idiosyncratic needs of the various states. (Perez Decl., ¶ 25). The voting systems in place in New Jersey include two of the nation's largest vendors. In short, New Jersey is unique, but it's not *that* unique.

Taking this body of information all together, then, including the regular use of office block layouts in certain elections, and admissions and omissions by the County Clerks as described above, one wonders whether the Defendants are in search of problems rather than solutions when it comes to New Jersey's primary ballot.

### B. Neither voter confusion, the burdens of additional ballot draws, voter education needs, or other factors will meaningfully burden clerks if the injunction is granted.

Several defendants, including Melfi, actually have the temerity to argue that granting plaintiffs the relief they seek will confuse voters, dissuade them from voting, and require that they be educated on voting procedures. There are several reasons why this argument is unsustained.

Initially, Melfi is mistaken in claiming that the 2014 primary ballot (Exhibit A to her declaration) was an office-block ballot. On the contrary, this is a typical, party-column, county-line primary ballot. Here, the fourth line of that Republican ballot is the "county line" listing in a single row the names of all candidates endorsed by the leadership faction of the political party.

As noted above, her Exhibit B is a bona fide office-block ballot that is an exemplar of office-block ballots, used in 49 other states and 2 of New Jersey's 21 counties. In the midst of the COVID pandemic, Melfi admirably created a ballot where the list of candidates pursuing an office were placed under the office they were seeking, in order, and without visual linkage to candidates running for other offices. It looks nothing like the party-column ballot from 2014. Regrettably, by the time the 2023 primary came around, Melfi reverted her primary ballot to the archaic                                     county-line                                     style. https://www.co.hunterdon.nj.us/DocumentCenter/View/11875/Alexandria-Township-PDF.

Melfi's other arguments also ring hollow. First, according to verifiedvoting.org, at sometime between 2020 and 2022, Melfi decided to change the voting equipment to be used by Hunterdon voters. She offers no evidence that the change in equipment - clearly, a change that is at least as substantial as a change in ballot design, led to a mass disenfranchisement of voters. Indeed, her certification oozes with paternalism, stating that offering voters a clearer and simpler ballot, such as that used elsewhere nationally, will require "notification and re-education." Melfi, along with every other clerk, already educates and re-educates voters literally every single time she sends out sample or mail-in ballots, with extensive education on how to vote them. (E.g., Melfi Decl., Exh. B; DE1, Exh. A (multiple ballots with "important instructions to voters")). Moreover, reliable survey results make clear that voters disapprove of the process that leads to the gerrymandered and manipulated ballots she offers to voters (DE1, ¶127).  Finally, Melfi does not account for the fact that in any given year, approximately 10 percent of all U.S. residents move,[26] thus forcing them to learn about new ballot styles and modes of voting, nor does she

---

[26] Riordan Frost, *Who is Moving and Why? Seven Questions about Residential Mobility*, Joint Center for Housing Studies of Harvard University (May 4, 2020), *available at*:

consider that millions of new voters, because they are coming of age, becoming citizens, or leaving prison, enter the rolls as new voters every year.

The Clerks' insistence on clinging to discredited and confusing practices for election administration calls to mind Justice Holmes's observation that "[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897). The county line ballot system may not date from the time of Henry IV, but it is still an anachronism that under current constitutional law, must be stricken (a) under the Elections Clause, because it risks affecting election outcomes; and (b) under the First and Fourteenth Amendments, because the moderate to severe harms it inflicts on voters are not outweighed by petty and insignificant interests in holding on to a relic of the past.

Middlesex Clerk Pinkin and Somerset Clerk Peter, among others, argue that an order requiring separate ballot draws for every candidate, rather than groups of candidates, will unduly burden them. It falls flat and is but a scare tactic. Draws of candidates are only required where a particular race is contested. In a race where only one person is to be elected, if only one candidate submits a valid petition, or no candidate at all applies, no drawing is necessary. Middlesex explains that in 2023, they had to conduct ballot draws for 62 candidates, a process that lasted one hour. (DE54-1, ¶ 9). Peter says he needed a half hour to conduct all the draws in his county. (DE60-1, ¶ 19). To be sure, that number may rise modestly if the bracketing and lined draws of candidates is enjoined, but it would only be true of contested elections, and there is no evidence before the Court supporting the idea of an unacceptable abundance of contested

https://www.jchs.harvard.edu/blog/who-is-moving-and-why-seven-questions-about- residential-mobility.

primaries that they would be doing candidate draws in an all-nighter. It is hardly the kind of state interest that justifies awarding county line candidates with the large and outcome-determinative advantages shown by Plaintiffs' experts.[27]

Defense claims that reject presenting all voters with an office-block ballot in the 2024 primary are self-serving and meritless. As demonstrated below, county clerks <u>already</u> use office-block balloting in multiple elections annually, with their existing equipment, and also regularly use hybrids of gridded and office-block balloting in most general elections.  It is absurd for them to claim that they cannot use office-block ballots for primary elections, given that they are already doing so for other elections.

<u>**CONCLUSION**</u>

For these reasons, and for the reasons in Plaintiffs' opening brief and the proofs to be presented at the upcoming evidentiary hearing, Plaintiffs' motion should be granted. Defendants should be enjoined from using ballot designs that are consistent with the discriminatory, unconstitutional, and undemocratic party-line ballot. It is respectfully suggested that the use of an appropriate office-block ballot (as defined above) for the primary presents a convenient

---

[27] The declaration offered on behalf of Middlesex County in this regard is embarrassing. It raises the specter that in 2024, there will be elections for Republican County Committee in 615 precincts throughout the county, each with a separate ballot. This happens regularly statewide, in those years where the Democrats and/or Republican Committees hold their races, and regardless of any decision by the Court in this case. (DE54-1, ¶ 7; *accord* D61-2, ¶ 10). However, the declarant leaves out affirmative evidence from her own records showing few of those races are likely to be contested.  According to her own records of the 2022 Republican County Committee primaries found at https://app.powerbigov.us/view?r=eyJrIjoiN2U0MmE2M2MtY2E0ZC00YWQ3LTljZTEtYWMzNGUxMGU0MWU3IiwidCI6IjhlZjNiNGU0LTBlODgtNDM4Yi1iOWE1LTEwZmVjYmQwYjcxZSJ9, there were few <u>if any</u> contested races for Republican County Committee. For example, in Carteret, where 38 seats were available, 18 candidates filed petitions.  In Highland Park, where 26 seats were available, no candidates filed. In East Brunswick, with 80 available seats, 37 filed petitions. And in Woodbridge, with 156 available seats, 43 filed petitions. Middlesex County's baseless fear-mongering that it will be burdened with having to perform multiple ballot draws finds no support in reality, or in this record.

alternative to the county-line ballot, as such ballot layouts are already in use and familiar to voters, and as the voting machines in place in New Jersey can accommodate them.

Respectfully submitted,

WEISSMAN & MINTZ

Co-counsel for Plaintiffs

By:     */s/ Brett M. Pugach*

By:     */s/ Flavio L. Komuves*

BROMBERG LAW, LLC

Co-counsel for Plaintiffs

By:     */s/ Yael Bromberg*

Date: March 12, 2024

# EXHIBIT A

**March 10, 2024**

**United States District Court**

**for the District of New Jersey**

**Kim v. Hanlon**

**Civ. Action. No.: 3:24-cv-1098-ZNQ-TJB**

**Expert Reply of Dr. Josh Pasek, Ph.D.***

* I am an Associate Professor of Communication and Media and Political Science (by Courtesy) at the University of Michigan. This report is written in my personal capacity and does not represent the views of the University or the State of Michigan.

**Introduction**

1.  In my original report, I presented evidence on why we should expect the design of New Jersey primary ballots to result in systematic behaviors among voters that can influence election outcomes and that we have every reason to believe will have such an impact in the upcoming June primaries. That report relied on a combination of (1) literature on nudging effects and other cognitive biases and their applications to the ballot, (2) an analysis of how current ballot design procedures result in systematic placement of particular candidates, (3) evidence from direct examination of ballots that party line candidates were disproportionately placed in the first position, and (4) an original study designed to estimate the effects of ballot positioning in the 2024 primaries that differentiated the influence of candidate placement from the other factors that are coupled with placement decisions on the ballot.

2.  As I find across that body of evidence, (1) the cognitive biases induced by New Jersey primary ballot design are overwhelmingly expected to benefit candidates on the line in ways that are independent of the reasons they are placed on the line, (2) the effects of county party leadership endorsements and bracketing decisions should be expected to incentivize candidate's decisions about whether and how to bracket, (3) county clerks appear to be placing candidates on the line in the first column or row more often than should be expected, (4) there are material benefits for candidates listed on the line and those who are placed in the first position regardless of who those candidates are, (5) these effects are poised to influence the 2024 primary elections if the ballot format

remains the same, and (6) an office block ballot for the 2024 primary elections would reduce or eliminate perpetuation of most biases.

3. The defendants' briefs attempt to raise a set of questions and challenges to both the conclusions and methods that I used in the original report. Some of these were directly addressed in the original report whereas others reflect defendants' misunderstandings either of the evidence gathered or of how social science evidence can and should be used in this context. Although to my reading none of the points raised were both novel and substantive, they nonetheless merit a reply, if only to make it clear why the conclusions should not be affected.

4. To help contextualize the questions they raise and to address them more directly, I devote the remainder of this report to directly responding to the points posed. In total, I identify a handful of sections that either directly or indirectly consider evidence and claims from my report across 3 of the opposition briefs; I address each point in turn.

