# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANDY KIM**, *in his personal capacity as a candidate* for U.S. Senate, ***et al.**,*<br><br>Plaintiffs,<br><br>v.<br><br>**CHRISTINE GIORDANO HANLON**, *in her capacity as Monmouth County Clerk,* ***et al.**,*<br><br>Defendants. | Civil Action No. 24-1098 (ZNQ) (TJB) |

## *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

                                                                                                       **Page**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ....................................................................................................1

STATEMENT OF INTEREST .................................................................................2

ARGUMENT ............................................................................................................3

    I.     Courts Have Routinely Applied Heightened Scrutiny to,
          and Invalidated, Electoral Regulations with Far Smaller
          Effects than the County Line. ...............................................................3

    II.    Courts Have Frequently Struck Down Ballot Primacy
          Laws Far Less Impactful than the County Line. .....................................9

    III.   The County Line Is Distinct from a Party Endorsement,
          Which a Party Would Remain Free to Give if the County
          Line Were Eliminated. .............................................................................13

CONCLUSION .......................................................................................................15

# TABLE OF AUTHORITIES

**Cases:**                                                                                                                                                           **Page(s)**

*Akins v. Sec'y of State*,
   904 A.2d 702 (N.H. 2006) ................................................................................11

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ..........................................................................................4

*Applewhite v. Pennsylvania*,
   No. 330 M.D.2012, 2012 WL 4497211 (Pa. Commw. Ct. Oct. 2, 2012) ..............5

*Common Cause Indiana v. Lawson*,
   937 F.3d 944 (7th Cir. 2019) .............................................................................7

*Fish v. Schwab*,
   957 F.3d 1105 (10th Cir. 2020) .........................................................................7

*Gould v. Grubb*,
   536 P.2d 1337 (Cal. 1975) ...............................................................................11

*Graves v. McElderry*,
   946 F. Supp. 1569 (W.D. Okla. 1996) ..............................................................12

*Green Party of Tenn. v. Hargett*,
   No. 3:11-cv-692, 2016 WL 4379150 (M.D. Tenn. Aug. 17, 2016) ....................12

*Holtzman v. Power*,
   313 N.Y.S.2d 904 (N.Y. Sup. Ct. 1970), *aff'd*, 311 N.Y.S 2d 824 (N.Y. App.
   Div. 1970) ........................................................................................................12

*League of Women Voters of Indiana, Inc. v. Sullivan*,
   5 F.4th 714 (7th Cir. 2021) ................................................................................7

*Martin v. Kohls*,
   444 S.W.3d 844 (Ark. 2014) .............................................................................5

*McLain v. Meier*,
  637 F.2d 1159 (8th Cir. 1980) ............................................................................... 12

*Mi Familia Vota v. Fontes*,
  No. CV-22-00509-PHX-SRB, ___ F. Supp. 3d ___,
  2024 WL 862406 (D. Ariz. Feb. 29, 2024) ............................................................ 7

*Obama for America v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ................................................................................. 8

*Ohio State Conf. of NAACP v. Husted*,
  768 F.3d 524 (6th Cir. 2014), *vac'd as moot*,
  2014 WL 10384647 (6th Cir. 2014) ...................................................................... 8

*Pavek v. Simon*,
  967 F.3d 905 (8th Cir. 2020) ............................................................................... 13

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
  140 S. Ct. 1205 (2020) ........................................................................................... 8

*Richardson v. Trump*,
  496 F. Supp. 3d 165 (D.D.C. 2020) ....................................................................... 9

*Sangmeister v. Woodard*,
  565 F.2d 460 (7th Cir. 1977) .............................................................................. 12

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ............................................................................................ 15

*Weinschenk v. Missouri*,
  203 S.W.3d 201 (Mo. 2006) .................................................................................. 6

*Weisberg v. Powell*,
  417 F.2d 388 (7th Cir. 1969) .............................................................................. 12

*Wisconsin ex rel. Zignego v. Wis. Elections Comm'n*,
  957 N.W.2d 208 (Wis. 2021) ................................................................................. 7

**Other Authorities:**

Adam J. Berinsky, *The Perverse Consequences of Electoral Reform in the United States*, 33 Am. Pol. Rsch. 471 (2005) .................................................................... 8

Benjamin Highton, *Voter Registration and Turnout in the United States*, 2 Persps. on Pol. 507 (2004) ........................................................................................... 6

