

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO BOX 080
TRENTON, NJ 08625-0080

March 17, 2024

**VIA ECF**

Honorable Zahid N. Quraishi, U.S.D.J.
United States District Court
Clarkson S. Fisher Building
402 East State Street
Trenton, New Jersey 08608

Re:  *Kim et al. v. Hanlon et al.*, No. 24-cv-1098 (ZNQ)(TJB)

Judge Quraishi:

Federal Rule of Civil Procedure 5.1(c) expressly provides the Attorney General 60 days to decide whether to intervene in a federal action challenging the constitutionality of a state statute. The Attorney General writes to inform this Court of his decision not to intervene in this matter—and to confirm he is waiving the remainder of that 60-day period—and to provide the reasons for that decision. In light of the evidentiary record, the Attorney General has concluded that the challenged statutes are unconstitutional and therefore will not be defending them.

I

New Jersey's system of ballot design for primary elections is unique across the Nation. The system, referred to as the "county line," is the result of intersecting statutes, judicial decisions, and discretionary practices that have developed over time.

Three statutes lay out the basic parameters for primary ballot design in New Jersey. First, N.J. Stat. Ann. § 19:49-2 provides both for the use of a grid ballot for primary election ballots voted via voting machine and establishes that candidates may bracket together on a single line. Second, N.J. Stat. Ann. § 19:23-26.1 provides special rules for primary ballot positions of United States Senate and Governor candidates. Finally, N.J. Stat. Ann. § 19:23-24 sets the general rules for random ballot draws to determine the ballot positions of primary candidates.

Conditions have subsequently altered the real-world impact of those statutes. For most of the twentieth century, including when the bracketing law was first enacted, L. 1941, ch.163, § 1, New Jersey prohibited political parties from endorsing primary candidates. *See* L. 1930, c. 187, at



905, *codified as* N.J. Stat. Ann. § 19:34-52 ("It shall be unlawful for any State, county or municipal committee of any political party prior to any primary election to endorse the candidacy of any candidate for a party nomination or position."). But in 1989, the Supreme Court held such primary endorsement bans unconstitutional, *see Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989), paving the way for official party endorsements to appear and for the party's desired candidates to be bracketed as the "county line" on New Jersey's primary ballots. *See Batko v. Sayreville Democratic Org.*, 860 A.2d 967, 972 (N.J. App. Div. 2004).

Nor was that the only intervening development: statewide candidates for U.S. Senate and Governor were at one time excluded from bracketing, *see* N.J. Stat. Ann. § 19:23-26.1, but later became a core part of the county line system. Indeed, while the Legislature had prohibited Senatorial and Gubernatorial candidates from bracketing with other candidates, New Jersey state courts subsequently invalidated that provision—thus allowing Senatorial and Gubernatorial candidates to be bracketed with down-ballot candidates, including on any endorsed "county line." *Schundler v. Donovan*, 872 A.2d 1092, 1099 (N.J. App. Div.), *aff'd*, 874 A.2d 506 (N.J. 2005).

Further, because these state statutes afford wide discretion in designing the grid ballot, real-world practices illustrate the impact of the "county line." State statutes afford significant discretion over how to lay out the ballot in the face of physical limitations inherent in a grid format and significant discretion over the sequence of offices selected for a ballot draw—known as the pivot position. As a result, it is often impossible for unbracketed, non-pivot office candidates to secure an earlier position on the ballot compared to their bracketed competitors.[1] These features of grid balloting and bracketing also have allowed unbracketed candidates to be placed at the end of a ballot with multiple blank spaces separating them from their competitors, which creates the phenomenon known as "ballot Siberia." And these features have allowed for candidates who have *not* bracketed together—or are running against each other—to be grouped on the same line.[2]

II

Although 28 U.S.C. § 2403(b) and Fed R. Civ. P. 5.1(c) afford the Attorney General the unqualified opportunity to defend these statutes, the Attorney General has concluded based on review of this record that the evidence does not provide a basis for intervening to defend their constitutionality. That factual and expert record, which did not exist when the Attorney General's Office filed briefs defending these statutes in *Conforti v. Hanlon*, No. 20-8267 (D.N.J.), and *Mazo v. Durkin*, No. 20-8336 (D.N.J.), lacks contrary evidence. Indeed, in the multiple years since these state statutes were challenged in this Court, the Attorney General has not identified reliable empirical evidence countering this record evidence, including after reviewing the filings of the other parties in this very case. As such, the Attorney General will not be intervening to defend these statutes.

