

Genova Burns LLC
494 Broad Street, Newark, NJ 07102
Tel: 973.533.0777  Fax: 973.533.1112
Web: www.genovaburns.com

Angelo J. Genova, Esq.
Partner
Member: NY, NJ & PA Bar
agenova@genovaburns.com
Direct: 973-535-7100

March 22, 2024

**VIA ELECTRONIC FILING**
Honorable Zahid N. Quraishi, U.S.D.J
United States District Court
Clarkson S. Fisher Building
402 East State Street
Trenton, New Jersey 08608

   **Re:**  **Kim, et al. v. Hanlon, et al.**
      **Docket No. 3:24-cv-01098-ZNQ-TJB**

Dear Judge Quraishi:

   We write regarding the Court's instruction during the March 18, 2024 preliminary injunction hearing in this matter that parties provide any supplemental cross examination materials in writing, as the Court concluded the hearing before all of plaintiffs' experts could be examined. *See* Transcript ("Tr.") 375:8-14. This inability to cross examine plaintiffs' experts further prejudices defendants, who have also not been able to depose plaintiffs' experts or secure discovery of their data or research. Accordingly, while defendants welcome the opportunity to briefly summarize their intended cross examination of Dr. Josh Pasek, Ph.D. ("Pasek"), and do so below, it must be stressed that a written summary is not a substitute for thorough cross examination.

## I.  Participant Selection and Demographics

   Pasek prepared and conducted a survey of registered Democratic voters in New Jersey Congressional Districts 7 and 8 in which he sent different sample potential ballot layouts to respondents via text message. *See* Exhibit B to Plaintiffs' Complaint, Pasek Report ("Pasek Rep."), ¶¶ 115-116. Pasek claims that this survey allowed him to "determine the effect of ballot cues" by observing participants' response to various ballots. *Id.* at ¶ 115. In total, text messages were sent to 184,762 individuals, 13,473 individuals clicked on the link to the study, 3,062



Honorable Zahid N. Quarishi, U.S.D.J.
March 22, 2024
Page 2

agreed to participate in the study, and just 1,393 completed the study, or the equivalent of a mere 0.75% of participants contacted. *Id.* at n. 13.

Pasek did not explain his reason for limiting his study to Congressional Districts 7 and 8, nor did he address whether any other Districts were considered, or even if Democratic voters across the entire state of New Jersey were considered. Despite this limitation, plaintiffs seem to think that Pasek's study reflects voters' behavior statewide. Pasek's observations also did not analyze real world election results, meaning the study did not account for any votes cast by individuals in any other District.

Moreover, while claiming to analyze the decisions of voters in Congressional Districts 7 and 8, Pasek failed to provide any information regarding this target audience or the survey's ultimate participants. Specifically, Pasek did not address relevant demographic information of the participants in his study, including their age, education level, technology proficiency, income, gender, etc. Though Pasek apparently considered this information irrelevant to his study, failing to address or report same deprives the Court, defendants, and the public of information that is critical to understanding the implications, if there indeed are any, of this study to voters beyond the participants.

## II.     External Validity

External validity describes the extent to which a study's conclusions or inferences can apply to a population beyond the study's sample population. *See* Michael G. Findley, *et al.*, "External Validity," Annual Review of Political Science, https://doi.org/10.1146/annurev-polisci-041719-102556 (May 2021). Generalizability, a related concept, refers to whether an inference "concerns the broad population of a predefined sample." *Ibid.* An effective study should account for criteria that may impact its external validity and generalizability. Failure to prioritize external validity results in conclusions that are not generalizable – that is, conclusions that are applicable to study participants but not applicable to a broader population of interest.

In this case, the extent of the information that defendants have regarding participants in Pasek's study are that they were registered Democratic voters in New Jersey's 7th and 8th Congressional Districts who completed a sample ballot texted to them by Pasek. Pasek uses these study participants to make bold claims about all voters in New Jersey; however, his study fails to control variables that impact its external validity and generalizability. Ultimately, Pasek's



Honorable Zahid N. Quarishi, U.S.D.J.
March 22, 2024
Page 3

study may reveal information about its sample population, but the failure to create an externally valid study means that the sample population's behavior is not representative or reflective of the general population's behavior.

      *A. Setting*

      "Settings refer to the environments in which a study's data are generated, which could be places such as a laboratory, country, or village." *Ibid.* A study may produce more externally valid or generalizable results if its participants engage with the experiment in a setting similar to that of the population of interest. For the purposes of this matter, the population of interest, New Jersey's upcoming primary voters, will review ballots and make their electoral decisions either by mail, at early voting stations, or in voting booths on June 4, 2024.

      If external validity was a priority to Pasek, one would expect that his study would attempt to emulate similar scenarios for its participants. Instead, participants in Pasek's study were in a setting wholly divorced from voting by mail or in a voting booth. Unlike in a voting booth, individuals reviewing a ballot on their phone may be distracted or multitasking. Indeed, individuals frequently use their phone while engaging in other activities, such as watching television, cooking, conversing, working, and even driving.

      Moreover, Pasek reported that his study's respondents spent on average just 114.6 seconds completing office-block ballots while the median party-column respondent used 115.5 seconds to complete their ballot. *See* Pasek Rep. ¶ 166. While communicating these findings, Pasek fails to compare the time spent on his text message survey to the time and consideration that voters typically spend making their decision in voting booths or completing mail-in ballots, which voters can hold on to for hours or days before making their final decisions.

