UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDY KIM, et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>CHRISTINE GIORDANO HANLON, in her capacity as Monmouth County Clerk, et al.,<br><br>      Defendants. | Civil Action No.3:24-cv-1098(ZNQ)(TJB)<br><br><br><br>**CERTIFICATION OF<br>DR. JULIA SASS RUBIN** |

I, Dr. Julia Sass Rubin, do hereby certify:

    1.    I am Dr. Julia Sass Rubin, Associate Dean of Academic Programs, Director of the Public Policy Program, and Associate Professor at Rutgers University's Edward J. Bloustein School of Planning and Policy. I have expertise in New Jersey political structures and New Jersey primary election ballots. I previously submitted an Expert Report in this matter (DE1-3), where my curriculum vita was attached.

    2.    My expertise about New Jersey's county line primary ballots is based on more than a decade of research of New Jersey's political structures, candidate endorsement processes, and county line primary ballots. During that time, I have viewed and analyzed tens of thousands of ballots in New Jersey and in all other states. My research documented that New Jersey is the only state to use a primary ballot that is laid out using what is known as county line features. I also am

1

the author or co-author of all published research examining the impact of New Jersey's county line primary ballot on election outcomes.

3. My extensive research in this area enables me to understand the relevance of candidate placement on different types of primary ballots. I am familiar with variations in ballots between counties and election cycles and between New Jersey primary ballots and those used in other states. This knowledge enables me to identify natural experiments that encompass relevant bases of comparison for testing the impact of county line primary ballots that can then be further analyzed using statistical methods, as was done by Professor Sam Wang.[1]

**Response to Points Raised in Brief in Support of In Limine Motion 1 (ECF Document 152-2)**

4. Defense counsel claims that, "Dr. Sass Rubin, although formally engaged by Plaintiffs' counsel on or about January 22, 2024, had discussions regarding this matter with Plaintiffs' counsel as early as December 23, 2023." This is true, but it does not in any way support their subsequent contention of unreasonable delay.

5. My initial conversations with counsel took place around the holidays. Around that time and following into the New Year, I began to review the information in the paper I prepared that was published by the *Seton Hall Journal of Legislation and Public Policy*. Despite my numerous responsibilities as both the Associate Dean of Academic Programs and Director of the Public Policy Program, and my other research commitments, I carved out considerable time to work on the report. This included, among other items, (1) recollecting 20 years of election results for all state legislative races that Francisco Diez had collected for CWA, and that I had relied on in the Seton Hall article, in order to verify accuracy; (2) identifying additional bases for comparison

---

[1] My qualifications, education and professional background, and publication record can be found in my curriculum vita, which is appended to my original report.

and collecting and compiling the corresponding data in order to expand the analysis and control for the impact of county party endorsement on candidate performance; (3) double and triple checking sources through publicly available information, ballots, newspaper articles, public statements of endorsement by county parties, etc.; and (4) running the analyses on the various data compiled. The steps involved in this process took a considerable amount of time, as all of the data had to be collected by hand, by me, in light of the manner in which public records are kept in New Jersey. The data collection included reviewing and analyzing each U.S. House, U.S. Senate, and Gubernatorial race, as well as all state legislative races for 20 years.

6. Once all of the data was collected, checked and confirmed with additional sources, and the analyses were run, I was able to prepare and finalize my expert report on February 10, 2024. Timeliness was stressed to me by counsel in light of the fact that my data was going to be used by Dr. Wang to prepare additional statistical analyses. I worked with as much speed and diligence as I could to ensure the accuracy of the data presented and in light of my other professional obligations.

**Response to Points Raised in Brief in Support of In Limine Motion 2 (ECF Document 153-2)**

7. Defense counsel suggests that my report did "not account for potential endogeneity," "disregarded factors (such as a candidate's popularity, campaign resources, or experience)," and "did not use specific statistical methods designed to test for causation, such as instrumental variables or difference- in-differences." However, there are various ways to account for other factors such as the ones referenced by defense counsel, including through the methods I applied in my report.

8.  For example, defense counsel suggested doing a "difference-in-difference" analysis, which is also known as a "controlled-before-and-after study."[2] Such a study requires matching conditions before and after removal of a variable, in this case the county line. However, this is an inferior design, because it compares different candidates with one another, in different years. Instead, I used a natural experiment that used data from the same candidates, in the same year. In this way, candidates and time are no longer variables that need to be controlled in the way that would occur in a difference-in-difference analysis.[3]

9.  It is not possible to control all potential sources of endogeneity in a non-experimental design.[4] Using a series of natural experiments, however, allows me to control for the most likely endogenous variables.

10.  The first natural experiment I conducted (See Figure 9) was a comparison of the performance of all federal candidates who were in split endorsement primaries over the last twenty years. In this study, it appears each candidate I studied was qualified, experienced, and serious enough as a candidate that he or she obtained one county line, and was by no means a fringe candidate. By examining those 45 candidates when they were on the county line versus when their opponent was on the county line, I was able to control for candidate quality, experience, and funding levels, as the candidates were being compared to their own performance, in the same

---

[2] See Difference in Difference Estimation, Columbia Mailman School of Public Health, https://www.publichealth.columbia.edu/research/population-health-methods/difference-difference-estimation (downloaded March 19, 2024).

