UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDY KIM, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CHRISTINE GIORDANO HANLON, in her capacity as Monmouth County Clerk, et al.,<br><br>　　　　Defendants. | Civil Action No.3:24-cv-1098(ZNQ)(TJB)<br><br><br>**CERTIFICATION OF<br>DR. JOSH PASEK** |

I, Dr. Josh Pasek, do hereby certify:

1.　　I am Dr. Josh Pasek, an Associate Professor in the Departments of Communication & Media and Political Science at the University of Michigan. I have expertise in political psychology, survey methodology, statistics, and voter behaviors in elections. I previously submitted an Expert Report in this matter (DE1-2), where my curriculum vita was attached, and also submitted an Expert Reply in connection with Plaintiffs' Reply Brief (DE95, Exhibit A).

2.　　As an expert in these areas, my experience has distinct relevance to the case at hand.[1] Not only do I understand the way voters' psychology would be expected to play off the features of the New Jersey primary election ballot, but I am almost uniquely positioned to design

---

[1] My qualifications, education and professional background, and publication record can be found in my curriculum vita, which is appended to my original report.

1

and conduct original research to answer questions about the role of ballot features in electoral decision-making. Building on my experience in survey methods and experimental design, I was able to create a survey that allowed us to directly interrogate many of the key questions about how New Jersey primary election ballots shape voter behavior. As an expert in statistical analyses as well, I was also well-prepared to assess, and did assess, not only what kinds of differences were observed, but also to establish their statistical significance and magnitude.

3. Conducting a study of this sort is an established social scientific mechanism commonly relied on in the field for isolating the effects of cues given to voters on their subsequent behavior. This design strategy allows us to both establish not just correlational but causal evidence of ballot effects and rule out the potential that factors that were not manipulated as part of the design could have been the reasons for the effects observed. In other words, the factors that defense counsel has repeatedly raised as "relevant variables" to candidate performance that they contend are inextricably linked to positioning on the line are in fact completely unlinked in an experimental study and cannot be a basis for the conclusions reached. Indeed, the study is designed to specifically account for any such features and thus the defense is mistaken in the potential that they might somehow confound the results observed.

**Response to Points raised in Brief in Support of In Limine Motion 1 (ECF Document 152-2)**

4. In this filing, defense counsel asserts that the gap in timing between December 18th, 2023 when experts were first contacted about the case and February 26th, 2024 when the initial complaint was filed reflected an unreasonable delay in timing that they purport was designed to make it impossible for the defense to respond to the evidence presented.

5. While I can only speak to my own experience in the case, I can confidently assert that the evidence gathered for and offered in my expert report was produced with all possible haste.

It is also my understanding that my report was one of the primary sources of delay in filing the preliminary injunction. To explicate this, it is helpful for me to review the timeline of the generation of my report.

6. I was first contacted by the plaintiffs' lawyers about the potential that I would be retained for this case on December 18th. Immediately upon being informed about the nature of the potential case, I expressed my view that the ideal body of evidence would involve conducting a study that directly engaged the issues raised. Evidence of effects from historical ballots could clearly identify the overall influence of being on the line, but it would be valuable to disentangle the various components of this influence, namely to separate the direct effect of the "weight of the line" from the reasons that candidates had historically been listed on the line. In addition, I knew that prior ballot cases had invited arguments about whether effects from historical analyses could be applied to future elections; while such evidence is commonplace in the social sciences, conducting a new study would allow us to observe whether those effects would be present for the election at hand.

7. Although there was no agreement in place at the time for my services, nor for some time thereafter, in discussion with counsel I began to proactively explore the possibilities of running such a study knowing that it would take some time to develop. There were three reasons I felt it necessary to contact potential vendors immediately: 1) I needed to determine which approach to conducting the study would best fit the urgency of the project, 2) I needed to find a vendor that would be capable of running the study I was hoping to design, and 3) I was preparing to leave the country for two months as I would be traveling to France for a week of winter break before conducting sabbatical research in Germany, departing on December 22nd and not returning until February 24th and it would be easier to initiate things before I left the country.

