UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDY KIM, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTINE GIORDANO HANLON, in her capacity as Monmouth County Clerk, et al.,<br><br>Defendants. | Civil Action No.3:24-cv-1098(ZNQ)(TJB)<br><br>CERTIFICATION OF<br>DR. JOSH PASEK |

I, Dr. Josh Pasek, do hereby certify:

1.  I am Dr. Josh Pasek, an Associate Professor in the Departments of Communication & Media and Political Science at the University of Michigan. I previously submitted an Expert Report in this matter (DE1-2), an Expert Reply in connection with Plaintiffs' Reply Brief (DE95, Exhibit A), and a Certification in Response to *in Limine* Motions to exclude my expert testimony (DE170). This certification now responds to items raised by defense counsel regarding cross-examination (DE165).

2.  In the March 18th evidentiary hearing, my report was stipulated into the record but I was not cross-examined about my report and the original study it contained. In a letter submitted to the court on Friday, March 22nd (DE165), defense counsel posed a few questions about the nature of the study that I ran. In this response, I briefly reply to each of the questions posed.

1

3. As a note, I provided all original data from the study as well as all code needed to analyze that data and replicate all study findings in the materials which I understand were promptly provided to the defense counsel via a dropbox link on or about March 5th.[1]

**Participant Selection and Demographics**

4. The memorandum notes that a small proportion of individuals who were texted in the study completed the survey. While no particular question is asked about this, I assume that the point of this information is to question whether the study can be reasonably used to identify effects.

5. The response rate for the study is not particularly concerning for a few reasons in this case. First, the central question of the study is about causality, namely whether the psychological effect that we expect was indeed present when voters actually complete ballots. This question does not depend on the response rate. Second, response rates of around 1% are fairly common for high quality contemporary surveys and despite this fact surveys with similar response rates continue to effectively track social phenomena. Part of the reason for this is that who responds to surveys appears to be relatively random compared to the population sampled. There is reason to think that this is especially likely to be true for text-to-web studies, where individuals are particularly likely to respond if they are momentarily available, which is a relatively randomized attribute.

6. The memorandum asks why the study was limited to Congressional Districts 7 and 8 and wonders whether the results would hold statewide. This was done for a few reasons. Most importantly, the 7th and 8th Congressional Districts included contested Congressional elections at the time. This meant that a study in these districts could establish whether ballot effects were

---

[1] Although two weeks is admittedly a short amount of time to analyze a study, it is the same amount of time that I had between receiving the final data from Braun Research and completing my full report on that data and I provided not just the raw data, but also the analytic code for the project.

present across multiple candidates and multiple bracketing situations. Sampling the entire state, where most Congressional Districts were uncontested, would require a much larger, more expensive, and likely longer-term study; would have required additional resources in terms of designing ballots, collecting voter file information, and likely necessitating a larger sample size; and would provide a relatively smaller body of evidence compared to these districts where multiple contests were contested. Hence, we adopted a pragmatic focus to maximize the evidence gained for the resources expended. To be clear, no data was collected that was not included in the study. There is also no reason to think that biases present in the 7th and 8th Congressional Districts would not be present statewide.

7. The memorandum states that we did not provide information about the target audience or participants of the study, specifically noting demographics. Indeed, this is an analysis we did not conduct given timing and privacy concerns. In the study itself, we did not collect any information beyond willingness to participate, ballot responses, and answers to two open-ended questions about task.[2] There is no reason to think that the demographics of who was filling out the study or how technologically proficient those people were would impact the types of effects observed. Hence, to retain anonymity on vote choice we did not subsequently link survey completions with demographic information from the voter file.

---

[2] This was to determine if voters openly reported confusion or had difficulties with the task. Nobody reported difficulties with the task, though a small number of respondents used the open-ended box to assert that some particular candidate was unlikely to get their county's county line to state that they personally were opposed to the line, or to criticize US support for the Israeli-Gaza war, among a few other things. The individuals mentioning the line were slightly less likely to vote straight party line than other respondents, making their continued inclusion in the study a conservative bias on the results.

**External Validity**

8.     The memorandum notes the importance of external validity in the study and questions whether the sampled population is externally valid as a representation of the primary electorate. Indeed, it is not possible to know in advance exactly who is going to vote on Election Day. Nevertheless, the strategy used here of sampling people who are registered with a particular party and who had participated in prior primaries is considered a standard method for predicting primary electorates. It should be noted that primary voters are not actually the "general population", and understanding their behavior is best estimated by selecting voters who are the most likely to actually vote in primaries and who we know are eligible to do so.

