# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

ANDY KIM, et al.,

        Plaintiffs,

        v.

CHRISTINE GIORDANO HANLON, in
her capacity as Monmouth County Clerk,
et al.,

        Defendants.

Civil Action No.3:24-cv-1098(ZNQ)(TJB)

==================================================================

## PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTIONS IN LIMINE

==================================================================

WEISSMAN & MINTZ
220 Davidson Ave., Suite 410
Somerset, New Jersey 08873
732-563-4565

BROMBERG LAW LLC
43 West 43rd Street, Suite 32
New York, New York 10036
212-859-5083

Of Counsel and On the Brief:
Brett M. Pugach
Yael Bromberg
Flavio L. Komuves
Dated: March 25, 2024

**TABLE OF CONTENTS**

INTRODUCTION .........................................................................................................1

I.     THE ROLE OF EXPERT WITNESS TESTIMONY
      AND REPORTS .........................................................................................1

      Motion No. 1 (all experts) should be denied.....................................5

      Motion No. 2. (Rubin) should be denied ........................................10

      Motion No. 3 (Appel) should be denied .........................................13

      Motion No. 4 (Wang) should be denied...........................................14

      Motion No. 5 (Pasek-initial report) should be denied......................17

      Motion No. 6 (Pasek-supplemental report) should be denied..........20

      Motion No. 7 (Mr. Macias) should be denied .................................21

CONCLUSION............................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Bowers v. Nat'l Collegiate Athletic Ass'n*, 564 F. Supp. 2d 322 (D.N.J. 2008) ............................3

*Burns v. SeaWorld Parks & Ent.*, 2024 WL710631 (E.D. Pa. Feb. 21, 2014) ...............................2

*In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices & Products Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) ...........................................................3

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000).............2, 4

*Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61 (3d Cir. 2017) .................................................3

*Kos Pharmaceuticals v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) ....................................10

*Langbord v. U.S. Dept. of Treasury,* 832 F. 3d 170 (3rd Cir. 2016) .................................................2

*Matter of Soued*, CV2006674RMBMJS, 2023 WL 5623235 (D.N.J. Aug. 31, 2023)....................3

*Meyer-Chatfield v. Central Bus. Svcs.*, 732 F. Supp. 2d 514 (E.D. Pa. 2010)................................4

*Singleton v. Merrill*, 582 F. Supp. 3d 924, 942 (N.D. Ala. 2022), *appeal dismissed sub nom. Milligan v. Sec'y of State for Alabama*, 22-10278-BB, 2022 WL 2915522 (11th Cir. Mar. 4, 2022), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023) ..........................................10

*Plymovent Corp. v. Air Tech. Sols., Inc.*, 243 F.R.D. 139, 141 (D.N.J. 2007) .............................10

*United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010) ..................................................................3, 4

*Waldorf v. Shute*, 142 F.3d 601 (3d Cir. 1998).............................................................................2

## RULES

Fed. Evid. R. 401 ....................................................................................................................1, 13

Fed. Evid. R. 702 ............................................................................................................. *passim*

Fed. Evid. R. 1006 ........................................................................................................................13

Fed. R. Civ. P. 26 .............................................................................................................10, 20, 22

## INTRODUCTION

Plaintiffs respectfully submit this omnibus response to seven motions *in limine* filed by three of the Defendants (Durkin, Rajoppi, and Ireland-Imhof) (hereinafter, the "Movants") in this matter.[1]

While couched as motions to exclude expert testimony, taken as a whole, Movants' papers are a hodge-podge of meritless arguments that:

- (1) try to relitigate their claims of "delay," despite the cogent explanation for the timing of this matter demonstrated from the documentary record, by witnesses who took the stand and were cross-examined; and from the experts' declarations filed March 22, 2024;

- (2) repeatedly confuse the *admissibility* of an expert's testimony with the question of how much *weight* it should be given, by proffering irrelevant arguments about the exclusion of witness testimony; and

- (3) misunderstand the basics of "relevance" under the Federal Rules of Evidence and how time can be computed under the Rules of Civil Procedure, especially in the context of an expedited hearing.

For the reasons that follow, each of Movants' arguments should be rejected, and their seven motions *in limine* should be denied in their entirety.

## I.    THE ROLE OF EXPERT WITNESS TESTIMONY AND REPORTS

The testimony of experts is governed by a combination of Fed. Evid. R. 401 and 702. Rule 401, the broad test for relevance, provides that evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and

---

[1] On March 22, 2024, intervenor Camden County Democratic Committee filed a letter joining in the motions (DE162). There is nothing on the docket indicating that any other defendant joins in these motions.

1

**(b)** the fact is of consequence in determining the action.

Rule 702, in turn, authorizes expert testimony based on the following four factors:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Third Circuit has distilled the requirements of Rule 702 into "a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Langbord v. U.S. Dept. of Treasury*, 832 F.3d 170, 194 (3d Cir. 2016) (quotation omitted).

