<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ANDY KIM** *in his personal capacity as a candidate for U.S. Senate*, ***et al.***, | |
| Plaintiffs, | Civil Action No. 24-1098 (ZNQ) (TJB) |
| v. | **OPINION** |
| **CHRISTINE GIORDANO HANLON, *et al.***, | |
| Defendants. | |

<u>**QURAISHI, District Judge**</u>

  **THIS MATTER** comes before the Court upon a Motion for Preliminary Injunction (the "Motion", ECF No. 5) filed by Plaintiffs Andy Kim, Sarah Schoengood, Carolyn Rush, and their respective campaign committees (collectively, "Plaintiffs"). Plaintiffs filed a brief in support of their Motion. ("Moving Br.", ECF No. 5-1.) Defendant County Clerks Christine Giordano Hanlon, Scott M. Colabella, Paula Sollami Covello, Mary H. Melfi, Steve Peter, Holly Mackey, Nancy J. Pinkin, Joseph J. Giralo, John S. Hogan, Joanne Schwartz, Joseph Ripa, Rita Rothberg, Celeste M. Riley, Christopher J. Durkin, James N. Hogan, E. Junior Maldonado, Ann Grossi, Danielle Ireland-Imhof, and Joanne Rajoppi (collectively, "Defendants") filed oppositions to the Motion. (ECF Nos. 16, 26, 44–46, 48–51, 53, 54, 57, 59–61, 63, 65, 69.)[1] Plaintiffs filed a reply

---

[1] The Court granted a Motion to Intervene filed by the Camden County Democratic Committee ("CCDC") (ECF No. 121), and the CCDC attended the evidentiary hearing but did not file its own brief opposing Plaintiffs' Motion for Preliminary Injunction.

brief in further support of their Motion.  ("Reply", ECF No. 95.)[2]  At the Court's request, the parties filed a letter identifying *all* the relevant submissions before the Court on the Motion for Preliminary Injunction.  (ECF No. 193.)[3]

Pursuant to Federal Rule of Civil Procedure 65, the Court conducted an evidentiary hearing ("Hearing") on the record on March 18, 2024.  (ECF No. 159; "Hearing Tr.")

The Court has carefully considered the parties' submissions as well as the evidence and arguments presented at the Hearing.  For the reasons set forth below, the Court will **GRANT** the Motion for Preliminary Injunction.

## I.    BACKGROUND AND PROCEDURAL HISTORY[4]

This matter arises out of the upcoming 2024 Democratic primary election (the "2024 Primary") for which Plaintiffs have declared their candidacies.  Plaintiff Andy Kim is running for U.S. Senate.  Plaintiff Sarah Schoengood is running for the U.S. House of Representatives for New Jersey's Third Congressional District.  Plaintiff Carolyn Rush is running for the U.S. House of Representatives for New Jersey's Second Congressional District.  Defendants are the County Clerks for nineteen of the twenty-one counties in New Jersey.[5]

On February 26, 2024, Plaintiffs filed a Verified Complaint raising concerns with a ballot design used for primary elections in nineteen of the twenty-one counties in New Jersey.  ("V.C.",

---

[2] The Court additionally received six amici submissions, (ECF Nos. 90 (certifications from candidate amici), 116–18, 128, 134, 136.)

[3] The Court has carefully reviewed each of these submissions.  It does note that the parties' joint list appears to have omitted the Response in Opposition by Joanne Schwartz at ECF No. 53.

[4] The Court recites the procedural history only as relevant to the instant Motion.  Notably, various issues concerning the underlying litigation that are not relevant here, such as discovery disputes, have been stayed pending the Court's resolution of Plaintiffs' Motion.

[5] The remaining two County Clerks are named as interested parties, together with Tahesha Way in her official capacity as Secretary of State for New Jersey and her related role as chief elections officer in the state.  The Attorney General for the State of New Jersey advised by letter dated March 17, 2024, that he was electing not to intervene in this matter. (ECF No. 149.)  His letter included additional discussion that this Court does not consider, given that it was essentially provided by a non-party that had not sought leave to brief the Court amicus curiae.

ECF No. 1.)  Plaintiffs' Motion for Preliminary Injunction was filed on the same day.  (ECF No. 5.)  In their Verified Complaint, Plaintiffs allege that the ballot design's "bracketing system" infringes upon their constitutional rights under the First Amendment[6]—specifically, the Right to Vote (Count I), Equal Protection (Count II), and Freedom of Association (Count III)—and that it violates the Elections Clause of the U.S. Constitution (Count IV).  (V.C. ¶¶ 168–227.)[7]

Defendants were properly served.  (ECF No. 8.)  Interested parties Tahesha Way, as Secretary of State for New Jersey, and County Clerks for the remaining two counties in New Jersey were furnished with copies of, *inter alia*, the Verified Complaint and Plaintiffs' Motion.  (*Id.*)  Plaintiffs also furnished the following non-parties with copies of the Verified Complaint and Motion: all declared candidates that at the time were running against Plaintiffs in the upcoming primary election, the Democratic and Republican State Committees, and all county party committees for whom email addresses could be found.  (*Id.*)

By way of background, the Verified Complaint alleges the following facts.

In nineteen of its twenty-one counties, New Jersey's primary election ballot system features, or "brackets," certain groups of candidates together in the same column[8] based on endorsements by political party leaders (the "Bracketing Structure"), rather than grouping candidates together based on the office for which they are running ("Office Block Structure").[9] (V.C. ¶¶ 3–6, 53–55, 62.)  New Jersey is the only state in the country that organizes its primary election ballots by the Bracketing Structure.  (*Id.* at 2 n.1; *id.* ¶¶ 1, 5.)  The Bracketing Structure is

---

[6] Plaintiffs correctly plead their First Amendment injuries via the Fourteenth Amendment.  For the sake of brevity only, the Court refers directly to the First Amendment.

[7] Plaintiffs' claims are brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and 42 U.S.C. § 1983.

[8] The Verified Complaint refers to "column" as either the vertical or horizontal grouping together of the various bracketed candidates on New Jersey ballots.  (V.C. ¶ 3.)

[9] The two New Jersey counties that do not and have historically not used the Bracketing Structure for their ballots, Salem County and Sussex County, use the Office Block Structure instead.  (*Id.* ¶ 55.)

governed by New Jersey state law,[10] which allows candidates to request that they be bracketed, or grouped, with other party-endorsed candidates on the ballot.  (*Id.* ¶¶ 6, 59–60.)

Once the deadline passes for submitting bracketing requests, whichever office position the County Clerk draws first becomes the "pivot point" of that county's ballot.  (*Id.* ¶ 56.)  The pivot point is the first column (or row, depending on the design) that appears on that county's primary ballot.  (*Id.* ¶¶ 56, 65–66.)[11]  This is known as the "preferential ballot draw."  (*Id.* ¶ 7.)  The other candidates endorsed by the county party and thus bracketed with the endorsed pivot point candidate(s) are then automatically placed on that same column (or row), with the same county party slogan.  (*Id.* ¶¶ 6, 14, 62, 65.)  This is referred to as the "county line."  (*Id.* at 3.)

If a candidate chooses not to bracket with other candidates, or requests to do so but loses that spot to another candidate, that candidate is an "unbracketed candidate."  (*Id.* ¶ 58.)  Unbracketed candidates cannot receive the first ballot position (*i.e.*, the top left position), and are placed instead either farther to the right or farther to the bottom of the ballot, with no guarantee that they will be placed on the next available column after the bracketed candidates.  (*Id.* ¶¶ 65–67.)[12]  As a result, unbracketed candidates tend to occupy obscure parts of the ballot that appear less important and are harder to locate, and may be grouped in a column with other candidates with whom they did not want to be associated.  (*Id.* ¶ 67.)

The Bracketing Structure is not imposed consistently throughout New Jersey, as the layout for a given county's ballot depends on that county's pivot point, and County Clerks have applied

---

[10] Defendants are elected officials vested with certain statutory duties and obligations including but not limited to designing, preparing, and printing all ballots, issuing mail-in ballots, and conducting a drawing for ballot positions for various elections held in various counties.  (*Id.* ¶¶ 28–47.)

[11] According to the Verified Complaint, New Jersey law requires U.S. Senators (or Governors, if not Senators) to be drawn as the pivot point when those positions are up for election.  (*Id.* ¶¶ 69–70.)

[12] Specifically, the Verified Complaint alleges that unbracketed candidates are: "(a) placed multiple columns away from the bracketed candidates, (b) stacked in the same column as another candidate for the exact same office, and/or (c) placed in the same column as candidates with whom they did not request to bracket and who requested a different ballot slogan."  (*Id.* ¶ 67.)

internally inconsistent approaches to determining the pivot point candidate.  (*Id.* ¶¶ 73, 75–76.)  The Verified Complaint makes several allegations regarding the purported effects of the county line on elections in New Jersey, including positional bias, "arbitrary advantage[s]" that are given to candidates on the county line, and voter confusion.  (*Id.* ¶¶ 77–78, 84–87.)  Several expert reports were submitted with the Verified Complaint in connection with Plaintiffs' claims.  (*Id.* ¶¶ 103–133; *id.* at Exs. B–E.)

The Verified Complaint also alleges the ways each Plaintiff has been or will be affected by the county line.  Kim launched his campaign for the position of U.S. Senator in the 2024 Primary on September 23, 2023.  (*Id.* ¶ 144.)  Within one week after Tammy Murphy's campaign started for the same position, numerous counties in New Jersey endorsed her, including some of the largest Democratic counties in the state and totaling over half of New Jersey's registered Democratic voters.  (*Id.* ¶ 145.)  Although Kim at the time had received some endorsements himself, Murphy's position on the county line over Kim in certain counties disadvantaged Kim in the election and forced him to consider choosing to bracket with other candidates to avoid further disadvantages.  (*Id.* ¶¶ 147–50.)  Previously, Kim was elected three times—in 2018, 2020, and 2022—to represent New Jersey's Third Congressional District.  (*Id.* ¶ 137.)  Although Kim was unopposed in 2018 and 2020, he expressed frustration in 2018 with having to appear on the ballot in a column with Senator Bob Menendez.  (*Id.* ¶¶ 139–40, 142.)  After this suit was filed and the Hearing was conducted, Tammy Murphy announced her withdrawal from the Democratic Primary.  Kim has been offered the county line in 17 counties.  He accepted the line in 16, declining the county line in Camden because the CCDC is adverse to him in this suit.[13]  He will therefore not appear on the county line in Camden.

---

[13] As of the parties' last communication dated March 27, 2024 on the status of endorsements, Cumberland County had not yet offered Mr. Kim its endorsement.  (ECF No. 188.)

