## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHRISTINE CONFORTI,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk,** *et al.*, <br><br> **Defendants.** | Case No. 3:20-CV-08267-ZNQ-TJB <br><br><br> <u>Civil Action</u> <br><br><br> **STATEMENT OF UNDISPUTED MATERIAL FACTS** |
| **ANDY KIM,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk,** *et al.*, <br><br> **Defendants.** | Case No. 3:24-CV-1098-ZNQ-TJB <br><br><br> <u>Civil Action</u> <br><br><br> **STATEMENT OF UNDISPUTED MATERIAL FACTS** |

The Plaintiffs in the above-captioned cases, in support of their motions for summary judgment in each of the respective cases, present this Local Civil Rule 56.1 Statement of Undisputed Material Facts ("SUMF") as follows:

**Abandonment of Defense of Constitutionality of Challenged Statutes**

1.      Remaining county clerk defendants, the Bergen County Clerk and the Union County Clerk have abandoned their defense of the constitutionality of the ballot design statutes at issue in this matter. (<u>Kim</u> Certification of John Hogan in Support of Joint Brief of Defendants Rajoppi and Hogan in Support of Motion to Dismiss, ECF 295-2 and 296-2, ¶ 13 ("First, the Bergen County Clerk's Office did not create the Ballot Design Statute as [sic] has no intention of defending it."); <u>Kim</u> Certification of Joanne Rajoppi in Support of Joint Brief of Defendants Rajoppi and Hogan in Support of Motion to Dismiss, ECF 295-3, ¶ 8 ("I . . . do not intend to defend against Plaintiffs' challenge to the statutes that mandate the Bracketing Structure.")).

**Parties in <u>Kim</u>**

2.      Plaintiff Andy Kim was a candidate for United States Senate in the 2024 Democratic Primary Election, was a three-time United States Congressional Representative for New Jersey's Third Congressional District (<u>Kim</u> Verified Complaint, ECF 1 (hereinafter "V.C."), ¶ 24), and is currently a United States Senator following victory in the 2024 General Election (F.R.E. 201).

3.      Plaintiff Andy Kim for New Jersey is an unincorporated association which served as the official campaign entity for Andy Kim's campaign for United States Senator in the 2024 Democratic Primary Election. (V.C., ¶ 25.)

4.    Plaintiff Sarah Schoengood was a candidate for United States House of Representatives for New Jersey's Third Congressional District in the 2024 Democratic Primary Election. (V.C., ¶ 28[1].)

5.    Plaintiff Sarah for New Jersey is an unincorporated association and was the official campaign entity for Schoengood's campaign for United States Congress in the 2024 Democratic Primary Election. (V.C., ¶ 29.)

6.    Plaintiff Carolyn Rush was a candidate for United States House of Representatives for New Jersey's Second Congressional District in the 2024 Democratic Primary Election, having previously run unsuccessfully for the nomination to the same seat in the 2022 Democratic Primary Election. (V.C., ¶ 26.)

7.    Plaintiff Carolyn Rush for Congress is an unincorporated association and is the official campaign entity for Rush's campaign for United States Congress in the 2024 Democratic Primary Election. (V.C., ¶ 27.)

8.    Defendant County Clerks in this case included the 19 county clerks in the state,  other than Salem and Sussex, who are each vested with certain statutory duties, obligations, and a healthy amount of individual discretion, in connection with, among other things, the designing, preparation, and printing of all ballots, the issuance of mail-in ballots, and conducting a drawing for ballot position for various

---

[1] The numbering of paragraphs on pages 14 and 15 of the Verified Complaint contain some errors in that, after Paragraph 25, it skips to 28 and 29, and then starts again at Paragraph 26.  This also mistakenly resulted in two paragraphs being labeled as Paragraph 27, 28, and 29.

elections held in their respective counties, and who act under color of law in receiving and acting on bracketing requests, designing ballots, and conducting ballot draws. (V.C., ¶¶ 28-49; <u>Kim</u> District Court Opinion on Preliminary Injunction, ECF 194 (hereinafter "D.C. Opinion"), p. 4 n.10.)

