## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHRISTINE CONFORTI**, *et al.*,<br><br>　　　　　**Plaintiffs**,<br><br>　v.<br><br>**CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk**, *et al.*,<br><br>　　　　**Defendants**. | **Case No. 3:20-CV-08267-ZNQ-TJB**<br><br><u>Civil Action</u> |
| **ANDY KIM**, *et al.*,<br><br>　　　　　**Plaintiffs**,<br><br>　v.<br><br>**CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk**, *et al.*,<br><br>　　　　**Defendants**. | **Case No. 3:24-CV-1098-ZNQ-TJB**<br><br><u>Civil Action</u> |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AGAINST JOANNE RAJOPPI, UNION COUNTY CLERK, JOHN S. HOGAN, BERGEN COUNTY CLERK, RITA ROTHBERG, CAPE MAY COUNTY CLERK

**WEISSMAN & MINTZ LLC**
220 Davidson Avenue, Suite 410
Somerset, New Jersey 08873
732.563.4565
bpugach@weissmanmintz.com
Co-counsel for Plaintiffs

Of Counsel and On The Brief:
Brett M. Pugach (No. 032572011)
Yael Bromberg (No. 036412011)
Flavio L. Komuves (No. 018891997)

**BROMBERG LAW LLC**
43 West 43rd Street, Suite 32
New York, New York 10036
212.859.5083
ybromberg@bromberglawllc.com
Co-counsel for Plaintiffs

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF FACTS ....................................................................4

PROCEDURAL HISTORY....................................................................4

LEGAL STANDARD.........................................................................11

LEGAL ARGUMENT ........................................................................13

I.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT THAT
      NEW JERSEY'S PRIMARY BALLOT DESIGN LAWS AND
      PRACTICES VIOLATE THE FIRST AMENDMENT, THE
      FOURTEENTH AMENDMENT, AND THE ELECTIONS CLAUSE.......13

            A. FIRST AND FOURTEENTH AMENDMENT CLAIMS.................17

            B. ELECTION CLAUSE ......................................................23

II.   THE RELIEF SOUGHT BY PLAINTIFFS IN THEIR MOTIONS IS
      APPROPRIATE .........................................................................25

CONCLUSION ..................................................................................28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986)....................................................................................11

*Carey v. Wisconsin Elections Comm'n*,
　624 F. Supp. 3d 1020 (W.D. Wis. 2022)......................................................25

*Cook v. Gralike*,
　531 U.S. 510 (2001)....................................................................................23

*Hodinka v. Delaware Cnty.*,
　759 F. Supp. 2d 603 (E.D. Pa. 2011) ..........................................................26

*Kim v. Hanlon*,
　99 F.4th 140 (3d Cir. 2024) .................................................................*passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986)...........................................................................12,13,14

*Mazo v. N.J. Sec'y of State*,
　54 F.4th 124 (3d Cir. 2022) .............................................................17,22,23

*Olagues v. Russoniello*,
　770 F.2d 791 (9th Cir. 1985) ......................................................................25

*OpenPittsburgh.Org v. Voye*,
　563 F. Supp. 3d 399 (W.D. Pa. 2021) .........................................................26

*Reifer v. Westport Insurance*,
　751 F.3d 129 (3d Cir. 2014) .......................................................................25

*Resol. Tr. Corp. v. Fid. & Deposit Co. of Maryland*,
　205 F.3d 615 (3d Cir. 2000) .................................................................12,13

*Reynolds v. Sims*,
　377 U.S. 533 (1964)....................................................................................27

*Sarullo v. U.S. Postal Serv.*,
    352 F.3d 789 (3d Cir. 2003) .......................................................................12

*United States v. Berks Cnty., Pennsylvania*,
    277 F. Supp. 2d 570 (E.D. Pa. 2003) ........................................................27

## Statutes

28 U.S.C. §2201 ...........................................................................................25

## Rules

Fed. R. Civ. P. 56 ....................................................................................11,12

Fed. R. Civ. P. 57 ........................................................................................25

Fed. R. Civ. P. 65 ........................................................................................25

## PRELIMINARY STATEMENT

The time has come to bring New Jersey's unconstitutional primary ballot laws and practices to an end, via judicial decree. New Jersey's ballot design is a national outlier, and a national embarrassment. All other states organize their primary ballots around the office sought, with almost all using an "office-block" display, i.e., with candidates for a given office listed in a single column under (or to the side of) the office for which they were nominated. This is the same multiple choice format that school children easily comprehend and use for testing. In contrast, before this Court and the Third Circuit intervened in 2024, New Jersey designed primary ballots in a gridded format that visually links candidates running for one office with those pursuing a different one. A core feature of this ballot was the "county line," a grouping of candidates (also commonly referred to as "bracketing" of candidates) endorsed by political party leadership who are rewarded with favored ballot position and visual cues nudging voters to support them.

Plaintiffs' experts showed that candidates chosen for the county line receive immense electoral advantages over their opponents, who are further disadvantaged by being placed in obscure portions of the ballot known as "Ballot Siberia," being excluded from drawing for first ballot position, being stacked in a column with their opponents or other candidates with whom they do not wish to associate, and

being set aside in the ballot design to stand alone relative to other candidates for the same and/or different offices.

