UNITED STATE DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDY KIM, in his personal capacity as a candidate for U.S. Senate, et al., <br>           Plaintiffs, <br><br>     v. <br><br> CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk, et al., <br>           Defendants. | Case No.: 3:24-cv-0198-ZNQ-TJB <br><br> <u>CIVIL ACTION</u> |
| CHRISTINE CONFORTI, et al., <br>           Plaintiffs, <br><br>     v. <br><br> CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk, et al., <br>           Defendants. | Case No.: 3:20-cv-08267-ZNQ-TJB <br><br> <u>CIVIL ACTION</u> |

**OMNIBUS BRIEF IN OPPOSITION TO BERGEN AND UNION COUNTY CLERKS' JOINT MOTIONS TO DISMISS AND IN OPPOSITION TO BERGEN COUNTY CLERK'S MOTION FOR SUMMARY JUDGMENT**

**WEISSMAN & MINTZ LLC**
Brett Pugach, Esq.
Flavio Komuves, Esq.
220 Davidson Avenue, Suite 410
Somerset, NJ 08873
732-563-4565

**BROMBERG LAW LLC**
Yael Bromberg, Esq.
43 West 43rd Street, Suite 32
New York, NY 10036-7424
212-859-5083

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

PROCEDURAL HISTORY AND STATEMENT OF FACTS ...............................1

LEGAL ARGUMENT...........................................................................3

I:    THE LITIGATIONS ARE NOT MOOT AND THIS COURT'S
       JURISDICTION REMAINS UNINTERRUPTED. .............................3

       A.    Defendants Cannot Show that there is No Reasonable
              Likelihood that Unconstitutional Practices will Continue
              to Occur.........................................................................5

       B.    The NBL Does Not Address All of the Constitutional
              Harm from All of the Attendant Features of the
              Bracketing Structure. ..................................................5

II:    PLAINTIFFS MAY LEGITIMATELY FILE A FEE
       PETITION FOR ATTORNEY HOURS AND LITIGATION
       COSTS AGAINST THE DEFENDANT COUNTY CLERKS..........28

       A.    Plaintiffs are "Prevailing Parties" under 42 U.S.C.
              1988(b) ......................................................................30

       B.    The Two Remaining County Clerk Defendants are the
              Appropriately Named Publicly Actors in the Litigations,
              and are Liable for Attorney Fees. .............................37

CONCLUSION ...................................................................46

# TABLE OF AUTHORITIES

Page(s)

Cases

*Andrews v. Rajoppi,*
  2008 WL1869869 (N.J. App. Div. Apr. 29, 2008) ……………...................... 41

*Black United Fund of New Jersey, Inc. v. Kean,*
  763 F.3d (3d Cir. 1985)..................................................................................... 27

*Buffin v. California,*
  23 F.4th 951 (9th Cir. 2022) ............................................................................ 45

*Clark v. Governor of New Jersey,*
  53 F.4th 769 (3d Cir. 2022)............................................................................... 7

*Coalition for the Abolition of Marijuana Prohibition v. City Atlanta,*
  219 F.3d 1301 (11th Cir. 2000)........................................................................ 4

*Cook v. Gralike,*
  531 U.S. 510 (2001) ......................................................................................... 25

*Echols v. Parker*
  909 F.2d 795 (5th Cir. 1990)............................................................................ 45

*Empower Our Neighborhoods v. Guadagno,*
  453 N.J. Super. 565 (N.J. App. Div. 2018)............................................ 42, 43, 44

*Fields v. Speaker of the Pa. House of Representatives,*
  936 F.3d 142 (3d Cir. 2019)............................................................................... 6

*Finberg v. Sullivan,*
  55 F. Supp. 1068 (E.D. Pa. 1982), *aff'd*, 707 F.2d 1390 (3rd Cir. 1983)...... 39, 40

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.,*
  528 U.S. 167 (2000) ............................................................................ 5, 6, 35, 36

*Hartnett v. Pa. State Educ. Ass'n,*
  963 F.3d 301 (3d Cir. 2020).................................................................... 4, 5, 6

*Hawkes v. Gates,*
  129 N.J.L. 5 (1942) ........................................................................................... 9

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ........................................................................ 34, 38, 45, 46

*Herbst v. Ryan*
  90 F.3d 1300 (7th Cir. 1996)............................................................................ 45

*Kentucky v. Graham,*
  473 U.S. 159 (1985) ......................................................................................... 40

*Khodara Envtl., v. Beckman,*
  237 F.3d 186 (3d Cir. 2001).............................................................................. 3

*Kim v. Hanlon,*
  99 F.4th 140 (3d Cir. 2024)........................................................................Passim

*Knox v. SEIU, Local,*
  567 U.S. 298 (2012) ........................................................................... 6
*Kremens v. Bartley,*
  431 U.S. 119 (1977) ..................................................................... 26, 27
*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,*
  510 F.3d 253 (3d Cir. 2007) ............................................................. 7
*Massachusetts v. Oakes,*
  491 U.S. 576 (1989) ..................................................................... 26, 27
*Miller v. Caudill,*
  936 F.3d 442 (6th Cir. 2019) ......................................................... 45
*Missouri v. Jenkins,*
  491 U.S. 274, 286 (1989) ............................................................... 38
*Naturist Soc'y, Inc. v. Fillyaw,*
  958 F.2d 1515 (11th Cir. 1992) ....................................................... 4
*New Jersey Democratic Party, Inc. v. Samson,*
  175 N.J. 178 (2002) ....................................................................... 41
*Nextel Partners Inc. v. Kingston Twp.,*
  286 F.3d 687 (3d Cir. 2002) ............................................................. 4
*Nextel W. Corp. v. Unity Twp.,*
  282 F.3d 257 (3d Cir. 2002) ...................................................... Passim
*Northeastern Florida Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,*
  508 U.S. 656 (1993) ......................................................................... 4
*Richardson v. Caputo,*
  46 N.J. 3 (1965) ............................................................................... 9
*Sole v. Wyner,*
  551 U.S. 74 (2007) ......................................................................... 32
*Sooy v. Gill,*
  340 N.J. Super. 401 (N.J. App. Div. 2001) ..................................... 41
*Turner v. District of Columbia Board of Elections and Ethics,*
  354 F.3d 890 (D.C. Cir. 2004) ....................................................... 38
*Lackey v. Stinnie,*
  No. 23-621, slip op. (U.S. Sup. Ct. Feb. 25, 2025) ..................... Passim
*University of Tex. v. Camenish,*
  451 U.S. 390 (1981) ....................................................................... 34
*Virginia v. Consumers Union of the United States, Inc.,*
  446 U.S. 719 (1980) ....................................................................... 39
*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ..................................................................... 7

Statutes

42 U.S.C. 1983 .................................................................................... 38

42 U.S.C. 1988(b) ................................................................. 30, 31, 38

N.J.S.A. 19:23-17 ............................................................................... 19

N.J.S.A. 19:23-18 ..................................................................... 19, 21,22

N.J.S.A. 19:23-24 ............................................................................... 19

N.J.S.A. 19:23-26.1 ............................................................................ 19

N.J.S.A. 19:49-2................................................................................ 9, 19

Other Authorities

A5116[3R], P.L. 2025, c.32 (March 6, 2025)..................................Passim

The Plaintiffs file this omnibus brief in opposition to the joint motions by the Defendant County Clerks of Union and Bergen (*Kim*, ECF 295, *Kim*, ECF 296), and in opposition to the motion for summary judgment filed by Defendant Bergen Clerk (*Conforti*, ECF 232.) For the reasons set out below, these three motions filed by the last two remaining county clerks in these litigations should be denied in full.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

Mindful of the Court's time and to avoid repetition across multiple rounds of briefing, Plaintiff incorporates the procedural history set forth in Plaintiffs' Briefs in Support of their Motion of Summary Judgment. (*Kim* ECF 298-2; *Conforti* ECF 234-2.) After Plaintiffs filed their Motion for Summary Judgement, the Bergen County Clerk admitted to all of the statements in Plaintiff's Statement of Undisputed Material Facts.

Plaintiffs also incorporate the factual background set out in their pending Motions for Summary Judgment (*Kim*, ECF 298; *Conforti*, ECF 234), and accompanying Statement of Undisputed Material Facts, as well as their Responses and Additional Statement of Facts to the Bergen County Clerk's Motions for Summary Judgment.

1

The *Conforti* parties engaged in discovery, including the exchange of written interrogatories and requests for production of documents, and related responses detailed in a July 11, 2024 joint letter by the parties to the court. (*See* Certification of Y.Bromberg accompanying this omnibus opposition brief, Ex. A, July 11, 2024 joint letter to the court regarding discovery.) As Defendant Bergen County Clerk acknowledged therein, he "[r]eceived Plaintiffs' discovery responses 07.10.24 which must be reviewed. Will provide responses to Plaintiffs' discovery demands on or before 07.19.24." (*Id*.) In the course of discovery, Plaintiffs produced an audio file on or about June 30, 2024 of a phone call between a representative for Plaintiff Kreibich's congressional campaign and the Bergen County Clerk's office, whereby the campaign representative seeks clarification as to the intended ordering of the ballot draw. (*See* Certification of R.Coll accompanying this omnibus opposition brief and accompanying link to audio file.) The Plaintiffs incorporate by reference here the certifications accompanying this omnibus opposition brief and their accompanying exhibits.