**Points raised in the Hanlon memorandum (ECF Document 61)**

5. The Hanlon memorandum asserts that the evidence from my own report as well as those of the other experts fails to provide "persuasive, empirical evidence" (p.28) that there will be a significant influence of ballot placement because they are "based on generalized and untested statistical conclusions" (p. 20) and analyses are not "particularized [to the] impact of their ballot positioning on [the] actual [2024] elections" (p.2). By this reasoning, no scientific data could ever be used to guide future decision-making, because the future has not yet been observed. While it is objectively

true that none of our analyses could possibly confirm the exact size of a bias in a contest where voters have not yet gone to the polls, if this is the standard of evidence then science itself is of no forecasting value. Indeed, between the original study that I conducted and evidence of effects from studies by Dr. Rubin and others, a strong body of overlapping evidence suggests that the county line influences voters, has done so in prior elections, and can be expected to do so for the candidates in the upcoming 2024 primary election. That we cannot test whether an effect has occurred in an election that has not yet happened is not a reason to doubt these effects. Indeed, absent a compelling reason to expect that the influence of the county line would disappear, coupled with supporting statistical evidence, one cannot expect anything other than the effects observed.

6. The Hanlon memorandum dismisses the relevance of the primacy effect in the U.S. Senate race in New Jersey, noting both that the primacy effect in my study was not significantly different for that contest between party-column and office-block ballots and that Senate candidates always have a chance of being listed first (p.29). The first statement is indeed true but only partially relevant, whereas the second statement should be true, but does not appear to be in practice. With respect to the first statement, there was a consistent benefit of being listed first on party column ballots in my study, meaning that this is a substantive bias. It is true that merely changing to an office block ballot would not necessarily eliminate any primacy benefit, but such a benefit could easily be eliminated if additional steps were taken that are relatively easy to implement on an office-block ballot but that are harder to implement for a party-

column ballot. In other states, the ordering of candidates is randomized or rotated across relatively small geographic units allowing this bias to be neutralized. This would be harder to accomplish with a party-column format as reordering columns across ballots or districts might make it substantially more difficult to find candidates (as candidates using these types of ballots often refer to their column and row as a voter guide). Of course, the irrelevance of the type of ballot only applies to pivot-point candidates, and does nothing to address the either the other harms that may occur for Senate candidates who are not on the line nor the harms that may occur for Congressional candidates or those elsewhere on the ballot.

7.  The claim that "as a Senate candidate, Kim's ballot position is randomly assigned" (Hanlon memorandum, p.29) appears to be true in some, but not all counties. My finding "that there appears to be a considerable bias in favor of placing the county line in the first position" (original expert report, ¶68) indicates that counties are not uniformly following the randomization procedure that Hanlon is relying upon for this claim. Were that the case, indeed the influence of ballot position for pivot-point positions would be independent of the influence of candidate name order effects, but it is simply not so.

8.  With respect to the primacy effect for Congressional candidates, the Hanlon memorandum inaccurately asserts that "there is still no reliable evidence on the record suggesting that appearing in the first versus second or third column of the ballot will have a significant impact on a candidate's election chances" (p.29). In fact, in my original report I show that primacy benefits were present in both analyzed Congressional races

regardless of whether the comparison was between the first column with a Congressional candidate and all other columns, between the first column and other columns when there was a candidate in column 1, and between the first and second listed Congressional candidates (see Table 6 of my original expert report). This evidence thus exists and contradicts the statement in the Hanlon memorandum.

9. The Hanlon memorandum claims that "Plaintiffs failed to provide Defendants with timely or complete information about Dr. Pasek's study design, or his conduct of the study or its results" (p.30). This is inaccurate, as the information about the study contained within my report itself would have been deemed sufficient for peer review at any major journal.

10. The Hanlon memorandum also misleadingly interprets the fact that endorsement effects varied somewhat in magnitude across contests as evidence that the data itself was limited (p.30). The referenced endorsement effect, however, was not on party-column ballots but on office-block ballots where county party slogans were presented. The inconsistent effects of these slogans actually provided more evidence that the weight of the line was not the same as a county party endorsement. The former was present consistently even when county party slogans were not directly impactful. The data thus leads to exactly the opposite conclusion from the memorandum's interpretation thereof.

11. The Hanlon memorandum misunderstands the concept of incentivized behavior by candidates as it is referenced in my expert report. In stating that "Schoengood has not been incentivized to bracket because she has made clear that she would only bracket

with a candidate with aligned interests such as Kim" (pp.31-32), they presume that the failure to heed a particular incentive is evidence that the incentive does not exist. This reflects a logical fallacy. When attempting to plumb the reasons that a particular decision has been reached, the fact that there are multiple competing pressures does not imply that any one of those influences is irrelevant. Indeed, it is likely that many candidates do decide to bracket together for ideological or other substantive reasons. But the fact that there is an external reward for bracketing (namely ballot placement) that does not depend on these substantive reasons means that at least some candidates are likely to bracket together for reasons that are not driven by shared ideology or association. And historical candidate behavior makes it clear that candidates do indeed make these kinds of decisions, varying their bracketing preferences across counties and contests. Under these circumstances, the presence of an alternative incentive to bracket indeed means that shared views cannot be presumed. Such a conclusion is far from "conclusory" (Ibid, p.32), but instead reflects a logical derivation from known behavioral incentives.

**Points raised in the Durkin et al. Brief (ECF Document 63)**

12. The Defendants Brief representing Essex, Passaic, and Union County Clerks highlights a series of factors that I do not directly analyze in my expert report that they consider "critical" (p.24). Specifically, they cite: "incumbency, money raised or spent by a candidate, candidate endorsements, name identification, or candidate popularity/approval" as features that are likely to influence outcomes (Ibid, p.24). They

are correct that all of these factors matter in elections, but their concern about them,

vis-à-vis the study I conducted, reflects a misunderstanding of the benefits of

experimental design. When candidates are randomly assigned to the different positions

on the ballot, as they were in the aforementioned study, the influence of these factors

need not be separately analyzed. Because the effects in the current study are averaged

across all candidates, based solely on whether they receive the benefits of the line or

not, the differences are definitionally independent of which candidate is an incumbent

(if any), how much various candidates spent, who endorsed which candidates, or how

well they are known. Because candidates do indeed vary in these features, it is true that

some candidates perform better, both on and off the line, than others. The estimates of

the effect of the line, however, do not depend on these differences because each

candidate was on the line an equivalent number of times.


**Points raised in Schwartz Brief (ECF Document 53)**

13. The Schwartz Brief notes that the study was conducted fully six months before the

actual primary date and speculates that the effect of additional information voters

receive is likely to reduce the effects of ballot design. It further asserts that "the study

ignores the very real chance that any effect ballot design has is diluted the more

information voters learn about the race" (p.9). Indeed, I note this very point in

paragraph 171 of my original report. But while there is a case to be made that learning

about the candidates may reduce the magnitude of the effects somewhat, it does not

justify the conclusions that "the behaviors of the voters in the study cannot be

compared to behaviors of voters in June of 2024" (Schwartz brief, p.9). Instead, as I note in paragraph 172 of my report, "the question is not one of whether there are differences between a simulated election and a real one but instead whether the effects observed reflect processes that would be expected to occur both in a study like the one I conducted and in the voting booth." Coupled with knowledge of voter psychology, evidence that the effects we observe have influenced prior elections, evidence of impacts from the study that are far larger than margins in many elections, and some countervailing reasons to think that the study may also have underestimated impacts of ballot design, it is hard to imagine that 2024 will somehow be uninfluenced by the effects in question.

14. As a practical matter, the timing of the study had to fall in the relatively narrow window between when most candidates had announced themselves and when county parties began their process of endorsing the county line candidates. To conduct the study earlier would have undermined the extent to which it applied directly to the 2024 elections and to conduct the study later would have required presenting inaccurate information to voters about which candidates had been endorsed.


15. As these responses should make clear, defendants' briefs do not raise any issues that seem likely to diminish the implications of my initial findings or highlight any limitations that were not already considered and addressed in my initial report. My expert opinion thus remains that all indications suggest that New Jersey's placement system will influence voters, shape candidate behaviors, and affect election results and outcomes.

I certify that the opinions and analyses presented herein are based on my education, training, and expertise. The foregoing analysis is accurate to my knowledge, information, and belief.


Joshua M Pasek

# EXHIBIT B

**March 12, 2024**

**United States District Court for the District of New Jersey**

**Civil Action No. 3:24-cv-01098(ZNQ)(TJB)**
**Andy Kim, et al. vs. Christine Giordano Hanlon, et al.**

**Expert Reply by Dr. Samuel S.-H. Wang**

**Princeton University**
**Neuroscience Institute, Washington Road**
**Princeton, New Jersey 08544**

Dr. Samuel S.-H. Wang

**Doc 53, response in opposition by Burlington County Clerk Joanne Schwartz, at 10:**
**"Nowhere does [Dr. Wang] look at the individual races he is using to derive his opinion and**
**explore the very same alternative explanations he writes about in his introduction. In fact,**
**he also argues that these alternative explanations by looking at lines within the same race,**
**without any consideration for the fact that the alternative explanations he previously listed**
**(as well as several others) can exist within a race. Dr. Wang's broad statistical approach**
**completely loses the nuance of each election and undermines his results."**

Clerk Schwartz's statements are misguided. The fundamental basis of the science of statistics is
to avoid cherry-picking individual examples to suit a pet hypothesis. By examining all the data at
once, it is possible to rigorously test claims that a particular candidate has performed well or
poorly because of factors that are unrelated or incidental to the use of the county line format.