Bernard L. Fraga & Michael G. Miller, *Who Do Voter ID Laws Keep from Voting?*, 84 J. Pol. 1091 (2022) ....................................................................................... 5

Daniel M. Thompson et al., *Universal Vote-by-Mail Has No Impact on Partisan Turnout or Vote Share*, 117 Proc. Nat'l Acad. Sci. 14052 (2020) ........................ 7

Enrico Cantoni & Vincent Pons, *Strict ID Laws Don't Stop Voters: Evidence from a U.S. Nationwide Panel, 2008-2018*, 136 Q.J. Econ. 2615, 2637 (2021) ............... 5

Gregory A. Huber et al., *The Racial Burden of Voter List Maintenance Errors: Evidence from Wisconsin's Supplemental Movers Poll Books*, Sci. Advances, Feb. 17, 2021 ......................................................................................................... 6

Paul Gronke et al., *Convenience Voting*, 11 Ann. Rev. Pol. Sci. 437 (2008) ....... 7, 8

Phoebe Henninger et al., *Who Votes Without Identification? Using Individual-Level Administrative Data to Measure the Burden of Strict Voter Identification Laws*, 18 J. Empirical Legal Stud. 256 (2021) .............................................................. 5

Richard L. Hasen, *Record Election Litigation Rates in the 2020 Election: An Aberration or a Sign of Things to Come?*, 21 Election L.J. 150 (2022) ............... 3

W. James Scott Jr., *California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents*, 45 S. Cal. L. Rev. 365 (1972) .................................. 10

Zoltan Hajnal et al., *Voter Identification Laws and the Suppression of Minority Votes*, 79 J. Pol. 363 (2016) .............................................................................. 5

## INTRODUCTION

New Jersey's county line system for primary election ballots is a national outlier, used by no other state. And for good reason. As Plaintiffs' filings make clear, the county line massively distorts election results, conferring an enormous advantage to candidates on the line and a nearly insurmountable handicap to all other candidates. Plaintiffs' statistics about the magnitude of this skew are astonishing. Between 2002 and 2022, the difference between being on and off the county line for congressional candidates "ranged from 13 to 79 percentage points, with a median of 36 percentage points." Compl. Ex. C, at 3. The loss rate for incumbents running off the county line over this period (52.6%) was nearly 38 times higher than the loss rate for incumbents running on the line (1.4%). *Id.* at 4. In a novel experiment conducted for this litigation, congressional candidates placed on the county line in New Jersey's Seventh and Eighth Districts more than doubled their vote shares, drawing over twenty percentage points more support simply because of their ballot positions. Compl. Ex. B ¶ 175.

New Jersey's county line system is unique, but federal litigation over the constitutionality of electoral regulations is entirely familiar. The purpose of this brief is to compare the county line to other electoral practices that courts and scholars have previously analyzed. *First*, the distortive effect of the county line is far greater—at least an order of magnitude larger—than those of frequently

1

litigated measures like photo ID requirements for voting, proof-of-citizenship requirements for registering to vote, voter roll purges, and cutbacks to early and absentee voting. Yet these laws have often been subjected to heightened scrutiny, even invalidated, despite their much smaller impacts. *Second*, the county line is also far more distortive than the ballot design policy of automatically listing certain candidates first (like candidates from the governor's party). Yet numerous federal and state courts have nullified ballot primacy rules because they unjustifiably manipulate voters' choices at the polls. And *third*, while the county line conveys party endorsements, its influence on election outcomes remains large even when it's disentangled from them. This shows that the county line's distortive effect is the product of ballot design, not the transmission of information about parties' preferred candidates to voters.

Accordingly, this Court should hold that the county line system is unconstitutional and mandate its replacement by the office-block ballot structure used by every other state (as well as two New Jersey counties). As this brief stresses, the unlawfulness of the county line is underscored by the many cases in which courts have struck down significantly *less* distortive electoral regulations.