---

[1] *See* Dkt. 1-2, Pasek Rpt. 21-24 (collecting evidence that outcomes of these draws are inconsistent with random selection, and that the draws do not consistently use the same pivot office, leading to disparate practices).

[2] *See* Pasek Rpt. 21-24, 70-71; Dkt. 1-3, Rubin Rpt. 27.



As this Court has explained, these constitutional issues turn on the evidence regarding both the burdens imposed by this ballot layout and the government interests these state statutes do or do not advance. *See Conforti*, 2022 WL 1744774, at *17 (D.N.J. 2022) (emphasizing importance of evidence in evaluating ballot position effects); *see also Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447, 458 (D.N.J. 2012) (same). Under the *Anderson-Burdick* test, it is the obligation of "the reviewing court to (1) determine the 'character and magnitude' of the burden that the challenged law imposes on constitutional rights, and (2) apply the level of scrutiny corresponding to that burden." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 136 (3d Cir. 2022) (discussing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)). The Attorney General has carefully reviewed the available evidence regarding both the burdens and government interests, including the evidence in the record submitted in this case. That evidence dictates his decision on how to proceed.

As to the character and magnitude of the burden on voters' and candidates' constitutional rights, the record in this case establishes an electoral advantage for candidates who bracket and a corresponding disadvantage for candidates who do not, imposing a burden on associational rights. That factual and expert record evidence includes historical data of primary results within the State;[3] an observational study that excludes confounding variables like endorsements;[4] and a randomized experiment of New Jersey primary voters.[5] These results are also consistent with the cognitive mechanisms experts have identified that would be expected to lead to these results.[6] Furthermore, as explained above, the grid ballot combined with a bracketing system enables the phenomenon known as "ballot Siberia"—where unbracketed candidates are placed at the end of a ballot, far from their competitors.

On the other side of the ledger, the record lacks evidence showing that these laws advance the relevant government interests; instead, the record confirms that they do not. Both observational and randomized experimental evidence alike show that voters are more likely to make errors when encountering grid ballots with bracketing than standard office-block ballots.[7] And the empirical and expert record calls into doubt that bracketing advances candidates' associational interests or voters' interests in identifying those associations. Because candidates are incentivized to bracket with candidates endorsed by the relevant county political party—given the structural advantages conferred by the county line—voters cannot be certain that the bracketing decisions reflect the true associational preferences of candidates. Moreover, the record evidence reflects multiple instances in which candidates who did *not* choose to associate together have been placed on the same line—

---

[3] *See* Rubin Rpt. 3-4, 11-12, 15-18; Dkt. 1-4, Wang Rpt. 2, 9-11.

[4] *See* Rubin Rpt. at 19-22; Wang Rpt. 12-13.

[5] *See* Pasek Rpt. 41-52.

[6] *See* Pasek Rpt. 28-37; Wang Rpt. 5-8, 14-15.

[7] *See* Pasek Rpt. 34-38, 71-72.



a phenomenon that can communicate inaccurate associations to voters, and is made possible only by use of a grid ballot that authorizes the bracketing of candidates.[8]

The widely-used office-block ballot, by contrast, avoids these concerns for candidates and voters alike, while still communicating candidates' legitimate associational interests. Office-block ballots permit candidates and factions to associate and to communicate those associations to voters via shared slogans, which may be printed on the ballot alongside candidate names. *See Mazo v. N.J. Sec'y of State*, 54 F.4th at 131-32 (upholding state statutes relating to slogans).[9] But whether or not candidates choose to associate with other candidates will have no bearing on their placement on the office-block ballot. Indeed, such ballots are uniformly used outside New Jersey; that New Jersey is the *only* State to use a grid ballot with a bracketing system for primary elections undermines the view that such a system "is necessary" to advance government interests. *Eu*, 489 U.S. at 226; *cf. Holt v. Hobbs*, 574 U.S. 352, 368-69 (2015). Moreover, that multiple New Jersey counties have declined to use a grid ballot with bracketing for machine voting or have used other kinds of ballots for other forms of voting likewise supports that the governmental interests can still be accomplished without the challenged statutes.[10]