      Ultimately, the setting of Pasek's study is fraught with issues that diminish the applicability of its results to the broader voting population. Instead of providing insight into real world voting behavior, Pasek's study merely demonstrates that individuals will spend less than two minutes reviewing an experimental ballot on their phone, which they might be doing while also sitting at a red light, watching a sporting event, or listening to a lecture.



Honorable Zahid N. Quraishi, U.S.D.J.
March 22, 2024
Page 4

### B. Time

Ignoring time's impact on a study leads to "untenable assumptions" such as that the interests, knowledge, and motivations of the population remain unchanged indefinitely. *See* Findley, "External Validity." Pasek acknowledges in his report that the timing of his study, which was conducted between January 16, 2024 and January 27, 2024, "assuredly mean[s] that our results will not perfectly reflect voter decision-making on Election Day." Pasek Rep., at n. 13; ¶ 171. He states clearly that his study cannot completely account for voter behavior in "real elections." Pasek Rep, ¶ 171. Besides acknowledging this limitation, however, Pasek fails to account for the considerations and information that voters are likely to focus on between January and the Primary Election scheduled approximately five months later.

Between Pasek's study and Election Day, voters will become more familiar with the candidates running for open positions, particularly as campaigns ramp up advertising and public outreach over the next few months. In January, voters were most likely making decisions based not off familiarity with all candidates and their policies, but off other readily available information, such as name recognition. Because voters are likely to have different knowledge and concerns in June at the voting booth than they do in January responding to a text, the timing of Pasek's study dilutes any observations or inferences that can be made about real world voters.

## III.    Study Design

Like the flawed setting in which Pasek's study was conducted, Pasek's report makes clear that the design of his study was skewed from the start. Specifically, as mentioned above, Pasek's study was conducted via text message on voters' phones. While this apparently caused no difficulties for participants who received party-column ballots, a copy of the sample office-block ballot used shows that participants' phone screens had difficulty displaying the office-block ballot. Pasek Rep., ¶ 119. Indeed, to view the office-block ballot clearly, participants were directed to "try using landscape mode." *Ibid*. No such manipulation of the ballot or respondents' phone screens was necessary to view the party-column ballots.

This design, which made the office-block ballot more difficult for respondents to analyze and respond to than the party-column ballot, undoubtedly impacted the time participants spent reviewing their ballots, the number of participants who abandoned the study before completing it, and participants' ultimate selections. In comparison to this texted ballot, voters in New Jersey



Honorable Zahid N. Quarishi, U.S.D.J.
March 22, 2024
Page 5


will not have to turn the voting booth sideways to shift it into landscape mode, or manipulate their mail-in ballots, in order to read all options available to them.


### IV.      Professional Disagreement and Unsupported Conclusions

Beyond his study, Pasek's report makes several assertions without sufficient support. First, though his experiment focused on ballot design and participants' associated choices, Pasek spends much of his paper making determinations about candidates' decisions and motivations, not voters'. Pasek decides that candidates are likely to bracket together even if they do not share policies, viewpoints, or party factions, based purely on the benefits of potentially receiving a position closer to the top and left of a ballot. Pasek Rep., ¶ 170. While making this claim, Pasek fails to analyze whether candidates who choose to bracket with those who do not share their views or party affiliations risk voter confusion or disapproval, and whether such a risk would outweigh any alleged bracketing benefit.

Pasek's study also fails to account for other informational cues besides ballot position that may direct voter decision-making. Name recognition, for example, clearly influences voters' decisions. This may come from voters' knowledge of a specific candidate, most likely impacted by a campaign's outreach and media efforts, or their recognition of gender or ethnicity cues. Indeed, other studies on voter cues in low information elections, such as primaries, have found that ballot position has a minimal impact on voters, particularly compared to gender and ethnicity cues. Marsha Matson, *et al.,* "Gender, Ethnicity, and Ballot Information: Ballot Cues in Low-Information Elections," State Politics and Policy Quarterly (2006). Other theories also counter the primary effect, including the recency effect, which shows that candidates who appear last on the ballot may benefit from that final position. Pasek only addresses the recency effect in a footnote of his report. Pasek Rep., at n. 6

Despite ignoring potential other ballot cues and voter motivations in his experiment, Pasek acknowledges in his report that other studies that evaluate these factors, or otherwise question the importance of a primary effect, exist. Pasek Rep., ¶ 44. Ultimately, defendants were deprived the opportunity to question Pasek about these studies and alternative theories as cross examination was not permitted.



Honorable Zahid N. Quarishi, U.S.D.J.
March 22, 2024
Page 6

**V.    Failure to Account for all Types of Voting**

Finally, Pasek's report, including his experiment, fails to account for recent changes in the conduct of elections. Pasek appears focused on decisions made by voters in voting booths, when they have no immediate access to outside information and generally spend minutes, as opposed to hours or days, filling out their ballots. Pasek makes no attempt to address or acknowledge a recent increase in votes by mail and absentee votes. This is a critical oversight, as voter behavior is likely to change when they have more time and more access to information when reviewing their ballots.

The above represents an overview of defendants' planned cross examination of Pasek, though it does not encompass all questions or issues that defendants hoped to raise during the preliminary injunction hearing. We thank the Court for its time and attention to this matter.


Very truly yours,

**GENOVA BURNS LLC**

*/s/ Angelo J. Genova*
ANGELO J. GENOVA

AJG/KS:tc

17490093v2 (851.007)

Genova Burns LLC

Newark, NJ   •   New York, NY   •   Lambertville, NJ   •   Philadelphia, PA   •   Jersey City, NJ   •   Basking Ridge, NJ