[3] See also Expert witness Dr. Sam Wang's response to the brief filed by Burlington County Clerk Joanne Schwartz, in which he applied a fixed-effect model to my data from the 2020 primary. A fixed-effect model achieves the same goal as a difference-in-difference design, but with fewer potentially confounding assumptions. Dr. Wang's findings in that analysis are consistent with mine.

[4] Expert witness Dr. Josh Pasek conducted a study of the impact of county line primary ballots that used an experimental design. Dr. Pasek's study produced results consistent with mine, further confirming the validity of both studies.

contest. Notably, the presence of a *double digit* (13 to 83 percentage points) positive advantage was observed *for each of those 45 candidates*, over the twenty years of the analysis. The mean advantage was 38 percentage points. The significance of the advantage observed in each race, the range of the advantage, and the standard deviation of the advantage, was explained in Dr. Wang's expert report.

11. The second natural experiment (See Figures 16 and 17) was a comparison of the performance of all US House, US Senate and Gubernatorial candidates over the last twelve years who were both (i) endorsed and on the county line and (ii) endorsed but there was no county line. The analysis of those 37 candidates controlled for the financial and other benefits that the party endorsement provides beyond the county line as those benefits would be present regardless of whether the county used a county line ballot. This analysis included counties that never use a county line ballot as well as counties that usually use a county line ballot but did not use one in 2020 because they relied on paper ballots where electoral contests are presented to voters in an office block format. In 35 of these 37 cases, candidates did better when they were endorsed and on the county line versus simply endorsed. The mean difference in performance was 12 percentage points, and 17 percentage points for non-incumbents.

12. The consistent positive performance associated with placement on the county line that I found in both natural experiments strongly supports the conclusion that placement on the county line provides candidates with a substantial electoral advantage.

13. In addition to these two natural experiments, my analysis also included an analysis of the performance of all incumbent state legislators over the last twenty years who had a primary challenger. These 228 incumbent candidates included those who were on the line, off the line, or

partially on the line (i.e. on the line in some but not all counties in their district). Candidates on the county line won at 38 times the rate of candidates who were off the line or partially off the line.

14. In addition to the controls built into the structures of the natural experiments, the large number of cases included in all three analyses (45, 37 and 228) and the consistency of findings across the three data sets further confirm the improbability of alternative explanations.

15. Next, defense counsel points out that my analysis shows that a party endorsement can account for a portion of the advantage found for candidates on the county line, and uses a Tweet of mine to suggest a lack of transparency on my part. Defense counsel did not need to sort through my tweets as my report states on page 19 that "Endorsements by county party organizations provide benefits beyond placement on the county line, including access to financial and human resources and a slogan candidates can use on the primary ballot to indicate the party's endorsement." To control for those benefits, I examined twelve years of competitive primaries for governor, the U.S. Senate, and the U.S. House of Representatives in which a candidate was endorsed only vs endorsed and on the county line. That analysis showed that candidates who were endorsed *and* on the county line performed an average of 12 percentage points better than those who were endorsed only. For non-incumbents, a feature shared by the four candidates in the current U.S. Senate race, the difference was 17 percentage points. This natural experiment controlled not only for candidate quality and funding but also for any benefits that come with party endorsements as the candidates were endorsed by county party organizations in both comparison scenarios.

16. Defense counsel then asserts voters might not be influenced by the county line but instead are merely recognizing that endorsed candidates are "those vetted by the party." However, if voters were interpreting the county line as a measure of party endorsement, they would respond similarly when candidates are endorsed but not on the county line, as the county party slogan

communicates to voters which candidates are endorsed by the county parties. Yet, candidates performed on average 12 percentage points better when they were endorsed and on the county line versus only endorsed. Non-incumbents performed 17 percentage points better when they were on the county line versus only endorsed.

17. Rather, the defense counsel's argument acknowledges that the county line ballot is not merely providing voters with a set of candidate choices or communicating which candidates were endorsed, as is true for the slogan. Rather, the county line is encouraging voters to vote for candidates on the county line. This is consistent with my findings that appearing on the county line provides candidates with a substantial electoral advantage.

18. Next, defense counsel claims that not citing to scholarly, peer-reviewed articles particularly relating to the county line somehow undermines "the reliability of the methodology or conclusions reached." I cited my own work on the uniqueness of New Jersey's county line primary ballots because my research is the only published scholarship on this very narrow topic. I also am an author or co-author of all published research examining the impact of the county line on voter behavior. Therefore, there is no scholarship to cite on this specific topic besides my own.

19. Nevertheless, as explained above, the use of natural experiments of the kind utilized here is a commonly relied on method throughout various areas of social science research to build a body of evidence analyzing causal effects. I did not think it was necessary to cite the validity of

natural experiments[5] and descriptive statistics[6] as these methods are fundamental to social science. Moreover, in relation to ballot quality, I cited Andrea Córdova McCadney, Lawrence Norden, & Whitney Quesenbery of the Brennan Center.