8. Between December 18th and our departure, my wife largely packed for the family while I reached out to multiple potential survey firms and gathered information about candidates for the ballots; most firms I reached out to either asserted that they could not directly conduct the study or said that they could not determine feasibility until January because members of their shops had already left for the holidays. While spending the holidays with my family in Strasbourg, I pursued a dual course: designing a total of 15,552 sample ballots that represented all permutations of ballot positions and counties that could be used for the study while both exploring additional possible firms and simultaneously preparing to ascertain the requisite permissions from the University of Michigan should I need to run the study myself.[2] In that period, I filed all paperwork to run the study through the university in case I needed to go that route and assembled all ballots for the study as well as a draft survey instrument either to show any potential vendor how it should look or to administer this myself.

9. A colleague put me in touch with Paul Braun about the possibility of running the study with his firm, Braun Research, on January 2nd. On January 3rd, he was able to determine with his team that he was, in fact, able to conduct my proposed design. Between January 3rd and January 8th, we assessed whether his team was able to program the study into their software as designed. He then needed to copy the permutations of candidate positions and information from my mock ballots to his sample ballots for all 9 county-congressional district combinations that comprise the 7th and 8th Congressional districts, which took about another week of programming and testing before it was ready to field on January 16th.

---

[2] Indeed, if I was going to run the study myself, I would need to use University of Michigan resources and would therefore need to work through the university's conflict of interest office and their human subjects review, both of which were closed until a week into January.

10. As per the study design and work order, each individual that we sampled for the study was messaged twice over the course of the field period, with the final text messages sent on January 27th; the study was closed on January 31st. Following that, I had to analyze all the data, complete my report, and check the data in my report. By building the analyses beforehand, I was able to complete all analyses a few days into February and finish an 88-page report, complete with results from and full documentation of an original data collection, by February 14th. As should probably be clear from the set of steps involved (which is itself heavily abridged), this study would typically take many months to plan and conduct. A two-month span from proposal to writeup is virtually unheard of for this sort of research and reflected the quickest reasonable timeline.

11. Moreover, as explained in my supplemental expert reply, the release of the study fell within the time period where the study would be most effective (ECF Document 95, Exhibit A, Paragraph 14). If it was done significantly earlier, it would exclude candidates who had not yet announced. By contrast, if it was done significantly later, official party endorsements would have been made, which would result in the survey presenting voters with inaccurate information about which House and Senate candidates would be running under the county slogan, which we avoided.

**Response to Points raised in Brief in Support of In Limine Motion 5 (ECF Document 156-2)**

12. The defense contends that I rely on "improper sources" in my citations of two student theses instead of only "expert, peer reviewed, or reliable opinions" (p.3) and also a preliminary report.

13. The claim that referencing student and preliminary work in this context is "improper" rests on fallacious assumptions. It fails to recognize the nature of scientific evidence, focuses on claims that are principally used to raise hypotheses, and ignores the fact that none of these sources were used as the primary basis for any of the report's conclusions.

14. The question of the validity of scientific results is not dependent on *who* conducted a particular study, but instead on the evidence brought to bear in that study. In science, we don't particularly care whether work is generated by an esteemed professor or an undergraduate and indeed this information is typically not provided to peer reviewers when they are evaluating work. Instead, we look at the methods used and whether they support the results generated. Theses are considered well within the realm of citable evidence, even if they are conducted by undergraduates. So too is the evidence in public-facing but not peer reviewed reports. In fact, on a scientific basis it is considered more problematic to omit such studies, as doing so may result in only identifying data that fits a particular conclusion and may wrongly report on evidence of an effect where nonsignificant evidence never made it through the publication process.