9.     The memorandum raises particular external validity questions around the similarity of the setting of the study with that of the behaviors to be predicted. While the memorandum does not reference this, we refer to questions of this sort as "ecological validity." The memorandum posits that in the processes of voting by mail or participating in a voting booth voters would be expected to pay more attention to their ballots. While this is indeed possible, we know from studies of biases on actual ballots that voters do not always pay complete attention to every contest in the voting booth. This can be observed from evidence of ballot drop-off, where individuals fail to complete parts of their real ballots, and from the fact that biases that appear in experimental settings generally reproduce themselves on Election Day ballots.

10.    The memorandum questions whether the median 115 seconds that it took voters to complete their ballots might be evidence that voters were not paying attention to the study. This is an odd claim, as 115 seconds seems like more than enough time to look at the offices on the ballot and select any choices they had. Indeed, voters only had to select candidates in four contests and only two of those included meaningful choices. In fact, as counsel brought to my attention in New

4

Jersey there is actually a statutory requirement that voters complete their ballots within two minutes stating, "No voter shall remain in the voting machine booth longer than two minutes, and having cast his vote the voter shall at once emerge therefrom and leave the polling room; if he shall refuse to leave after the lapse of two minutes he shall be removed by the district election officers" (NJSA 19:52-3). Clearly voters were spending at least as much time as we would expect them to do in the voting booth.

11. The memorandum notes that the timing of the study implies that the effects are likely to differ from what will be observed on Election Day, as indeed I noted in my original report and already discussed in response to defense arguments in my expert reply report on March 10th (ECF Document 95, Exhibit A, paragraph 13). Of course, in any study, the effects are not likely to be 100% identical; the real question is *how* things are likely to differ. In particular, without compelling evidence for why effects would somehow entirely disappear, we should expect the same psychological processes to yield the same basic effects.

12. When assessing the magnitude of effects across time points, we can also generate an estimate by looking at how other similar effects compare between pre-election and experimental results and Election Day results. Here, we can estimate how the magnitude of biases might change over time using other data from the current study. Prior studies of primacy biases in primary elections tend to find benefits of a few percentage points. These benefits can be compared to average benefits that are similar or a pinch larger in the office-block ballots examined in my report. Because the primacy benefits on office block ballots can be clearly estimated and were measured the same amount of time before the election as our estimates of the weight of the line on party column ballots, our best estimate would posit a similarly minimal reduction for the effects of the weight of the line attributable to timing.

5

13. But the magnitude of the weight of the line was far larger than what we observe from experimental effects of primacy in office-block ballots. And these estimates of double-digit cognitive effects are also supported by observational results of the sorts conducted by Drs. Rubin and Wang, which are based on Election Day data.

14. As noted in my original report and in my Expert Reply Report, there are also countervailing reasons to think that effects might even be larger in the upcoming election.

**Study Design**

15. The memorandum discusses the question of whether the suggestion to use landscape mode may have proven a problem for voters on ballots where this was the case (this was presumably for the party-column ballots, not the office-block ballots mistakenly mentioned by defense counsel in the memorandum).

16. Although I addressed the implications of this request in my certification (ECF Document 170, paragraphs 17-20), it is worth noting that the need for particular voter actions to fill out ballots is actually not an ecological validity problem. In fact, in a paper that David Kimball and Martha Kropf published in 2008, they actually show that when New Jersey changed to electronic voting machines in 2006 this resulted in voting on machines in some counties that required scrolling and machines in other counties that did not. Despite this fact, voters were actually *more* likely to cast valid votes on the machines that required scrolling.[3] Not only is it unclear why rotating a phone would provide a particular burden, but it was merely a suggestion and was not even required to fill out the ballots.

---

[3] Kimball, D. C., & Kropf, M. (2008). Voting technology, ballot measures, and residual votes. *American Politics Research*, *36*(4), 479-509.

**Types of Voting**

17.     Finally, the memorandum asks whether things would be different given the increase in voting by mail. It is not clear how this is a relevant concern as 1) there is no reason to think that mail in ballot responses would somehow be immune to voter biases and 2) many voters still use the machines meaning that a machine-only bias would still be highly consequential.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief. Executed at Ann Arbor, Michigan, on the 24th day of March, 2024.

_____

Dr. Josh Pasek