**"Qualification"** simply means sufficient scientific, technical, or other specialized knowledge, greater than that of the average layman, that will assist the trier of fact. *Burns v. SeaWorld Parks & Ent.*, 2024 WL710631 (E.D. Pa. Feb. 21, 2014) at *3 (citations omitted). The Third Circuit interprets the "specialized knowledge requirement liberally." *Waldorf v. Shute*, 142 F.3d 601, 625 (3d Cir. 1998). Taken as a whole, the experts proffered by plaintiffs have earned advanced degrees and performed advanced academic studies, experimental and otherwise, on elections, including ballot design, and/or have years of experience working with the very election systems that New Jersey uses to collect and tabulate votes in New Jersey.

**"Reliability"** means that the testimony is "based on the methods and procedures of science, not on subjective belief or unsupported speculation." *In re TMI Litig.*, 193 F.3d 613, 704 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000). Ultimately, the testimony must be based on "good grounds" and does not mean the "best methodology" or research that is "unassailable," or on grounds that are "perfect." *Id.* at 665. The standard for reliability is "'is not that high" and the Rules of Evidence "embody a strong and undeniable preference for admitting any evidence

which has the potential for assisting the trier of fact." *Matter of Soued*, CV2006674RMBMJS, 2023 WL 5623235, at *7 (D.N.J. Aug. 31, 2023) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 155-56 (3d Cir. 2000)).

Neither imperfection in the research nor the existence of alternative conclusions is sufficient grounds for deeming an expert unreliable. *See, e.g. In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices & Products Litig.*, 509 F. Supp. 3d 116, 131 (D.N.J. 2020) (even if the judge believes that "there are better grounds for some alternative conclusion," or that there are some flaws in the scientist's methods, the expert's testimony should be admitted so long as there are "good grounds"). Nor is testimony excludable because it only relates to one aspect of the case without proving the whole issue. *Id.* Finally, the question of whether a study's results were properly calculated or interpreted ordinarily goes to the weight of the evidence, not to its admissibility. *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017).

The opinions expressed by Plaintiffs' experts are no less reliable just because they touch on social, rather than natural, science. On the contrary, what Plaintiffs did here - an expert review of relevant social science data, documents, and testimony, a review of literature in the field at issue, a quantitative methodology, and application of their own knowledge and experience in the subject area –has been described as "a conventional social science approach that courts have routinely admitted as methodologically reliable." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 564 F. Supp. 2d 322, 361 (D.N.J. 2008).

Lastly, the requirement of **"fit"** asks "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010). Put another way, this is "a question of relevance," and "Rule 702, which governs the admissibility of expert testimony, has a liberal

policy of admissibility" if it has the "potential for assisting the trier of fact." *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985) and *Kannankeril v. Terminix Intl. Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). The experts' work, individually and taken as a whole, "fits" the facts of the case because rather than being an abstraction, it wrestles with particularity with the ballots and the election machinery *in actual use* in New Jersey. It provides the Court with useful information about the effects of New Jersey's primary ballot design laws and the usability of New Jersey's existing software and hardware, for both mail and in-person voting, to comply with an injunction that bars (1) a ballot designed by columns and rows rather than office sought; (2) letting a ballot position draw for one candidate control the ballot position of a candidate pursuing a different office; (3) placing candidates with an incongruous separation from other candidates running for the same office; (4) mixing the horizontal and vertical listing of candidates for a particular office; and (5) bracketing candidates on the ballot such that candidates for different offices are featured on the same column (or row) of the ballot. (*See* DE5). Since the "fit" requirement "primarily goes to relevance," *In re TMI*, 193 F.3d at 663, it is satisfied here.

In this Circuit, "[t]he rejection of expert testimony is the exception rather than the rule." *Meyer-Chatfield v. Central Bus. Svcs.*, 732 F. Supp. 2d 514, 525 (E.D. Pa. 2010) (quoting 2000 Advisory Committee Notes to Rule 702). In light of that policy, and because each and every expert proffered by Plaintiffs qualifies as an expert under Rule 702, the motions *in limine* should be denied in their entirety.

In responding to the motions *in limine*, Plaintiffs respectfully incorporate by reference the Certifications of Dr. Rubin (DE168), Dr. Wang (DE169), Dr. Pasek (DE170) and Mr. Macias (DE171), each filed March 22, 2024.

**Motion No. 1 (all experts) should be denied.[2]**

Not content with attacking the Plaintiffs' decisions concerning when to bring this complaint, and apparently unsatisfied with the answers given on that point in court (T188-196), the first of Movants' motions proceed to attack the timeliness of the plaintiffs' experts and the speed of their work.