Schoengood declared her candidacy on January 21, 2024, for New Jersey's Third Congressional District, which is comprised of the counties of Monmouth, Burlington, and Mercer. (*Id.* ¶¶ 151–52.) She did so after the deadline had passed for her to seek endorsement in Monmouth County by its Democratic Committee, and thus will not be featured on the county line. (*Id.*) She will also not be featured on the county line in Burlington County, which had already by that time selected its endorsed candidate. (*Id.* ¶ 153.) Schoengood does not wish to consider bracketing with any senatorial candidate other than Kim, with whom her ideology aligns, and therefore it is "virtually certain" she will be excluded from preferential ballot draws in the Third Congressional District. (*Id.* ¶¶ 154, 157.) She is thus an unbracketed candidate. (*Id.* ¶ 155.)

Rush declared her candidacy for New Jersey's Second Congressional District, which is comprised of the counties of Atlantic, Cape May, Cumberland, and Salem, and portions of Gloucester and Ocean Counties, both in the 2024 Primary and in the 2022 primary election. (*Id.* ¶ 158.) In 2022, her opponent Tim Alexander was featured on the county line in Cumberland, Cape May, Atlantic, and Ocean Counties. (*Id.* ¶ 159.) In Gloucester County, Rush shared the county line with Alexander even though the vote was only for one person. (*Id.* ¶ 160.) She did not prevail in the election despite obtaining 38.8% of the total vote. (*Id.*) In the 2024 Primary, four counties had endorsed Alexander for the county line by the time the Verified Complaint was filed, putting her at a "substantial electoral disadvantage." (*Id.* ¶ 162.)

Voting for the 2024 Primary will occur on June 4, 2024. (*Id.* ¶ 164.) Plaintiffs filed the instant Motion for Preliminary Injunction seeking declaratory and injunctive relief, including an order enjoining Defendants from using the county line system in the 2024 Primary.

## II.     <u>JURISDICTION</u>

Based on the nature of the constitutional claims asserted, the Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. §§ 1331 and 1343.

## III.    <u>STANDING</u>

Defendants challenge Plaintiffs' standing to raise their claims.  The analysis is relatively straightforward.  Plaintiffs' First Amendment claims allege that the Bracketing System and ballot placement for primaries in New Jersey confer advantages to candidates who win a county line, bracket with other candidates, and/or are placed in an early position on the ballot.  There is at least one county where Kim will not have the county line:  Camden.  There is at least one county where Schoengood will not have the county line:  Monmouth, Burlington, and Mercer.  Finally, there is at least one county where Rush will not have the county line:  Ocean County.  Moreover, even in counties where Plaintiffs will be appearing on a county line and/or bracket, they allege an associational harm of being forced to associate with other candidates not of their choosing.  With respect to Plaintiffs' Elections Clause claims, Plaintiffs' allegations of an impermissible regulation of federal elections are sufficient to show an injury-in-fact given that the Bracketing Structure regulates federal elections, and the three plaintiffs allege injuries related to their candidacy in such elections.  Accordingly, the Court finds that Plaintiffs have alleged sufficient injuries-in-fact.

Moreover, Plaintiffs' injuries derive from the current and future enforcement of the Bracketing Structure.  Thus, Plaintiffs' injuries flow directly from Defendants' actions.  *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 77–78 (1978) (applying a "but for" test to the causation analysis).  It is likely that a declaratory judgment stating that the Bracketing Structure is unconstitutional and an injunction enjoining Defendants from enforcing it would prevent Plaintiffs' injuries. *See Friends of the Earth*, *Inc. v. Laidlaw Env'tal Servs.*, 528 U.S. 167,

185–86 (2000) (reasoning that "for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress"); *New Jersey Civ. Just. Inst. v. Grewal*, Civ. No. 19-17518, 2021 WL 1138144, at *5 (D.N.J. Mar. 25, 2021) (same).

For these reasons, the Court concludes Plaintiffs have standing to raise each of their claims in this matter.

## IV.    <u>FAILURE TO JOIN CERTAIN PARTIES</u>

Defendants (other than Holly Mackey and E. Junior Maldonado) argue that this matter should be dismissed because certain parties were not named despite being required under Federal Rule of Civil Procedure 19.  (*See, e.g.*, ECF No. 63 at 39–41.)  The list of parties that Defendants view as indispensable is substantial: Plaintiffs' opponents in the primary; all other primary candidates; all county Democratic and Republican county committees; county boards of election and superintendents of election; and all local and statewide political organizations.  Defendants argue that these absent parties' constitutional rights "hang in the balance."  (ECF No. 50 at 5.)

Plaintiffs respond that the Court has already rejected similar arguments in *Conforti v. Hanlon*, Civ. No. 20-8267, 2022 WL 1744774 (D.N.J. May 31, 2022), and should do so again here.  In their view, Plaintiffs in this case have gone further than *Conforti* plaintiffs by naming as Interested Parties the other County Clerks (Salem and Sussex) and the Secretary of State; and serving the Verified Complaint and Motion on their opponents in the primary, the Democratic and Republican State Committees, and 39 of the 42 Democratic and Republican county party committees.  (Reply at 1–3; V.C. ¶¶ 48–52.)  None of these parties has sought to intervene other than the Camden County Democratic Committee.

A Rule 19 analysis is a two-step process.  *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007).  Given that a failure to name a required party can be grounds for dismissal for lack of subject-matter jurisdiction, *see Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 117 (1968), a court must first determine whether a party is a "necessary" party that must be joined if "feasible" under Rule 19(a).  *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993).[14]  If the party is necessary, but joinder is not feasible because it would defeat subject-matter jurisdiction, then the Court must determine whether the party is "indispensable" under Rule 19(b).  *Gen. Refractories Co*., 500 F.3d at 312*; accord Janney Montgomery Scott*, 11 F.3d. at 404.  "A holding that joinder is compulsory under Rule 19(a) is a necessary predicate to the district court's discretionary determination under Rule 19(b)."  *Culinary Serv. of Delaware Valley, Inc. v. Borough of Yardley, Pa.*, 385 F. App'x 135, 145 (3d Cir. 2010) (citation omitted).  If the party is found to be indispensable under Rule 19(b), the action therefore cannot go forward.  *See Janney Montgomery Scott*, 11 F.3d. at 404.

Rule 19(a)(1) provides that:

---

[14] The Third Circuit in *Janney Montgomery Scott* discussed the differences between the present and prior Rule 19 wording:

> The present version of Rule 19 does not use the word "necessary." It refers to parties who should be joined if *feasible.*  The term *necessary* in referring to a Rule 19(a) analysis harks back to an earlier version of Rule 19.  It survives in case law at the price of some confusion. *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116 n. 12, 88 S. Ct. 733, 741 n. 12, 19 L. Ed. 2d 936 (1968) ("Where the new version [of the Rule] emphasizes the pragmatic consideration of the effects of the alternatives of proceeding or dismissing, the older version tended to emphasize classification of parties as 'necessary' or 'indispensable.'"); *see also Park v. Didden*, 695 F.2d 626, 627 (D.C. Cir. 1982) (acknowledging 1966 amendments to the Rule as attempt to circumvent "'a jurisprudence of labels'") (citation omitted).

*Id.* at 404 n.4.  However, *Janney Montgomery Scott* favorably used the "necessary" language in its analysis.  Therefore, the Court will employ the same language in its own analysis.

> *Required Party.*  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  "Any party whose absence results in any of the problems identified in either subsection is a party whose joinder is compulsory if feasible." *Janney Montgomery Scott*, 11 F.3d at 405.

Here, the Court finds that joinder of the parties sought by Defendants is feasible because the matter presents a federal question (such that joinder of the additional defendants would not risk depriving the Court of subject matter jurisdiction) and because Plaintiffs have neither argued nor shown that the absent parties would not be subject to formal[15] service of process.  Accordingly, the Court moves on to assessing the alternative prongs of Rule 19(a)(1)(A) and 19(a)(1)(B) to determine whether joinder of the absent parties is "necessary."

"Subsection (a)(1)(A) is limited to considerations of whether the court can grant complete relief to persons already named; the effect on unnamed parties is immaterial." *Culinary Serv. of Delaware Valley*, 385 F. App'x at 145; *accord Field v. Volkswagenwerk AG*, 626 F.2d 293, 301 (3d Cir. 1980), *modified on other grounds* (quoting 3A James W. Moore et al., *Moore's Federal*

---

[15] The Court distinguishes formal service of process from any informal process by which Plaintiffs have served the various absent parties identified in their Verified Complaint.  (V.C. ¶¶ 48–52.)

*Practice* ¶¶ 19.07–1[2], at 19–128 (2d ed. 1979), and counseling that "mere theoretical considerations of disposing of the whole controversy should not be employed" to dismiss an action [on Rule 19(a)(1) grounds] 'where it appears unlikely that absent persons could be adversely affected'").

"Subsection (a)(1)(B), however, requires the court to take into consideration the effect the resolution of the dispute may have on absent parties." *Culinary Serv. of Delaware Valley*, 385 F. App'x at 145 (citation omitted). "Under the first prong of subsection (a)(1)(B), a party must show that some outcome of the federal case would preclude the absent parties with respect to an issue material to the absent parties' rights or duties." *Id*. (citation omitted). "[C]oncerns regarding privity and the possibility of preclusion are too speculative to require joinder. *Id*. (citation omitted). "The second prong of (a)(1)(B) focuses on the obligations of named parties, not absent parties." *Id*. (citations omitted). "Further, an unsubstantiated or speculative risk will not satisfy Rule 19(a) criteria—the possibility of exposure to multiple or inconsistent obligations must be real." *Id*. (citation omitted).

Subsection (a)(1)(A) does not apply to absent parties. Therefore, the Court will consider whether the absent parties must be joined under subsection (a)(1)(B). First, the Court finds that the absent County Boards of Elections and Superintendents of Elections are not necessary parties under subsection (a)(1)(B)(i). The Defendant County Clerks argue that ordering the County Clerks to change the ballot structure will not afford complete relief because "the putative new ballot structure Plaintiffs seek to have the Court impose would need to be configured to voting machines, which are outside of the control and purview of the County Clerks." (ECF No. 63 at 39–40.) Rather, the Defendant County Clerks contend, each County's Board of Elections or Superintendent of Elections has custody over voting machines. (*See id.*) (citing N.J. Stat. § 19:48-6)). Therefore,

the County Clerks argue that at least joinder of those absent parties is necessary to afford complete relief.  (*See id.*)

The Court disagrees that custody over voting machines is relevant to the issue at hand.  The issue here is ballot design, over which Defendant County Clerks do, in fact, have custody and control.  (*See* V.C. ¶¶ 28–47.)

Furthermore, the Court finds the absent County Boards of Elections and Superintendents of Elections are not necessary parties under subsection (a)(1)(B)(ii).  This subsection focuses on the effect on obligations of named parties, and there is no real risk that deciding the case without joining the absent parties would expose any of the named parties to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations . . . ."  Fed. R. Civ. P. 19(a)(1)(B)(ii).  For instance, a county clerk's duties regarding voting machines are clearly delineated in N.J. Stat. §19:48-6 and other provisions of New Jersey law (*see* V.C. ¶¶ 28–47), and any concerns on their behalf are purely speculative.  The Court therefore finds that although it is feasible to join the County Boards of Elections and Superintendents of Elections, it is not necessary to join these absent parties in this action.  For this reason, the Court need not decide whether the County Boards of Elections and Superintendents of Elections are indispensable parties under Rule 19(b).