9.    Of the original 19 County Clerk Defendants, all but three (Bergen, Union, and Cape May) have entered into consent orders signed by this Court ordering them to adopt an office block ballot and otherwise comply with the provisions of same, to pay counsel fees, and otherwise dismissing them with prejudice from the case. (<u>Kim</u> Consent Orders, ECF 237 (Burlington), 238 (Middlesex), 240 (Warren), 247 (Essex), 250 (Cumberland and Gloucester), 253 (Atlantic), 254 (Somerset), 256 (Mercer), 258 (Monmouth), 265 (Camden), 270 (Morris), 273 (Passaic), 277 (Hunterdon), 279 (Ocean), 281 (Hudson).)

10.    All Defendants and all Interested Parties named in the caption (Secretary of State, and Salem and Sussex County Clerks) were properly served with the <u>Kim</u> Verified Complaint, and notice of the Verified Complaint was sent to all candidates opposing the plaintiffs, the Republican and Democratic State Committees, and all county Republican and Democratic committees for which an address could be identified (39 of 42 possible committees), including the Republican and Democratic county committees in the three counties where there

are remaining county clerk defendants (<u>Kim</u>, Certification of Service of Verified Complaint, ECF 8).

11.    The Camden County Democrat Committee ("CCDC") intervened in and continues to remain in this matter. (<u>Kim</u> Order Granting CCDC Intervention, ECF 121.)

**Parties in <u>Conforti</u>**

12.    Plaintiff Christine Conforti was a candidate for United States House of Representatives for New Jersey's Fourth Congressional District in connection with the 2020 Democratic Primary Election. (<u>Conforti</u> First Amended Complaint, ECF 33 (hereinafter "A.C."), ¶ 19; V.C., ¶¶ 89-90, 92, 99-100; <u>Conforti</u> Opinion on Motion to Dismiss, ECF 111 (hereinafter "MTD Opinion"), p. 3.)

13.    Plaintiff Arati Kreibich was a candidate for United States House of Representatives for New Jersey's Fifth Congressional District in connection with the 2020 Democratic Primary Election. (A.C., ¶ 24; MTD Opinion, p. 3.)

14.    Plaintiff Mico Lucide was a candidate for County Clerk in Atlantic County in connection with the 2021 Democratic Primary Election. (A.C., ¶ 28; MTD Opinion, p. 3.)

15.    Plaintiff Joe Marchica was a candidate for party office on the County Committee in Mercer County from Hamilton Township's 27th Election District in

connection with the 2020 Democratic Primary Election. (A.C., ¶ 33; MTD Opinion, p. 3.)

16.    Plaintiff Kevin McMillan was an incumbent Township Committeeperson in Neptune Township and candidate for same in connection with the 2020 Democratic Primary Election. (A.C., ¶ 37; V.C., ¶¶ 92-93; MTD Opinion, p. 3.)

17.    Plaintiff Zinovia Spezakis was a candidate for United States House of Representatives for New Jersey's Ninth Congressional District in connection with the 2020 Democratic Primary Election. (A.C., ¶ 44; MTD Opinion, p. 3.)

18.    New Jersey Working Families Alliance, Inc. ("NJWF") is a non-profit 501(c)(4) grassroots independent organization which, among other functions, organizes campaigns to advance progressive policies and works to elect candidates who share its values and policy priorities. (A.C., ¶ 48; MTD Opinion, p. 3.)

19.    NJWF has many members and member organizations (A.C., ¶ 49), and has endorsed numerous candidates for various elections (A.C., ¶ 51), including Conforti plaintiff Mico Lucide. (MTD Opinion, pp. 3, 19.)

20.    Defendant County Clerks in Conforti are the county clerks in Monmouth, Ocean, Mercer, Bergen, Atlantic, and Hudson Counties, who are each vested with certain statutory duties and obligations, and a healthy amount of individual discretion, in connection with, among other things, the designing,

preparation, and printing of all ballots, the issuance of mail-in ballots, and conducting a drawing for ballot position for various elections held in their respective counties, and who act under color of law in receiving and acting on bracketing requests, designing ballots, and conducting ballot draws. (A.C., ¶¶ 57-63.)

21.    Of the original 6 County Clerk Defendants, and the Burlington County Clerk who had previously intervened (Conforti Order Granting Motions to Intervene, ECF 164), all but one (Bergen) have entered into consent orders signed by this Court ordering them to adopt an office block ballot and otherwise comply with the provisions of same, to pay counsel fees, and otherwise dismissing them with prejudice from the case. (Conforti Consent Orders, ECF 202 (Burlington), 211 (Atlantic), 214 (Mercer), 215 (Monmouth), 222 (Ocean), 226 (Hudson).)