The bracketing and ballot placement system fails to treat similarly situated candidates running for the same office equally. Further, county line ballots burden candidates with either foregoing the advantages of being placed on the county line or forced to associate with candidates they wouldn't otherwise associate with – or punishing those who do not associate with other candidates, in violation of their right not to associate. This system violates a confluence of constitutional rights (right to vote, equal protection, freedom of association) contrary to the First and Fourteenth Amendments, and the Elections Clause of the United States Constitution.

In this Court's previous opinion in *Kim* granting a preliminary injunction ending the county line ballot for the 2024 Democratic primary election, the Court canvassed Plaintiffs' scientific evidence, expert reports, sworn declarations, and live testimony by both fact and expert witnesses during a nine-hour evidentiary hearing. The Court credited the testimony and credibility of these witnesses, and found a severe burden on candidates' and voters' rights, which outweighed the ephemeral interests asserted by the government parties. Sixteen of the original 19 county clerks in *Kim* have already abandoned the defense of this case, and settled with Plaintiffs for a consent decree including a permanent injunction and an award

of counsel fees, as have five of the original six in *Conforti*. Two of the remaining clerks have admitted in a March 13 filing that they will not contest the court's ruling that the county line ballot was unconstitutional or otherwise defend the constitutionality of New Jersey's ballot design laws/practices at issue in these cases. (SUMF ¶1.) All but one of the political party intervenors, have also abandoned their opposition to Plaintiffs' demands. And the Attorney General has remained firm in his independent conclusion that the balancing of burdens and interests favored Plaintiffs' right to relief.

That was the state of the evidence a year ago, when this Court granted Plaintiffs' requested injunction, enjoining the use of county line ballots and commanding the use of office-block ballots in their place for the 2024 primary election. And, despite vehement resistance by the 19 of the state's 21 county clerks who previously employed the county line ballot, office-block primary ballots were the law of the land in 2024 in the Democratic primary. *A year later, the evidence hasn't changed*. Plaintiffs' expert reports, individually and collectively, still stand unrebutted as demonstrations of the distortive effects of the county line and its burdens on voters and candidates. *The legal analysis also hasn't changed*. The Court's findings that an application of *Anderson-Burdick* showed the burdens on Plaintiffs were "severe" and that the proffered state interests were "not especially compelling" hasn't changed (District Court opinion in *Kim*, ECF No. 194

(hereinafter, "*Kim* Op." 32-33)), requiring exacting scrutiny, nor has the analysis changed under the Elections Clause, which provided an independent basis for voiding the county line ballot due to its distortive effects (*Kim* Op., 34-35).

This matter presently comes before this Court as a motion for summary judgment to find that the county-line ballot design and all its associated bells and whistles, including the bracketing of candidates, is unconstitutional. While the pertinent law and facts have not changed, and remain unrebutted, it is important to note that the position of the two remaining county clerk defendants, the Bergen and Union Clerks, *has* changed. *They have now altogether abandoned their defense of the constitutionality of the ballot design*. Based on this change of position alone, the Court is on good footing to enter summary judgment in favor of Plaintiffs.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference the Statement of Undisputed Materials Facts ("SUMF") filed with this brief.

## PROCEDURAL HISTORY

The Complaint in the *Conforti* matter was initially filed on July 6, 2020, a day before New Jersey's primary election that year. The initial plaintiff, Christine Conforti, was a candidate for U.S. Congress who identified various harms that had come to her and her campaign as a result of New Jersey's county line ballot design system, and she sued the clerks of three counties that encompassed her

congressional district – Monmouth, Ocean, and Mercer – for redress of her rights to a fair ballot. (*Conforti*, ECF 1).

An amended complaint followed on January 25, 2021. (*Conforti*, ECF 33). The amended complaint added four additional plaintiffs who had pursued federal, local, and party office in 2020, and who had been damaged by the county line ballot scheme's effect on their associational rights and its diminution of their chances of winning their election. A fifth new plaintiff was a candidate for county office in 2021, and made similar allegations of harm. The sixth and final new plaintiff was the New Jersey Working Families Alliance, which had members comprised of both voters and candidates throughout the state who had suffered similar harms, and the organization also endorsed candidates forced to contend with the biased ballot, and otherwise engaged in voter education. In addition, three new county clerks were added as defendants, as they had been the individuals who designed the ballots that had harmed Plaintiffs, hailing from Bergen, Atlantic, and Hudson County. While all county clerks and the State were put on notice of the filing, only the State and Gloucester County chose to intervene at this point.