Further, Plaintiffs incorporate by reference here the record below, including the expert reports supporting the motion for preliminary injunction in the *Kim* litigation. A year later, these expert reports remain unrebutted, and none of the nineteen original Defendant County Clerks in that matter have sought *any* form of discovery such as depositions of the underlying experts or requests for production

of documents, nor have they provided *any* indication of seeking or obtaining any experts to support their ongoing defense following the Third Circuit's unanimous, precedential decision upholding this court's entry of preliminary injunction.

Presently pending before the court are several motions by the remaining parties in these litigations: Plaintiffs' motions for summary judgment against the clerks of Bergen, Union, and Cape May (*Kim*, ECF 298; *Conforti*, ECF 234); joint motions to dismiss by the County Clerks of Bergen and Union (*Kim*, ECF 295; *Kim*, ECF 296); the Bergen Clerk's motion for summary judgment (*Conforti*, ECF 232); the Plaintiffs' motions to dismiss Defendant Intervenor (*Kim*, ECF 287; *Conforti*, ECF 229); and Defendant Intervenor's motion for partial summary judgment (*Kim*, ECF 286) which is separately addressed by the Plaintiffs in a contemporaneously filed letter brief.

## **LEGAL ARGUMENT**

## I.   **THE LITIGATIONS ARE NOT MOOT AND THIS COURT'S JURISDICTION REMAINS UNINTERRUPTED.**

The amendment or repeal of a statute does not automatically render a plaintiff's claims moot. *See Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 261-62 (3d Cir. 2002) (hereinafter "*Unity Twp.*"). Rather, the issue turns "on the impact of the amendment." *Id.* If a statutory amendment removes all the unconstitutional features, the injunctive relief could be deemed moot. *Id.* at 262 (quoting *Khodara Envtl., v. Beckman*, 237 F.3d 186, 194 (3d Cir. 2001)). By contrast, if the statutory

3

amendment only removes constitutional concerns "'to a lesser degree,'" or if the constitutional concerns "could be reasonably expected to continue," then the case is not moot. *Id.* (quoting *Northeastern Florida Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) and *Coalition for the Abolition of Marijuana Prohibition v. City Atlanta*, 219 F.3d 1301, 1313-15 (11th Cir. 2000)); *see also id.* (quoting *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) ("Where a superceding[sic] statute leaves objectionable features of the prior law substantially undisturbed, the case is not moot . . . .")). As with injunctive relief, a claim for declaratory judgment will not be rendered moot if there are features of the unconstitutional law or practice which are not "substantially amended or repealed" by the statutory amendment. *Nextel Partners Inc. v. Kingston Twp.*, 286 F.3d 687, 693 (3d Cir. 2002) (citing *Unity Twp.*, 282 F.3d at 263 n.5). Critically, "a defendant arguing mootness must show that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306-07 (3d Cir. 2020).

Here, the case is not moot for two main reasons. First, the two last remaining County Clerk Defendants cannot show that there is no reasonable likelihood that unconstitutional practices will continue to occur. Second, the New Ballot Law

("NBL")[1] does not address all of the constitutional harm of all of the attendant features of the Bracketing Structure.[2] As a result, both injunctive and declaratory relief in Plaintiffs' favor in Plaintiffs' favor are appropriate, the case remains live, and is not moot.

### A. Defendants Cannot Show that there is No Reasonable Likelihood that Unconstitutional Practices will Continue to Occur.

The burden is on the last two remaining County Clerk Defendants to demonstrate that there is no reasonable likelihood that unconstitutional practices will continue to occur. *Hartnett*, 963 F.3d at 305. The Supreme Court has recognized that this is a formidable burden. *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("heavy burden")); *id.* (burden is "formidable"). Courts are "reluctant to declare a case moot [ ] when the defendant argues mootness because of some action it took unilaterally after the litigation began." *Id.* at 306. A case is not deemed moot merely due to a voluntary cessation of a defendant's conduct, but rather it must be "'absolutely clear that the allegedly

---

[1] The NBL is reflected in Assembly Bill 5116[3R], and was signed into law on March 6, 2025 by the Governor, as P.L. 2025, c.32. For ease of reference for the Court, a copy of A5116[3R] appears in the March 24, 2025 Certification of Yael Bromberg, Esq. in support of the Opposition to Defendants Bergen and Union County Clerks' Joint Motions to Dismiss in *Kim* and Defendant Bergen County Clerk's Motion for Summary Judgement in *Conforti* (hereinafter "Bromberg Cert."), ¶ 4, Ex. I.

[2] The Bracketing Structure is defined and described in further detail in Plaintiffs' Statement of Undisputed Material Facts in support of Plaintiffs' motions for summary judgment (*Kim*, ECF 298-1, ¶¶ 24-36; *Conforti*, ECF 234, same.)

wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019)). Due to the shifting in burden[3] onto defendants, it is possible the "'the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.'" *Id.* (quoting *Friends of the Earth*, 428 U.S. at 190).

The same "principles apply even when the defendant's cessation is not entirely voluntary." *Hartnett*, 963 F.3d at 306. Thus, it is not necessarily the reason for the defendant's cessation of conduct (although that is relevant) that matters so much as whether the defendant "could reasonably be expected to engage in the challenged behavior again." *Id.* (citing *Friends of the Earth*, 428 U.S. at 189). Notably, courts are *particularly skeptical of mootness claims* "when a defendant yields in the face of a court order and assures [the Court] that the case is moot because the injury will not recur, yet maintains that its conduct was lawful all along." *Id.* (quoting *Knox v. SEIU, Local 1000*, 567 U.S. 298, 307 (2012)). Courts are comparatively less skeptical of mootness claims where "the defendant ceases because of a new statute or ruling *in a completely different case*." *Id.* at 307 (citing

---

[3] The court explained as follows: "Though voluntary or volitional cessation is often described as an exception to mootness, that is not quite right. The burden always lies on the party claiming mootness, whether the case involves voluntary cessation or not." 963 F.3d at 307 (citing *Friends of the Earth*, 428 U.S. at 189).

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 260 (3d Cir. 2007) (emphasis added)). "Either way, it must be 'absolutely clear' that the same acts could not 'reasonably be expected to recur.'" *Clark v. Governor of New Jersey*, 53 F.4th 769, 782 (3d Cir. 2022) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022)).

Here, the last two remaining County Clerk Defendants did not cease their conduct: (1) upon Plaintiffs' submission of overwhelming evidence and the multiple expert reports accompanying the Verified Complaint (*see generally Kim* Verified Complaint, ECF 1 (hereinafter "V.C.") and accompanying exhibits); (2) when the Attorney General refused to defend the constitutionality of the Bracketing Structure (*Kim* ECF 149; *Conforti* ECF 188, 188-1 (affirmatively withdrawing from the lawsuit)); (3) when this Court's preliminary injunction order and opinion was issued finding a likelihood of success on the merits (*Kim* ECF 194); nor (4) upon the Third Circuit panel's unanimous precedential opinion affirming the preliminary injunction, *Kim v. Hanlon*, 99 F.4th 140 (3d Cir. 2024). Indeed, even <u>*after*</u> the Third Circuit' affirmance, the Bergen County Clerk indicated his intent to engage in discovery with the *Conforti* plaintiffs. *See* Bromberg Cert., ¶2, Ex. A. Moreover, the last two remaining County Clerk Defendants in this action remain recalcitrant, notwithstanding the entry of *twenty-two* (22) settlement and consent orders by their peer county clerks. (*Kim* Consent Orders, ECF 237, 238, 240, 247, 250, 253, 254,

256, 258, 265, 270, 273, 277, 279, 281; *Confori* Consent Orders, ECF 202, 211, 214, 215, 222, 226.)

Throughout this case, and even now, the last two remaining County Clerk Defendants have a hard time admitting that they did anything wrong. (*See, e.g.*, *Kim* Certification of Joanne Rajoppi in Support of Motion to Dismiss, ECF 295-3, ¶¶ 3, 8 (disclaiming responsibility); *Kim* Certification of John S. Hogan in Support of Motion to Dismiss, ECF 295-2, ¶¶ 4-5 (same).) Their claims that they were just doing what the law required them to do until a new statute was passed is not only misleading and disingenuous, but a far cry from the type of repudiation of prior conduct that might provide sufficient assurances to this Court.

They disclaim responsibility for their actions by claiming that the county clerk lacks discretion in designing the ballot. However, this is belied by the simple fact that Sussex and Salem Counties have historically used an office block ballot for all ballots, various counties have used an office block ballot for vote by mail, including during the 2020 pandemic election, and Morris County used to use an office block for Republican primaries only, up until 2021 when it switched to party column. (V.C., ¶ 55.)