**Section 4.3.2 of the Wang report tests alternative hypotheses linked with specific candidates**
**such as party endorsement and funding**

The particularities of individual candidates were eliminated by comparing each candidate's
performance with his or her own performance elsewhere, the difference being the use or nonuse
of a party column design. In this manner, thirty-seven individual contests were addressed.

One alternative explanation is that some candidates enjoy the advantages of more funding, which
translate into enhanced capability to win votes. This is addressed on pages 12-13 of the Wang
report (Section 4.3.2, For Nonincumbent Candidates, The County Line Confers An Average
Additional 17 Percentage Points Over Party Endorsement Alone). Comparing the same
candidate's performance between counties where he/she has been endorsed provides a
comparison with the same candidate identity, fact of party endorsement, and funding. The result
that candidates still obtain a larger percentage of the vote where the county line is additionally
used shows that the matched factors are insufficient to account for the difference in performance.

**Special circumstances in 2020 allow the county line's effects to be separated from those of a**
**party's county-level organizational capacity**

In another alternative explanation, the use of a county-line system merely reflects the degree of
engagement by a county's political party. In this telling, the county line is merely one facet of a
greater system that includes a county's party machinery, including voters and/or party officials,
or a county's willingness and/or capacity to spend campaign funds. This concept was tested on
pages 20-22, including Figures 18 and 19 of the Rubin expert report. That research took
advantage of the fact that in 2020, the first year of the COVID-19 pandemic, some counties
(Hunterdon, Passaic, and Warren) switched from a county-line ballot to use of vote-by-mail
using ballots printed according to a standard office-block design.

Republican U.S. Senate candidate Rik Mehta gained the party endorsement and appeared on the
county line in 11 counties, where he averaged 50.6% of the vote. In 3 counties (Hunterdon,
Passaic, and Warren) he gained the endorsement but an office-block format was used, and
averaged 33.3% of the vote. This 17.3 percentage point difference would arise by chance with a
probability of 0.000050, or 1 out of 20,000 times, which is highly statistically significant.

1

Two other non-incumbent candidates also had party endorsements and were on the ballot in Hunterdon, Passaic, and/or Warren County: Thomas Kean Jr. in the Seventh Congressional District, and Billy Prempeh in the Ninth Congressional District. To perform a statistical test, I analyzed county-level primary results.[1] Consistent with the Rubin report, Kean averaged 87.1% of the vote in 3 counties where he was on the line, and 74.0% in Hunterdon and Warren Counties, which used an office-block design. The difference of 13.1 percentage points would have arisen by chance with a probability of 0.00125, or 1 out of 800 times, highly statistically significant.

Prempeh averaged 68.8% of the vote in 2 counties where he was on the line, and 61.8% in Passaic County, which used an office-block design. The difference of 7.0 percentage points is in the same direction as the differences for Mehta and Kean. A statistical test cannot be done for Prempeh alone with only one office-block county.

However, it is possible to assess the overall effect for all three candidates taken together using a fixed-effects model, a statistical tool that is used routinely in social science and biomedical research. Using a fixed-effects model, the overall effect of implementing an office-block design for Mehta, Kean, and Prempeh is 14.5 percentage points. The probability that this difference would have arisen by chance is 0.000043, or 1 out of 23,000 times, once again highly statistically significant.

To summarize the foregoing results, it is possible to estimate the loss of vote share that occurs in a county party with all the organizational and governmental capacity to produce a county line ballot, but with one missing factor: not using a county-line ballot on an isolated basis. The loss of vote share, estimated at 14.5 percentage points, is therefore associated not with the party's local organizational infrastructure, but with the county line ballot design *per se*.

## Summary

1. Contrary to Clerk Schwartz's claim, the Wang report does provide analysis that tests the alternative explanation that county-line effects arise from individual candidate-specific factors. Based on thirty-seven candidates, that alternative explanation is not supported.
2. As another example of the power of this method, it is furthermore possible to test the idea that counties capable of producing a county line will deliver a smaller advantage when they fail to deploy the county line mechanism. In 2020, such a temporary suspension of the county-line mechanism led to a lost advantage of 14.5 percentage points for nonincumbent candidates.
3. This difference is statistically consistent with the 17-point advantage identified in the original Wang expert report for the county line's effects above and beyond the effects of party endorsement alone.
4. Combined with the original Wang and Rubin expert reports, I conclude that the advantages of the county line ballot format cannot be explained by candidate strength, party endorsement, or a county's intrinsic capacity to mobilize votes.
5. The parsimonious explanation of all the data taken together is that the county line ballot format misdirects the eye, leading to a large and consistent advantage for candidates who are placed on the line.

---

[1] https://www.nj.gov/state/elections/assets/pdf/election-results/2020/2020-official-primary-results-us-house-amended-0826.pdf

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANDY KIM, et al.,<br><br>    Plaintiffs<br><br>    ,<br><br>    v.<br><br>CHRISTINE GIORDANO HANLON, in her capacity as Monmouth County Clerk, et al.,<br><br>    Defendants. | Civil Action No. 3:24-01098 (ZNQ-TJB)<br><br>**CERTIFICATION OF EDWARD P. PEREZ** |

EDWARD P. PEREZ, of full age, hereby certifies:

1. I am a member of the Board of Directors for the OSET Institute, a nonpartisan, nonprofit 501(c)(3) organization devoted to elections infrastructure and public education. Before serving as a Board member, I was formerly in an operational role as the OSET Institute's Global Director of Technology & Standards. In that role, I focused on election technology data standards, certification, audit, user-centered design and security-centric engineering practices. In my Board role at the OSET Institute, I advise on matters of election law research, technology policy research, and government relations.

2. I have over thirty years of professional experience at the intersection of civic life and technology, including elections, technology design and development, trust and safety, traditional and social media, government, and political science.

3. On the topic of voting technology in particular, I have been an invited speaker before the Presidential Commission on Election Administration, as part of the "American Voting Experience" initiative; the National Academies of Sciences, Engineering, and Medicine as part of the Academies' "Securing the Vote" initiative; The National Institute of Standards and Technology, on "The Future of Voting;" The National Conference of State Legislatures, on the election technology landscape; and I have testified before the U.S. Election Assistance Commission (EAC) on the EAC's federal certification program and federal standards for voting technology. All of these speaking engagements required

1

detailed knowledge of voting systems and common election administration practices in the United States.

4. My prior voting industry experience includes working for almost 16 years (January 2003 to October 2018) with Hart InterCivic, a full-service election solutions vendor which provides election technology and services to hundreds of governmental jurisdictions nationwide. Hart InterCivic is the third largest commercial provider of voting technology to counties and municipalities in the United States (after Election Systems & Software, and Dominion Voting Systems). Hart's clients are typically county clerks.

5. I retired from the commercial voting technology industry in 2018, and I currently have no financial interest in any voting technology provider, including Hart InterCivic, Election Systems & Software (ES&S), or Dominion Voting systems. Due to my deep experience with voting technology in the United States, my ongoing work in election technology and election administration has been through my affiliation with the nonpartisan nonprofit 501(c)(3) OSET Institute.

6. While at Hart InterCivic for almost 16 years, I served in a variety of roles that included training, professional services, certification and compliance, and product management. This broad range of experiences included voting system implementation, training and support for county clerks (including many who previously used voting systems from Hart InterCivic competitors, including ES&S); product management and certification activities that required knowledge of voting system requirements, as well as the capabilities of competing systems; and detailed election management workflows (including data entry, ballot design and layout) common to county clerks across the diverse landscape of election administration in many different states.

7. During my last five years at Hart InterCivic, I served as Director of Product Management. This included leadership of vision, strategy, and execution of a complex voting technology platform successfully launched in 2015, as well as oversight of the certification team that successfully completed five federal certifications from the U.S. Election Assistance Commission and 12 state certifications. As is common to all major voting technology products in the U.S. today, this voting system platform included a suite of proprietary "election management system (EMS)" software applications, used for data entry; ballot layout design; in-person and by-mail voting; and tabulation of results, as well as proprietary voting machines, including electronic voting devices and paper ballot scanning devices. Accordingly, I have years of experience with both voting system software and hardware. The Hart InterCivic platform whose development I oversaw resulted in implementations with jurisdictions of over 2 million registered voters. Today,

2

that same voting system is used in public elections in the United States' third largest voting jurisdiction (Harris County (Houston), Texas) and in the fifth largest voting jurisdiction (Orange County, California). In short, in my capacity as Director of Product Management, I oversaw the process of designing, building, and certifying voting systems to comply with the federal *Voluntary Voting System Guidelines* of the United States Election Assistance Commission; as well as successfully completing numerous state certification processes in states with diverse needs (i.e. review, testing, and approval); and regularly researching and analyzing the capabilities of competitors' voting systems, based on publicly-available information, over a period of at least seven years (2011 to 2018).

8. I first served Hart InterCivic as a Senior Training Specialist / Training Services Supervisor (5 years) where I created, delivered and managed voting system software and hardware training curriculum for state, county, and local elections staff and polling place officials. I was thereafter promoted to Manager of Professional Services & Compliance (3 years) where I led a team of up to 6 project managers for all professional services offerings, including implementation of legacy voting system technology, and supported elections on-site for various primary and general elections in California, Colorado, Hawaii, Illinois, Oregon, Texas, and Virginia. I was thereafter promoted to Product Manager (2 years) where I lead the ideation and definition phase for the voting technology platform described above, which involved significant elections domain research; writing 700+ pages of Product Requirement Documents for the entire voting system platform (including multiple software applications and voting hardware); and system design, involving consultation with third-party experts in industrial design for modular device hardware and UX design for application software and voting devices. The platform was the first commercialized implementation in the United States of EAC/AIGA "Design for Democracy" templates for voting device user interfaces (i.e. the overall voting experience on electronic voting devices, including ballot design layouts). I was thereafter promoted to Director of Product Management to oversee implementation of the voting technology platform's long-term strategic plan.