## STATEMENT OF INTEREST

*Amicus curiae* Election Law Clinic at Harvard Law School ("ELC") is a clinical legal program committed to protecting free and fair elections through

litigation and legal advocacy. Its mission is to train the next generation of election lawyers and to bring novel academic ideas to the practice of election law. ELC aims to build power for voters, not politicians, and recognizes that the struggle for voting rights is a struggle for racial justice. ELC has represented parties in partisan gerrymandering, racial gerrymandering, and voter suppression litigation. *See e.g.*, *Jacksonville Branch of the NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229 (M.D. Fla. 2022); *Citizens Project v. City of Colorado Springs,* No. 1:22-cv-01365 (D. Colo. 2022); *Clarke v. Wis. Elections Comm'n*, 998 N.W.2d 370 (Wis. 2023); *Mont. Democratic Party v. Jacobsen*, 518 P.3d 58 (Mont. 2022).

ELC writes in order to compare New Jersey's county line system for primary election ballots to other electoral policies assessed by courts and scholars. ELC hopes this comparative perspective will prove useful to the Court by illuminating how much more distortive the county line is than essentially all other modern electoral practices.

## ARGUMENT

**I.     Courts Have Routinely Applied Heightened Scrutiny to, and Invalidated, Electoral Regulations with Far Smaller Effects than the County Line.**

In courtrooms across the country, litigants frequently allege that electoral regulations violate the First and Fourteenth Amendments and their state constitutional analogues. *See, e.g.*, Richard L. Hasen, *Record Election Litigation*

3

*Rates in the 2020 Election: An Aberration or a Sign of Things to Come?*, 21 Election L.J. 150 (2022). Some of these suits succeed and some fail. But almost all of them have one thing in common: They involve policies whose effects on election results pale compared to the impact of the county line. This section addresses "generic" measures pertaining to issues other than ballot design. The next section zeroes in on ballot primacy rules, arguably the litigated provisions most similar to the county line. The final section distinguishes the county line from party endorsements that are communicated *without* warping ballots.

To be sure, the empirical evidence emphasized by most of this litigation relates to voter turnout (or other metrics of voter participation), not voters' choices among candidates. But it's plain that a regulation's distortive effect on voters' choices is an aspect of "the character and magnitude" of the voting burden it imposes. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Consider a policy (not unlike the county line) that prevents no one from casting a ballot but guarantees that a favored candidate will win a supermajority of the vote. This policy levies a heavy burden on both the voters who support other candidates and those inevitably defeated candidates. Indeed, for them, the policy is indistinguishable in operation from one overtly disenfranchising all backers of unfavored candidates.

Over the last couple decades, photo ID requirements for voting have likely been the most controversial voting restrictions. Despite the furor over these

measures, most studies find that their effects on election outcomes are minor: less than one percentage point. *See, e.g.*, Enrico Cantoni & Vincent Pons, *Strict ID Laws Don't Stop Voters: Evidence from a U.S. Nationwide Panel, 2008-2018*, 136 Q.J. Econ. 2615, 2637, 2645 (2021); Zoltan Hajnal et al., *Voter Identification Laws and the Suppression of Minority Votes*, 79 J. Pol. 363, 372 (2016). The reason for this marginal impact is that, while many eligible voters lack valid photo IDs, few individuals who *do* vote (in states without photo ID laws) or *would* vote (in states with these laws) are missing proper identification. *See, e.g.*, Bernard L. Fraga & Michael G. Miller, *Who Do Voter ID Laws Keep from Voting?*, 84 J. Pol. 1091, 1103 (2022); Phoebe Henninger et al., *Who Votes Without Identification? Using Individual-Level Administrative Data to Measure the Burden of Strict Voter Identification Laws*, 18 J. Empirical Legal Stud. 256, 258 (2021).

Notwithstanding these small electoral effects, numerous courts have applied heightened scrutiny to, and invalidated, photo ID laws, especially under state constitutional counterparts to the First and Fourteenth Amendments. These courts have reasoned that even small electoral effects are cognizable voting burdens. These courts have also found no state interests that could justify these burdens since in-person voter impersonation—the main evil sought to be prevented by photo ID laws—is practically nonexistent today. *See, e.g.*, *Martin v. Kohls*, 444 S.W.3d 844 (Ark. 2014); *Applewhite v. Pennsylvania*, No. 330 M.D.2012, 2012

WL 4497211 (Pa. Commw. Ct. Oct. 2, 2012); *Weinschenk v. Missouri*, 203 S.W.3d 201 (Mo. 2006).