### III.

Although the Attorney General traditionally defends all state statutes from constitutional challenge in any case in which there is any plausible basis to defend the law, *see* N.J. Stat. Ann. § 52:17A-4(g) (empowering Attorney General to "attend generally to all legal matters in which the State['s] rights or interests are involved"), nothing in New Jersey law prevents the Attorney General from "interpret[ing] a statute as unconstitutional" in exceptional cases. *Mech. Contractors Ass'n of N.J., Inc. v. State*, 605 A.2d 743, 749 (N.J. App. Div. 1992); *see also, e.g.*, *N.J. Highway Auth. v. Sills*, 263 A.2d 498, 501 (N.J. Ch. Div. 1970) ("That [the Attorney General] takes the position the statutes in question are unconstitutional is also within the scope of his powers and duties."). To take one example, the Attorney General will not defend a law—even if a plausible defense exists—if it infringes the executive branch's authority in violation of state separation of powers. *See Gen. Assembly of State of N.J. v. Byrne*, 448 A.2d 438, 440 (N.J. 1982).

This is an exceptional case, justifying the Attorney General's exceptionally rare decision not to defend the constitutionality of the challenged statutes. <u>First</u>, a central reason for the Attorney General's defense of state statutes is to implement the will of the democratic process that enacted them, but as explained above, subsequent court decisions and practices on the ground have

---

[8] *E.g.,* Rubin Rpt. 24-26, 29 (examples of primary ballots listing candidates on same line even though they did not bracket together or share a slogan).

[9] New Jersey's slogan statutes are fully compatible with an office-block ballot. N.J. Stat. Ann. §§ 19:23-17; 19:23-25.1. Indeed, the original slogan statute was enacted a decade before the original bracketing statute. *See* L. 1930 c. 187 at 798.

[10] *See* Rubin Rpt. 21-22 (machine voting); Dkt. 45, Melfi Cert. Ex. B (provisional ballots); Dkt. 95-1, Exs. A-H (office-block ballots for nonpartisan municipal elections).



overtaken the Legislature's original intent in enacting the challenged state statutes. Second, the traditional need for the Attorney General to defend the results of the democratic process does not apply neatly to a case where the plaintiffs produced substantial record evidence to challenge the statutes as undermining the democratic process. Third, New Jersey stands alone across the Nation in the use of bracketing for primary-election machine ballots, which further undermines the claim that these laws are necessary to advance the government interests on which the Attorney General would have relied. Fourth, no official that the Attorney General represents in court implements these laws, so there is no risk that any state agencies would simultaneously be enforcing but declining to defend a particular statute.[11] Finally, this Court has made clear in its prior decisions that the constitutional question at issue turns on the evidence. The Attorney General has concluded that the evidence presented does not support a defense of the constitutionality of these statutes.

For these reasons, the Attorney General declines to intervene to defend the statutes at issue in this case.[12] Consistent with that decision, the Attorney General will be moving to withdraw as intervenor in *Conforti v. Hanlon*, No. 20-8267 (D.N.J.). In *Mazo v. Durkin*, No. 20-8336 (D.N.J.), where the Secretary of State was improperly named as a defendant, the Attorney General will be seeking her dismissal from the case, because the discovery exchanged to date confirms that she does not administer or enforce any of the statutes at issue. *See, e.g.*, *Ex parte Young*, 209 U.S. 123, 157 (1908) (holding named "officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party"). But the Attorney General will not otherwise provide a defense of the challenged statutes on the merits in that case.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum, Solicitor General
Angela Cai, Deputy Solicitor General

Cc: All counsel via ECF

---

[11] An executive official's duty to enforce, *see* N.J. Stat. Ann. § 52:17A-4(h), is distinct from its duty to defend. *See* Kate Shaw, *Constitutional Nondefense In The States*, 114 Colum. L. Rev. 213, 218 (2014). The Secretary of State does not enforce any of the statutes at issue here.

[12] Because the Attorney General will not be participating as a party, and because it does not bear on the intervention decision under 28 U.S.C. § 2403(b) and Fed R. Civ. P. 5.1(c), the Attorney General does not address *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), or any of the equitable factors that courts consider as part of a preliminary injunction application.