20.   Defense counsel loosely suggests that my report rests "on speculative connections between observed data" and "the conclusions drawn," creating "an 'analytical gap.'" As to "observed data," I note initially that no one has questioned the accuracy of my observations of tens of thousands of ballots and hundreds of candidates and election contests. These foundational observations formed the basis for my comprehensive analysis of historical election results based on twenty years of U.S. House, U.S. Senate and New Jersey legislative elections that includes data on more than 300 candidates and includes detailed supporting documentation for that analysis. My expert report is not speculative. Rather, it is based on large-scale observations which were applied using scientifically accepted methods (see paragraph above and fn.5) to form conclusions to a reasonable degree of scientific certainty.

---

[5] See, for example, Sieweke & Santori (2020), Natural experiments in leadership research: An introduction, review, and guidelines, The Leadership Quarterly, 31(1), https://doi.org/10.1016/j.leaqua.2019.101338. "The key feature of natural experiments is the presence of 'naturally' occurring events – such as new regulations and laws, natural disasters, or economic and political crises – which heterogeneously affect the units of a population (Dunning, 2012, Harrison and List, 2004, Robinson et al., 2009). Given that these events generate random or as-if random variations in the environment, natural experiments mimic the experimental ideal in which units (e.g., individuals, teams, organizations) are split into a treatment and a control group, or, alternatively, receive different levels of treatment. This setting enables causal inference even when the substantive relationship at hand is difficult to investigate in a laboratory setting and/or would require operating costly, impractical, or unethical field experiments" (p. 1).

[6] See, for example, Alabi & Bukola (2023), Alabi, O., & Bukola, T. (2023). Introduction to Descriptive Statistics. IntechOpen. doi: 10.5772/intechopen.1002475 "Descriptive statistics is a fundamental concept in academia that is widely used across many disciplines, including social sciences, economics, medicine, engineering, and business. Descriptive statistics provides a comprehensive background for understanding data by organizing, summarizing, and presenting information effectively. In academia, descriptive statistics are used to summarize and analyze data, providing insights into the patterns, trends, and characteristics of a dataset." (p. 1).

21.     Defense counsel takes issue with one of the examples of apparent voter confusion I referenced in connection with the 2020 Democratic Primary Election for United States Senate in Atlantic County where there was a large and anomalous undervote. The discussion of voter understanding of their options in relation to the 2020 Atlantic County Democratic primary ballot in no way undercuts the validity of the finding that the county line primary ballot leads to voter confusion. This confusion is demonstrated by the fact that 19 percent of those who voted for President and for U.S. House of Representatives in the Atlantic County Democratic primary did not vote for the U.S. Senate. My finding that this was the result of Senator Booker choosing to bracket with Bridget Harrison in column C and therefore no U.S. Senate candidate appearing on the county line is supported by the fact that the undervotes hurt Senator Booker, who received only 66% of the total votes cast for President in Atlantic County versus 89% in the rest of the state and 86% in the next lowest county. Booker's opponent Larry Hamm, did not experience a similar decline in vote share in Atlantic County, receiving 15% of the vote in Atlantic County vs. 12% in the rest of the state. Both the discrepancy in votes cast for President and U.S. House of Representatives versus U.S. Senate and the fact that the undervotes came from Senator Booker's total support the finding that the undervote is a result of voters "voting the line."

22.     The Atlantic County undervote was one example. We also see similar voter confusion caused by the county line ballot in the 2020 CD 4 Mercer County Democratic primary in which two candidates running against each other both appeared on the county line and 32.4% of the voters selected more than one candidate, thereby overvoting and disqualifying their votes.

Overvotes are considered to be a form of voter error as it would be irrational for voters to intentionally disqualify their votes.[7]

23. The Atlantic and Mercer cases highlight both the voter confusion caused by county line primary ballots and the tendency of New Jersey primary voters to "vote the line," which they are encouraged to do by the county party organizations. This supports my finding that the county line primary ballot provides a substantial electoral advantage to candidates who appear on the line.

24. Finally, defense counsel tries to point out an alleged inconsistency. They say on the one hand that I claim that voter confusion may have been behind the large undervote in the 2020 Atlantic County example, as voters may have thought they completed their ballot, were reluctant to vote for candidates who were not on the county line, or did not realize they could vote for candidates who were on and off the county line. They claim that on the other hand, I inconsistently assert that voters are more likely to recognize the names of candidates running for higher level office. Contrary to defense counsel assertions, voters may both know (1) who Senator Booker is; and (2) not know that they are able to vote for him if he is not on the county line or not have found him on the ballot if they just went straight down the county line. This voter confusion in relation to the county line primary ballot is furthered by the county party organizations, which encourage voters to "vote the line."

---

[7] See Herron & Sekhon (2003) Overvoting and representation: an examination of overvoted presidential ballots in Broward and Miami-Dade counties, Electoral Studies, 22(1), 21-47, https://doi.org/10.1016/S0261-3794(01)00052-X.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief. Executed at New Brunswick, New Jersey, on the 22nd day of March, 2024

_Julia Sass Rubin_
Dr. Julia Sass Rubin