15. The body of evidence from prior studies presented in the paper yields expectations for what we might observe as individuals encounter ballots and render other choices in visual formats. It is for this reason that it is valuable to see the full body of evidence and to derive from it clear expectations about what we might find given the architectures of choice that are implemented in New Jersey primary ballot design. These hypotheses are not the point of the report, however; instead, they serve as a basis for our expectations about what we may find when we look at how voters respond to the ballot itself. The studies are primarily context rather than content. Understanding prior expectations helps us know what to expect and make sense of the weight of the evidence.

16. The defense secondarily contends that I "fail to account for relevant variables" that influence voter behavior and asserts that my study should directly address "candidate quality" (p.4). This point, which I already addressed in my previous reply, reflects a fundamental misunderstanding of experimental design. By design, "candidate experience, name recognition,

campaign advertising, candidate accolades" and any other differentiating features of the candidates, such as county party funding and resources, could only lead to the conclusions from the study if those features were attributed to different candidates each time candidates were placed in different positions on the ballot. While the argument may be true that many "New Jersey voters, [] have likely already decided who to vote for regardless of ballot design," "many" does not mean "all" (p.4). Indeed, had all voters decided on a candidate, this could not possibly explain any of the biases my report identifies. In practice, the experimental design used in the study is equivalent to comparing how a candidate performs when he or she is in a favored position against how that same candidate performs when not in a favored position. Unless the defense could somehow explain how candidate experience, name recognition, advertising, and accolades changed each time voters saw a different ballot in my study, this point is irrelevant.

17. The final point that the defense raises is admittedly a limitation of the study. It is true that voters do not typically receive their ballots on a mobile phone and that the format may be slightly more daunting for voters to fill out than an office block format, which fits more regularly on the screen. And it is indeed possible that voters encountering this ballot may have been less likely to try to fill it out than they would be on a voting machine.

18. Again, however, the defense misses the point of the analysis in trying to highlight this limitation and fails to recognize additional corresponding evidence. For one, administrative difficulty was not regarded as a primary purpose of the study. Unlike paragraph 120 in my original report, which outlines the central goals of the research with numbered questions, paragraph 121 regards administrative difficulty as an open research question. When addressing the question with data, in paragraphs 165-167, I note that I consider three metrics, "each of which is indicative of the challenges that voters encounter in the process, though none of which should be treated as

definitive evidence alone." And the results of these analyses correspondingly receive less attention in my summaries of what to make of the study results and the overall conclusions.

19. More notably, in my analyses I did not simply compare whether individuals left the study, but also whether they voted for most of the offices on their ballots. Party-column ballot voters were more likely to partially fill out their ballots than office-block ballot voters. So even among individuals who started completing the ballot, the rates of completion were different. It is not at all obvious why this would be the case if the need for landscape mode was a primary deterrent.

20. Additionally, while I did not address this point in the original report, part of the reason that this particular analysis was conducted was to assess the potential that voters' experience with party column ballots may somehow have rendered voting easier for them in this format. Clearly the process was not easier for them, and indeed the data points to it being somewhat more difficult. Hence, that is the result I reported.[3]

21. Finally, my goal as a scientist and as an expert specifically on this case is to develop and provide evidence pertaining to what we can and should expect from voters when they encounter the New Jersey primary election ballot format. The evidence that I generate, like all scientific evidence, is probabilistic in nature and is based on a series of assumptions about the relevance of the content and context of the research conducted to the situation at hand. In aggregate, our understanding of the relevance and importance of any given piece of evidence, as well as its confluence with other pieces of evidence and bases for expectations, should drive the extent to which the evidence provided shapes our collective expectations. As a philosophy of

---

[3] It is worth noting that even were we to dismiss the conclusion that voting on these ballots is more challenging for voters, this would have no bearing on any of the central conclusions in the report, most notably that both the line and column positioning influence voter behavior and that these biases are not similarly present on an office-block ballot.

8

knowledge, I reject the notion that any one piece of data should necessarily yield a definitive conclusion. But to ignore the collective weight of the evidence because of a few questions about the importance of a couple of claims is to entirely miss the point.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief. Executed at Ann Arbor, Michigan, on the 22nd day of March, 2024.

Dr. Josh Pasek

9