It's worth noting that Movants have themselves expressed the difficulties that a litigant can encounter with identifying an expert, assessing their ability and interest in performing the requested work, and in obtaining drafts and ultimately a final product from them. In DE150, Movants explain how since learning of this action on February 26, they contacted two experts who were unable to assist them. Leaving aside the question of whether the defense should have been more diligent and made inquiries of additional experts beyond these two, or made inquiries sooner, the filing reveals that it is not always that simple to identify, hire, and finalize an expert witness on the timelines that Movants seem to demand of Plaintiffs.

At any rate, the experts' own certifications reveal the inaccuracies in the Movants' telling of how they were hired as experts. In the week before Christmas and New Year's, each of the experts was contacted about the possibility of doing expert work for the Plaintiffs.

Dr. Appel, who issued a report describing New Jersey's inventory of voting systems, completed an initial draft of the report on December 26, 2023, and substituted it with another report on January 24, 2024. (DE1-5, Exh. E).[3] In the report, he reviewed New Jersey's inventory

---

[2] In the Brief supporting Motion No. 1 (DE152), Movants say that Plaintiffs are requesting "mandatory" relief, and place that term in quotation marks. (DE152-2, p. 2). They cite to DE1, 5, and 7 for this proposition. However, a review of those pleadings revealed that the word "mandatory" does not appear. For a more accurate characterization of what Plaintiffs' motion seeks to restrain, see the description on the prior page.

[3] As Mr. Appel testified, he was originally asked to write a report about the capabilities of voting machines used in New Jersey, but was unaware that there was even a case at the time, and did not learn the identity of the plaintiffs until after the lawsuit was filed. (T289).

of voting machines and their accompanying election management software ("EMS"), and researched reliable databases to determine whether this equipment and software was in use in states that had office-block ballots. Dr. Appel deduced that if the equipment was in use (or useable) in states that required ballots to be presented in office-block format, with a particular model of election management software, it followed necessarily that the same equipment and software could be used in New Jersey to present ballots to voters in office-block format. (DE1-5). He noted that in preparing for an election, a great deal of work was required to input candidate names and contests and otherwise populate ballot information for ballots of *any* type – party column or office block – and to then transfer files to the voting machines. But, he stressed, this work would be required in "each election" regardless of whether the court granted or denied the injunction Plaintiffs seek. (*Id.*, p. 5). Turning to the issue of whether it was feasible to change the ballot layout from party-column ballots as currently used in New Jersey primaries, to office-block ballots (the most plausible solution if Plaintiffs' requested injunction were granted), Dr. Appel gave his reasoning and stated: "It is my opinion that the work or effort needed to prepare office-block ballots, using the same EMS, will not be significantly different from the work or effort needed to prepare row-and-column ballots." (*Id.*)

Dr. Appel's work on this point thus demonstrated the feasibility of using New Jersey's existing equipment and software to present office-block ballots to primary voters, with "work or effort" that was not "significantly different" from what is required now. Clearly, this conclusion was an important part of Plaintiffs' case, but it was far from the only proofs Plaintiffs needed to prevail on their motion for a preliminary injunction.

To that end, Plaintiffs also engaged Dr. Rubin, Dr. Wang, and Dr. Pasek, to demonstrate scientifically what every political operative and candidate already knows (and which Rep. Kim

6

testified to, (*see* T169-70)), which is that the New Jersey primary ballot laws and features that comprise the "county line" system, give favored candidates a nearly insurmountable advantage. This group of experts worked concurrently with, and not sequentially to, Dr. Appel.

Dr. Rubin, who has viewed tens of thousands of ballots in the course of her prior work in this field, determined that as the holidays ended and she began a new academic year, it would be appropriate (1) to re-collect 20 years of election results for all state legislative races to personally verify their accuracy, rather than rely on data previously collected for only a portion of the time period for CWA; (2) identify additional bases for comparison and data therefor, in order to expand the analysis and control for the impact of county party endorsement on candidate performance; (3) double and triple check other sources through publicly available information; and (4) run the analyses on the various data. (DE168, ¶ 5). Dr. Rubin was careful, thorough, and deliberate in her work. These steps were time-consuming, but she followed them. Additionally, rather than wait until all data analysis was complete, Dr. Rubin stayed in touch with both counsel and Dr. Wang before her final product was issued on February 10, 2024 so that Dr. Wang's report could in turn be speedily finished. (DE169, ¶ 5; DE168, ¶ 6). Upon the finalization of her data collection and analysis, this in turn allowed Dr. Wang to finish his work just three days after Dr. Rubin's report was finalized, after several weeks of diligent collaboration.

Dr. Wang explained that on December 29, 2023, he engaged in a single hour of preparatory work in anticipation of this engagement. But, he continued, his work did not (and indeed could not) begin in earnest until Dr. Rubin presented him with her quality-controlled data. (DE169, ¶ 5). As that data began to arrive, Dr. Wang could devote additional time to the project (in addition to his work as a Princeton professor). Beginning January 20, 2024, he invoiced for over 22 hours of work between then and February 13, 2024, when he completed and presented

his final report. (*Id.*, ¶ 6). There is no serious argument that, given the inputs required for his report, which offer a quantitative analysis of Dr. Rubin's findings in addition to description of socio-cognitive behavior, that Dr. Wang's scholarly and careful work product could have been prepared on a timeline that Movants feel would have been more suitable. (*Id.*, ¶¶ 6-7).