The Court next considers whether the other absent parties Defendants mention—other primary candidates; all county Democratic and Republican county committees; Plaintiffs' opponents in the primary; and all local and statewide political organizations—are necessary parties under subsection (a)(1)(B).  For the reasons stated below, the Court finds that these are not necessary parties.

Defendants argue that these are necessary parties under subsection (a)(1)(B)(i) because "the Bracketing System at least serves a legitimate interest of political candidates to associate with

one another and for political parties to endorse candidates . . . ."  (ECF No. 63 at 40.)  Defendants note that the Supreme Court held these constitutional interests to be compelling in *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989) and that upending the bracketing system would impair the interests of the absent parties.  (ECF No. 63 at 40.)

However, Defendants misplace their reliance on *Eu*.  That case concerned challenges to sections of the California Election Code that purported to, *inter alia*, ban primary endorsements by political parties and dictate the organization and composition of those parties.  *See Eu, 489 U.S.* at 216.  The U.S. Supreme Court in *Eu* opined:

> Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association.  It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments.  Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to "'identify the people who constitute the association,'" and to select a "standard bearer who best represents the party's ideologies and preferences."  Depriving a political party of the power to endorse suffocates this right.

*Id.* at 224 (citations omitted).

Defendants have not adequately explained how a change to the county line balloting system would burden the interests of the absent political committees, parties, and organizations.  Unlike in *Eu*, this is not a case of an outright ban on primary endorsements by political parties, nor is it a case of a state dictating the internal organization of a political party or political organization.  Absent the Bracketing Structure, political parties and political organizations would still maintain the freedom to endorse their preferred candidates.  Merely presenting the information in a different format, the Office Block Structure, will not detract from the political parties' and political organizations' freedom of speech and association.  In fact, Plaintiffs made clear in their Verified Complaint that they do not seek to inhibit political parties' ability to endorse candidates:

> Plaintiffs do not seek to disrupt the conduct of parties in their right
> to endorse the standard-bearer of their choice, or their right to
> contribute and pool resources to support that candidate in the
> primary or general election.  Nor do Plaintiffs seek to disrupt the
> ability of parties to signify their endorsements or slogans on the
> ballot alongside the candidates of their choice.

(V.C. ¶ 17.)  Clearly, the Defendants' stated interest does not rise to the level of the interests

identified in *Eu*.  Consequently, the Court finds that these parties are not necessary under

subsection (a)(1)(B)(i).  Nor are they necessary under subsection (a)(1)(B)(ii).  Any concerns about

the effect of the balloting system on the existing parties are purely speculative, as there is no real

risk that deciding the case without joining these absent parties would adversely affect the

obligations of the named parties.  In fact, the allegations in the Verified Complaint (as well as

Plaintiffs' supporting evidence discussed further, infra) suggest that maintaining the *current*

Bracketing Structure adversely affects the named parties by creating "arbitrary advantage[s]" for

candidates on the county line and leading to voter confusion.  (V.C. ¶¶ 77–78, 84–87.)  For the

above reasons, the Court finds that the absent parties are not required to be joined under Rule 19(a).

Therefore, the Court need not decide whether they are indispensable parties under Rule 19(b).[16]

---

[16] Even if Rule 19(b) did apply, the Court would find the absent parties were not indispensable parties.  Under Rule 19(b), the Court would have to consider, in relevant part: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;" or "(2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures[.]"  Fed. R. Civ. P. 19(b).  Regarding (1), as discussed, Defendants have not adequately explained how failing to join the absent parties would prejudice the absent parties or the existing parties.  Regarding (2), Defendants argue that there is no way to shape the relief Plaintiffs seek—requiring the County Clerks to use an "office-block ballot"—that would not require joining the absent county officials.  (*See* ECF No. 63 at 41.)  However, this argument is undermined by the fact that Salem County and Sussex County both use the Office Block Structure instead of the Bracketing Structure.  (*See* V.C. ¶ 55.)  Moreover, Plaintiffs' expert, Mr. Ryan Macias, testified at the Hearing that all of New Jersey's balloting machines are capable of laying out both paper and electronic ballots in the Office Block Structure instead of the Bracketing Structure.  (*See* Hearing Tr. at 93:21–96:19).  Defendants' response, via their expert David Passante's testimony, that their county officials and printing staff are unprepared to implement a new balloting system, does not entirely rebut Macias's point and therefore does not constitute a compelling reason to join additional parties.  (*See* Hearing Tr. 257:16–259:17.)

## V.    THE MARCH 18, 2024 EVIDENTIARY HEARING

### A.    DEFENDANTS' MOTIONS IN LIMINE

The Court first addresses seven motions in limine filed on the day of the Hearing by Defendants Durkin, Ireland-Imhof, and Rajoppi ("Moving Defendants").  The motions sought to prevent Plaintiffs' expert witnesses from testifying and to preclude the Court's consideration of their expert reports.  (ECF Nos. 152–158.)  Plaintiffs filed an omnibus brief opposing all seven motions.  ("MIL Opp'n Br.", ECF No. 177.)  This unusual posture warrants some explanation.

Defendants first indicated their intention to file "pre-hearing motions" of an unspecified type as part of a Joint Proposed Hearing Agenda filed by the parties three days before the Hearing:

> *Defendants' Position:*  Any pre-hearing motions shall be filed on or before March 15, 2024. Defendants believe that motions related to evidence are appropriate in advance of an evidentiary hearing and intend on filing same today.  Defendants have offered to Plaintiffs that responses to any such motions may be filed by March 17, 2024.

(ECF No. 140 at 5.)  Plaintiffs responded that they did not believe pre-hearing motions were appropriate given the nature of the Hearing.  (*Id*.)  On the basis of the information provided by the parties, the Court decided the issue by instructing counsel "to timely raise any objections during the hearing rather than file pre-hearing motions."  (ECF No. 141 at 5.)

At the start of the Hearing, however, Moving Defendants' intentions became clear when they raised their dispute as to the qualifications of Plaintiffs' experts.  (*See* Hearing Tr. 24:13–25:25.)  Given that the Hearing had already commenced and there was no jury involved, the Court exercised its discretion to permit the experts to testify as planned, and reserved its decision as to the merits of the motions in limine.  (*Id*. at 26:1–14.)  *See UGI Sunbury LLC v. A Permanent Easement for 1.775 Acres*, 949 F.3d 825, 833 (3d Cir. 2020).  Accordingly, the Court addresses

the motions by assessing, after the fact, the experts' testimony and reports.  For the reasons set

forth below, the Motions in Limine will be **DENIED**.

        1.    <u>MOTION No. 1: SEEKING TO EXCLUDE TESTIMONY OF ALL PLAINTIFFS' EXPERTS BASED ON FAILURE TO COMPLY WITH DISCOVERY REQUIREMENT</u>

Moving Defendants' First Motion in Limine is premised on discovery and cries unfair

delay.  They cite Federal Rule of Civil Procedure 26 for the principle that expert disclosures must

be made "at least 90 days before the date set for trial or for the case to be ready for trial[.]"  ("First

MIL", ECF No. 152-2 at 5) (quoting Fed. R. Civ. P. 26(a)(2)(D)(i)).  Moving Defendants argue

that Plaintiffs contacted their experts more than two months before disclosing their opinions in this

suit and Plaintiffs obtained one complete expert report nearly two months before filing suit.  (*Id.*

at 6.)  According to Moving Defendants, Plaintiffs' decision to pursue an "eleventh-hour filing"

with regard to the primary election deprived all Defendants of the opportunity to depose Plaintiffs'

experts or prepare rebuttal reports.  (*Id.*)

Plaintiffs broadly argue that all seven of Moving Defendants' motions in limine are merely

attempts to "relitigate their claims of 'delay.'"  (MIL Opp'n Br. at 1.)  Plaintiffs also argue that

Moving Defendants "confuse *admissibility* of an expert's testimony with the question of how much

*weight* it should be given" when addressing the merits of Plaintiffs' Motion.  (*Id.*) (emphasis in

original).  Finally, Plaintiffs contend that Moving Defendants misunderstand the concept of

"relevance" under the Federal Rules of Evidence as well as "how time can be computed" in the

context of an expedited hearing under the Federal Rules of Civil Procedure.  (*Id.*) (emphasis in

original).  As it relates to the First Motion in Limine, Plaintiffs detail the timeline, content, and

speed of the expert reports authored by Dr. Wang, Dr. Pasek, Dr. Rubin, and Dr. Appel.  (*Id.* at 5–

9.)  Plaintiffs take the position that they brought this emergent application in a timely manner, with

the proper evidence to support such application consistent with Article III standing requirements.

(*Id.*)  Plaintiffs deny the existence of any "grand scheme to line the whole case up in advance, press the pause button, and press play at the last second."  (*Id.*)

First, Moving Defendants provide no authority to support the notion that the disclosure requirements of Rule 26(a)(2)(D)(i) apply to a hearing on a motion for preliminary injunction. (*See generally* First MIL.)  Indeed, as accurately quoted by Moving Defendants' brief, the language of this part of the Rule contemplates a "trial" rather than a preliminary hearing.  (*Id.* at 5–6; *see also* MIL Opp'n Br. at 10.)  Setting aside the language of the Rule, Plaintiffs and the Court agree: reason dictates that it would defeat the purpose of a litigant seeking emergent relief if that litigant were required to wait 91 days for a hearing so that it could meet the strictures of Rule 26(a)(2)(D)(i).  (MIL Opp'n Br. at 10.)  Here, Plaintiffs provided their expert reports the very same day they filed suit.  Plaintiffs explain how the experts "worked concurrently and not sequentially" and the four expert reports "could not have come any earlier than they did."  (*Id.* at 8–9.)  Their disclosures could not reasonably be expected to have been provided to Moving Defendants any earlier.

Next, as Plaintiffs note, Moving Defendants' actual challenge is to when this suit was filed. That issue is properly addressed on the merits of Plaintiffs' emergent application rather than on a motion in limine.  As a final alternative, even if Plaintiffs' disclosures could be deemed a technical violation under Rule 26(a), the Court finds that Plaintiffs' technical failure was nevertheless "substantially justified" within the meaning of Rule 37(c)(1) based on the circumstances of this case.  For these reasons, the Court will **DENY** Moving Defendants' First Motion in Limine (ECF No. 152).

2.      MOTION Nos. 2–5: SEEKING TO EXCLUDE TESTIMONY OF RUBIN, APPEL, WANG, AND PASEK BASED ON THE FEDERAL RULES OF EVIDENCE

Four of the Motions in Limine—the Second through Fifth Motions in Limine—raise challenges to the experts' testimony and reports based on Federal Rule of Evidence 702 alone or in combination with Rule 402.  (ECF Nos. 153–156.)  The Court can dispose of these Motions quickly.  The Federal Rules of Evidence are "relaxed" in the context of a hearing on a motion for preliminary injunction.  (*See* Hearing Tr. 89:18–19) (Court reminding counsel of relaxed application of evidence rules); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (noting that because preliminary injunctions have a "limited purpose," they are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits").  For reasons unclear, the moving briefs supporting these motions in limine do not acknowledge, much less mention, that fact.  Plaintiffs however, repeatedly emphasize that Moving Defendants' arguments improperly challenge the admissibility of the expert testimony.[17]  (*See* MIL Opp'n Br. at 1, 12, 17.)  At best, Plaintiffs claim, Moving Defendants' challenges relate to the weight the Court should give the expert reports and testimony.  (*See id.* at 12, 17.)