22.    CCDC intervened in and continues to remain in this matter. (ECF 164.)

23.    The other county party committee organizations that intervened in this matter (Conforti ECF 164)  subsequently entered into consent orders dismissing them with prejudice. (Conforti Consent Orders, ECF 203 (Middlesex Democrats), 207 (Cumberland, Union, and Warren Republicans), 209 (Union Dems), 224 (Morris Republicans).)

**Mechanics of Bracketing Structure on Primary Election Ballot**

24.    Historically[2], in 19 of New Jersey's 21 counties (all but Salem and Sussex who have traditionally used an office block ballot), the county clerk used a party column ballot utilizing columns and rows for their primary elections which featured "bracketing" whereby certain groups of candidates were featured together in the same column or row based on the endorsement of such candidates by the leadership faction of the political party or based on mutual bracketing requests of candidates for various offices ("Bracketing Structure"), instead of grouping candidates together based on the office sought in an office block ballot. (V.C., ¶¶ 3-6, 53-55, 62; id. at p.2 & n.1; D.C. Opinion, p. 3; Kim v. Hanlon, 99 F.4th 140, 147-48 (3d Cir. 2024) ("hereinafter "Kim, 99 F.4th at ___".)

25.    New Jersey is the only state in the nation that organizes its primary election ballots using the Bracketing Structure. (V.C., ¶¶ 1, 5; D.C. Opinion, p. 3; Kim, 99 F.4th at 147-48.)

26.    The Bracketing structure was governed based on provisions of New Jersey State law allowing candidates who submit mutual bracketing requests to be featured on the same column or row of the ballot as other party-endorsed

---

[2] The description of New Jersey's ballot design laws and practices in this section refers to those in effect in and prior to the 2024 primary election. The full operation of those laws was enjoined by this Court's injunction relating to the 2024 Democratic primary.

candidates running for the same or different office. (V.C., ¶¶ 6, 60-62; D.C. Opinion, pp. 3-4; <u>Kim</u>, 99 F.4th at 148; <u>N.J.S.A.</u> 19:23-18; <u>N.J.S.A.</u> 19:49-2.)

27.    After petitions are filed and after bracketing requests are submitted, the county clerk chooses an office to be drawn first for ballot position, and such office is considered the "pivot point" for such county's ballot. (V.C., ¶¶ 56-59; D.C. Opinion, p. 4; <u>Kim</u>, 99 F.4th at 148.)

28.    New Jersey law requires that if U.S. Senate is on the ballot, it shall be drawn first in such elections where applicable, and if not, then if Governor is on the ballot, it shall be drawn first in such elections where applicable. (V.C., ¶¶ 69-70; D.C. Opinion, p. 4; <u>Kim</u>, 99 F.4th at 148 n.2; <u>N.J.S.A.</u> 19:23-26.1.)

29.    Once the pivot point is selected, and the candidates for that office are drawn ("preferential ballot draw"), candidates who bracketed with a pivot point candidate are automatically placed on the same column or row of the ballot by virtue of the preferential ballot draw, and will be featured with the same slogan. (V.C., ¶¶ 6-7, 14, 62, 65; D.C. Opinion, p. 4; <u>Kim</u>, 99 F.4th at 148.)

30.    The slate of candidates endorsed by the county party leadership faction who are featured together in the same column or row with the same slogan is known as the "county line." (V.C., p. 3; D.C. Opinion, p. 4, <u>Kim</u>, 99 F.4th at 148.)

31.    In practice, the county party leadership uses a slogan which allows it to prevent other candidates that it did not endorse from using that slogan, and such slogan serves as the basis upon which bracketing on the county line can take place. (V.C., ¶ 14 & n.10; Kim, 99 F.4th at 148; N.J.S.A. 19:23-17.)

32.    The candidates on the county line typically are displayed in a full or almost full slate of candidates, which often includes incumbents and other party elites with high name recognition (the "weight of the line"), and almost always includes a pivot point candidate, making all of those candidates eligible for first ballot position since they are included in the preferential ballot draw, and allowing them to be placed further to the left or top of the ballot than any unbracketed opponents. (V.C., ¶¶ 4, 7, 65; Kim 99 F.4th at 148.)