All defendants filed motions to dismiss on a myriad of grounds, and on May 31, 2022, this Court filed an Opinion and Order largely denying the motions to dismiss. Of particular relevance here, the Bergen Clerk filed a wide-ranging attack on the Plaintiffs' complaint, vigorously defending the legality of the county line

system and their prerogatives to administer it, and demanding the dismissal of the complaint as to it (*Conforti*, ECF 60). In the order denying the motion to dismiss, after canvassing the New Jersey primary ballot design laws and practices, and the various interests asserted by the parties, the Court found that all plaintiffs had standing to sue on at least one theory, and that the matter was not moot under the 'capable-of-repetition-while evading review' rule. The Court proceeded to hold that under the controlling *Anderson-Burdick* test, the plaintiffs had pleaded facts showing "the fundamental rights involved in this case are more than moderately infringed upon," which justified a "moderate to severe level of scrutiny." (ECF 111, p. 35).

Suddenly concerned that their valued but unconstitutional ballot design laws might be at risk, a number of county political organizations from both the Democratic and Republican parties and one clerk moved to intervene into the case (*Conforti*, ECF 164). Over plaintiffs' objections, the motions to intervene were granted on March 31, 2023. By this point, the Defendants had all filed answers, and the Rule 26 conference was held on June 13, 2023. A limited amount of written discovery was exchanged. On March 20, 2024, New Jersey Attorney General Matthew Platkin filed an application to withdraw from the case because he had concluded that his office "cannot defend these statutes because he has concluded they are unconstitutional." (*Conforti*, ECF 188-1) - a similar statement

he also placed on the docket in the *Kim* matter. (*Kim*, ECF 149). Then, in the wake

of the *Kim* decision's affirmance by the Third Circuit, multiple parties entered into

consent decrees in *Conforti*: (a) as to the government defendants, permanently

enjoining county line ballots and requiring office block ballots, and agreeing to

stipulated counsel fees (SUMF ¶21); and (b) as to the county political

organizations, permanently withdrawing their objections to the relief sought

(SUMF ¶23.)

This left only the Bergen Clerk and the Camden Democrats as defendant and

intervenor, respectively, in *Conforti*. This motion seeks final judgment against the

Bergen Clerk permanently enjoining and declaring unconstitutional the use of the

county line ballot and its attendant features and requiring the use of office block

ballots. A separately filed pending motion seeks dismissal as to the Camden

Democrats for lack of standing due to the consent decree reached with the Camden

Clerk, and for lack of sufficient interest in connection with the ballots to be

distributed in the two counties related to these litigations. (*Conforti*, ECF 229). An

identical motion is pending in *Kim*, ECF 287).

The Verified Complaint in *Kim* was filed on February 26, 2024. The

plaintiffs were then-U.S. Representative Andy Kim and two Congressional

candidates. The suit sought preliminary and permanent injunctive relief against all

19 counties in New Jersey that used a county line ballot. The Secretary of State

was named as an interested party, but was not actually sued. Separately, Plaintiffs notified known candidates opposing Plaintiffs, and State and county political organizations of the filing of the suit. Generally, *Kim* sought similar relief as that sought in *Conforti*: invalidation of the county-line ballot laws and practices as unconstitutional under the First Amendment, the Fourteenth Amendment, and the Elections Clause. The *Kim* filing, however, was accompanied by four comprehensive expert reports by nationally recognized scholars proving the harms of the county-line ballot design to candidates and voters. The initial filing also sought an injunction against the use of the county-line ballot in the 2024 primaries. A flurry of hearings and filings from the existing parties, proposed parties, and amici, too numerous to recount, ensued. One of these (*Kim*, ECF149) was a letter from the New Jersey Attorney General based on his conclusion that the statutes challenged by Plaintiff were unconstitutional, an unusual step that the Third Circuit specifically mentioned when affirming the preliminary injunction.

Notably, during the defense's briefing, the county defendants now remaining in *Kim*, and particularly the Union and Bergen Clerks, were among those who strenuously opposed the motion for a preliminary injunction, and in the case of Union, even tried to have the case dismissed (see Table of Contents of *Kim* ECF 50, 63; *Kim* ECF 71), and filed seven *in limine* motions in the midst of the marathon evidentiary hearing to exclude expert testimony and reports. (SUMF ¶68,

see also *Kim*, ECF 152, 153, 154, 155, 156, 157, 158.) This is in addition to Bergen's filing of a motion to dismiss in *Conforti*. (*Conforti*, ECF 60-1.) They hardly stood as neutrals in the case.[1]

On March 18, 2024, the Court held a nine-hour "marathon" evidentiary hearing, where both Plaintiffs and Defendants presented fact and expert testimony, and witnesses were subject to direct and cross-examination by the party and intervenor attorneys, and the Court. To be sure, this was a nine-hour intensive preliminary injunction hearing; nonetheless, neither Plaintiffs nor Defendants were necessarily allowed to probe facts as thoroughly as in a trial. But it's worth noting that in the year that has passed since then, no defendant (including the remaining