Furthermore, the Bergen County Clerk's position is squarely at odds with his own position in *Conforti*. On pages 9-10 of his brief in support of motion to dismiss, the Bergen County Clerk wrote as follows:

In reviewing this statute [N.J.S.A. 19:49-2] governing Primary Election ballot design, the New Jersey Supreme Court has held, nearly 80 years ago, that *it is in fact up to the discretion of the county clerks to determine how to structure the candidate ballot placement drawing as between bracketed candidates and independent candidates*. Hawkes v. Gates, 129 N.J.L. 5 (1942). The New Jersey Supreme Court, over 20 years following its decision in Hawkes, opined that "it is not for a court to choose one of several reasonable courses, *for that choice is precisely what the Legislature left to another" -- that being the county clerks --* and the New Jersey Supreme Court went on to declare that it would only act "if it clearly appears the course taken [by the county clerk] is not rooted in reason.' Richardson v. Caputo, 46 N.J. 3, 9 (1965)."

(*Conforti* ECF 60-1) (emphases added).[4]

In short, the last two last two remaining County Clerk Defendants' assertion that they lack discretion is plainly legally wrong, and is belied by their own positions.

Equally unavailing is the half-hearted assertion that their "primary" basis for opposing the preliminary injunction in *Kim* was based on a belief that an office block ballot could not be prepared in time for the election. (*Kim* Hogan Cert., ECF 295-2, ¶7; *Kim* Rajoppi Cert., ECF 295-3, ¶5.) Ironically, the Bergen County Clerk admits that he learned that changing to an office block format was feasible for the 2024 primary election through testimony of the printer, David Passante at the preliminary injunction hearing *on March 18, 2024* (ECF 295-2, ¶11), and yet he did not

---

[4] Similarly, the Bergen County Clerk's Fifth Affirmative Defense accompanying his Answer in *Conforti* states as follows: "Answering Defendant at all times relevant hereto was *acting pursuant to authority invested in him by law*. All acts so performed were the rules[sic] of the *appropriate exercise of the Answering Defendants' discretion."* (*Conforti* ECF 132, p. 44) (emphases added).

immediately withdraw his opposition to the request for preliminary injunctive relief at that time, instead pursuing opposition even after this Court issued the preliminary injunction and his request for a stay was denied by this Court (*Kim* ECF 219) and again by the Third Circuit on April 3, 2024 (*Kim*, Third Circuit D.E. 22). It is undeniable that the last two remaining County Clerk Defendants fought the Plaintiffs on the merits of the litigations.

Notably,  in *Kim*, the Union County Clerk largely led the charge of collective opposition by all the clerks during various phases of the litigation, filing briefs in opposition to the request for preliminary injunctive relief (*Kim* ECF 63), filing seven *in limine* motions to exclude Plaintiffs' experts (*Kim*, ECF 152, 153, 154, 155, 156, 157, 158), and having counsel actively participate in the preliminary injunction hearing (*see generally Kim* Transcript from Preliminary Injunction Hearing ("Hearing Tr.")). To be sure, in the very first paragraph of Union's Brief in Opposition to Preliminary Injunctive Relief, it states as follows:  "These age-old practices – specifically, the ballot design, candidate ballot placement drawing, and the placement of candidates and bracketing procedures – have withstood similar and unsuccessful challenges. This Court should similarly reject Plaintiffs' claims here." (*Kim* ECF 63, p. 1.) In that brief, the Union County Clerk dedicated an entire section of the brief under the heading "Plaintiffs Are Unable to Demonstrate a Substantial Likelihood of Success On the Merits," defending the constitutionality of the

Bracketing Structure. (*Id.* at pp. 20-35.) The Bergen County Clerk had a similar section in its opposition brief. (*Kim* ECF 50, pp. 8-11.)

In *Conforti*, the Bergen County Clerk filed a substantive motion to dismiss Plaintiff's Complaint. (*Conforti* ECF 60.) Moreover, *even after the Third Circuit ruling* in *Kim*, the Bergen County Clerk engaged in discovery with Plaintiffs in *Conforti*, and confirmed that he would produce forthcoming discovery. *See* Bromberg Cert., ¶ 2, Ex. A.

Additionally, the remaining two County Clerk Defendants claim that they ceased their conduct as a result of the decisions of this Court and of the Third Circuit *in this case*, rather than in a *different case*. The Union County Clerk attested, via signed certification: "Since that time [when the decisions in *Kim* were issued], . . I have instructed my counsel not to defend the constitutionality of the statutes mandating the Bracketing Structure." (Rajoppi Cert., *Kim* ECF 295-2, ¶¶ 7-8.; *see also* Hogan Cert., *Kim* ECF 295-3, ¶11 (claiming that the Bergen County Clerk's Office ceased its conduct with respect to Democratic Primaries after this Court issued a preliminary injunction)). For the foregoing reasons, this Court should be skeptical of the mootness claims.

There are additional concerns. To begin with, many of the unconstitutional features of the Bracketing Structure remain in place (e.g., in-office bracketing, stacking, forced association, etc.) notwithstanding the passage of the NBL, such that

11

similar harm will inevitably continue. *See infra* Point I.B (describing ongoing harm in more detail). For that reason alone, Defendants cannot meet their heavy and formidable burden of demonstrating that continued harm is not reasonably likely to recur. *See Unity Twp.*, 282 F.3d at 261-62.

Additionally, even theoretically if some of the unconstitutional features of the county-line ballot design were removed under the NBL, they can, in practice, be easily recreated. And, since the county clerks have a history of employing unconstitutional practices and otherwise manipulating the ballot in favor of party-endorsed candidates and against unbracketed candidates, skepticism surrounding the likelihood of these concerns recurring is appropriate.

While the NBL calls for the elimination of party column ballots, various unconstitutional features of the Bracketing Structure *can* be recreated in an office block format. For example, county clerks can recreate the equivalent of the county line by manipulating where each office block is placed and/or the order in which candidates are drawn. In this manner, county clerks can visually align all or many of the party-endorsed candidates. This is made even more possible by virtue of a component of the NBL which requires clerks to assign a number letter combination to each candidate within each office block (e.g., 1A, 2A, 3B, 4C, etc.), what we refer to as "Battleship" numbers. *See* A5116[3R], Section 2(a)(6).

Plaintiffs offer the following examples, not to allege that they are *per se* indicative of ballot manipulation, but to illustrate how the county clerk's authority to design primary election ballots may be applied in the future such that, even with office blocks, they can replicate the noxious features at issue in *these* underlying litigations, and thereby reasonably shake public confidence in the expectation of, and constitutional right to, impartial election administration.

Example: Recreating a county-line based on ordering and positioning of office blocks, reinforced with "Battleship" numbers

One example can be seen from a sample ballot from the 2024 Democratic Primary, which was created after this Court's preliminary injunction order. *See* Bromberg Cert., ¶3, Ex. B. The ballot utilized Battleship letter/number combinations (like in the NBL) and featured five office blocks across the top of the Democratic Party ballot, four of which were contested (3 candidates for president, 3 candidates for U.S. Senator, 2 candidates for U.S. House of Representatives, 2 candidates for County Sheriff, and 1 candidate for County Register). *Id.* In each of these races, the county party endorsed candidate was miraculously drawn first. *Id.* Thus, all of the "organization" candidates are featured at the top of each office block, which visually creates a horizontal "county line" equivalent of endorsed candidates with the same

13

slogan. *Id.* And, each such candidate is featured with the Battleship letter/number combination of "1A." *Id.*[5]

Example: Lining affiliated candidates up across office blocks *just so*

Another example can be seen from a second sample ballot from the 2024 Democratic Primary, also created after this Court's preliminary injunction order. *See* Bromberg Cert., ¶3, Ex. C. There were six office blocks, five of which were featured across the top (President, U.S. Senator, U.S. House of Representatives, County Commissioner, and Member of Borough Council), and one of which was featured under another office block (County Sheriff). *Id.* Even though County Sheriff and County Commissioner are both county-wide offices (Member of Borough Council is not), the two county-level office blocks were not featured next to each other. *Id.* Rather, the office block for Sheriff was placed under that of the U.S. House of Representatives, and moved down far enough on the ballot *just so* to ensure that the Sheriff candidate on the dissident slate running against the county party leadership's faction was not featured near the County Commissioner candidates running with the same slogan, whereas the "organization's" Sheriff candidate was lined up neatly next to the "organization" candidate for County Commissioner. *Id.* Similar potential for manipulation can seen from a third sample ballot from the 2024 Democratic Primary

---

[5] The likelihood of the ordering of the party leadership candidates in such a manner across five office blocks can be calculated using the formula: $[ \frac{1}{3} \times \frac{1}{3} \times \frac{1}{2} \times \frac{1}{2} \times 1 ]$ $= 1/36 = 0.028$. This shows a less than 3% likelihood of this ballot arrangement.