9. I have extensive experience in assisting states in the implementation of voting systems, which requires an understanding of their various certification systems, different laws, and election infrastructure systems and processes. My former employer's implementation process always included a "change management" assessment, during which we would assess common election administration tasks that our clients performed with their previous voting systems, so that we could "map" their workflow onto our system. As part of that change management process, our implementation teams gathered detailed information about the election administration workflows that our customers were accustomed to with ES&S, Dominion, and other legacy systems, including the detailed

workflow associated with election data entry and ballot layout functions, and the capabilities of the systems they were accustomed to using.

10. Based on my past and present work, I also understand basic industry standards with respect to election software and voting systems.

11. In my capacity as Product Manager and (later) Director of Product Management at Hart InterCivic, my role required ongoing research on the capabilities of competitor systems through publicly-available sources. As a normal part of my work responsibilities over seven years in product, I routinely reviewed detailed technical documentation about competitor systems available from the EAC's federal Testing and Certification program, including system descriptions; software and hardware test plans; testing reports from third-party EAC-accredited testing laboratories; and final Certificates of Conformance and Scope of Certification documents, which provide descriptions of various systems' capabilities. In addition, as a normal part of my work responsibilities, I also reviewed similar documents associated with testing and approval of voting systems from the secretaries of state, departments of state, and other election authorities in over a dozen states. Collectively, all of these publicly-available documents provided me and my former employer with detailed information about the capabilities of modern voting systems, including those from ES&S and Dominion.

12. In my capacity as Product Manager and Director of Product Management, my role also required participation in competitive bidding processes as part of my work responsibilities; these activities provided extensive insight into the capabilities of voting technology systems commonly used today, based on competing vendors' own statements in public presentations and in written documents. My support and participation in competitive bidding processes typically included careful review and analysis of various states' Requests for Proposals, including detailed state-specific requirements, as well as vendors' lengthy responses to very specific questions about the capabilities of their voting systems. (Vendor RFP responses are often hundreds of pages in length, and I personally reviewed these; below, we refer to a 668-page ES&S response to the State of Delaware, for example.) Requests for proposals and vendor responses commonly address details of election management software; election definition; data entry; flexibility of ballot layout design templates; and display of office and candidate information, in both electronic and paper formats. In addition, I personally attended and/or reviewed (e.g., via video) voting system vendor presentations to various jurisdictions, during which they answered detailed questions from voting officials about the process of creating elections; managing data entry; selecting features to support various and sometimes idiosyncratic ballot design formats across the states; and managing both electronic and by-mail ballot processing devices.

4

13. Every vendor, and especially large vendors such as ES&S, is accustomed to capturing diverse market share by designing flexible voting system software and hardware that can support the requirements of idiosyncratic state laws and design needs. Due to the complexity and cost of federal and state certification testing procedures, there is a strong market incentive for voting system vendors to create comprehensive voting systems with features that can be uniformly applied across many states, as much as possible, while also allowing for flexibility to support unique features to meet the needs of various states. For example, it is common for voting system vendors to have "macro" level generations of their voting system platform, with a major version number, followed by minor version number variations to meet the needs of specific implementations. So, for example, currently, the latest versions of voting technology in the United States include: *ES&S EVS Version **6.x.x**; Dominion Democracy Suite Version **5.x.x**;* and *Hart InterCivic Verity Version **2.x.x***. Based on my review of the State of New Jersey's Voter Information Portal, it is my understanding that New Jersey has certified voting systems from these vendors that conform with these same version control conventions, indicating that each vendor is currently offering New Jersey a broad, comprehensive, and flexible "base" system that can also accommodate the specific needs of different types of election logic and ballot design requirements.

14. The "system configuration version" referenced above is a numerical identifier that "bundles" together all of the different component parts of a voting system, each of which also has its own version control number. Thus, the "top level" system configuration describes a single unique combination of specific parts, including election management software applications plus voting hardware running specific device software (i.e. similar to having specific versions of an operating system on one's Android or Apple smartphone). For example, it is my understanding, based on the New Jersey Voter Information Portal, that ES&S **EVS v. 6.3.0.0** is the latest version that New Jersey has certified. EVS System Configuration v. 6.3.0.0 *includes all of the following component parts*: ElectionWare election management system (EMS) software (which includes data entry, ballot design, and results tabulation) v. 6.3.0.0; DS200 Ballot Scanner v. 3.0.0.0; DS300 Ballot Scanner v. 3.0.0.0; DS450 mid-speed Ballot Scanner v. 4.2.0.0; DS850 high-speed Ballot Scanner v. 4.2.0.0; DS950 high-speed Ballot Scanner v. 4.2.0.0; and ExpressVote XL Universal Voting Device v. 4.2.1.0.[1] While this particular example relates to a system configuration for ES&S, the same logic is true of a Dominion or Hart InterCivic system: each includes EMS software to design ballots, program voting devices, and tabulate results; as well as voting devices and scanners to support in-person,

---

[1]    Certificate of Conformance and Scope of Conformance for ES&S EVS 6.3.0.0 by the United States Election Assistance Commission (Nov. 17, 2022), https://www.eac.gov/sites/default/files/voting_system/files/ESS%20EVS%206300%20Certificate%20and%20Scope%20of%20Conformance.pdf

accessible, and by-mail voting. I note this explanation of the "system configuration" to emphasize two important points: 1) when vendors bring software and hardware to any given state for approval, they are typically presenting an entire integrated system of software and hardware that supports election officials' end-to-end election needs. Thus, the software required to produce specific ballot design layout is part and parcel of an entire system designed for compatibility with the related voting device hardware; and 2) vendors are accustomed to continually updating their systems, to provide ongoing support for election officials' changing needs. In fact, across all vendors in the industry, the common model for all multi-year service contracts between vendors and county (or municipal) customers is that the jurisdiction pays annual "license and support fees," which give the county end-users not only a license to *use* the software (which they do not *own*), but in return, annual "license and support" fees also give end-users access to updated versions of approved EMS and voting device software, as vendors make those updates available. In this way, vendors and customers are engaged in an ongoing dynamic that allows continuing change management and access to updates as a given state's needs might change.

15. In common industry parlance, across vendors and election officials in various states, the process of creating a specific election with modern voting system software is typically referred to as creating an "***election definition.***" Broadly speaking, creating a specific election definition involves the following workflow steps, using an "election management system" (EMS) software suite: 1) **data entry**, including jurisdiction and precinct information; election type and logic; specific office and candidate information; number of allowed choices; etc. 2) **ballot design layout**, for both electronic and paper ballot formats; and 3) **"finalizing" or "locking"** the election definition, with internal security features, so that the overall data package can be transferred to voting devices and/or ballot scanning machines. (This last step is typically accomplished by copying the election definition, with a unique identifier and security credentials, onto removable flash memory, such as USB sticks, which are used to configure voting and scanning devices.) With regard to the election definition process itself, it must be emphasized that data entry is distinct and separate from ballot layout (and selecting ballot layout templates, in turn, is also separate from finalizing and deploying the election to hardware devices).

16. Step 1 of election definition: Data entry. Data entry is typically accomplished through the import of relevant data through an external file (such as an Excel file), and/or through manual entry of data into the software user interface, typically by a dedicated member of the county clerk staff. For example, the EMS specialist might use the keyboard to enter information such as "Democratic Primary for Senate," "5 candidates," candidate names, and "Vote for 1" logic. It should be emphasized that regardless of the ballot layout design

ultimately being used -- be it a traditional, more common office block-style ballot, or a grid-style ballot -- the first step is to input the contest-level data and the candidate names associated with each contest. Furthermore, all modern voting systems also allow for the re-use of data, to support efficiency. For example, if a jurisdiction had previously "locked" or "finalized" an earlier election definition, it is commonly possible to "copy forward" (akin to "Save As…in Microsoft Word) the entire election definition and then select different ballot layout templates using the same baseline data, without having to re-enter the data. Again, this is due to the fact that data entry is separate and distinct from layout. Similarly, if a county had a general or primary election definition from two to four years ago, and if the jurisdiction and precinct data has not changed much, the county can simply upload the past data and make any necessary final edits for the new election, without needing to manually enter all information from scratch. In sum, the data entry process in all major modern voting system platforms (ES&S, Dominion, Hart) is designed for flexibility because that is what election officials require: multiple methods to input data; the ability to re-use past data without the inefficiency of total re-entry, manually; and a data input process that is entirely separate from the task of selecting ballot layout formats.

17. The candidates' names are input as a part of the data entry process in creating an election definition. Thus, the entry of these names into the system can only be done once their candidate petitions are filed and approved.

18. <u>Step 2 of creating the election definition: Ballot layout and template selection.</u> The second step is the determination of what ballot layout template to use. This is akin to how someone might use templates in a Microsoft Word document. Once a data set has been input for an election, modern voting systems offer election officials a wide variety of choices to meet their needs; again, the process of selecting formats is distinct from data entry, and different layout formats can be applied against the same baseline data set.

19. The selection of a layout is akin to setting a document in Microsoft Word to Landscape or Portrait mode, but including a far greater number of variables, such as electronic and ballot paper sizes; specific layout formats; font sizes; and so forth. Additional detail about templates is presented below.

20. Even if an election official or third-party service provider has already created an election definition that includes a grid-style ballot layout, the data used to support that ballot format can be recopied and reused. This is akin to saving the existing data in a Word document as "Version 1," and then doing a "Save As…" and transferring that data into a new "Version 1.1," with different layout templates selected against the same baseline data set. In other words, setting the ballot template or layout is not immutable; county workers

or third-party providers can still reuse the data that has been previously input. This is a common capability of all modern election management software suites, including ES&S EVS, Dominion Democracy Suite, and Hart InterCivic Verity.