Proof-of-citizenship requirements for registering to vote are similar to photo ID laws in that they too demand documentation to participate in the electoral process. These requirements make it more difficult for eligible voters to be placed *on* the voter rolls. In turn, voter purges—the terminations, sometimes erroneous, of individuals' voter registrations—make it easier for eligible voters to be taken *off* the voter rolls. Both proof-of-citizenship requirements and voter purges can result in eligible voters being unable to cast ballots. But both policies have negligible electoral impacts. This is because they affect too few people to make a difference in all but the closest elections. *See, e.g.*, Gregory A. Huber et al., *The Racial Burden of Voter List Maintenance Errors: Evidence from Wisconsin's Supplemental Movers Poll Books*, Sci. Advances, Feb. 17, 2021, at 5. It's also because "today's registration laws," in general, have minimal "partisan implications." Benjamin Highton, *Voter Registration and Turnout in the United States*, 2 Persps. on Pol. 507, 510 (2004).

Despite these muted electoral effects, courts have repeatedly blocked both proof-of-citizenship requirements and voter purges. The Tenth Circuit recently enjoined Kansas's proof-of-citizenship law, finding that it "imposed a significant burden on the right to vote" and that the state lacked any sufficient "interest [that]

6

made it necessary to burden voters' rights here." *Fish v. Schwab*, 957 F.3d 1105, 1132-33 (10th Cir. 2020); *see also, e.g.*, *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, ___ F. Supp. 3d ___, 2024 WL 862406 (D. Ariz. Feb. 29, 2024) (striking down Arizona's proof-of-citizenship law). Likewise, the Seventh Circuit twice nullified Indiana policies that would have made possible largescale voter purges. *See League of Women Voters of Indiana, Inc. v. Sullivan*, 5 F.4th 714 (7th Cir. 2021); *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019); *see also, e.g.*, *Wisconsin ex rel. Zignego v. Wis. Elections Comm'n*, 957 N.W.2d 208 (Wis. 2021) (refusing to compel a voter purge requested by an activist group).

Cutbacks to early voting and absentee voting are two more common voting restrictions in modern American politics. These curbs likely reduce voter turnout, just as the adoption of convenience voting boosts participation. *See, e.g.*, Paul Gronke et al., *Convenience Voting*, 11 Ann. Rev. Pol. Sci. 437, 443 (2008). But these curbs *don't* have substantial electoral consequences. "In terms of the partisan composition of the electorate," changes to early voting and absentee voting "seem neither to help nor to hurt political parties." *Id.* at 444-45; *see also, e.g.*, Daniel M. Thompson et al., *Universal Vote-by-Mail Has No Impact on Partisan Turnout or Vote Share*, 117 Proc. Nat'l Acad. Sci. 14052, 14054 (2020). The explanation is that the individuals prevented from voting by these policies politically resemble the voters who remain able to cast ballots. That is, the policies influence the size, but

not the makeup, of the electorate. *See, e.g.*, Adam J. Berinsky, *The Perverse Consequences of Electoral Reform in the United States*, 33 Am. Pol. Rsch. 471, 482 (2005); Gronke et al., *supra*, at 444.

Even though cutbacks to early voting and absentee voting are mostly inconsequential, in electoral terms, courts have often stopped them from going into effect. The Sixth Circuit first invalidated an Ohio law that would have barred non-military voters from voting in person during the three days before election day, concluding that this change "unjustifiably burdened" the franchise. *Obama for America v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012). The same court later struck down another Ohio law that would have eliminated five days of early voting, reasoning that "none of the [state's] interests . . . sufficiently justify the significant [voting] burden." *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 549 (6th Cir. 2014), *vac'd as moot*, 2014 WL 10384647 (6th Cir. 2014). With respect to absentee voting, when the coronavirus pandemic increased its volume and complicated election administration, the Supreme Court allowed a district court order to go into effect extending by six days the deadline for receiving absentee ballots. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020). Also in this period, a federal district court enjoined United States Postal Service policy shifts that slowed mail delivery and thus hindered absentee

ballots from being received and returned on time. *See Richardson v. Trump*, 496 F. Supp. 3d 165 (D.D.C. 2020).

Of course, none of these electoral regulations is equivalent to New Jersey's county line system. But that's precisely the point. None of these electoral regulations materially distorts election outcomes. Yet each of these measures was carefully scrutinized and then declared unlawful by a court, typically for violating the First and Fourteenth Amendments of the federal Constitution. If this was the fate of each of these measures, then the same verdict should await the county line. The county line, after all, is both more distortive than any of the policies discussed above and unsupported by any legitimate state interest. Its unconstitutionality follows logically from the illegality of the above policies.