Dr. Pasek – who focused more on the forthcoming June 2024 primary election rather than historical races – also worked concurrently and not sequentially. In his certification (DE170), he explained that promptly after being contacted, he advised conducting a field study that would "directly engage []" the issues raised. (*Id.*, ¶ 6). In his own words: "Evidence of effects from historical ballots could clearly identify the overall influence of being on the line, but it would be valuable to disentangle the various components of this influence, namely to separate the direct effect of the 'weight of the line' from the reasons that candidates had historically been listed on the line." (*Id.*)

Dr. Pasek accordingly began immediate work identifying a survey firm capable of doing the work, and upon locating one and entering into a Scope of Work agreement, proceeded to design and implement the survey, which was fielded from January 16 to January 31, 2024. (DE170, ¶ 14). He explained that the speed with which this survey was accomplished was "virtually unheard of." (*Id.*) Upon receiving the final data on January 31, 2024, Dr. Pasek had to analyze all of the data from the study and draft and finalize the detailed report that was ultimately submitted with the Verified Complaint, and which was completed, and dated, February 14, 2024. (*Id.*)

Moreover, even though he and the survey firm worked at an "unheard of" pace to conduct the field study and finalize the report, there were constraints about when such a study could properly be performed, even if there had been unlimited time to plan and present the study's

findings. As Dr. Pasek explained in his supplemental expert reply (DE95, Exh. A), the timing of the study had to fall in the relatively narrow window, "between when most candidates had announced themselves and when county parties began their process of endorsing the county line candidates. To conduct the study earlier would have undermined the extent to which it applied directly to the 2024 elections and to conduct the study later would have required presenting inaccurate information to voters about which candidates had been endorsed." (*Id.*, ¶ 14; *see also* DE170, ¶ 10). The calendar controlled the time when the study ordered by Dr. Pasek would have been appropriate to run. He followed that calendar carefully, expedited the completion of the voter study, and proceeded to author his own report with the final data from that study. Nothing relating to Dr. Pasek's work is suggestive of delay or lack of diligence. As the Court is aware, Dr. Pasek's February 14, 2024 report was the final of four reports that formed the basis of Plaintiffs' application to this Court. The evidence does not suggest that these four pillars could have come any earlier than they did.

Contrary to defense counsel's unsupported theories and insinuation, there was no grand scheme to line the whole case up in advance, press the pause button, and the press play at the last second. Instead, the evidence in the record all points to diligent efforts, consistent with the testimony of Rep. Kim, to bring this case in a timely manner while marshaling the type of evidence that court's require on an application for preliminary injunction, and consistent with Article III standing requirements. Moreover, the diligent efforts of the plaintiffs, attorneys, and experts nevertheless allowed this case to be filed 100 days before Election Day, 2 months before mailing of mail-in ballots, 1.5 months before printing, and 1 month before the petition filing deadline.

Movants also posit a secondary argument premised on the text of Fed. R. Civ. P. 26(a)(2)(D)(i). That rule provides that as a general matter, in the case of a *trial*, and absent leave of Court, expert reports must be served 90 days before the trial commenced. This, of course, was not a trial but an evidentiary hearing.[4] And even if it were a trial, under Movants' argument, Plaintiffs would have been obligated to serve expert reports before they filed suit, and even before the reports were finished. The implication of Movants' argument is silly: that expert reports can never be used in a preliminary injunction hearing unless there is a 90-day gap between the filing of the report and the hearing date. This is not the case, as expert testimony is routinely used and admitted in federal preliminary injunction hearings, including those relating to voting rights. *E.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 942 (N.D. Ala. 2022), *appeal dismissed sub nom. Milligan v. Sec'y of State for Alabama*, 22-10278-BB, 2022 WL 2915522 (11th Cir. Mar. 4, 2022), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023) (legislative redistricting); *Plymovent Corp. v. Air Tech. Sols., Inc.*, 243 F.R.D. 139, 141 (D.N.J. 2007).

### Motion No. 2. (Rubin) should be denied.

Movants' attack on the report and testimony of Dr. Rubin is factually flawed and lacks any legal merit. One of the multiple points of evidence offered by Plaintiffs in this case was Dr. Rubin's report and oral testimony finding that candidates who were awarded the county line saw their performance increase from 13 to 83 points, with a mean improvement increase of 38 points. (T312; DE1-3, p. 11). This came from a study of 45 Senate and House races over 20 years. Another aspect of her study looked at 228 state legislative races over a 20 year period. (DE1-3, p.