Given the expedited schedule leading up to the Hearing driven by the emergent nature of the pending application, coupled with the relaxed standards generally utilized during a preliminary injunction hearing, the Court declines to exclude the expert testimony as inadmissible.  With respect to emergent applications, courts routinely permit expert testimony at preliminary injunction hearings before addressing any challenges to the expert testimony.  *See, e.g.*, *In re Ohio*

---

[17] For the avoidance of doubt, Plaintiffs firmly oppose Moving Defendants' admissibility challenges and Plaintiffs' position is that "each and every expert proffered by Plaintiffs qualifies as an expert under Rule 702."  (MIL Opp'n Br. at 4.)

*Execution Protocol Litig.*, Civ. No. 11-1016, 2018 WL 6382108, at *2 (S.D. Ohio Dec. 6, 2018) ("However in this case it is simply not possible to put the process on hold while the *Daubert* inquiry is separately conducted, given the imminence of the hearing . . . ."); *F.T.C. v. BF Labs Inc.*, Civ. No. 14-815, 2014 WL 7238080, at *2 n.3 (W.D. Mo. Dec. 12, 2014) (explaining that defendants moved to exclude expert testimony but the court took the motions "under advisement" and permitted the expert to testify at the hearing). Notably, at this stage of the proceedings, rather than evaluate the admissibility of the expert testimony, the more appropriate inquiry is to determine whether the expert reports and testimony "present the indicia of reliability common to expert testimony." *Parks v. City of Charlotte*, Civ. No. 17-670, 2018 WL 4643193, at *4 (W.D.N.C. Sept. 27, 2018).

Here, the Court finds that, for the limited purposes of resolving the pending preliminary injunction application, Plaintiffs' expert reports and their testimony contain the indicia of reliability sought under Rule 702 and *Daubert*. The reports and testimony seek to explain, *inter alia*, the "feasibility of using New Jersey's existing equipment and software to present office-block ballots to primary voters," the impact the county line had on candidates who were awarded it, and how ballot design affects voter behavior. (*See generally* MIL Opp'n Br.) Notably, the experts rely upon their professional and educational experience when providing the various quantitative and statistical analysis within their respective reports. Further, the Court finds that the various challenges raised in the Second through Fifth Motions in Limine attacking the reliability, relevance, and methodological flaws of the reports and testimony more properly go to the weight the Court affords the testimony and not the admissibility. *See BF Labs Inc.*, 2014 WL 7238080, at *2 n.3. For these reasons, the Court will **DENY** Moving Defendants' Second through Fifth Motions in Limine (ECF Nos. 153–156).

3.    MOTIONS Nos. 6–7: SEEKING TO EXCLUDE THE TESTIMONY OF PASEK AND MACIAS BASED ON THE FEDERAL RULES OF CIVIL PROCEDURE

The Sixth and Seventh Motions in Limine raise challenges to Dr. Pasek and Mr. Macias's testimony and reports based on Rule 26(a)(2)(D)(ii).[18]  ("Sixth MIL", ECF No. 157; "Seventh MIL", ECF No. 158.)  Moving Defendants rely on Rule 26(a)(2)(D)(ii) for the proposition that an expert's reply is prohibited unless it is "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)."  (Sixth MIL at 1) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)).  Here, Moving Defendants have not procured their own experts.  (*Id.*)  Accordingly, they argue that Dr. Pasek's Expert Reply, attached as Exhibit A to Plaintiffs' Reply ("Expert Reply", ECF No. 95 at 48–57), and Mr. Macias' expert report and testimony should be excluded because they do "not purport to rebut any expert report submitted by any of the Defendants[.]"  (Sixth MIL at 1.)

First, the Court finds that Moving Defendants' reliance on Rule 26(a)(2)(D)(ii) to exclude Dr. Pasek's Expert Reply and testimony is inapposite.  Rule 26(a)(2)(D)(ii) governs expert *rebuttal* reports, not expert *reply* reports.  *See Haskins v. First Am. Title Ins. Co.*, Civ. No. 10-5044, 2013 WL 5410531, at *2 (D.N.J. Sept. 26, 2013) (citing *Crowley v. Chait*, 332 F. Supp. 2d 530, 550–51 (D.N.J. 2004)); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 591 (N.D. Ill. 2015) ("Rule 26 does not address reply expert reports.")  Unlike Mr. Macias's report, which Plaintiffs characterized as a "rebuttal", (ECF No. 115), Dr. Pasek's Expert Reply was submitted as part of Plaintiffs' Reply Brief.  Therefore, the Expert Reply is a reply report, not a rebuttal report.

---

[18] Defendants also argue that Mr. Macias's report should be excluded because it was filed and served on March 13, 2024, a day after the Court's deadline for Plaintiffs to reply to Defendants' opposition of March 12, 2024.  (Seventh MIL at 1; ECF No. 34.)  Notably, Defendants do not argue that they suffered any impact or prejudice due to this one-day delay.  As such, the Court rejects Defendants' challenge to Mr. Macias's report on this basis.

Even so, Moving Defendants' challenge to the expert testimony is narrow because they do not challenge the contents of the testimony.  Instead, Moving Defendants argue that Dr. Pasek and Mr. Macias do not respond to any expert testimony procured by Moving Defendants.  (Sixth MIL at 1; Seventh MIL at 2.)  Though Moving Defendants did not procure experts, Plaintiffs argue that the expert reports responded to Defense certifications that "contained a fair amount of 'technical discussion.'"  (*Id.* at 22) (quoting Suppl. Certification of Ryan Macias, ECF No. 171 at ¶ 5).  Plaintiffs emphasize Dr. Pasek and Mr. Macias were responding to briefs and certifications containing "arguments that were at least arguably in the realm of experts, not fact witnesses."  (MIL Opp'n Br. at 20–21.)  And as Plaintiffs reiterate, rules of procedure are relaxed in the context of preliminary injunction hearings.  (MIL Opp'n Br. at 20, 22.)  Moving Defendants recognize that the emergent nature of this application might have impacted their opportunity to procure experts.  (Sixth MIL at 1.)  Yet Moving Defendants fail to appreciate that Plaintiffs' experts are rebutting arguments raised by Moving Defendants in their various opposition briefs and certifications in the absence of, or even more accurately, in lieu of, expert testimony.  Considering the circumstances of this case and the emergent nature of the application, the Court rejects Moving Defendants' hyper-technical challenge to the Expert Reply and testimony of Dr. Pasek and the expert report and testimony of Mr. Macias, especially in light of these experts' responses to evidence put forth by Defendants. For these reasons, the Court will **DENY** Moving Defendants' Sixth and Seventh Motions in Limine (ECF Nos. 157–158).

### B.   HEARING CONDUCT AND TESTIMONY

On February 29, three days after the Verified Complaint and emergent application were filed, the Court conducted a case management teleconference with counsel for the parties.  The Court set March 18 as the date for a one-day hearing and emphasized that it sought an *evidentiary* hearing rather than mere oral argument from counsel.  The primary purpose of the hearing was to

provide Defendants with an opportunity to challenge Plaintiffs' proofs that were previously provided to the Court through documentary evidence as well as an opportunity for Defendants to introduce their own evidence. The Court instructed counsel to meet and confer and submit a proposed agenda for the one-day hearing by March 15 that included identification of witnesses and a proposed schedule.  (ECF No. 34.)  The parties timely submitted a proposed schedule—which although it presented some disputes, was largely agreed upon—but it identified an improbable number of witnesses for a one-day hearing: fifteen.  (ECF No. 140.)  The Court resolved the parties' disputes and, balancing the appropriate time allotted for the hearing against the unreasonable proposed scheduled submitted by the parties, the Court took what steps it could to manage the hearing in advance.   The Court expressly noted that it "encourages the parties to streamline witness testimony as much as possible" to include limiting direct examination of certain expert witnesses at times to simply adopting the accompanying expert report; it limited opening arguments; it reserved on whether closing arguments could be presented and then ultimately denied this request; it instructed the parties to call each witness only once; it allowed for and permitted witnesses to be called out of order at Defendants' request; and it encouraged Plaintiffs to prepare any Plaintiff-candidates who were testifying to also serve as their own Rule 30(b)(6) designee-witnesses. (ECF No. 141.)

The marathon hearing that ensued lasted nearly 9 hours.  It was not a model of efficiency by either side, a problem the Court noted to both sides during the proceedings. On several occasions throughout the hearing, the Court reminded the parties to manage their time wisely and make adjustments where needed to prioritize their presentations as it became obvious that the parties would not be able to fully comply with their proposed schedule in the allotted time. However, the Court, in an effort to ensure Defendants had sufficient time to respond to Plaintiffs'

proofs, extended the hearing beyond the expected time period.  Ultimately, seven of the fifteen witnesses testified.  The Court ultimately concluded the hearing because the courthouse was closing for the day and if the hearing continued further there would be insufficient security on staff to safely escort attendees from the building.  Defendants final act was to request to nevertheless continue to present closing arguments which was denied.  Overall, the Court provided Defendants with ample time to call and cross examine selected witnesses.  It should be noted that neither party chose to call the plaintiff candidates to testify other than Andy Kim.  Whether this was a tactical decision on the part of the parties or an error is unknown to the Court.  What is known and wholly supported by the record is that Defendants could have called and examined all three plaintiff candidates as a priority during the hearing whether or not Plaintiffs elected to testify themselves in support of their motion for a preliminary injunction, especially in light of the Verified Complaint that was filed by them.  Nevertheless, for reasons of their own choosing, Defendants only focused on Mr. Kim.

## 1.   Witness Testimony: Ryan Macias (Hearing Tr. 71–158)

Ryan Macias testified by video at the Hearing.  Mr. Macias has worked for nearly 20 years in election infrastructure technology and security, as well as election administration and election policies.  (Hearing Tr. 73:12–14).  He was the acting director of voting systems and testing and certification program under the U.S. Election Assistance Commission, the agency designed by Congress to conduct testing and certification for voting systems in federal elections.  (*Id*. 73:17– 74:4.)  He now owns a private consulting company that provides guidance to domestic and international election management bodies.  (*Id*. 74:5–11).  Having reviewed Mr. Macias' education and experience, the Court finds that he is qualified to testify as an expert on election technology.  Mr. Macias described the voting systems in place in New Jersey and the election management software used design ballots.  (*Id*. 75:14–118:14.)  He testified that New Jersey's vote-by-mail and

in-person electronic voting systems have the ability to layout a ballot in an office-block style. (*Id.* 118:11–14.) He noted that the office-block ballot design was already used in the same or similar voting systems across the county. He further opined that the office-block style was actually less complicated and therefore less time consuming to lay out. On the whole, assessing Mr. Macias' demeanor, manner in which he testified, and the substance of his testimony together with other corroborative evidence, the Court found Mr. Macias's testimony credible and assigns it substantial weight.