33.    Candidates that choose not to bracket with a pivot point candidate (or with whom no pivot point candidate wants to bracket) are referred to as "unbracketed candidates," who are ineligible for the preferential ballot draw, will not receive the first ballot position (left-most column or top row), and are placed further to the right or the bottom of the ballot, and are not even guaranteed the next available column, but rather have often been placed multiple columns (or rows) away from bracketed candidates running for the same office, leaving ballot gaps. (V.C., ¶¶ 58, 65-67; D.C. Opinion, p. 4 & n.12; Kim, 99 F.4th at 148.)

34.     Unbracketed candidates can be featured multiple columns away from bracketed candidates running for the same office, in obscure portions of the ballot known as "Ballot Siberia," and/or be stacked in the same column as another candidate for the same or different office with whom they did not request to bracket.  (V.C., ¶¶ 5, 67; D.C. Opinion, p. 4 & n.12; Kim, 99 F.4th at 148.)

35.     Unbracketed candidates are generally positioned on the ballot such that they are harder to find, harder to know what they are running for or who they are running against and otherwise appear less legitimate, and may be stacked in a column or row with candidates with whom they do not want to associate.  (V.C., ¶ 67; D.C. Opinion, p. 4 & n.12; Kim, 99 F.4th at 148.)

36.     County clerks in New Jersey have not consistently applied the Bracketing Structure, often using different pivot point offices across counties and internally inconsistently across election cycles within the same county. (V.C., ¶¶ 73, 75-76.; D.C. Opinion, pp. 4-5.)

**Impact of Bracketing Structure on Plaintiffs**

37.     In the 2024 Democratic Primary Election, Andy Kim was forced to choose between accepting the county line and thereby associating with and appearing in a column alongside various candidates that he did not know or otherwise did not want to associate with, or exercising his First Amendment right to not associate with the other candidates on the county line, and thereby allowing

one of his opponents to obtain a considerable advantage over him. (V.C., ¶ 147-50; D.C. Opinion, p. 5, <u>Kim</u> Transcript from Preliminary Injunction Hearing ("Hearing Tr.") 181:19–185:10; <u>Kim</u>, 99 F.4th at 155.)

38.    But for the District Court's issuance of the preliminary injunction, Andy Kim would have appeared on the county line in all but one county (Camden) where it was offered, forcing him to associate with candidates when he did not want to, in order to prevent another candidate from obtaining an electoral advantage as a result of the Bracketing Structure. (<u>Kim</u> Bracketing Update, ECF 188; D.C. Opinion, p. 5.)

39.    Among others with whom Andy Kim did not want to associate, Kim would have been featured on the county line in Monmouth County with an incumbent Congressman who "is not supportive of [Kim's] campaign," and the same was true for Morris County. (Hearing Tr. 182:1–22.)

40.    In the 2024 Democratic Primary Election, Sarah Schoengood was not going to be featured on the county line in any county within her congressional district, and did not want to bracket with any other candidate for U.S. Senate other than Andy Kim. (V.C., ¶¶ 152-54; D.C. Opinion, p. 6.; <u>Kim</u> ECF 188.)

41.    But for the District Court's issuance of the preliminary injunction, Sarah Schoengood would not have been included in the preferential ballot draw in any of these counties within her congressional district because she did not bracket

with another U.S. Senate candidate, and would have been subject to a significant ballot and electoral disadvantage since she was unbracketed and ran against an opponent who was featured on the county line in each county. (V.C., ¶¶ 152-56; D.C. Opinion, p. 6.)

42.    As an unbracketed candidate, Sarah Schoengood would have been "vulnerable to be placed with ballot gaps in between her bracketed opponents or otherwise put out in Ballot Siberia, and/or could be either in a column by herself or stacked in a column with other candidates for the same or different offices with whom she does not want to associate." (V.C.. ¶ 156.)

43.    In the 2024 Democratic Primary Election, Carolyn Rush was not going to be featured on the county line in multiple counties within her congressional district (Kim ECF 188), and was also going to be featured on the county line with at least one of her opponents in multiple other counties within her congressional district (V.C., ¶ 162; D.C. Opinion, p. 6; Kim ECF 188).

44.    But for the District Court's issuance of the preliminary injunction, Carolyn Rush would have been subject to a significant ballot and electoral disadvantage since she ran against an opponent who was featured on the county line in multiple counties. (V.C., ¶ 162; D.C. Opinion, p. 6; Kim ECF 188.)

45.    Carolyn Rush also would have been stacked in the same column as one of her opponents in multiple counties, leaving the appearance that they were

associated, even though they were running against each other. (ECF 188 & n.1; V.C., ¶¶ 89-91; D.C. Opinion, pp. 38-39 & n.25.)