---

[1] While the Bergen and Union Clerks have now abandoned the defense of the constitutionality of the bracketing system, it's not true that they never opposed the Plaintiffs. *See Kim* ECF 50, 63; *Kim* ECF 71 (briefs in opposition to preliminary injunction by the Bergen and Union Clerks); ECF 152, 153, 154, 155, 156, 157, 158) (seven *in limine* motions filed by the Union Clerk); *Conforti* ECF 60-1 (brief in support of motion to dismiss by Bergen Clerk). And despite their claim that the State was really the responsible party here and should pay fees, it is notable that they never filed a third-party claim against the State of New Jersey. Indeed, while "[t]he bracketing structure is governed by New Jersey State law" (*Kim*, ECF194, pp. 3-4), Plaintiffs alleged that county clerks as a general matter flouted or misapplied state law and/or exercised their discretion in an unconstitutional manner by producing their ballots in inconsistent ways that left candidates to guess whether clerks would follow state law, and if they did, whether it would be done consistently or not. (*Id*., pp. 4-5; ECF 1, ¶59). In short, the clerks, left to their own devices, were applying state law inconsistently and in a way to benefit themselves and their allies. (*Id*.; *see also id*. at ¶115 (discussing manipulation of the ballot drawing process)).

ones) have presented any expert reports or testimony of their own, or noticed any depositions of plaintiffs' experts, to contradict what was presented at the hearing.

In an opinion issued March 29, 2024, this Court granted Plaintiffs' motion for a preliminary injunction, and also denied the defense's *seven* motions *in limine* seeking to exclude Plaintiffs' expert reports and testimony. Those *in limine* motions were filed in the midst of the evidentiary hearing, with the Union County Clerk leading the initiative, consistent with her vigorous defense throughout the litigation of *Kim*. (*Kim*, ECF 152, 153, 154, 155, 156, 157, 158.) Most of the defendants then sought a stay of the ruling from the District Court. When that was denied, most defendants (including the Bergen and Union clerks) made the same request of the Third Circuit. That too was denied, with the Court ordering expedited briefing and argument on the merits.

Oral argument was held on April 12, 2024, and on April 17, 2024, a three-judge panel unanimously affirmed the district court's injunction in all respects in a published opinion. *Kim v. Hanlon*, 99 F.4th 140 (3d Cir. 2024).

Following this, Plaintiffs entered into successful negotiations with sixteen of the clerk defendants. Each of them agreed to a consent decree permanently enjoining them from using county-line ballots, and using office-block ballots instead. Bergen and Union did not, and continue to fight this matter. And while Cape May agreed to a consent decree, and counsel has affirmed such consent and

10

approval of the proposed consent decree to the Magistrate Judge, they have been hard to reach, and have yet to offer their signature so that the agreement can be uploaded on the docket.[2,3] It is accordingly against these three remaining defendants that this motion is brought.

## LEGAL STANDARD

A motion for summary judgment may be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248. A dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion

---

[2] Regardless of whether summary judgment is granted against the Cape May Clerk, the Plaintiffs have evidence showing that counsel for that Clerk repeatedly, from October 2024 through February 2025, affirmed that Cape May would enter into basically the same consent decree as the other settling counties. Despite this, the Cape May Clerk has refused to execute the agreed-upon order. Consequently, if summary judgment is not granted against Cape May, Plaintiffs intend to file a motion to enforce the settlement, as there was a meeting of the minds on the matter, but the formalities of the agreement have not been completed.

[3] The Camden Democrats also presently remain in this action; a motion to dismiss it was filed on February 21, 2025 and is currently pending before the Court. (*Kim*, ECF 287-1; *Conforti*, ECF 229-1.) That Camden Democrats are seeking "different relief" than the main parties in this action is made even further stark by the fact that, in their March 13, 2025 filings, the Union and Bergen Clerks are expressly no longer defending the constitutionality of the county line ballot design.

by "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Summary judgment is proper only if this Court is "persuaded . . . that the facts . . . are so one-sided so as to require judgment as a matter of law in its favor," *Resol. Tr. Corp. v. Fid. & Deposit Co. of Maryland*, 205 F.3d 615, 657 (3d Cir. 2000)), and "inappropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 794 (3d Cir. 2003) (*citing Anderson*, 477 U.S. at 248).

Where, as here, "the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and the Court must grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## LEGAL ARGUMENT

**I.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT THAT NEW JERSEY'S PRIMARY BALLOT DESIGN LAWS AND PRACTICES VIOLATE THE FIRST AMENDMENT, THE FOURTEENTH AMENDMENT, AND THE ELECTIONS CLAUSE.**

The facts regarding the biased county-line ballot design are "so one-sided so as to require judgment as a matter of law" here. *Resol. Tr. Corp.*, 205 F.3d at 657. The material facts today are no different than those presented to this Court, and upheld by a unanimous appeals court panel in a precedential opinion one year ago. More, the Bergen and Union Clerks refuse to even defend the constitutionality of the county-line ballot design. (SUMF ¶1.) Specifically, the Bergen Clerk attests in his signed certification that he "has no intention of defending it." (Id.) The Union Clerk similarly attests that she "do[es] not intend to defend against Plaintiffs' challenge to the statutes that mandate the Bracketing Structure." (Id.) For this reason alone, there is no genuine issue for trial, and summary judgment may be summarily granted as a matter of law.