14

Election insofar as the office blocks across the top of the ballot are curiously not evenly aligned. *See* Bromberg Cert., ¶¶3, Ex. D.

These examples demonstrate how county clerks can use their authority to design ballots so as to rearrange an office block ballot to revive unconstitutional practices prevalent under the Bracketing Structure. *Cf.* A5116[3R], Section 5(a) ("The position which the candidates for the primary for the general election shall have upon the ballots used for the primary election for the general election, in the case of candidates for nomination for [various offices] . . . shall be determined by the county clerks in their respective counties.").

Furthermore, it must be emphasized that it is the *legislature*, not the county clerks, that passed the NBL to require office block ballots and to address certain (and only some) of the unconstitutional features. Ultimately, the manner in which this law is administered lies at the county clerk level. Indeed, county clerks themselves are candidates that run on the ballot and have historically benefited from their own unconstitutional practices which favored the county line candidates with whom they run and with whom they will run again in the future. And on issues related to ballot design and ballot order, past history demonstrates that the county clerks have not only engaged in unconstitutional behavior and used unconstitutional practices, but they have also manipulated the ballot and ballot drawings, applied inconsistent

standards, improperly ceded their authority to county party leadership,[6] and

otherwise circumvented the spirit and intent of the law, and not taken accountability

for their actions. Under these circumstances, good faith compliance is no guarantee.

Among other items, Plaintiffs submitted an unrebutted expert report from Dr.

Josh Pasek which reviewed ballot order for the pivot point offices of U.S. Senate in

2020 and Governor in 2021 primary elections. (V.C., Ex. B, Expert Report of Dr.

Josh Pasek (hereinafter "Pasek Report"), ¶¶ 65-69.) Based on a review of New Jersey

primary election ballots, Dr. Pasek found that the New Jersey county clerks had

exhibited "*a considerable bias in favor of placing the county line in the first

position*," which, if the ballot draws had been conducted truly randomly, the chances

of the county line candidate being drawn first would have been only 2 in 1,000.

(Pasek Report, ¶68 & n.9) (emphasis added.) "Put simply, the county line was in

first position far more frequently than it should have been if the placement rules

---

[6] Morris County used to have a county line ballot for Democrats and an office block ballot for Republicans, but changed the Republican primary to a county line ballot in 2021 *at the request of the party*. (V.C., ¶55.) Notably, even after this Court's and the Third Circuit's rulings in *Kim*, the Bergen County Clerk continued to consult with, and take directions from the Republican Party organization in designing the 2024 Republican Primary ballot. (*See Kim* Bergen County Brief in Support of Motion to Dismiss, ECF 296-1, p. 6 ("As the *Bergen County Republican Organization insisted* on the bracketing bystem[sic], which would have left the Bergen County Clerk open to a lawsuit if it ignored that *demand*, two different ballot designs were used for the Democratic and Republican primaries in Bergen County.") (emphases added.)) That the Bergen County Clerk was continuing to design ballots based on the preferences of county party leadership, is highly disturbing.

(based on a random draw of Senate or Gubernatorial candidates) were being followed as expected." (Pasek Report, ¶68.) He found the data to be consistent with action of the county clerks that demonstrates a "*willing[ness] to manipulate the rules to place the county line first*," (Pasek Report, ¶69, emphasis added), in order to "us[e] this bias in favor of endorsed candidates (Pasek Report, ¶65). In short, county clerks manipulated the ballot draw and circumvented the law to bestow favorable ballot positions upon the county party-endorsed candidates.[7]

The county clerks have abused their authority to design primary election ballots to cast unfavored candidates who are unbracketed out in Ballot Siberia and/or stacked them in columns with candidates for the same or different offices with whom they did not want to associate. (V.C., ¶¶ 5, 58, 65-67; *Kim* District Court Opinion on Preliminary Injunction, ECF 194 (hereinafter "D.C. Opinion"), p. 4 & n.12; *Kim*, 99 F.4th at 148.) They have also arbitrarily selected pivot point offices in ways that are inconsistent with other counties and even across election cycles within the same county. (V.C., ¶¶ 73, 75-76; D.C. Opinion, pp. 4-5.) These decisions were conveniently not announced prior to the petition filing deadline, leaving candidates guessing at what candidates, if any, they needed to bracket with to be included in the

---

[7] The first sample ballot described above, *supra* at 13, demonstrates an application of this phenomena as applied to office block ballots, wherein a pattern is unlikely to arise by chance, and where the equivalent of the "weight of the line" can be combined with the primacy effect.

preferential ballot draw, and allowing county clerks to make retroactive decisions on the pivot point office used to benefit the party leadership endorsed candidates. *See* March 24, 2025 Certification of Rebecca Coll in Opposition to Defendants Bergen and Union County Clerks' Joint Motions to Dismiss in *Kim* and Defendant Bergen County Clerk's Motion for Summary Judgement in *Conforti* (hereinafter "Coll Cert."), ¶ 4.[8]

Under the circumstances set forth above, Defendants simply cannot meet their "formidable" burden of demonstrating there is no reasonable likelihood that their unconstitutional practices will continue to occur, both because the NBL does not

---

[8] In *Conforti*, in response to discovery demands propounded by the Bergen County Clerk, Plaintiffs produced a 25-minute audio file of a recorded conversation between Rebecca Coll, a representative from plaintiff Arati Kreibich's congressional campaign, and the Bergen County Clerk's office. Ms. Coll endeavored to learn the order in which candidates would be drawn, so that Ms. Kreibich might seek out candidates with whom to associate and bracket with in order to secure a better ballot placement and avoid being pushed out into Ballot Siberia. Specifically, Ms. Coll sought a straightforward answer as to whether the U.S. Senator or County Freeholder would be drawn first, to avoid being disadvantaged on the ballot. When staff for the Bergen County Clerk's office could not answer the question, the staff member patched in Ms. Coll to a call with counsel for the Bergen County Clerk. Despite multiple attempts to get clarity, Ms. Coll was given the runaround, evasively told that the Bergen County Clerk would follow the law, but not given an answer as to which office would actually be picked first. Instead, she was told that she can't know the answer to her question until after the Bergen County Clerk knows exactly who is running for which office, and what slogan they want to use – in other words, the decision is made retroactively after the petition filing deadline has passed. While Plaintiffs are mindful of the Court's time, a review of the full audio recording demonstrates that good faith compliance by county clerks is no guarantee in what should be an open, transparent, and nonpartisan process for implementing ballot design laws.

address or still allows certain of those practices to occur, *see infra* Point I.B, and because they cannot be trusted to refrain from conduct which circumvents the letter, spirit, or intent of the law so as to recreate the equivalent of various unconstitutional features of the county line.

### B. The NBL Does Not Address All of the Constitutional Harm from All of the Attendant Features of the Bracketing Structure.

Unlike other scenarios where a single and straightforward statute is repealed or amended to remove all constitutional harm, the Bracketing Structure in New Jersey emanated from a complicated web of various authorities and practices developed over the course of time and culminating in the advantages of the county line system. For example, a variety of statutes[9] played a role in creating the Bracketing Structure, including, but not limited to *N.J.S.A.* 19:23-17 (slogans), *N.J.S.A.* 19:23-18 (joint petition county candidates), *N.J.S.A.* 19:23-24 (ballot position and ballot draw), *N.J.S.A.* 19:23-26.1 (ballot placement of candidates for United States Senator and Governor); *N.J.S.A.* 19:49-2 (bracketing and authority for clerk to arrange ballots). In addition, county clerks exercised considerable discretion in designing ballots beyond statutory prescripts, which led to the development of unconstitutional practices.

---

[9] For purposes of this argument, Plaintiffs refer to these statutes as they existed prior to the NBL.

What resulted was the Bracketing Structure and its many attendant features. Among others, these included preferential ballot draws and ballot placement for bracketed candidates (V.C, ¶¶ 6-7, 14, 62; D.C. Opinion, p. 4; *Kim*, 99 F.4th at 148), ballot gaps and Ballot Siberia, stacking candidates for the same and/or different offices in the same column, having ballot position determined by the drawing of a different candidate, etc. (V.C., ¶¶ 5, 58, 65-67; D.C. Opinion, p. 4 & n.12; *Kim*, 99 F.4th at 148.) This resulted in harms stemming from the primacy effect (Pasek Report, ¶¶ 27 38-43, 49, 81, 144; V.C., Ex. D, Expert Report of Dr. Samuel S.-H. Wang ("Wang Report"), pp 5-8, 15 D.C. Opinion, pp. 31-32, 37-38; *Kim*, 99 F.4th at 156), and the "weight of the line" (Pasek Report, ¶¶ 149-52, 156; V. C., Ex. C, Expert Report of Dr. Julia Sass Rubin ("Rubin Report"), p.4; Wang Report, p.13; D.C. Opinion, pp. 31-32; *Kim*, 99 F.4th at 155), among other various advantages for county line and bracketed candidates and disadvantages for non-county line and unbracketed candidates. (V.C., ¶¶ 103-33.). It also resulted in gamesmanship whereby county clerks exercised discretion to choose different pivot points across counties and across election cycles within the same county and to otherwise manipulate the order and placement of candidates on the ballot. (V.C., ¶¶ 73, 75-76; D.C. Opinion, pp. 4-5.) Furthermore, it forced and incentivized candidates to associate to prevent opponents from obtaining an advantage over them or otherwise

penalized them if they exercised their right to not associate. (V.C., ¶¶ 147-50, 152-56, 152; D.C. Opinion, pp. 5-6; Hearing Tr. 181:19–185:10; *Kim* 99 F.4th at 155.)