21. Additionally, even for the limited machines on the market which are configured for a full-face grid-style template – i.e., ES&S's ExpressVote XL system – it appears that ES&S's implementation in New Jersey can accommodate office-block type layouts. It is my understanding that New Jersey counties already use their ES&S EVS systems to run non-primary elections presented as office-block type layouts. It is also my understanding that New Jersey also runs general elections with races presented in a combination of grid-style layout and office-block style layouts on the same ballot. New Jersey also runs other elections that utilize an office block style layout, including among others, those for board of education and other nonpartisan races. This indicates to me that the version of ES&S's voting system implemented in New Jersey appears to currently include templates for office block and primary grid formats, in its current configuration, or that the primary grid format can be modified in some way to offer an office block appearance.

22. The bottom line is that the election management system (EMS) software included in modern voting systems is already designed to accommodate a significant degree of diversity in ballot design, including unique state-specific needs. Again, there is a market incentive for vendors to design their EMS to be both comprehensive and customizable. A robust baseline or "core" system that is also designed to be flexible enough to be tailored to each state's needs is an essential part of the voting technology business model.

23. As a general matter, it is important to recognize that vendors, particularly the large vendors such as ES&S and Dominion, are accustomed to sometimes providing full-service or "turnkey" contracts, where the vendor provides a greater degree of "hand-holding" to the counties, rather than training counties to be entirely self-sufficient. The "full-service" model frequently includes election definition "programming" services, whereby the vendor receives relevant jurisdiction, election, and contest data, and uses that information to lay out ballots according to the customer's needs, and to deliver flash memory drives with completed election definitions, to be installed on relevant voting devices at the county level. In other words, a large number of counties do not know, and do not need to know, the manual labor process to create an "election definition" because the vendor will do this work for them – including, if necessary, the creation of any customized ballot layout templates to meet counties' specific needs. Needless to say, this illustrates the fact that vendors of modern voting systems have the capability to deliver and/or customize ballot templates as a normal part of their business.

24. As described above, Step 1 of the election definition process is data entry. Step 2 is the application of ballot layout templates to the baseline data set. All of the latest voting system platforms from ES&S, Dominion, and Hart InterCivic (including the specific version of ES&S EVS used in New Jersey) allows for the selection of separate and distinct ballots for the electronic ballots, paper ballots, and/or accessible voting devices. It is typical for modern voting systems to offer many different choices for each medium, including, for example, different font sizes; layouts to accommodate different numbers of contests per screen or per page; different paper sizes for in-person versus by-mail voting (esp. because election officials often prefer to use fewer sheets for by-mail, to save postal costs). Furthermore, modern voting system vendors are accustomed to providing both "standard," or "out of the box" templates to support common types of contest presentations, such as office-block formats, as well as providing support to create customized templates for more exceptional or unique needs. Given how common the office block presentation is, some systems like ES&S offer different variations of office block templates. As a general matter, it is not uncommon for templates to be customized, either by the vendor or by the county end-users.

25. With regard to the subsequent printing of paper ballots, there are standard industry sizes for paper ballots: 8.5x11; 8.5x14; 8.5x17; 8.5x19; 11x17; and in rare instances in exceptional states like Michigan or Wisconsin, 8.5x22. In my life, I cannot recall an election that could not be accommodated in one of these standard sizes. Furthermore, due to the flexibility and choice available in multiple ballot templates, election officials commonly have some measure of control over their ballot printing process. It is normal, for example, for county clerks to take data, apply a template to the data set, and if they already know which stock of paper they prefer to use, to make the layout work for that paper size – or, alternatively, to experiment with new templates in order to decide the most cost-effective or usable printing methods (e.g. some layouts produce more sheets; or undesirable page breaks). Again, the nature of the election definition process allows for flexibility and choice.

26. Once the data entry is complete (Step 1) and ballot layout templates are applied (Step 2), Step 3 includes "finalizing and locking the election definition." At this point, the election definition incorporates security credentials and becomes immutable so that the final election logic may be transferred onto memory cards that will go into the physical voting devices or ballot scanning stations.

27. It should be emphasized that if data entry is already complete, and if new ballot layouts need to be applied to the baseline data set for any reason (whether the election definition has been finalized or not), the task of selecting new template styles or doing a "Save

As…" to copy a previously-finalized election in order to select new layout templates, can be accomplished with modern election management software in a relatively modest amount of time. After the data is entered, the ballot layout phase is a matter of selecting templates and clicking buttons in the EMS user interface. Not including the time required to proofread all ballot styles in the new ballot format (which is a necessary part of the election definition process, regardless of the layout chosen), and not including the time to proofread ballot data reports (which, again, occurs regardless of the layout chosen), or to remake flash memory cards for a modified election definition, I estimate that the time required for a modern election management system to produce new ballot styles after new formats have been selected against the same baseline data can be measured in a matter of hours (or a day or so at the very most -- and certainly not weeks or months, for example). For a moderately large county in New Jersey, such as Essex County, which I understand to have approximately 600,000 voters, I would be surprised if the task of copying a previously finalized election definition in order to apply a new ballot layout would take more than a few hours at the most.

28. In summary, my 15+ years of voting technology industry experience, including training, implementation, product management, certification, and competitive bidding processes allow me to state confidently that all three voting systems currently approved for use in the State of New Jersey offer a very high degree of flexibility during the election definition process. Whether through the use of standardized ballot layout templates that are typically offered as part of the EMS system, or with the support of vendors to customize templates (which is highly common, due to diverse state-specific requirements), the voting technology industry today supports a high degree of flexibility and choice for election officials in designing and deploying various designs for electronic and/or paper ballots. Election officials demand this level of flexibility, and all major voting system vendors have designed EMS systems to support those market requirements. Perhaps the most important design architecture decision that is common across the voting technology industry is the distinction between data entry versus ballot layout, which, as described above, are entirely separate steps. The distinction between these steps allows election officials -- either self-sufficiently, or with the support of their vendor – to use and/or customize ballot layout templates without the need to re-enter all of their baseline election data. Finally, if my understanding is correct that New Jersey counties already use their ES&S EVS systems to run elections other than primaries with office-block type layouts, then I can say with high confidence that it appears that the version of ES&S's voting system implemented in New Jersey includes templates for both office block and primary grid formats, in its current configuration.

29. As an illustration of the foregoing analysis, this reply also includes highlighted sections from ES&S's official responses to the State of Delaware's Request for Proposal for a new voting system, illustrating a high degree of flexibility in their system, which is currently the same product implemented in New Jersey. According to Delaware's Office of the State Election Commission, Delaware currently uses ES&S EVS system version 6.3.0.0. According to the New Jersey Voter Information Portal, the State of New Jersey has also certified ES&S EVS system version 6.3.0.0. Accordingly, the capabilities of these two systems should match, as they are the same.

30. Although ES&S RFP responses do not appear to be publicly-available for the State of New Jersey, ES&S's responses to Delaware appear to be a reasonable proxy for the capabilities of the system implemented in New Jersey. The sections we have highlighted in the ES&S Delaware RFP Response appended to this Certification present ES&S's own claims about the flexibility of their system, in terms of ballot design layouts and customizable templates.[2] For ease of reference, an index is provided here, referencing page numbers in the PDF itself (i.e. not the page numbers on page footers):

<u>PDF Page Number corresponding with appended ES&S Delaware RFP Response</u>

| | |
|---|---|
| p. 29 | Flexibility |
| p. 107 | Integrated voting system |
| p. 144 | Implicitly contains a description of an office-block layout |
| p. 144 | Flexible ballot formats[3] |
| p. 146, 355 | Flexibility and scalability; templates, and re-use |
| p. 146 | Ballot style capability |
| p. 147, 356 | Ballot creation flexibility[4] |
| pp. 202-203 | ElectionWare EMS, re-use of data |

---

[2] Appended please find a highlighted version of the ES&S Delaware response for ease of reference with the above index. The original 2018 ES&S RFP Delaware response can be found at: https://verifiedvoting.org/wp-content/uploads/2020/10/Delaware_RFP_ESSS-combined-redacted-.pdf

[3] "ES&S Response: We understand that there are many different formats required. Our flexible ballot management software is designed to allow for many different ballot layout options. We have some jurisdictions that require multiple page ballots with various languages and requirements. Our system makes ballot design easy. By utilizing ballot templates, the majority of the layout can be completed quickly and efficiently. Then additional changes can be made depending on the number of candidates, offices and parties on the ballot."

[4] "Our systems contain the utmost ballot creation flexibility to support the various jurisdiction rules of our current and potential customers. At a high level, ElectionWare provides complete control over items such as ballot sizes and oval density, stubs and perforations, number of ballot rows and columns, ballot orientation, text and graphic placement, watermarks, ruling lines and margins . . . [Further describing typographic elements under the user's control] . . . For the ExpressVote XL, contests and questions appear on one screen; they may also be broken up into multiple screens if Delaware ever requires this." (ES&S RFP Delaware Response, at pdf 147.)

| | |
|---|---|
| p. 367 | Flexibility in office, candidate presentation[5] |
| p. 368 | Re-use of previously defined elections |
| p. 370 | Customization of absentee ballots |
| p. 374 | Re-use of ballot printing templates |
| p. 374 | Multiple templates for standard paper sizes |
| p. 388 | Customized implementation and project management |

31. I understand that New Jersey uses both EVS 6.3.0.0 (13 counties) and 6.2.0.0 (2 counties) versions. By virtue of the fact that both system configurations share the same major version (i.e. "6") and are separated only by minor version control variant (i.e. 6.*3* vs. 6.*2*), it is reasonable to assume that both versions support the same basic flexibility and customizability necessary to support an office ballot layout, regardless of whether it is developed on a technological office ballot or grid system. This is further evident based on New Jersey's use of various ballot designs for its elections, as described in Paragraph 21 above.