## II. Courts Have Frequently Struck Down Ballot Primacy Laws Far Less Impactful than the County Line.

New Jersey's county line system is, at its core, a kind of ballot design. To date, the most frequently litigated aspects of ballot design have been ballot primacy rules: rules requiring certain favored candidates to be listed first on ballots. These favored candidates can be candidates from the governor's party, candidates from the party of local officials, candidates from the party receiving the most votes in the last election, or incumbent candidates. In the academic literature, it's well established that the top position on a ballot confers a small but statistically significant advantage to a candidate. This edge, known as the primacy effect, has

9

been studied for at least half a century. *See, e.g.*, W. James Scott Jr., *California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents*, 45 S. Cal. L. Rev. 365, 376 (1972) (foundational study of the primacy effect). As Plaintiffs' experts correctly note, the primacy effect has been demonstrated across a wide array of elections and geographies. *See* Compl. Ex. B ¶ 41 ("Evidence of benefits for candidates listed first on the ballot has been shown across the United States in elections in California, Florida, Illinois, New Hampshire, New York, Ohio, Texas, North Dakota, Vermont, and Wyoming." (internal citations omitted)).

While the magnitude of the primacy effect varies with the unique contours of each election, the thrust of the research is this: Candidates placed at the top of the ballot can expect, on average, an electoral advantage between one and five percentage points. *See* Compl. Ex. D, at 14-15. This edge is larger in primary elections and in lower-level races appearing further down ballots: both contexts in which voters have less information about candidates. *See id.* An effect of this size can swing a close election but doesn't change most election outcomes. An effect of this size is also about an order of magnitude smaller than the huge distortive impact of the county line.

Notwithstanding the relatively minor electoral implications of ballot primacy rules, many courts have invalidated these policies. The supreme courts of New Hampshire and California subjected ballot primacy laws to strict scrutiny based on

10

the burden they pose to voters. New Hampshire formerly had two ballot primacy policies: one requiring all candidates for certain offices to be listed in alphabetical order, the other (somewhat like the county line) establishing "party columns" grouping candidates by party and assigning the first column to the party with the most votes in the last election. The court decided that the federal *Anderson-Burdick* framework applied; and that, under this framework, the burden on "candidates running in minority parties and against candidates whose surnames do not begin with letters located near the beginning of the alphabet" warranted strict scrutiny, which the policies couldn't survive. *Akins v. Sec'y of State*, 904 A.2d 702, 707 (N.H. 2006). California also used to have two ballot primacy practices, one favoring incumbents and the other ordering candidates alphabetically. The court applied strict scrutiny to, and then struck down, both practices, explaining that "any procedure which allocates such advantageous positions to a particular class of candidates inevitably discriminates against voters supporting all other candidates." *Gould v. Grubb*, 536 P.2d 1337, 1338-39 (Cal. 1975).

Following the logic of either of these cases, New Jersey's county line would trigger—and fail—strict scrutiny because of its enormous and unjustified distortive impact. Notably, multiple courts have nullified ballot primacy rules even under less stringent standards of review. The Eighth Circuit, for instance, held that a North Dakota law that assigned top ballot positions to incumbents was unconstitutional

11

under rational basis review. *See McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980). The court reasoned that mere "convenience" for voters backing incumbents couldn't justify "burden[ing] the fundamental right to vote possessed by supporters of the last-listed candidates." *Id.* The New York Supreme Court likewise ruled that a ballot primacy law benefiting incumbents had no rational basis. The state lacked a valid interest in "affording such favoritism to a candidate merely on the basis of his having been successful at a prior election," thereby "preserving for only the remaining candidates the competition heretofore required for all." *Holtzman v. Power*, 313 N.Y.S.2d 904, 908 (N.Y. Sup. Ct. 1970), *aff'd*, 311 N.Y.S 2d 824 (N.Y. App. Div. 1970); *see also, e.g.*, *Graves v. McElderry*, 946 F. Supp. 1569, 1581 (W.D. Okla. 1996) (Oklahoma law providing that Democratic candidates are always listed first "cannot survive even this Court's lowest level of scrutiny, the rational basis test); *cf. Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977) (Illinois county clerks' practice of placing candidates from their party in top ballot positions amounts to intentional discrimination); *Weisberg v. Powell*, 417 F.2d 388, 392 (7th Cir. 1969) (similar).