---

[4] When a preliminary injunction is sought, the Court is permitted to rely on affidavits and even hearsay material to adjudicate the motion. *Kos Pharmaceuticals v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004). Therefore, while holding an evidentiary hearing was manifestly appropriate, neither party had a *right* to such a hearing.

15). And her report also added a third perspective: a study of 37 primary contests for Governor, Senate, and House, over a period of over 10 years. (*Id.*, p. 19).

As explained below and at greater length in Dr. Rubin's Certification, these data are valid for two reasons: one, as natural experiments, they adequately control for key variables beyond the county line. Second, these observations were not confined to one or a few races, or one or a few years. A large number of races for different offices, and for different years, were considered in their totality.  Whether or not some other factors like popularity, resources, or endorsements may have played a role in a particular race, the overall finding of this report is unassailable based on its own adequate internal controls and the large number of elections it studied. (T316-324).

Movants' attacks on Dr. Rubin's methodology accordingly fall flat. The Movants suggested doing a "difference-in-difference" analysis, which is also known as a controlled-before-and-after study." (DE168, ¶ 8). This, according to Dr. Rubin, "is an inferior design, because it compares different candidates with one another, in different years." (*Id.*) Instead, she used a "natural experiment that used data from the same candidates, in the same year." (*Id.*) In this way, candidates and time are no longer variables that need to be controlled in the way that would occur in a difference-in-difference analysis. In social science, Dr. Rubin acknowledges that "[i]t is not possible to control all potential sources of endogeneity in a non-experimental design." (*Id.*, ¶ 9). However, by using a series of *two* natural experiments – the results in the split-endorsement aspect of the study and the study of electoral results where candidates received an endorsement, but were not displayed on the county line – she was fully able to control for the most likely endogenous variables. (*Id.*, ¶ 9-14).

In addition to the two natural experiments, Dr. Rubin also conducted an analysis of the performance of all incumbent state legislators over the last twenty years who had a primary

challenger. These 228 incumbent candidates included those who were on the line, off the line, or partially on the line (i.e. on the line in some but not all counties in their district). Candidates on the county line won at 38 times the rate of candidates who were off the line or partially off the line.

In sum: "In addition to the controls built into the structures of the natural experiments, the large number of cases included in all three analyses (45, 37 and 228) and the consistency of findings across the three data sets further confirm the improbability of alternative explanations." (*Id.*, ¶ 14).

Other suggestions of flaws in Dr. Rubin's study also lack merit. Dr. Rubin states - and it is not contested - that to the extent she relies on her own work, that work was not just a passing examination of some public records but was rather the product of a "decade of research of New Jersey's political structures, candidate endorsement processes, and county line primary ballots. During that time, I have viewed and analyzed tens of thousands of ballots in New Jersey and in all other states." (*Id.*, ¶ 14). To the extent that any other specific complaint by Movants is not addressed here, Plaintiffs respectfully refer the Court to Dr. Rubin's certification.

At bottom, the movants' arguments are directed to the weight the Court should give her report and testimony, not its admissibility. The reliability requirement of "good grounds" is amply satisfied here and the fact that alternative conclusions might exist is insufficient to exclude the report as unreliable. Therefore, Motion No. 2 should be denied.

Alternatively, even if Dr. Rubin's report were to be disregarded as an *expert* report, there is no reason why its underlying data (as opposed to the conclusions drawn from the data) should be disregarded. In particular, Dr. Rubin has attested to her review of thousands of ballots and hundreds of election results, both New Jersey and nationally. Even without analysis of those

ballots and races, her data is precisely the kind of "summary, chart, or calculation to prove the content of voluminous writings" that is within the contemplation of Evid. R. 1006. And to the extent that even a single Defendant continues to question whether the county line ballot imposes real harms on certain candidates and offers real benefits to others, such data is plainly relevant to the matter in the sense of Evid. R. 401.

### Motion No. 3 (Appel) should be denied.

Movants' request to strike the expert report of Dr. Appel on relevance grounds is also without merit. Of note here, Dr. Appel asserts that New Jersey's machinery and software, in its present form, can be used to present voters with office-block ballots. And he has opined on the level of effort that would be required to accomplish it: it will "not be significantly different from the work or effort needed to prepare row-and-column ballots." (DE1-5, p. 5).

Movants' allegations notwithstanding, at least some Defendants have most certainly contested one or both of these propositions, either claiming that it might not be feasible at all with existing equipment, or that the effort required to do it would in fact be significant. (*E.g.*, DE49, ¶ 9 (Grossi) ("it is possible that" deviations from current ballot structure could not be implemented on time); DE61-1 ¶ 8 (Swartz) (depending on certain circumstances, machine recertification might be necessary)).  Dr. Appel's statement and testimony counters that by explaining that it actually is feasible with existing equipment and without "significant" effort. Since Dr. Appel's statements rebut other materials in the case, they easily pass the relevance test under Evid. R. 401.