### 2.   Witness Testimony: Andy Kim  (Hearing Tr. 164–245)

Congressman Andy Kim testified in person at the hearing. Mr. Kim held a variety of roles within the executive branch of the federal government until he was elected as U.S. Congressman for New Jersey's Third District in 2018. He was re-elected to the same office in 2020 and 2022. Mr. Kim testified as to the reasons he filed this suit: his frustration with the current primary ballots and the effects they have on him individually and on his campaign. He also explained the timing as to when it was brought: his attempts to approach the county clerks on the ballot issue without a response, then trying to balance assembling the evidence he needed to bring strong case against bringing suit in a timely manner. He testified as to the effect that the county line has on candidates and their campaigns. (*see, .e.g, Id*. 168:16–170:2.) Based upon Mr. Kim's demeanor, manner in which he testified, and substance of his testimony in conjunction with other corroborative evidence, the Court found Mr. Kim's testimony to be credible and assigns it substantial weight.

### 3.   Witness Testimony: David Passante (Hearing Tr. 250–280)

David Passante testified in person at the hearing. He is co-owner of a printing service that does a lot of government work, and specializes in the printing of ballots. His company has been printing ballots in New Jersey since 1983. It has been printing New Jersey county ballots since 1994. It currently prints ballots for 11 counties in New Jersey. Ten of those use bracketing. Mr.

Passante opined that if the ballot layout for the primaries were to change—due to the deadlines his staffing, training required—the result within his company would be "chaos." (Hearing Tr. 257:12–14.) He expressed doubt that it could be done in time. On cross-examination, Plaintiffs challenged Mr. Passante on bias based on his company's relationship with the county clerks and its $6 million per year revenue earned from ballot printing. They also showed him office-block ballots prepared by his company that were prepared using the ES&S system. The Court concluded by questioning Mr. Passante whether, if requested by a county clerk, his company could find a way to print office-block ballots. Tellingly, Mr. Passante responded that his company would find a way. (Hearing Tr. 282:4–283:5.) Based upon his demeanor, manner in which he testified, and conflicting and contradictory testimony, the Court finds that Mr. Passante's testimony with respect to Defendants' professed inability to deliver office-block ballots for the 2024 Primary was of low credibility, and the Court assigns it minimal weight.

#### 4.    Witness Testimony: Andrew Wilson Appel  (Hearing Tr. 284–302)

Dr. Appel testified in person at the hearing. Having reviewed Dr. Appel's education and experience, the Court finds that he is qualified to testify as an expert on election technology. Plaintiffs adopted his expert report for the purposes of his direct testimony (ECF No. 1-5). His report surveyed the voting machines used in New Jersey and their related election management software. He opined that the work required to prepare office-block ballots using the current systems "will not be significantly different from the work or effort needed to prepare row-and-column ballots." (ECF No. 1-5 at 5.) On cross examination, Defendants challenged the bases for Dr. Appel's opinion with respect to particular voting systems (including the ExpressVote) and election management software. On re-direct, Plaintiffs elicited testimony that emphasized Dr. Appel's overall assessment and a fundamental premise underlying his opinion: that voting machines from manufacturers come with software that accommodates many ballot designs and

that no software or hardware updates would be required to perform office-block voting.  The Court

found Dr. Appel's testimony credible and assigns it substantial weight based upon his demeanor,

manner in which he testified, and substance of his testimony which was corroborated by other

evidence.

     5.    <u>Witness Testimony: Julia Sass Rubin  (Hearing Tr. 309–333)</u>

Dr. Rubin testified in person at the hearing.  Plaintiffs adopted her expert report for the

purposes of her direct testimony.  The Court has reviewed Dr. Rubin's education and experience

(Rubin Report at 2, and Appendix B thereto), and it satisfied that she is qualified to serve as an

expert in the area of public policy.  The relevant substance of her testimony and her expert report

and Defendants' cross-examination is discussed later in this Opinion.  Based upon Dr. Rubin's

demeanor, manner in which she testified, and substance of her testimony which was corroborated

by other evidence presented, the Court found her testimony credible and assigns it substantial

weight.

     6.    <u>Witness Testimony: Christine Hanlon (Hearing Tr. 335–369)</u>

Christine Hanlon testified in person at the hearing.  She was elected Monmouth County

Clerk in 2015 and has held the office since then.  She described the responsibilities of her office,

as well as the magnitude of the effort assorted with voting in her county.  With respect to ballot

changes, she expressed her concern that "there is a design process that would need to be undertaken

to determine where things go, whether the equipment and software that we have could

accommodate changes to the ballots that we have right now."  (Hearing Tr. 358: 5–10.)  Her office

"would have to undertake an analysis of how these races would be laid out on a ballot" and new

ballots "would take us some time to figure out where things would go."  (*Id*. 359:6–20.)  In sum,

she related that based on communications with her ballot vendor and because her staff is untrained

on office-block ballot format, she has "grave concern" about their ability to get this done "in the

very short time frame" left.  (Hearing Tr. 362:17–363:6.)  Although the Court does not express concern regarding Ms. Hanlon's demeanor, the Court found her testimony only moderately credible and assigns it medium weight for a number of reasons.  First, for portions of her testimony she was doing little more than recounting what she had been told by third parties.  Second, and more importantly, her assertions that she did not know how or if Monmouth County could administer office-block voting and her expressions of concern that they might not be able to, fell short of fully rebutting the direct testimony from Mr. Macias and Dr. Appel.  Put another way, saying she was not sure it could be done does not necessarily fully respond to Plaintiffs' expert testimony that it can be done.  Ms. Hanlon's testimony appeared to be based more on speculation than fact.

7.   <u>Witness Testimony: Noah Dion  (Hearing Tr. 374–375)</u>

Noah Dion testified in person at the hearing.  He has been Andy Kim's campaign manager since October 13, 2023.  Defendants called Mr. Dion to testify as to the timing of Mr. Kim's decision to bring this suit.  Mr. Dion's testimony was compatible with Mr. Kim's testimony in this regard and corroborated a similar timeline.  Defendants specifically questioned Mr. Dion on when the campaign communicated with litigation counsel and experts and when they were retained.  The Court, upon assessing Mr. Dion's demeanor, manner in which he testified, and substance of his testimony together with corroborative evidence from others, finds his testimony credible and assigns it substantial weight.

## VI.   <u>LEGAL STANDARD</u>

To determine whether a preliminary injunction should issue, a court must consider "(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest*." Amalgamated*

*Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty*, 39 F.4th 95, 102–103 (3d Cir. 2022) (quoting *Swartzwelder v. McNeilly*, 297 F.3d 228, 234. (3d Cir. 2002)).

The first two factors are "gateway factors" that the moving party must establish.  *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020).  If they are established, the "court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* (internal quotation marks omitted).

"[W]hen the preliminary injunction is directed not merely at preserving the status quo but . . . at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) (citing *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976)). "[A] mandatory injunction is an 'extraordinary remedy to be employed only in the most unusual case.' " *Trinity Indus. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (citing *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972)).  For a court to grant mandatory injunctive relief, "the moving party's 'right to relief must be indisputably clear.'" *Id.* (quoting *Communist Party of Indiana*, 409 U.S. at 1235).

## VII.   DISCUSSION

### A.   *PURCELL*

Unsurprisingly, Defendants are eager for the Court to view this suit as a last-minute election case, and exercise caution against upsetting the status quo as directed by the U.S. Supreme Court in *Purcell v. Gonzalez*, 549 U.S. 1 (2006).  The problem with Defendants' position is that this case is not last-minute.  It was filed 100 days before the primary election on June 4th, and well over a month before the April 5th deadline for preparing official primary election ballots for printing.  On this basis alone, this case is readily distinguishable from the line of *Purcell* cases invoked by Defendants.  *See, e.g., Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396 (E.D.

Pa. 2016) (suit filed mere 18 days before election).  The Court is satisfied that it has made every effort to move quickly and efficiently through the briefing and hearing process while protecting the parties' rights to present their positions.[19]  The Court is likewise satisfied that it has exhausted its own resources to render a comprehensive decision with substance that is also timely in relation to the 2024 Primary, one that can and should be enforced without disrupting the upcoming election.

### B.    LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1.    FIRST AMENDMENT

The parties largely agree that the *Anderson-Burdick* framework applies to Plaintiffs' First Amendment Claims.  Indeed, because New Jersey's bracketing system regulates the voting ballots themselves as well as the "the mechanics of the electoral process," the Court finds that the Third Circuit requires the use of *Anderson-Burdick* in this instance.  *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 142–43 (3d Cir. 2022) ("*Mazo II*") *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023) (location/timing of regulation and nature/character of regulation decide applicability of *Anderson-Burdick*).

The parties disagree, however, as to the appropriate standard of review under *Anderson-Burdick*.  Plaintiffs argue for strict scrutiny because they believe the burdens on their rights are severe. (Moving Br. at 22–32).  Defendants argue for rational basis review because they believe the alleged burdens on Plaintiffs' rights are minimal.  The Third Circuit has distilled how to determine the appropriate level of scrutiny under *Anderson-Burdick*:

> [t]he *Anderson-Burdick* test "requires the reviewing court to (1) determine the "character and magnitude" of the burden that the challenged law imposes on constitutional rights, and (2) apply the level of scrutiny corresponding to that burden.  *Burdick*, 504 U.S. at

---

[19] Application of the *Purcell* principle is also not so automatic as Defendants hope.  As recently as March 28, 2024, one Third Circuit judge observed that the *Purcell* concerns did not apply to challenges to mail-in ballot requirements in Pennsylvania.  *See Pa. State Conference of NAACP Branches v. Sec. Commonwealth of Pa.*, App. No. 23-3166 at 9 n.5 (3d Cir. 2024) (Shwartz, C.J., dissenting).

434, 112 S.Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564). If the burden is "severe," the court must apply exacting scrutiny and decide if the law is "narrowly tailored and advance[s] a compelling state interest." *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364. But if the law imposes only "reasonable, nondiscriminatory restrictions," *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564, the court may use *Anderson-Burdick's* sliding scale approach under which a State need only show that its "legitimate interests . . . are sufficient to outweigh the limited burden," *Burdick*, 504 U.S. at 440, 112 S.Ct. 2059.

*Mazo II*, 54 F.4th at 137.

Here, Plaintiffs present argument and evidence that New Jersey's system of bracketing and ballot placement violates their First Amendment rights.