46.    Kim, Schoengood, and Rush do not want to associate with candidates for a variety of reasons, including, among others, policy differences, different personal views, not wanting to appear together with a candidate who is supporting one of their opponents or not supporting them, and not even knowing who some of the candidates on the county line are. (V.C., ¶¶ 140, 148-49 (Kim), 154, 157 (Schoengood), 163 (Rush); Hearing Tr. 170:16–171:8, 181:19–185:10 (Kim); D.C. Opinion, pp. 30, 36-37.)

47.    Andy Kim provided testimony at the preliminary injunction hearing, which was deemed credible and assigned substantial weight by the District Court. (Hearing Tr. 165–247; D.C. Opinion, p. 24.)

48.    Andy Kim explained that being featured on the county line with candidates who do not support him impacts his campaign and voter engagement. (Hearing Tr. 182:21–24; D.C. Opinion, p. 37.)

49.    Andy Kim also explained the confusion surrounding a situation where candidates featured together on the county line "are actively working against each other," or where he would be featured on the county line with candidates he does not even know. (Hearing Tr. 183:5–14; D.C. Opinion, p. 37.)

50.    Andy Kim further explained that he "just want[s] to run for the Senate seat and does not want to have to consider the implications of associating with hundreds of candidates in various counties across the state. (Hearing Tr. 184:2–21; D.C. Opinion, p. 37.)

51.    Kim, Schoengood, and Rush fear they would suffer a significant disadvantage at the hands of an opponent if they do not pursue the county line and/or otherwise bracket, and would therefore be punished for exercising their right to not associate. (V.C., ¶¶ 154-57, 162-63.)

52.    Candidates like Schoengood, who are not on the county line and who are unbracketed are excluded from first position and often placed in columns further to the right or rows further to the bottom. (V.C., ¶¶ 152-56; D.C. Opinion, pp. 37-38; Kim, 99 F.4th at 155-56.)

53.    As candidates that were unbracketed, not placed on the ballot via the preferential ballot draw, not eligible for first ballot position, featured in Ballot Siberia or with ballot gaps between candidates running for the same office, running in a column by themselves as compared to the "weight of the line," not on the county line, and/or as candidates that were forced to associate in order to prevent or otherwise mitigate against the advantage of their opponent, the Conforti Plaintiffs suffered the same harms that the Kim Plaintiffs were subjected to. (A.C., ¶¶ 101-167; MTD Opinion, pp. 6-8; V.C., ¶¶ 88-102; Kim, 99 F.4th at 155-56.)

15

**Expert Reports Demonstrating Burdens of Bracketing Structure**

54.    Expert reports demonstrate that the Bracketing Structure affords candidates on the county line enormous ballot advantages, with respect to the primacy effect/position bias, the weight of the line, and other ballot features, as well as disadvantages for unbracketed candidates.  (V.C., ¶¶ 103-33; <u>id.</u> at Ex. B, Expert Report of Dr. Josh Pasek ("Pasek Report"); Ex. C., Expert Report of Dr. Julia Sass Rubin ("Rubin Report"); Ex. D, Expert Report of Dr. Samuel S.-H. Wang ("Wang Report"); D.C. Opinion, pp. 31-32.)

55.    Dr. Josh Pasek prepared an expert report that Plaintiffs submitted with the Verified Complaint on February 26, 2024 (V.C., Ex. B, Pasek Report), as well as an Expert Reply that Plaintiffs submitted with their Reply Brief on March 12, 2024 (<u>Kim</u> ECF 95, Ex. A), a Certification that Plaintiffs submitted in opposition to Defendants' *in limine* motions on March 22, 2024 (<u>Kim</u> ECF 170), and a Certification that Plaintiffs submitted in response to items raised by defense counsel concerning cross-examination (<u>Kim</u> ECF 175-1).

56.    Dr. Pasek explained that the primacy effect is a pervasive phenomenon in elections which supports the conclusion that candidates listed in the first position or earlier-listed on the ballot receive a distinct electoral advantage solely from the order in which they are placed on the ballot. (Pasek Report, ¶¶ 27, 38-43, 49; D.C. Opinion, p. 31.)