Even beyond Defendants' abandonment of a defense of constitutionality, the record, "taken as a whole," *Matsushita*, 475 U.S. at 587, additionally includes the copious expert reports, testimony, and certifications in this manner, as well as the procedural posture by which this motion comes before the Court – including the withdrawal and consent decrees entered by nearly 90% of the original county clerk

Defendants in this action, and the Attorney General's agreement that the county-line ballot design is unconstitutional giving way to his refusal to defend it. Plaintiffs accordingly urge this Court to enter a motion for summary judgment in their favor finding that the county-line ballot design and its attendant features are unconstitutional pursuant to the First and Fourteenth Amendments and the Elections Clause. There remains "no genuine issue for trial" as to the merits of this corrupt and corrupting ballot design. *Id.*

The Third Circuit Court of Appeals recognized that the county line ballot design and its "endorsements and ballot placement" have "*significant electoral value.*" *Kim v. Hanlon*, 99 F.4th 140 (3d Cir. 2024) (emphasis added). The Third Circuit also acknowledged the impact of this ballot design on the voters: "Voters must navigate complex and sometimes contradictory ballots in order to vote for candidates who are left off the county line." *Id*. The panel properly understood the county line as a ballot "*structure of preferential treatment*" which favors some candidates over others, "with candidates chosen by local party leaders eligible for *prime ballot placement* by county clerks." *Id*. (emphasis added).

The Third Circuit also recognized that "[e]ven apart from its placement, the county line itself *carries weight*, as it visually signals to voters the candidates whom the county's political leadership favors and typically includes incumbents, other highly-recognizable names, and party elites." *Id*. (emphasis added). Whereas

14

"[n]on-pivot candidates who do not obtain a spot on the county line and choose not to be bracketed with a pivot candidate are often placed in more obscure parts of the ballot to the right (or bottom) of the county line, colloquially referred to as 'Ballot Siberia.'" *Id*. "Those *unfavored candidates may also be stacked* with their opponents or with other candidates with whom they do not wish to be associated, which to a voter would be indistinguishable from bracketing." *Id.* (emphasis added).

Notably, the Third Circuit opinion incorporated images of the county-line ballot design and an office block ballot design in use in New Jersey. *Id.* These visual representations alone show that it is <u>plain as day</u> that the county-line design is, in the words of the Third Circuit, "complex and sometimes contradictory" by prioritizing a "structure of preferential treatment" favoring some candidates over others with "prime ballot placement," and by the "weight" that the county line carries compared to the "obscure parts of the ballot" i.e., Ballot Siberia. *Id.*

These basic facts are not in dispute, and the underlying facts presented for summary judgment today are no different than those presented to this Court a year ago in securing the preliminary injunction upheld unanimously on appeal. As recognized by the Third Circuit, the county-line ballot has "significant electoral value," causes "complex and sometimes contradictory ballots" for the voters to navigate, and establishes "preferential treatment" on the ballot for only a subset of

candidates who obtain "prime ballot placement" due to their proximity to power. *Id*. (*See also Kim* Verified Compl., Exh. F.) There is no genuine dispute as to these material facts in terms of the significant burden that the county-line ballot imposes on voters and candidates. To be sure, the uncontested, persuasive expert reports offer additional statistical evidence demonstrating the pervasiveness and extremity that the ballot bias yields, and the degree to which incumbents become entrenched and uncontested due to the county-line ballot design. (See, e.g., SUMF ¶¶54-69). The basic premise that a considerable built-in bias exists cannot be refuted by any reasonable trier of fact – it is plain to the naked eye, and the expert reports offered additional, critical scientific analysis to substantiate this reality.

Further noteworthy is that the New Jersey Attorney General took the rare position to not defend the constitutionality of the county-line ballot design due to the exceptional circumstances here, based on a recognition that the challenge "lacks contrary evidence." (*Kim*, ECF 149 at 2.) As set out in his letter to court explaining his decision not to intervene in the *Kim* litigation, and his related decision to withdraw as an intervenor in the *Conforti* litigation, the Attorney General explained: "in the multiple years since these state statutes were challenged in this Court, the Attorney General has not identified reliable empirical evidence countering this record evidence, including after reviewing the filings of the other parties in this very case." (*Id.*; *see also* SUMF ¶¶76-77.)

16

## A. FIRST AND FOURTEENTH AMENDMENT CLAIMS.

The *Anderson-Burdick* test offers a framework to analyze constitutional challenges to specific provisions of election laws whereby "the reviewing court [is] to (1) determine the 'character and magnitude' of the burden that the challenged law imposes on constitutional rights, and (2) apply the level of scrutiny corresponding to the burden." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 136 (3d Cir. 2022) (discussing *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992)).