Nowhere in Title 19 (or elsewhere) does it mention anything about (1) preferential ballot draws or differential treatment between bracketed and unbracketed candidates; (2) pivot point candidates; (3) the practice of stacking candidates; or (4) having any input from party leaders in designing the ballot. Yet, despite a complete absence of any statutory text explicitly requiring, let alone permitting or even mentioning at all, many of the features at issue in these litigations, practices were developed and implemented by the county clerks to create the system which was largely preliminarily enjoined by this Court in connection with the 2024 Democratic Primary (*see generally* D.C. Opinion and accompanying *Kim* Order Granting Preliminary Injunction, ECF 195).

Because of the various layers of complication and the combination of statutory law and practices implemented over time by the county clerks, it is simply insufficient to say that the case should be moot because statutory text related to some features of the county line were amended or in some instances, at least in theory, eliminated.

For example, one feature of the Bracketing Structure that was left unaddressed in the NBL pertains to what can be referred to as "in-office bracketing." This refers to the practice whereby candidates who filed a joint petition pursuant to *N.J.S.A.*

21

19:23-18, who are running for the same office, are permitted to be featured ("associated")[10] together on the ballot. The NBL does not change this practice, and even explicitly enables such candidates to be drawn together for ballot position and displayed sequentially right on top of one another with the same slogan. *See* A5116[3R], Section 2(c)(2) ("Each county clerk shall . . . . allow candidates for the same office with multiple open seats to associate in the same office block, using a common slogan or endorsement, next to or below the associated candidate names, in compliance with the provisions of R.S.19:23-18.").[11] Voters viewing the ballot will still continue to see such candidates bracketed or "associated" together. Additionally, opposing candidates, and particularly unbracketed (or "unassociated") candidates running for the same office are going to be precluded from certain ballot positions, and could be featured by themselves with their individual slogan as compared to a group of candidates all aligned one right after the other with a common slogan.

---

[10] It should be noted that the NBL in numerous instances simply replaces the word "bracketed" with "associated," *see, e.g.*, A5116[3R], Section 5(b), but such wordplay does not detract from principle that, just like bracketing, candidates filing a joint petition for the same office will continue to be featured together on the ballot, with the same slogan, and will have their names drawn together. For this reason, notwithstanding the fact that the NBL now uses the word "associating," instead of "bracketing," Plaintiffs refer to this practice as "in-office bracketing."

[11] *See also id.*, Sections 4(a), 4(d), 5(c), 6(8).

For purposes of illustration, imagine three county commissioner seats up for election ("vote for 3") and seven candidates run for office. Assume that the county party leadership runs a slate of three, an opposition faction runs a dissident slate of three, and one candidate runs independently and does not bracket or "associate" with other candidates running for that office. The unbracketed (or "unassociated") candidate would be eligible only for first, fourth, or seventh ballot position, but never second, never third, never fifth, and never sixth. In addition, even the bracketed or "associated" candidates would in many instances be forced to associate with candidates with whom they did not want to associate (for the same reasons set forth by Plaintiffs in the record of these cases) to avoid preclusion from certain ballot positions and from the "weight" of the visual grouping of opponents that bracket together within the office block.

Another feature of the Bracketing Structure that was left unaddressed or not sufficiently addressed in the NBL is the issue of stacking and forced association. In particular, the Bracketing Structure allowed for a situation where candidates who did not want to be associated were nevertheless featured in the same column. Take, for example, Christine Conforti and Stephanie Schmid who were both running for U.S. House of Representatives in CD-4 in the 2020 Democratic Primary Election. In that instance, both candidates appeared in the same column, even though it was a "Vote for One" office. This not only gave the appearance that these candidates were

23

associated, even though they did not want to be, but also led to the disenfranchisement of approximately one-third of all voters in Mercer County who voted in that congressional district who were confused and thus over-voted for too many candidates. (V.C., ¶¶ 89-91, 117; Pasek Report, ¶109; Rubin Report, pp. 8-9; D.C. Opinion, p. 33.)

While the NBL got rid of party-column ballots in favor of office block ballots, *see* A5116[3R], Section 2(a)(3), it explicitly allows a person or incorporated association to give permission to multiple candidates (and specifically more than the number of available positions) to use the same slogan, and requires the county clerk to list both candidates with the same slogan in the same office block. *See* A5116, Section 4(c) ("If multiple candidates or associations of candidates shall receive the endorsement of the same person or incorporated association, such endorsement shall be printed next to or below all candidates having indicated such endorsement on their petitions of nomination . . . ."). Thus, for example, two or more candidates could be featured in the same office block column with the same slogan, even though it is a "Vote for One" office.

In fact, this exact scenario can be seen on multiple sample ballots from the 2024 Democratic Primary, which were created after this Court's preliminary injunction order. *See* Bromberg Cert., ¶3, Ex. E-H. They list four candidates for U.S. House of Representatives, and indicate "VOTE FOR ONE." *Id.* However, in one

24

county's ballot two candidates share the same slogan, plaintiff Carolyn Rush and Tim Alexander. *Id.* In the three other counties' sample ballots, three out of four candidates (including plaintiff Carolyn Rush) all shared the "organization's" slogan, even though it was a "vote for one" office. *Id.* This implicates the same constitutional concerns regarding forced association and risk of voter confusion and/or disenfranchisement from over-votes. Notably, Plaintiffs anticipated this harm with respect to plaintiff Carolyn Rush (V.C., ¶160), and this Court acknowledged same. (*See* D.C. Opinion, p. 38 & n.25 ("However, in two of these districts, Rush will be bracketed with her opponents in the same column, creating the perception that Rush is associated with these candidates although she is not.").) Yet, the NBL did not address these same concerns based on similar harms.[12]

---

[12] Indeed, on March 20, 2025, the Somerset County Democratic convention endorsed five of the six gubernatorial candidates, who may now all accept the slogan associated with the Somerset County Democratic Party although only one candidate may be elected. This means that there is a possibility that five gubernatorial candidates share the same slogan associated with the party apparatus (even though they are all competing with each other, and actively campaigning against each other across the state) while a single candidate does not. See David Wildstein, *Five of Six Candidates for Governor May Use Somerset Dem Slogan*, NJ GLOBE (March 21, 2025), https://newjerseyglobe.com/local/five-of-six-candidates-for-governor-may-use-somerset-dem-slogan/. In addition to forced associational concerns and concerns of voter confusion leading to overvotes/disenfranchisement, this practice applied to a federal election would further implicate the Elections Clause by favoring/disfavoring certain candidates and attaching a concrete consequence by singling out, on the ballot itself, one candidate with whom the party organization dislikes or disagrees. *See Cook v. Gralike*, 531 U.S. 510, 524-25 (2001); *see also Kim*, 99 F.4th at 159.

These examples demonstrate how the mere amendment of certain portions of certain statutes does not address all of the attendant features of the unconstitutional Bracketing Structure. For these additional reasons, these litigations are not moot.

The Plaintiffs' litigations are thus distinguishable from the three cases advanced in the joint brief by the Clerks of Bergen and Union, which are the same three cases relied on in Bergen's motion for summary judgment. In *Massachusetts v. Oakes*, 491, U.S. 576 (1989), the Supreme Court dealt with the very narrow circumstance of the "overbreadth" doctrine in the context of the First Amendment regarding a criminal statute related to nude photography of a minor. The Court found that the issue of First Amendment overbreadth was moot, since the former criminal statute was entirely repealed, and the new law added certain requirements and removed certain exemptions to remove overbreadth concerns. *Id.* at 582-84.

In *Kremens v. Bartley*, 431 U.S. 119 (1977), the Supreme Court dealt with a statute that had previously contained different provisions and requirements for involuntary commitment of juveniles depending on their age, which was subsequently removed with the passage of a new statute. As set forth by the Court, "the Act completely repealed and replaced the statute challenged below, and obviated their demand for a hearing, and other procedural protections, since the named appellees had total freedom to leave the hospital, and could not be forced to return absent their consent." *Id.* at 129. Thus, the issue was moot since "[t]hese

26

concerns were *eradicated* with the passage of the new Act, which applied immediately to all persons receiving involuntary treatment." *Id.* (emphasis added).