I declare under penalty of perjury the foregoing is true and correct.

_____
Edward P. Perez

Dated: March 12, 2024

---

[5]     ES&S Response: "Offices linked to the appropriate candidates may be imported into ElectionWare or entered via data entry. ElectionWare provides many fields to allow more flexibility on how offices and their candidates are to appear on the ballot, if needed."

# EXHIBIT D

From:  Andrew W. Appel
To: Flavio Komuves
Date:  March 12, 2024
Re: Supplemental Expert Report

This is a supplement to my report of January 24, 2024 entitled "Capability of New Jersey's Voting Equipment to handle Office-Block Ballots."

I have been asked to assess whether New Jersey's voting equipment can accommodate an "office block" ballot format.  In my previous report I discussed all the different voting machines used in New Jersey.  In this report I provide more information about those machines.

## Capabilities of machines used in New Jersey

**Regarding equipment used to scan paper ballots:** To count paper ballots, every New Jersey county uses either the Dominion ImageCast Central scanner or the ES&S DS series (DS200, DS300, DS450, DS850, DS950).  All of those machines are used in other states to scan paper ballots that use the office-block style.  In my previous report I documented this with specific sample ballots from other states.

**Regarding equipment for in-person voting:**  In my previous report I explained that New Jersey counties use the following machines for in-person voting; here I provide more information.

- **Dominion ImageCast Precinct (ICP)** polling-place optical scanner, used in Essex County.  This machine is used in other states for office-block ballots as documented in my previous report.
- **Dominion ImageCast X BMD** ballot-marking device, used in Bergen, Burlington, Mercer, Salem, and Cumberland counties.  This machine is used in other states for office block ballots.
- **ES&S ExpressVote** ballot-marking device, used in Sussex County.  This is a small-screen machine, so it is typically used in a one-contest-per-screen format, which is naturally an office-block format.
- **ES&S ExpressVote XL** ballot-marking device, used in Atlantic, Cape May, Gloucester, Hudson, Hunterdon, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Union, and Warren Counties.  The capability of this machine to do an office-block ballot is demonstrated by the Egg Harbor Township (Atlantic County) November 2023 ballot, in which the School Board election is a separate block, vote for any 3 out of a 7x2 array of candidates, including write-in.[1]
- **ES&S DS200/DS300** polling-place optical scanner for hand-marked paper ballots, used in Camden County.  This machine is used in other states for office-block ballots as documented in my previous report.  Even in New Jersey, the November 2023 Haddonfield (Camden

---

[1] Attached as Exhibit A.

County) ballot is partially office-block: the school-board election is a separate block, vote for any 3 out of a 4x2 array of candidates, including write-in.[2]

- **AVC Advantage** direct-recording electronic (paperless) "touchscreen"[3], used in Burlington County. [4] This machine is capable of doing office-block ballots, as demonstrated by the Bass River Township ballot of November 2023, in which the school-board election (unexpired 2-year term) is a separate block, vote for any 2 out of a 2x2 array of candidates, including write-in.[5]

This list accounts for all 21 New Jersey counties.  In some of those counties, other equipment is used in an ancillary fashion; in each county I have listed the primary voting machine on which voters indicate their choices during in-person voting.  On the question of exactly which counties use which voting machines, I have relied on the election equipment database maintained by the Verified Voting Foundation.[6]  This is in part because the information on the web site of the New Jersey Secretary of State is out of date and inaccurate; and in part because I have used the Verified Voting database for more than a decade and I have found it be generally accurate.  Regardless of the precise lists of which counties use a particular voting machine, my conclusion remains the same: All of New Jersey's counties use voting machines from the two largest vendors of election equipment in and for the United States, and the equipment that these vendors sell is used in many states for office-block ballots.

**Office-block is the primary mode of ballot design in most of the United States.**  For example, the U.S. Election Assistance Commission published its manual, "Effective Designs for the Administration of Federal Elections", in 2007.[7]  This 266-page manual contains recommendations for how to design polling-place signage, voter information materials, optical-scan paper ballots, full-face touchscreen-ballots, and small-screen touchscreen ballots.  In all of these categories, the emphasis is on how best to communicate to voters.

The EAC's manual illustrates office-block ballots, but does not mention row-and-column layout at all.[8]  This is perhaps because so few states use row-and-column ballots.

---

[2] Attached as Exhibit B.  The Camden City, Ward 1 ballot, not attached, demonstrates the same thing in the same way, as does the Cherry Hill ballot.

[3] Technically this is not a touchscreen, it is a pushbutton machine that appears and operates much like a touchscreen.

[4] It appears that Burlington County uses the Dominion ImageCast X BMD for early voting, and the AVC Advantage for election-day voting—the Bass River Township ballot (Exhibit C) appears to be an AVC Advantage ballot.

[5] Attached as Exhibit C.  In addition, the Madison Borough (Morris County) November 2018 ballot demonstrates the same principle; attached as Exhibit D.

[6] Except that for Salem County I am relying on the statement on their web site that "As of November 2020 we are using the Dominion ImageCast X Prime with VVPAT", which is the ImageCast X DRE; and for Burlington County I am relying on their web site's description of equipment used for early voting.
https://elections.salemcountynj.gov/using-the-voting-machines/
https://www.co.burlington.nj.us/CivicAlerts.aspx?AID=1733&ARC=3524

[7] https://ftt-uploads.s3.amazonaws.com/wp-content/uploads/2020/03/02100957/eac_effective_election_design.pdf

[8] Of the 32 illustrations of paper-ballot layouts, not a single one is a row-and-column design, they are all office-block.  Of the 7 illustrations of full-face touchscreen layouts, not a single one is row-and-column design, all are office-block.  Of the many illustrations of small-screen touchscreen layouts, not a single one is row-and-

## No reprogramming needed

**Programming vs. configuration:** Voting machines come from their manufacturer *programmed* with software that accommodates many ballot styles, so that they can be sold and used in many states with different practices.  Before each election, the voting machine must be *configured,* that is, supplied with a *ballot-design file* that lists the contests and candidates for that election.  The ballot-design file can be prepared by county election office employees or can be contracted out to an election-services vendor.  In either case, the choice to use office-block vs. row-and-column layout is done during the preparation of the ballot design, which is done by election administrators, and would not require any software update or hardware upgrade to the voting machines.

## Deadlines for absentee ballots vs polling places

The Secretary of State's office points to April 6, 2024 as the statutory date for printing absentee (mail-in/dropbox).[9]  The equipment used in New Jersey for counting those ballots has long been used in many other states for office-block ballots.  No technical innovations or design innovations will be required to use office-block mail-in ballots in New Jersey.

In-person voting starts on May 29, 2024 for the New Jersey primary election.  Sample ballots are to be mailed out on May 22.[10]  Ballot designs for polling-place voting machines need to be prepared and tested in advance of that deadline, which is far later than the deadline for printing absentee ballots.  Therefore, those counties that do not have experience configuring their ExpressVote XL voting machines for office blocks, have additional time (beyond the absentee-ballot printing deadline) to prepare.

## Conclusion

My general conclusion is the same as in my previous report.  In this supplement I have provided additional evidence that all voting machines currently used in New Jersey are capable of handling office-block ballots, without any manufacturer upgrade.

Signed,

March 12, 2024, Princeton, NJ

---

column—but, of course, the distinction hardly applies to small-screen touchscreens on which only one contest is presented per screen, and the voter must page through different contests on different screens.
[9] 2024 Primary Election Timeline, Updated March 5, 2024, from the Office of the NJ Secretary of State, https://nj.gov/state/elections/assets/pdf/chrons/2024-chron-primary-election.pdf
[10] 2024 Primary Election Timeline, *id.*

# Exhibit A

Egg Harbor Township (Atlantic County) November 2023 ballot

| OFFICE TITLE<br>*TÍTULO OFICIAL* | Column/Columna<br>**A**<br>Republican<br>*Republicano* | Column/Columna<br>**B**<br>Democratic<br>*Demócrata* | Column/Columna<br>**C**<br>Nomination by Petition<br>*Nominación por Petición* | PERSONAL CHOICE<br>*SELECCIÓN PERSONAL* |
|---|---|---|---|---|
| **State Senate**<br>VOTE FOR ONE<br>*Senado Estatal*<br>*VOTE POR UNO* | Vince POLISTINA | Caren FITZPATRICK | Shawn PECK<br>*Libertarian Party* | Write-In<br>*Escribir en* |
| **Members of the General Assembly**<br>VOTE FOR TWO<br>*Miembros del Asamblea General*<br>*VOTE POR DOS* | Don GUARDIAN | Alphonso HARRELL | | Write-In<br>*Escribir en* |
| | Claire SWIFT | Elizabeth "Lisa" BENDER | | Write-In<br>*Escribir en* |
| **County Executive**<br>VOTE FOR ONE<br>*Ejecutivo del Condado*<br>*VOTE POR UNO* | Dennis LEVINSON | Joyce PRATT | | Write-In<br>*Escribir en* |
| **Sheriff**<br>VOTE FOR ONE<br>*Alguacil*<br>*VOTE POR UNO* | Joe O'DONOGHUE | Eric SCHEFFLER | | Write-In<br>*Escribir en* |
| **County Commissioner-at-Large**<br>VOTE FOR TWO<br>*Comisionado del Condado*<br>*en General*<br>*VOTE POR DOS* | John W. RISLEY, Jr. | Kim O'BRIEN | | Write-In<br>*Escribir en* |
| | June BYRNES | Habib REHMAN | | Write-In<br>*Escribir en* |
| **Township Committee**<br>*Comité de la Municipalidad* | Paul W. HODSON | Trina T. JENKINS | | Write-In<br>*Escribir en* |
| | Laura PFROMMER | Lisa M. MARCH | | Write-In<br>*Escribir en* |