Unsurprisingly, not all challenges to ballot primacy laws have succeeded. In some cases, the plaintiffs failed to present "competent statistical evidence or expert testimony" documenting the primacy effect. *Green Party of Tenn. v. Hargett,* No. 3:11-cv-692, 2016 WL 4379150, at *38 (M.D. Tenn. Aug. 17, 2016). In others, the

12

disputed policy was neutrally structured such that it "neither systematically advantage[d] incumbents nor advantage[d] the state's most popular party." *Pavek v. Simon*, 967 F.3d 905, 908 (8th Cir. 2020). But neither of these defenses can rescue New Jersey's county line system. The empirical evidence that it dramatically benefits candidates appearing on the line is overwhelming. And the system is structured the opposite of neutrally—it advantages whomever party insiders choose. Since ballot primacy rules to which these defenses are inapplicable have been invalidated time and again, the same result should follow for the far more distortive county line.

**III.     The County Line Is Distinct from a Party Endorsement, Which a Party Would Remain Free to Give if the County Line Were Eliminated.**

Finally, the county line might be analyzed relative not to generic electoral regulations, nor to aspects of ballot design like ballot primacy rules, but rather to party endorsements. Plaintiffs' experts explain how the consequences of the county line and of party endorsements can be distinguished in New Jersey. (This distinction can be difficult to make based on election results from county line ballots alone, since the county line itself indicates which candidates a county party endorses.) First, experimentally, party endorsements can be conveyed to voters on conventional office-block ballots. Any advantage enjoyed by an endorsed candidate must then be attributable to the endorsement—not to the county line system, which isn't used in the experiment. This approach reveals that "the

13

presence of an endorsement benefit is inconsistent across contests," appearing in two surveyed races out of three. Compl. Ex. B ¶ 134. Second, observationally, since some New Jersey counties don't use the county line, the performance of endorsed candidates in these counties can be compared to their performance in county line counties. In 35 of 37 races from 2012 to 2022, endorsed candidates did better in county line than in non-county line counties. The edge attributable to the county line—controlling for party endorsement—was a median of eleven percentage points, rising to a median of fifteen percentage points for non-incumbent candidates. Compl. Ex. C, at 4.

The other key point about party endorsements is that parties would remain free to make them if this Court deemed the county line unlawful. Parties could endorse, nominate, and otherwise support candidates as they saw fit without encroaching on the design of ballots themselves. If the state thought it was important to communicate party endorsements to voters on actual ballots, that could also be done without use of the county line. On standard office-block ballots, it could be specified which candidates are endorsed by which parties (or which candidates are associated with which slogans). *See* Compl. ¶¶ 180, 196, 209.

This possibility of disentangling party endorsements from the county line negates any claim that the county line's elimination would infringe parties' associational rights. A party has no First Amendment entitlement to transmit the

14

identity of its endorsed candidate to voters via a state-sponsored ballot. And even if a party did implausibly possess this entitlement, the party's preference could be shared with voters, on the ballot, without reliance on the county line. *Cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) (rejecting a party's First Amendment challenge to an electoral system that prevented the party from conveying on the ballot whom it endorsed or nominated).

## CONCLUSION

For the foregoing reasons, this Court should hold that New Jersey's county line system is unconstitutional. The county line is far more distortive than many electoral regulations—including aspects of ballot design—that courts have previously struck down because of their unjustified voting burdens.

Dated: March 12, 2024

Respectfully submitted,

| | |
|---|---|
| */s/ Nicholas Stephanopoulos* | */s/ Ronald Chen* |
| Nicholas O. Stephanopoulos | Ronald K. Chen |
| ELECTION LAW CLINIC AT | NJ Attorney No. 027191983 |
| HARVARD LAW SCHOOL | RUTGERS CONSTITUTIONAL RIGHTS |
| 6 Everett Street, Ste. 4105 | CLINIC |
| Cambridge, MA 02138 | Center for Law & Justice |
| Tel: (617) 998-1010 | 123 Washington St. |
| nsteph@law.harvard.edu | Newark, NJ 07102 |
| | Tel: (973) 353-5378 |
| | ronchen@law.rutgers.edu |

*Counsel for Amicus Curiae*

15