13

**Motion No. 4 (Wang) should be denied.**

Movants offer that Dr. Wang's report should be excluded because it is "unhelpful" and its methodology "unreliable." Counsel's argument is mistaken as a matter of law, and ill-informed about the scientific process generally and Dr. Wang's disciplines specifically.

In response to the Movants, Dr. Wang notes that his expertise is in quantitative neuroscience and statistical analysis, which allows him to apply principles of neuroscience to contextualize how the "brain processes information based on visual cues presented in a variety of circumstances, including with respect to ballot design." (DE169, ¶ 2). This knowledge allows him to develop potential explanations for how ballot design affects voter behavior, and to develop hypotheses and testing of those hypotheses via examination of data to control for different variables. (*Id.*)

Movants misunderstand the role that neuroscience plays in his report, mistaking it as a sole basis for reaching conclusions, rather than as an explanation which can then be tested. (*Id.,* ¶ 8). In other words, the principles of neuroscience and cognitive science discussed in his report tell what we might expect to be happening when voters are presented with various visual cues on the ballot. (*Id.*) However, Dr. Wang's use of neuroscience material in that way was only the beginning of the inquiry, not its end. (*Id.,* ¶ 9). His report explains how natural experiments, such as those resulting from variations in ballot design across counties and which hold the individual candidate constant, can be used to test certain alternate hypotheses, and to account for various other explanations such as incumbency, candidate funding, endorsement, etc. Dr. Rubin's data and analysis of various New Jersey elections, discussed above, formed two of those natural experiments. (*Id.*, ¶¶ 5, 7). While one cannot account for and test every variable in every study, this distinguished professor relates that the hypothesis testing applied here is commonly relied on

14

in *all* quantitative sciences to rule out various alternative explanations, making it exceedingly likely to show causal effects to a *reasonable degree of scientific certainty*, bolstered by use of *statistical analyses providing additional clarity* on the extent to which the results observed differ from what we could expect to find by chance. (*Id.*). That *controlled* experiments have their own separate value in contributing to the body of evidence explaining causal effects and magnitude does not in any way detract from the value of examining such causal effects via the *natural* experiments utilized here. (*Id.*).

This is especially true given that the natural experiments (*i.e.*, the dozens of races Dr. Rubin studied) allowed for review of a large number of contests over a large period of time, which is reflected in the statistical significance testing performed.

Moreover, Movants' criticism misconstrues the scientific process and method (*Id.*, ¶ 10). Dr. Wang formed a well-founded hypothesis, and then tested it statistically, using natural experiments that could be done with the data to ask whether the pattern of benefits accruing to candidates on the county line could be explained by reasons other than the ballot placement itself. In his judgment, a natural experiment – a situation "where the forces of nature or government policy have conspired to produce an environment somewhat akin to a randomized experiment" was useful to test his hypothesis. (*Id.*, ¶ 13).

Movants' criticism of Dr. Wang's statistical skills borders on the insulting. In science, most expertise in statistics is acquired in a practicing context. (*Id.*, ¶ 14). Dr. Wang reviews several articles demonstrating that he is a known innovator in statistical data analysis methods in the social sciences that other scientists have relied on. (*Id.* at ¶ 14 & nn. 3, 4). Many of his recent published scholarship publications use the same statistical tests used here, including t-tests, chi-square statistics, or both. (*Id.*, ¶ 14).

15

At bottom, Dr. Wang's knowledge, experience and training gave him the ability to conclude with high scientific confidence that the county line provides benefits that are not found elsewhere in the United States and far exceed those of normal associational rights such as party endorsement. To the extent that there is a "shock value" recognized by movants, it would be as a result of the significant impact of the county line, rather than misapplication of basic, foundational statistical methods and tests which are routinely relied upon.

Further, Movants' discourse about Dr. Wang's report fundamentally misunderstands the entire discipline of statistical science. Movants' discussion of the Krosnick report in *Jacobson v. Lee*, is premised on the idea that *Jacobson* court found a mere average electoral percentage number – an arithmetic mean – could not adequately reveal what might happen in a subsequent individual instance. (*Id.*, ¶ 18). But Dr. Wang didn't just rely on averages for predictive value. Rather, he used other tools of basic statistical analysis which *are* sufficient to make a prediction. The degree to which an individual instance varies around the average 17-percentage-point benefit derived from the county line is measured by a quantity called the standard deviation. (*Id.*). This is easily calculated from his work materials which are in Defendants' possession and in the Rubin report, and is 10.1 percentage points. (*Id.*). Put another way, his calculation of an average (or arithmetic mean) may be simply a result of adding up the total benefits observed in *n* races and dividing that total by *n*. However, his report is premised on the significance of the data based on the electoral benefits observed in *each* of the individual races, *and* their variation from the average (*i.e.*, the standard deviation), not just the average alone, which was disapproved of in *Jacobson*. (*Id.*).