### a)      Burdens on Associational Rights

All Plaintiffs assert that their right to associate (and not associate) with other candidates is burdened by the bracketing system no matter their circumstance with respect to the county line. Notably, they say that if they win the endorsement of a county and appear on the county line, they are forced to appear alongside (and thereby associate with) candidates for other offices with whom they don't wish to associate. Plaintiffs cite various reasons they often would prefer not to associate with other candidates on the county line or a created bracket: differences in policy, differences in personal views, line-mates who are supporting a competing candidate, and not even knowing the other line members. (V.C. ¶¶ 140 (Kim), 154 (Schoengood), 163 (Rush); Hearing Tr. 170:20–171:8 (Kim).) In Plaintiffs' view, if they do not pursue a position on the county line or other bracket, they suffer, whether it is viewed as ceding a significant advantage to their opponents or as being punished for asserting their own right to not associate.

### b)      Burdens of Ballot Placement & the "Weight of the Line"

For the reasons noted above, candidates who do not win a position on the county line and do not bracket are excluded from even the opportunity to be placed in or near the first position on

the ballot.[20]  Plaintiffs proffered expert witnesses to show that this imposes real-world burdens on candidates' prospects.  As to ballot positioning, Plaintiffs offer Dr. Pasek's expert report.[21]  His report reviews and summarizes more than four dozen studies in the literature to support the conclusion that there is a pervasive primacy effect that favors candidates in elections that appear in an early position on a ballot.  (Pasek Report ¶¶ 27, 38–43.)  Dr. Pasek also assesses four competing studies that called into question that primacy effect.  (*Id.* ¶¶ 44–47.)  For various reasons the Court finds are sound, he concludes that those competing studies are less credible.  (*Id.*)  On the whole, the Court finds that Dr. Pasek's report is well-reasoned and suffices to establish, for this preliminary stage of this case, that candidates placed in an early position on a ballot receive a distinct advantage.[22]

As to the effect of the county line on voting ("the weight of the line") apart from its potential for leading to early ballot placement, Plaintiffs offer Dr. Pasek and Dr. Rubin.  Dr. Pasek's report describes a voting experiment he designed and conducted involving 1,393 volunteer-voters in two Congressional districts in New Jersey.  (Pasek Report ¶¶ 114–157.)  He draws several conclusions from his experiment, including that his voters selected candidates endorsed by a county 11.6% more frequently when the endorsed candidates appeared together on a county line than if they appeared separately in office-block format.  (*Id.* ¶ 156.)  Pasek finds this

---

[20] Here, there is arguably some differences in Plaintiffs' respective circumstances.  As already noted, Kim is running for U.S. Senate, which is expected to be considered a pivot office, such that he would not appear far from a first ballot position.  He continues to maintain that, given a choice, he would prefer to simply run for office on his own merit without associating with other candidates by appearing on any county line.  Schoengood and Rush, running for U.S. Congress, clearly remain subject to the ills of ballot placement and the weight of the line.

[21] Dr. Pasek's report was filed with the Verified Complaint as Exhibit B (ECF No. 1-2) and separately admitted into evidence at the Hearing as P-9.  Neither of the parties called him to testify at the Hearing.

[22] On this issue, Plaintiffs also offered the opinion of Dr. Wang who reached a similar conclusion based on the way human cognition works when faced with voting choices on a ballot and a statistical treatment of voting data.

difference "statistically significant" and concludes that it has "less than a one-in-a-million probability of appearing by chance."[23]  (*Id*.)

Dr. Rubin was called to testify at the Hearing and, for the purposes of her direct testimony, Plaintiffs adopted her report.  (Hearing Tr. 312:8–11; Exhibit C to VC, ECF No. 1-3.)  Dr. Rubin focused her analyses on historical data.  Her findings include the observation that in 35 of the 37 primary contests that took place in New Jersey between 2012 and 2022, "candidates received a larger share of the vote when they were on the county line than when they were endorsed but there was no county line.  The difference in the candidate's performance ranged from -7 to 45 percentage points, with a mean of 12% points and a median of 11 percentage points."  (Rubin Report at 4.)  On cross-examination at the Hearing, Defendants challenged Dr. Rubin's choice of statistics and whether she had adequately accounted for other potential causes of the effects she observed.  (Hearing Tr. 312:14–332:15.)  In response, she emphasized that her analyses were intended to be statistically descriptive, and that she saw a pattern of the county-line having a consistent positive effect on the race results.  (Hearing Tr. 317:12–19.)  Having considered Dr. Pasek's report and Dr. Rubin's report and her testimony on the issue of ballot placement and the weight of the line, the Court finds that their opinions are well-reasoned and that they suffice to show, again, at this preliminary stage of this case, that the county-line provides a substantial benefit in terms of voting over and above candidates that are merely endorsed by a county. [24]

Based on the foregoing, the Court finds that Plaintiffs have shown a severe burden on their First Amendment rights.  Accordingly, the Court applies exacting scrutiny to decide whether the

---

[23] On this issue, Plaintiffs again offered the opinion of Dr. Wang who reached a similar conclusion based on the way human cognition works when faced with voting choices on a ballot and a statistical treatment of voting data.
[24] On this issue, Plaintiffs also offered the opinion of Dr. Wang who reached a similar conclusion based on the way human cognition works when faced with voting choices on a ballot and a statistical treatment of voting data.

laws establishing bracketing and ballot placement are "narrowly tailored and advance a compelling state interest."

> ### c)      State Interests

Defendants maintain that the current system in 19 counties of bracketing and ballot placement furthers important State interests because it: 1) preserves other candidates' rights and the political parties' rights to associate; 2) communicates those associations of candidates to voters; 3) provides a manageable and understandable ballot; and 4) prevents voter confusion.

As to the first two considerations, Plaintiffs in this case are quick to point out that they are not disputing political parties' rights to associate by choosing their standard bearers or disputing other candidates' rights to associate by choosing common slogans.  Nor are Plaintiffs disputing a state's interest in communicating these associations to voters.  As the Verified Complaint makes clear, Plaintiffs do not challenge any of these endorsement efforts *even on the ballots themselves*. Plaintiffs challenge is only to the practice of the county line/bracketing and ballot placement, with its attendant infringement on their right to not associate and its outsized effects on primary elections.

As to the last two considerations—state interests in providing a manageable and understandable ballot, and ensuring an orderly election process—Defendants' position is hampered by the fact, pointed out by Plaintiffs and Dr. Pasek, that history has demonstrated otherwise insofar as one-third of all Mercer County voters were disenfranchised in the 2020 Democratic Primary Election because they voted for more than one candidate for the same office due to the current ballot systems. (V.C. ¶ 117; Pasek Report ¶ 109.)  Under the circumstances, the Court concludes that the State's interests are not especially compelling.

d)      Balancing the Burdens Against the Interests

Based on Plaintiffs' preliminary showing as to the burden imposed upon them, it is not clear at this stage how these burdens can be justified by the State's interests. This case is different from a previous one addressed by this Court where aggrieved candidates alleged purely legal burdens that could be measured at the motion to dismiss stage. *See Mazo v. Way*, 551 F. Supp. 3d 478, 508 n.12 (D.N.J. 2021) ("*Mazo I*").  This case is also different from another previous case addressed by this Court where aggrieved candidates needed only to allege sufficient factual burdens to survive a motion to dismiss and proceed to discovery. *See Conforti*, 2022 WL 1744774, at *17.  Rather, in this case, Plaintiffs have come forward seeking emergent relief and support their application with a substantive factual record, including expert reports and credible expert and factual testimony.  On the basis of that record, the Court finds that there is a sufficient likelihood that Plaintiffs will succeed on the merits of their First Amendment claims.

2.      ELECTIONS CLAUSE

The Elections Clause of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." U.S. Const. art. I, § 4, cl. 1. When the regulation involves the time, place, and manner of primary elections, the only question is whether the state system is preempted by federal election law on the subject. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995). However, when the regulation does not regulate the "time, place, or manner," courts must consider whether the regulation on its face or as applied falls outside that grant of power to the state by, for example, "dictat[ing] electoral outcomes, favor[ing] or disfavor[ing] a class of candidates, or evad[ing] important constitutional restraints. *Cook v. Gralike*, 531 U.S. 510, 523 (2001). The Supreme Court has struck down such regulations when

34

they "attach[ ] a concrete consequence to noncompliance" rather than informing voters about some topic. *Id*. at 524. The timing may also add to the gravity of injury, especially when it occurs "at the most crucial stage in the election process – the instant before the vote is cast." *Id*. at 525 (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)).

Here, as set forth above, the State conferred its power to regulate the "manner" of federal elections to the county clerks, including the Defendant County Clerks, by requiring them to design and print ballots. N.J. Stat. Ann. 19:23-26.1, 19:42-2.   In Defendants' view, the Bracketing Structure is a permissible regulation on the "manner" of federal elections.   On the record already reviewed, Plaintiffs' evidence is sufficient to make their showing of a likelihood they will succeed in establishing that the Bracketing Structure and ballot placement is improperly influencing primary election outcomes by virtue of the layout on the primary ballots.   This would clearly exceed a State's right to regulate the "manner" of federal elections. *Cook*, 531 U.S. at 525 ("the instant before the vote is cast" is the "most crucial stage in the election process").

### C.   IRREPARABLE HARM

Next, the Court considers the extent to which Plaintiffs will suffer irreparable harm absent the requested relief.

"It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"   *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).   At least one district court, later affirmed by the Third Circuit, noted that "[f]or the purposes of this [preliminary injunction], the Court assumes that Plaintiffs have satisfied the irreparable harm prong if they can demonstrate a constitutional injury." *Democratic-Republican Org. of New Jersey v. Guadagno*, 900 F. Supp. 2d 447, 453 (D.N.J. 2012), *aff'd*, 700 F.3d 130 (3d Cir. 2012).   In other instances, however, the Third Circuit has provided that "the assertion of First Amendment rights does not automatically require

a finding of irreparable injury,'"  *Hohe*, 868 F.2d at 72–73, and that Plaintiffs who show a likelihood of success on the merits for their First Amendment claim are not entitled to preliminary injunctive relief unless they can show a "'real or immediate'" danger to their rights "in the near future."  *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997).

The Court could find that Plaintiffs have satisfied the irreparable harm prong because it concluded that Plaintiffs met their burden of showing success on the merits as to their constitutional challenges.  However, the Court additionally finds that Plaintiffs have met their burden to show they are likely to suffer "real or immediate" irreparable harm "in the near future" should the Court not grant the Motion.

From the Verified Complaint through the testimony provided at the Hearing, Plaintiffs have made their position evident as to the associational harm they face with the current ballot design. In particular, Plaintiffs explain that their associational harm is twofold.  If Plaintiffs "forfeit their right to not associate with certain other candidates," they will be harmed because they will be "punished for doing so by being excluded from the preferential ballot draw and risk getting relegated to obscure portions of the ballot in Ballot Siberia and/or put themselves at a substantial disadvantage from their opponents."  (V.C. ¶ 201.)  Alternatively, Plaintiffs are "forced" to associate with candidates "with whom they may not want to associate and whose policies they may disagree with."  (*Id.* ¶ 202.)