57.     In an experimental study conducted by Dr. Pasek (Pasek Report, ¶¶ 114-57), among other findings, he found that "all candidates on party-column ballots performed better when listed in the leftmost available position, with these benefits ranging from 3.9 percentage points to 27.8 percentage points across candidates." (Pasek Report, ¶ 144; D.C. Opinion, p. 38; <u>Kim</u> 99 F.4th at 156.)

58.     In Dr. Pasek's study, even comparing only bracketed candidates (and thus not including candidates featured in a column by themselves), "the earlier listed candidate received an 8.2% and 11.1% benefit over chance and 16.5% and 22.2% benefit over later-listed candidates" in the congressional districts studied. (Pasek Report ¶ 143; D.C. Opinion, p. 38.)

59.     Dr. Pasek concluded that "primacy biases in New Jersey elections will always negatively impact candidates who do not bracket with a candidate for the pivot point position, as these candidates are guaranteed to be placed in positions further to the right of (or below) colleagues who are bracketed with someone in the pivot-point position." (Pasek Report, ¶ 81; D.C. Opinion, pp. 37-38; <u>Kim</u>, 99 F.4th at 156.)

60.     Dr. Pasek found that candidates featured on the county line also obtain a distinct advantage from the "weight of the line," separate and apart from ballot placement. (Pasek Report, ¶¶ 149-52; D.C. Opinion, p. 31; <u>Kim</u>, 99 F.4th at 155.)

61.     In the study conducted by Dr. Pasek (Pasek Report ¶¶ 114-57), he found an 11.6% difference in voters' "tendency to elect the same candidates for both uncontested races depending on whether respondents were seeing the party-column or office-block ballot," which was statistically significant with "less than a one-in-a-million probability of appearing by chance." (Pasek Report, ¶ 156; D.C. Opinion, pp. 31-32; <u>Kim</u>, 99 F.4th at 155.)

62.     Dr. Julia Sass Rubin prepared an expert report that Plaintiffs submitted with the Verified Complaint on February 26, 2024 (V.C., Ex. C, Rubin Report), as well as a Certification that Plaintiffs submitted in opposition to Defendants' *in limine* motions on March 22, 2024 (<u>Kim</u> ECF 168).

63.     In a review of historical data of 37 U.S. Senate, congressional, and gubernatorial primary races with split endorsements between counties from 2012 and 2022, among other findings, Dr. Rubin found that in 35 of such contests, "candidates received a larger share of the vote when they were on the county line than when they were endorsed but there was no county line. The difference in the candidate's performance ranged from -7 to 45 percentage points, with a mean of 12% and a median of 11 percentage points." (Rubin Report, p. 4; D.C. Opinion, p. 32; <u>Kim</u>, 99 F.4th at 155.)

64.     Dr. Samuel S.-H. Wang prepared an expert report that Plaintiffs submitted with the Verified Complaint on February 26, 2024 (V.C., Ex. D), as well

as an Expert Reply that Plaintiffs submitted with their Reply Brief on March 12, 2024 (<u>Kim</u> ECF 95, Ex. B), and a Certification that Plaintiffs submitted in opposition to Defendants' *in limine* motions on March 22, 2024 (<u>Kim</u> ECF 169).

65.     Dr. Wang provided expert statistical analysis based on the data compiled by Dr. Rubin. (Wang Report, pp. 12-14.)

66.     Among other data analyzed, Dr. Wang reviewed Dr. Rubin's data show showing that in the 35 out of 37 split endorsement primary contests, there was an average of 12.2% greater difference in vote share in counties where the candidate was both endorsed by the county party leadership and featured on the county line than when receiving the endorsement but not featured on a county line ballot; he found that "[t]his average difference differs from zero with extreme statistical significance, occurring by chance 1 in 1.9 million times (a probability of 0.00000051)," which "is consistent with the hypothesis that candidates derive a specific benefit from being on the county line that is separate from party endorsement." (Wang Report, p. 13.)

67.     Dr. Wang also explained the primacy effect and the "weight of the line" and concluded "[b]ased on principles of neuroscience and statistical testing," that "the physical arrangement of candidate names on the county line acts as a powerful force to steer voter behavior toward" those candidates. (Wang Report, pp. 5-8, 16; D.C. Opinion, pp. 31-32 nn.22-24.)

68.     In connection with the application for a preliminary injunction, certain defendants submitted *in limine* motions to exclude, among others, the expert reports of Dr. Pasek, Dr. Rubin, and Dr. Wang (Kim, ECF 152, 153, 155, 156, 157) and the District Court rejected such motions and further relied on the export reports submitted by Dr. Pasek, Dr. Rubin, and Dr. Wang, as well as the testimony of Dr. Rubin, who testified at the preliminary injunction hearing, which the District Court found to be credible and afforded substantial weight. (D.C. Opinion, pp. 26, 31-32, 37-38.)