The Third Circuit recognized that "[t]he county-line system discriminates based upon the candidates' associational choices and policy positions." *Kim v. Hanlon*, 99 F.4th at 157. This is distinguishable from a scheme which "utilizes a lottery or applies to all parties equally." *Id.* Rather, "the county-line system is discriminatory – it picks winners and punishes those who are not endorsed or, because of their political views, want to disassociate from certain endorsed candidates. Those disfavored candidates are put in undesirable ballot positions and, by random coupling, can end up paired with potentially objectionable candidates." *Id.* Such outcomes "amount to a severe burden on the Plaintiffs' rights." *Id.*

This Court examined the record evidence, and especially the expert testimony and reports supporting the motion for preliminary relief, and found that an "exacting scrutiny" applies due to the "severe burden" on the First

Amendment's right to freedom of association.[4] The applicable test, then, is whether the county-ballot design laws are "narrowly tailored and advance a compelling state interest." (*Kim*, Op. at 33 (relying on *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 137 (3d Cir. 2022) and *Timmons v. Twin Cities*, 520 U.S. 351, 358 (1997)).

To recount, among other items, Plaintiffs' experts demonstrated burdens of the county-line ballot design by showing it affords candidates on the county line enormous ballot advantages with respect to the primacy effect/position bias, the weight of the line, and other ballot features, as well as disadvantages for unbracketed candidates. (SUMF ¶54).

Dr. Pasek explained that the primacy effect is a pervasive phenomenon in elections, which supports the conclusion that candidates listed in the first position or earlier-listed on the ballot receive a distinct electoral advantage solely from the order in which they are placed on the ballot. (SUMF ¶56). In an experimental study

---

[4] The Court initially instructed, in denying seven motions to dismiss in the *Conforti* litigation, that, "[a]ccepting the allegations of the Amended Complaint as true, and drawing all reasonable inferences in favor of Plaintiffs as the non-moving parties . . . the fundamental rights involved in this case are more than moderately infringed upon." (*Conforti* May 31, 2022 Op., at 35.) The Court thus applied a "moderate to severe level of scrutiny" based on the evidence to be presented in the as-applied challenge there. (*Id.*) Thus, based on the persuasive expert evidence collected and submitted in the *Kim* matter, this Court recognized the "severe burden" resulting from the county line, and thus that "exacting scrutiny" was required for the analysis. (*Kim* Op., at 32.)

he conducted of New Jersey voters and the county line ballot, among other findings, Dr. Pasek found:

- "[A]ll candidates on party-column ballots performed better when listed in the leftmost available position, with these benefits ranging from 3.9 percentage points to 27.8 percentage points across candidates." (SUMF ¶57).

- Even comparing only bracketed candidates (and thus not including candidates featured in a column by themselves), "the earlier listed candidate received an 8.2% and 11.1% benefit over chance and 16.5% and 22.2% benefit over later-listed candidates" in the congressional districts studied. (SUMF ¶58).

- "[P]rimacy biases in New Jersey elections will always negatively impact candidates who do not bracket with a candidate for the pivot point position, as these candidates are guaranteed to be placed in positions further to the right of (or below) colleagues who are bracketed with someone in the pivot-point position." (SUMF ¶59).

- Candidates featured on the county line also obtain a distinct advantage from the "weight of the line," separate and apart from ballot placement. (SUMF ¶60).

- An 11.6% difference in voters' "tendency to elect the same candidates for both uncontested races depending on whether respondents were seeing the party-column or office-block ballot," which was statistically significant with "less than a one-in-a-million probability of appearing by chance." (SUMF ¶61).

In a review of historical data of 37 U.S. Senate, congressional, and gubernatorial primary races with split endorsements between counties from 2012 and 2022, among other findings, Dr. Julia Sass Rubin found that in 35 of such contests, "candidates received a larger share of the vote when they were on the county line than when they were endorsed but there was no county line. The

difference in the candidate's performance ranged from -7 to 45 percentage points, with a mean of 12% and a median of 11 percentage points." (SUMF ¶63.) Dr. Samuel S.-H. Wang provided expert statistical analysis based on the data compiled by Dr. Rubin, finding that "[t]his average difference differs from zero with extreme statistical significance, occurring by chance 1 in 1.9 million times (a probability of 0.00000051)," which "is consistent with the hypothesis that candidates derive a specific benefit from being on the county line that is separate from party endorsement." (SUMF ¶¶65, 66).[5]

This Court rejected various *in limine* motions to exclude Plaintiffs' expert reports, and instead found them to be credible, reliable, and deserving of substantial weight. (SUMF ¶68.) Defendants have not submitted any expert reports to rebut the expert reports of Dr. Pasek, Dr. Rubin, and Dr. Wang, have not submitted any of their own expert reports which would otherwise refute any of their findings and conclusions, and to date, have not even identified any expert witness of their own. (SUMF ¶69.) As was true with respect to the preliminary injunction, these unrebutted expert reports further support this Court's prior

---

[5] Dr. Wang also explained the primacy effect and the "weight of the line" and concluded "[b]ased on principles of neuroscience and statistical testing," that "the physical arrangement of candidate names on the county line acts as a powerful force to steer voter behavior toward" those candidates. (SUMF ¶ 67).

conclusion that Plaintiffs are subjected to a severe burden warranting exacting scrutiny.