In *Black United Fund of New Jersey, Inc. v. Kean*, 763 F.3d 156 (3d Cir. 1985), the Third Circuit dealt with a challenge by a charitable organization to a state statute allowing only a different charitable organization to make voluntary payroll deductions for charitable contributions. The issue was deemed moot, since "[t]he statute which the court struck down has now been repealed." *Id.* at 160. The Court found that the new legislation "enlarged the group of charitable organizations which may have access to state facilities and establish criteria which govern eligibility," thereby eliminating the exclusive grant for only one charitable organization, and setting up eligibility criteria for other groups. *Id.* The Court emphasized that "[p]resumably, plaintiff will qualify as a 'charitable fund-raising organization,' and will be eligible to participate in the campaign later this year." *Id.*

In *Oakes*, *Kremens*, and *Black United Fund*, the material statutes at issue were completely repealed, and the new statutes enacted completely addressed the concerns of the plaintiffs. These statutes and constitutional concerns were fairly straightforward, and there was no evidence of concerns that the applicable state actors might attempt to circumvent the spirit and intent of the new laws. By contrast, here the harm stemmed not only from statutes themselves, but also from *practices* which developed over the course of time by county clerks. While some portions of

some statutes were repealed, many portions of the old statutes remain in place, and the county clerks continue to exercise authority over the design of primary election ballots. Additionally, unlike the cases cited in the Defendants' pending briefs, here various constitutional concerns remain. Furthermore, Plaintiffs have set forth the various ways in which, even under the NBL, county clerks can manipulate the ballot to recreate many of the unconstitutional features. Moreover, Plaintiffs have set forth numerous reasons why, based on past history, the County Clerks cannot be trusted to act in good faith to implement the NBL in a way that does not violate the spirit and intent of the constitutional principles articulated by this Court, and upheld by the Third Circuit in *Kim*.

## II.    PLAINTIFFS MAY LEGITIMATELY FILE A FEE PETITION FOR ATTORNEY HOURS AND LITIGATION COSTS AGAINST THE DEFENDANT COUNTY CLERKS

The last two remaining County Clerk Defendants represent the extreme minority of the state.[13] The Bergen and Union County Clerks now come before the

---

[13] Of the nineteen (19) Defendant County Clerks in *Kim* Litigation, only two continue to litigate; of the six (6) original Defendant County Clerks in *Conforti*, plus Intervenor Burlington County Clerk, only one continues to litigate. Between the two cases, *twenty-two* (22) court-ordered consent decrees with New Jersey's county clerks have been entered and judicially approved, and are under continuing judicial review, with another presumably on the way, as to Cape May County. While the New Jersey Attorney General refused to engage in *Kim* based on his independent analysis of the unconstitutionality of the county line ballot, he actively withdrew from *Conforti* upon a review of the totality of the evidence offered in support of preliminary relief in *Kim*.

court and place blame on everyone else. They blame the legislature and the state government, removing any independent accountability for the obvious role that county clerks play in election administration and ballot design, and ignoring the impact of their own discretion. Meanwhile, they continue to litigate this matter *a year after* the Attorney General found the state law to be unconstitutional and meritless.

They minimize the impact of the preliminary injunction, as if it was a simple flash in the pan securing some transient relief, a far cry from the "political earthquake" and "seismic development" impacting "the future of New Jersey politics," as widely recognized across New Jersey and the nation.[14] As POLITICO's

---

[14]    See e.g., Matt Friedman, *The Future of New Jersey Politics is On the Line*, POLITICO (March 24, 2024), https://www.politico.com/news/2024/03/24/new-jersey-politics-menendez-00148703 ("The events have even the most ardent defenders of the line acknowledging its days are numbered, at least in its current form."); Brent Johnson, Susan K. Livio, Ted Sherman, *N.J. Party Bosses Hit with Huge Loss as Ballot System Tossed. 'A Political Earthquake*,' NJ.COM (March 29, 2024), https://www.nj.com/politics/2024/03/nj-party-bosses-hit-with-huge-loss-as-ballot-system-tossed-a-political-earthquake.html ("a ruling that could forever change New Jersey's political landscape"); Arvin Alaigh, *Abolishing the "Ballot Line" Will Reshape Progressive Politics: With the eradication of the unconstitutional ballot design, New Jersey ushers in a new era of electoral politics*, THE NATION (April 4, 2024) ("Democracy activists in the state have heralded this as the end of ballot lines in New Jersey – and if this monumental decision holds, it will mark a seismic development in the state's political history."); Yash Roy, *Political Earthquakes Rock New Jersey's Democratic Machine*, THE HILL (July 10, 2024), https://thehill.com/homenews/campaign/4761600-new-jersey-andy-kim-george-norcross-bob-menendez/ ("A series of political earthquakes has shaken New Jersey's Democratic machine to its core over the past year as a new generation of

Matt Friedman covered, "The events have even the most ardent defenders of the line acknowledging its days are numbered, at least in its current form."

## A. Plaintiffs are "Prevailing Parties" under 42 U.S.C. 1988(b).

The approximately 10% of the state's remaining county clerk litigants argue that the Plaintiffs are not "prevailing parties" under 42 USC 1988(b), and are therefore not entitled to attorney fees and costs of the litigation such as expert reports. They cite to *Stinnie v. Lackey*, No. 23-621, slip op. (U.S. Sup. Ct. Feb. 25, 2025), as being "on all fours with the instant litigation as it currently stands." (Bergen-Union Joint Motion to Dismiss Brief ("Joint MTD Br."), at 19; Bergen Motion for Summary Judgment Brief ("Bergen MSJ Br."), similar.) They rely on *Stinnie* as supporting the notion that "a preliminary injunction cannot be the basis to conclude that a litigant is a 'prevailing party' that is entitled to an award of attorneys' fees, without exception." (Joint MTD Br., at 15; Bergen MSJ Br., similar.)

First, the County Clerks' arguments are premature because Plaintiffs' motions for summary judgement remain pending. (*See Kim*, ECF 298, *Conforti*, ECF 234.) This is because the successful resolution of Plaintiffs' motions will render the pending Defendant Clerks' objection to the availability of attorney fees moot and inapplicable.

---

leaders looks to bring change to the Garden State. It's a moment that's been building for years.").

Further, even if this Court were to deny the Plaintiffs' motions for summary judgment despite the fact that the Bergen and Union County Clerks have admitted that they are no longer defending the unconstitutionality of the county-line ballot design, Plaintiffs are nonetheless entitled to attorney fees as prevailing parties.

Following the Third Circuit's decision in *Kim* to uphold the preliminary injunction, and following the 2024 primary election season which finally brought New Jersey in line with the 49 other states in the nation which generally use office block ballots, a series of settlement discussions proceeded individually with the nineteen Defendant County Clerks. Over several months, approximately 90% of the Defendant County Clerks entered into court-ordered consent decrees which essentially share identical terms, and which provide for an award of attorney fees and litigation costs paid by each county clerk, the amount of which differed based on the clerks' involvement in one or both of the litigations, and the nature of their defenses in the litigation.

*Stinnie* explains that "[t]he availability of fees following the entry of a court-ordered consent decree is fully consistent with the rule we announce today." Slip Op. at. 12. Moreover, "Section 1988(b) permits courts to award attorney's fees to a 'prevailing party.' A party 'prevails' when a court conclusively resolves his claim by granting enduring relief on the merits that alters the legal relationship between the parties." Slip Op. at 13. Here, the Plaintiffs "prevail" because they have secured

"enduring relief on the merits" of these litigations, at least via consent decree with approximately 90% of the Defendant County Clerks in the state, and that is not all. The Plaintiffs persuaded the NJ Attorney General in the process, and by virtue of the preliminary injunction, rendered the death of the county-line ballot design a *fait accompli*, at least for practical purposes. In the words of the media, the preliminary injunction secured "a political earthquake," "a seismic development," impacting "the future of New Jersey politics." Thus, the orientation of this case is completely different than that contemplated in *Stinnie*, where the Court was concerned with "transient victory on a preliminary injunction," slip op. at 6-7.

The Supreme Court discerned, "[t]he transient nature of preliminary injunctions is most apparent when a court reaches a different conclusion upon full consideration on the merits," for example where – as per the example offered in *Stinnie* – nude protesters are initially permitted to assemble to form a human peace sign on the beach, but where upon further review for a final determination, a conclusion is reached that the clothing "regulation was no more burdensome than necessary to protect the public." *Id.* (discussing *Sole v. Wyner*, 551 U.S. 74 (2007)). The Supreme Court explained:

> "Because preliminary injunctions do not conclusively resolve the rights of parties on the merits, they do not confer prevailing party status. A plaintiff who secures a preliminary injunction has achieved only temporary success at an intermediary 'stage[ ] of the suit.' It cannot yet be said that he will 'ultimately prevail when the matter is finally set at rest' or that he will have 'successfully maintained' his claim 'at the

end.' And external events that render a dispute moot do not convert a temporary order designed to preserve the status of the parties into a conclusive adjudication of their rights."