**OFFICIAL GENERAL ELECTION SAMPLE BALLOT**
*BOLETA DE MUESTRA OFICIAL DE LAS ELECCIONES GENERALES*

## Egg Harbor Township
**Atlantic County, New Jersey**
**2nd Legislative District - November 7, 2023**



**Joseph J. Giralo**
*Atlantic County Clerk*
*Secretario del Condado de Atlantic*

**OFFICIAL SCHOOL BOARD ELECTION BALLOT**
*BOLETA DE ELECCIÓN DE LA JUNTA ESCOLAR OFICIAL*

| OFFICE TITLE<br>*TÍTULO OFICIAL* | Column/Columna<br>**1**<br>Board of Education<br>*Junta de Educación* | PERSONAL CHOICE<br>*SELECCIÓN PERSONAL* |
|---|---|---|
| | Borna NOURI | Write-In<br>*Escribir en* |
| | Lynnette COATES | Write-In<br>*Escribir en* |
| | Victoria DRUDING | Write-In<br>*Escribir en* |
| **Members of the Local Board of Education**<br>*Miembros de la Junta Directiva de Educación Local*<br>FULL 3 YEAR TERM - VOTE FOR THREE<br>*TÉRMINO COMPLETO DE TRES AÑOS - VOTE POR TRES* | Janelle EYKYN | |
| | Michael PRICE<br>*#EHT Proud* | |
| | Tamika GILBERT<br>*#EHT Strong* | |
| | Patrick Ryan IRELAND | |

Printed on Recycled Paper.

**ATTENTION VOTERS!**

- Familiarize yourselves with this ballot and instructions. It will assist you in voting, and save time on Election Day.
- This sample ballot contains important information regarding voting, including your voting district and polling location. Please feel free to bring this ballot along with you on Election Day.
- All voters who can, should vote early in the day and thus avoid possibility of congestion and inconvenience to themselves and others near the close of the polls.
- Additional voter information will be available in all polling locations.

**¡ELECTORES ATENCIÓN!**

- Estudie esta boleta y sus instrucciones. Esto le ayudará a votar y a economizar tiempo el Día de Elecciones.
- Esta boleta de muestra contiene información importante en cuanto a la votación, incluyendo su distrito electoral y sitio de votación. Usted puede traer esta boleta el día de las elecciones.
- Los votantes deben tratar de votar temprano en el día y así evitar la conglomeración e inconveniencias que suceden a la hora de cerrar las urnas de votación.
- Información adicional para los electores estará disponible en todas las urnas electorales.

**TO RECORD YOUR VOTE**
DO NOT PRESS THE "CAST VOTE" BUTTON
UNTIL YOU HAVE MADE ALL DESIRED SELECTIONS.
**CAST VOTE BUTTON**

**PARA REGISTRAR SU VOTO**
NO PRESIONE EL BOTÓN "CAST VOTE"
HECHO TODAS LAS SELECCIONES DESEADAS.
**BOTÓN "CAST VOTE" / "REGISTRAR VOTO"**



4

# Exhibit B

November 2023 Haddonfield (Camden County) ballot



This Official General Election Sample Ballot is an exact copy of the Official General Ballot to be used on General Election Day. This ballot cannot be voted.   Este ejemplo es una copia idéntica de la Papeleta Oficial de las Elecciones Generales que será utilizada el día de las elecciones. Usted no podrá votar en esta papeleta.

**OFFICIAL ELECTION SAMPLE BALLOT** Muestra Oficial de la Papeleta
**Tuesday, November 7, 2023**     El Martes, 7 de Noviembre del 2023

Polls Open 6 A.M.-8 P.M.
Los Colegios Electorales estarán abiertos de 6 A.M. hasta las 8 P.M.

**ED/EV   Haddonfield**

## New Voting Machines in Camden County

Integrity and security are essential to free and fair elections. With our aging election equipment and voting machines at the end of life, the decision was made to purchase new equipment. The new election systems put into service by Camden County will not only ensure our elections are completely secure, but also easy to use from the perspective of our voters.

Here is what you can expect the next time you cast your vote at a polling place in Camden County.

- **Sign In:** You will sign in on an electronic tablet device, speeding up the process and assuring you receive the ballot for your district.
- **Your Ballot:** Upon signing in, the board workers will give you your ballot. Ballots are paper and are similar to those who vote using a Vote by Mail ballot. You will be directed to a privacy screen where you will make your selections using a pen to vote for the candidates and questions by coloring in the corresponding oval.
- **Voting Machines:** After you have voted your ballot, place it in a provided privacy sleeve to keep all voting selections secret. A board worker will then direct you to the new tabulating device. You will then feed your ballot into the scanner where your votes will be recorded, and your ballot is securely stored within the device. This ensures that there is a paper record of every single vote that has been cast.
- **Ballot Marking Device:** Every polling location throughout Camden County will be equipped with an ADA compliant ballot marking device. Voters that require such accommodations will be able to utilize the Express Vote machine which will assist the voters in making selections on their ballot. Ballots printed from the ballot marking device are read on the tabulators the same as any other ballot.

While some see this as a regression from fully electronic machines, it is widely believed by election security experts that a hand-marked paper ballot are the most secure method of voting since voter intent is clear and each ballot can easily be recounted if needed.

We look forward to all Camden County voters having the opportunity to cast their vote for our upcoming elections!

## Nuevas Máquinas de Votación en el Condado de Camden

La integridad y la seguridad son esenciales para elecciones justas y democráticas. Con nuestro equipo electoral y nuestras máquinas de votación obsoletas, ya era necesario que se actualizaran. Por eso se tomó la decisión de comprar equipo nuevo. Los nuevos sistemas electorales puestos en servicio por el Condado de Camden no solo garantizarán que nuestras elecciones sean completamente seguras, sino también fáciles de usar desde la perspectiva de nuestros votantes.

Esto es lo que puede esperar la próxima vez que emita su voto en un lugar de votación en el Condado de Camden.

- **Firmar:** Iniciará la sesión en una tableta electrónica, acelerando el proceso y asegurándose de recibir la papeleta para su distrito.
- **Su Papeleta:** Al registrarse, los trabajadores de la junta le darán su papeleta. Las papeletas son de papel y son similares a las que se usan votando en una papeleta de Voto por Correo. Se le dirigirá a un cubículo privado, donde hará sus selecciones usando un bolígrafo para votar por los candidatos y las preguntas coloreando el óvalo correspondiente.
- **Máquinas de votación:** Después de haber votado en su papeleta, colóquela en una carpeta privada provista para mantener en secreto todas las selecciones de votación. Luego, un trabajador de la junta lo dirigirá al nuevo dispositivo de tabulación. Luego, ingresará su papeleta en el escáner donde se registrarán sus votos, y su papeleta se almacenará de forma segura dentro del dispositivo. Esto asegura que haya un registro en papel de cada voto que se haya emitido.
- **Dispositivo de marcado de Papeletas:** Cada lugar de votación en todo el Condado de Camden estará equipado con un dispositivo de marcado de papeletas que cumpla con la ADA. Los votantes que requieran dichas adaptaciones podrán utilizar la máquina Express de Votar, que los ayudará a realizar las selecciones en su papeleta. Las papeletas impresas desde el dispositivo de marcado de papeletas se pueden volver a contar fácilmente si es necesario.

Mientras algunos ven esto como una regresión de las máquinas totalmente electrónicas, los expertos en seguridad electoral creen ampliamente que una papeleta de papel marcada a mano es el método más seguro para votar, ya que la intención del votante es clara y cada papeleta se puede volver a contar fácilmente si es necesario.

¡Esperamos que todos los votantes del condado de Camden tengan la oportunidad de emitir su voto para nuestras próximas elecciones!