Lastly, Dr. Wang amply cited to peer-reviewed research on primacy effects in general. He applied that body of scholarship to the question of primacy's role in ballot design and

therefore, in this litigation. To be sure, there is some conflicting evidence on the issue of primacy, which Dr. Wang fully acknowledged and accounted for in his report. (*Id.*). But that does not undermine the vast body of literature that generally affirms the existence of the primacy effect. Nor is it the sole basis of his report, but instead helped to generate a hypothesis which he was then able to test through natural experiments and use of fundamental statistical analyses. None of the foregoing affects the report's admissibility under the applicable standards of Evid. R. 702, as his conclusion remains rooted in "good grounds" that are helpful to the trier of fact.

**Motion No. 5 (Pasek-initial report) should be denied.**

Movants question the sources, variables, and design flaws used in Dr. Pasek's initial report. Once again, Movants cannot demonstrate that the report should be excluded. Their suggestions, at best, relate only to the weight, not admissibility of the report.

As to the claim of "improper sources," it is entirely proper to rely on student and preliminary work when conducting research studies. (DE170, ¶ 13). This argument fails to recognize the nature of scientific evidence, and doesn't mention that the reliance on these sources was chiefly to raise hypotheses, rather than to form the primary basis for any of the report's conclusions. (*Id.*). The question of the validity of scientific results is not dependent on *who* conducted a particular study, but instead on the evidence brought to bear in that study. Scientists are not particularly concerned with the rank or esteem of an author, but rather, the author's research methods used and whether they support the results generated. Even undergraduate theses or reports that have not undergone peer review are considered well within the realm of citable evidence. (*Id.*, ¶ 14).

Further, the body of evidence from prior studies presented in a paper yields *expectations* for what a researcher might observe as individuals encounter ballots and render other choices in visual formats. (*Id.*, ¶ 15). But these hypotheses are not the point of the report, nor its conclusion; instead, they serve as a basis for expectations about what researchers find given the architectures of choice that are implemented in New Jersey primary ballot design. (*Id.*). The studies are primarily context rather than content. (*Id.*).

The defense secondarily contends that Dr. Pasek "fail[s] to account for relevant variables" that influence voter behavior and asserts that his study should directly address "candidate quality." This point, previously discussed in DE95, Exh. A, reflects a fundamental misunderstanding of experimental design. By design, "candidate experience, name recognition, advertising, funding, etc., could only lead to the conclusions his study reached if those features were attributed to different candidates each time candidates were placed in different positions on the ballot. (DE170, ¶ 16). "While the argument may be true that many 'New Jersey voters, [] have likely already decided who to vote for regardless of ballot design,' 'many' does not mean 'all.'" (*Id.*). If it were otherwise, then how a candidate performs when he or she is in a favored position against how that *same* candidate performs when *not in a favored position* would fully explain the differences. (*Id.*). But the data shows real differences on the point, leaving the biases in ballot design identified in the report as the best explanation. (*Id.*).

The final point that the defense raises is admittedly a limitation of the study. (*Id.*, ¶ 17). It is true that voters do not typically receive their ballots on a mobile phone and that the format may be slightly more daunting for voters to fill out than an office block format, which fits more regularly on the screen. And it is indeed possible that voters encountering this ballot may have been less likely to try to fill it out than they would be on a voting machine. Again, however, the

defense misses the point of the analysis in trying to highlight this limitation and fails to recognize additional corresponding evidence. (*Id.*, ¶ 17). For one, administrative difficulty was not regarded as a primary purpose of the study. (*Id.*). Unlike paragraph 120 of the original report, which outlines the central goals of the research, paragraph 121 expressly regards administrative difficulty as an open research question. (*Id.*). When addressing the administrative difficulty question with data, Dr. Pasek explained that the data was such that it should not be treated "as definitive evidence alone." (*Id.*).

Additionally, part of the reason that this particular analysis was conducted was to assess the potential that voters' experience with party column ballots may somehow have rendered voting easier for them in this format. Clearly the process was not easier for them, and indeed the data points to it being somewhat more difficult. Hence, the result he reported. (*Id.*, ¶ 20).

The evidence that Dr. Pasek found, like all scientific evidence, is probabilistic in nature and is based on a series of assumptions about the relevance of the content and context of the research conducted to the situation at hand. (*Id.*, ¶ 21). In the aggregate, the understanding of the relevance and importance of any given piece of evidence, as well as its confluence with other pieces of evidence and bases for expectations, should drive the extent to which the evidence provided shapes our collective expectations. (*Id.*). Not unlike how juries are instructed, Dr. Pasek rejects the notion that "any one piece of data should necessarily yield a definitive conclusion." (*Id.*). But to ignore the collective weight of the evidence because of a few questions about the importance of a couple of claims is to entirely miss the point. (*Id.*). Based on the applicable law regarding expert reports, Dr. Pasek's initial study is plainly admissible.