Defendants' arguments that the changed political landscape has eliminated Kim's associational harm is specious at best.  (ECF Nos. 190–91.)  First, at the Hearing, Kim testified that he won the Monmouth County convention making him the endorsed candidate in that county. (Hearing Tr. 182:7–8.)  Notably, Kim won and accepted the county line in Monmouth County *before* his main opponent withdrew from the primary.  Kim will share the endorsed candidate line

with a congressman who chose *not* to endorse Kim and "is not supportive of [Kim's] campaign." (*Id.* 182:9–14.)   Kim faces a similar problem in Morris County too.   (*Id.* 182:18–22.)   Kim expressed that being on the same line with candidates that do not support him is "difficult" because it affects his campaign and voter engagement.   (*Id.* 182:21–24.)   Finally, Kim explained how being on the same candidate endorsed line with candidates that "are actively working against each other" is confusing to voters: "whole idea of association, you know, presents the idea that these are candidates that chose to associate with each other" yet Kim has not had formal conversations with nor does he "even know most of these candidates."  (*Id.* 183:5–14.)

Not only does Kim contend that the associational harm will be eliminated if this Court grants Plaintiffs relief, Kim underscored that he "just want[s] to run for the Senate seat."   (*Id.* 184:2–7.)   Kim does not want "to consider, you know, dozens if not hundreds of other candidates across multiple counties" but that he "unfortunately [has to] given the system here in New Jersey." (*Id.* 184:17–21.)   The Court reiterates that Kim's harms are not alleviated because his main opponent withdrew from the election.   Kim's harms, like Schoengood and Rush's, are real and immediate whether or not they are on the county line or not.

Second, though Defendants disproportionately focus on Kim, the Court emphasizes that Schoengood and Rush will also face irreparable harm.   Schoengood will not be on the county line in the three counties within her congressional district.   (V.C. ¶¶ 151–57; ECF No. 188 at 1.)   Nor will Schoengood be bracketed with any candidates, thus leaving her "vulnerable to be placed with ballot gaps in between her bracketed opponents or otherwise put out in Ballot Siberia, and/or could be either in a column by herself or stacked in a column with other candidates for the same or different offices with whom she does not want to associate."  (V.C. ¶ 156.)   As evidenced by Dr. Pasek's report, the impact on a candidate who fails to secure the county line or the first ballot

position is consequential.  Dr. Pasek concluded that "[p]rimacy biases in New Jersey elections will always negatively impact candidates who do not bracket with a candidate for the pivot-point position, as these candidates are guaranteed to be placed in positions further to the right of (or below) colleagues who are bracketed with someone in the pivot-point position."  (Pasek Report ¶ 81.)

More specifically, Dr. Pasek found that "all candidates on party-column ballots performed better when listed in the leftmost available position, with these benefits ranging from 3.9 percentage points to 27.8 percentage points across candidates."  (*Id.* ¶ 144.)  Even just among bracketed candidates that are not in a column by themselves, "the earlier listed candidate received an 8.2% and 11.1% benefit over chance and 16.5% and 22.2% benefit over later-listed candidates" in the districts the study was conducted in.  (Moving Br. at 9 n.9; Pasek Report ¶ 143.)  Dr. Pasek's report, together with the other reports and testimony, highlights the negative impact resulting from a failure to secure the county line.  However, the evidence as it relates to unbracketed candidates further explains the harm that a candidate faces when they choose to remain unbracketed in exchange for exercising their right to associate.  As such, unbracketed candidates like Schoengood will be harmed.

Similarly, Rush will be off the county line in two of the counties within her congressional district.  (ECF No. 188 at 1.)  In these two counties, Rush will also remain unbracketed and will face the same harm that Schoengood faces.  In three other counties within her congressional district, Rush will be on the county line.  However, in two of these districts, Rush will be bracketed with her opponents in the same column, creating the perception that Rush is associated with these candidates although she is not. [25]

---

[25] There is an additional concern of overvoting that occurs when candidates are stacked together in the same column in "vote for one" counties.  (V.C. ¶ 117.)  For example, Mercer County is a vote for one county whereby multiple

Lastly, Defendants largely challenge that any harm Plaintiffs will suffer is the product of their own delay.[26]   Defendants claim that Plaintiffs "slow-walked" bringing this action and therefore "orchestrated" the existence of harm.  (Hearing Tr. 55:12–19.)  As previously discussed, the Court is not persuaded by Defendants' challenge for several reasons.

First, Defendants improperly frame undue delay as fatal to Plaintiffs' Motion.  However, delay is only one of the various *factors* a court considers when addressing a preliminary injunction. *See Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*, 99 F. Supp. 3d 461, 504 (D.N.J. 2015) (noting that delay is an "important factor bearing on the need for a preliminary injunction, particularly irreparable harm"); *Cortés*, 218 F. Supp. 3d at 404 (considering plaintiffs' unreasonable delay as part of the court's analysis of the preliminary injunction and relief sought).  Therefore, the Court considers any delay as it relates to Plaintiffs irreparable harm.

Second, to the extent Defendants argue that Plaintiffs have unreasonably or unduly delayed, the Court disagrees.  Defendants characterize Plaintiffs' Motion as an "eleventh-hour application" and argue that Plaintiffs "have known about New Jersey's ballot structure for years" yet they "rested on their claims until the final weeks of preparation for the Primary Election."  (*Id.* at 19, 46.)  Defendants contend that that Kim's "clock on applying for injunctive relief" started in September of 2023 when he decided to run for Senate.  (ECF No. 191 at 2.)  However, Plaintiffs' written submissions and testimony at the Hearing clarified why Plaintiffs filed the emergent application when they did.

At the Hearing, Kim explained the timeline from when he decided to run in September of 2023 to when Plaintiffs filed this action in February of 2024.  Kim first explained that after

---

candidates are stacked in the same column but voters may only select one.  (*Id.*)  Dr. Pasek explained that in the 2020 Democratic Primary Election in Mercer County, a vote for one county, 32.4% of voters overvoted resulting in their votes being invalidated.  (Pasek Report ¶ 109.)

[26] Defendants Hanlon

speaking with his senior staff, "sometime in December [2023] was the first time that [Kim] had conversations with different attorneys." (Hearing Tr. 189:7–11.) Next, Kim described some of the considerations he faced about taking legal action. Kim explained that a key other consideration he faced was whether he was "able to demonstrate a — a real and non-speculative injury, a harm done to [Kim] personally." (*Id.* 189:12–18.) When asked when, it if at all, Kim faced a concrete injury, Kim stated the following: "So the concrete injury that happened in a real and non-speculative way was on February 10th [2024] with the – with the awarding of the actual formal, official county-line in Passaic County on February 10th. That was – that was adverse to me." (*Id.* 190:5–13.) Kim expressed concern that if he brought the action any sooner than February 10th, it "would be seen as – that [Kim had] not actually been injured at that point." (*Id.* 196:10–14.) Kim also feared that if he brought an action too soon, "there could be efforts to try to dismiss or push off" because he lacked an injury. (*Id.* 196:14–16.)

Kim also testified about his understanding of preliminary injunctions and how they "[require] a very high burden of evidence and proof to be able to demonstrate." (*Id.* 189:19–23.) Consequently, Kim became familiar with the types of evidence, research, and testimony that would be required to reach the burden and to make a "successful case." (*Id.* 189:24–190:4.) Kim subsequently testified about the various research and expert reports ultimately produced and why these materials were critical to his case. Ultimately, Kim emphasized that because of the high threshold he believed was required for a preliminary injunction, Kim needed "all of the necessary research and evidence that [he] felt was necessary to reach it." (*Id.* at 196:17–23.)

Having considered Kim's testimony, and Plaintiffs' written submissions, the Court rejects Defendants' position that Plaintiffs have unduly delayed bringing this action. Plaintiffs have explained that they filed suit as soon as they believed there was a concrete injury on February 10,

2024.  And Plaintiffs filed the Verified Complaint and the present Motion about two weeks later on February 26, 2024.   Plaintiffs even appreciated the consequences of filing this action prematurely.[27]

Also, Plaintiffs assert that the relief sought can be accomplished in time for the 2024 Primary.  (V.C. ¶ 18.)  Plaintiffs explain that the action was "filed 100 days prior to the Primary Election, almost two months before vote by mail ballots are to be sent out, about one and a half months before the ballot draw, and even almost a full month prior to the petition filing deadline." (Reply at 5.)  In sum, despite Defendants' arguments to the contrary, the Court finds based on the entire record before it that Plaintiffs have timely filed this Motion.

### D.     BALANCE OF THE HARM

Given the Court's finding that Plaintiffs have successfully met the first two prongs, it must next consider the final two factors.  The third factor requires the court to "balance the parties' relative harms; that is, the potential injury to the plaintiffs without this injunction versus the potential injury to the defendant with it in place."  *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017).  At this stage, a court should also consider "the possibility of harm to other interested persons from the grant or denial of the injunction."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (internal citation and quotation marks omitted).   "[W]hen considerable injury will result from either the grant or denial of a preliminary injunction, these factors to some extent cancel each other."  *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 924 (3d Cir. 1974).

---

[27] Testimony from Kim's campaign manager, Mr. Dion, further supported Kim's testimony about the timing of the action.  Mr. Dion stated that as of late January 2024, "we had not made, in my summation, a final decision, because there needed to be other pieces brought together."  (Hearing Tr. 380:23–381:7.)

Plaintiffs argue that, should the Court grant injunctive relief, any harm to Defendants would be minimal and would pale in comparison to the deprivation of Plaintiffs' constitutional rights. (Moving Br. at 51.)  Plaintiffs assert that office-block ballots would be easy for Defendants to implement, as it is already regularly used in two New Jersey counties.  (*Id.*)  Not only is the required infrastructure already in place according to Plaintiffs, (Moving Br. at 52), but the two voting systems that are predominantly used in New Jersey, ES&S[28] and Dominion, have already been employing the office-block ballots in various elections throughout the state, including in some of Defendants' counties,[29] with the same software and vendors that will be used in the 2024 Primary.  (Reply at 28–34 (detailing various elections that have occurred in New jersey using Office Block Structure entirely or Office Block Structure plus other structures in a hybrid format).)  Plaintiffs provide the expert report and testimony of Dr. Andrew W. Appel, (Moving Br. at 51–52; V.C. ¶¶ 130–33; Appel Report at 2–6; Hearing Tr. 285:17–286:7), as well as the expert report and testimony of Ryan Macias to show that voting machines in New Jersey are capable of accommodating office-block ballots.  (ECF No. 115-1; Hearing Tr. 92:11–96:19.)  Furthermore, Plaintiffs provide the expert report of Edward P. Perez to show that changing a ballot's layout after the data has been entered takes just "a matter of hours," or one day at most.  (Reply at 29, 35–36, Ex. C ¶ 27.)  Plaintiffs emphasize that their requested relief would not eliminate counties' slogans, ability to endorse candidates, or right to associate by any constitutional means, and that the same election procedures must occur with or without a court order in preparation for the 2024 Primary. (Moving Br. at 52; Reply at 29.)

---

[28] In full, Election Systems & Software, LLC.

[29] Plaintiffs specify that some County Clerk Defendants have admitted to using office-block ballots, or incredibly deny knowledge of same.  (Reply at 30, 33–34.)