69.     Defendants did not submit any expert reports to rebut the expert reports of Dr. Pasek, Dr. Rubin, and Dr. Wang, did not submit any of their own expert reports which would otherwise refute any of their findings and conclusions (D.C. Opinion, p. 20), and to date, have not even identified any expert witness of their own.

**Alleged State Interests**

70.     Defendants' alleged state interests in preserving the right of political parties and candidates to associate and to communicate such associations to voters, providing a manageable and understandable ballot, and avoiding voter confusion. (D.C. Opinion, p. 33; Kim, 99 F.4th at 158.)

71.    Candidates and political parties maintain the ability to associate on the ballot itself via a common slogan/designation, and Plaintiffs do not seek relief to eliminate the slogan. (V.C., ¶¶ 6, 17, 180; D.C. Opinion, p. 33; <u>Kim</u>, 99 F.4th at 158.)

72.    Candidates and political parties are not prevented from otherwise communicating their association with/endorsement of candidates outside the ballot. (V.C., ¶¶ 17, 180; D.C. Opinion, p. 33; <u>Kim</u>, 99 F.4th at 158.)

73.    The Bracketing Structure has historically led to voter confusion and even voter disenfranchisement. (V.C., ¶¶ 86, 104, 117; Pasek Report, ¶¶ 106-07, 109, 178; Rubin Report, pp. 8-10; D.C., Opinion, p. 33; <u>Kim</u>, 99 F.4th at 151 n.3, 158 n.13.)

74.    In the 2020 Democratic Primary Election, Christine Conforti was running for a congressional seat and was featured on the county line in Mercer County, in the same column as one of her opponents for the same office, even though it was only a "Vote for One" office, which led to the disenfranchisement of approximately one-third of all voters in that congressional district from Mercer County due to overvotes. (V.C., ¶¶ 89-91, 117; Pasek Report, ¶ 109; Rubin Report, pp. 8-9; D.C. Opinion, p. 33.)

**Elections Clause**

75.    The Bracketing Structure favors candidates on the county line over their opponents, and further disfavors unbracketed candidates who exercise their right to not associate. (V.C., ¶¶ 104, 109-11, 113-14, 119, 124-27; Rubin Report, p. 4; Wang Report, pp. 13, 16; Pasek Report, ¶ 38-43, 50-64, 73, 76-78, 81, 125-26, 149, 153-57, 161, 175, 183, 185; D.C. Opinion, pp. 37-38; Kim, 99 F.4th at 147, 157, 159.)

76.    The Bracketing Structure influences primary election outcomes through the manner in which the primary election ballots are organized and displayed to voters, and does so at the critical moment right as the vote is about to be cast. (V.C., ¶¶ 113, 120; Pasek Report, ¶¶ 50-64, 127-28, 180, 183, 185; D.C. Opinion, p. 35; Kim, 99 F.4th at 147, 157, 159.)

**New Jersey Attorney General**

77.    On March 17, 2024, the New Jersey Attorney General submitted a letter to the District Court advising that he would not seek to intervene in the Kim case to defend the constitutionality of the Bracketing Structure since he had "concluded that the challenged statutes are unconstitutional." (Kim ECF 149; Kim, 99 F.4th at 150, 154 n.9, 157 n.12.)

78.    On March 20, 2024, the New Jersey Attorney General provided a similar submission to the District Court in Conforti, moving for leave to withdraw

from the case and removing his opposition based on his conclusion that the Bracketing Structure was unconstitutional (Conforti ECF 188, 188-1). That motion was granted by the District Court (Conforti ECF 191).


Respectfully submitted,

**WEISSMAN & MINTZ LLC**
220 Davidson Avenue, Suite 410
Somerset, New Jersey 08873
732.563.4565
bpugach@weissmanmintz.com
Co-counsel for Plaintiffs

By:    *Flavio L. Komuves*
         *Brett M. Pugach*

Dated: March 14, 2025

**BROMBERG LAW LLC**
43 West 43rd Street, Suite 32
New York, New York 10036
212.859.5083
ybromberg@bromberglawllc.com
Co-counsel for Plaintiffs

By:    *Yael Bromberg*