Similarly, record evidence demonstrates the manner and degree to which the distinct electoral advantages of being bracketed on the line, and the corresponding disadvantages of being off the line and/or unbracketed, tramples on associational rights by forcing candidates to associate with others with whom they do not want to associate. For example, the county line ballot design in some cases forces candidates to associate with those who are actively supporting an opponent, or whom they do not even know. And due to the extreme advantages that the county-line ballot design causes, on the other side of the coin, it disadvantages and punishes those who exercise their right to not associate. (SUMF ¶¶37-53.)

In *Kim*, the District Court and the Third Circuit found that the asserted states interests largely fell flat and were otherwise not compelling, and that the evidence in the record did not justify the burdens on Plaintiffs' rights, and were certainly not narrowly tailored to advance compelling state interests. (*Kim*, Op. at 33-34; *Kim*, 99 F.4th at 158-59.) Indeed, the alleged states interests included preserving the right of political parties and candidates to associate and to communicate such associations to voters, providing a manageable and understandable ballot, and avoiding voter confusion. (SUMF ¶70.) Yet, candidates and political parties maintain the ability to associate on the ballot itself via a common slogan/

designation, and Plaintiffs do not seek relief to eliminate the slogan. (SUMF ¶71.) Similarly, candidates and political parties are not prevented from otherwise communicating their association with or endorsement of candidates outside the ballot. (SUMF ¶72.) Moreover, the Bracketing Structure has historically led to voter confusion and even voter disenfranchisement. (SUMF ¶73); *see also Kim*, 99 F.4th at 158 & n.13 (the county-line ballots are "not understandable" and can "cause rather than prevent" voter confusion whereas office-block ballots on the whole are "manageable, understandable, and unconfusing").[6]

Any state interests asserted by the remaining Bergen and Union County Clerks simply cannot be "narrowly tailored," *Mazo*, 54 F.4th at 137, as evident by the fact that 1) the county-line ballot design is an extreme anomaly – it is a national outlier; 2) two other counties in the state have used the commonsense office block ballot design instead; and 3) for the first time, in the 2024 election, due to these litigations, every county in the state was able to and did in fact use an office-block ballot. It is perhaps for this reason, knowing that they have no leg to stand on in

---

[6] In the 2020 Democratic Primary Election, Christine Conforti was running for a congressional seat and was featured on the county line in Mercer County, in the same column as one of her opponents for the same office, even though it was only a "Vote for One" office, which led to the disenfranchisement of approximately one-third of all voters in that congressional district from Mercer County due to overvotes. (SUMF ¶ 74.)

defense of this unconstitutional design, that the Bergen and Union Clerks have now abandoned their defense. (SUMF ¶1.)

There being no genuine dispute of material fact remaining, and the presentation of the case at this point being so fundamentally one-sided – it would be hard to imagine a more one-sided posture in a case – that judgment as a matter of law must be entered in favor of the Plaintiffs as to the unconstitutionality of the county-line ballot design pursuant to the First and Fourteenth Amendments.

### B. ELECTIONS CLAUSE.

The Elections Clause of the U.S. Constitution empowers states to regulate the "times, places, and manner of holding elections" for federal office. Where state laws "fall outside of State's constitutional authority, they do not enjoy the deference afforded by the *Anderson-Burdick* balancing test." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 140 n.14 (3d Cir. 2022). A state election law exceeds the state's authority to regulate the time, places, and manner boundary when it "dictate[s] electoral outcomes," or "favor[s] or disfavor[s] a class of candidates," especially when the "adverse [ballot practice] handicap[s] candidates 'at the most critical stage in the election process – the instant before the vote is cast.'" *Cook v. Gralike*, 531 U.S. 510, 523, 525 (2001) (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)).

23

Counsel for the intervenor Camden Democrats[7] previously acknowledged that where the county-line ballot design sets up a preferential treatment system, such a design is a "per se" violation of the Elections Clause. (Oral Arg. 46:43-56.) The Third Circuit similarly upheld this Court's finding, based on the same record, that the county line ballot "does not merely regulate 'the numerous requirements . . . ensuring that elections are fair and honest, and that some sort of order, rather than chaos, is to accompany the democratic process'; *it puts a thumb on the scale for preferred candidates, impacting elections outcomes 'before the vote is cast.*" *Kim v. Hanlon*, 99 F.4th at 159 (emphasis added). The District Court and the Third Circuit found that the bracketing structure and its various features favor candidates on candidates on the county line and disfavor unbracketed opponents. (SUMF ¶¶75-76.)

The Bergen and Union County clerks will no longer defend the constitutionality of the county-line ballot, including as it relates to the Elections Clause. There being no genuine dispute of material fact remaining, and the presentation of the case at this point being so one-sided, taken as a whole, judgment as a matter of law must be entered in favor of the Plaintiffs as to the

---

[7] The standing of CCDC in this matter is currently contested pursuant to Plaintiffs' motion to dismiss the county-based political party for want of standing due to the entry of a consent decree with the Camden County Clerk and because the CCDC has no interest as to the county line ballot design as applied to the voters of Bergen and Union counties here.

unconstitutionality of the county-line ballot design pursuant to the Elections Clause.