*Id.* at 7 (internal references omitted).

Again, here, the Bergen and Union Clerks are no longer defending the unconstitutionality of the county ballot design – they simply are waging the current defense because they are displeased with, and take offense to, the outcome of the litigations and the implication that they acted unconstitutionally, and because they do not want to pay Plaintiffs' attorney fees and expert costs, although the other Defendant County Clerks in the litigations have done just that.

The underlying principles and foundations which animate *Stinnie* simply do not apply here. Plaintiffs are certainly "prevailing parties" in these litigations. Whereas *Stinnie* was principally concerned with "judicial economy," that 10% of the Defendant County Clerks now come before this Court, abandoning their defense of the unconstitutionality of the county line ballot design, without the presentation of any affirmative evidence even at least with regard to the state's interests as required by *Anderson-Burdick*, arguing mootness to avoid permanent relief, diverting any blame to the state government even a year after the Attorney General's decision, and filing several pending motions before this Court, *is the antithesis* of judicial economy. The posture of the case is simply an artful circumvention of the principles animating the holding in *Stinnie*.

33

Moreover, note that the preliminary injunction secured here is different than that contemplated in *Stinnie,* where "a temporary order [was] designed to preserve the status of the parties." Slip Op. at 7. The Court in *Stinnie* acknowledged that the purpose of a preliminary injunction is to preserve the position of the parties until the matter can be decided. *Id.* at 6 (citing *University of Tex. v. Camenish*, 451 U.S. 390, 395 (1981)). Thus, in *Stinnie*, the preliminary injunction enjoined the Commissioner of Motor Vehicles from enforcing a law regarding driver license suspensions for unpaid fines without due process such as notice, a hearing, or opportunity to be heard, and further enjoining the Commissioner from charging fees to reinstate driver licenses for unpaid fines. Here, the preliminary injunction secured did more than preserve the status quo; it *changed* the status quo of approximately 80 years, and conclusively resolved the issue with respect to the 2024 Democratic Primary Election. *Cf. Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (plaintiff deemed prevailing party if they "succeed on any significant issue in the litigation which achieves some benefit . . . sought in bringing the suit."). Indeed, the injunction was mandatory, ordering the county clerks to affirmatively draw office block ballots with specifications as to ballot draw, ballot ordering, and bracketing. For Plaintiffs running in the 2024 Primary, the victory of that preliminary injunction is hardly "transient," and can certainly be said to have "materially alter[ed] the legal relationship between the parties." *See id.* at 9.

*Stinnie* may have been a transient victory which the Virginia legislature then remedied prior to the judicial permanence of the remedy, but in *Conforti/Kim*, the preliminary injunction was a widely recognized political earthquake forever changing the New Jersey political landscape, as evident by the securement of *twenty-two* judicially approved consent decrees with the state's county clerks; the New Jersey Attorney General's office refusal to further participate in the litigations for want of constitutionality upon an independent review of the evidence; the remaining two County Clerk Defendants' refusal to defend the constitutionality of the Bracketing Structure, thereby necessitating Plaintiffs' pending motions for summary judgment.

Moreover, this case falls into a small category of cases that the majority in *Stinnie* thought would be "speculative," or might "arise in only a small number of contexts." *Id.* at 10. In particular, the majority was responding to concerns of the dissent that litigation could try to be strategically mooted after a government defendant lost at the preliminary injunction phase in order to avoid having to pay fees. *Id.* The majority was less concerned, given that (1) if a plaintiff had a damages claim, the damage claim would not be moot; and (2) even if the plaintiff only sought injunctive relief, "voluntary cessation of the challenged conduct does not moot an action 'unless it is 'absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Friends of the Earth*, 528 U.S. at

189). As set forth above, plaintiffs maintain that this matter is not moot, and thus the counsel fee issue is premature. However, in the event that the Court were to deem this matter moot, an exception to the general rule set forth in *Stinnie* should apply in that it would represent that rare circumstance in which Plaintiffs did not bring a damage claim and their case is otherwise blocked from proceeding to the merits whereby the remaining county clerks do not defend the constitutionality of the Bracketing Structure, but simply waited for new legislation to be passed in an attempt to escape liability for counsel fees under Section 1988. Indeed, evading liability for counsel fees under such circumstances would circumvent the purposes of the fee shifting provisions of the Civil Rights Act.

In sum, the issue of whether or not counsel fees are appropriate in this case is premature, because even under the two remaining County Clerks' position, it is yet to be determined whether or not Plaintiffs will prevail on the underlying merits of the claim. Even if Plaintiffs claims were deemed moot, this Court should recognize an exception to *Stinnie*, and allow for an award of counsel fees because the fundamental underlying premises upon which that case was decided are absent here. In particular, the facts here are distinguishable for the following reasons: (1) the two remaining County Clerk Defendants do not defend the constitutionality of the Bracketing Structure; (2) as a result of the preliminary injunction, all of the other county clerks entered into consent orders and paid fees; (3) the New Jersey Attorney

General independently concluded that the Bracketing Structure was unconstitutional; (4) the preliminary injunction did not just preserve the status quo, but changed the status quo via a mandatory injunction, affirmatively requiring office block ballots and requiring/forbidding various practices; (5) the preliminary injunction was conclusive as to the 2024 Democratic Primary in which Plaintiffs ran, and thus was not "transient," and did alter the legal relationship of the parties; and (6) the facts of this case would fit into the narrow and rare set of circumstances even acknowledged by the *Stinnie* majority where government actors who lost on a preliminary injunction could circumvent the spirit and intent of the fee shifting provisions of the Civil Rights Act through subsequent changes in the law.

For the reasons set forth above and in Plaintiffs' pending motions for summary judgment, the court should find that the Plaintiffs are the prevailing parties in this action, either pursuant to a grant of final judgment, and/or pursuant to the grant of the preliminary injunction obtained under the circumstances of these litigations, thereby entitling Plaintiffs to attorney fees and costs.

**B.      The Two Remaining County Clerk Defendants are the Appropriately Named Public Actors in the Litigations, and are Liable for Attorney Fees.**

Defendants rely on a circuit split with respect to government actors performing only ministerial functions. The two problems here are that the Third Circuit came out against the position that the Defendants are asserting, and the

37

government actors at issue here are exercising discretion rather than purely performing a ministerial function.

Section 1988 provides that in any suit pursuant to 42 USC §1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 USC §1988(b). "In computing the fee [pursuant to Section1988], counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.'" *Hensley v. Echerhart*, 461 U.S. 424, 430 n. 4 (1983) (quoting S. Rep. No. 94-1011, at 6 (1976)). Thus, Section 1988 "grants the successful civil rights plaintiff a 'fully compensatory fee.'" *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989) (quoting *Hensley*, 461 U.S. at 435).

"Longstanding precedents establish that plaintiffs who have achieved excellent results in civil rights litigation should normally receive a fully compensatory attorney's fee . . . [which] is not meant as a punishment for 'bad' defendants . . . [but] is meant to compensate civil rights attorneys who bring civil rights cases and win them . . . the fact that it was not the 'fault' of the Board of Elections that the [statute] was enacted by Congress . . . is irrelevant." *Turner v. District of Columbia Board of Elections and Ethics*, 354 F.3d 890, 895-897 (D.C. Cir. 2004) (holding elections board liable for fees jointly and severally, even where the defendant elections board agreed that the congressional statute in question was

unconstitutional, and even where a party immune to fees continued to defend the litigation, reasoning that the elections board continued to be adversarial throughout the merits litigation and could have settled the matter instead).

Here, the Bergen and Union Clerks spill ink to disclaim their accountability for fees and to assign blame, and offset costs, onto the state. (Joint MTD Br. at 16-18.) It should be underscored that *over 365 days ago, on March 17, 2024, the New Jersey Attorney General acknowledged the unconstitutionality of the county-line ballot, yet, the County Clerks continue to litigate the matter today, repeatedly forcing Plaintiffs back to court*. Moreover, even the Intervenor CCDC acknowledges: "It is the county clerks who are responsible for any alleged violation of federal law as they are responsible for implementation of the ballot design[.]" (CCDC motion for partial summary judgment br. at 9.)

The Supreme Court has acknowledged that "[f]ee awards against enforcement officials are run-of-the-mill occurrences, even though, on occasion, had a state legislature acted or reacted in a different or more timely manner, there would have been no need for a lawsuit or for an injunction." *Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 739 (1980) (awarding fees against the State Bar, which by statute is designed as an administrative agency to help enforce the State Bar Code). The Third Circuit has affirmed a similar finding. *Finberg v. Sullivan*, 555 F. Supp. 1068, 1070 (E.D. Pa. 1982) ("That the sheriff and prothonotary were

performing ministerial acts and had no authority to change the challenged rules does not compel a finding that the award of attorney's fees against these parties would be unjust."), *affirmed*, 707 F.2d 1390 (3rd Cir. 1983).[15] As recognized by the Eastern District of Pennsylvania, "[t]o deny the award of attorney's fees against public officials sued in their official capacity, merely because they are complying with existing rules which they lacked the capacity to change, would frustrate the purpose of the [Civil Rights Attorney's Fees Awards] Act." *Finberg*, 555 F. Supp. at 1071.