## Exhibit C

Bass River Township ballot of November 2023



**JOANNE SCHWARTZ**
*County Clerk*

**OFFICIAL GENERAL ELECTION SAMPLE BALLOT**
BURLINGTON COUNTY
**Election Day – November 7, 2023**
POLLS OPEN 6:00 A.M. TO 8:00 P.M.
**TOWNSHIP OF BASS RIVER**
8th LEGISLATIVE DISTRICT

ATTENTION: Familiarize yourself with this ballot, it will assist you in voting and save time. IMPORTANT! All voters who can, should vote early to avoid congestion and inconvenience to themselves and others near the close of the polls.

| OFFICE TITLE | DEMOCRAT COLUMN 1 | REPUBLICAN COLUMN 2 | NOMINATION BY PETITION COLUMN 3 | PERSONAL CHOICE |
|---|---|---|---|---|
| STATE SENATOR FULL TERM (VOTE FOR ONE) | JEFF BURTON | LATHAM TIVER | | (USE KEYBOARD BELOW) WRITE-IN |
| MEMBERS OF THE GENERAL ASSEMBLY FULL TERM (VOTE FOR ONE) | ANDREA KATZ | MICHAEL TORRISSI Jr. | | (USE KEYBOARD BELOW) WRITE-IN |
| | ANTHONY ANGELOZZI | BRANDON A. UMBA | | (USE KEYBOARD BELOW) WRITE-IN |
| COUNTY CLERK FULL TERM (VOTE FOR ONE) | JOANNE SCHWARTZ | DEBORAH BUZBY-COPE | | (USE KEYBOARD BELOW) WRITE-IN |
| MEMBERS OF THE BOARD OF COUNTY COMMISSIONERS FULL TERM (VOTE FOR TWO) | TOM PULLION | ALPHONSO GAMBONE | | (USE KEYBOARD BELOW) WRITE-IN |
| | BALVIR SINGH | LARRY VERNAMONTI | | (USE KEYBOARD BELOW) WRITE-IN |

Form 1 - Bass River

**LOCAL SCHOOL DISTRICT**

| OFFICE TITLE | COLUMN 1 | PERSONAL CHOICE |
|---|---|---|
| TOWNSHIP OF BASS RIVER SCHOOL DISTRICT MEMBER OF THE BOARD OF EDUCATION FULL TERM (VOTE FOR ONE) | CAROL BITZBERGER | (USE KEYBOARD BELOW) WRITE-IN |
| TOWNSHIP OF BASS RIVER SCHOOL DISTRICT MEMBERS OF THE BOARD OF EDUCATION UNEXPIRED 2 YEAR TERM (VOTE FOR TWO) | WILLIAM CURTIN | (USE KEYBOARD BELOW) WRITE-IN |
| | NO PETITION FILED | (USE KEYBOARD BELOW) WRITE-IN |

THIS BALLOT CANNOT BE VOTED, IT IS A SAMPLE COPY OF THE OFFICIAL GENERAL ELECTION BALLOT USED ON ELECTION DAY.

ADDITIONAL VOTER INFORMATION WILL BE AVAILABLE IN ALL POLLING LOCATIONS



**WARNING**
DO NOT PRESS THE "CAST VOTE" BUTTON UNTIL YOU HAVE MADE ALL DESIRED SELECTIONS.
**CAST VOTE BUTTON**

6

# Exhibit D

Madison Borough (Morris County) November 2018

Ann F. Grossi Esq
**ANN F. GROSSI, ESQ.**
County Clerk

**ATTENTION:** Familiarize yourself with this ballot, it will assist you in voting and save time. IMPORTANT! All voters who can, should vote early to avoid congestion and inconvenience to themselves and others near the close of the polls.

ADDITIONAL VOTER INFORMATION WILL BE AVAILABLE IN ALL POLLING LOCATIONS

## COUNTY OF MORRIS
## OFFICIAL GENERAL ELECTION SAMPLE BALLOT

ELECTION DAY — TUESDAY, NOVEMBER 6, 2018 • POLLS OPEN 6:00 A.M. TO 8:00 P.M.

## BOROUGH OF MADISON
## 11TH CONGRESSIONAL DISTRICT

THIS BALLOT CANNOT BE VOTED, IT IS A SAMPLE COPY OF THE OFFICIAL GENERAL ELECTION BALLOT USED ON ELECTION DAY.

**Official General Election Sample Ballot**

In cases where the sample ballot is to be sent an addressee who does not receive his mail by delivery to his home or through rural free delivery 'if not delivered within five days return to the Superintendent of Elections' and in all other cases ' if not delivered within two days return to Superintendent of Elections.' Do not Forward. "Return Postage Guaranteed."

**SUPERINTENDENT**
**OF ELECTIONS**
**PO BOX 900**
**Morristown, NJ 07963-0900**
RETURN SERVICE REQUESTED

OFFICIAL ELECTION MAIL™ Authorized by the U.S. Postal Service

NONPROFIT
U.S. POSTAGE
PAID
MORRIS COUNTY
CLERK

POSTMASTER:
PLEASE DELIVER BY FRIDAY NOVEMBER 2, 2018

**VOTE HERE** 018-00-000

| OFFICE TITLE | DEMOCRATIC COLUMN 1 | REPUBLICAN COLUMN 2 | NOMINATION BY PETITION COLUMN 3 | NOMINATION BY PETITION COLUMN 4 | NOMINATION BY PETITION COLUMN 5 | WRITE-IN COLUMN |
|---|---|---|---|---|---|---|
| MEMBER OF THE UNITED STATES SENATE For 6 Years (Vote for 1) | Democratic ROBERT MENENDEZ 1 | Republican BOB HUGIN 1 | For The People NATALIE LYNN RIVERA 1 | Green Party MADELYN R. HOFFMAN 1 | Libertarian Party MURRAY SABRIN 1 | (USE KEYBOARD BELOW) WRITE-IN |
| | | | Make it Simple KEVIN KIMPLE 2 | Economic Growth HANK SCHROEDER 2 | New Day NJ TRICIA FLANAGAN 2 | |
| MEMBER OF THE HOUSE OF REPRESENTATIVES (11th Congressional District) For 2 Years (Vote for 1) | Democratic MIKIE SHERRILL 3 | Republican JAY WEBBER 3 | Honesty, Integrity, Compassion ROBERT F. CROOK 3 | | Libertarian Party RYAN MARTINEZ 3 | (USE KEYBOARD BELOW) WRITE-IN |
| COUNTY CLERK For 5 Years (Vote for 1) | Democratic SHALINI "SHALA" GAGLIARDI 4 | Republican ANN F. GROSSI 4 | | | | (USE KEYBOARD BELOW) WRITE-IN |
| MEMBER OF THE BOARD OF CHOSEN FREEHOLDERS For 3 Years (Vote for 3) | Democratic MARY DOUGHERTY 5 | Republican DEBORAH SMITH 5 | | | | (USE KEYBOARD BELOW) WRITE-IN |
| | Democratic RUPANDE MEHTA 6 | Republican JOHN KRICKUS 6 | | | | (USE KEYBOARD BELOW) WRITE-IN |
| | Democratic RICHARD CORCORAN 7 | Republican STEPHEN H. SHAW 7 | | | | (USE KEYBOARD BELOW) WRITE-IN |
| MEMBER OF THE BOROUGH COUNCIL For 3 Years (Vote for 2) | Democratic ASTRI J. BAILLIE 8 | Republican MARK CHIAROLANZA 8 | | | | (USE KEYBOARD BELOW) WRITE-IN |
| | Democratic DEBRA J. COEN 9 | Republican KATHY DAILEY 9 | | | | (USE KEYBOARD BELOW) WRITE-IN |

**LOCAL SCHOOL DISTRICT**

| OFFICE TITLE | COLUMN 1 | WRITE-IN COLUMN |
|---|---|---|
| BOROUGH OF MADISON SCHOOL DISTRICT MEMBER OF THE BOARD OF EDUCATION For 3 Years (Vote For 2) | THOMAS J. PISKULA 1 | (USE KEYBOARD BELOW) WRITE-IN |
| | SARAH G. FISCHER 2 | (USE KEYBOARD BELOW) WRITE-IN |
| | DAVID STEKETEE 3 | |
| | CURTIS B. GILFILLAN 4 | |

## PUBLIC QUESTIONS TO BE VOTED UPON

**STATE QUESTION NO. 1**

**SECURING OUR CHILDREN'S FUTURE BOND ACT**

Do you approve the "Securing Our Children's Future Bond Act"? This bond act authorizes the State to issue bonds in the aggregate principal amount of $500 million. The money from the sale of the bonds would be used to provide grants to schools, school districts, county vocational school districts, and county colleges. Money from the grants would be used to build, equip, and expand facilities to increase career and technical education program capacity. Money would also be used for school security upgrades and school district water infrastructure improvement projects.

**INTERPRETIVE STATEMENT**

This act would allow the State to borrow a total principal amount of $500 million. This money would be used to provide grants to county vocational school districts and county colleges to construct and equip buildings to increase capacity in career and technical education programs. The money would also be used to provide grants for school security projects at kindergarten through grade 12 schools. The money would also be used to provide grants for school district water infrastructure improvement projects. Three hundred fifty million dollars would support county vocational school district projects and school security projects. Fifty million dollars would support county college projects. One hundred million dollars would support school district water infrastructure improvement projects.

YES

NO

## INSTRUCTIONS FOR VOTING

1. Press the button ☐ to the right of the candidate of your choice; a green "X" will appear next to your selection.
2. To change a selection, press the button ☐ again. The green "X" will disappear and you may make a new selection.
3. If you wish to cast a WRITE-IN vote (you may not write-in any name that is printed on the ballot for the same office), go to the WRITE-IN column and press the button ☐ next to WRITE-IN across from the office you wish to write-in. A blinking green "X" will appear. Using the alphabetical keyboard below, enter the name of the person of your choice, one letter at a time. To make a space between first and middle name or initial and last name use the arrow pointing to the right on the keyboard. To make a correction, use the arrow pointing to the left. The name you ENTER will appear in the display to the left of the keyboard. When you have entered the whole name, proof it, then press the enter button on the keyboard. Your choice is recorded and removed from the display. Do not press the cast vote button until all other choices are complete. (Each write-in is a separate entry.)

   **WARNING!** An improperly cast write-in vote will be void. Be sure that your write-in vote is cast in the WRITE-IN column on the same line as the office for which you are casting the write-in vote.
4. To vote on the PUBLIC QUESTIONS press the button ☐ to the right of the word "YES" or "NO"; a green "X" will appear next to your selection.
5. After ALL selections have been made, press the RED CAST VOTE BUTTON located in the lower right corner. This electronically records all of your votes.
6. Part the curtains and exit the voting booth.

**WARNING**

DO NOT PRESS THE 'CAST VOTE' BUTTON UNTIL YOU HAVE MADE ALL DESIRED SELECTIONS.

**CAST VOTE BUTTON**