**Motion No. 6 (Pasek-supplemental report) should be denied.**

The other motion involving Dr. Pasek – to exclude his supplemental report – should also be denied.  Notwithstanding the cited provisions of Fed. R. Civ. P. 26, this was a preliminary injunction hearing where otherwise applicable rules of procedure and evidence could be, and were, properly relaxed or otherwise shortened by the Court, in a way that affected *all* parties to this matter, not just the defense.

Substantively, Dr. Pasek's second report (DE95, Exh. A) was a response to several technical claims that one or more defendants had offered. Whether labeled as a rebuttal to an expert report or something else, it does not change the reality that Dr. Pasek's rebuttal was trying to give the Court a thorough response about his findings about the magnitude of ballot effects that he observed in his experiment. Defendants, indeed, took issue with the very notion that science had a predictive value in studying elections and election results. Dr. Pasek deftly refuted this proposition (*Id.* at 4). He also repeated for emphasis that regardless of what impact the primacy effect had on senatorial candidates, its impact on unbracketed congressional candidates was undeniable. (*Id.* at 5-6). Further, in response to criticism that the exogenous factors such as incumbency, finances, popularity, or others should have been taken into account, Dr. Pasek clearly explained that by randomly assigning these candidates to different ballot positions, those factors (whatever their level) would be constant while ballot position varies, thus giving a true measure of the effect of ballot position. (Id., pp. 7-8). Lastly, he explained why the experimental study he conducted with real candidates had to be done at a very specific point in time. (*Id.,* p. 9). In short, whether he was responding to a brief discussing alleged methodological flaws, or a certification supporting such a brief, he was in fact responding to arguments that were at least

20

arguably within the realm of experts, not fact witnesses. His efforts to assist the trier of fact in that regard should not be met with the exclusion of his testimony on a hypertechnical reading of the Rules of Civil Procedure.

Thus, Motion No. 6 should be denied.

### Motion No. 7 (Mr. Macias) should be denied.

The motion to exclude Mr. Macias's report and testimony claims that Mr. Macias' report should be rejected because (i) it was filed on March 13, 2024, one day after the reply brief and all remaining reply certifications were filed; and (ii) it rebuts factual, nonexpert evidence, rather than another expert report. Both contentions lack merit.

First, Mr. Macias was disclosed as a witness to the defense the prior day, March 12, 2024, when Plaintiffs' counsel updated its witness list in preparation for the joint submission that became the court's order about the scheduling of the hearing (DE141). Furthermore, as Mr. Macias recounts, he concluded his report a mere moments before it was filed on the Court's docket and thus disclosed to all counsel of record. (DE171, ¶ 4).  After the witness' identity was disclosed, the report could not have been produced any more quickly than it was. (*Id.,* ¶¶ 2-4).

As further noted in his certification, Mr. Macias was identified and engaged by Plaintiffs' counsel on March 9, 2024, three days after the defense filed their opposition, and he completed his report just 4 days following his engagement. (*Id.,* ¶ 1). In addition, even with the report coming a day after the other experts' rebuttals were produced to the Court and the parties, Movants don't even claim, much less prove, any prejudice to them. On the contrary, considering that this was a preliminary injunction hearing, they were given sufficient time to cross-examine Mr. Macias and inquire about his conclusions. (T123-165). Thus, the date that Mr. Macias filed

his report did not impact or prejudice the defense in any way and should not be stricken on those grounds.

The second rationale proffered to strike Mr. Macias' report is also without merit. First, notwithstanding the cited provisions or Fed. R. Civ. P. 26, this was a preliminary injunction hearing where otherwise applicable rules of procedure and evidence were relaxed or otherwise shortened, which is within the Court's power, and which affected *all* parties to this matter, not just the defense. Second, Mr. Macias makes clear that the defense certifications he was rebutting contained a fair amount of "technical discussions" (DE171, ¶ 4; *see also* T106-117).  At that moment in time, it was not at all clear at that point whether those three declarants "were being offered as expert witnesses or in some other capacity." (DE171, ¶ 4).  Thus, the objection, which is based on the claim that his report rebutted fact rather than expert witnesses, is not sustainable. Clearly, what he was rebutting were technical discussions of voting systems' features and limitations. Whether the label given is "fact" or "expert" does not change the reality that Mr. Macias was trying to give the Court a complete picture of Defendants' ability to conduct the upcoming primary election without the county line ballot.

Thus, Motion No. 7 should be denied.

**CONCLUSION**

For the foregoing reasons, all of Movants' motions *in limine* should all be denied.

Respectfully submitted,

WEISSMAN & MINTZ                    BROMBERG LAW, LLC

Co-counsel for Plaintiffs           Co-counsel for Plaintiffs

By:    */s/ Brett M. Pugach*        By:    */s/ Yael Bromberg*

By:    */s/ Flavio L. Komuves*

Date: March 25, 2024

23