Defendants, on the other hand, argue that Plaintiffs' lack of urgency in bringing the lawsuit negates any purported harm to Plaintiffs.  (ECF No. 60 at 26.)  As for potential harm to others, some Defendants argue that a change in the ballot design cannot be effectuated in time for the 2024 Primary,[30] while other Defendants state that imposing the change in such a short timeframe would be a significant hardship to election workers and officials.  (ECF No. 16 at 5; ECF No. 26 at 2; ECF No. 44 at 9–10; ECF No. 51 at 40–41; ECF No. 61 at 49–53 (describing the 2024 Primary ballot as "particularly complex"); ECF No. 63 at 47.)  Defendants provide a certification from Benjamin R. Swartz, the Principal State Certification Manager for ES&S, (ECF No. 60 at 26 (citing Swartz Aff. (ECF No. 46)); ECF No. 61 at 54 (same)), witness testimony from County Clerk Hanlon, (Hearing Tr. 358:19–364:9), and a certification plus witness testimony from David Passante, owner of Royal Printing Services, to support their arguments concerning the timeline implications of Plaintiffs' request at this stage of the election cycle.  (ECF No. 53 at Ex. A; Hearing Tr. 257:12–263:5.)  Additionally, Defendants assert that the change sought by Plaintiffs would cause chaos and disruption, destroying the integrity or fairness of the election.  (ECF No. 26 at 1; ECF No. 50 at 25; ECF No. 51 at 41; ECF No. 59 at 17; ECF No. 60 at 24–26; ECF No. 61 at 55.)  They argue that injunctive relief would not only cause voter confusion and distrust in the system (ECF Nos. 51 at 42, 65 at 15), but it would impose a burden on election officials to educate voters about the new design and potentially lead to disenfranchisement.  (ECF No. 48 at 1–2; ECF No. 51 at 42; ECF No. 53 at 15; ECF No. 59 at 17; ECF No. 61 at 50, 53; ECF No. 65 at 15.)  Defendants insist that injunctive relief would infringe upon the broad discretion of the Defendants

---

[30] Plaintiffs counter that even if revisions are necessary to the ballot, they will take a matter of hours or one day at the most to effectuate, not weeks or months.  (Reply at 36.)

to design ballots in a manageable and understandable way, as well as the rights of various non-parties.[31]  (ECF No. 54 at 20–21.)

Given the extensive evidence in the record, and the relative weight the Court has assigned to each witness's testimony, the Court finds that the harm Plaintiffs would suffer absent an injunction well exceeds the harm that Defendants would suffer should the Court grant the injunction.  Plaintiffs have put forth credible evidence not only that their constitutional rights are violated by the present ballot design used in New Jersey, which is used in no other state in the country, *see supra* discussion of irreparable harm, but that Defendants would suffer minimal harm in implementing the ballot design requested by Plaintiffs.[32]  First, Defendants' argument that they simply cannot implement the Office Block Structure is readily belied by the fact that two counties in New Jersey, Salem and Sussex, already use office-block ballots for primary elections, and that some of the other counties have used the office-block ballots for other elections, including in a school board election, nonpartisan municipal election, school board race, fire commission race, and general elections.  (V.C. ¶ 55; Reply at 28–34; *see also* Appel Report at 2–6; Hearing Tr. 285:17–286:7; ECF No. 115-1; Hearing Tr. 92:11–96:19 ("[A]ll voting systems used in New Jersey have the ability to lay out ballots without the county-line style.").)  Even considering the reduced timeframe in which Defendants would have to change the ballot design before the 2024 Primary, the evidence indicates that it can be done.  (*See, e.g.*, Perez Decl. ¶¶ 21–23, 27.)  In fact,

---

[31] Specifically, Defendants argue that the following rights and interests will be infringed: the state legislature's interest in organizing ballots in such a way (ECF No. 54 at 20); the right of other candidates to associate (ECF No. 54 at 20–21; ECF No. 57 at 12–13; ECF No. 60 at 26); and the fundamental right of New Jersey's political parties to associate, which is particularly concerning because they are not named as parties in the lawsuit and thus their interests are not represented, (ECF No. 53 at 14–15; ECF No. 65 at 14).

[32] The Court notes that assertions by Defendants that they lack knowledge about what it would require to implement a change in the ballot design or about how it works are not responsive to Plaintiffs' argument that the ballot design can in fact be easily changed.

the undersigned asked that exact question to Defendants' witness Passante at the Hearing, during which the following exchange occurred:

> THE COURT: So erase me from the equation and erase this entire courtroom. One of the county clerks, they decide their preference is office ballot, and they come to you and your company and say, This is how we want it done. You tell them No, get another vendor?
>
> THE WITNESS: No.
>
> THE COURT: It would be chaos or you would find a way to do it?
>
> Do you see the difference between my question and the one that these guys have been asking?
>
> THE WITNESS: Yes.
>
> THE COURT: So what do you tell your client? What do you tell the county clerk when he or she says, We want this done. We made a decision that we prefer this ballot in this county for this election. Do you say yes or no?
>
> That's my first question.
>
> THE WITNESS: Yes.
>
> THE COURT: And you find a way to do it, correct?
>
> THE WITNESS: One hundred percent, yes.

(Hearing Tr. 282:12–283:5.)[33]

The Court finds that the effort that it would take Defendants to implement Office Block Structure in their respective ballots does not pose more harm than that suffered by Plaintiffs now because of the existing structure. *See supra* discussion of irreparable harm. Moreover, the timeline for implementing the change would not require the drawn-out process that Defendants would have

---

[33] ECF No. 191 points to a list of "unrefuted evidence in the record" that the suggested ballot changes cannot be implemented on time; this exchange with a witness called by the Defendants, along with testimony and reports from Plaintiffs' experts, squarely refute that contention.

the Court believe; rather, the evidence suggests that it would take not nearly as long.  (*See, e.g.*, Reply at Ex. C ¶ 27.)[34]

In sum, the Court finds that Plaintiffs have shown that the harm to them absent an injunction exceeds the harm Defendants and other interested persons would suffer in the face of an injunction here.  Accordingly, the Court finds that this factor also weighs in favor of granting Plaintiffs' Motion.

### E.     PUBLIC INTEREST

Finally, the Court must weigh whether the public interest favors injunctive relief pending the outcome of this litigation.  "As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."  *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).  The Third Circuit has recognized that "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights." *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 883–84 (3d Cir. 1997).

Plaintiffs argue that government compliance with the Constitution "should always be in the public interest, particularly where the fundamental right to vote is at stake."  (Moving Br. at 52.)  They provide the expert report of Dr. Pasek to show that the current Bracketing System can be outcome-determinative even when candidates win by double-digit margins.  (*Id.* at 52; V.C. ¶ 127; Pasek Report ¶ 183.)  Plaintiffs urge that injunctive relief is necessary to restore the power of the people to select nominees "without unnecessary government interference" and to instill confidence in election results.  (Moving Br. at 53.)

---

[34] To the extent Defendants argue that the state legislature will be harmed if they cannot continue to organize their ballots using the Bracketing Structure under the current statutory framework, that argument fails because it is well-settled that there is no legitimate interest in the enforcement of an unconstitutional law.  *Am. Civ. L. Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003).

Defendants argue that no fundamental rights are at stake, and Plaintiffs are acting in their own interest rather than for the public interest.  (ECF No. 51 at 43, 46.)  Defendants assert that, rather, the following public interests are at stake[35]: an interest in allowing states to regulate their own elections absent judicial intervention, especially when intervention would require last-minute ballot changes, (ECF No. 53 at 15–16; ECF No. 60 at 27–28); an interest in allowing candidates to signal to voters their chosen political associations, (ECF No. 50 at 24; ECF No. 60 at 27; ECF No. 61 at 58–59); and an interest in the "orderly administration of elections," (ECF No. 53 at 16–17 (citing Passante Cert., ECF No. 53 at Ex. A); ECF No. 61 at 56; ECF No. 65 at 16.)  Defendants additionally argue that injunctive relief should not be granted on the "eve of an election," as it would confuse voters, cause them to feel distrust, disenfranchise them, (ECF No. 51 at 45–46, 53 at 16, 60 at 28, 61 at 58, 65 at 16.)  Defendants point Plaintiffs instead towards "multiple political remedies" that they can use to address their concerns, as well as the state Legislature as another option for redress.  (ECF No. 53 at 15–16, 65 at 15–16, 50 at 23 n.5)  Lastly, Defendants argue that current election laws have already been deemed constitutional by New Jersey state courts (ECF No. 51 at 43–45.)

Here, the Court has already found a likelihood of success on the merits for Plaintiffs as well as a showing of irreparable harm, including the likelihood of constitutional violations.  *See supra*.  The Court finds that the concerns expressed here by Defendants are not the "legitimate, countervailing concerns" to be favored over the protection of Plaintiffs' constitutional rights in such a situation.  *Council of Alt. Pol. Parties*, 121 F.3d at 883–84.  Although mindful of Defendants' various concerns, the Court finds they do not weigh more heavily than the public

---

[35] Defendants argue that the public interests at stake here require fact discovery before any injunction should be granted.  (ECF No. 60 at 28.)

interest in having candidates running in the 2024 Primary presented on the ballot in a fair and equal manner that is free from unnecessary government interference.  (ECF No. 192 at 4.)

Accordingly, the Court concludes that public interest favors granting Plaintiffs' motion for a preliminary injunction.  *Council of Alt. Pol. Parties*, 121 F.3d at 883–84; *Am. Tel. & Tel. Co.*, 42 F.3d at 1427 n.8.

### F.    SECURITY

Having concluded that a preliminary injunction order should issue, the Court turns to the final consideration under Rule 65: bond.  Fed. R. Civ. P. 65(c).  This is not a commercial case. Plaintiffs are claiming violations of their constitutional rights.  Defendants have raised no more than speculative concerns that some counties may incur million-dollar costs *if* technical obstacles force them to switch to vote-by-mail for the 2024 Primary.  The Court finds that imposing a bond on Plaintiffs based on this type of speculation would constitute an unnecessary hardship on Plaintiffs.  On balance, the Court therefore finds it appropriate to waive the bond requirement of Rule 65.  *See Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir. 1996); *Koons v. Platkin*, 673, F. Supp. 3d 515, 671 (D.N.J. 2023).

## VIII.  <u>CONCLUSION</u>

As a final note, the Court wishes to make clear that it recognizes the magnitude of its decision.  The integrity of the democratic process for a primary election is at stake and the remedy Plaintiffs are seeking is extraordinary.  Mandatory injunctive relief is reserved only for the most unusual cases.  Plaintiffs' burden on this Motion is therefore particularly heavy.  Nevertheless, the Court finds, based on this record, that Plaintiffs have met their burden and that this is the rare instance when mandatory relief is warranted.

For the reasons stated above, the Court will **GRANT** the Motion for Preliminary Injunction.  Defendants' Motions in Limine will be **DENIED**.  An appropriate Order will follow.


Date: March 29, 2024

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**