## II.    THE RELIEF SOUGHT BY PLAINTIFFS IN THEIR MOTIONS IS APPROPRIATE.

In their notice of motion, Plaintiffs posit that the Court should enter both declaratory and final injunctive relief against the remaining Defendants, mirroring that request in the proposed orders. Both injunctive and declaratory relief are appropriate in these circumstances. *See* Fed. R. Civ. P. 57 (declaratory judgment) and 65 (injunctions); *see also* Declaratory Judgment Act, 28 U.S.C. §2201(a) (courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); *accord, Reifer v. Westport Insurance*, 751 F.3d 129, 144 (3d Cir. 2014) (setting forth a "non-exhaustive" list of "uniform" factors for district courts to consider in deciding whether to exercise jurisdiction under the Declaratory Judgment Act).

One of the purposes of declaratory relief in the elections and voting context is "to confirm plaintiffs' federal rights." *Carey v. Wisconsin Elections Comm'n*, 624 F. Supp. 3d 1020, 1034 (W.D. Wis. 2022) (granting injunctive and declaratory relief in Voting Rights Act case). Such judgments also constitute a judicial statement that an official's conduct is unlawful and should be corrected. *Olagues v. Russoniello*, 770 F.2d 791, 803 (9th Cir. 1985). Similarly, declaratory relief is appropriate against a state election official who is "personally charged" with

enforcing and applying an allegedly unconstitutional election law. *OpenPittsburgh.Org v. Voye*, 563 F. Supp. 3d 399, 414–15 (W.D. Pa. 2021). Even county officials whose actions are "purely ministerial . . . cannot evade liability when they are charged with enforcing an allegedly unconstitutional law." *Id.*

The Court here is being asked to declare that the most pernicious and offensive features of the county line ballot system, which have been proven by Plaintiffs through testimony, are unconstitutional. This conveys an expectation that the Defendants should not revert to their former ways of designing unconstitutional ballots. In addition, the declaratory judgment sought here is meant to affect future conduct rather than adjudicate past liability. *Hodinka v. Delaware Cnty.*, 759 F. Supp. 2d 603, 610 (E.D. Pa. 2011) (citing *Gruntal & Co., Inc. v. Steinberg,* 837 F.Supp. 85, 89 (D.N.J. 1993) ("The real value of the judicial pronouncement . . . is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff")). Here, a declaratory judgment will set expectations about what county clerks must and must not do in regard to ballot design to avoid future constitutional liability.

Injunctive relief against these defendants is equally appropriate. In the voting rights context, courts consider the following factors in determining whether to issue a permanent injunction: "(1) whether the moving party has shown actual success on the merits; (2) whether denial of injunctive relief will result in

26

irreparable harm to the moving party; (3) whether granting of the permanent injunction will result in even greater harm to the defendant; and (4) whether the injunction serves the public interest." *United States v. Berks Cnty., Pennsylvania,* 277 F. Supp. 2d 570, 578 (E.D. Pa. 2003) (relying on *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).

For reasons stated elsewhere in this brief, Plaintiffs have adequately shown that the county line ballot system is unconstitutional. Further, being forced to run in an election that is on its face unfair, and the risk of losing such an election, and the systemic impact that such a system has on voters, is not the kind of relief compensable in monetary damages after the election. Injuries like this, which cannot be remedied by money damages, make the injury "irreparable" for purposes of analyzing a permanent injunction application. Abridgment of voting rights and manipulation of electoral processes are by nature irreparable injury warranting appropriate action to ensure that no further elections are conducted pursuant to an invalid state law. *See e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). The final two factors also favor Plaintiffs, as the Defendants have long abandoned any pretense that county line ballots are more difficult for them to run than ones organized by office block, and the injunction serves the public interest by stopping unconstitutional election practices that injure candidates and voters and which call the legitimacy of elections into question. The Third Circuit has already effectively

27

held the same in this particular case. *Kim*, 99 F.4th at 159. Accordingly, the Court should grant plaintiffs both the declaratory and injunctive relief sought.

## CONCLUSION

Based on the foregoing reasons, Plaintiffs respectfully request a finding that no genuine issue of material fact remains here, and that summary judgment as a matter of law be granted because the facts are so one-sided in Plaintiffs' favor, such that no reasonable trier of fact could find otherwise. The Court should therefore grant a declaratory judgment and a permanent injunction enjoining use of the county line ballot-design and its attendant features due to its unconstitutionality pursuant to the First and Fourteenth Amendments and the Elections Clause.

Respectfully submitted,

**WEISSMAN & MINTZ LLC**
220 Davidson Avenue, Suite 410
Somerset, New Jersey 08873
732.563.4565
bpugach@weissmanmintz.com
Co-counsel for Plaintiffs

By:   *Flavio L. Komuves*

      *Brett M. Pugach*

Dated: March 14, 2025

**BROMBERG LAW LLC**
43 West 43rd Street, Suite 32
New York, New York 10036
212.859.5083
ybromberg@bromberglawllc.com
Co-counsel for Plaintiffs

By:   *Yael Bromberg*