Here, the county clerks are "the party legally responsible for relief on the merits," *Kentucky v. Graham*, 473 U.S. 159 (1985), as they – and only they, and not the legislature or even the New Jersey Secretary of State – are responsible for ballot drawing, ballot ordering, and ballot design. It could not be clearer that the County Clerks are legally responsible for implementing relief on the merits here, if not for the simple fact that the preliminary injunction directed *them* to draw the 2024 primary ballot pursuant to specific prescriptions. (*Kim*, Order.) The county clerks do not act under the direction of the Secretary of State; they are constitutional officers vested with specific responsibilities independent of state government, and they are independently represented by counsel.

---

[15] Defendant Clerks acknowledge in a footnote that *Finberg* reaches a decision contrary to their argument, but argue that it is "not [ ] binding on this Court." (Joint MTD at 17 n.3.) They fail to acknowledge, however, *Finberg*'s subsequent history; it was upheld on appeal by the Third Circuit, and thus is binding.

Notably, New Jersey precedent shows that county clerks have a central role in election administration, and in particular when it comes to ballot designs, meaning that in litigation over ballot design, it is the *clerks* who are named as proper defendants. *E.g., New Jersey Democratic Party, Inc. v. Samson*, 175 N.J. 178 (2002) (naming chief state election official *and* every county clerk in litigation over whether ballot would be designed with one candidate's name rather than another); *Sooy v. Gill*, 340 N.J. Super. 401 (App. Div. 2001) (clerks named as defendants when candidate challenged whether ballot could include his professional degree); *Andrews v. Rajoppi*, 2008 WL1869869 (App. Div. Apr. 29, 2008) (county clerks of all 21 counties named as defendants). Although counsel fees were not sought in these matters, it is nevertheless telling who the defendants were: county clerks purporting to follow state law. In *Samson*, it was county clerks bound by a state-law deadline on candidate replacement; in *Sooy*, the issue was the county clerk enforcing a state law on whether honorifics could be included next to a candidate's name when printing a ballot; and in *Andrews*, the issue was how county clerks also followed state laws dictating how U.S. Senate candidates were to be treated in ballot design. Other than in *Samson*, state election officials were not named parties to the cases. They were not named as initial defendants. They did not intervene. Nor were they named as third-party defendants on a theory, whether for fee shifting claims or for the county clerks' own defense costs. R. 4:8-1.

41

More recently, in another election (though not ballot design) case, *Empower Our Neighborhoods v. Guadagno*, 453 N.J. Super. 565 (App. Div. 2018) ("EON"), the defendants were election officials at four different levels of government – the State, a county clerk, a municipal clerk, and a board of education secretary, responsible for accepting candidate nominating petitions under state law. Like the defendants here, the EON defendants did not simply defer their defenses to the state official defendant. Nor did they implead a state official or the State as a third-party defendant on the grounds that they ought to be funding their defense counsel and any eventual award of counsel fees. Nor, like the clerk defendants here, did they tell the court that they would take a passive role and simply accept the court's ultimate judgment and not actively litigate. Rather, like the defendants here, those EON defendants:

> participated in the litigation, choosing to defend the constitutionality of many aspects of the election statutes at issue. Consequently, [the non-State election officials] were [not] mere pawns of the State, enforcing a statutory scheme without discretion.

*Id.* at 581.

According to the *EON* court, "[t]he knowing enforcement of unconstitutional provisions in the law is a proper basis for liability." *Id*. Thus, in responding to complaints by the non-state election officials that they were simply enforcing a state law and therefore should not have to pay any attorney fees, the court responded: that

the clerks were "responsible for more than mere passive collection and transmission of petitions—they actually exercise independent judgment in scrutinizing petitions submitted to them in order to assess compliance . . . Thus, the harm caused by the enforcement of invalid State requirements imposed upon petition circulators is one for which the non-State defendants were responsible." *Id*. at 582.

Like the defendants here, the EON defendants vigorously defended the constitutionality of the statutes they were implementing. A brief look at the Bergen and Union clerks' submissions to this court does not support their revisionist history that "their primary argument . . . was that a redesign of the primary ballot would be unduly burdensome and inappropriate" under federal precedent cautioning courts not to enjoin election practices too close to an election (ECF 232-1, p. 10). Here, the Bergen and Union clerks vigorously fought the case in the trial court on the merits, arguing that the statute was constitutional after balancing the state interests and voter burdens it identified. They then sought a stay of judgment from the Third Circuit, arguing not just the timeliness issue, but again raising the merits. The Union Clerk alone filed *seven* meritless motions *in limine* against Plaintiffs.

In *EON*, the litigants at least enjoyed the support of the Attorney General, who also joined their views that the statute was constitutional. Not so here. While most defendants here have settled, the Bergen and Union clerks have continued this case knowing that the Attorney General viewed the statute as unconstitutional and would

not be coming to their aid. The Bergen and Union clerks are not the innocent *naïfs* they now claim to be. Rather, they vigorously litigated this case at every turn, attempting to obstruct the relief plaintiffs ultimately received. And they did so without the support of the Attorney General, whose correspondence effectively confessed the unconstitutionality of the statute. Defendants like these who ultimately lose are properly held accountable for counsel fees, just like the *EON* defendants were.

The Bergen and Union County Clerk defendants look to decisions reached in other circuits to support the notion that where a county actor mechanically executes a state law in ministerial fashion, they are acting on the state's behalf, and therefore the state is liable. However, the *Conforti* and *Kim* litigations have established the highly discretionary nature by which New Jersey county clerks have designed their ballots; that ballot design is not simply a result of statutory law, but also practice in interpreting that law; and that the county clerks are not simply executing a ministerial role on behalf of the state, but are designing ballots pursuant to the requests of the county political parties. The Court needs to look no further than the discrepancies in the selection of pivot point candidates and the design of the ballot in the counties of Salem and Sussex which have always used office block ballots, as have a myriad of the counties in various settings for certain political parties or certain types of ballots.

Thus, this case is different than *Miller*, where the county clerk was issuing marriage licenses, 936 F.3d 442 (6th Cir. 2019); different than *Echols*, where the local police were implementing an official state policy with no ambit of discretion, 909 F.2d 795 (5th Cir. 1990); and different than *Herbst*, where the defendant county attorneys had yet to even enforce the state abortion law, 90 F.3d 1300 (7th Cir. 1996); or *Buffin*, where the sheriff similarly had no discretion in applying the state mandatory bail law, 23 F.4th 951 (9th Cir. 2022).

Since the county clerks executed wide discretion in ballot design, and since they vociferously advocated against the preliminary injunction, and continue to advocate today against these litigations despite that 90% of the other county clerk defendants have already settled the matter, and despite that the New Jersey Attorney General has explained its analysis that the law is indefensible, this court is amply able to deny the Defendant Bergen and Union Clerks' motions seeking a determination that they are not responsible for attorney fees. Moreover, it is notable, given the arguments presented, that although they disclaim liability for fees and impose blame on the state, that they have not sought to involve the state in briefing this matter.

The broad remedial purpose of the Civil Rights Act is *primarily* to encourage private attorney generals to remedy violations of civil rights through the availability of fee awards to enable a plaintiffs' bar to correct such violations. *Hensley* cautions

45

that the purpose is not to create "second major litigation" in consideration of fee awards. 461 U.S. at 437 (1983). Relieving the Defendant Union and Bergen Clerks of their obligations would establish perverse incentives where county clerks may use their wide discretion as a sword to violate future litigants' rights, while also using it as a shield from actual accountability, even where the State has long refused to defend an unjust law. Perhaps the analysis would be different if the county clerks were defended by the Office of Attorney General, however here, the county clerks are using county coffers to support their own legal defense, while endeavoring to disclaim liability for their losses in connection with the Civil Rights Act shifting fee provision. A finding to the contrary would subvert the purpose of the Civil Rights Act by creating lopsided incentives for unconstitutional behavior.

## CONCLUSION

For all the foregoing reasons, the Defendants Bergen and Union County Clerks' motions to dismiss this matter with prejudice should be denied, as should the Defendant Bergen County Clerk's motion for summary judgment.

Respectfully submitted,

**WEISSMAN & MINTZ LLC**
220 Davidson Avenue, Suite 410
Somerset, New Jersey 08873
732.563.4565
bpugach@weissmanmintz.com

**BROMBERG LAW LLC**
43 West 43rd Street, Suite 32
New York, New York 10036
212.859.5083
ybromberg@bromberglawllc.com

By:  *Brett M. Pugach*
       *Flavio L. Komuves*

By:  *Yael Bromberg*

46

Dated:  March 24, 2025